FILED

NAME **Jofama Coleman**

PRISON IDENTIFICATION/BOOKING NO. **V.27659**

ADDRESS OR PLACE OF CONFINEMENT **CSATF; P.O. Box 5242 ; Corcoran, Ca. 93212**

2010 MAR 31 AM 9:36

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

Note:     It is your responsibility to notify the Clerk of Court in writing of any change of address. If represented by an attorney, provide his name, address, telephone and facsimile numbers, and e-mail address.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

FULL NAME (Include name under which you were convicted) **Jofama Reo Coleman**

Petitioner,

-v.-

NAME OF WARDEN, SUPERINTENDENT, JAILOR OR AUTHORIZED **Ken Clark, Warden**
PERSON HAVING CUSTODY OF PETITIONER

Respondent.

CASE NUMBER:

CV **CV10-02343** AHM (RNB)

To be supplied by the Clerk of the United States District Court

☐ _____ AMENDED

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY
28 U.S.C. § 2254

PLACE/COUNTY OF CONVICTION **L.A. County**
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(List by case number)

CV _____

CV _____

## INSTRUCTIONS - PLEASE READ CAREFULLY

1.    To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2.    In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge the judgment entered by a different California state court, you must file a separate petition.

3.    Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4.    Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5.    You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

5.    You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

6.    When you have completed the form, send the original and two copies to the following address:

    Clerk of the United States District Court for the Central District of California
    United States Courthouse
    ATTN: Intake/Docket Section
    312 North Spring Street
    Los Angeles, California 90012

LODGED
CLERK, U.S. DISTRICT COURT

MAR 29 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

PLEASE COMPLETE THE FOLLOWING: (*Check appropriate number*)

This petition concerns:
1. ☒ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☐ a parole problem.
4. ☐ other.

PETITION

1. Venue
   a. Place of detention <u>CSATF/Corcoran State Prison; P.O. Box 5242; Corcoran, Ca. 93212</u>
   b. Place of conviction and sentence <u>Torrance Superior Court, Los Angeles County</u>

2. Conviction on which the petition is based (*a separate petition must be filed for each conviction being attacked*).
   a. Nature of offenses involved (*include all counts*): <u>First Degree Murder</u>

   b. Penal or other code section or sections: <u>187, Subd.(a)</u>

   c. Case number: <u>YA059765</u>
   d. Date of conviction: <u>April, 26. 2006</u>
   e. Date of sentence: <u>August, 16. 2007</u>
   f. Length of sentence on each count: <u>25 years to life</u>

   g. Plea (*check one*):
      ☒ Not guilty
      ☐ Guilty
      ☐ Nolo contendere

   h. Kind of trial (*check one*):
      ☒ Jury
      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction?   ☒ Yes  ☐ No
   If so, give the following information for your appeal (*and attach a copy of the Court of Appeal decision if available*):
   a. Case number: <u>B202597</u>
   b. Grounds raised (*list each*): <u>Jury Misconduct, due to the improper exposure</u>
      (1) <u>of the jury to petitioner's prior criminal history.</u>

Evidence of petitioner's criminal history was inadmissible evidence because it was more prejudicial than

(2) probative.

(3) Prosecutorial Misconduct

(4) Ineffective Assistance of Counsel, denial of fair trial and impartial

(5) jury

(6) _____

c. Date of decision: December, 30. 2008

d. Result   Affirmed

4. If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision? X☒ Yes    ☐ No

If so give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)*:

a. Case number:   S170438, consolidated with petition.

b. Grounds raised *(list each)*:

(1) Jury Misconduct

(2) Prosecutorial Misconduct

(3) Denial of Right to an impartial jury and due Process of Law

(4) Ineffective Assistance of Counsel

(5) Introduction of False Evidence, due process right violation

(6) _____

c. Date of decision: April, 1. 2009

d. Result Petition for review was denied, which was consolidated with petition and treated as direct appeal.

5. If you did not appeal:

a. State your reasons   N/A

b. Did you seek permission to file a late appeal?    ☐ Yes  X☒ No

6. Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

X☒ Yes    ☐ No

If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

---

a.  (1) Name of court: Court of Appeal, Second Appellate Dist., Division Seven.

(2) Case number: B210118, was consolidated with direct appeal.

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: August, 15. 2008

(4) Grounds raised *(list each)*:

(a) Introduction of False Evidence, Due Process Right Violation

(b) Denial of Constitutional Right to fair trial

(c) Ineffective Assistance of Counsel

(d) _____

(e) _____

(f) _____

(5) Date of decision: December, 30. 2008

(6) Result Petition was "Summarily Denied".

_____

(7) Was an evidentiary hearing held?    ☐ Yes  ☒ No

b.  (1) Name of court: N/A

(2) Case number: N/A

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: N/A

(4) Grounds raised *(list each)*:

(a) _____ N/A _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: N/A

(6) Result N/A

_____

(7) Was an evidentiary hearing held?    ☐ Yes  ☒ No

c.  (1) Name of court: N/A

(2) Case number: N/A

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: N/A

(4) Grounds raised *(list each)*:

(a) _____ N/A _____

(b) _____

(c) _____

(d) _____ N /A _____

(e) _____

(f) _____

(5) Date of decision: _____ N/A _____

(6) Result _____ N/A _____

(7) Was an evidentiary hearing held?        ☐ Yes  ☒ No

7. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the facts supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

CAUTION:    *Exhaustion Requirement*: In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court. This means that, prior to seeking relief from the federal court, you first must present all of your grounds to the California Supreme Court.



a. Ground one: Petitioner's constitutional Right to Due Process of Law and a Fair Trial were violated.

(1) Supporting FACTS: False Evidence was introduced at trial during the testimony of Maria Renteria, she stated she could "see" because there were not big vehicles in front of her or many vehicles, but there was in fact big vehicles in front blocking her view.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?        ☒ Yes  ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☒ Yes  ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?       ☐ Yes  ☒ No

b. Ground two: Ineffective Assistance of Counsel in violation of the 6th Amend. to U.S. Const, and article 1, sec. 15 Cal. Con.

(1) Supporting FACTS: Counsel failed to adequately investigate the fact, to present evidence that Renteria was 128 feet away, to present evidence that it is impossible to see the driver under the circumstances Renteria described, to adequately question Renteria and produce impeachment evidence.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?        ☒ Yes  ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☒ Yes  ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☒ No

c.  Ground three: Petitioner's Constitutional Right to a Fair trial, an Impartial Jury, and Due Process were violated.

(1) Supporting FACTS: The Jury received Prejudicial Information about Petitioner's prior criminal history that had not been presented at trial, during it's deliberations.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☒ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☒ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☒ No

d.  Ground four: Prosecutorial Misconduct

(1) Supporting FACTS: The Prosecutor placed before the jury inadmissible evidence about Petitioner's criminal history, and also reference to petitioner having been booked/arrested, the reference was made 7 times during the examination of Deputy Steven Marella.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☒ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☒ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☒ No

e.  Ground five: Jury Misconduct

(1) Supporting FACTS: The jury inadvertent receipt of Petitioner's criminal history falls under the catagory of jury misconduct, comments made by the jurors told other jurors about Petitioner's criminal history.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☒ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☒ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☒ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

**f.** Ground ~~three:~~ Six: Ineffective Assistance of Counsel

(1) Supporting FACTS: The prosecutor claimed there was no error or prejudice if defense counsel was ineffective for failing to object to the introduction of petitioner's criminal history, then counsel was ineffective for his failure.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☒ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☒ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☒ No

**g.** Ground ~~four:~~ Seven: _____

(1) Supporting FACTS: _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

**h.** Ground ~~five:~~ Eight: _____

(1) Supporting FACTS: _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

8.  If any of the grounds listed in paragraph 7 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: _See attached motion To Stay Adjudication of Habeas Corpus To Allow Petitioner To Exhaust Unexhausted Federal Claims._

9.  Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

    ☐ Yes   ☒ No

    If so, give the following information for each such petition (use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available):

    a.  (1) Name of court: _____ N/A _____

        (2) Case number: _____

        (3) Date filed (or if mailed, the date the petition was turned over to the prison authorities for mailing): _____

        (4) Grounds raised (list each):

            (a)  _____

            (b)  _____

            (c)  _____
                            N/A
            (d)  _____

            (e)  _____

            (f)  _____

        (5) Date of decision: _____

        (6) Result  _____

        _____

        (7) Was an evidentiary hearing held?    ☐ Yes   ☐ No

    b.  (1) Name of court: _____

        (2) Case number: _____

        (3) Date filed (or if mailed, the date the petition was turned over to the prison authorities for mailing): _____

        (4) Grounds raised (list each):

            (a)  _____

            (b)  _____

            (c)  _____

            (d)  _____

            (e)  _____

            (f)  _____

        (5) Date of decision: _____

        (6) Result  _____

(7) Was an evidentiary hearing held?     ☐ Yes   ☐ No

10. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect
to this judgment of conviction?  ☒ Yes   ☐ No  ; *See Motion To Stay Adjudication of Habeas Corpus... attached/Enclosed.*

If so, give the following information *(and attach a copy of the petition if available)*:

(1) Name of court: _California Supreme Court_

(2) Case number: _N/A_

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _March, 25. 2010_

(4) Grounds raised *(list each)*:

(a) _Ineffective Assistance of counsel_

(b) _Prosecution Misconduct, False and missleading comments_

(c) _Violation of Penal Code. Sec. 1025_

(d) _Violation of Const. Right to Due Process & Fair Trial_

(e) _____

(f) _____

11. Are you presently represented by counsel?     ☐ Yes   ☒ No

If so, provide name, address and telephone number: _N/A_

_____

_____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding,

_____
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on _March, 25. 2010_     _Jafama Coleman_
          Date                      *Signature of Petitioner*

Jofama Reo Coleman
*Petitioner*

Ken Clark, Warden
*Respondent(s)*

**DECLARATION IN SUPPORT
OF REQUEST
TO PROCEED
IN FORMA PAUPERIS**

I, Jofama Reo Coleman , declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1. Are you presently employed? ☒ Yes    ☐ No  ;" Prison work"

   a. If the answer is yes, state the amount of your salary or wages per month, and give the name and address of your employer. ___ 8¢ an hour, approximatly $4.00 a month.

   b. If the answer is no, state the date of last employment and the amount of the salary and wages per month which you received. _____

2. Have you received, within the past twelve months, any money from any of the following sources?

   a. Business, profession or form of self-employment?     ☐ Yes  ☒ No
   b. Rent payments, interest or dividends?     ☐ Yes  ☒ No
   c. Pensions, annuities or life insurance payments?     ☐ Yes  ☒ No
   d. Gifts or inheritances?     ☐ Yes  ☒ No
   e. Any other sources?     ☒ Yes  ☐ No

   If the answer to any of the above is yes, describe each source of money and state the amount received from each during the past twelve months: source, friends, amount $25.00 from one friend and $30.00 from another.

3. Do you own any cash, or do you have money in a checking or savings account? *(Include any funds in prison accounts)*
   ☒ Yes  ☐ No
   If the answer is yes, state the total value of the items owned: ___ money currently in prison account is "0," no funds. (attached hereto).

---

4.  Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property? *(Excluding ordinary household furnishings and clothing)* ☐ Yes ☒ No

If the answer is yes, describe the property and state its approximate value: _____ N/A _____
_____

5.  List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support: "Family" unable to support due to wrongfull incarceration. No Money on account, (See attach ~~the~~ Inmate Statement)

I, declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

Executed on _March, 25, 2010_
_____Date_____                    _Jafama Coleman_
                                         *Signature of Petitioner*

## CERTIFICATE

I hereby certify that the Petitioner herein has the sum of $_____0_____ on account to his credit at the __CSATF/State Prison @ Corcoran__ institution where he is confined. I further certify that Petitioner likewise has the following securities to his credit according to the records of said institution: _____NONE_____
_____
_____
_____

_____          _____
_____Date_____                *Authorized Officer of Institution/Title of Officer*

Date\Time: 2/22/2010 1:47:18 PM

Institution: SATF

**CDCR**

Verified: _____

## Inmate Statement Report

| CDCR# | Inmate/Group Name | Institution | Unit | Cell/Bed |
|---|---|---|---|---|
| V27659 | COLEMAN, JOFAMA | SATF | FDB4T1000000 | 00137U |

**Current Available Balance:** $0.00

### Transaction List

| Transaction Date | Institution | Transaction Type | Source Doc# | Receipt#/Check# | Amount | Account Balance |
|---|---|---|---|---|---|---|
| 01/01/2010 | SATF | BEGINNING BALANCE | | | | $16.10 |
| 01/06/2010 | SATF | PAY - SUPPORT | 12/09 CEN KIT | | $4.36 | $20.46 |
| 01/06/2010 | SATF | RESTITUTION FINE PAYMENT | | | ($2.18) | $18.28 |
| 01/06/2010 | SATF | ADMINISTRATIVE FEE | | | ($0.21) | $18.07 |
| 01/11/2010 | SATF | LEGAL COPY | LEGAL COPY | | ($6.95) | $11.12 |
| 01/13/2010 | SATF | SALES | 43 | | ($11.10) | $0.02 |
| 02/05/2010 | SATF | PAY - SUPPORT | 01/10 CEN KIT | | $9.28 | $9.30 |
| 02/05/2010 | SATF | RESTITUTION FINE PAYMENT | | | ($4.64) | $4.66 |
| 02/05/2010 | SATF | ADMINISTRATIVE FEE | | | ($0.46) | $4.20 |
| 02/17/2010 | SATF | SALES | 6 | | ($4.20) | $0.00 |

### Encumbrance List

| Encumbrance Type | Transaction Date | Amount |
|---|---|---|
| **No information was found for the given criteria.** | | |

### Obligation List

| Obligation Type | Court Case# | Original Owed Balance | Sum of Tx for Date Range for Oblg | Current Balance |
|---|---|---|---|---|
| **No information was found for the given criteria.** | | | | |

### Restitution List

| Restitution | Court Case# | Original Owed Balance | Interest Accrued | Sum of Tx for Date Range for Oblg | Current Balance |
|---|---|---|---|---|---|
| RESTITUTION FINE | YA048176 | $200.00 | $0.00 | $0.00 | $0.00 |
| RESTITUTION FINE | YA055244 | $200.00 | $0.00 | $0.00 | $0.00 |
| RESTITUTION FINE | YA059765 | $200.00 | $0.00 | ($6.82) | $115.95 |

1197

Date\Time: 3/19/2010 2:42:44 PM

Institution: SATF

**CDCR**

Verified: _____

## Inmate Statement Report

| CDCR# | Inmate/Group Name | Institution | Unit | Cell/Bed |
|---|---|---|---|---|
| V27659 | COLEMAN, JOFAMA | SATF | FDB4T1000000 | 00137U |

**Current Available Balance:**          $0.00

## Transaction List

| Transaction Date | Institution | Transaction Type | Source Doc# | Receipt#/Check# | Amount | Account Balance |
|---|---|---|---|---|---|---|
| 02/01/2010 | SATF | BEGINNING BALANCE | | | | $0.02 |
| 02/05/2010 | SATF | PAY - SUPPORT | 01/10 CEN KIT | | $9.28 | $9.30 |
| 02/05/2010 | SATF | RESTITUTION FINE PAYMENT | | | ($4.64) | $4.66 |
| 02/05/2010 | SATF | ADMINISTRATIVE FEE | | | ($0.46) | $4.20 |
| 02/17/2010 | SATF | SALES | 6 | | ($4.20) | $0.00 |

## Encumbrance List

| Encumbrance Type | Transaction Date | Amount |
|---|---|---|
| **No information was found for the given criteria.** | | |

## Obligation List

| Obligation Type | Court Case# | Original Owed Balance | Sum of Tx for Date Range for Oblg | Current Balance |
|---|---|---|---|---|
| LEGAL COPY | 03-09-10 | $3.90 | $0.00 | $3.90 |

## Restitution List

| Restitution | Court Case# | Original Owed Balance | Interest Accrued | Sum of Tx for Date Range for Oblg | Current Balance |
|---|---|---|---|---|---|
| RESTITUTION FINE | YA048176 | $200.00 | $0.00 | $0.00 | $0.00 |
| RESTITUTION FINE | YA055244 | $200.00 | $0.00 | $0.00 | $0.00 |
| RESTITUTION FINE | YA059765 | $200.00 | $0.00 | ($4.64) | $115.95 |

1163

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOFAMA COLEMAN,<br><br>           Petitioner,<br><br>    -V-<br><br>K. CLARK, Warden of CSATF<br>at Corcoran State Prison,<br><br>         Respondent. | Case No:_____<br><br>Los Angeles County Superior Court<br>Case No. YA059765; and the Court<br>of Appeal, Second Appellate Distr-<br>ict Case No. B202597."<br><br>PETITION FOR WRIT OF HABEAS CORPUS |

TO: THE HONORABLE PRESIDING CHIEF JUDGE AND THE MAGISTRATES OF THE UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA:" )

    COMES NOW, JOFAMA COLEMAN, hereinafter referred to as petitioner, complains of the Respondent, K. CLARK, Warden as above designated, and for legal cause of action.

    (a) That petitioner is confined, detained, imprisoned and restrained of his liberty by K. CLARK, Warden of CSATF at Corcoran Prison, Corcoran, California; that such confinement and restraint are illegal, and that the illegality thereof will consist in the basic constitutional violations which will hereinafter be set forth.

    (b) This Honorable Court has jurisdiction herein pursuant to the

essential provisions of Title 28 U.S.C. Section 2254; including the 6th and 14th Amendments of the United States Constitution.

(c) This petitioner for writ of habeas corpus is brought by petitioner following the Court of Appeal, Second Appellate District Court's affirmancy of his conviction on direct appeal, and the California Supreme Court's denial of his Petition for Review.

Petitioner, Jofama Coleman, through his jail house lawyer Wade Everett Granville (AKA-COWBOY) B-17383, and by this verified petition alleges as follows:

1.    Petitioner is incarcerated at the California State Prison in Corcoran, California. Petitioner was convicted of first degree murder. (Pen. Code, § 187, subd.(a)). On August 16, 2007, he was sentenced to 25 years to life in state prison. (2CT 302.)[1/]

2.    Petitioner's judgment of conviction is nolonger on Appeal before the state courts.

3.    Petitioner's judgment of conviction and sentence have been, and are now unlawfully and unconstitutionally imposed in violation of his federal constitutional rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments, because false material evidence was introduced at trial about the circumstances under which Maria Renteria identified petitioner as the driver of the van.

4.    Additionally, petitioner's judgment of conviction and sentence have been, and are now unlawfully and unconstitutionally imposed in violation of his federal constitutional rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments, and his state constitutional rights as guaranteed by Article I, section 15 of the California Constitution, because petitioner received ineffective assistance of counsel where counsel failed to adequately investigate the facts of this case, failed to adequately cross-exam Renteria on

---

1/ "#CT" refers to the two volume clerk''s transcript. "#RT" refers to the five volume reporter's transcript. "RB" refers to respondent's brief. "AOB" refers to petitioner's opening brief. "Exh." refers to the exhibits attached to this petition unless indicated otherwise.The references to "RB" and "AOB" was briefs' on direct appeal.

how far away she was from the white van, and failed to present evidence on the distance between Renteria and the white van during the shooting. Trial counsel's performance resulted in an inadequate presentation of a potentially meritorious defense.

5.     The legal contentions in support of this petition are fully set forth in the accompanying argument and points and authorities which are incorporated by reference herein.

6.     The prosecution case was as follows:[2]

On May 10, 2003, around 9:00 P.M., Jose Robles ("Chino")[3] was shot and killed on the sidewalk two houses west of his house on 101st Street in Los Angeles. (2RT 937, 938, 945.)

Chino and his younger brother Jesse were members of the No Control ("NC") tagging crew. (2RT 948, 3RT 1630.) Earlier that evening, several NC crew members had gathered at Chino's house for a barbeque. (2RT 937, 3RT 1538.) Alberto Segundo, an NC member, left to go see Andre Sandoval across the street. On his way, he saw a suspicious looking white van drive by. Segundo threw up a NC gang sign. The passenger laughed at him. He recognized the driver and the front seat passenger. (3RT 1536-1538, 1556.) Petitioner has a pierced left eyebrow and was the leader of a local tagging crew called the Notorious Graffiti Artists ("NGA"). Abel Soto ("Drips") is a member of the Evil Klan ("EK") gang. (3RT 1546, 1556-1557.) According to Segundo, petitioner was the driver and Soto was the front seat passenger. (3RT 1538.)

Segundo told Sandoval about seeing the van. They were on their way to the barbeque when they saw Chino walking to the liquor store on 99th Street. Segundo warned him it was in enemy territory; 99th and Budlong belonged to the Mexicans Kicking Ass ("MKA") tagging crew. Chino said he would be all right because he had his knife with

---

[2] These facts are identical to the facts stated in petitioner's opening brief filed in the court of appeal, second appellate district on April 25, 2008, with one correction in the first paragraph about the location of the shooting. These facts are also identical the the facts stated in petitioner's petition for writ of habeas corpus filed in the court of appeal, second appellate district on August 15, 2008.
[3] Petitioner will refer to the victim and some of the witnesses by their first names and/or nicknames that were used at trial because several witnesses shared last names with other witnesses. No disrespect is intended.

him. (3RT 1539.) About 10 to 15 seconds later, Segundo heard two gunshots. He looked across the street and saw Chino grabbing onto a rail. He saw Soto get out of the white van and shoot Chino 13 more times. (3RT 1542.)

Maria Renteria, a family friend who lived in the back part of the Robles's house, had parked her car in front of the house just before the shooting and saw the shooter and the driver of the van in the light of her headlights. (3RT 1225-1226, 1228-1229, 1232.) Although she was unable to identify the driver from a photo lineup shortly after the murder, at trial (three years later), she said petitioner looked like the driver of the van. (3RT 1227, 1502-1503.)

Chino's father, his younger brother Jesse, and Carlos Lopez (Chino's friend/NC member), went to the front of the house after they heard the gunshots. (2RT 937-938, 941, 994, 3RT 1614.) As the van drove past the house, Jesse and Lopez saw the driver; they both recognized petitioner from prior encounters. (2RT 942-943, 3RT 1616-1617.) Adrian (Chino's younger brother) was at a friend's house across the street and looked outside when he heard the gunshots. He saw a person get out of the passenger side of a white van and start shooting. (3RT 1255-1257, 1274.) The vehicle light went on when the passenger opened the door. There were at least three to four people in the van. (3RT 1256.)

Sandoval, who was with Segundo, thinking it was his little brother who got shot, jumped in his car with Segundo and followed the van to 103rd Street where it came to a stop on Hoover. (3RT 1544, 4RT 1845, 1854, 1859.) Sandoval stopped five or six car lengths away. Sandoval did not get a good look at either the driver or the shooter; it was too dark. (4RT 1853, 1855.) The passenger got out the van and pointed a gun at them. Sandoval made a u-turn and fled. (3RT 1544, 4RT 1846-1846, 1859.)

However, Segundo saw the driver's profile when the shooter opened the van door and the interior light went on. (3RT 1571-1572.) When Segundo first spoke with the police, he told them the two people in the van were Palone from Dog Pound and Willie. Palone and Willie are Hispanic. At trial, he admitted he had lied to the police "about

4

those guys"; he was certain that petitioner was the driver and Soto was the shooter. (3RT 1547-1548, 1550.) Jesse admitted that he told all his friends and family that petitioner was the driver. (2RT 944, see 3RT 1278, 1285.)

Petitioner is a member of the NGA tagging crew. (2RT 949, 3RT 1593.) His nickname is Illusion. (3RT 1541, 4RT 2427.) Sometime before the shooting, Jesse and his friend were in an alley crossing out NGA's graffiti and putting up their own tags. Jesse was on a bicycle. Petitioner came by in a white Thunderbird with one of his brothers. (2RT 947-948.)[4/] Petitioner asked them, "Why are you crossing out my 'hood?" Petitioner's brother chased Jesse's friend; petitioner took Jesse's bicycle and threw it over a gate. (2RT 950-951.)

According to Segundo, a month or two before the shooting, he saw Chino and his friends attack petitioner between 101st and 102nd street. (3RT 1643-1644.)

On the day of the shooting, sometime between 10:00 and 3:00 p.m., petitioner's younger brother Jeremy was on 102nd Street visting his then girlfriend, Catherine Morales. (3RT 1618, 1869, 1871, 4RT 2108.) Jeremy and Catherine were in front of Maria Perez's[5/] house when Chino and Jeremy got into an argument relating to their tagging crews. (3RT 1631, 4RT 1873, 4RT 2108-2109.) Eric Sandoval was there, too.[6/] (4RT 1871.) After Chino said, "Fuck NGA," Jeremy told him to say that to his brother's face. (3RT 1631, 4RT 1873, 2109.) As Jeremy was walking away, Chino came behind him. Jeremy started to run and Chino hit him in the back of his arm with a bat. (4RT 2110-2111.) Jeremy went up the street. A liquor store was in that direction. (4RT 1874.)

Jeremy told his brothers what had happened. (4RT 2111.) About

---

4/ Petitioner has two brothers, Deandre and Jeremy. (3RT 1505, 4RT 1887.) According to Jesse, they look alike. (2RT 948.)
5/ NC member Carlos Lopez is Maria Perez's brother. (3RT 1631.)
6/ Eric Sandoval is Andres Sandoval's brother. (3RT 1544, 4RT 187!.) Eric is a NC member. (4RT 1848.)

20 to 30 minutes later, Jeremy and petitioner drove back to 102nd Street in petitioner's green Camry. (3RT 1613, 1618, 4RT 2112.) Chino, Carlos Lopez, Lopez's brothers, and two others were in a van. (3RT 1619-1620, 4RT 2112.) Petitioner asked them, "Which one of you was trying to fight my brother?" When nobody answered they left. (3RT 1613-1614.) Petitioner told Jeremy not to go there anymore. (4RT 2112.)

According to Perez, after Chino and the others left for Chino's hounse, Jeremy returned in a black car. (3RT 1632.) Jeremy got out and asked her, "Where [is] Chino?" She told him he went home. (3RT 1633.) Jeremy said he was going to get Chino or anybody from NC. (3RT 1634.) She dis not know who was driving the car. (3RT 1635.)

Around 6:30 p.m. that evening, petitioner went with Jeremy, Deandre, and a friend, to the Burger King where Karen Hernandez was working. They stayed for about an hour. (4RT 1881, 1886-1887.) Petitioner asked Karen if she wanted to go to the movies that night but she said that she had to get home. (4RT 1885.)

Around 7:00 p.m., petitioner went to visit his ex-girlfriend Laura Marquez at her workplace. Petitioner told Marquez that somebody had jumped his brother outside a liquor store and that he was going to go talk to someone. (3RT 1637-1638.) He was with Aaron Arellano. (3RT 1638.)

Jeremy testified that he was with petitioner on 98th Street when they heard the gunshots. (3RT 2113-2114.) However, in an earlier interview he told the police that petitioner had dropped him off at his house prior to the shooting. (3RT 2113.) He admitted that his memory was fresher when he had talked to the police in May 2003 and that he had told them the truth. (3RT 2115.)

About a week later, petitioner told Hernandez that on the day of the murder, after some NC members had attacked Jeremy with a bat at a liquor store, Jeremy had called him. When he arrived at the liquor store, a couple of NC members had tried to attack him. He ran back home to get his car and then went to 101st Street. (4RT 1881-1882.)

Surveillance videotape from the Blockbuster Video store on 8811 S. Western Avenue (located about five to ten minutes from the crime

scene) showed petitioner checking out videos on the night of the mur-
der. (3RT 1890-1891.) He was in the store with a woman who could
have been Evelyn Medina for at least five minutes before he paid for
the videos. (5RT 2462, 2467.) The video did not show when he ente-
red the store or how long he had been there. (5RT 2443.) According
to the case register receipt, petitioner paid for the videos at 9:38
p.m. (5RT 2470.)

The police found 11 casings, 6 bullets, and bullet fragments at
the crime scene. (3RT 1291-1292.) All of the casings came from the
same gun. (3RT 1518.) Based on that evidence and the eyewitnesses'
descriptions of a blue steel gun, the firearms expert opined that
the murder weapon was a .9 millimeter Luger semiautomatic manufact-
ured by Larsen. (4RT 1817-1818, 1822, 1838.)

Detective Michael Valento, the police gang expert, explained
that there is a distinct difference between a tagging crew and a
gang. A tagging crew's mission is to tag as much of the city's pro-
perty as it can. In contrast, a gang will make its territory (tag)
but it consistently  commits violent crime to gain respect and ele-
vate its status. (4RT 2138.) A tagging crew will commit violence
when provoked. Crossing out a rival's graffiti is a show of disres-
pect and rivalry. (4RT 2138.)

Valento is familiar with the EK gang, the MKA, and the NC tagg-
ing crews. (4RT 2139-2140.) He learned of the NGA through his inves-
tigation on this case. All of the information he got about NGA was
from NC members. (4RT 2162-2163.) NGA is a tagging crew, not a gang.
(4RT 2140.) In his opinion, Chino was a member of the NC tagging
crew; petitioner is a member of the NGA tagging crew. (94RT 2140-
2141.) At the time of the shooting, NGA, MKA, and EK had friendly
relationships. (4RT 2161.) All three groups did not like NC. (4RT
2162.)

In gang and tagging cases, witnesses are often afraid to tesify.
Some change their stories; others tell the truth and then lie beca-
use they are afraid. (4RT 2142.) A Snitch is somebody who informs the

---

5/ Renteria testified on April 13, 2006. (3RT 1224.) The shooting
occurred on May 10, 2003. (1CT 88.)

POLICE. The code on the street is not to inform the police for risk
of retaliation often resulting in death. A snitch reputation puts
a person in fear of his life. (4RT 2153.) Segundo told Valento he
did not initially identify Soto to the police because he was fearful
for his family members who still lived in the area. (4RT 2144.) (4RT
2144.)

On April 5, 2003, about a month before the shooting, Deputy
Marella and his partner contacted petitioner who was in a green
1993 Toyota Camry. (3RT 1528.) Evelyn Medina was in the front passe-
nger seat and her younger brother David was in the back seat. (3RT
1529.) Petitioner was wearing a distinctive metal bar through his
pierced left eyebrow. (3RT 1529, 1546.) Deputy Marella presented
petitioner for a booking photograph. (3RT 1529.) His partner had
petitioner remove the jewelry from his left eyebrow before he was
placed in a booking cell. He was then presented to the jailer for a
photograph and fingerprinting.(3RT 1530.)

7.    The defense case was as follows:

On May 10, 2003, Lennin Chavarria was visiting with petitioner
as the sun was going down on 98th Street. They were in the same tag-
ging crew. (5RT 2405-2406.) Petitioner was parked in front of Eve-
lyn's house in his green Toyota. (5RT 2406.) Petitioner was with
Evelyn, David and Jesse (her two brothers), and Aaron Arellano.(5RT
@S)&, @$@).) Chavarria parked next to petitioner's car and they che-
cked out each other's sound systems. After about 10 to 15 minutes,
they heard gunshots. (5RT 2408.) Chavarria went to 103rd Street
(where his friends lived) to see what was going on. He picked up
his friend Juan Maldonado. (5RT 2409, 2415.) When he returned to 98th
Street, petitioner, Evelyn, and her brothers were sitting in petit-
ioner's green Camry. (5RT 2411.) Evelyn and her two brothers went

---

6/ http://maps.google.com/maps?f=q&h1=en&geocode=&q=1115+101st+St.+
Los+Angeles+CA&sll=33.945185,-118.294655&sspn=.0.001146,0.002403&layer
=c&ie=UTF8&11=33.9451,-118.294408&spn=0.001146,0.002403&t=h&z=19&cbll=
33.944981,-118.294362&panoid=n2D8W09qCYqrJDMcGai7nQ&1ci=cb>
7/ The street lamp's location is visible by doing a Google map search
on "1117 101st Street Los Angeles, CA" then click on "Street view."

with **petitioner** to Bloclbuster's to  pick up some videos. (5RT 2425.)

8.    Additional facts relevant to this petition are as follows:

The trial took place almost three years after the shooting.[7]
soon after the shooting, the police showed Maria Renteria a photographic six-pack; she was unable to identify petitioner in the photo lineup. (3RT 1502-1503.) At trial, the prosecutor asked Renteria to look at petitioner who was sitting at the end of counsel table. She asked Renteria if petitioner looked like the driver of the white van. Renteria answered "yes." (3RT 1227.) Defense counsel did not expect Renteria's answer. (Exh. C.)

During trial counsel's cross-examination, he asked Renteria where she had parked. (3RT 1232-1233.) She said she was right next to the Robles house, but was not sure. She guessed,"I would say like in the middle, I think probably." (3RT 1233.) Trial counsel did not ask her about the distance between her car and the white van nor did he ask her to locate her car in the crime scene photos. Trial Counsel did not present any evidence of the distance between the Robles house and the location where Chino was shot.

9.    The evidence shows that Chino was shot in front of a house two lots west of his house, closer to Budlong. (See Exh. A 2-4; 1CT 51.) The Robles house is a brown house with a chain link fence around the front and side perimeter.[8] To the west, a portion of the lot next to the Robles house is vacant. The other half has a white or light green house with horizontal wood slats. There is a driveway to the west of that house. The next lot has two houses on it with bars on the windows facing the street. A railing fence set in a white concrete foundation adjacent to the sidewalk surrounds that lot. The

_____

8/ People's Exh. 6 has a mark "RR" on the house between the Robles house and the house with the railing. (Exh. A 1.) Renteria agreed with the prosecutor that the house with the "RR" was the Robles house. (Exh. E 1816.) However, the Robles house is actually one house further to the east.  Exh. A 3 [marked with "R"].) Renteria correctly identified the Robles's house on People's Exhibit No. 58 with a "R".(Exh. A 3; Exh. E 1823.)

location of the shooting was near the west property line of that lot. (Exh. A 1.) There is a street lamp located on the south side of the street opposite the house west of the Robles house. It was between Renteria's van and the white van, but closer to Renteria's van.[9/] (2RT 952.)

!).   Abel Soto's trial took place about a couple of weeks before petitioner's sentencing hearing. In Soto's case, Renteria testified for the defense. Soto is Hispanic. Renteria testified the shooter was Black and had shoulder length curly hair. (Exh. E 1808, 1819.)

During direct, Renteria testified that she parked her car past the Robles's driveway towards Budlong Street. (Exh. E 1804.) She saw Chino walking towards his home. Exh. E 1818.) What caught her attention was a white van driving on the wrong side of the street coming towards her with the lights off. (Exh. E 1804-1805.) It stopped, the passenger got out of the car, walked in front of the van, and started shooting. (Exh. E 1805.) She was about the distance from the witness box to the back of the courtroom [35 feet] from the white van, a little over two car lengths away. (Exh. E 1806.)

When she heard the gunshot she was shocked. (Exh. E 1807.) She said she saw the driver as the van drove past her after the shooting. (Exh. E 1810-1811.) She turned away after looking at the driver because she did not want him to know that she saw him. (Exh. E 1811.) When she looked at People's Exhibits Nos. 6 and 9, photos of the cars contained within the crime scene area, she could not find her car. (Exh. E 1813.)[9/]

During cross-examination, the prosecutor asked her to look at the crime scene photos and point to her car. She pointed to her car one People's Exhibit No. 58 and marked the location of her car with "MR." (Exh. A 3.) On People's Exhibit No. 61, the photo shows her car parked behind a large work truck. (Exh. A 6; Exh. E 1823-1824.)

---

[9]/ See Exh. G [100 foot photograph at www.Prisonpolicy.org/zones/thousand_feet.htm]

The prosecutor asked Renteria, "Did you know it's about 160 feet from the shooting site to the Robles' residence?" (Exh. E 1826.) Renteria admitted that she was not good a estimating distances. (Ibid.)

On redirect, Rentria agreed it was possible that she was about five car lengths away from the shooting. (Exh. E 1827.)

According to Sergeant Katz, Chino was killed on the western property line of the lot with the railings depicted in People's Exhibit Nos. 6 and 9. (Exh. A 1 & 2, Exh. E 1845-1846.) Renteria was parked on the west perimeter of the Robles residence property line. (Exh. E 1847.) She would have to look past the large work truck, a driveway, a SUV, and two other cars to see the murder. (Ibid.; Exh. A 1.)

11.    In Soto's case, the jury did not believe Renteria's eyewitness description of the shooter as a Black male. The impeachment evidence established she was much farther away from the shooting that she had stated on direct and the work truck that was parked in front of her van would have blocked her view. The jury convicted Soto of first degree murder. (See Court of Appeal Case No. B203546.)

12.    At petitioner's trial, Renteria testified that she saw Chino cross the street to the north side of the street. (3RT 1249.) She pulled over and parked her car in front of the Robles house. (3RT 1232-1233, 1249.) She saw a white van on the wrong side of the street with its headlights on. (3RT 1249.) Then they turned the lights off. (3RT 1250.) Her headlights hit the white van and she had a good view of the driver. (3RT 1245.) When she looked at petitioner nothing unusual was happening and she was not "paying him any particular attention. "(3RT 1236.) She looked at petitioner's face "[j]ust a little bit." When the prosecutor asked her if it was a minute, she answered "about2 minutes," and "it seemed like forever at that time." (3RT 1230.) On cross, she changed her time estimate to more than 10 seconds. (3RT 1237.)

Renteria said she saw the shooter get in front of the blue car and go up to the victim who was on the sidewalk. (3RT 1246-1247.) She saw the victim fall. He was on the ground when the shooter went up to him. (3RT 1247, 1250.) She said, "there was not a lot of cars in front. You could see there was not like big cars, vehicles. So

you could see."(3RT 1250.)

After the shooting the white van drove past her; she turned away so the occupants would not see her looking at them. (3RT 1238.) She agreed she did not tell the police she had seen Chino cross the street or that she had seen him fall to the ground. (3RT 1251.)

12.    Renteria's testimony at petitioner's trial introduced false evidence that is substantially material and probative on the issue of petitioner's guilt. It would have been physically impossible to get a "good view" of the face of the driver if Renteria was parked near the curb over 100 feet away from the white van;[11]/ even more so if she was behind the large work truck in People's Exhibit Nos. 6 and 61. (Exh. A 1, 6, Exh. D & G.) It would also have been physically impossible for her to see Chino fall on the sidewalk if she were sitting in the driver's seat of her vehicle with the large truck, the SUV, and the two other cars blocking her view. (Exh. E 1847.)

Renteria testified falsely when she said,"there was not a lot of cars in front. You could see there was not like big cars, vehicles. So you could see." (3RT 1250.) The police photos taken on the night of the murder that were admitted at Soto's trial show her statement was false. Chino was killed in front of a blue car. There was another car behind that car, a SUV, and a driveway.To the east of the driveway was the large work truck. Renteria's van was behind that truck. (Exh. A 1, 2, 6.)

Furthermore, at Soto's trial, Renteria testified that she saw petitioner's face after the shooting when the white van was coming in her direction. (Exh. E 1810-1811.) In contrast, at petitioner's trial, Renteria inconsistently and falsely testified that she observed petitioner's face before the shooting for more than 10 seconds. (3RT 1226, 1230-1231, 1237.)

When the prosecutor asked Renteria what petitioner was wearing, she answered,"I didn't really see. I was - I seen him, but I like I was in shock when I heard the gun shots." (3RT 1228.) That was the most credible statement she made.

14.    Petitioner told his trial counsel Ronald White about the evidence presented at trial impeaching Renteria's identification testimony at Abel Soto's trial. According to petitioner, White told

petitioner, "I did not follow Abel's case, if there['] s an issue with the D.A. not handing over evidence then that['] s something for your appeal." (Exh. B.) White, however, denied that petitioner mentioned the matter to him. He had not expected Renteria to identify petitioner at trial. (Exh. C.)

15.    Petitioner's Appellate counsel received part of petitioner's trial file from White. There were no copies of crime scene photographs in the file. Appellate counsel wrote to White asking him if the prosecutor had provided him with the photos of the crime scene. Appellate counsel did not get a response to this question. (Exh. D.)

16.    Trial counsel was ineffective for failing to present physical evidence of the distance between the Robles property and the crime scene. It was the distance of two property lots. (Exh. A 2; Exh. E 1847; 1CT 51.) Each property lot is 64 feet wide.[12]/ Based on Renteria's testimony that she was parked in front of the Robles house and the crime scene photos, Renteria was at least 128 feet away from where the white van had stopped. (Exh. F; 3RT 1233.) It is physically impossible to recognize a known person sitting inside a vehicle during the daylight at that distance. (See Exh. G.) It would have been impossible for her to get a good look at a stranger with non-distinctive features similar to petitioner's and recognize him three years later. (See Exh. D, AOB Att. 1.)

Trial counsel was also ineffective for failing to have Renteria point out where her vehicle was parked in relationship to the van and the shooting. Because she was a defense witness at Soto's trial, the prosecution had Renteria point out her car using the crime scene photos. (Exh. E 1816, 1821-1823.) It established that Renteria was much farther away from the crime scene then she had initially stated, and that she was behind a large work truck that would have blocked part of her view of the street ahead as well as the illimination from her headlights.(Exh. E 1823-1824.)

---

10/ See Exh. G [100 foot photograph at www.prisonpolicy.org/zones/thousand_feet.html]
11/ See Exh. F; http://maps.assessor.lacounty.gov/mapping/view AssessorMapPDF.asp?val=6060-027.

Furthermore, trial counsel was ineffective for failing to pro-
duce evidence that it would have been impossible for a person to see
details of a person's face from over 100 feet away at night under
any light conditions without binoculars. (Exh. D.) This was relevant
to discredit Renteria's testimony that she had a good view of the
driver who she had never seen before that night, and could recognize
him three years later. This is also relevant to discredit Albert
Segundo's testimony that he saw petitioner's profile "real clearly"
when the dome light of the van flashed on; he was in Sandoval's car
that was five to six car lengths behind the white van. (See 3RT 1572,
4RT 1859.)

As shown at Soto's trial, reasonably competent counsel would
have pinpointed where Renteria was parked and established the dist-
ance between her car and the shooter's van. Her ability to see was
crucial to the credibility of her identification of petitioner as
the driver. Even though her identification of petitioner as the
driver was unexpected, at the very least, counsel should have had
her subject to recall and questioned her further at a later point in
the trial.

17.    Renteria's in-trial identification of petitioner as the
driver was prejudicial. Her identification testimony was substanti-
ally material and probative. This was an eyewitness identification
case. There were four witnesses who identified petitioner as the
driver. Three of the witnesses were members of Chino's tagging crew
and rivals of petitioner's tagging crew. (2RT 948, 994, 3RT 1536,
1541, 1630.) They all had past contacts with petitioner, had a motive
to implicate him, and had ample opportunity to confer with each other
before they identified petitioner as the driver to the police. (See
2RT 982-983, 3RT 1319-1320, 1509-1510, 1547, 1625.) They had all
been impeached with lies they told to the police. (See 2RT 983,3RT
1547, 5RT 2438; AOB 35-36.) Renteria was the only unaffiliated eye-
witness who had never seen petitioner before the night of the shoot-
ing. (3RT 1226.) Her testimony corroborated and bolstered the identi-
fications of the other biased witnesses. (See AOB 35-39.)

18.    On Appeal to the Court of Appeal, Second Appellate Dist-
rict, petitioner has raised errors of prejudicial juror misconduct

14

and prosecutorial misconduct. Respondent relies on the fact that four witnesses identified petitioner as the driver to argue that" any errors were harmless because the evidence of petitioner's guilt was "overwhelming." (See RB 16-19, 21.)

19.    The outcome of this case was tightly balanced on the jury's evaluation of the credibility of the prosecution and defense alibi witnesses. The length of the jury deliberations and the jury's request for readback of numerous witnesses' testimonies indicates the case was close. (See AOB 40.)

Had Renteria's identification of petitioner as the driver been discredited as her identification of the shooter was discredited at Soto's trial, there is a reasonable probability that the jury would have reached a more favorable result. (People -v- Watson (1956) 46 Cal.2d 818, 836.)

20.    Petitioner has previously presented this claim of ineffective assistance of trial counsel and/or false evidence in which was presented at trial to the state courts.

21.    Under Article 6, section 10 of the California Constitution, state court has original jurisdiction over a petition for writ of habeas corpus. Petitioner has filed this petition only in the Court of Appeal because of the pendency of his direct appeal and requested consolidation because it directly relates to respondent's prejudice argument of appeal. Petitioner's request to consolidate was granted by the court of appeal.

22.    Petitioner has no adequate remedy at law.

WHEREFORE, Petitioner requests that this Court:

1.    Take judicial notice of all records in this case, including the records in which was involved in the case when it was on direct appeal, People -v- Jofama Coleman, Case No. B202597 and People -v- People -v- Abel Soto, Case No. B203546;

2.    Issue an order to show cause why petitioner's conviction and sentence should not be set aside;

3.    Grant petitioner an evidentiary hearing;

4.    This petition for writ of habeas corpus was originally Consolidated with the direct Appeal;

5.    Upon final review, order that his conviction and sentence

be set aside; and,

   6.    Provide such other and further relief as may be deemed
appropriate in the interests of justice.

   Additionally, Evidentiary hearing are required on claims of jury
Misconduct, <u>Lawson -v- Borg,</u> 60 F.3d. **608.**


DATED:_____ _____(2009)          Respectfully Submitted,

                                        /s/_____
                                           Jofama Coleman,

                                              Petitioner.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPP-
ORT OF PETITION FOR WRIT OF "HABEAS CORPUS

I.    False Evidence Was Introduced During Petitio-
      ner's Trial.

      a.    The Law

      Penal Code section 1473, subdivision (b)(1), allows relief on habeas corpus where the petitioner shows that "substantially mate-rial or probative" false evidence was introduced against him on the issues of guilt or punishment. In In re Malone (1996) 12 Cal.4th 935, our high court explained the materiality standard for false evidence as follows:

> "False evidence is 'substantially material or probative' if it is 'of such significance that it may have affected the outcome,' in the sense that 'with reasonable probability it could have affected the outcome....' [Citation.] In other words, false evidence passes the ind-icated threshold if there is a 'reasonable probability' that, had it not been introduced, the result would have been different. [Citation.] The requisite 'reasonable pro-bability,' we believe, is such as undermines the reviewing court's confidence in the outcome. [Citation.] It is depe-ndent on the totality of the relevant circumstances. [Citation.] It is also, we believe, determined objectively. [Citations.]

(Id. at p. 965.)

      Petitioner has the burden of proving by a preponderance of the evidence that the evidence is false. (In re Imbler (1963) 60 Cal.2d. 554, 560.)

      b.    The False Evidence.

      At trial, false evidence was presented in Maria Renteria's testimony. Sergeant Steven Katz was the investigating officer on this case and it appears he attended petitioner's trial in that cap-acity. (See 2RT 945.) He testified as a witness in this case. (3RT 1288.) He also testified at Abel Soto's trial. (Exh. E 1828.)

      Renteria arrived home and parked her Toyota Astrovan in front of the Robles's property. (3RT 1232-1233, 1241.) Renteria had never seen petitioner before that night. (3RT 1226.) She left her headli-ghts on after she had parked in front of the Robles house by the

17

curb. (3RT 1230.) She saw: (1) Chino cross the street (3RT 1249),
(2) a white van stopped on the wrong side of the road with the head-
lights on (3RT 1249-1250, 1244),(3) the driver of the white van (3RT
1226), (4) a person who was in the front passenger seat get out of
the van and fire his gun (3RT 1229, 1235, 1241-1242), and (5) the
shooter cross in front of the van to get back into the van. (3RT
1243.)

Renteria said she had more than ten seconds to look at the
driver and got a good look at his face. (3RT 1230-1231, 1237.) She
could not describe anything about the driver except that he was a
Black male and probably had a "little bit of hair" on his head.
(3RT 1228, 1239-1240.) She admitted, however, that she had no part-
icular reason to pay much attention to him and focused her attent-
ion on the shooter when she heard the gunshots. (3RT 1230, 1236-
1238.) The van was facing east, but was on the westbound side of
the street. She was parked by the curb facing west. (3RT 1226, 1233-
1234.) At trial, she testified that petitioner looked like the dri-
ver of the van. (3RT 1227.)

Unlike Renteria's "Black male" description of the driver, she
described the shooter in detail – he was five feet eitht inches,
around 18 years old, heavy-built, wore a beanie on his head and a
plaid flannel shirt, had curly hair short, but ending a "little bit
above the shoulders." (3RT 1228-1229, 1239.) She described him hol-
ding the gun in his right hand, using both hands to fire it, then
holding it in his left hand as he walked backwards to the van.(3RT
1241.) She said she saw Chino fall to the ground because there were
not a lot of cars in front of her; no big vehicles. (3RT 1250.)
When the white van drove in her direction, she turned her head so
the van occupants could not see her. (3RT 1230.) After the shooting,
the police showed her a six-pack photo lineup with petitioner's
photo but she did not recognize him. (3RT 1502-1503.)

Based on her testimony, the jury could have believed that she
was close enough to get a good view of the driver of the van, was a
good observer, and had enough time to look at petitioner's face

18

before the shooter fired his gun.

Abel Soto was charged as the shooter in Chino's murder. At Soto's trial, which took place about a week before petitioner's hearing on his new trial motion, Renteria was called as a defense witness. (Exh. E 1, 1802.) Her description of the shooter was introduced to show that Soto could not have been the shooter. Her testimony at Soto's trial differed from her testimony at petitioner's trial in several respects:

1.    At Soto's trial she said she looked at the white van because it was driving on the wrong side of the street coming toward her with the headlights off. (Exh. E 1804-1805.) At petitioner's trial, the van was on the wrong side of the road and it had the headlights on. The driver turned the lights off "afterwards." (3RT 1249-1250.)[13/]

2.    At Soto's trial Renteria said she saw the driver of the van when the van drove toward her vehicle after the shooting. (Exh. E 1810-1811.)[14/] At petitioner's trial, Renteria said she looked at petitioner's face for about two minutes (she later changed that to "more that ten seconds") before she heard the gun shots and got a good look at the driver's face. (3RT 1230-1231, 1237.) After the shooting, Renteria turned her head away as the vehicle drove in her direction because she did not want them to see her. (3RT 1230.)

3.    At Soto's trial, Renteria said the distance between her car and the shooting was 35 feet; a little over two car lenghts. (Exh. E 1806, 1825.) However, an SUV was parked two car lengths away. (Exh. A 2.) Renteria admitted she was not good at estimating distances when the prosecutor told her it was about 160 feet from the shooting site to the Robles's residence. (Exh. E 1826.) At petitioner's trial she was not asked to approximate the distance but said she was able to get a good look at the driver. (3RT 1231, 1245.) She was certain that she was parked in front of the Robles house. (3RT 1233.)

4.    At Soto's trial, Renteria identified her van in Exhibit No,38 as the vehicle parked behind a large work truck. (Exh. E 1822.) There was a driveway an SUV and two cars in front of the work truck. (Exh. A 1; Exh. E 1847.) At petitioner's trial she said there were

not many cars in front of her and there were no big vehicles. (3RT 1250.)

5.   At petitioner's trial Renteria testified that she saw Chino fall to the ground, she also saw the shooter walking towards him to shoot him several more times. (3RT 1249-1250.) She did not say that at Soto's trial.

At Soto's trial, Sergeant Katz, the investigating officer at petitioner's trial, testified that Renteria had parked on the west perimeter of the Robles property. (Exh. E 1847.) The shooting occurred on the west perimeter of the property two lots away. (Exh. A 2; 1CT 51.) There were about three cars, a driveway, and a large work-truck between Renteria and where Chino was shot. (Exh. A 1, Exh. E 1847.)

Petitioner's appellate counsel's investigation shows the distance between Renteria's vehicle and where she said the white van had stopped would have been about 128 feet. (Exhs. D & F.) Furthermore, it would have been physically impossible for Renteria to see petitioner's face through the windshield of his vehicle from that distance at night (Exhs. D & G.) Notably, the headlights of her van were not directly facing the white van, they were offset because she was parked at the curb and the white van was stopped in the west-bound lane of the street. (3RT 1233-1234.) Headlights facing oncoming traffic would not have been able to illuminate the interior of a vehicle 128 feet away. (Exh. D.) Moreover, if the large truck were in front of Renteria's van, it would have blocked some of the illumination from her headlights, and if she was sitting in the driver's seat, it would have blocked her view of Chino on the sidewalk. (See Exh. A 6, Exh. E 1847.)

Soto's jury did not find Renteria's eyewitness testimony about the shooter credible; it convicted Soto of the shooting. Renteria

---

5/ Based on common experience, it would have been physically impossible for her to se details on the driver's face if both cars had their headlights on. (Exh. D.)

6/ Notably, at petitioner's trial, Jesse Robles testified that the van took off fast, less than ten seconds after the shooting. (2RT 942.)

was not any more credible at petitioner's trial than she was at Soto's. Her statement that she could see petitioner's face well enough to identify it three years after the fact was physically impossible and false under the circumstances she described.

Sergeant Katz, the investigating officer, should have known that Renteria's in-trial identification of petitioner as the driver could not have been based on what she saw from over 100 feet away. It could be reasonably inferred that he told the prosecutor about the distance between the Robles house and the place where Chino was shot at Soto's trial. (Exh. E 1826 [about 160 feet].) A police officer of his experience should have known that it would have been physically impossible for Renteria to see the driver's face at that distance.

   c.   Petitioner's Constitutional Rights to Due Process
        of Law and a Fair Trial Were Violated By the Int-
        roduction of False Evidence at Trial.

A conviction obtained through use of false evidence denies a defendant the constitutional rights to due process of law and a fair trial. (Napue -v- People of the State of Ill. (1959) 360 U.S. 264, 269 [79 S.Ct. 1173, 3 L.Ed.2d. 1217]; Jackson -v- Brown (9th Cir. 2008) 513 F.3d. 1057, 1071-1072; U.S. Const. 5th & 14th Amends.) Federal law, unlike state law, requires that the government know that the evidence is false. However, "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." (Napue, supra, 360 U.S. at p. 269.) Here, the prosecution had to have known that Renteria was parked too far from the white van to have been able to get a good look at the driver. At Soto's trial, it knew that and was able to discredit Renteria's testimony by proving that she was parked much farther away from the crime scene than she had remembered and that she was parked behind a large truck. Given those circumstances, it would have been impossible for her to see what she said she saw at petitioner's trial.

Notwithstanding, at petitioner's hearing on his new trial motion, after it had impeached Renteria at Soto's trial, the prosecution

argued that the evidence against petitioner was "overwhelming" because four witnesses testified that he was the driver. (5RT 3908; 2CT 255-256.) Respondent makes that same claim on appeal. (RB 16-19.) Thus, Renteria's false testimony continues to go uncorrected. The government's continued reliance on false evidence, in turn, impacts this Court's determination of the prejudicial effect of the error raised in petitioner's appeal and/or in this petition for writ of habeas corpus. Petitioner's constitutional right to due process of law and a fair trial is violated by the government's continued reliance on false evidence.

> II.   Trial Counsel Provided Ineffective Assistance of Counsel by Failing to Adequately Question Renteria About Her Ability to See the Driver of the Van and Failing to Investigate and Produce Evidence That it Would Have Been Physically Impossible for Her to See the Driver Under The Circumstances She Described.
>
> a.   General Principles of Ineffective Assistance of Counsel.

A defendant's right to assistance of counsel guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution,"entitles the defendant not to some bare assistance but rather to effective assistance. [Citations.] Specifically, it entitles him to 'the reasonably competent assistance of an attorney acting as his diligent conscienious advocate' to protect the defendant's right to a trial that is both fair in the proceedings and reliable in the result. (People -v- Ledesma (1987) 43 Cal.3d. 171, 215, quoting United States -v- DeCoster (D.C. Cir. 1973) 487 F.2d. 1197, 1202; Strickland -v- Washington(1984)466 U.S. 668, 688 [104 S.Ct. 2052; 80 L.Ed.2d. 674].) This right requires that "before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation." (People -v- Ledesma, supra, 43 Cal.3d. at p. 215.)

In  order to establish ineffective assistance of counsel, the accused must show (1) that counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms; and (2) that there is a reasonable probability that, but for counsel's unprofessional error, the result

22

of the proceeding would have been different.(People -v- Ledesma, supra, at 216-218; Strickland, supra, 466 U.S. at pp. 688, 690-692.)

In determining whether trial counsel fell below the standard of reasonableness, the court provides a strong presumption of competence. A reviewing court generally defers to trial counsel and avoids second guessing counsel as to matters of strategy and tactics. However, a claim of strategy and tactics is irrelevant if an action is taken without benefit of substantial inquiry, is based on ignorance of the law, or if there could be no satisfactory explanation for the actions.(See People -v- Frierson (1979) 25 Cal.3d. 142, 162-163; People -v- Bess (1984) 153 Cal.App 3d. 1053, 1061; People -v- Guizar (1986) 180 Cal.App.3d. 487, 492, fn. 3.) Because' [r]epresentation of an accused murderer is a mammoth responsibility [citation] the seriousness of the charges against the defendant is a factor that must be considered in assessing counsel's performance.[Citation.] (In re Jones (1996) 13 Cal.4th 552, 566.)

>    b.  Counsel's performance fell below an objective standard
>        of reasonableness under prevailing professional norms.

Reasonably competent counsel would have marshaled all available evidence to support petitioner's defense. (See People -v- Rodriguez (1977) 73 Cal.App.3d. 1023, 1032; People -v- Hall (1981) 30 Cal.3d. 408, 428.) Criminal defense attorneys have a "duty to investigate carefully all defenses of fact and of law that may be available to the defendant."(People -v- Ledesma (1987) 43 Cal.3d. 171, at p. 222.)

Counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. As shown in Soto's trial, reasonably competent counsel would have questioned Renteria about the distance between her van and the crime scene and asked her to identify her vehicle's location on the crime scene photographs. Based on the distance between Renteria's car and the crime scene, and in light of the large work truck that was parked in front of her that would have blocked part of her view, her testimony describing what she saw would have been discredited.

Trial counsel was ineffective for failing to adequately investigate the facts, to present evidence of the distance between Renteria's car and the crime scene, and to present evidence that a person

with normal eyesight would be unable to see a person's face from
128 feet away in the daylight, let alone in the driver's seat of an
oncoming vehicle at night. It was physically impossible for Renteria
to have seen the driver's face well enough under the circumstances
she  described to be able to identify petitioner as the driver three
years later. (Exh. D & G.) Evidence showing that a normal person of
average eyesight would not be able to see another person's face "cle-
arly" from 100 feet away would also have discredited Segundo's test-
imony that he could clearly see petitioner's profile when the van's
dome light flashed on from the distance of five to six car lengths
away. (3RT 1572, 4RT 1859.)

        C.    Trial counsel's failure to adequately question Renteria
              and to investigate and introduce impeachment evidence
              was not reasonably tactical.

        Trial counsel was surprised when Renteria made an in-court ide-
ntification of petitioner as the driver at trial. (Exh. C.) Consequ-
ently, it appears he was unprepared to cross-examine her about her
ability to see what she said she saw.Because Renteria's identificat-
ion of petitioner was unexpected, at the very least, trial counsel
should have requested that she be subject to recall because her iden-
tification of petitioner as the driver testimony was damaging to the
defense. He did not. (3RT 1253.) Alternatively, he could have had an
investigator go to the crime scence and measure the distance, conduct
a visibility experiment, and present the findings during the defense
case to discredit Renteria's ability to see under the circumstances
she described. (Exh. D.) Or he could have called Sergeant Katz to
testify about the distance between the Robles house and the shooting.
He did not. There could be no tactical reason for not impeaching Ren-
teria's testimony.

        Prejudice.

        The standards of prejudice for introducing false evidence and
for ineffective assistance of counsel are essentially the same. For
error relating to false evidence, petitioner must show that it may
have affected the outcome of his trial. (In re Wright (1978) 78 Cal.
App.3d. 788, 807.) Two show prejudice on a claim of ineffective assi-
stance of counsel, petitioner must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the res-
ult of the proceeding would have been different. A reasonable prob-
ability is a probability sufficient to undermine confidence in the
outcome. (Strickland, supra, 466 U.S. at p. 694.) A reasonable prob-
ability is not a showing that Counsel's conduct more likely than not
altered the outcome in the case," but simply a probability suffici-
ent to undermine confidence in the outcome. (Id. at pp. 693-694.) In
other words, a significant probability of success, but something
less than a 50% likelihood of a more favorable result. (People -v-
Howard (1987) 190 Cal.App.3d. 41, 48.) This case involved a close cr-
edibility determination between the prosecution eyewitnesses and the
defense alibi witnesses. Jesse Robles, Carlos Lopez, and Alberto Seg-
undo (the three other identification witnesses) had been impeached
with their lies to police officers (See 2RT 983, 3RT 1547, 5RT 2438;
AOB 35-36) and were all members of Chino's NC tagging crew and riv-
als of petitioner's tagging crew. (2RT 948, 994, 3RT 1536, 1541,
1630.) All three had ample opportunity to confer with each other be-
fore they spoke with the police and identified petitioner as the
driver. (See 2RT 982-983, 3RT 1319-1320, 1509-1510, 1547, 1625.)

Renteria was the only witness of the four witnesses who identi-
fied petitioner as the driver who did not know petitioner, was not
a NC member, and who appeared to be unbiased. Renteria's testimony,
thus, bolstered the credibility of the three NC witnesses' testimon-
ies. The prosecutor strongly relied on that fact. During opening sta-
tements she told the jury,"You will hear a witness by the name of
maria Renteria--who had nothing to do with either of the tagging
crews in this case; she just lived at that location...like I said,
she had nothing to do with any of the tagging crews in this case.(2RT
908-909.) During closing argument, she told the jury," [O]ne thing
that's really noteworthy about Miss Renteria, she doesn't have any-
thing to do with NC. She doesn't have anything to do with NGA. She
doesn't have anyting to do with anybody, so she's kind of an import-
ant witness because she confirms, first of all, that the driver of
the van was a male, black...¶ She was unable to identify out of the
photographic six packs, but then, lo and behold, she comes to court
and she identifies the defendant. She, like Jesse Robles, saw direc-
tly into the van with her headlights. Again, lo and behold, so she

confirms also that that happened and also saw the driver of the van
as it drove by...it was clearly a product of what she remembered.
When she saw the defendant in person, she recognized him." (5RT 2728-
2728.) The prosecution also repeatedly emphasized to the jury that
four witnesses identified petitioner as the driver. She said,"The de-
fense will try to make you believe that you didn't see four witnesses
identify the petitioner as the driver. "(5RT 2742.) "Four witnesses
in this case, four witnesses identified that man there as the driver.
If it were just Albert Segundo, maybe you'd be right not to convict.
If it was Jesse Robles, maybe you's be right not to convict, but are
you seriously going to say that you don't believe four witnesses who
identified him as the driver of the van?" (5RT 2760-2761.) "How do
you overcome four people saying that he is the one who did it?" (5RT
2762.)

This was a close case because the outcome of this case was tig-
htly balanced on the jury's evaluation of the credibility of the pro-
secution and defense witnesses. Similar to this case, in People -v-
Anderson (1978) 20 Cal.3d. 647, the trial court granted the prosecu-
tor permission to elicit information from the defendant that, on two
prior occasions, the defendant had been arrested with the codefendant
on other unspecified charges. (Id. at p. 650.) The Court held the
admission of that evidence was prejudicial error, since the record
revealed a close credibility determination concerning evidence desc-
ribing a fight and, but for admission of the prior arrest evidence,
it was reasonably probable that the jury would have rendered a more
favorable verdict, and prejudicial error would not have been rende-
red harmless had the defendants agreed to an admonition to consider
prior arrest evidence only for purpose of determining the defendants'
credibility. (Id. at 651.) Here, as in Anderson, there was a close
credibility determination between the prosecution eyewitnesses and
the defense alibi witnesses.

This was a close case. The most obvious indication of a close
case is lenghty jury deliberations. (E.g. In re Martin (1987) 44
Cal.3d 1, 51; People -v- Cardenas (1982) 31 Cal.3d. 897, 907 [12
hours of deliberations is evidence of a close case]; Lawson -v- Borg

(9th Cir. 1995) 60 F.3d. 608, 612 [nine hours of deliberations deemed protracted."] Here, the jury deliberated for over two full days to reach its verdict. (5RT 2768, 3301-3302, 3601, 1CT 128, 131-132, 187.) While the Supreme Court has indicated that lengthy deliberations are not significant in a complex case (People -v- Cooper (1991) 53 Cal.3d. 771, 837), this case was not complex; it involved one count of aiding and abetting a murder and the jury basically had to determine just one main fact--whether petitioner was the person who drove the van.

The jury's request for readback of testimony also establishes that this was a close case. (See People -v- Pearch (1991) 229 Cal.App. 3d. 1282, 1295 ["[J]uror question and requests to have testimony reread are indications the deliberations were close"]; People -v- Williams (1971) 22 Cal.App.3d. 34, 38-40 [request for readback of critical testimony].) Here, the jury requested "total readbacks" of prosecution witnesses; Jesse Robles, Maria Renteria, Maria Perez, Albert Segundo, Andres Sandoval, Adrian Robles, and Carlos Lopez. (1CT 130.) Despite the court's comment that it would take a substantial amount of time to prepare and readback all of these testimonies, the jury had all the requested testimony readback to it. (See 1CT 131-132.)

Had Renteria's identification of petitioner been discredited as her identification of the shooter was descredited at Soto's trial, there is a reasonable probability that the jury would have reached a more favorable result. (People -v- Watson, supra, 46 Cal.2d. at p. 835; Strickland -v- Washington, supra, 466 U.S. at pp. 688, 690-692; U.S. Const., 5th, 6th and 14th Amends.)

iii.
Evidence of a Defendant's Prior Arrest and Criminal History Was Inadmissible Evidence Because it Was More Prejudicial Than Probative.

Post-Verdict Juror Inquiry.

After the verdict, but before the sentencing hearing, in a letter responding to the court's post-verdict follow-up letter to the jurors, "Juror No. 5 (i)nformed the court that several jurors had looked at "an exhibit" that "contained information "about the petitioner's

27

prior arrest during deliberations. She was not sure this was Proper. (3AugRT H4-5; 4AugRT L7-8; 2CT 229.) Exhibit No. 3, is an 8 1/2 X 11 inches sheet of paper with petitioner's booking photo on the right half of the page and police information about an arrest on the left half of the page. (Att. 1.) The page was folded in half with the booking photo on the front and the arrest information on the back. The booking photo was admitted into evidence; the parties had agreed the arrest information would be removed. However, the entire page was sent in to the jury room. (4AugRT L-10.)

the trial court held individual hearings with eleven jurors to inquire about their exposure to the arrest information and whether it had been discussed. (2CT 200-206, 4AugRT L1-P5.) One juror had pointed out the arrest information to other jurors. (4AugRT L12, M18-19.) One juror heard another juror comment that it should not be considered. (4AugRT L12,N12.) Several jurors saw the arrest record and understood it meant that petitioner had a prior criminal history. (AugRT L12, 16, 18, N3, 6-9, 11-12.) The foreperson did not remember either seeing the arrest information or any discussion about it. No one had brought it to his attention. (4AugRT 08-10.) Forwarding petitioner's criminal history to the jury deprived petitioner of the right to confrontation under the 5th and 14th Amend. to the U.S. Const. such information was prejudicial to petitioner in the initial determination of the issue of guilt. Furthermore, evidence of petitioner's prior conduct in possessing the firearm one month before the instant shooting was inadmissible under Evidence Code section 352.

According to Juror No. 5, one of the jurors said, "Well, he was arrested for carrying a loaded weapon before."Someone responded,"We are not suppose[d] to consider that." (4AugRT L12.) After she heard that discussion, other jurors looked at the arrest information. (4Aug RT L18.) And while there was, at most, a general discussion about the prior arrest, she stated," [I]t's kind of like a white elephant in the room that you don't talk about." (4AugRT L12.) Furthermore, Juror No. 5 indicated she did not understand all the abbreviations relating to the charges, but inferred from the text that "petitioner" had been charged with having stolen property; having a "loaded firearm" that was probably  (P)rohibited; and carrying a "loaded firearm. (4AugRT L 16.) However, Juror No. 10 read the back of Exhibit 3 and understood it

was about another offense. (4AugRT M6.)

Juror No. 2 remembered that somebody had noticed the arrest record among the "vast array" of exhibits and pointed it out saying, "Look at this." (4AugRT M18-19.) She explained that the jury did not pass the exhibits around in an organized rotation; the exhibits were gathered in piles; the jurors individually decided what they wanted to look at. (4AugRT M19.)

According to Juror No. 8, she remembered that petitioner had been arrested; Exhibit No. 3 had given her the impression that petit-ioner had a previous criminal record. (4AugRT N8-9.)

Juror No. 9 (the jury foreperson (see 1CT 187))did not remember seeing the backside of Exhibit No. 3. (4AugRT 08.) He did not remem-ber any discussion about evidence that had not been properly submi-tted to the jury and would have remembered if he had been told about it. He would have said, "Let's talk about it." (4AugRT 09.)

The record shows six jurors--half of the jury--remembered see-ing the booking information; Jurors Nos. 2, 4, 5, 8, 10, and 11 saw the booking report and knew what it was. (See 4AugRT L12, M6, M14, 17, N3, 6-9, 11-12.)

In People -v- Holloway (1990) 50 Cal.3d. 1098 [disapproved on other grounds in People -v- Stanbury (1995) 9 Cal.4th 824, 830, fn. 1], the court explained, it could not "overlook the fact that 1 juror went through the entire guilt phase contaminated by knowledge of what had been judicially determined to be inadmissible and prejud-icial information. His silence exacerbated matters because it preve-nted the court and counsel from taking any action to remedy the sit-uation." (Id. at p. 1111.) The Court held that because it could not know,"and may not discover under Evidence Code section 1150" if the improper information had any influence on that juror, or what influe-nce he had on the other jurors, the presumption of prejudice had not been rebutted.(Id. at pp. 1111-1112.) Here, there were at least four jurors [Jurors Nos. 2, 5, 8, and 10] who cannot be said to have not been contaminated by knowledge of what had been judicially determi-ned to be inadmissible and prejudicial information. Notwithstanding, even if the jury did not actively discuss the information contained in the booking record, Juror No. 5's "white elephant" comment was close to an admission that it was an influential factor for her dur-ing the jury deliberations.

IV.

Petitioner Was Denied His Constitutional Rights to an Impartial Jury and to Due Process of Law When the Jury Received Prejudicial Information About Petitioner's Criminal History That Had Not Been Presented at Trial During Its Deliberations.

Background Facts.

On April 6, 2003, about a month before the murder, the police "had contact" with petitioner when he was driving his green Camry. He was arrested, booked, and charged with possession of a firearm. (3RT 1528-1530, Exh. No. 3.) The parties agreed that no evidence would be presented to the jury about the arrest or the charges. (3RT 1531.)

A couple of days after the murder, the police showed petitioner's booking photo from that arrest to Jesse Robles to confirm Jesse's identification of petitioner as the van driver. At trial, Jesse said he recognized petitioner when the police showed him a photo - Exhibit No. 3.[7] (2RT 945-946, 968.) Exhibit No. 3 is an 8 1/2 by 11 inches sheet of paper with petitioner's booking photo on the right side. The left side is text - police information about petitioner's arrest on April 6, 2003. It states that petitioner was charged with: (1) receiving known stolen property valued over $400; (2) two counts of carrying a loaded firearm; and (3) carrying a concealed weapon in a vehicle with a prior felony conviction.[8] The page was folded in half with the booking photo on the front and the arrest information on the back. (4AugRT 1.23.) Only the front, the booking photo, was admitted into evidence. (2RT 968, see 5RT 3902.) However, the jury received the entire folded page with the booking photo on the front and the arrest information on the back. (5RT 3902, 3AugRT H1.)

The jury's improper receipt of petitioner's arrest information

---

[7] A copy of Exhibit No. 3 is attached at the end of this petition for the court's convenience.

[8] Exh. No. 3 is as follows:

on the back. (4AUGRT L23.) Only the front, the booking photo, was admitted into evidence. (2RT 968, see 5RT 3902.) However, the jury received the entire folded page with the booking photo on the front and the arrest information on the back. (5RT 3902, 3AugRT H1.)

The jury's improper receipt of petitioner's arrest information was brought to the trial court's attention in the period following the jury verdict but prior to sentencing. The court received a letter from Juror No. 5 who wrote in part:

"There was one concern about the deliberation process that still resonates in my mind and I would like to know whether it was a normal procedure in order to put my conscious at rest - at ease, rather. During the hearing, a picture of petitioner (Mr. Coleman) was presented as evidence. Later when this picture was presented in the jury room it entailed information about the defendant detailing a prior arrest which occurred a month before the incident in question. I know for a fact that the details of this prior arrest influenced the jury's decision in determining the final verdict. Since Mr. Coleman's past was not brought up during the hearing, I have been wondering whether the information about his previous arrest should have been presented to the jury during the deliberation process. I have pondered this question for awhile and I would like to have an answer for my peace of mind." (3AugRT H4-5; 2CT 229.)

The jurors were asked to return to the courtroom. (Aug3RT K1.) The trial court held individual interviews with each juror over several days. (2CT 201-206.)

According to Juror No. 5, during the trial, the jury was only

Police Department
JOFAMA COLEMAN
Booking Num: 7648090
Charge(s): 496(A)/PC/F/REC KNWN STOLEN PROP $400+
           12031(A)(2)(D)/PC/F/C/LOADED
              F/ARM:PROHIB/ETC
           12031(A)(1)/PC/F/CARY LOAD F/ARM:PUB:S/CIR
           12025(A)(i)/PC/F/CCW IN VEH W/PR FEL CONV
Arrest Date:04-06-2003
Birth Date: 01-16-1983
Sex:        M
Race:       B
Height:     5'9"
Weight:     165

shown the front of Exhibit No.3 (petitioner's booking photo), but it was able to read the information on the back in the jury room. The page had been folded in half. (4AugRT L10.) She was one of the jurors who had read the backside with the charges. One of the jurors said, "Well, he was arrested for carrying a loaded weapon before." Someone else responded, "We are not suppose(d) to consider that." (4AugRT L12.) She believed that no one had disagreed with that comment. (4AugRT L.17.) After she heard that discussion, other jurors looked at the arrest infomation. (4AugRT L18.) And while there was, at most, a general discussion about the prior arrest, she stated, "[I]t's kind of like a white elephant in the room that you don't talk about." (4AugRT L12.) Juror No. 5 indicated she did not understand all the abbreviations relating to the charges, but inferred from the text that petitioner had been charged with having stolen property; having a loaded firearm that was probably prohibited; and carrying a loaded firearm. (4AugRT L16.)

Juror No. 10 read the back of Exhibit 3 and understood it was about another offense. She said the jury did not discuss it. (4Aug RT M6.)

Juror No. 7 did not look at the back of Exhibit 3 and did not remember any discussion about it. (4AugRT M11.)

Juror No. 2 remembered that somebody had noticed the arrest record among the "vast array" of exhibits and pointed it out saying, "Look at this." (4AugRT M18-19.) She was one of the jurors who had looked at it. (4AugRT M19-20.) She understood it to mean that petitioner had been arrested with a firearm. (4AugRT M14.) She remembered a discussion about "the tragedy of people getting in bad situations and neighborhoods and so on and so forth." (4AugRT M13.) She did not know when it was said, but "a couple times people said, ' Well, neither of these felons were choir boys, the victim nor the accused.' And, like I said earlier, there was this feeling that these young men - it was a tragedy that they get involved in these tagging teams and so on and so forth and that was just a very small item that was part of the whole thing that we had." (AugRT M17, emphasis added.) She explained that the jury did not pass the exhibits around in an organized rotation; the exhibits were gathered in

piles; the jurors individually decided what they wanted to look at.
(4AugRT M19.)

Juror No. 1 did not see the backside of the exhibit.(4AugRT
M23.)

Juror No. 4 saw the backside of Exhibit No. 3 and remembered
it was about a conviction or a previous incident that petitioner
may have been involved in. (4AugRT N3.) One juror had expressed sur-
prise that it had been admitted as evidence. (4AugRT N4.)

Juror No. 8 saw the backside of the exhibit and remembered it
was some kind of criminal record. (AugRT N6-7.) She did not recall
any discussion about it. (4AugRT N7.) Exhibit No.3 had given her
the impression that petitioner had a previous criminal record.(4Aug
RT N8-9.)

Juror No. 11 saw the backside of Exhibit No. 3 and was aware
that petitioner might have had a past criminal history. She said,"
[I]t did not really play much of a role. We were just using the
facts that were given to us during the trial."(4AugRT N11-12.) Some-
one had pointed the information out but the foreperson said they
should not be using that information, just the information that was
presented at trial. (4AugRT N12.)

However, Juror No. 9 (the jury foreperson (see 1CT 187)) did
not remember seeing the backside of Exhibit No. 3. (4AugRT O8.) He
did not remember any discussion about evidence that had not been
properly submitted to the jury and would have remembered if he had
been told about it. He would have said,"Let's talk about it." (4Aug
RT O9.) He did not recall any discussion about prior arrests or
police contacts involving possession of a gun. (4AugRT O10.)

Juror No. 3 did not come to the hearing and told the court
clerk on the phone, "I feel that the right decision was made and I
choose not to come." (4AugRT N13.)

Juror No. 6 [9]/could not remember Exhibit No. 3 very well. She
did not believe she saw the backside of the exhibit, nor could she

---

[9]/ The transcript identifies Juror No. 7762 as Juror No. 3 on pages
4AugRT O2 to O6. However, it appears that she was actually Juror
No. 6. (See 4AugRT P1 [Juror No. 7762].)

remember much about what had been discussed. (4AugRT 03, 5-6.)

However, on the day following her court appearance on this matter, she returned to court because she remembered seeing the booking photo. (4AugRT p2.) The photo she saw was possibly in black and white; the one she was shown the day before had been in color.(4Aug RT P2.)

Juror No. 12 did not remember seeing Exhibit No. 3. He remembered something about "this one thing that we cannot say allowed on the evidence room." (4AugRT P4.)

The defense moved for a new trial on the grounds of juror misconduct. (2CT 213, 216.) After considering the defense new trial motion, the opposition to the motion, and argument, the trial court ruled as follows:

> [T]he court finds no juror misconduct or indication of actual bias or prejudice due to the forwarding of that particular exhibit with criminal history in its unedited form. The court also finds that there was overwhelming evidence presented at trial to support the jurors' verdict and special finding. The motion for a new trial is denied.

(5RT 3908-3909.)

B. The Improper Exposure of the Jury to petitioner's Prior Criminal History and Arrest Was Error.

  i.    This issue is properly presented to this Court.

The error in this case has many facets--there was juror misconduct; prosecutorial misconduct; ineffective assistance of counsel; trial court error for failing to grant petitioner's new trial motion; and a violation of petitioner's constitutional rights to an impartial jury and to due process of law. As will be discussed, the main gist of the error is constitutional error. However, the various cpmponents contributing to the error will be discussed because they are crucial to understanding how the error occurred and the impact of the error on the jury.

  ii.   Evidence of a defendant's prior arrest and criminal history was inadmissible evidence because it was more prejudicial than probative.

It has long been held that evidence of an accused's prior arrests

34

is inadmissible.  (People -v- Hamblin (1885) 68 Cal. 101, 103 [a person is protected by the legal presumption of innocence]; People -v- Arlington (1899) 123 Cal.356, 357; People -v- Guiterrez (1957) 152 Cal.App.2d. 115, 120; People -v- Medina (1995) 11 Cal.4th 694, 769.) Evidence of mere arrests is inadmissible because it suggests "bad character." (People -v- Anderson (1978) 20 Cal.3d. 647, 650-651.) The record shows that the parties agreed that the prosecutor would not bring in evidence of petitioner's prior arrest. (3RT 1531.)

Furthermore, it is well recognized that evidence of prior cri-mes, parole status, or criminal propensity is prejudicial. (United States -v- Phillips (7th Cir. 1968) 40! F.2d. 301, 305 ["Evidence of a prior crime is always unduly prejudicial to a defendant"] see, People -v- Alcala (1984) 36 Cal.3d. 604, 630 ["The rule excluding evidence of criminal propensity is nearly three centuries old in the common law"], superseded by statute on other grounds as stated in People -v- Falsetta (1999) 21 Cal.4th 903, 911].) Evidence that petitioner has committed other crimes is prejudicial because it sug-gests to the jury that the defendant is a person of bad character and it further invites the jury to conclude that the defendant is guilty of the charged crimes because he committed other crimes. See Michelson -v- United States (1948) 335 U.S. 469, 475-476 [69 S.Ct. 213, 93 L.Ed. 168], fn. omitted [prior crimes evidence must be tre-ated with extreme care "not...because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so over persuade them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge"]; People -v- Thompson (1980) 27 Cal.3d. 303, 314 [admission of any evidence that involves crimes other than those for which a defendant is being tried has a "highly inflammatory and prejudicial effect"].)

The police report indicated that petitioner was charged with "CCW IN VEH W/PR FEL CONV". (Exh. No. 3.) In this age of text mess-aging and vehicle plates using abbreviations for common words, while the meaning of "CCW" [the acronym for "carrying concealed weapon"]

is not obvious, "IN VEH W/PR FEL CONV" can easily be understood to
mean "in a vehicle with a prior felony conviction." This charge app-
rised the jury that petitioner was a felon with a prior criminal
record. (Cf. People -v- Stinson (1963) 214 Cal.App.2d. 476, 480
[reference to defendant's parole status].) Significantly, the state-
ment, "Well, neither of these felons were choir boys, the victim
nor the accused" (M-17, emphasis added.), shows that Juror No.2
(who reported hearing that statement) and the person who made that
statement were influenced by the arrest information. There was no
other evidence presented at trial that petitioner was a felon.

iii.    The error properly falls under the category of jury miscon-
duct.

"In People -v- Danks (2004) 32 Cal.4th 269, the California
Supreme Court stated,

> "[A]juror's inadvertent receipt of information that [has]
> not been presented in court falls within the general category
> of 'juror misconduct.'[Citation.]'"Although inadvertent expo-
> sure to out-of-court information is not blameworthy conduct,
> as might be suggested by the term 'misconduct,' it neverthe-
> less gives rise to a presumption of prejudice, because it
> poses the risk that one or more jurors may be influenced by
> material that the defendant has had no opportunity to con-
> front, cross-examine, or rebut." [Citation.]

(People -v- Danks, supra, 32 Cal.4th at p. 307, quoting from People
-v- Nesler (1997) 16 Cal.4th 561, 579.)

Here, the issue concerns the jury's inadvertent exposure to
out-of-court information. Thus, it was proper for the defense to
raise the error as juror misconduct in his new trial motion. The
standard of review is de novo. (People -v- Nesler, supra, 16 Cal.
4th at p. 582, fn. 5 [when a criminal defendant appeals the denial
of his or her motion for a new trial on grounds of juror misconduct,
the appellate court must independently review, as a mixed question
of law and fact, the trial court's conclusion that no prejudice
arose from the misconduct].)

Additionally, as to the juror who knew the arrest information
was not supposed to be in evidence but did nothing more than mention

it to a couple other jurors. that was also juror misconduct. Analogous to this case, in People -v- Holloway (1990) 50 Cal.3d. 1098 [disapproved on other grounds in People -v- Stanbury (1995) 9 Cal. 4th 824, 830, fn. 1], one juror read a newspaper article on the second day of the trial and found out the defendant was on parole having served time for assault with a deadly weapon. (Id. at p. 1106.) He did not mention it during deliberations to any other juror, but after the jury had reached a verdict, he told another juror about it. That juror reported the matter to the court. (Ibid.) The trial court examined the jurors, the defense raised the issue of jury misconduct in a motion for a new trial, and the trial court denied the motion finding no misconduct and no prejudice. (Id. at pp.1107-1108.)

Our Supreme Court reversed the trial court's ruling. (People -v- Holloway, supra, 50 Cal.3d at p. 1108.) While the Court agreed that 11 jurors in that case had not been contaminated, it could not "overlook the fact that 1 juror went through the entire guilt phase contaminated by knowledge of what had been judicially determined to be inadmissible and prejudicial information. His silence exacerbated matters because it prevented the court and counsel from taking any action to remedy the situation."(Id. at p. 1111.) The Court held that because it could not know."and may not discover under Evidence Code section 1150" if the improper information had any influence on the juror, or what influence he had on the other jurors, the presumption of prejudice had not been rebutted. (Id. at pp. 1111-1112.)

Conversely, In re Carpenter (1995) 9 Cal.4th 634, the Court found that a juror who had learned during trial that the defendant had been convicted and sentenced to death in a related case and told nonjurors about it did not commit prejudicial misconduct.There, as in Holloway, the juror did not inform the trial court about what she had learned. (Id. at p. 656.) The Carpenter court, however, found no substantial likelihood that juror was biased reasoning that: the juror's failure to report her knowledge was only "passive" misconduct; telling nonjurors did not itself prejudice the defendant;

the juror did not suggest to nonjurors she would consider this information in reaching her verdict; and there was no evidence the juror told any fellow jurors what she had learned. (Id. at pp. 656-657.) It also concluded that when she did not reveal her knowledge to other jurors, her silence tended to show she intended the forbidden information to not influence the verdict. (Id. at p. 657.) The court found that nothing about the juror's conduct indicated that she had failed to base her verdict on anything other than the evidence presented at trial. (Id. at p. 656.)

As Justice Mosk's dissent in Carpenter explains, the majority's decision was wrongly decided. (In re Carpenter, supra, 9 Cal.4th at pp. 673-687.) Notwithstanding, one significant fact makes this case distinguishable from Carpenter. Here, one juror appears to have known that the arrest report should not have been given to the jury. ————10/ Had the matter been raised corrective steps would have been taken. (See People -v- Holloway, supra, 50 Cal.3d. at pp. 1111-1112 [conviction reversed for jury misconduct because misconduct was not discovered until after the verdict; the court had no opportunity to take corrective steps to cure it through admonition or by other prophylactic measures].) Inaction in this case had the opposite effect of the juror's silence in Carpenter because it tends to show the juror knowledgly allowed the erroneously received information to influence the verdict, particularly when he was privy to the other juror's reaction to it.  The juror's misconduct in this case is more like the juror misconduct in Holloway than Carpenter.

Accordingly, under both Danks and Holloway, this issue is properly raised as jury misconduct.

   iv.   The error also properly falls under the category
         of prosecutorial misconduct.

The prosecutor also committed misconduct for placing before the jury inadmissible evidence that infected "the trial with such unfairness as to make the conviction a denial of due process."

        "The applicable federal and state standards regarding prosecutorial misconduct are well established.
        "A prosecutor's...intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such

unfairness as to make the conviction a denial of due
process.'"' [Citations]. Conduct by a prosecutor
that does not render a criminal trial fundamentally
unfair is prosecutorial misconduct under state law
only if it involves--the use of deceptive or repreh-
ensible methods to attempt to persuade either the
court or the jury. [Citation.]

"It is, of course, misconduct for a prosecutor
to 'intentionally elicit inadmissible testimony.'[]
[Citation.]) Such misconduct is exacerbated if the
prosecutor continues to attempt to elicit such evid-
ence after defense counsel has objected. [Citation.]

(People -v- Smithey (1999) 20 Cal.4th 936, 959-960; see also People

-v- Morales (2001) 25 Cal.4th 34, 44.) "The relevant question is

whether the prosecutors' comments 'so infected the trial with unfai-

rness as to make the resulting conviction a denial of due process.

(Darden -v- Wainwright (1986) 477 U.S 168, 181 [106 S.Ct. 2464, 91

L.Ed.2d. 144]; U.S. Const. 14th Amend.)

It is not necessary for the prosecutor to act in bad faith.

Even unintentional acts may constitute misconduct. (People -v- Hill

(1998) 17 Cal.4th 800, 822-823.) The focus of inquiry is on the pot-

ential injury to the defendant, not the motive of the prosecution.

(People -v- Sanders (1995) 11 Cal.4th 475, 526.)

The record shows the prosecutor's improper placement of the

arrest information before the jury was not an isolated act. During

the prosecutor's examination of Deputy Steven Marella, the prosecu-

tor asked him if, on April 5, 2003, when he had contact with petiti-

oner, he had petitioner take a booking photograph? Marella answered

"ye." The prosecutor followed that with several questions using the

word "booked" or "booking" seven times. (3RT 1529-1530.) A reasona-

ble juror would have inferred from the "booking" references that

petitioner had been arrested at that time. (See 3RT 1531.)

Out of the presence of the jury, defense counsel pointed out

that the prosecutor had agreed to not mention that petitioner had

been arrested as a result of the "police contact" on April 5. The

officer was simply going to testify about petitioner's distinctive

eyebrow piercing; the prosecutor was supposed to "sanitize" her que-

stions. The prosecutor apologized saying, "It was my screw up." (3RT 1531-1532.) Defense counsel did not request a cautionary inst- ruction because he did not want to draw any more attention to the fact of petitioner's arrest. (3RT 1531-1532.) Notably, the prosecu- tor was willing to stipulate that the booking photo was related to petitioner's arrest on this case. Defense counsel pointed out that would not make sense because the officer testified he booked petit- ioner on April 5 and the murder took place a month later. (3RT 1532.)

Subsequently, the prosecutor placed the police information about petitioner's April 6, 2003 arrest among the exhibits that were given to the jury. This second act of misconduct - sending back the unsanitized arrest/booking report--accomplished the very danger defense counsel had sought to avoid during Deputy Marella's testimony.

Furthermore, in opposition to petitioner's new trial motion, the prosecutor exploited the erroneously admitted evidence relating to Deputy Marella's testimony by arguing that because the jury had already been told that petitioner had been booked, any prejud- icial effect of the arrest information was "lessened." (See 2CT 256, 261; see People -v- Wagner (1975) 13 Cal.3d. 612, 620-621 [prosecutor's misconduct in implicating defendant in prior crimi- nal acts].)

Trial counsel did not specifically object on the ground of prosecutorial misconduct to any of these instances of misconduct. Notwithstanding, he pointed out the nature of the first error bec- ause he wanted to make sure it did not happen again. When the se- cond error occurred, he had no opportunity to object because he did not know that Exhibit No. 3 had not been redacted. Therefore, no objection could be made under these circumstances. (See People

9/ The transcript identifies Juror No. 7762 as Juror No. 3 on pages 4AugRT O2 to O6. However, it appears that she was actually Juror No. 6. (See 4AugRT P1 [Juror No. 7762].)

10/ Of the eleven jurors who appeared, no one admitted he or she was the juror who knew that the jury was not supposed to consider the arrest information. By the process of elimination,Juror No. 3, who told the court clerk, "I feel that the right decision was made and I choose not to come" (4AugRT N13), was most likely that juror.

Hill, supra, 17 Cal.4th at pp. 820-821.) Moreover, by raising the matter in his new trial motion, defense counsel gave the court ample opportunity to address the error. (See People -v- Bonin (1988) 46 Cal.3d. 659, 689, overruled on other grounds in People -v- Hill, supra, 17 Cal.4th at p. 823, fn. 1.)

During the juror hearings, the prosecutor stated, "[I]n a perfect world I would not have sent that exhibit back because normally I wouldn't have wanted to send that exhibit back." (4AugRT L22.) But she claimed that the defense had waived the issue for failing to object and argued that it was proper for the jury to consider the evidence of petitioner's prior arrest because of the defense failure to object. (4AugRT L22, 25.) Defense counsel argued that he and the prosecutor had discused the exhibit and that it was supposed to be cut or blacked out. (4AugRT L23.)

Common sense dictates it was the prosecutor's responsibility to redact the inadmissible information about petitioner's prior arrest because she   offered that exhibit. The prosecutor had ample notice that when an exhibit combines admissible and inadmissible evidence, the inadmissible part should be removed. Earlier in the trial, the defense objected to the prosecutor's exhibit that combined a receipt from Blockbuster with a receipt from Jack in the Box into a single exhibit- both were copied onto the same sheet of paper. Because no evidence had been presented relating to the Jack in the Box receipt the trial court sustained the defense objection to it. When the prosecutor explained it was on the same page as the Blockbuster receipt, the trial court told her, "Cut it off." (5RT 2446-2447.) It would have been a simple matter to use the same pair of scissors to cut off the inadmissible booking information.

Here, all three instances of prosecutorial misconduct must be considered together: Marella's testimony set the stage for the arrest report that was received by the jury, which in turn was used by the prosecutor to persuade the trial court that the arrest report was harmless error. In combination they "infected the trial with such unfairness as to make the conviction denial of due process." (Darden -v- Wainwright, supra, 477 U.S. at p. 181; U.S. Const., 5th

& 14th Amends.) Furthermore, as will be discussed further below, and the prosecutor refrained from the misconduct, "it is reasonably probable that a result more favorable to the defendant would have occurred." (People -v- Sassounian (1986) 182 Cal.App.3d. 361, 391.)

     V.  The prosecutor claimed there was no error or prejudice if defense counsel was ineffective for failing to object.

The prosecutor pointed to defense counsel's failure to object to the exhibit to argue the error was waived. (4AugRT L22; 2CT 260-261.) The record shows that after the prosecution rested, the prosecutor moved for the admission of all the exhibits she identified during trial. Trial counsel did not object to Exhibits Nos. 1,2,4, 5, or 7. He eventualy had an objection to Exhibit No. 3. The trial court then held an off-the-record discussion. After the discussion, trial counsel stated that he had no objections. (4RT 2173.)

During the hearing on the new trial motion, trial counsel stated that he and the prosecutor had specifically agreed the arrest information was not going to be presented to the jury. (5RT 3902.) He did not object to the inadmissible part of Exhibit No. 3 because it was not supposed to go to the jury. (Ibid.)[11/] If this court deems the above-mentioned issue waived because trial counsel somehow failed to object, failed to check the exhibit before it was given to the jury, or failed to properly raise and preserve the issue below, trial counsel was ineffective. (E.g., In re Jones (1996) 13 Cal.4th 552, 571-573 [ineffective assistance for failure to present strongest ground for exclusion of evidence and for eliciting highly damaging evidence]; People -v- Stratton (1988) 205 Cal. App.3d. 88, 94 [failing to object to inadmissible evidence]; Graveley -v- Mills (6th Cir. 1996) 87 F.3d. 779, 785-786 [ineffective

---

11/ Trial counsel stated,"It's just my recollection that I did comment on that, that we made an attempt to make sure that it wasn't going to go back. We even folded it to have the appropriate information. It's my understanding that that was supposed to be either cut or blacked out and it was either, through some inadvertence or something on somebody's part - and I'm not going to say who because I don't recall who was suppose[d] to do it." (4AugRT L22-23.)

assistance of counsel for failure to object to prosecutorial misconduct].)

A criminal defendant has a federal and state constitutional right to the effective assistance of counsel. To establish a claim of incompetence of counsel, a defendant must establish both that counsel's representation fell below an objective standard of reasonableness and that it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different. (Strickland -v- Washington (1984) 466 U.S. 668, 687 [104 S.Ct. 2052; 80 L.Ed.2d. 674]; People -v- Ledesma (1987) 43 Cal.3d. 171, 215-218.) To prevail, a defendant must establish incompetence of counsel by a preponderance of evidence. (People -v- Ledesma, supra, at p. 218.)

In order to raise ineffective assistance of counsel on appeal, petitioner must show counsel's actions were not reasonable tactical decisions. (People -v- Weaver (2001) 26 Cal.4th 876, 925-926.) The partied had agreed to exclude evidence of petitioner's prior arrest. (3RT 1531, 5RT 3902.) The prosecutor breached the agreement twice. The only "tactical" reason counsel may have had for not objecting on the grounds of prosecutorial misconduct was his civility; he acknowledged that the prosecutor's errors might have been inadvertent. (3RT 1531, 4AugRT L23.) However, if this Court deems the error waived, counsel's "tactical" reason was not reasonable. (People -v- Ray (1996) 13 Cal.4th 313, 349 ["In order to prevail...the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission."]; Strickland -v- Washington, supra, 466 U.S. at p. 690 [counsel's decision making must be evaluated in the context of available facts and viewed at the time of counsel's conduct].)

Although appellate courts should avoid second-guessing counsel's informed choice among tactical alternatives, a defense attorney's freedom to make those decisions is not without limits. (People -v- Pope (1979) 23 Cal.3d. 412, 424, overruled on other grounds in People -v- Berryman (1993) 6 Cal.4th 1048, 1081, fn. 10, overruled on other grounds in People -v- Hill, supra, 17 Cal.4th at p. 823, fn. 1.) If counsel was ineffective, it appears on the face of the record and relief may be granted in this petition. (See People -v- Nation

(1980) 26 Cal.3d. 169, 179.)

VI.   The gist of the error is a denial of petitioner's constitutional right to an impartial jury and due process of law.

As discussed, the jury, the prosecutor, trial counsel, and/or the trial court can all be said to have erred. The main gist of the error, however, is not who did it, but whether any member of the jury was improperly influenced by evidence of petitioner's prior arrest and criminal history.

"Due process [as well as the Sixth Amendment] means a jury capable and willing to decide the case solely on the evidence before it..."(People -v- Nesler, supra, 16 Cal.4th at p. 578, quoting Smith -v- Phillips (1982) 455 U.S. 209, 21 [102 S.Ct. 940, 946, 71 L.Ed.2d. 78]; Hughes -v- Borg (9th Cir. 1990) 898 F.2d. 695, 700; U.S. Const. 5th and 14th Amends.: Fields -v- Brown (9th Cir. 2005) 431 F.3d. 1186, 1192 [Sixth Amendment].) A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16: Irvin -v- Dowd (1961) 366 U.S. 717, 722 [81 S.Ct. 1639, 6 L. Ed.2d. 751]; In re Hitchings (1993) 6 Cal.4th 97, 110.) A defendant is "entitled to be tried by 12, not 11, impartial and unprejudiced jurors. 'Because a defendant charged with crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced."(Citations.]"(People -v- Holloway, supra, 50 Cal.3d. at p. 1112; Dyer -v- Calderon (9th Cir. 1998) 151 F.3d. 970, 973.)

Here, there was a substantial likelihood that several of the jurors were influenced and prejudiced by their exposure to petitioner's arrest report.

C.   Prejudice Analysis.

   i.   Under People -v- Nesler, supra, reversal per se is required.

This court must start with a presumption of prejudice. Juror misconduct, such as the receipt of information about a party or the

case that was not part of the evidence received at trial, leads to a presumption that petitioner was prejudiced and may establish juror bias. (People -v- Marshall (1990) 50 Cal.3d. 907, 949-951; In re Carpenter (1995) 9 Cal.4th 634, 650-655.) "The presumption of prejudice 'may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine there is a reasonable probability of actual harm to the complaining party....'[Citation.] Whether a defendant has been prejudiced...depends upon 'whether the jury's impartiality has been adversely affected, whether the prosecution's burden of proof has been lightened and whether any asserted defense has been contradicted.'''(People -v- Miranda (1987) 44 Cal.3d. 57, 117, abrogated on other grounds in People -v- Marshall (1990) 50 Cal.3d. 907, 933, fn. 4.)

In People -v- Nesler, supra, our Supreme Court explained:

We assess the effect of out-of-court information upon the jury in the following manner. When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. [Citation.] Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant. If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard. [Citation.]

(Id. at pp. 578-579.)

As to Nesler factor (1), here, the extraneous material was so inherently prejudicial that it was substantially likely to have influenced a juror. (People -v- Nesler, supra, 16 Cal.4th at pp. 578-579.) As discussed above, evidence of a defendant's prior arrests and prior criminal history is inadmissible because it is so

inherently prejudicial. (See ante pp. 16-17.) Moreover, the arrest
evidence in this case was particularly prejudicial because it was
the only evidence that associated petitioner and his activities
with a gun - it put a loaded gun in petitioner's hand just a month
before the murder and also revealed that he was a convicted crimi-
nal. As Juror No. 5 so aptly stated, it was a "white elephant in
the room" (4AugRT L12)--i.e., could not be ignored or forgotten.

As to Nesler factor (2), "from the nature of the misconduct
and surrounding circumstances...it [was] substantially likely a
juror was 'actually biased' against the defendant." (People -v-
Nesler, supra, 16 Cal.4th at p. 579.) Here, one juror knew the jury
was not supposed to consider the information about petitioner's
arrest. (See ante, pp. 18-21.) That juror's failure to report the
matter made certain that the arrest information would not be remo-
ved from the jury's purview and permitted other jurors to see the
evidence and understand it to be exactly what it was - evidence of
petitioner's prior arrest and criminal history. Consequently, the
"white elephant" was free to roam around the room.

It is evident that the juror who pointed the arrest informat-
ion out and said, "Look at this" (4AugRT M18-19) and the juror
who said outloud, "Well, he was arrested for carrying a loaded wea-
pon before" (4AugRT L-12), thought the arrest information was signi-
ficant. The comment, "Wee, neither of these felons were choir boys,"
shows the juror who said that had incorporated the information about
petitioner's prior criminal history into her deliberations. Two
other jurors remembered they had looked at something relating to
petitioner's criminal record. (4AugRT N3, 6-7.) The totality of the
circumstances shows it was substantially likely that petitioner's
prior criminal history influenced some of these jurors in determin-
ing petitioner's guilt.

Notably, the jury was not instructed with CALJIC No. 2.50,
which would have told it, "[O]ther crimes" evidence "if believed,
may not be considered by you to prove that defendant is a person of
bad character or that he has a disposition to commit crimes." (CAL-
JIC No. 2.50; see e.g., People -v- Price (1991) 1 Cal.4th 324, 431.
And as the prosecutor acknowledged, the jury would have been justi-

fied in believing it could consider that evidence because it was given to them. (2CT 251.) The prosecution did not rebut the presumption of prejudice.

The juror's comments show there was a substantial likelihood that some jurors were improperly influenced by information about petitioner's criminal history. Petitioner's judgment of conviction must be reversed. (People -v- Nesler, supra, 16 Cal.4th at p. 590; People -v- Holloway, supra, 50 Cal.3d. at p. 1110.)

ii.   Under Chapman and Watson, reversal is required.

Additionally, even under the Chapman,[13]/ Watson,[14]/ or Strickland[15]/ standard of prejudice, the error was not harmless. Petitioner was prejudiced because he did not testify and if not for the prosecutor's erroneous acts of placing the evidence of petitioner's arrest before the jury, the jury would not have learned of petitioner's criminal record. (See, e.g., People -v- Allen (1978) 77 Cal. App.3d. 924, 934; People -v- Ozuna (1963) 213 Cal.App.2d. 338, 342; People -v- Figuieredo (1955) 130 Cal.App.2d. 498, 502, 505; People -v- Cabrellis (1967) 251 Cal.App.2d. 681, 685-688.)

---

[12]/  Trial counsel did not want the jury to be instructed with CALJIC No. 2.50. (5RT 2475.) However, his objection to the instruction should not be held against petitioner. At the time, he believed that the arrest information had been or would be redacted from the exhibit. (4AugRT L22-23.)

---

[13]/  The federal constitutional error standard of prejudice in Chapman -v- California (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed. 2d. 705], is "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (Id. at p. 828.)

---

[14]/  The state error standard of prejudice in People -v- Watson (1956) 46 Cal.2d. 818, is whether it is reasonably probable that a result more favorable the the appealing party would have been reached in the absence of the error. (Id. at p. 836.) The California Supreme Court has "made clear that a 'probability' in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (College Hospital Inc. -v- Superior Court (1994) 8 Cal.4th 704, 715, emphasis in original.)

In People -v- Holloway, supra, our high court reversed the defendant's conviction because it found the juror's exposure to the defendant's parole status and prior criminal history "extremely prejudicial; it revealed information about defendant's prior criminal conduct...counsel had gone to great lengths to avoid having the jury learn of defendant's prior conviction...." (People -v- Holloway, supra, 50 Cal.3d. at p. 1110.) Here, too, defense counsel tried to make sure the jury would not learn about petitioner's arrest. After the prosecutor's "screw up" during Deputy Marella's testimony, he stated, "I'm bringing it up now because I want to make sure that we proceed cautiously every step of the way so that such an error dosen't occur again." (3RT 1532.)

Although the procedureal facts of People -v- Dacy (1970) 5 Cal. App.3d. 216, are facially similar, the differences between Dacy and this case and are instructive. In Dacy, the defendant moved for a mistrial based on juror misconduct. After the jury had returned its verdicts but before the penalty stage of the trial, one of the jurors wrote a note informing the court that during a break in the jury's deliberations, one juror had remarked that the defendant had an arrest record. Several other jurors overheard the remark. The court conducted an inquiry. Two jurors admitted that they had heard the defendant had a prior arrest record and had commented on it in a "passing way" during a coffee break. However, the were not sure if that happened before the verdicts were agreed on or afterwards. Other jurors overheard them and told them not to discuss the matter.

After an examination of the jurors, because the two jurors who had discussed the arrest both told the court they did not take into account the defendant's arrest record in reaching their verdicts and

---

15/  The Strickland -v- Washington (1984) 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d. 674] standard of prejudice is the standard for effective assistance of counsel. To prove prejudice,"[D]efendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Id. at p. 694.) The existence of prejudice is to be decided on the basis of the totality of the evidence before the judge or jury. (Id. at p. 695.) This standard is the same as the Watson standard.

would not do so on the penalty verdict, the trial court denied the
defense mistrial motion. (Id. at pp. 221-222.)

Distinguishable from this case, in Dacy, jurors who overheard
the prohibited remarks told the jurors who made them not to discuss
the matter. Furthermore, the jurors who made them told the trial
court they did not consider the defendant's prior arrest record in
reaching their verdicts. (People -v- Dacy, supra, 5 Cal.App.3d. at
p. 222.) Additionally, all the jurors had been admonished that it
was not to consider anything outside the evidence and there was a
presumption the jury heeded the admonition. The jurors also "stated
that they had heeded the admonition and they would continue to do
so." (Ibid.)

In contrast, here, any presumption that the jury heeded the
admonition to only consider the evidence presented at trial was reb-
utted by the very fact of Juor No. 5's letter indicating she did
not know if the jury should have considered the arrest evidence -
which implies that she did. (2CT 229 ["Since Mr. Coleman's past was
not brought up during the hearing, I have been wondering whether
the information about his previous arrest should have been presen-
ted to the jury during the deliberation process."].) Additionally,
of the 11 jurors, only Jurors No. 5 and 11 reported that they heard
someone say they were not supposed to consider that evidence. (4
AugRT L12, N12.) While Juror No. 11 stated that the arrest informa-
tion "did not really play much of a role"(4AugRT N11), and Juror
No. 2 said, it "was just a very small item that was part of the
whole thing that we had" (4AugRT 17), their statements imply that,
as to those two jurors, it was a factor, albeit a minor one, in det-
ermining petitioner's guilt. And as to the Juror Nos. 4,5,8 and 10,
there is a presumption of prejudice because they saw it and knew
what it was. (See 4AugRT L12,M6,N3, 6-9.) Moreover, the juror who
said to the others, "Look at this" (4AugRT M18-19) had to have found
the evidence significant enough to point it out to the others, as
did the juror who said, "Well, he was arrested for carrying a loaded
weapon before." (AugRT L12.)

Furthermore, in Dacy, the Dacy court found that if the jurors

had committed misconduct, it was not prejudicial because evidence of the defendant's guilt was overwhelming. (People -v- Dacy, supra, 5 Cal.App.3d. at p. 222.) Not only was Dacy identified by the two victims and numerous other witnesses, he fully confessed to the kidnapping with which he was charged and conceded on appeal that the evidence of kidnapping was overwhelming. (Id. at pp. 219-220.)

In contrast, the evidence in this case was weak. Although the prosecutor argued the evidence was overwhelming because four witnesses identified petitioner as the driver (2CT 252), the record shows numerous inconsistencies in those witnesses' testimonies.

Three of the four, Jesse Robles, Alberto Segundo,and Lopez were impeached as liars. Jesse admitted he lied when he testified at the preliminary hearing that he had identified petitioner as the driver to the police on the night of the murder (2RT 983); Segundo admitted he lied to the police when he identified two other men as the shooter and the van driver. (3RT 1547.) Both of their lies directly related to their identification of petitioner as the driver. And, according to Sergeant Katz, Lopez testified that he never saw the white van before but had previously told the police that he had almost been run over by petitioner in a similar white van. (5RT 2438.) The jury could have reasonably believed that these three witnesses, all members of the NC tagging crew, collaborated with each other to name petitioner as the driver. Notably, none of these three witnesses identified petitioner to the police on the night of the murder or the following day. (See 2RT 982-983, 3RT 1319-1320,1509-1510, 1547, 1625.)

The fourth eyewitness, Maria Renteria, lived in the same house as the victim and his family. (3RT 1231-1232.) Shortly after the murder, she could not identify the van's driver from the photo lineup. (3RT 1502-1503.) However, the trial (three years later), she looked at petitioner and said, "It looks like him." (3RT 1227, 1321.) However, when asked for details she said, "I didn't really see. I was--I seen him, but I - like I was in shock when I heard the gun shots." (3RT 1228, 1240.) [16/] Her belated identification of petitioner as the driver was not strong evidence under these circumstances. [17/]

Segundo's identification appeared the strongest because he said

he saw half of petitioner's face "real clearly" (3RT 1572) and des-
cribed petitioner's pierced eyebrow (3RT 1546) - an unusual identi-
fing feature of petitioner's face.[18]/ However, Segundo knew about
petitioner's pierced eyebrow from his prior encounters with petiti-
oner. (3RT 1550, 1577-1578.) He also made a mistake when he told the
police the piercing was in petitioner's right eyebrow. (3RT 1576.)
[19]/ Segundo testified that he saw half of petitioner's face "real
clearly" in the light of the interior van light when Soto opened the
door and petitioner turned towards Soto. (3RT 1571-1572.) That would
necessarily have been the right side of petitioner's face because
Segundo was behind the van, five to six car lengths away. (3RT 1859.)
While it is hard to believe that Segundo had a chance to get a clear
view of the driver from that distance when there were possibly two
people in the back seat of the car (3RT 1256), and when his focus
would normally be on the person getting out of the van with a gun,

---

16/ The eyewitnesses' descriptions of the shooter's clothing varied
so much they could have been describing three different people.
Renteria said the shooter had a knit hat on his head with a Jheri
curl hairstyle and wore a Pendleton shirt. (2RT 942, 3RT 1512-1513.)
Segundo said the shooter wore light blue shorts, a beanie, and an
Ecko white sweater with the hoodie pulled up on top of his head.
(3RT 1561.) Jesse told the police the shooter wore a black hooded
sweat shirt with the hood up. But at trial he said he never saw the
shooter/passenger. (2RT 984.) Sandoval said the shooter was wearing
all black. (4RT 1859.)

17/ When the court orally instructed the jury with CALJIC No. 2.92
on factors to considere in proving identify by eyewitness testimony,
it omitted reading one factor that was particularly relevant to
Renteria's testimony - "Whether the witness was able to identify the
alleged perpetrator in a photographic or physical lineup." (5RT
2496, compare with 2CT 158.)

18/ Deputy Marella testified that a month before the shooting, he
saw petitioner's pierced left eyebrow. It was a "good sized pierc-
ing" and petitioner was wearing a straight metal bar through it.
(3RT 1529.)

19/ At trial, Segundo changed his testimony and said petitioner's
left eyebrow was pierced. (3RT 1546.)

it is harder to believe that he could see petitioner's left eyebrow piecing when he was looking at the right side of petitioner's face.

Of the three other witnesses - Renteria, who claimed to have had a good look at the driver in the headlights of her car (3RT 1231), Jesse, and Lopez - none of these witnesses mentioned seeing anything unusual near the driver's left eye. Jesse and Lopez would have seen the left side of petitioner's face as the van passed. However, even though they claimed to have seen his clothing (2RT 942 [Jesse - white t-shirt, beanie on his head]; 3RT 1617, 1621 [Lopez - black t-shirt, no beanie/bald head]), they did not mention the eyebrow piercing.

It was undisputed that petitioner was a tagger. As Deputy Valento explained, a tagger's mission is to tag, not to commit acts of violence. (See 4RT 2138.) When Jesse and his friend instigated a prior confrontation with petitioner by crossing out petitioner's tags, petitioner did not attack Jesse, he simply threw Jesse's bicycle over a gate. (2RT 947-950.) Petitioner's other confrontations with the NC involved NC members "jumping" him and attacking his younger brother with a bat. (3RT 1588, 1637, 1643.) On the night of the murder, Chino was going into known enemy territory armed with a knife. (3RT 1539.) Thus, the totality of the evidence tended to show it was the NC crew who were violent and the aggressors of the attacks, not petitioner.

While the prior attacks on petitioner and his brother provided the prosecutor with a retaliation motive, at the same time it provided the NC a motive to target petitioner for a murder he was not involved in to get rid of him. According to Segundo, petitioner was the NGA's leader. (4RT 1557.) By pinning the murder on petitioner, the NC was able to wield a mortal blow to their rivals by removing their leader. And as to the real culprits, the gang could deal with them with street justice. Notably, there was no physical evidence that connected petitioner to the murder[20/] and petitioner had alibi witnesses who testified he was with them at the time of the shooting. The evidence against petitioner was close, not overwhelming.

This was a close because the outcome of this case was tightly balanced on the jury's evaluation of the credibility of the prosecu-

tion and defense witnesses. Similar to this case, in People -v- Anderson(1978) 20 Cal,3d. 647, the trial court granted the prosecutor permission to elicit information from the defendant that, on two prior occasions, the defendant had been arrested with codefendant on other unspecified charges. (Id. at p. 650.) The Court held the admission of that evidence was prejudicial error, since the record revealed a close credibility determination concerning evidence describing a fight and, but for admission of the prior arrest evidence, it was reasonably probable that jury would have rendered a more favorable verdict, and prejudicial error would not have been rendered harmless had defendants agreed to an admonition to consider prior arrest evidence only for purpose of determining defendants' credibility. (Id. at p. 651.)

Here, as in Anderson, there was a close credibility determination between the prosecution eyewitnesses and the defense alibi witnesses. The most obvious indication of a close case is lengthy jury deliberations. (E.g., In re Martin (1987) 44 Cal.3d. 1, 51; People -v- Cardenas (1982) 31 Cal.3d. 897, 907 [12 hours of deliberations is evidence of a close case]; Lawson -v- Borg (9th Cir.1995) 60 F.3d. 608, 612 [nine hours of deliberations "deemed protracted"].) Here, the jury deliberated for over two full days to reach its verdicts. (5RT 2768, 3301-3302, 3601, 1CT 128, 131-132, 187.) While the Supreme Court has indicated that lengthy deliberations are not significant in a complex case (People -v- Cooper (1991) 53 Cal.3d. 771, 837), this case was not complex; it involved one count of aiding and abetting a murder and the jury basically had to determine just one main fact – whether petitioner was the person who drove the van.

The jury's request for readback of thestmony also establishes that this was a close case. (See People -v- Pearch (1991) 229 Cal.

---

20/ At trial, the witnesses who previously told the police they saw petitioner in a white van before the murder denied they had ever seen him in a white van. (2RT 946; 3RT 1525, 5RT 2437-2438.)

App.3d. 1282, 1295 ["[j]uror questions and requests to have testi-
mony reread are indications the deliberations were close"]; People
-v- Williams (1971) 22 Cal.App.3d. 34, 38-40 [request for readback
of critical testimony].) Here, the jury requested "total readback
of prosecution witnesses; Jesse Robles, Maria Renteria, Maria Perez,
Albert Segundo, Andres Sandoval, Adrian Robles, and Carlos Lopez.
(1CT 130.) Despite the court's comment that it would take a substan-
tial amount of time to prepare and readback all of those testimonies,
the jury had all the requested testimony readback to it. (See, 1CT
131-132.)

In this case, there was a presumption of prejudice that was not
rebutted by an affirmative evidentiary showing that prejudice did not
exist. Additionally, evidence of petitioner's guilt was not overwhe-
lming - it was very close. Where, as here, in a case entirely based
on witness credibility, evidence about petitioner's prior criminal
history and arrest was prejudicial and requires reversal under any
standard. (See, Chapman -v- California, supra, 384 U.S. at p. 24;
Strickland -v- Washington, supra, 466 U.S. at pp. 693-694; People
-v- Watson, supra, 46 Cal.2d. at p. 836.)

Had Renteria's identification of petitioner been discredited as
her identification of the shooter was discredited at Soto's trial,
there is a reasonable probability that the jury would have reached
a more favorable result. (People -v- Watson, supra, 46 Cal.2d. at p.
836; Strickland -v- Washington, supra, 466 U.S. at pp. 688, 690-692;
U.S. Const., 5th, 6th and 14th Amends.)

## CONCLUSION

For the Forgoing reasons, petitioner urges this court to issue
an order to show cause and/or reverse the judgment of conviction be-
cause of (1) False Evidence Was Introduced During petitioner's trial;
(2) petitioner's Constitutional Rights to Due Process of Law and a
Fair Trial Were Violated By the Introduction of False Evidence; (3)
Trial Counsel Provided Ineffective Assistance of Counsel by Failing
to Adequately Question Renteria About Her Ability to See the driver
of the van and Failing to Investigate and Produce Evidence That it

54

Would Have Been Physically Impossible for Renteria to see the Driver Under The Circumstances She Described; (4) Trial Counsel's Failure to Adequately Question Renteria and to investigate and Introduce Impeachment Evidence Was Not Reasonably Tactical; (5) Evidence of Petitioner's Prior Arrest and Criminal History Was Inadmissible Evidence because it was More Prejudicial Than Probative; (6) Petitioner Was Denied His Constitutional Rights to an Impartial Jury and To Due Process of Law When the Jury Received Prejudicial Information About Petitioner's Criminal History That Had Not Been Presented at Trial Durin Its Deliberations; (7) The Error Also Properly Falls Under the category of Prosecutorial Misconduct; (8) The Prosecutor Claimed There Was no Error or Prejudice if Defense Counsel Was ineffective for Failing to Object; and (9) Under Chapman and Watson, reversal is required. Lawson -v- Borg, evidertiary hearing is required, 60 F.3d. 608.)

THEREFORE, Petitioner respectfully request this Court reverse his conviction.

DATED: _March, 25.___ (~~2009~~) 2010

Respectfully Submitted,

/s/ _Jofama Coleman_
Jofama Coleman,

Petitioner.

## INDEX of EXHIBITS

Exhibit A – Photographic Exhibits from Abel Soto's trial

Exhibit B – Declaration of Jofama Coleman

Exhibit C – Declaration of Ronald White, Esq.

Exhibit D – Declaration of Patricia Ihara

Exhibit E – Excerpts from the Reporter's Transcript of Abel Soto's trial

Exhibit F – Assessor's Plot Map

Exhibit G – 100 Feet Photograph

Exhibit H – Letter From Juror #5 to Court

Exhibit I – Contents of Information Discovered by Jurors during Deliberation From Peoples Exhibit #3 as Read in Court by Juror #5.



**EXHIBIT A**

1













DECLARATION OF JOFAMA COLEMAN

I Jofama Coleman declare the following:

I am the defendant currently housed at CSATF/STATE PRISON, P.O. BOX 7100. CORCORAN, CA. 93212. Patricia Ihara, P.M.B # 139 is counsel for appellant.

The statement below is true and correct to the best of my knowledge.

I descovered through Abel Soto that in his second trial the prosecutor introduced evidence that contained impeachment value in regards to the testimony and identification of Ms. Renteria. The material was that of a large truck blocking her view. I had a verbal conversation with trial attorney Ronald White in regards to this issue. His response was to the following affect. "I did not follow Abel's case, If theres an issue with the D.A not handing over evidence then thats something for your appeal".

I declare under penalty of perjury that the foregoing is ~~TRUE~~ true and correct.

Executed on this day 7.29.2008

*Jofama Coleman*

at CSATF.

**EXHIBIT B**

## DECLARATION OF RONALD WHITE, ESQ.

I, RONALD WHITE, declare as follows:

1.     I am an attorney at law duly admitted and licensed to practice before courts of this State.  I was trial counsel for Jofama Coleman in Superior Court Case No. YA059765.

2.     The facts contained herein are true of my own knowledge and if called as a witness I could testify competently thereto.

3.     The prosecution's witness Maria Renteria told the police she was parking her car when the shooting occurred in the street.  She saw the driver of the van and the shooter but was unable to pick Mr. Coleman's photo out from the photo line-up.

4.     When Ms. Renteria testified at trial, she said Mr. Coleman looked like the van driver.  Her identification testimony was unexpected.

5.     Abel Soto's trial took place after Mr. Coleman's trial.  When Mr. Coleman informed me that Ms. Renteria's testimony was impeached at Mr. Soto's trial – she was parked much farther away from the van and behind a large truck that would have obstructed her view – I told him it would help his appeal.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 22nd day of July 2008 at Gardena, California.

Ronald White

**EXHIBIT C**

## DECLARATION OF PATRICIA IHARA, ESQ.

I, PATRICIA IHARA, declare as follows:

1.      I am an attorney at law duly admitted and licensed to practice
before courts of this State.  I was appointed to represent petitioner Jofama
Coleman in his appeal from his conviction in Court of Appeal Case
B202597, Superior Court Case No. YA059765.

2.      The facts contained herein are true of my own knowledge and
if called as a witness I could testify competently thereto.

3.      I went to the Google homepage and clicked on maps.  I typed
the Robles's address [1115 W. 101st Street, Los Angeles, CA] into the
search box.  I then clicked on "street view."  Using copies of People's
Exhibits 6, 9, 58 and 59 from Abel Soto's trial, I located the Robles house.
I then clicked on the white arrow and moved the street view west.  I found
the location where the victim was shot.

I also typed in the address across the street from the Robles house
[1117 W. 101st Street, Los Angeles, CA] into the search box.  I then
clicked on "street view."  This street scene shows the location of the street
lamp on the south side of the street.

4.      I then went to the Los Angeles county assessor maps at
http://maps.assessor.lacounty.gov and typed into the search box the
intersection of Budlong and 101st Street.  Exh. F is a true and correct copy
of the plot maps showing the length and width of the lots.  I compared the
plot map to the "street view" on Google maps and the assessor records.  I
determined that lot 13 is where the Robles house was located.  According to
Sergeant Katz, Jose Robles was killed on the west perimeter of lot 15.  The
plot map shows that if Renteria was parked on the west perimeter of lot 13
and Jose Robles was shot at the west perimeter of lot 15, the closest
distance between Renteria's vehicle and the white van would have been 128
feet.

## EXHIBIT D

5.      I found a website that shows what a person could see in the daylight at 100 feet at www.prisonpolicy.org/zones/thousand_ feet.html.  Exhibit G is a true and correct copy of the 100 feet photo from that website.

6.      I also conducted an investigation on what a normal person would be able to see at night.

Around 9:00 p.m., on August 12, 2008, I parked my car by a sidewalk on a straight road and had another person drive on the wrong side of the road facing me at a distance of about five car lengths away.  There were street lamps on both sides of the street between the other car and my car.  I could not see the face of the driver of the car at all when both vehicles had the headlights on.

7.      When the driver turned his headlights off, I still could not see his face because my headlights did not illuminate the interior of his vehicle at that distance.

8.      I had the driver turn on the interior lights of his car.  I could not see his face well.

9.      I measured off 100 feet.  I had someone stand *in the daylight* 100 feet away from me.  I could not make out his facial features clearly from that distance.

10.     Before I did this investigation, I had no idea how far away 100 feet is or what is visible at that distance.  However, several people I know who have participated in sports, taught children in school, or dealt with real estate, say they know how far 100 feet is between two points.  It is my belief that had trial counsel presented evidence that Renteria was 128 feet away from the white van, it would have been within the common knowledge and experience of some of the jurors that it is physically impossible to get a good look at a person's face at that distance in any type

2

of light with normal vision.  However, it would have been better to show
the jury what is visible at 100 feet.

11.    Exhibit A is a true and correct copy of photographic exhibits
from Abel Soto's trial.  On Exhibit A 2 (People's Exh. No. 9) Sergeant
Katz marked the location where Jose Robles was shot with a "v"
surrounded with a circle.  Because the mark was not visible on the copy, I
marked it with a light colored sticker.  I have requested transmission of the
original exhibits to the Court of Appeal.

12.    Exhibits B and C are true and correct copies of the
declarations I received from Jofama Coleman and Ronald White, Esq.
Exhibit E are pages from the reporter's transcript of Abel Soto's trial
proceedings.  I did not renumber those pages because the original page
numbering will facilitate comparison with the original.  I have omitted
pages 1829 to 1844 from Sergeant Katz's testimony.

14.    At my request, Mr. White sent me part of his trial file.  I did
not find any photos of the crime scene in the file.  I sent two letters to Mr.
White asking him if the prosecution provided the defense with crime scene
photos of the vehicles in the area of the shooting.  I have not received a
response to this question yet.

I declare under penalty of perjury under the laws of the State of
California that the foregoing is true and correct.

Executed on this 15th day of August, 2008 at Irvine, California.

Patricia Ihara

3

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

---

THE PEOPLE OF THE STATE OF CALIFORNIA, )
)
          PLAINTIFF-RESPONDENT, )
)
    VS. ) SUPERIOR COURT
) NO. YA 064697
ABEL SOTO, )
)
         DEFENDANT-APPELLANT. ) **NOV 2 8 2007**
---)

APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY

HONORABLE FRANCIS J. HOURIGAN, JUDGE PRESIDING

REPORTERS' TRANSCRIPT ON APPEAL

TUESDAY, AUGUST 7, 2007

APPEARANCES:

FOR PLAINTIFF-RESPONDENT: EDMUND G. BROWN, JR.
                              STATE ATTORNEY GENERAL
                              300 SOUTH SPRING STREET
                              NORTH TOWER, SUITE 1701
                              LOS ANGELES, CALIFORNIA 90013

FOR DEFENDANT-APPELLANT:  IN PROPRIA PERSONA

VOLUME 4 OF 5
PAGES 1501 THROUGH 1676/1800, INCL.



DENISE K. NAGAO, CSR NO. 7722
OFFICIAL REPORTER

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

**EXHIBIT E**

1803

```
1       A       THE NIGHTTIME.

2       Q       WAS IT LIGHT OR DARK?

3       A       IT WAS ALREADY KIND OF DARK.

4       Q       IT WAS ALREADY DARK.

5               WHERE DID YOU LIVE AT THAT TIME?

6       A       BEHIND THE ROBLES.  I WAS RENTING.  FROM

7   THE ROBLES.

8       Q       YOU LIVED BEHIND THE ROBLES' HOUSE?

9       A       YES.

10      Q       ON THE SAME PROPERTY?

11      A       THE SAME PROPERTY.

12      Q       BUT IN ANOTHER DWELLING?

13      A       YES.

14      Q       WAS THAT AT 1115 101ST STREET?

15      A       YES.

16      Q       DID YOU ARRIVE AT THAT SCENE AFTER DARK

17  THAT NIGHT?

18      A       YES.

19      Q       AND WHAT WERE YOU DRIVING?

20      A       BROWN ASTROVAN.

21      Q       BROWN ASTROVAN?

22      A       LIGHT BROWN AND BURGUNDY.

23      Q       WHERE HAD YOU BEEN BEFORE THEN?

24      A       FROM WORK.

25      Q       SO YOU WERE COMING HOME FROM WORK?

26      A       YES.

27      Q       DID YOU PARK THE CAR?  AT ALL?

28      A       YES.
```

1805

1    Q    SO IT WAS COMING TOWARDS YOU, LIGHTS OFF,

2  ON THE WRONG SIDE OF THE STREET?

3    A    YES.

4    Q    DID THAT ATTRACT YOUR ATTENTION?

5    A    YES.

6    Q    WHAT DID YOU SEE HAPPEN?

7    A    THE VAN, THE VAN PULLED -- STOPPED.  AND

8  THE PASSENGER GOT OUT OF THE CAR.  AND WALKED TOWARDS --

9  THE CAR, AND STARTED SHOOTING.

10   Q    WELL, LET'S GO BACK A LITTLE BIT.

11        THIS WAS A VAN THAT WAS COMING DOWN THE

12 STREET?

13   A    YES.  IT WAS A WHITE VAN.

14   Q    THE PASSENGER GOT OUT OF WHICH SIDE OF THE

15 CAR?

16   A    OF THE PASSENGER SIDE.

17   Q    PASSENGER SIDE.

18        AND DID HE GO IN FRONT OR IN BACK OF THE

19 VAN?

20   A    IN FRONT OF THE VAN.

21   Q    NOW, THE FRONT OF THE VAN WAS FACING

22 TOWARDS YOU?

23   A    YES.

24   Q    SO HE THEN WALKED IN FRONT OF WHERE YOU

25 WERE SOME FEET AWAY?

26   A    YES.

27   Q    ABOUT HOW FAR AWAY FROM THE VAN WERE YOU

28 WHEN THAT MAN GOT OUT OF THAT VAN?

1807

```
 1        Q      ALL RIGHT.

 2               CHINO WAS WALKING?

 3        A      WALKING.

 4        Q      DO YOU KNOW WHO CHINO IS?

 5        A      YES.

 6        Q      WHO IS CHINO?

 7        A      HE'S THE FATHER, WELL, THE -- HE'S THE

 8   GRANDSON OF THE PEOPLE, OF THE ROBLES I WAS RENTING

 9   FROM.

10        Q      SO HIS NAME LAST NAME IS ROBLES?

11        A      YEAH.

12        Q      WERE YOU RENTING FROM HIS GRANDPARENTS?

13        A      YES.

14        Q      DO YOU KNOW, DOES JOSE ROBLES -- DOES THAT

15   SOUND LIKE HIS REAL NAME?  OR DID YOU KNOW HIS REAL

16   NAME?

17        A      WELL, I MEAN, I JUST ALWAYS KNOWN HIM AS

18   CHINO.

19        Q      SO THIS MAN WHO GOT OUT OF THE VAN WAS

20   SHOOTING AT CHINO?

21        A      YES.

22        Q      WHAT DID YOU DO?

23        A      I WAS JUST, I WAS JUST IN SHOCK.  I WAS

24   JUST -- COULDN'T BELIEVE --

25        Q      COULDN'T BELIEVE IT WAS HAPPENING IN FRONT

26   OF YOU?

27        A      YES.

28        Q      HOW MANY SHOTS, DO YOU RECALL?
```

1809

```
1         A       AROUND THE SAME HEIGHT.

2         Q       AND HOW WOULD YOU DESCRIBE THE BUILD OF THE

3    PERSON?

4         A       MUSCULAR.  STOCKY.  LIKE -- HEAVY BUILT.

5         Q       HEAVY BUILT.  YOU SAID MUSCULAR.

6                 WHAT MADE YOU THINK OF MUSCULAR?

7         A       LIKE HE WORKS OUT.  LOOKED LIKE HE WORKS

8    OUT.

9         Q       YOU'RE POINTING TO YOUR SHOULDERS, MOVED

10   YOUR ARMS?

11        A       LIKE STOCKY BECAUSE --

12        Q       TRY NOT TO TALK AT THE SAME TIME.  I'LL TRY

13   NOT TO TALK AT THE SAME TIME.

14                I SAW YOU MOVE YOUR SHOULDERS UP AND YOUR

15   ARMS UP.  WHAT DID YOU MEAN BY THAT?

16        A       STOCKY.  LIKE THEY WORK OUT.  THE WAY THEIR

17   BODIES -- LIKE BUFF.

18        Q       BUFF?

19        A       YES.

20        Q       AND WHEN YOU DID YOUR ARMS UP AND YOUR

21   SHOULDER, DO YOU MEAN THEY LOOKED LIKE HE HAD WORKED

22   OUT, SOME TYPE OF WORKOUT, AND HE WAS MUSCULAR IN THAT

23   AREA?

24        A       FROM HIS SHOULDERS, THE PART RIGHT HERE,

25   YES, IT DID.

26        THE COURT:  THE WITNESS TOUCHED THE TOPS OF HER

27   SHOULDERS.

28        THE WITNESS:  JUST BUFF, LIKE -- JUST BIG.
```

1811

```
 1        Q        WAS THIS AFTER THE SHOOTING, THEN?

 2        A        YES.

 3        Q        SO EXPLAIN HOW THAT HAPPENED.

 4        A        AFTER -- AFTER -- THE SHOOTING TOOK PLACE,

 5   HE GOT BACK IN THE CAR, HE WENT IN FRONT OF THE CAR, AND

 6   GOT BACK INSIDE.  AND THEY DROVE PAST ME.

 7                 I ONLY LOOKED AS -- LIKE BEFORE -- HOW CAN

 8   I EXPLAIN.  WE LIKE UP TO HERE, MAYBE, THEN I TURNED

 9   AWAY.

10        THE COURT:  ALL RIGHT.

11                 AGAIN YOU POINTED AT SOMETHING.

12        THE WITNESS:  LIKE UP TO --

13        THE COURT:  POINTED ABOUT TWO FEET AWAY.

14        Q        BY MR. YOUNG:  WHY DID YOU TURN AWAY AFTER

15   LOOKING AT THE DRIVER?

16        A        BECAUSE I HAD MY KIDS IN MY CAR, AND I WAS

17   SCARED.  I DIDN'T WANT THEM TO KNOW I HAD SEEN WHAT THEY

18   DID.

19        Q        YOU DIDN'T WANT THE DRIVER TO SEE YOU

20   STARING AT HIM?

21        A        YES.

22        Q        DID YOU SEE ENOUGH OF THE FACE OF THE

23   DRIVER TO RECOGNIZE HIM?

24        A        YEAH.

25        Q        DID YOU IDENTIFY THE DRIVER AT A LATER

26   DATE?

27        A        YES.  AT THE TRIAL.

28        Q        YOU WERE YOU ASKED TO GIVE A DESCRIPTION OF
```

1813

```
1    Q    YOU HAVE TO SPEAK UP, MA'AM.

2    A    YES.

3    Q    AND IS THAT 101ST STREET THAT NIGHT?

4    A    YES.

5    Q    IS YOUR CAR DEPICTED ON THERE ANYWHERE?

6    A    I DON'T SEE IT.

7    Q    CAN YOU TELL IF THE CAR THAT YOU WERE

8 DRIVING WAS THERE?

9    A    I WAS THERE, BUT I DON'T SEE IT.   .

10   Q    OKAY.   THERE ARE SOME CARS BLOCKING THE

11 VIEW, HERE.   LOOKING AT PEOPLE'S 9, ARE ANY OF THOSE

12 CARS YOURS?

13   A    NO.

14   Q    SO THIS SUV IS NOT YOURS?

15   A    NO.

16   Q    ALL RIGHT.

17        IN THE BACK OF THE PHOTOGRAPH, CAN YOU MAKE

18 OUT THOSE CARS, ANY OF THOSE BACK THERE TO SEE IF

19 THEY'RE YOURS?

20   A    I CAN'T TELL.

21   Q    OKAY.

22        NOW, DO YOU THINK THAT THAT SHOOTER COULD

23 HAVE BEEN A MEXICAN OR HISPANIC PERSON?

24   A    NO.

25   Q    YOU'RE CERTAIN IT WAS AFRICAN AMERICAN?

26   A    YES.

27   Q    DO YOU HAVE AN IDEA OF THE GENERAL AGE

28 RANGE AT ALL?   AS OPPOSED TO AN OLD GUY LIKE ME, OR
```

1815

1      A      YES, IT IS.

2      Q      AND DID YOU TELL DETECTIVES THAT THE SHIRT

3  WAS TAN WITH LIGHT GRAY SQUARES, OR GREEN WITH DARK

4  BROWN SQUARES?

5      A      NO, I TOLD THEM IT WAS LIKE A BROWN SHIRT

6  WITH TAN.

7      Q      SO IF DETECTIVE KATZ WROTE THAT THE SHIRT

8  WAS TAN WITH LIGHT GRAY SQUARES, OR GREEN WITH DARK

9  BROWN SQUARES, THAT'S WRONG?

10     A      I ALWAYS SAID IT WAS BROWN CHECKERS TAN.

11  THAT'S WHAT I SAID.

12     Q      DO YOU REMEMBER WHAT COLOR THE GUN WAS?

13     A      BLACK.

14     Q      OKAY.  AND YOUR TESTIMONY IS THAT THE

15  SHOOTER GOT OUT OF THE VAN AND WALKED AROUND THE FRONT

16  OF THE VAN?

17     A      YES.

18     Q      ARE YOU SURE ABOUT THAT?

19     A      YES, I AM.

20     Q      OKAY.  SO IF THE OTHER WITNESSES TESTIFIED

21  THAT THE SHOOTER GOT OUT AND WALKED AROUND THE BACK OF

22  THE VAN, THEY'RE ALL MISTAKEN?

23     A      YES.  I SEEN --

24     Q      OKAY.  YOU WERE PARKED IN YOUR VEHICLE; IS

25  THAT CORRECT?

26     A      YES.

27     Q      AND YOUR VEHICLE IS NOT DEPICTED IN THESE

28  PHOTOGRAPHS; CORRECT?

1819

```
 1   WALKING TOWARDS --
 2        A      TOWARDS, YES.
 3        Q      WELL -- IF SO THE OTHER WITNESSES TESTIFIED
 4   CHINO IS WALKING THE OPPOSITE DIRECTION TO GO TO THE
 5   STORE, THEY WOULD BE WRONG?
 6        A      YES.
 7        Q      WHAT WAS CHINO WEARING?
 8        A      CAN'T REMEMBER.
 9        Q      OKAY.  SO YOU SAW THE SHOOTER.  WHAT DID
10   YOU SEE IN THE SHOOTER'S FACE?
11        A      HE WAS BLACK.  AND -- JUST I REMEMBER HIM
12   HAVING A LONG JHERI CURL WITH A BEANIE ON.
13        Q      SO WHEN YOU SAY JHERI CURL, DOES THAT MEAN
14   HE HAD LONGER HAIR?
15        A      LIKE -- SHOULDER LENGTH.  LIKE MAYBE UP TO
16   HERE.
17        THE COURT:  THE WITNESSES HAS PLACED HER LEFT HAND
18   JUST TO THE TOP OF HER SHOULDER, HER LEFT SHOULDER.
19        Q      BY MS. BARNES:  IT WAS CURLY?
20        A      YES.
21        Q      WAS IT WAVY, OR TIGHT CURLS?
22        A      NOT JUST -- NOT TIGHT, THE -- I MEAN --
23   JUST KIND OF -- NOT TIGHT, AND NOT LOOSE.  JUST -- I
24   DON'T KNOW.  HARD TO EXPLAIN TO YOU.
25        Q      WHAT COLOR WAS THE HAIR?
26        A      IT WAS BLACK.
27        Q      THE PERSON HAD A BEANIE; IS THAT CORRECT?
28        A      YES.
```

1821

1    I?

2         THE COURT:  AFTER YOU MARK THEM, PLEASE SHOW THEM

3    TO MR. YOUNG.

4         MS. BARNES:  OKAY.  THESE ARE THE PART OF THE

5    ORIGINAL DISCOVERY.  BUT I'LL SHOW HIM THE ONES I'M

6    USING.  I'LL PUT A P-50.

7         THE COURT:  NO, 58, PLEASE.

8         MS. BARNES:  58?  THANK YOU.

9         THE COURT:  AND THREE BY FIVE COLOR PHOTO.

10        MS. BARNES:  YES, I HAVE FOUR OF THEM.

11        THE COURT:  THEY'LL BE MARKED 58, 59, 60, AND 61.

12

13             (PEOPLE'S EXHIBITS 58 THRU 61,

14              PHOTOGRAPHS, WERE MARKED FOR

15              IDENTIFICATION.)

16

17        MS. BARNES:  PEOPLE'S 60, AND PEOPLE'S 61.

18             COUNSEL, YOU WANT TO SEE THE ONES I'M

19    SHOWING?

20        MR. YOUNG:  YES, PLEASE.

21

22             (A DISCUSSION WAS HELD

23              OFF THE RECORD.)

24

25        Q    BY MS. BARNES:  I'M GOING TO SHOW YOU A SET

26    OF PHOTOGRAPHS.  THESE ARE DIFFERENT ONES.  I'VE JUST

27    MARKED PEOPLE'S 58 THROUGH 61.

28             IF YOU WANT TO LOOK AT THESE PICTURES.  LET

1823

```
1        Q       BY MS. BARNES:  CAN YOU MARK R FOR THE
2   ROBLES' RESIDENCE?
3        A       (THE WITNESS COMPLIES.)
4        THE COURT:  THE WITNESS PUT AN R ON PEOPLE'S 58.
5        Q       BY MS. BARNES:  I'M GOING TO SHOW YOU
6   ANOTHER PHOTOGRAPH, PEOPLE'S 61.  DO YOU SEE YOUR VAN
7   PARKED BEHIND THIS LARGE TRUCK BEHIND -- YOUR VAN PARKED
8   BEHIND THE LARGE TRUCK ON PEOPLE'S 61?
9        A       YES.
10        Q       OKAY.
11                CAN YOU PUT YOUR INITIALS THERE?
12        A       (THE WITNESS COMPLIES.)
13        THE COURT:  THE WITNESS HAS INITIALED 61 IN THE
14   POSITION WHERE SHE SAYS HER CAR IS.
15        MS. BARNES:  THANK YOU.
16        Q       SO REVIEWING THESE PICTURES, IT ACTUALLY
17   APPEARS YOU PARKED YOUR CAR BEFORE THE ROBLES'
18   RESIDENCE, FURTHER AWAY FROM THE SHOOTING THAN THE
19   ROBLES' RESIDENCE; IS THAT TRUE?
20        A       NO.
21        Q       AND YOU PARKED YOUR CAR BEHIND A LARGE
22   TRUCK, LOOKS LIKE IT MAY BE SOME KIND OF A LARGE DUMP
23   TRUCK OR --
24        A       NO.
25        Q       STORAGE TRUCK?
26        A       I DON'T KNOW.
27        Q       WELL, THAT'S YOUR CAR PARKED BEHIND THE
28   TRUCK; RIGHT?
```

1825

1    BUILDER, OR JUST HEAVY-SET, AND YOU SAID THE PERSON WAS
2    JUST HEAVY-SET?
3         A     WELL, I MEAN -- BODY BUILDERS, THERE'S
4    DIFFERENT TYPES OF BODY BUILDERS.
5         Q     DID YOU SEE THE PERSON'S ARMS TO SEE IF
6    THEY WERE MUSCULAR, OR JUST BIG?
7         A     I WAS TALKING ABOUT LIKE FROM THE
8    SHOULDER -- FROM THIS, AND THE CHEST, THE WAY IT LOOKS.
9    THAT'S THIS WAY MY HUSBAND LOOKS.  THAT'S WHY I KNOW.
10        THE COURT:  THE WITNESS POINTED TO HER OWN
11   SHOULDERS, MOVED HER HAND SLIGHTLY DOWN HER UPPER CHEST.
12        Q     BY MS. BARNES:  COULD HE HAVE JUST BEEN
13   SOMEONE WHO WAS FAT OR STOCKY IN HIS SHOULDER AREA?
14        A     NO.
15        Q     WELL, DID YOU SEE HIS ACTUAL CHEST, OR YOU
16   SAW HIM WITH CLOTHES ON?
17        A     THE WAY -- I KNOW BECAUSE, THE WAY MY
18   HUSBAND LOOKS.  THAT'S WHY I'M ABLE TO TELL.
19        Q     OKAY.  AND YOU SAID THAT THE DISTANCE
20   BETWEEN YOUR CAR AND THE SHOOTING WAS 35 FEET; IS THAT
21   CORRECT?
22        A     YES.
23        THE COURT:  WELL, AGAIN, SO WE'RE CLEAR, YOU
24   INDICATED THE BACK WALL; IS THAT CORRECT?
25        THE WITNESS:  YES.
26        THE COURT:  THAT IS 35 FEET.
27        Q     BY MS. BARNES:  YOU'RE SAYING YOU PARKED
28   RIGHT IN FRONT OF THE ROBLES' RESIDENCE?

1827

1   THEY COULDN'T SEE YOU?

2        A      NO.

3        Q      DID YOU SEE -- DID YOU SEE THERE WAS

4   SOMEONE, DID YOU SEE SOMEONE SITTING IN ONE OF THE CARS?

5   A BLACK MALE SITTING IN ONE OF THE CARS?

6        A      NO.

7        MS. BARNES:  NO FURTHER QUESTIONS.

8        THE COURT:  MR. YOUNG, REDIRECT.

9

10                 REDIRECT EXAMINATION

11  BY MR. YOUNG:

12       Q      IS IT POSSIBLE YOU WERE ABOUT FIVE CAR

13  LENGTHS AWAY FROM THE SHOOTING?

14       A      MAYBE.  I DON'T KNOW.

15       Q      NOW, THIS VAN THAT THE SHOOTER CAME FROM,

16  YOU SAID IT WAS COMING ON THE WRONG SIDE OF THE STREET;

17  IS THAT RIGHT?

18       A      YES.

19       Q      SO IT WOULD HAVE BEEN FACING YOU, BUT ON --

20  ACTUALLY WOULD HAVE BEEN YOUR SIDE OF THE STREET IF YOU

21  HAD BEEN TRAVELING ON THE STREET INSTEAD OF PARKED AT

22  THE CURB?

23       A      YES.

24       Q      THIS EVENT BURNED IN YOUR MEMORY?

25       A      WHAT WAS THAT?

26       Q      DID THIS EVENT BURN IN YOUR MEMORY THAT

27  NIGHT?  THE SHOCK YOU SAID YOU WENT THROUGH?

28       A      YES.

1845

1    HERE, PEOPLE'S 6 AND THEN PEOPLE'S 9, DO YOU RECOGNIZE

2    THESE PICTURES?

3        A        YES.

4        Q        AND YOU TESTIFIED EARLIER WHEN THERE'S A

5    MURDER, THE CRIME SCENE IS SECURED BY THE FIRST DEPUTIES

6    ON SCENE AS SOON AS THEY CAN; IS THAT CORRECT?

7        A        YES.

8        Q        AND PEOPLE ARE NOT ALLOWED TO DRIVE IN AND

9    OUT OF THE CRIME SCENE?

10       A        CORRECT.

11       Q        AND WOULD IT BE FAIR TO SAY THAT MOST

12   PEOPLE ARE BEING INTERVIEWED ANYWAY, SO THEY'RE NOT

13   REALLY LEAVING THE SCENE?

14       A        YES.

15       Q        NOW, THE PHOTOGRAPH PEOPLE'S 6, THE MURDER

16   HAPPENED ACTUALLY RIGHT IN FRONT OF THIS BLUE CAR; IS

17   THAT CORRECT?

18       A        THE OLDSMOBILE, YES.

19       Q        CAN YOU PUT THE INITIALS THERE OF

20   MR. ROBLES, KIND OF WHERE IT WOULD BE IN THERE IF HE HAD

21   IN FACT BEEN DEPICTED IN THAT PHOTOGRAPH?

22       A        THE VICTIM?

23       Q        YES.  JOSE ROBLES.

24       A        (THE WITNESS COMPLIES.)

25   THE COURT:  THE WITNESS MADE A MARK ON THE

26   PHOTOGRAPH AS REQUESTED.

27       Q        BY MS. BARNES:  THANK YOU.

28                IN THE NEXT PHOTOGRAPH, PEOPLE'S 9, CAN YOU

1847

1    CORRECT?

2         A       YES.

3         Q       AND FINALLY, THE LAST PICTURE SHOWS ANOTHER

4    ANGLE THAT'S PEOPLE'S 61 OF HER CAR BEHIND THE WORK

5    TRUCK; IS THAT CORRECT?

6         A    .  YES.  IT'S IN THE -- TOWARDS THE RIGHT

7    SIDE, ALMOST THE CENTER LINE OF THAT PHOTOGRAPH.

8         Q       IS THAT 35 FEET AWAY FROM WHERE THE MURDER

9    HAPPENED?

10        A       NO.

11        Q       THAT'S ACTUALLY FURTHER AWAY FROM WHERE THE

12   ROBLES RESIDENCE IS; IS THAT CORRECT?

13        A       I WOULD SAY THAT IT'S -- ALMOST -- IT'S

14   ALMOST PARKED AT THE -- WHAT WOULD BE THE WEST PERIMETER

15   OF WHAT THE ROBLES RESIDENCE WOULD HAVE BEEN.  THE WEST

16   PERIMETER LINE OF THE PROPERTY LINE.

17        Q       SO MISS RENTERIA WOULD HAVE HAD TO LOOK

18   PAST THE LARGE WORK TRUCK, PAST THE CHEVY BLAZER, AND

19   THEN THE TWO OTHER CARS IN ORDER TO SEE THE MURDER; IS

20   THAT CORRECT?

21        A       YES.  AND THERE'S SPACE IN BETWEEN THOSE AS

22   WELL, BECAUSE THERE'S DRIVEWAYS FOR EACH OF THOSE

23   RESIDENCES.  SO IT'S FURTHER.

24        MS. BARNES:  YOUR HONOR, BECAUSE OF THE SIZE OF

25   THE PHOTOS, I'D ASK THE COURT TO PUBLISH THEM TO THE

26   JURY NOW.  JUST THE TWO, PEOPLE'S 58 AND 61.

27        THE COURT:  CAN I TALK TO BOTH OF YOU AT SIDE BAR

28   BEFORE WE DO THAT?



**EXHIBIT F**



**EXHIBIT G**

CONTENTS OF JULY 20, 2006 LETTER FROM JUROR #5 TO COURT

(From August 10, 2006 Reporter's Transcript, pp. 4-5)

EXHIBIT _____ H

"DEAR JUDGE TAYLOR, IT WAS TRULY AN HONOR TO SERV. AS A JUROR IN YOUR COURTROO. MY EXPERIENCE AS A JUROR WAS VERY EDUCATIONAL AND ENLIGHTENING. I WAS ABLE TO SEE A SNAPSHOT VIEW OF THE INTRICACIES OF OUR JUSTICE SYSTEM. I WAS ALSO REMINDED THAT FREEDOM IS A PRIVILEGE THAT WE MUST ALL EXERCISE WITH CAUSE.

THERE WAS ONE CONCERN ABOUT THE DELIBERATION PROCESS THAT STILL RESONATES IN MY MIND AND I WOULD LIKE TO KNOW WHETHER IT WAS A NORMAL PROCEDURE IN ORDER TO PUT MY CONSCIOUS AT REST -- AT EASE, RATHER. DURING THE HEARING, A PICTURE OF MR. COLEMAN WAS PRESENTED AS EVIDENCE. LATER WHEN THIS PICTURE WAS PRESENTED IN THE JURY ROOM IT ENTAILED INFORMATION ABOUT THE DEFENDANT DETAILING A PRIOR ARREST WHICH OCCURRED A MONTH BEFORE THE INCIDENT IN QUESTION. I KNOW FOR A FACT THAT THE DETAILS OF THIS PRIOR ARREST INFLUENCED THE JURY'S DECISION IN DETERMINING THE FINAL VERDICT. SINCE MR. COLEMAN'S PAST WAS NOT BROUGHT UP DURING THE HEARING, I HAVE BEEN WONDERING WHETHER THE INFORMATION ABOUT HIS PREVIOUS ARREST SHOULD HAVE BEEN PRESENTED TO THE JURY DURING THE DELIBERATION PROCESS. I HAVE PONDERED THIS QUESTION FOR AWHILE AND I WOULD LIKE TO HAVE AN ANSWER FOR MY PEACE OF MIND.

MORE THAN ANYTHING ELSE, I WOULD LIKE TO KNOW THAT A REPRESENTATIVE OF THE COMMUNITY -- THAT AS A REPRESENTATIVE OF THE COMMUNITY I MADE THE RIGHT DECISION THAT THIS -- I MADE THE RIGHT DECISION THAT WILL ALLOW JUSTICE TO BE SERVED APPROPRIATELY."

H

JUROR #5

RT pp 4-5

P8



**Police Department**

**JOFAMA COLEMAN**

Booking Num:    7648090

Charge(s):    496(A) / PC / F / REC KNWN STOLN PROP $400+
12031(A)(2)(D) / PC / F / C/LOADED F/ARM:PROHIB/ETC
12031(A)(1) / PC / F / CARY LOAD F/ARM:PUB:S/CIR
12025(A)(1) / PC / F / CCW IN VEH W/PR FEL CONV

Arrest Date:    04-06-2003

Birth Date:    01-16-1983

Sex:    M

Race:    B

Height:    5' 9"

Weight    165

P6

Copyright © 2001 All rights reserved. ImageWare Systems, Inc.

5/12/2003

http://lacris/iws_PrintReport.asp

## Attachment 1

**CONTENTS OF INFORMATION DISCOVERED BY JURORS DURING DELIBERATIONS FROM PEOPLES' EXHIBIT #3 AS READ IN COURT BY JUROR #5**

**(From November 14, 2006 Reporter's Transcript, pp. 27-28)**

EXHIBIT 

1   P-R-O-B-H-I-B, BACK SLASH, E-T-C. CONTINUES 12031, OPEN

2   PARENS A, CLOSE PARENS. OPEN PARENS 1, CLOSE PARENS,

3   SPACE, BACK SLASH, SPACE, P-C, SPACE, BACK SLASH, SPACE,

4   F, SPACE, BACK SLASH, SPACE C-A-R-Y, SPACE, L-O-A-D,

5   SPACE, F, BACK SLASH, A-R-M, COLON, P-U-B, COLON, S,

6   BACK SLASH, C-I-R, 12025 OPEN PARENS A, CLOSE PARENS.

7   OPEN PARENS 1, CLOSE PARENS, SPACE, BACK SLASH, SPACE

8   P-C SPACE, BACK SLASH, SPACE, F, SPACE, BACK SLASH,

9   SPACE, C-C-W, SPACE, I-N, SPACE, V-E-H, SPACE W, BACK

10   SLASH, P-R, SPACE, F-E-L, SPACE, C-O-N-V.

11     THE COURT: DOES IT SAY ANYTHING ELSE TOWARDS THE

12   ARREST?

13     JUROR NO. 5: IT SAYS, "ARREST DATE 4/6/2003; BIRTH

14   DATE 01/16/1983; SEX: MALE; RACE: B; HEIGHT: 5-9;

15   WEIGHT: 165."

16     THE COURT: OKAY. AND WHEN PARTICIPATING IN

17   DELIBERATIONS, DID YOU READ THROUGH ALL OF THIS?

18     JUROR NO. 5: YES.

19     THE COURT: YOU YOURSELF?

20     JUROR NO. 5: YES.

21     THE COURT: DO YOU KNOW WHETHER OR NOT OTHER JURORS

22   APPEARED TO BE DOING THE SAME?

23     JUROR NO. 5: YES.

24     THE COURT: DID YOU HAVE ANY DISCUSSION ABOUT WHAT

25   THIS INFORMATION WAS?

26     JUROR NO. 5: YES. I REMEMBER IT BEING STATED,

27   "WELL, HE WAS ARRESTED FOR CARRYING A LOADED WEAPON

28   BEFORE."

                                                           28

Exh. I