20      JUROR NO. 5:  "POLICE DEPARTMENT, JOFAMA COLEMAN,

21  BOOKING NUMBER 7648090, CHARGES 496, OPEN PARENS A,

22  CLOSE PARENS, BACK SLASH PC, BACK SLASH F, BACK SLASH R.

23  I DON'T KNOW WHAT THIS MEANS BUT IT SAYS R-E-C-K - SPACE

24  K-A-W-M SPACE S-D-O-L-N SPACE P-R-O-P SPACE $400 PLUS.

25  12031, OPEN PARENS A, CLOSE PARENS, OPEN PARENS 2, CLOSE

26  PARENS, OPEN PARENS D, CLOSE PARENS, SPACE, BACK SLASH,

27  PC, SPACE, BACK SLASH, F, BACK SLASH, SPACE, C, BACK

28  SLASH, LOADED, SPACE, F, BACK SLASH, ARMED, COLON

27

Jofama Reo Coleman )
**PLAINTIFF/PETITIONER** )
)
)
— VS )
)
Ken Clark, Warden )
**DEFENDANT/RESPONDENT** )
-----------------------------

CASE NO_____

**PROOF OF SERVICE BY MAIL**

I the undersigned, hereby declare:

(1) I am a citizen of the United States; (2) I am over the age of 18 years. I am a residence of Kings County, in California.

My mailing address is Post Office Box 5242 Corcoran, California 93212-5242

On March, 25 , ~~200~~ 2010 , I served a true copy or original copy of the following;   PETITION FOR WRIT OF HABEAS CORPUS

by placing said document (s) in a sealed postage paid envelope into the CSATF/State Prison at Corcoran mail box for delivery to the United States Post Office at Corcoran, California, addressed as followed;

Jofama Reo Coleman
c.d.c.r # V.27659
CSATF/State Prison @ Corcoran
P.O. Box 5242
Corcoran, Cal. 93212

by placing said document (s) in a sealed Interdepartmental envelope into the California CSATF Facility Legal Mailbox for inner-institutional delivery to the below listed person(s) at the following addresses;
Clerk of the United States District Court for the Central District of California ; ATTN: Intake/Docket Section
312 North Spring Street
Los Angeles, California. 90012
And that this declaration was executed under the penalty of perjury at Corcoran, California 93212-5242, on March, 25 ,~~200~~ 2010

Jofama Coleman
**PRINTED NAME (DECLARANT)**

Jafama Coleman
**SIGNATURE (DECLARANT)**

1  Jofama Coleman,
   V-27659, D4-137-U.,
2  CSATF, at Corcoran
   State Prison,
3  P.O. Box-5242
   Corcoran, California
4               93212

5

6

7          IN AND FOR THE SUPREME COURT OF THE STATE

8                     OF CALIFORNIA

9

10

11 JOFAMA COLEMAN,           )      Case No._____
                             )
12          Petitioner,      )      Los Angeles County Superior
                             )      Court No. YA059765; and the
13          -Vs-             )      Court of Appeal, Second App-
                             )      ellate District Case No.
14 KEN CLARK, Warden of      )      B202597."
   CSATF, at Corcoran        )
15 State Prison,             )      PETITION FOR WRIT OF HABEAS
                             )                CORPUS
16          Respondent.      )
                             )
17 _____  )

18 TO: THE HONORABLE PRESIDING CHIEF JUSTICE AND THE ASSOCIATE JUSTICES

19 OF THE SUPREME COURT, STATE OF CALIFORNIA)."

20      COMES NOW, JOFAMA COLEMAN, hereinafter referred to as petitioner

21 complains of the Respondent, KEN CLARK, Warden as above designated,

22 and for legal cause of action.

23      (a) That petitioner is confined, detained, imprisoned and restr-

24 ained of his liberty by KEN CLARK, Warden of CSATF at Corcoran State

25 prison, Corcoran, California; that such confinement and restraint are

26 illegal, and that the illegality thereof will consist in the basic

27 constitutional violations which will hereinafter be set forth.

28      (b) This Honorable Court has Jurisdiction herein pursuant to the

                              1

essential provisions of 1473, of the California Penal Code; including the 6th, 8th, and 14th Amendments of the United States Constitution.

(c) This petition for Writ of Habeas Corpus is brought by Petitioner following the Court of Appeal, Second Appellate District's 12/30/2008, affirmancy of his conviction on direct Appeal, and the California Supreme Court's later denial of his Petition for Review.

. Petitioner, Jofama Coleman, through his jail house lawyer Wade Everett Granville (AKA-COWBOY) B-17383, who were an attorney prior to his own wrongful conviction, and by this verified petition alleges as follows:

1.    Petitioner was convicted in the Superior Court, Los Angeles County, Eric C. Taylor, J., of first degree murder. (Penal Code, section 187, subd. (a)). On August 16, 2007, he was sentenced to 25-years to life in state prison. (2CT 302.)

Petitioner contends that where he challenges validity of evidence of his prior arrest and criminal history, he was entitled to a bifurcation of the trial, which would have prevented the jury from being given bad character evidence unless it first found petitioner guilty of charged offense, and the unitary procedure which had been previously accepted in California needlessly exposed to petitioner to potential prejudice by revealing his prior criminality without advancing any legitimate state interest.

Where petitioner challenges validity of his prior arrest and criminal history, petitioner was entitled to bifurcation of trial, which would have prevented the jury from being given bad character evidence unless it first found petitioner guilty of charged offense.

2

1    Unitary procedure in which jury may be either permitted to read

2   information about prior bad acts or be advised of such prior bad

3   acts before it finds petitioner guilty of charged offense, though

4   previously accepted in California, needlessly exposed petitioner to

5   serious potential prejudice by revealing his prior criminality with-

6   out advancing any legitimate state interest. West's Ann.Const. Art.

7   1, §§ 15, 16.

8    In murder prosecution wherein petitioner challenges validity of

9   evidence of police information about petitioner's arrest on April 6,

10  2003. It states that petitioner was charged with (1) receiving known

11  stolen property valued over $400; (2) two counts of carrying a loaded

12  firearm; and (3) carrying a concealed weapon in a vehicle with a

13  prior felony conviction. This evidence was, for most part, inadmiss-

14  ible and gave prosecutor opportunity to brand petitioner "a profess-

15  ional crook." West's Ann.Const. Art. 1, §§ 15, 16.

16   In murder prosecution wherein petitioner challenges validity of

17  evidence of petitioner's prior arrest and criminal history having

18  been inadvertently given to the jury before it found him guilty of

19  charged offense, the trial court should have given petitioner a bif-

20  urcated proceedings, since proof of prior bad acts was unrelated to

21  substantive issue of guilt and affected only penalty imposed, yet,

22  before reaching verdict on murder, jury was permitted to read detai-

23  led evidence of petitioner having suffered five previous bad acts

24  including one felony conviction, three of them involving a firearm,

25  while at the same token, the substantive offense involved use of a

26  firearm because the victim was shot and killed; unitary procedure

27  was unnecessarily prejudicial and deprived petitioner of due process

28                              3

rights to fair trial secured by California Constitution. West's Ann. Const. Art. 1, § 15.

In murder prosecution wherein petitioner challenges validity of the improper exposure of the Jury to petitioner's prior criminal history and arrest record, and the trial court failed/or refused to bifurcate proceedings, and the limiting instructions, such as were given, did not eliminate risk of prejudice. West's Ann.Const. Art. 1, § 15.

Bifurcated procedure for determining guilt and separate issue of enhanced punishment, whereby same jury determines both issues separately, is considered fairest, most desirable procedure, because it combines efficiency, adequate notice to petitioner and due regard for right to jury trial with lack of prejudice to petitioner. West's Ann.Const. Art. 1, §§ 15, 16.

Under bifurcated procedure whereby same jury determines issues of guilt and enhanced punishment separately, prior bad acts and/or prior convictions are alleged in latter part of information, which is not read to jury unless it first finds petitioner guilty of cha-rged offense, then jury is read allegations of prior bad acts, prior convictions, or other wise evidence thereon is presented and jury determines validity of such prior bad acts. West's Ann.Const. Art. 1, §§ 15, 16.

Bifurcated trial whereby same jury determines issues of guilt and enhancement of punishment separately would carry out intent of legislature to impose greater penalties upon recidivists who have failed to respond to prior conviction or prior bad acts without sub-jecting those challenging their recidivist status to unnecessary

4

1  prejudice. West's Ann.Const. Art. 1, §§ 15, 16.

2      Statutory scheme providing for charging, trying and finding of

3  previous felony arrests, convictions, prior prison term(s) does not

4  mandate unitary procedure in which jury may be supplied with docume-

5  ntation of prior bad acts or informed of prior bad acts, including

6  prior convictions, before they determine guilt, nor is judicial con-

7  venienience or economy promoted thereby. West's Ann. Pen. Code, §§

8  969, 1025, 1093, 1158.

9      Detailed procedure for charging, trying and finding of previous

10  felony convictions established by statutes serves to provide safegu-

11  ard of value to accused against improper increased punishment. See,

12  West's Ann.Pen. Code, §§ 969, 1025, 1093, 1158.

13      Bifurcated procedure whereby same jury determines issues of

14  guilt and enhancement of punishment separately would be at least as

15  economical of court time as unitary practice, since such procedure

16  does not offend any principle of orderly procedure nor tend to delay

17  justice, in fact it might well expedite justice, for if petitioner

18  had been acquitted on substantive charge. there would have been no

19  occasion to take time to present evidence of prior criminal history.

20  West's Ann.Const. Art. 1, §§ 15, 16.

21      Under unitary procedure whereby jury was not only informed, but

22  given documentation of petitioner's prior arrest record as well as

23  his prior conviction before they determined petitioner's guilt of

24  crime charged, petitioner was forced without an opportunity to cho-

25  ose between equally unappealling alternatives of admitting prior

26  arrest record and prior conviction and losing his opportunity to

27  contest their validity or denying them and being faced with certai-

28                                  5

1   nty that state will attempt to prove them at trial, subjecting him

2   to resulting prejudice.

3       Unitary procedure whereby jury was supplied with documentation

4   of petitioner's prior criminal history as well as his prior convic-

5   tion before determining his guilt on crime charged and it could not,

6   and cannot be reconciled with protections otherwise accorded defend-

7   ants against potential prejudice resulting from supplying the jury

8   with documentation of petitioner's prior criminal activity. West's

9   Ann.Const. Art. 1, §§ 15, 16.

10      Petitioner contends that he was not given an opportunity to

11  either plead guily or not guilty to his prior criminal history and

12  a jury trial thereof should not be waived, petitioner was entitled

13  to bifurcated proceeding wherein jury is not supplied with documen-

14  tation of his prior criminal history, either through allegations in

15  charge, documentation among other exhibits, nor any other form of

16  introduction of evidence of his prior bad acts until the jury has

17  found petitioner guilty. West's Ann. Const. Art. 1,§§ 15. 16.

18      Although there are case laws on the books requiring bifurcated

19  proceeding whenever defendants pleads not guilty of prior conviction

20  and a jury trial thereof is not waived would only be prospective in

21  its operation, application of unitary procedure to petitioner resu-

22  lted in such prejudice that it constituted abuse of discretion and

23  operated to deny due process where, not only was petitioner portra-

24  yed in argument by prosecutor as professional crook, but, in case

25  where his credibility was crucial to his defense, his credibility

26  was impeached (without him having testified in his own behalf) by

27  evidence of prior arrest record, and prior conviction which would

28

6

1  otherwise have been excluded on grounds of being not relevant to de-

2  termination of credibility. West's Ann.Const. Art. 1, §§ 15, 16;

3  U.S.C.A. Const. Amends. 5, 14.

4      Petitioner contends that after the verdict, but before the sen-

5  tencing hearing, in a letter responding to the court's post-verdict

6  follow-up letter to the jurors, Juror No. 5 informed the court that

7  several jurors had looked at an exhibit that contained information

8  about petitioner's prior arrest during deliberations. She was not

9  sure this was proper. (3AugRT H4-5; 4AugRT L7-8;2CT 229.) Exhibit

10  No. 3, is an 8 1/2 x 11 inches sheet of paper with petitioner's boo-

11  king photo on the right half of the page and police information

12  about an arrest on the left half of the page. (Att. 1.) The page was

13  folded in half with the booking photo on the front and the arrest

14  information on the back. The booking photo was admitted into evide-

15  nce; the parties had agreed the arrest information would be removed.

16  However, the entire page was sent in to the jury room. (AugRT L-10.)

17      The trial court held individual hearings with eleven jurors to

18  inquire about their exposure to the arrest information and whether

19  it had been discussed. (2CT 200-206, 4AugRT L1-P5.) One juror had

20  pointed out the arrest information to other jurors. (4AugRT L12,M!8-

21  19.) One juror heard another juror comment that it should not be

22  considered. (4AugRT L12, N12.) Several jurors saw the arrest record

23  and understood it meant that petitioner had a prior criminal history.

24  (4AugRT L12, 16, 18, N3, 6-9, 11-12.) The foreperson did not remem-

25  ber either seeing the arrest information or any discussion about it.

26  No one had brought it to his attention. (4AugRT O8-1O.)

27      In addition to the charge of first degree murder, the document-

28                              7

1 ation received in the jury room contained information alleging that

2 petitioner had suffered (1) receiving known stolen property valued

3 over $400; (2) two counts of carrying a loaded firearm; and (3) car-

4 rying a concealed weapon in a vehicle with a prior felony conviction.

5     Petitioner, who pled not guilty and was not given an opportun-

6 ity to either admit or deny the allegations of the prior arrest rec-

7 ord nor the prior conviction, and was not advised by his defense co-

8 unsel, the prosecutor, or the court that he could bifurcate the

9 trial on the issues of guilt and the validity of his prior criminal

10 history on the ground that it would be "highly prejudicial to let

11 the same jury determine the truthfulness of the prior history...at

12 the same trial." (Italics added.) The trial counsel did not file any

13 motion for a separate trial on the prior criminal history because

14 the parties had agreed the arrest information would be removed from

15 the "vast array" of exhibits.

16     Pursuant to this erroneous conduct, the entire ducumentation

17 containing the complete information, including the allegation of the

18 one prior conviction, was supplied to the jury at the commencement

19 of the trial. The prosecutor then proceeded to present all the evid-

20 ence relating mainly to petitioner's guilt on the substantive offe-

21 nse but not the prior criminal acts before any verdicts were taken.

22 Documentation containing information evidence datailed the nature of

23 each of the prior bad acts.

24     The jury found petitioner guilty of first **degree** murder without

25 making any findings concerning his prior criminal history.

26     Petitioner contends that **the court** erroneously failed/refused

27 to (1) to **bifurcate** the proceedings; (2) failed to give petitioner

28

8

a choice whether to admit or deny the prior criminal history; (3)
failed to give petitioner a choice whether to choose a jury trial or
court trial on the prior criminal history; (4) failed to inform pet-
itioner that uncharged offenses would be used in a unitary trial
against him; (5) failed to inform petitioner that he would more
likely be found guilty than not by the prior bad acts being given to
the jury before it finds him guilty on the substantive offense; (6)
failed to inform petitioner that he would be prejudiced in the
initial determination of the issue of guilt by his prior criminal
history being given to the jury before it finds him guilty on the
substantive offense; (7) the trial court failed to acknowledge that
evidence of petitioner's prior arrest and criminal history was inad-
missible because it was more prejudicial than probative; (8) the
trial court failed to acknowledge that the error was prosecutorial
misconduct; (9) the trial court failed to acknowledge that the error
was a denial of petitioner's constitutional right to an impartial
jury and to due process of law; (10) the trial court erroneously
found no juror misconduct or indication of actual bias or prejudice
due to the forwarding of that particular exhibit with criminal his-
tory in its unedited form. Therefore, the trial judge was obviously
intending to not only cause prejudice to petitioner in the initial
determination of the issue of guilt, but intended to obtain a convi-
ction; (11) the trial court failed/refused to declare a mistrial af-
ter allowing petitioner's jury to be prejudiced against him; and
(12) the trial court erroneously failed to grant petitioner's new
trial motion.

 The judgment must be reversed. Under the circumstances of this

9

case petitioner was entitled to a bifurcation of the trial which would have prevented the jury given documented information of the prior arrest record and the prior conviction(s) unless it first found petitioner guilty of the charged offense. The unitary procedure, though heretobefore accepted in this state, needlessly exposed petitioner to serious potential prejudice by revealing his prior criminality without advancing any legitimate state interest. Not informing petitioner of the right to a bifurcated proceeding, not giving him a bifurcated proceeding on its own motion since his attorney was obviously acting as a District Attorney while faking as an attorney also prejudiced petitioner by permitting of his credibility without him having testified by evidence that he suffered a prior conviction and prior arrest record, which evidence was, for the most part, [119 Cal.App.3d. 650] inadmissible under Beagle standards, and gave the prosecutor the opportunity to brand petitioner "a professional crook.

The court, however, improperly denied the motion for new trial.

The court should have given petitioner a bifurcated proceedings. The admission of any evidence that involves crimes other than those for which a defendant is being tried has a 'highly inflammatory and prejudicial effect' on the trier of fact. (Fn. omitted.)"(People -v- Thompson (1980) 27 Cal.3d. 303, 314, 165 Cal.Rptr. 289, 611 P.2d. 883.) The issue of guilt "and the proof of prior arrest record and prior conviction(s) are clearly severable." (People -v- Morton (1953) 41 Cal.2d. 536, 543, 261 P.2d. 523.) The latter is unrelated to the substantive issue of guilt and affects only the penalty imposed. (Ibid.) Yet, prior to reaching a verdict on the murder, the jury was permitted to receive and read documentation information

10

1  in which was detailed evidence of petitioner having suffered a prior

2  criminal history including one prior conviction, three of the prior

3  incidences involved a firearm  while at the same token, a firearm

4  was used in the case for which he was on trial. This unitary proce-

5  dure was unnecessarily prejudicial and, under the circumstances of

6  this case, deprived petitioner of his due process rights to a fair

7  trial secured by the California Constitution (art. I, § 15).

8      Limiting instructions, such as were given here, do not elimin-

9  ate the risk of prejudice. "The naive assumption that prejudicial

10  effects can be ovecome by instructions to the jury, (citation) all

11  practicing lawyers know to be unmitigated fiction." (Krulewitch -v-

12  United States (1949) 336 U.S. 440, 453, 69 S Ct. 716, 723, 93 L.Ed.

13  790. (FN4) As the Supreme Court of Washington pointed out: "It seems

14  too plain for argument that to place before a jury the charge in an

15  indictment, and to offer evidence on trial as a part of the state's

16  case that the defendant has previously been convicted of one or more

17  offenses is to run a great risk of creating a prejudice in the minds

18  of the jury that no instruction of [119 Cal.App.3d. 651] the court

19  can wholly erase, and, while appellate courts will presume that the

20  jury has followed the instructions of the court, yet we cannot blind

21  our eyes to the active danger ever lurking in such action." (State

22  Kirkpatrick (1935) 181 Wash. 313, 43 P.2d. 44, 45.) Furthermore, emp-

23  irical data supports the [196] conclusion that a jury is likely to

24  be influenced by a defendant's past record such as in this case. (See

25  Kalven & Zeisel. The American Jury (1966) pp. 127-130, 177-180.)

26      The Standards for Criminal Justice of the American Bar Associa-

27  tion recommend that when, as here, "the defendant's prior criminal

28                                    11

history, including prior convictions are admissible solely for the purpose of determining the sentence to be imposed, the jury should not be informed of them, either through allegations in the charge or by the introduction of evidence, until it has found the defendant guilty." (ABA Project on Minimum Standards for Criminal Justice, Stds. Relating to Trial by Jury (Approved Draft 1968) (hereinafter ABA stds.) Std. 4.4, p. 102.) Moreover, the majority of states have adopted procedures requiring such a separation between the issues of guilt and of prior convictions. (See Spencer -v- Texas (1967) 385 U.S. 554, 586, 87 S.Ct. 648, 665, and cases and statutes cited in fn. 11, 17 L.Ed.2d. 606 (dis. opn. of Warren, C.j.); State -v- Olivera (1976) 57 Hawaii 339, 555 P.2d. 1199, 1203; Lawrence -v- State (1972) 259 Ind. 306, 286 N.E.2d. 830, 834; ABA Stds., supra, at p. 104.)

The weight of modern authority calls for a mandatory two-stage trial for the trial of the collateral issue of enhanced punishment to avoid prejudice to the defendant in the initial determination of the issue of guilt." (People -v- Fullerton (1974) 186 Colo. 97, 525 P.2d. 1166, 1167.) The bifurcated procedure, or English-Connecticut (FN5) rule, whereby the same jury determines both issues separately is considered the fairest, most desirable procedure, because it combines efficiency, adequate notice to the defendant, and due regard for the right to a jury trial with lack of prejudice to the defendant. (See Note, Recidivist Procedure: Prejudice and Due Process (1968) 53 Cornell L.Rev. 337, 342; Note, Recidivist Procedures (1965) 40 N.Y.U.L.Rev. 332, 348.) Under this procedure the prior arrest record and the prior conviction among the "vast array" of exhibits

12

given to the jury, which was read by the jury before it first found petitioner guilty of the charged offense; the court should have waited until after the jury found petitioner guilty of the charged offense, then it could have read to the jury the arrest record and prior conviction at which time the jury could have determined the validity of the prior criminal acts.

Petitioner contends that California Court of Appeals have consistently upheld the validity of the unitary procedure. (See, e.g., People -v- Owens (1980) 112 Cal.App.3d. 441, 446, 169 Cal.Rptr. 369; People -v- Gullen (1974) 37 Cal.App.3d. 976, 979, 113 Cal.Rptr. 43; People -v- Cruz (1970) 6 Cal.App.3d. 384, 394, 85 Cal.Rptr. 918; People -v- Mason (1969) 269 Cal.App.2d. 311, 313, 74 Cal.Rptr. 708; People -v- Hickok (1964) 230 Cal.App.2d. 57, 60, 40 Cal.Rptr. 687; People -v- Hoerler (1962) 208 Cal.App.2d. 402, 407-409, 25 Cal.Rptr. 209.)

A bifurcated trial would, however, carry out the intent of the Legislature to impose greater penalties upon recidivists who have failed to respond to prior convictions without subjecting those challenging their recidivist status to unnecessary prejudice. (See, Lawrence -v- State, supra, 286 N.E.2d. at pp. 835-836.)

The only rational offered to justify the present practice is the claim that it is part of a statutory  scheme" which "serve(s) the twin aims of judicial convenience and economy." (People -v- Owens, supra, 112 Cal.App.3d. at p. 447, 169 Cal.Rptr. 369.) The statutory scheme, however, does not mandate such a procedure, nor is judicial convenience or economy promoted thereby.

Bifurcation would be equally consistent with the legislation."

13

1    The detailed procedure for the charging uncharged offenses, tu-
2    rning such offenses over to the jury before it finds defendant gui-
3    lty, or charging, trying and finding of previous felony convictions
4    established by the statutes (See Pen.Code, §§ 969, 1025, 1093, 1158)
5    server to provide a "safeguard of value" to the accused against imp-
6    roper increased punishment. (People -v- LoCicero (1969) 71 Cal.2d.
7    1186, 1192, 80 Cal.Rptr. 913, 459 P.2d. 241.) Section 969 "affords
8    an accused advance notice that his prior conviction is in issue" and
9    section 1025 "gives him an opportunity to contest the fact and vali-
10   dity of the prior conviction to a jury." (71 Cal.2d. at p. 1192, 80
11   CalRptr. 913, 459 p.2d. 241.) While section 1025 does state that the
12   question whether or not he has suffered such prior conviction must
13   be tried by the jury which tries the issue upon the pleal of not
14   guilty" (italics added), it does not state nor imply that the jury
15   should try both issues simultaneously. Though the language of sect-
16   ion 1093, which sets forth the order of procedure of a [119 Cal.App.
17   3d. 653] trial, has been construed as permitting the reading of all-
18   egations of prior conviction(s) in the information together with all-
19   egations of charged offenses (People -v- Hoerler, supra, 208 Cal.App.
20   2d. at p. 08, 40 Cal.Rptr. 687; People -v- Williams (1957) 148 Cal.
21   App.2d. 525, 535, 307 P.2d. 48), it does not mandate such a proced-
22   ure and would not conflict with a two-part-trial. In any event, a
23   defendant can waive the formality of reading of the information,the-
24   reby avoiding the problem without any serious prejudice. (People -v-
25   Hall (i980) 28 Cal.3d. 143, 155, fn. 4, 167 Cal.Rptr. 844, 616 P.2d.
26   826; People -v- Herrera (1962) 209 Cal.App.2d. 748, 752, 26 Cal.Rptr.
27   409.) Section 1158 certainly is consistent with a bifurcated procedure
28

14

1   since it already provides that the jury must return a special sepa-

2   rate verdict on the issue of the prior conviction.

3       A bifurcated procedure would be at least as economical of court

4   time as the unitary practice. Such a procedure "does not offend any

5   principle of orderly procedure nor tend to delay justic. In fact it

6   might well expedite justice, for if a defendant is acquitted on the

7   substantive charge, there is no occasion to take time to present

8   evidence of prior criminal history such as arrest record and/or

9   prior convictions."(State -v- Stewart (1946) 110 Utah 203, 171 P.2d.

10  383, 387.)

11      Petitioner contends that he was entitled to both the right to

12  a jury trial of the validity of the arrest record and the validity

13  of the prior conviction (art. I, § 16: People -v- Ford (1964) 60 Cal.

14  2d. 772, 794, 36 Cal.Rptr. 620, 388 P.2d. 892) and he was also enti-

15  tled to the right to a fair trial (art. I, § 15) which are guarant-

16  eed by the California Constitution. Under the unitary procedure, a

17  defendant is forced to choose between the "equally unappealing alte-

18  rnatives" of admitting the prior convictions and losing his opportu-

19  nity to contest their validity or denying them and being faced with

20  the certainty that the state will attempt to prove them at trial,

21  subjecting him to resulting prejudice. (See 40 N.Y.U.L.Rev., supra,

22  at p. 338.) As the ABA Advisory Committee pointed out in criticizing

23  this California procedure: "Given the alternative procedures which

24  might be used, there is no real reason to confront...defendants with

25  the real possibility that they will be prejudiced by their failure

26  to enter a stipulation." (ABA Stds., supra, at p. 105.) "(T)he courts

27  should not participate in, or encourage, a procedure which obliges

28

1  the accused to forfeit one constitutional right in order to retain

2  the protection of another." (<u>Allegrezza -v- Superior Court</u> (1975) 47

3  Cal.App.3d. 948, 952, 121 Cal.Rptr. 245.)

4      Furthermore, though our Supreme Court has not specifically add-

5  ressed this issue, we cannot reconcile the continuation of this uni-

6  tary procedure with the protections our Supreme Court has otherwise

7  accorded [119 Cal.App.3d. 654] defendants against potential prejud-

8  ice resulting from informing the jury of a defendant's prior crimi-

9  nal activity. In <u>People -v- Hall</u>, <u>supra</u>, 28 Cal.3d. 143, 167 Cal.

10 Rptr. 844, 616 P.2d. 826, our Supreme Court (nearly three "decades

11 ago) held that in a prosecution for possession of a firearm by an

12 ex-felon, if the defendant is willing to stipulate to ex-felon sta-

13 tus, the jury may not even be told that a prior felony conviction is

14 an element of the offense. Underlying its decision was the express

15 view that unless nondisclosure would "legitimately impair the prose-

16 cutor's case," the court was "compelled" to totally bar any mention

17 of both "the nature and the fact of the prior conviction" in order

18 "to avoid any prejudice which might result from informing the jury

19 that (defendant) had been convicted of a felony." (Id., at pp. 156-

20 157, 167 Cal.Rptr. 844, 616 P.2d. 826.) (Italics in original.)

21     Our Supreme Court has found the potential for prejudic from

22 evidence of a defendant's prior criminal activity so great that the

23 trial court must exercise its discretion before determining whether

24 or not to admit such evidence even when the evidence is specifically

25 made admissible by statute. (See, e.g., <u>People -v- Thompson</u>, <u>supra</u>,

26 27 Cal.3d. 303, 317-318, 165 Cal.Rptr. 289, 611 P.2d. 883 (evidence

27 of other crimes admissible under Evid. Code, § 1101, subd.(b));

28

16

1  People -v- Beagle, supra, 6 Cal.3d. 441, 452-453, 99 Cal.Rptr. 313,

2  492 P.2d. 1 (evidence of prior felony conviction admissible for imp

3  eachment under Evid. Code, § 788).)

4      Accordingly, it is appropriate to now adopt a rule that when-

5  ever. in any future trial, a defendant pleads not guilty of priors

6  and a jury trial thereof is waived, he is entitled to a bifurcated

7  proceeding wherein the jury is not informed of his prior convictions,

8  either "through allegations in the charge or by the introduc ion of

9  evidence, until it has found the defendant guilty. As our Supreme

10 Court said in People -v- Aranda (1965) 63 Cal.2d. 518, 530, 47 Cal.

11 Rptr. 353, 407 P.2d.265, in a similar situation: "Whether or not it

12 is constitutionally permissible, the practice is prejudicial and

13 unfair to the defendant and must be altered. (I)n criminal actions,

14 where life or liberty is at stake, courts should not adhere to pre-

15 cedents unjust to the accused. it is never too late to mend. (United

16 States -v- Delli Paoli (2d Cir.) 229 F.2d. 319, 323 (Frank, J.,

17 dissenting).) In the absence, however, of a holding by the United

18 States Supreme Court, that the due process clause requires such cha-

19 nge, (FN6)) the rules we now adopt are to be regarded, not as const-

20 itutionally [119 Cal.App.3d. 655] compelled, but as judicially decl-

21 ared rules of practice....(Fn. omitted.)"

22     Petitioner contends that the application of the unitary proced-

23 ure in this particular case at bar has resulted in such prejudice

24 that it constituted as abuse of discretion and operated in fact to

25 deny petitioner due process of law. Not only was petitioner portra-

26 yed in argument by the prosecutor, in essence, as a professional

27 crook, but, in a case where his credibility was crucial to his def-

28                                  17

1  ense (FN 8) His credibility was impeached by evidence of his arrest

2  record and prior conviction (without him testifying in his own be-

3  half, but such evidence was given to the jury before it found peti-

4  tioner guilty of the charged offense which otherwise would have

5  been excluded under any court's acknowledgement of a Beagle motion.

6      Petitioner contends that the unitary procedure needlessly exp-

7  osed him to serious potential prejudice by revealing his prior cri-

8  minality without advancing any legitimate state interest. West's

9  Ann. Const. Art. 1, §§ 15, 16.

10     Most importantly, the two counts of carrying a loaded firearm,

11 the one count of carrying a concealed weapon in a vehicle with a

12 prior felony conviction would have been four counts in which would

13 have been inadmissible for impeachment purposes because petitioner

14 was accused at this trial of being connected with identical eleme-

15 nts, i.e., firearm (People -v- Fries, 24 Cal.3d at pp. 230-231,155

16 Cal.R½tr. 194, 594 P.2d 19; People -v- Spearman, supra, 25 Cal.3d

17 at p. 116, 157 Cal.Rptr. 883, 599 p.2d 74.) The prejudicial effect

18 of the admission of documented evidence of these offenses cannot be

19 discounted. As our Supreme Court has pointed out: "A jury which is

20 made aware of a similar prior conviction will inevitably feel pres-

21 sure to conclude that if an accused committed the prior crime he

22 likely committed the crime charged. (People -v- Fries, supra, 24

23 Cal.3d at p. 230, 155 Cal.Rptr. 194, 594 p.2d 19, italics in origi-

24 nal.)

25     The judgment attacked should be reversed and the cause should

26 be remanded for further proceedings consistent with the views above

27 expressed. Petitioner was denied his constitutional rights to an

28

1   impartial jury and to due process of law when the jury received Pre-

2   judicial information about petitioner's criminal history that had

3   not been presented at trial during its deliberations.

4       Petitioner contends that the prosecution should not have resor-

5   ted in its case in chief to any kind of evidence of petitioner's

6   evil character to establish probability of his guilt. There is no

7   presumption of petitioner's good character. The petitioner's charac-

8   ther, disposition and reputation is closed on the prosecution's case

9   in chief.

10      The state should not have shown petitioner's prior trouble with

11  the law, specific criminal acts, or ill name among his neighbors,

12  though such facts might logically be persuasive that he is by prop-

13  ensity a probable perpetrator of alleged crime, except when prior

14  crime is an element of later offense or where evidence as to other

15  transactions or a course of fraudulent conduct is admitted to estab-

16  lish fraudulent intent as an element of the crime charged.

17      Inquiry regarding petitioner's character on the prosecution's

18  case in chief is not rejected because character is irrelevant but

19  because the inquiry weighs too much with the jury, and cause them to

20  pre-judge one with a bad general record, thus denying him a fair

21  opportunity to defend against particular charge.

22      The overriding policy of excluding evidence of petitio-

23  ner's character, disposition and reputation on the prosecution's

24  case in chief, despite its admitted probative value, is the practi-

25  cal experience that its disallowance tends to prevent confusion of

26  issues, unfair surprise and undue prejudice. Inquiry as to petitio-

27  ner's character, disposition and reputation, denied to the state on

28                                    19

its case in chief, is and was open to petitioner because character is relevant in resolving probabilities of guilt.

Petitioner might have been intending to introduce affirmative testimony that general estimate of his character is so favorable that the jury might would have infered that he would not be likely to commit offense charged. Character testimony alone, in some circumstances, may be enough to raise a reasonable douby of guilt, and in proper case, jury should be so instructed. Permitting petitioner to introduce evidence of his good character, so-called character witnesses might not would have based his or her testimony on anything but hearsay and what commonly is called "character evidence" is only such when "character" is employed as a synonym for "reputation".

Character witnesses called by petitioner might not have testified about petitioner's specific acts or courses of conduct or his possession of a particular disposition or of benign mental and moral traits, not could he have testified that his own acquaintance, observation and knowledge of petitioner leads to his independent opinion that petitioner possesses a good general or specific character, inconsistent with commission of acts charged, but witness or witnesses may summarize what he has heard in the community, though much of it may have been said by persons less qualified to judge than himself.

Petitioner contends that any character witness must qualify to give an opinion by showing such acquaintance with petitioner, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally, he is regarded. Character witness is permitted to testify that he has heard nothing against petitioner, upon assumption that, if no

20

1  ill is reported of one, his reputation must be good but such an ans-

2  wer is accepted only from a witness whose knowledge of petitioner's

3  habitat and surroundings is intimate enough so that his failure to

4  hear of any relevant ill repute is an assurance that no ugly rumors

5  were about.

6      Where petitioner or any other defendant has put his reputation

7  in issue, his own character witness is suject to cross-examination

8  as to the contents and extent of the hearsay on which he bases his

9  conclusions, and the witness may be required to disclose rumors and

10  reports that are current even if they do not affect his own conclus-

11  ion, and the sufficiency of his knowledge may be tested by asking

12  what stories were circulating concerning events, such as one's arr-

13  est, about which people normally comment and speculate. Although the

14  law gives petitioner the option to show as a fact that his reputat-

15  ion reflects a life and habit incompatible with commission of offe-

16  nse charged, it subjects his proof to tests of credibility designed

17  to prevent him from profiting by mere parade of partisans.

18      Common sense dictats it was the prosecutor's responsibility to

19  redact the inadmissible information about petitioner's prior arrest

20  because she proffered that exhibit. The prosecutor had ample notice

21  that when an exhibit combines admissible and inadmissible evidence

22  the inadmissible part should be removed. Earlier in the trial, the

23  defense objected to the prosecutor's exhibit that combined a receipt

24  from Blockbuster with a receipt from Jack in the Box into a single

25  exhibit--both were copied onto the same sheet of paper. Because no

26  evidence had been presented relating to the Jack in the Box receipt

27  the trial court sustained the defense objection to it. When the pro-

28

secutor explained it was on the same page as the Blockbuster receipt, the trial court told her, "Cut it off." (5 RT. 2446-2447.) It would have been a simple matter to use the same pair of scissors to cut off the inadmissible booking information.

It is not necessary for the prosecutor to act in bad faith. Even unintentional acts may constitute misconduct (People -v- Hill (1998) 17 Cal.4th 800, 822-823.) The focus of inquiry is on the potential injury to the defendant, not the motive of the prosecution. (People -v- Sanders (1995) 11 Cal.4th 475, 526.)

The record shows the prosecutor's improper placement of the arrest information before the jury was not an isolated act. During the prosecutor's examination of Deputy Steven Marella, the prosecutor asked him if, on April 5, 2003, when he had contact with petitioner, he had petitioner take a booking photograph? Marella answered "Yes." The prosecutor followed that with several questions using the word "booked" or "booking" seven times. (3 RT. 1529-1530.) A reasonable juror would have inferred from the "booking" references that petitioner had been arrested at that time. (See 3 RT. 1531.)

Petitioner was denied his constitutional rights to an impartial jury and to due process of law when the jury received the prejudicial information about petitioner's criminal history that had not been presented at trial during its deliberations.

For all of the foregoing reasons, petitioner urges this Court to reverse the judgment of conviction in this case without unnecessary delay.

22

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

II

TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE
BY FAILING TO INVESTIGATE AND ASSERT A CRU-
CIAL OR POTENTIALLY MERITORIOUS DEFENSE, SUR-
ROUNDING THE TIME "PETITIONER" ARRIVED AT THE
BLOCKBUSTER VIDEO STORE

On May 10, 2003, Jose Robles (A-K-A. Chino) was shot and ki-
lled around 9:00 P.M., on 101st Street in Los Angeles a few houses
West of his home (2 RT. 937, 938, 945). Although the shooting occ-
urred around 9:00 P.M., however, "after the shooting two prosecut-
ion witnesses followed the white van and the suspects to another
location," which shows that "sometime after 9:00 p.m. these two
witnesses still had sight of the actual suspects envolved. The two
witnesses, Albert Segundo and Andres Sandoval followed the white
van and its occupants down 101st Street eastbound towards Vermont
where they made a right turn, then drove up to 104th Street on Ve-
rmont where there is a stop sign in which you have to yield at be-
before making a left turn, they made a left heading east on 104th
Street, then another left on the first upcoming street off 104th,
however, they continued straight until reaching 102nd street where
they made a right turn, on 102nd street. They continued eastbound
until ending on 102nd and Hoover (3 RT. 1570, 1571). The van then
came to a stop at the stop sign. Segundo and Sandoval then stoped
their vehicle in the middle of the street so as not to get to
close to the suspects van.

The passenger of the suspects van opens his door causing the
dome lights to come on, according to Segundo - the dome lights al-
lowed him to see the drivers profile real clear, (identified an

1  eyebrow peircing on the left side of the drivers face). The passe-
2  nger of the van then exits and points a gun in Segundo's direction
3  causing them to flee back to the scene (3 RT. 1571).

4      At petitioner's trial a Blockbuster surveillence tape was pl-
5  ayed before the jury by detective Steven Katz, however, the tape
6  showed petitioner inside the store at "9:41" P.M. (5 RT. 2469).
7  The video store is where petitioner had gone the night of the inci-
8  dent (5 RT. 2439). The store is located at 8811 South Western Ave-
9  nue in Los Angeles; according to detective Katz "you could make it
10 "from the crime scene to Blockbuster from 5 to 10 minutes" (4 RT.
11 1890). However, no evidence supports that the white van and it's
12 occupants drove from the crime scene to Blockbuster, and, in fact,
13 the complete opposite is supported when two prosecution witnesses
14 (Segundo and Sandoval), testified that after the crime they follo-
15 wed the white van to another location; a location in which was in
16 the opposite direction of the video store that petitioner was at
17 (3 RT. 1570-1572; 5 RT. 2759). At trial it was unknown what time
18 petitioner arrived at the video store (4 RT. 1892). When the surv-
19 eillence tape was played at trial it showed petitioner inside the
20 store at 9:35 p.m., the shooting occurred around 9:00 p.m. (5 RT.
21 2469).

22     According to detective Steven Katz the tape is six (6) minutes
23 slow, making the time petitioner was first seen on camera (9:41
24 P.M. (5 RT.2469). Detective Katz testified that petitioner was at
25 the video store about 40 minutes "after" the shooting (5 RT.2435).

26     At trial the tape was not played on the proper system that al-
27 lows a person to view the different images simultaneously, on a

28

multiplexor. If you were to show the video in court it would just look all garbled and views would change on a time sequence (5 RT. 2442). "As far at the detective could tell, petitioner was in the store for five (5) minutes" (5 RT. 2462). Thus, the tape did not support petitioner's mistaken identity defense.

Per petitioner's request previous appellant counsel filed a motion requesting an order for a complete copy of the Blockbuster surveillence tape in evidence, that motion was granted, "the motion was filed to the Superior Court after the Court of Appeals affirmed petitioner's conviction (See attached Exhibit I1-16 and J1). After receiving a copy of the surveillence tape petitioner had it sent to a George Reis, an Imaging Forensic who was able to discover what time petitioner arrived at the video store. The Imaging Forensic demultiplexed the tape and discovered that petitioner entered the video store at "9:25 p.m. (See attached Exh. K1). Also entering the store at 9:25 p.m. "with petitioner" is Evelyn Medina and Jesse Medina $\underline{1/}$ (5 RT. 2467; 4 RT. 1892, 1893; see attached Exh. L ) Petitioner is in view on camera entering the video store Sixteen (16) minutes "before" the time it was concluded at trial that petitioner was at the store." Petitioner contends that the twenty five (25) minutes window of opportunity could have been broken down tramendously, creating a serious degree of reasonable doubt in the minds of the jury, undermining confidence in a guilty verdict. Clearly time did not come to a freez after the shooting was committed around 9:00 p.m., time continued to pass as Segundo and Andres followed the suspects to another location "opposite" the direction of the video store petitioner was at. Detective Katz

1  stated you could make it from the crime scene to the video store
2  from five to ten minutes, however, if Segundo and Sandoval still
3  had sight of the actual suspects at 9:10 p.m., when the Second
4  event occurred after following the white van, then obviously the
5  five (5) to ten (10) minutes it would have taken to get from the
6  crime scene to the video store "was not" the case, and the dista-
7  nce from where the suspects van was last seen, had to have been
8  longer because Segundo and Andres followed the van in a direction
9  that was opposite the video store.

10      FOR EXAMPLE:
11  a) Crime occurs around "9:00 p.m."
12  b) Segundo and Sandoval follows the suspects to another location
13  "opposite" the direction of the video store; at that location ano-
14  ther event occurred, "at this point it's around "9:10 p.m."".
15  c) The distance from where the white van was "last seen" to the
16  video store became longer, approximately "15 to 20 minutes." If 20
17  minutes, "then petitioner would have had to be seen in view on the
18  surveillence tape "AFTER" 9:30 p.m. and "NOT BEFORE".
19  d) Petitioner discovered he is seen in view entering the video
20  store at "9:25 p.m., with his X-wife and wife's little brother,
21  Jesse Medina."
22      Furthermore, petitioner drives a green Toyota Camry and there
23  is no connection between petitioner and a van of any sort (2 RT.
24  953; 5 RT. 2432; 3 RT. 1515, 1516). Another factor that plays into

25  1/ Evelyn Medina is the X-wife of petitioner and Jesse Medina is
26  Evelyn's younger brother who was an eleven (11) year old chilt at
    the time.
27
28

showing petitioner was not the driver of the white van envolved in the crime, is the fact that petitioner is in view on the security tape entering the video store "with his x-wife and her little bro-ther at 9:25 p.m." The prosecutor would have had to take the unbe-lievable position that: "AFTER" Segundo and Sandoval followed the suspects to a location "opposite" the direction of the video store, petitioner was able to:

    1) Drop of the shooter somewhere;

    2) Get rid of the white van somewhere or somehow;

    3) Pick up his green Toyota Camry somewhere;

    4) Drive over to pick up his girlfriend and her little

       brother at their home;

    5) Change his close at some-point; and,

    6) Finally drive to the video store to be seen on camera

       at "9:25 p.m."

    Petitioner contends that it was not possible based on all of the above circumstances, especially with there being no time to do so as shown in petitioner's example above and on the previous pages. These matters would have created a serious degree of reaso-nable doubt in the minds of the jury. The second event that occur-red after the shooting was on 102nd street and Hoover, that is where Segundo and Sandoval followed the suspects to, however, at that location Segundo observed a brief conversation between the shooter and driver. The passenger opens the van door causing the dome lights of the van to come on, which according to Segundo all-owed him to see the drivers profile real clear. The passenger of the van then exits and head in the direction of Segundo pointing

a gun (See Police Report, page 164, attached.) Segundo was in Sand-oval's car that was five (5) to six (6) car lengths behind the white van when this second event occurred (3 RT. 1572; 4 RT. 1859). A crime broadcast went out via hand radio giving a discription of suspects and vehicle to look for, however, had the actual suspects been driving this white van in the places petitioner was, they would have been caught and arrested (See Police Report, page 7, attached.).

Petitioner lived on "104th street and Vermont" (4 RT. 1873, 1891). However, without an objection, the prosecutor falsely sta-ted and/or misled the jury, by stating the suspects were being fo-llowed towards petitioner's "home" and towards the territory of Nortorious graffiti artist," she stated the suspects were headed towards 103rd street which is exactly where the defendant lived" (5 RT. 2703). Such a false and misleading statement made petitio-ner appear guilty, it made it seem as though the suspects fled to petitioner's "home". The prosecutor's false and misleading statem-ents did not end there; the prosecutor also falsely stated and/or misled the jury by stating and/or claiming that petitioner was inside the Blockbuster video store for "only five (5) minutes."The prosecutor stated: "He was there for 5-minutes and picked out 3-movies. You ask yourself when was the last time you were able to go to Blockbuster and pick out 3-movies in 5-minutes.

He did is so that he could establish an alibi and that's why hes only in that store for 5-minutes and picked out 3-movies," (5 RT. 2741). The prosecutor's false and misleading comments were prejudicial, for they made it appear as though petitioner "Rushed"

1  while in the store because of having done something wrong, (the mu-

2  rder).

3       The prosecutors comments in regards to the blockbuster issue,

4  and comments that told the jury the suspects were headed exactly

5  where petitioner lived, makes petitioner's actual time of arrival

6  more significant. Such false and misleading comments were prejudi-

7  cial and violated petitioner's constitutional right to due process

8  of law (U.S.C.A. Const.Amend. 14; Constitutional law 268(8)). The

9  prosecutor's improper assertions and insinuations were calculated

10 to mislead the jury. (Berger -v- U.S. (1935), 295 U.S. 78, 79 L.

11 Ed. 1314, at p. 633).

12      Due to the prosecutor's improper assertions and insinuations

13 in the case at bar, the jury was invited to conclude that the sus-

14 pects drove to petitioner's home, and territory of NGA (Nortorious

15 Graffitti Artist). The jury was further invited to conclude that

16 petitioner was inside the video store for only "five minutes" and

17 picked out "3-D.V.D's," rushing because of having done something

18 wrong (the murder). A prosecutor has an obligation to govern impa-

19 rtially, this obligation to govern impartially is as compelling as

20 its obligation to govern at all; therefore, in a criminal prosecu-

21 tion is not that it shall win a case, but that justice shall be

22 done (Id. at 633). The twofold aim of which is that guilt shall

23 not escape or innocence suffer. She may prosecute with earnestness

24 and vigor indeed, she should do so. But, "while she may strike

25 hard blows, she is not at liberty to strike foul ones." It is as

26 much her duty to refrain from improper methods calculated to pro-

27 duce a wrongful conviction as it is to use every legitimate means

28

1  to bring about a just one (Id. at 633; Mooney -v- Holohan, 294 U.S.

2  103, 112, 55 S.Ct. 340, 79 L.Ed. 791; Pyle -v- State of Kansas,

3  317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214). It is fair to say that

4  the average jury, in a greater or less degree, has confidence that

5  these obligations, which so plainly rest upon the prosecuting att-

6  orney, will be faithfully observed. Consequently, improper sugges-

7  tions, insinuations, and especially, assertions of personal knowl-

8  edge "are apt to carry much weight against the accused" when they

9  should properly carry none. (Berger, supra, 629 at 633). Thus, the

10 prosecutors comments were prejudicial. The fact that petitioner is

11 seen entering the video store at 9:25 p.m. with his x-wife and br-

12 other-in-law, versus the prosecution claiming petitioner was in

13 the store for "only five minutes", when in fact petitioner was in-

14 side the store for approximately 16-minutes, is significant. It

15 shows petitioner was not- "rushing" and was not inside the video

16 store for "only five minutes". Petitioner enters the store at

17 9:25 p.m. and leaves at 9:41 p.m. ( Exhibit K1 attached ).

18     Although petitioner enters the store at 9:25 p.m. it should

19 be taken into account that the parking lot is located to the rear

20 of the Blockbuster, not directly in front, thus, it would take

21 another minute or two for petitioner to walk from the parking lot

22 to the front entrance of the video store.

23     Petitioner contends the "totality" of circumstances surround-

24 ing the actual time petitioner arrived at the video store and with

25 whom, is crucial. Had trial counsel asserted such a crucial or po-

26 tentially meritorious defense, there is a reasonable probability a

27 result more favorable would have occurred (Pope, supra, 23 Cal.3d

28

p.30

1   at p. 415; <u>Strickland -v- Washington</u>, <u>supra</u>, 466 U.S. at pp. 688,

2   690-92; <u>People -v- Watson</u>, <u>supra</u>, 46 Cal.2d at p. 836).

3       Petitioner contends that detective Steven Katz, taking the

4   position that the security tape is six (6) minutes slow, such a

5   claim can -not be relied upon as being accurate when the time was

6   being compared to the detective's very own wrisk watch (5 RT. 2440,

7   2441). It is not uncommon for the average working person to set

8   his or her watch ahead of the actual time. Additionally, this pos-

9   ition is coming from the same detective who appears to have had

10  trouble calculating time in regards to when petitioner was in view

11  on the security tape, and, in fact, in the police reports it sta-

12  tes the defendant was seen in view on the camera "<u>1 hour and 43</u>

13  <u>minutes after the incident,</u>" (See Police Report, at pg. 67, atta-

14  ched.)

15      Furthermore, detective Katz's word can-not be relied on with

16  him having a past of hideing evidence, his acts of concealing evi-

17  dence occurred around the same time period he was investigating

18  the case at bar (See attached Exh. **N 1-10**   ). As U.S. District

19  Judge Florence Marie Cooper stated, she found Katz's explanation

20  for the oversight "<u>utterly unbelievable</u>," (**Exh N-2**). Thus, petitio-

21  ner contends detective Steven Katz acted in a cover-up by:

22      1) Claiming the Security tape was 6 minutes slow;

23      2) Claining petitioner was at the video store 41 minutes

24          "after" the crime;

25      3) Making it appear as though petitioner was inside the store

26  for only "five minutes";

27      4) Claiming to have been unable to determine what time peti-

28

tioner arrived at the video store; and,

    5) During the testimony of Maria Retteria who testified

       petitioner was the driver envolved in the crime (3 RT.

       1227, 1228, 1229; See petition #B210118 pp. 10-17, 21-26)

    Petitioner contends it is crucial and relevant to reference to petition number B210118 so as to show the "cumulative" acts in a cover-up, for the "cumulative" acts in a cover-up when considering it's effect on petitioner's right to a fair trial, "Collectively" as opposed to individually, it can be said petitioner's right to a fair trial were violated. (U.S.C.A. Const. Amend. 5, 14; ABA Rules of Prof. Conduct, Rule 3.8(d); United States -v- Bagley, 473 U.S. 667, at 675 and n. 7, 105 S.Ct., at 3380, and n. 7).

    Detective Katz's acts in a cover-up deprived the jury of information, facts, and/or evidence in which petitioner contends there is a reasonable probability that had the jury been informed of such facts, information, and/or evidence, and had it not been for the prosecutors false and misleading comments, there is a reasonable probability a result more favorable would have occurred (Pepe, supra, 23 Cal.3d at p. 415; People -v- Watson, supra, 46 Cal.2d at p. 836).

    The error's also fall under the catagory of ineffective assistance of counsel:

    Petitioner contends a defense attorney "must" explore potentially meritorious defenses even if there are legitimate tactical reasons for introducing no evidence (In re Cordero (1988) 46 C.3d 161, 181, 249 CR 342). Therefore, it is contended that

trial counsel provided ineffective assistance of counsel by fai-
ling to investigate and assert a crucial or potentially meritor-
ious defense by:

    1) Failing to discover that petitioner arrived at the Bloc-
       kbuster video store at "9:25 p.m.";

    2) Failing to investigate and discover what time it was
       when Segundo and Sandoval last seen the suspects after
       following the white van to another location;

    3) Failing to show the distance between where the suspects
       was last seen and Blockbuster was longer than "5 to 10
       minutes";

    4) Failing to show that petitioner enters the video store
       "with his x-wife and her 11-year old brother" at "9:25
       P.M.;

    5) Failing to Secure the Services of a video expert, that
       could have discovered when petitioner arrived at the
       video store, and with whom;

    6) Failing to show that petitioner was inside the video
       store "longer then 5 minutes," thereby contradicting
       the prosecutions' claim;

    7) Failing to investigate and show that the suspect's did
       not drive towards petitioner's home, and did not drive
       towards the territory of the "notorious graffiti artist;

    8) Failing to investigate and discover possible bias, fals-
       ifying information, planting evidence, improperly coach-
       ing witnesses, lieing, or acts in covering-up of evide-
       nce on the part of detectives who investigated the case

at bar;

    9) Failing to object to the prosecution claiming that the blockbuster Security tape was 6 minutes slow, and failing to object to the prosecutors false and misleading statements;

    10) Failing to interview prosecution witnesses before trial for adequate trial preparation;

    11) Faling to Secure the Services of an investigator for full and adequate investigation and trial preparation;

AND,12) Failing to Secure the Services of a "Psychologist," regarding the Psychological factors that generally affect the accuracy of eyewitness identifications.

Petitioner contends that counsel's failures, when considered collectively as opposed to individually, it can be said that petitioner was denied the effective assistance of counsel and a crucial or potentially meritorious defense. The cumulative effect of counsel's failures is reversible error. (People -v- Pope (1979) 23 Cal.3d 412, 424-425; U.S.C.A. Const. Amend. 5, 5, 14; ABA Rules of Prof. Cond. Rule 3.8(d); United States -v- Bagley, 473 U.S. 667 at p. 675 and n. 7, 105 S.Ct., at 3380, and n. 7; 6th Amend. to U.S. Const.; Art. 1, Sec. 15 of the Calif. Const).

The 6th Amend. entitles petitioner to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate, to protect the defendant's right to a trial that is both fair in the proceedings and reliable in the result (see, People -v- Ledesma (1987) 43 Cal.3d 171, 215, quoting United States -v- Decoster (D.C. Cir. 1973) 487 F.2d 1197, 1202; Strickl-

1 and -v- Washington (1984) 466 U.S. 668, 688 (104 S.Ct. 2052; 80

2 L.Ed.2d 674). This right requires that before counsel undertakes

3 to act at all, he will make a rational and informed decision on

4 strategy and tactics founded on adequate investigation and prep-

5 aration (People -v- Ledesma, supra, 43 Cal.3d at p. 215).

6 In order to establish ineffective assistance of counsel,the

7 accused must show (1) that counsel's performance was deficient,

8 and that it fell below an objective standard of reasonableness

9 under prevailing professional norms; and (2) that there is a re-

10 asonable probability that, but for counsel's unprefessional err-

11 ors, the result of the proceeding would have been different (See

12 People -v- Ledesma, supra, at pp. 216-218; Strickland -v- Washsi-

13 ngton, supra, 466 U.S. at pp. 688, 690-692).

14 In dtermining whether trial counsel fell below the standard

15 of reasonableness, the court provides a strong presumption of

16 competence. A reviewing court generally defers to trial counsel

17 and avoids second guessing counsel as to matter's of strategy

18 and tactics.

19 However, a claim of strategy and tactics is irrelevant if

20 an action is taken without benefit of substantial inquiry, is

21 based on ignorance of the law, or if there could be no satisfac-

22 tory explanation for the actions" (see, People -v- Frierson

23 (1979) 25 Cal.3d 142, 162-163; People -v- Bess (1984) 153 Cal.

24 App.3d 1053, 1061; People -v- Guizar (1986) 180 Cal.App.3d 487,

25 492, fn. 3.) Because representation of an accused murderer is a

26 mammoth responsibility (citation), the seriousness of the char-

27 ges against the defendant is a factor that must be considered in

28

assessing counsel's performance (Citation), (In re Jones (1996) 13 Cal.4th 552, 566).

The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel playing a role that is critical to the ability of the adversarial system to produce just results.

For that reason, the court has recognized that the right to counsel is the right to the effective assistance of counsel (citation).

The performance inquire must be whether counsel's assistance was reasonable "considering all the circumstances,"(Strickland, supra, at p. 688). The accused has been denied the effective assistance of counsel where his trial attorney has failed to act as a reasonable competent diligent advocate (People -v- Ledesma, (1987) 43 Cal.3d 171, 215-218; People -v- Fosselman (1983) 33 Cal.3d 572-584).

Ineffective assistance is demonstrated where it is shown that counsel's performance resulted in the withdrawal of a potetially meritorious defense (People -v- Nation (1980) 26 Cal.3d 169, 179; People -v- Pope (1979) 23 Cal.3d 412, 424-425), or there is a reasonable probability that the accused would have received a better result, had counsel performed to a constitutionally adequate standard. Whah must be shown in determining counsel's ineffectiveness are in the two elements of the Pope test, (1) counsel failed to act in a manner to be expected of a reasonably competent attorney acting as a diligent advocate (Id. at 425). The second showing is that counsel's acts or omissions re-

sulted in the withdrawal of a potentially meritorious defense. (Id.) However, this second prong of the Pope test has caused a great deal of confusion among lower appellate courts, with respects to what is meant by a defense and of relevancy, as well as potentially meritorious. As for the latter, the Supreme Court has occasion to clarify what it meant in (People -v- Shaw; see Supreme Court Crim. No. 22443 (Slip opinion filed February 4, 1984).

In People -v- Farley (1979) 90 Cal.App.3d 851, 865, the Court of Appeals stressed that a defendant is denied the effective assistance of counsel, if by reason of counsel's failure to perform the obligations imposed upon him, defendant is deprived of an adjudication of a crucial or potentially meritorious defense (cited with approval in In re Hall (1981) 30 Cal.3d 408, at p. 434).

A crucial defense is not one which if presented, would have resulted inexorably in a defendant's acquittal. Rather, "by failing to obtain an adjudication of the stronger of two potential defenses," trial counsel deprives his client of constitutionally adequate assistance (People -v- Pope, supra, 23 Cal.3d 412, at 415).

It is well recognized that counsel cannot render effective assistance without having made an adequate investigation. (W. Schwarzer Dealing with Incompetent counsel, The trial Judge's Role, 93 Harv. L. Rev. 633 (1979).) The Supreme Court first enunciated this principle in the case of (Powell -v- Alabama, 287 U.S. 45, 57-58 (1932).) However, the minimum investigation requ-

1  ired is the pursuant of all obvious defenses. The Fourth Circuit

2  imposed this requirement when it stated, counsel must conduct

3  appropriate investigation, both factual and legal, to determine

4  if matters of defense can be developed, and to allow himself en-

5  ough time for reflection and preparation for trial. In any case

6  presenting an ineffective assistance claim, the performance inq-

7  uiry must be whether counsel's assistance was reasonable consid-

8  ering all the circumstances (Strickland, supra, 446 U.S. at p.

9  688).

10    The federal constitution guarantees a criminal defendant

11 the right to effective assistance of counsel. The same standard

12 applies whether counsel is appointed or retained (Cuyley -v- Su-

13 llivan, 466 U.S. 335, 342-345 (1980); People -v- Frierson, 25

14 Cal.3d 142, 160-162 (1979); McMann -v- Richardson, 397 U.S. 759,

15 771 fn. 14 (1970).) AS the Ninth Circuit has expressed, the

16 Sixth Amendment right to counsel is meaningless if counsel is

17 incompetent (United States -v- Tucker, 716 F.3d 576, 579 (9th

18 Cir. 1983).

19    Thus, a criminal defendant has the right to be represented

20 by counsel reasonably likely to render effective assistance

21 (Herring -v-Estelle, 491 F.2d 125, 127 (5th Cir. 1974); see also,

22 Rummell -v- Estelle, 590 F.2d 102, 104 (5th Cir. 1979).) Since

23 adequate investigations and preparation are keys to effective

24 representation (Ledesma, supra, 43 Cal.3d at p. 222), counsel

25 has a duty to interview potential witnesses and make an indepe-

26 ndent examination of the facts, circumstances, pleadings, and

27 laws involved (Von Monltke Gillies, 332 U.S. 708, 721 (1948).)

28    In the case at bar, petitioner contends he was denied a

1    crucial or potentially meritorious defense, and had it not been
2    for counsel's errors, a result more favorable would have occur-
3    red.There could be no satisfactory or tacticle explanation due
4    to the totality of failures on the part of counsel, therefore,
5    petitioner was denied effective representation. Reasonably comp-
6    etent assistance of an attorney would have objected to the pros-
7    ecutors damaging comments, and would have presented the facts
8    (See pp. 25 - 32   of this petition). Thus, counsel provided
9    ineffective assistance by failing to investigate, prepare and
10   assert a crucial or potentially meritorious defense (Pope, supra,
11   23Cal.3d at p. 415; People -v- Watson, supra, 46 Cal.2d at p.
12   836).

13       Trial counsel practically "relied" on the prosecutions' in-
14   vestigation, and the lead detective who investigated the case
15   has a past history of "foul play" such as hideing evidence."
16   However, no effective attorney acting as a diligent advocate
17   would rely on such an investigation, therefore, trial counsel
18   failed to conduct his very own investigation for adequate trial
19   preparation. At this stage, it can not be said in all honesty
20   and with full certainty that petitioner has received all favora-
21   ble/exculpatory relevant evidence. Trial counsel did not make a
22   written request for all Brandy material, and since the lead det-
23   ective (Steven Katz) has a past history of concealing evidence,
24   the only way of ever learning of such evidence is upon persona-
25   lly viewing the entire investigating file (#003-04469-0372-011).
26       Petitioner contends that it is fundamentally unfare to
27   force petitioner to rely on the investigation of the prosecution,
28

the very ones' who sought to convict, and did **wrongfully convict** petitioner, in violation of the 14th Amendment of the United States Constitution.

Trial counsel further provided ineffective assistance and deprived petitioner of a crucial or potentially meritorious defense by:

1) Failing to conduct an investigation into the prosecution witnesses ability to see;

2) Failing to put on demonstrative evidence during trial, or request that the jury be allowed to observe the situation under the same identifying circumstances as each of the witnesses, i.e., Albert Segundo, Maria Renteria, Carlos Lopez, and Jesse Robles;

3) Failing to file a Pitchess Motion;

4) Failing to attack the credibility of Carlos Lopez and Jesse Robles with the use of their past acts of criminal misconduct; AND,

5) Failing to sufficiently question detective Valento in regards of Valento failing to document what was said or stated when the two of them (Carlos Lopez and detective Valento) discussed aspects of the case.

Petitioner contends that attacking the prosecution witnesses' credibility and ability to see what they said they saw was crucial towards creating reasonable doubt in the minds of the jury, and discrediting a prosecution witness includes the detectives who investigated the case at bar.

Eyewitness testimony constituted the only evidence connect-

ing petitioner to the crime, and such evidence is not corrobora-
ted by any independent evidence. Therefore, counsel failed to
adequately investigate, prepare, and challenge the prosecution's
witnesses' ability to see exactly ehat was impossible to see.
Superman himself would not have been able to see what these wit-
nesses claimed to have saw. Trial counsel also failed to put on
demonstrative evidence, failed to seek impeachment evidence, and
failed to utilize information concerning the credibility of the
only evidence connecting petitioner to the crime which contribu-
ted to the denial of the effective assistance of counsel and a
crucial or potentially meritorious defense.

The right to evidence which impeaches the credibility of
prosecution witnesses is guaranteed by the United States Consti-
tution. The California Supreme Court ruled that the basic princ-
iple underlying defense discovery in a criminal case stems from
the fundamental proposition that an accused is entitled to a
fair trial and an intelligent defense in light of all relevant
and reasonably accessible information (Pitchess -v- Superior
Court (1974) 11 Cal.3d 531, 535; City of Santa Cruz -v- Munici-
pal Court (1989) 49 Cal.3d 74, 84). A legitimate goal of disco-
very is to obtain information for possible use to impeach or
cross-examine an adverse Witness (Foster -v- Superior Court
(1980) 107 Cal.App.3d 218, 227, 165 Ca.Rptr. 701)

Additionally, other courts have held that Pictches Motions
are proper for issues relating to credibilty (Larry E. -v- Sup-
erior Court (1987) 194 Cal.App.3d 25, 28 _33, 239 Cal.Rptr. 264
[motion seeking discovery of complaints for "improper police

41

1  tactics, dishonesty, and racial or class prejudice" was relevant

2  to show officers had a motive to lie and could show potential

3  bias which would affect the officer's credibility as a witness];

4  People -v- Hustead (1999) 74 Cal.App.4th 410, 417).

5      The codification of the Pitchess principles of discovery as

6  they relate to police personnel records (still commonly referred

7  to as "Pictchess discovery") Served not only to reaffirm, but

8  expand, the principles of criminal discovery articulated by the

9  Pitchess Court, (Santa Cruz, supra, 49 Cal.3d at 84).

10     Because a defendant's right to evidence which impeaches the

11  credibility of prosecution witnesses is a right guaranteed by the

12  United States Constitution, however, nothing in these California

13  Pitchess statutes may be interpreted to procedurally or substan-

14  tively deprive a defendant of access to material evidence in

15  police personnel files. Indeed, the California Supreme Court has

16  recognized that "this procedural mechanism for criminal defense

17  discovery must be viewed against the larger background of the

18  prosecution's constitutional obligation to disclose to a defend-

19  ant material exculpatory evidence so as not to infringe the def-

20  endant's right to a fair trial," (People -v- Mooc (2001) 26 Cal.

21  4th 1216, 1225-1226).

22     The California Supreme Court has made it clear that the Pi-

23  tchess discovery statutes in no way limit's discovery under

24  Brady. To the extent that Brady material exists within the mate-

25  rials responsive to a defendant's Pitchess Motion, it must be

26  provided to the defendant." Because Brady's constitutional mate-

27  rility standard is narrower than Pitchess requirments, any citi-

1  zen complaint that meets Brady's test of materiality necessarily

2  meets the relevance standard for disclosure under Pitchess

3  (Brandon, supra, 29 Cal.4th at 10.)

4      The federal courts have also addressed the issue of the dis-

5  covery of exculpatory evidence within officer's personnel files,

6  holding that prosecuting attorney's are required to provide such

7  evidence from officers personnel records (United States -v- Hent-

8  horn (9th Cir. 1991) 931 F.2d 29, 30-31 (prosecutor is obligated

9  to review and provide material evidence of perjurous conduct and

10  other like dishonesty from officers personnel records upon requ-

11  est); United States -v- Brooks (D.C. Cir. 1992) 966 F.2d 1500,

12  1503 (duty to search for and provide evidence that might bear on

13  the conduct and character of an officer extends to information

14  in the police department's homicide and Internal Affairs Divis-

15  ion files.)

16      Moreover, because of the importance of the constitutional

17  right to a fair trial and the concomitant right to disclosure

18  of Brady evidence, a court in responding to a Pitchess Motion

19  may under-take to review complaints or other confidential docum-

20  ents outside the purview of those materials responsive to the

21  motion (See, Brandon, supra, 29 Cal.4th at 15.) If those materi-

22  als contain Brady material, the court may order their disclosure

23  as well (Id.) Thus, records that are older than the five years

24  from the date of the incident that is the subject of a Pitchess

25  motion may be ordered disclosed (Id. at 13-15).

26      In the case at bar, detective Michael Valento conversed and/

27  or discussed aspects of this case with witness "Carlos Lopez"

28

1  while **transporting** "Lopez" to court to testify against petitioner

2  (4 RT. 2158), but failed to document what was stated and/or said

3  during the conversation between them, therefore, providing the

4  probability or open the door for Valento to coach Lopez on what

5  to say on the witness stand.

6      The question is: "how much of Lopez's testimony did detect-

7  ive Valento influence Lopez to testify to?

8      Detective Michael Valento was also a prosecution witness in

9  this case, therefore, a prosecution witness transported a prose-

10  cution witness (Carlos Lopez) to court to testify against petiti-

11  oner. The two witnesses (one a detective and the other gang mem-

12  ber, and both of them is Mexican and petitioner himself is a

13  black man, and yet, the two witnesses, Valento and Lopez, discu-

14  ssed the case in route to court to testify against petitioner,

15  therefore, the prosecution roled the dice and played a game of

16  Russial Roulette with petitioner's liberty.

17      Detective Valento's failure to document what was stated/and

18  or said between Lopez and himself about the crime and what to

19  say against petitioner, clearly provided the possibility that

20  the two of them as prosecution witnesses, conspired with one an-

21  other so that Lopez's testimony would be framed to falsely go

22  against petitioner so that he would be falsely found guilty.

23      Trial counsel did not question Valento sufficiently to det-

24  ermine what was discussed between Lopez and Valento, furthermore,

25  if detective Valento has a history of acting in a cover-up of

26  evidence or improperly coaching or influencing witnesses, it

27  would have been relevant at that point, due to Valento failing

28

1  to document what was stated, said, and/or discussed.

2  Counsel's failure to raise these crucial points, or assert
3  such a crucial defense, deprived the jury of information that
4  could have casted reasonable doubt in their minds, which in turn
5  contributed to the denial of crucial or potentially meritorious
6  defense (Pope, supra, 23 Cal.3d at p. 415). Thus, counsel was
7  ineffective for failing to file a Pitchess Motion. Furthermore,
8  DETECTIVE Steven Katz, the lead detective who investigated and
9  handled the case at bar "acted in a cover-up of evidence in the
10 past." The family of Christopher Wallace (A.K.A. Notorious
11 B.I.G., rap Artist), had long contended "cops" were responsible
12 for their Son's death. The evidence in which "detective Steven
13 Katz hid were statements linking the killing of Christopher
14 Wallace to rogue cops, "David A. Mack, (who is serving a 14-year
15 prison sentence for bank robbery), and Rafael Perez (the Central
16 figure in the 1998 corruption scandal) that rocked the Los Ange-
17 les Police Department.

18 Katz's explanation for the oversight was found to be "utte-
19 rly unbelievable", his actions were intentional and willfull,
20 Judge Florence Marie Cooper stated. The concealed evidence came
21 to light "only" through an anonymous tip and "after" the
22 L.A.P.D. Internal affairs investigators searched through the De-
23 partment's Robbery Homicide Division on the night of June 24,
24 2005. Much of the material turned up in the desk or cabinet of
25 Detective "Steven Katz", (Exh. N 1-10  ).

26 It would be erroneous for petitioner to be forced to "hope
27 on an anonymous tip" and an internal affairs investigation to

28

p. 45

1  discover the existence of undisclosed exculpatory evidence after

2  having been rail-roaded to prison wouldn't it?

3       It is fundamentally unfair to petitioner, to be forced to

4  trust and rely on detective Steven Katz handing over all relev-

5  ant and exculpatory evidence.

6       . Trial counsel was ineffective for failing to discover dete-

7  ctive Katz's past acts of misconduct for impeachment purposes,

8  and for not making an adequate effort to discover the existence

9  of exculpatory evidence. It can not be said that petitioner rec-

10 eived all exculpatory evidence guaranteed by the constitution.

11 Thus, petitioner should have been, and should be afforded such

12 fairness. A foul cop is a foul cop, that should not have been

13 the lead detective on this case, for it provided Katz the open

14 door to act in a cover-up in the case at bar. A foul cop would

15 not have a problem with coaching witnesses, thus, the prosecut-

16 ion's evidence is questionable. Therefore, it is necessary to

17 ask the question: "why was Steven Katz working in law enforcem-

18 ent at all?

19      How could one uncontaminate that in which may be contamina-

20 ted? Especially when the evidence favors prosecution, is bias,

21 dislikes petitioner, likely will not admit to being coached,

22 and/or may have simply sought to please the prosecution at the

23 point of taken the stand at trial.

24      Petitioner contends that in a case where the record reveals

25 counsel's explanation for the challenged acts or omissions, the

26 court must inquire whether the explanation shows whether counsel

27 was behaving in a reasonably competent, conscientious, and dili-

28

gent fashion.

In the present case, many of counsel's reasons for his acts and omissions at trial are not apparent from the record. When the record reveals no explanation for counsel's acts or omissions, the case will be affirmed on appeal, but counsel's reasons will be inquired into in an evidentiary hearing on a writ of habeas corpus. If there simply could be no satisfactory explanation, the case should be reversed even on appeal. (People -v- Pope, supra, 23 Cal.3d at p. 426.) In the present case, defense counsel failed and refused to be diligent in the preparation of the petitioner's case. Trial counsel failed to discover exculpatory material for impeachment purposes. Detective Katz was the "lead" detective who conducted an investigation on this case, information barring on his credibility was crucial. Especially since there is no physical evidence connecting petitioner to the crime, the prosecution's case was solely based on eyewitness testimony. Theerefore, if any of the detectives or officers who conducted an investigation on this case has a past of improperly coaching witnesses, fabricating evidence, improper police tactics, dishonesty, racial, or class prejudice, it should have been used to cross-examine and/or attack their credibility on the witness stand (People -v- Hustead (1999) 74 Cal.App.4th 410, 417.)Since the prosecutions case was solely based on eyewitness testimony, the detectives having a history of coaching witnesses is crucial, argueing that these witnesses were possibily coached could have casted reasonable doubt in the minds of the jury. Thus, trial counsel's failure to investigate and seek impeachment evidence

1   for possible use to impeach, and cross-examine and/or attack the

2   credibility of prosecution witnesses contributed to denial of a

3   crucial or potentially meritorious defense (Pope, supra, 23 Cal.

4   3d 412 at 415).

5        Jesse Robles was in possession of "Crystaline methampheta-

6   mine" (See Exhibit O-1 attached hereto), a drug in which he

7   possibly uses, sells, or both. Carlos Lopez has a past history

8   of being in possession of "marijuana" (See Exhibit P-1 attached

9   hereto.)

10       Trial counsel did not attempt to utilize Robles's and

11  Lopez's past acts of illegal drug possession for cross-examinat-

12  ion, impeachment, and/or credibility purposes. In violation of

13  petitioner's Sixth Amendment right to effective assistance of

14  counsel.

15                          III

16          TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COU-
            SEL FOR FAILING TO SECURE THE SERVICES OF A PSYCHOLO-
17          GIST, REGARDING THE "PSYCHOLOGICAL" FACTORS WHICH GE-
            NERALLY AFFECT THE ACCURACY OF EYEWITNESS IDENTIFICA-
18          TIONS.

19       In the case at bar, petitioner contends that he has been

20  wrongfully convicted of being the driver of a white van envolved

21  in the shooting death of Jose Robles. Eyewitness testimony cons-

22  tituted the only evidence connecting petitioner to the crime,and

23  such evidence was not corroborated by any other evidence giving

24  the testimonies reliability (3 RT. 1515-1516).

25       There are factors in the eyewitnesses testimony and police

26  reports which could have raised reasonable doubt in the minds of

27  the jury as to the accuracy of the eyewitness identifications.

28

At trial four witnesses identified petitioner as the driver envolved in the crime (5 RT. 2760-2761). "Three out of the four witnesses never" identified" petitioner as the driver until approximately three (3) years "after" the crime, which was at trial as petitioner was the only person who sat next to his attorney.

The three witnesses who identified petitioner for the first time in court 3-years after the incident, as petitioner was the only person sitting next to counsel. However, the three people who falsely identified petitioner 3-years after the incident were:

    1) Maria Renteria;

    2) Albert Segundo; AND,

    3) Carlos Lopez.

(See 3 RT. 1245, 1248, 1249, 1265, 1613, 1615, 1616).

These three witnesses identified petitioner as the driver will after Jesse Robles had "told all his friends and family members" who he "think" the driver of the suspects van was, according to himself(Jesse Robles,; 2 RT. 944). No one identified petitioner as the driver the night of the crime, and although they had the opportunity to do so, but did not, however, Jesse Robles claimed he did speak with officers the night of the crime but there are no reports supporting his claim (2 RT. 979-984; 3 RT. 1508-1510). The first witness who accused petitioner of being the driver envolved in the crime was Jesse Robles, who did so "two (2) days" after the Crime (2 RT. 945).

The crime occurred around 9:00 P.M. "at night" on May 10, 2003. Earlier that same day there was a confrontation between

the victim and petitioner's younger brother (5 RT. 2432). Petiti-
oner drove over to 102nd street where the confrontation occurred
and asked a group of people who was messing with his brother,
Jose Robles (the victim) was amongst the group of people that
petitioner asked, and no one responded to petitioner's question
and nothing occurred and petitioner simply left, and told his
brother," there is a lot of people here on 102nd street and no-
one's saying anything, so just don't go around that area anymore,
petitioner was in his green Toyota Camry (3 RT. 1613, 1614,1619;
4 RT. 2111, 2112). After which, petitioner carried on with his
normal day.

Petitioner drove all the way to a Burger-King in Culver-
City which is where his friend Karen Hernandez worked, and they
talked about going to the movie theater's later on at night; pe-
titioner was with his two brother's Deandre and Jeremy Coleman,
and also with petitioner was Aaron Arellano, Aaron Arellano and
petitioner drove to Culver-City from Los Angeles in seperate
cars (4 RT. 1881-1884).

From Burger King in Culver-City petitioner drove back to
Los Angeles to visit another friend at a McDonald's; Laura Marq-
uez was an employee at that McDonald's and petitioner had gone
there to exchange his cell phone to a newer model phone; petiti-
oner's phone was in her name because of having not established
credit for himself to make the purchasing price of the phone
more afforDABLE. Therefore, when petitioner wanted to up-grade
his cell phone to a newer model, he had to go through his friend
Laura Marquez, because the newer model phone came in mail to her

1   address. Aaron Arellano showed up as petitioner was at McDona-

2   ld's changing the phone casing (3 RT. 1636-1642; see attached

3   Declaration as Exhibit ___Q___ ). After leaving McDonald's, peti-

4   tioner left to get together with other friends and family--to

5   get ready to go to the movies; everyone eventually met and was

6   together on 98th street between Budlong and Vermont, which is

7   where petitioner's girlfriend lived (5 RT. 2407-2411, 2419,

8   2420, 2430, 2432). It was getting too late and petitioner deci-

9   ded to simply rent movies from a Blockbuster video store (5 RT.

10  2425, 2426.)

11      After renting three (3) D.V.D's, petitioner drove to get

12  food at a Jack-n-the box (See Police Report, pg. 56). Petitioner

13  was in his green Toyota Camry the entire day and was not driving

14  a white van (5 RT. 2406, 2407; 5 RT. 2432.) Petitioner's actions

15  through-out the day shows that he was not plotting some elaber-

16  ate murder.

17      On this same day, but at night, Jose Robles (A.k.A. Chino)

18  was shot and killed on 101st street a few houses west of his

19  home. The victim was an "NC gang member" with several enemies, as

20  the victims own friend stated: "anyone could have been involved

21  (4 RT. 1862, 1896; 3 RT. 1558-59; see Police note attached as

22  Exhibit ___R___ ); Police Report, pp. 10,18, 20). Coincidently

23  Chino was shot and killed on the same day that he had gotten

24  into a confrontation with petitioner's younger brother. Petiti-

25  oner contends that it is probable or likely that because of this

26  previous confrontation and since petitioner had asked a group of

27  people on 102nd street earlier that day: "who is messing with his

1  younger brother, therefore, Jesse Robles and many others in the

2  neighborhood "assumed" and/or believed petitioner was responsi-

3  ble for Chino's death.

4      Jose Robles (A.K.A. Chino) was amongst the group of People

5  on 102nd street when petitioner asked them who was messing with

6  his younger brother and nothing occurred, and petitioner simply

7  left and told his brother just to stay away from that area.

8      Petitioner contends that the prosecution witnessess's iden-

9  tifications are likely or may be products of assumption, rumors,

10  improper police questioning, including an unconscious wish to

11  please the police or prosecutor, officers, and detectives uncon-

12  sciously directing identification towards a suspect they are si-

13  ncerely convinced is the guilty party, pre-event and/or post-

14  event contamination, and/or Psychological factors which genera-

15  lly affect the accuracy of eyewitness identifications as will be

16  discussed in this case at bar, for such factors apply to petiti-

17  oner's case, i.e., the case at bar.

18      The first witness to identify petitioner as the driver of

19  the suspects white van, was Jesse Robles. [1st witness: Jesse

20  Robles]..."

21      Robles heard about the previous confrontation between the

22  victim and petitioner's younger brother," two days" following

23  this confrontation and the death of Jose Robles, "Jesse Robles

24  implicates petitioner as the driver of the suspects van (2 RT.

25  945, 955-958). Robles "told" all his friends and family members

26  that petitioner was the driver of the suspects van (2 RT. 944,

27  991-994). Robles told everyone: "Jofama" was the driver well

before anyone else identified petitioner as the driver of this imaginary white van."<u>Carlos Lopez and Albert Segundo</u>" were two (2) of the friends that Robles told that petitioner was the driver of the white van. Lopez and Segundo eventually jumped on the ban-wagon implicating petitioner as the driver. Two days after the crime, Jesse Robles implicated petitioner by name because detective Steven Katz showed Robles a single photograph of petitioner. This was an improper procedure, and should have been excluded, regardless of reliability, because the showing of the single photograph was unnecessary and suggestive, and that the identification was unreliable in any event, and simply because Robles implicated a "name," did not show Or prove that he knew petitioner, nor did it prove that he would have been able to "identify" petitioner in a Six Pac photo line-up at that time.

Robles claimed to have seen petitioner about fifty times in the past (2 RT. 943). He was 15-years of age when he talked to the detectives (See, Police Report, pg. 39). After having already seen a "single photo" of petitioner, however, Robles was shown a Six pac-photo line-up and was asked if he "<u>recognized</u>" anyone, and he was shown this Six-pac photo line-up approximately "Ten (10) months" after the homicide (2 RT. 958-961). Robles stated that at first he didn't want to implicate petitioner, but then he did so because "<u>his family</u>" wanted him to (2 RT. 983).

No one has ever threatened or attempted to do anything to Jesse Robles as a result of him testifying or falsely accusing petitioner of having been the driver of the suspects vehicle (2 RT. 970, 971, 983). Petitioner contends that the two (2) day

time period between the night of the crime and when Robles first spoke to officers, gave Robles and others plenty of time to go over the index event in his mind, fill in gaps, reconstruct details, thus altering the original recolections so as to eliminate inconsistencies between information in memory, and that acquired from other sources. Ultimately, petitioner became the person to blame.

Robles heard about the confrontation between the victim and petitioner's younger brother, and knew petitioner had asked the victim and his friends earlier that day, who was messing with his younger brother, therefore, Robles's false allegations against petitioner may be based on that fact, therefore, Jesse Robles, may have assumed and/or believed petitioner was the person responsible for his brother's death. This in turn may have led Robles to tell "all his friends and family about who he believed was behind his brother's death, and explained why he held such a belief. As Robles clearly stated: "he did not want to implicate petitioner but then he did so because "his family" wanted him too.

After Robles had told his family about what he thought and explained why, "his family became convinced that petitioner was behind the death of Jose Robles, which may be why his family told him to say that it was petitioner. Doing so was extreamly easy since Robles was shown a single photo by officers, however, this is the same witness who stated that petitioner and all his brother's "look alike" (2 RT. 948).

In laboratory experiments, it is common for own-race/other

1   race recognition rates to differ by as much as 30-per-cent.

2       (Cross-Racial Identification Errors at pp. 942-943). Even

3   for those who have considerable social contact with blacks may

4   be no better at identifying them than those who have not (Id. at

5   pp. 943-944). Some jurors may deny the existance of the own-race

6   **effect in the misguided belief that it is merely a racist myth**

7   exemplified by the derogatory remark, "they all look alike to

8   me", while others may believe in the reality of this effect but

9   may be reluctant to discuss it in deliberations for fear of

10  being seen as bigots (cross-Racial Id errors, at p. 969; see

11  also Wells, A Reanalysis of the Expert Testimony Issue, in Eye-

12  witness Testimony: Phychological Perspectives, p. 309). This in-

13  formation could have assisted the jurors on their fact finding

14  task.

15      Although not actually being able to clearly see the driver

16  under the circumstances Robles had to observe, however, Robles

17  was able to make petitioner be the driver based on his word and

18  contaimining the neighborhood by telling all his friends and

19  family members that petitioner was the driver of the suspects

20  white van. Heartless inside, Robles had not a care in the world

21  about blaiming the wrong person or a person who he did not get

22  along with, and may have unconscious Transfered petitioner's

23  face from the earlier situation to the driver of the suspects

24  van in the later situation, "Robles found this matter to be "FU-

25  NNY" (2 RT. 981).

26      In addition to Robles telling all his friends and family

27  that petitioner was the driver of the suspects van, unidentified

28

members of the "NC Gang" was going around the neighborhood "show-ing a single yearbook photo of petitioner," up showing people this yearbook picture the NC Gang members were <u>telling them that</u> <u>"Jofama (petitioner) was the person who done the crime</u>, this form of contamination was to ensure everyone was on the same ban wagon of accusing "Jofama (petitioner) (see Police Report, pg. 62 attached hereto.), a "<u>NAME</u>" everyone in the neighborhood be-came familure with.

Petitioner contends there are additional factors showing that the prosecution witnesses simply blaimed and/or blaiming the petitioner, therefore, such identifications are not founded upon what they actually saw or seen. For example, the crime occ-urred "<u>at night</u> around 9:00 p.m. (2 RT. 937).

Jesse Robles described the suspects van as having "<u>tinted</u> <u>windows</u>," (See, Police Report, pg. 39 attacted hereto.) Robles did not see the actual shooting, "the shots had already stopped as he ran from the back-yard to the front yard gate and seen the white van "<u>speeding</u>" eastbound passing his home (2 RT. 972). <u>At</u> <u>trial</u> Robles described the driver as wearing a "<u>white T-Shirt</u> and a <u>long hanging type beanie</u> that fit snug on a persons head," which shows a portion of the drivers <u>head and face was covered</u> (2 RT. 976).

Robles stated he never identified the driver as wearing a long sleeved black hooded sweat-shirt with the hood down, and he also claimed that he never seen the passenger, but contradicted himself by describing what the passenger was wearing (2 RT. 984-985). However, it's documented that Jesse Robles described a

white van with wood paneling, drivers door missing the wood paneling, wheels of the suspects van appeared to be stock, van had "tinted windows," the passenger had a long sleeved black hooded sweat-shirt with the hood up, and the "driver was wearing a long sleeved black hooded sweat-shirt with the hood down, and a beanie on his head," (See Police Report, Pg. 39 attached hereto.

The beanie was about a foot long, which shows a good portion of the drivers head and face was covered (Vol. 1 of 2, Preliminary Transcript, Pg. 26).

Robles made his observation from "28 feet away at night as the suspects van "sped by going fast," (2 RT. 942, 973, 985).

Petitioner contends that from the point Robles first saw the white van as it was "speeding" by, the length of time Robles had to observe was likely under "four (4) seconds." Partly obstructing Robles's view was Renteria's van which was parked on the Western perimiter line of the Robles home; Renteria parked her van there "before" the shooting (3 RT. 1225, 1232; see Soto's trial transcript, attached hereto as Exhibit E 1816).

Robles stated the "headlights" of Renteria's van illuminated the inside of the suspects van "allowing him to see petitioner's face (2 RT. 952-953), which was and is impossible based upon the fact that Renteria had parked her van on the "Western" perimiter line of the Robles home "before" the shooting, and also parked in front of Renteria's van was a large dump working truck (3 RT. 1225, 1232; see Soto's trial transcript attached hereto as Exhibit E 1818; see Petition #B-210118; see Photo Exhibit A1-A6).

Petitioner contends Renteria's front headlights could not

have possibly illuminated the inside of the suspects van under the circumstances discussed above, and furthermore, Renteria's "tail" lights could not have substituted for the headlights. Common sense tells us that Renteria's headlights hit the rear end of the dump truck parked in front of her vehicle, and did not illuminate the inside of the suspects van that was off-set from her vehicle traveling towards Vermont. The Western perimiter line of the Robles home is basically the "right" side of their drive way, therefore, when Jesse Robles was in the front yard, Renterias vehicle was to his right. Also another factor that shows that Robles falsely accused the petitioner and could not have actually identified the driver, is the fact that--"within a total of approximately three (3) seconds," from "twenty-eight (28) feet away", at "night", as the suspects were "speeding by", Robles described and/or identified" all" of the following:

1) A white van with wood paneling;

2) Drivers door missing the wood paneling;

3) Wheels appeared to be stock;

4) Windows of the van were "tinted";

5) The passenger had a long sleeve black hooded sweatshirt with the hood up;

6) Driver wearing a long sleeve black hooded sweatshirt with the hood down, and a long hanging type beanie; AND,

7) Robles also seen that his dad was not paying attention as the van "sped" by his home, because Robles' dad's attention was focused up the street where the crime occurred (see, Police Report, Pg. 39 , attached hereto; and

p. 58

2 RT. 973).

    This same witness also stated that petitioner and all of his brother's" look alike". (2 RT. 948). While it is hard to believe that Robles could positively identify the driver "within" appro- ximately "three (3) seconds" under the circumstances that he des- cribed. It is also hard to believe that the prosecution counted Robles as a credible "unbias" witness, and claim that his identi- fication is reliable.

    1) Robles found this matter to be funny (2 RT. 981);

    2) He admitted that he identified petitioner only after his family wanted him to (2 RT. 983).;

    3) He possibly has a drug addiction, and he does have a criminal history (see, Police Report, pp.1-19 ,attached hereto as Exhibit O-1 );

    4) His statements to officers, and in court testimony were riddled with contradictions and inconsistances;

    5) On the witness stand he admitted he lied (2 RT. 983);AND,

    6) Robles falsely stated that the headlights of Renteria's van, illuminated the inside of the suspects van allowing him to see, which makes the none-disclosure of evidence holding impeachment value more significate, for it would have without a doubt, "contributed to impeaching Robles.

    The second (2nd) witness..,"Carlos Lopez" also testified falsely against petitioner.

    Lopez first spoke with officers on May 15, 2003," five (5) days after the incident." This was well after Jesse Robles had told Lopez that the driver of the suspects van was Jofama (Peti-

tioner). However, after having been exposed to rumors, i.e.¸ ¸Ro-
bles, telling him that petitioner was envolved, and possibly
even shown a single year book photo by NC Gang members who was
also telling people Jofama (petitioner) was the person who done
the crime, "Lopez jumped on the same ban wagon of falsely accus-
ing petitioner of the crime.

However, Lopez's original statement's to officer's, show
that he wasn't honestly able to see the driver of the suspects
van by the time he made it to the front yard from the back yard,
because the suspects van had already passed and was two (2) hou-
ses east (left) of his location. Lopez stated the incident <u>actu-</u>
<u>ally occurred two (2) houses "east" of his location</u>, therefore,
<u>the suspect vehicle was facing "east"</u>, and <u>it also sped "Eastb-</u>
<u>ound" towards Vermont</u> (see Police Report, pg. 64, attached here-
to). However, by the time Lopez made it to the front yard - the
van was two (2) houses east of his location. For this reason,
Lopez <u>thought</u> the incident occurred East of his location instead
of West of his location, however, this his reason for coming to
such a conclusion that it occurred to the east.

Lopez describes the direction "<u>east</u>" "three (3)" times, and
Lopez knew and understood that <u>east</u> was <u>towards Vermont Avenue</u>
because he knew the suspects were driving towards that location.
(3 RT. 1624). It make sense that by the time Lopez made it to
the front yard the suspects van had already sped by--being that
Jesse Robles and his father were the only ones "<u>running</u>" to the
front," <u>everyone else" was walking</u> (2 RT. 937, 938, 972, 973).

Additionally, Lopez stated it wasn't until the shots had

stopped that he went out to the front yard, and Jesse Robles was "ahead" of him (3 RT. 1614, 1627), which also shows that by the time Lopez made it to the front the suspects van was already two (2) houses East of the location. This very same witness also knew about the previous confrontation between petitioner's younger brother and Chino, and he also knew petitioner had asked Jose Robles (Chino) and others on 102nd street a question about who was messing with petitioner's younger brother (3 RT. 1603-1605). All of which may have led Lopez to believe that petitioner was envolved in the crime, "he therefore jumped on the ban-wagon of accusing the "NAME" (Jofama)". Lopez never stated that he knew petitioner; he claimed that he "seen" petitioner four (4) times in the past "driving" his green Toyota Camry (3 RT. 1617), so the times in which Lopez allegedly seen petitioner was brief, in passing while petitioner was "driving" his green Toyota Camry.

Like everyone in the neighborhood "Lopez learned of petitioner's "name." This same witness was never shown a Six (6) pac photo-line-up, however, detective Steven Katz took the position that showing Lopez a photo line-up was not necessary because Lopez knew petitioner. This conduct was erroneous because mostly every other witness who implicated petitioner's name were shown a Six-pac-photo line-up to see if they could identify petitioner (4 RT. 1896-1899).

Additionally, implicating a "name" did not show or prove that Lopez knew petitioner, nor does is show or prove that Lopez could have identified petitioner in a Six-pac-photo line-up. The prosecution did not prove Lopez's identification was honestly

p.61

based on what he claimed to have seen. As a matter of fact, Lopez claimed to have seen petitioner approximately four (4) times in the past, while petitioner was "driving" his green Toyota Camry that had "tinted WINDOWS", which shows that Lopez's prior obser- vations of petitioner were "brief" in passing" while petitioner was "driving" his car. Officers made a decision not to show Lopez a Six-pac photo line-up, "possibly because his original statement showed that he could not have seen the driver of the suspects White-Van and because he was a witness that was least likely to identify petitioner.

Jesse Robles claimed to have seen petitioner fifty (50) or more times, and Albert Segundo claimed to have seen petitioner hundreds' (100's) of times, but yet both were shown Six-pac- photo line-up's (2 RT. 943; 3 RT. 1550). Based on the aforesaid circumstances, it can be said that Lopez's "first (1st) identif- ication" of petitioner was three (3) years "after" the incident, and his identification of petitioner was in court as petitioner was the only person who sat next to his counsel, and that ident- ification itself was suggestive and/or prejudicial. In a 402 he- aring the prosecutor practically pointed out and told Lopez where petitioner was seated before he identified petitioner,the prosecutor stated:

"Do you recognize the individual at the end of coun-
sel's table here?," (3 RT. 1600, 1601).

Like Renteria, Lopez likely knew that the person who was on trial, was the person who was being accused of being the dri- ver envolved in the crime. The "NAME": Jofama   (3 RT. 1248,

p. 62

1  1249).

2      Based on all of the aforesaid, "trial counsel provided ine-

3  ffective assistance for the following:

4      1) Failing to object to the prosecutor's leading and sugge-

5         stive question that practically pointed out and highlig-

6         hted petitioner in court so that Lopez would identify

7         petitioner for the first time 3-years after the crime

8         with the prosecutors help; And,

9      2) Failing to request the magistrate's permission to have

10        petitioner in street clothes sitting in the audience be-

11        fore Lopez attempted to make an in court identification

12        during the 402 hearing.

13        Please keep in mind that Lopez is the same witness who

14        was "told" by Jesse Robles, that "Jofama" (petitioner

15        was the person driving the suspects van (2 RT. 944, 991-

16        992).

17      After the prosecutor practically informed Lopez where peti-

18  tioner was seated in court, before determining if Lopez could

19  make his own identification, Lopez was permitted to testify bef-

20  ore the jury. However, Lopez again was asked to make an identif-

21  ication; he responded: "wearing a brown shirt" I guess right

22  there," at that point he still didn't sound sure of himself (3

23  RT. 1613).

24      This first identification 3-years after the incident was

25  well after the neighborhood had became tainted by Jesse Robele

26  tellin all of his friends and family members that "Jofama" (Pe-

27  titioner)was the driver, and also NC Gang members going around

28

p. 63

1   showing people a picture of petitioner and telling them that pe-
2   titioner was envolved. The lead detective who conducted an inve-
3   stigation on this case was "Steven Katz", a detective with a hi-
4   story of concealing evidence and/or acting in a cover-up of evi-
5   dence ( N 1-10 ) This same detective had access to all evide-
6   nce. Petitioner contends that under all of the aforesaid circum-
7   stances and facts, the case at bar can not be relied upon to pr-
8   oduce the truth or fairness to petitioner.

9       Please keep in mind that the witnesses were being asked if
10  they "recognized" anyone they know in the Six-pac photo line
11  up's, in which is different from asking witnesses to ID any all-
12  eged suspects (2 RT. 958, 959; 4 RT. 1849, 1850, 1862, 2143).

13      Furthermore, both Robles and Lopez allegedly observed the
14  suspects van speed by, but both of them could have been describ-
15  ing two different drivers. According to Lopez the driver was
16  wearing a "black shirt", and was "bald-headed". Lopez could see
17  that the driver "was not" wearing a beanie (3 RT. 1617, 1621,
18  1622).

19      Jesse Robles described the driver as wearing a "white T.
20  shirt" and a "long hanging type beanie," which would have cove-
21  red a bald head (2 RT. 976).

22      According to Lopez he and Robles were the only two in the
23  front yard (3 RT. 1623).

24      According to Robles three (3) people were in the front
25  yard, that being himself, Lopez, and Robles's father (2 RT.
26  973, 974).

27      And although Lopez at trial claimed that the front windows

28

of the suspects van was rolled up but untinted (3 RT. 1621,1622)

however, throughout the course of the investigation of this case,

the suspects van windows were described as being "TINTED" (See

attached Police Report, p. 8, 9, 29, 31, 39).

Petitioner contends that the prosecution witnesses easily

fabricated their stories to make it sound and appear as though

their identifications were based on what they saw, however, that

was not the case, "because petitioner's "name" became the target

to blame based upon assumption, rumors, post event contamination,

and/or other Psychological factors. Petitioner's name was convi-

cted from the start, not his face. The reality of this matter

is that anyone could have actually committed this crime (See

Police Note attached as Exhibit __R__ ; 4 RT. 1862, 1896; 3 RT.

1558, 1559).

Trial counsel did not even seek to investigate whether any

of the prosecution witnesses wore eye glasses, and if so--was

he or she wearing them, or did they have any vision problems.

Petitioner contends that this shows that trial counsel

failed to conduct an adequate investigation, if any, into the

prosecution witnesses' ability to see.

The Third (3rd) Witness...,"Albert Segundo".

Segundo never implicated or identified petitioner as being

the driver envolved in the crime until trial "three years" after

the crime," (3 RT. 1565). In Segundo's original statements to

officer's - he described the suspects van as having "TINTED"

windows", and the "driver of the van as a Male hispanic", the

shooter possibly male "hispanic" from MKA (Mexicans Kickin Ass),

1  (see Police Report, Pg. 10). Petitioner is a male black.

2    In a second statement Segundo stated that the "driver" of

3  the van might be "Pelon" from D.P.G. (Dog Pound Gangsters), and

4  the shooter might have been "Willie" from D.P.G., both are male

5  hispanics (see Police Report, Pg. 19, 20 attached hereto; 3 RT.

6  1547, 1548).

7    In a third statement to officer's, Segundo stated that he

8  originally believed that the shooter was <u>Willie</u> because <u>Willie</u>

9  resembled the shooter, then after having been "Told" by another

10 person (Jesse Robles), that "Jofama" (petitioner, was the driver,

11 Segundo then changed his own description of the driver to a male

12 black, bald, wearing a black T-shirt (see Police Report, pgs,

13 31, 32, attached hereto).

14    And although Segundo changed his identification of the dri-

15 ver to resemble petitioner, "after" he was "<u>told</u>" by Jesse Rob-

16 les that petitioner was allegedly the driver, however, Segundo

17 did not accuse petitioner as being the driver.

18    In one of Segundo's final statements which was on March 4th,

19 2004, approximately "<u>Ten (10) months</u> after the homocide", Segu-

20 ndo stated that he recognized "<u>ONE</u>" of the suspects (the shoo-

21 ter). Segundo claimed the shooter was A.K.A. Drips from E.K.

22 Gang and he was 100% certain that it was Abel Soto (A.K.A.Drips).

23 At that point detective Valento "<u>brought up</u>" petitioner's name

24 and asked Segundo if he knew who an individual named "Jofama"

25 was, "Segundo still doesn't identify petitioner as the driver,

26 but states that the driver looked like him; Segundo went on to

27 say that Jesse Robles "told him" the driver was Jofama. Segundo

28

1   suggested that he lied in the past because he was afraid for his

2   families safty, but was then telling the truth (Poplece Report,

3   pg. 162, 163, 164, attached hereto.)

4       On March 7, 2004, Segundo added to his story and stated it

5   was "after" the murder when he and Andres chased the van to

6   103rd street and Hoover Avenue. He remembered seeing the male

7   black driver as having a metal piercing in his right eyebrow(See

8   Police Report, pg, 165 attached hereto; 3 RT. 1564, 1565, 1577,

9   1578). And although Jesse Robles described the driver as wearing

10  a long hanging type beanie about a foot long, Segundo claimed he

11  seen that the driver was bald headed (3 RT. 1563). With super-

12  natural abilities, not only did Segundo claime to see that the

13  driver was bald headed, but also claimed to have been able to

14  see that the driver had an "eyebrow piercing", which would have

15  been covered by a long hanging type beanie.

16      Furthermore, according to Segundo, it was after he and San-

17  doval followed the suspects van to 103rd and Hoover, that he

18  got a "clear look at the drivers face as he sat parked behind

19  the suspects van approximately five to six car lenghts behind

20  (3 RT. 1571, 1572; 4 RT. 1859). Throughout the course on the

21  investigation on this case, the suspects van was described as

22  having "dark-Tinted windows" (Police Report, pg. 9, 29, 31, 39,

23  attached hereto). And although Jesse Robles described the driver

24  as wearing a long hanging type black beanie that was about a

25  foot long, Segundo claimed he seen that the driver was bald hea-

26  ded (3 RT. 1563). It would have been impossible for Segundo to

27  identify and have a "clearer" view of the driver "at night",

28

p.67

from approximately "100 to 125 feet behind" the suspects van, through "tinted windows", while the driver was wearing a long hanging type beanie that would have covered an eyebrow piercing and obstructed and/or covered part of the drivers head and face.

Furthermore, the driver of the suspects van was facing the passenger that was to his "right", therefore, Segundo would have been looking at the "right-side" of the drivers face, but yet he claimed that he saw an eyebrow piercing that was on the "left side" of petitioners face. Additionally, Segundo would be hard streached to be able to clearly see the driver of the suspects van who was seated in the driver's seat, while there is normally two back rows of seats in a van, especially when there was possibly two other people in the rear seats of the van (3 RT. 1256).

Segundo would have been looking in an up-wards angle because he sat parked in a grey car (Camaro), and the suspects vehicle was a van, therefore, Segundo did not have a direct view of the driver (3 RT. 1567). In fact, Albert Sandoval, the person who was with Segundo admitted that it was too dark to see inside the van, and would not lie in court in regards to identifying the suspects (3 RT. 1855, 1856, 1860, 1861). However, to down-play previous statements to officers and to support his fabricated trial testimony, Segundo claimed that he lied in the past because he was in fear for his families safty," but yet," Segundo was never threatened or harassed as a result of him implicating people into this crime. Each person who Segundo accused were real people from real gangs, and Segundo admitted that telling on all of these other individuals "would be exposing his

p.68

family and himself to danger (3 RT. 1560, 1561).

Petitioner contends that all of the aforesaid shows that Segundo's identification is likely founded on assumption, rumors, and/or Psychological factors. The people in which Segundo accused were "Willie" from D.P.G. (Dog Pound Gangster's),Pelon from D.P.P.G. (Dog Pound Gangster's), Male hispanic from MKA, and "Drips" from E.K. (evil Klan) (3 RT. 1556, 1559-1561, 1566), all of which are real people from real gangs.

Segundo's very first identification of petitioner as the driver of the suspects van at trial was 3-years after the crime, and was easily fabricated under the circumstances of this case. The Fourth (4th) Witness..." <u>Maria Renteria</u>.

Renteria's first identification was in court "three (3) years" after the crime as petitioner was the only person who sat next to trial counsel. Shortly after the crime she was shown a Six pac photo line-up and she did not identify petitioner in the photo line-up (3 RT. 1502, 1503). Renteria never seen the person who she saw inside the suspects van before (3 RT. 1226). She admitted that she was "in shock" and had no particular reason to pay attention to the driver (3 RT. 1228, 1236).

However, she stated petitioner was the driver, and it seemed like forever that she was looking at the driver (3 RT. 1229, 1237, 1244, 1245). Renteria's observation of the driver that was in the suspects van, was over 120 feet away at night "before" the shooting, when the van headed in her direction after the shooting she turned away (3 RT. 1236-1238). "Before" Renteria's in court identification, she was told that the person who was

on trial for Jose Robles's death is the person that was driving the suspects vehicle (3 RT. 1248, 1249). Renteria made it appear as though she had a "good view" of the suspects by claiming that there were no big vehicles or many vehicles in front of her so she could see (3 RT. 1250), she also claimed that the headlights of her vehicle hit the inside interior of the suspects van," allowing her a good view of the driver" (3 RT. 1233, 1245). After petitioner's conviction, it was discovered that the headlights of Renteria's van could not have possibly illuminated the inside of the suspects van because there was a large dump working truck parked in front of her vehicle, as well as other vehicles, com-mon sense tells us that Renteria's headlights hit the tail end of the dump truck.

Furthermore, the distance from her vehicle and the suspects was over 120 feet (See Petition #B210118, attached hereto). Renteria's false testimony contributed to petitioner's conviction, therefore, trial counsel provided ineffective assistance for failing to motion the court to exclude Renteria's identification.

Petitioner contends that attacking the prosecution witnesses ability to see was crucial towards creating reasonable doubt in the minds of the jury, and counsel's failures in challenging their ability to see contributed to the denial of a crucial or potentially meritorious defense.

Furthermore, counsel's failure to secure the services of a Psychologist regarding the "Psychological" factors that generally affect the accuracy of eyewitness identifications, deprived

1  the jury of vital information that could have assisted them on a
2  crucial issue, "the "accuracy" of eyewitness identifications.
3  Thus, trial counsel's failures in this matter contributed to the
4  denial of a crucial or potentially meritorious defense.

5      A Psychologist would have testified to the "Psychological"
6  factors that generally affect the accuracy of eyewitness identi-
7  fications. In the present case, eyewitness testimony constituted
8  the "only evidence" connecting petitioner to the crime, theref-
9  ore, counsel's failure to secure the services of a Psychologist
10 was not tacticle, nor could there be a satisfactor explanation
11 for depriving the jury of vital information that could have ass-
12 isted them on a crucial issue, the "accuracy" of eyewitness ide-
13 ntifications.

14     Petitioner contends that a witness can be impeached by dis-
15 crediting his or her capacity to perceive, recollect, or **commun-**
16 **icate (Evid. Code Sec. 780 Subd.(c).**The expert would not have
17 testified that any particular prosecution witness lacked the
18 capacity to perceive, remember, and relate; rather he would
19 simply have informed the jury of certain "Psychological" factors
20 that may impare the accuracy of an eyewitness identification,
21 such as the emotions of excitement or fear, stress, cross-race,
22 resemblance, post-event contamination or suggestiveness, famili-
23 arity (unconscious transference), Psychological pressures to re-
24 duce uncertainty, forgetting curve (memory), Relation Back phen-
25 omena, suggestiveness, confidence--accuracy correlation, and ex-
26 posure duration; such phenomena's would have been supported by
27 the testimony of a qualified Psychologist, backed with referen-
28

1 ces of experimental studies of each phenomena.

2    While it may be true that from personal experience and intu-

3 ition all jurors know that an eyewitness identification can be

4 mistaken, and also know the more obvious factors that can affect

5 it's accuracy, such as lighting, distance, and duration.[1] Other

6 factors bearing on **eyewitness identification may be known only**

7 to some jurors, or may be imperfectly understood by many, or may

8 be contrary to the intuitive beliefs of most. A few relevant fa-

9 ctors that appear to be either not widely known to lay-persons or

10 not fully appreciated by them, are,____the effect on perception

11 of an eyewitness, personal or cultural **expectations or beliefs**);

12 see, Loftus, eyewitness testimony (1979) pp. 36-48), the effects

13 on memory of the witness, exposure to **subsequent** information or

[1] Even with respect to these factors, expert **psychological** tes-
timony may be "helpful" **in appropriate** cases. For example, the
length of time that an eyewitness observes the person he later
identifies is often given significant weight by the jury. But in
virtually every such **case** the only evidence of that duration is
the witness's own estimate. Studies show that witnesses consist-
ently overestimate the length of brief periods of time, especia-
lly in the presence of stressful stimuli: "during sudden, action
packed events such as crimes, people almost always overestimate
the length of time involved because the flurry of activity leads
them to conclude that a significant amount of time passed." (Ex-
pert Psychological testimony, p. 977; see also Schiffman & Bobko
effects of stimulus complexity on the perception of Brief tempo-
ral Durations (1974) 103 J. Experimental Psychology 156.). In
the case at bar, Maria Renteria originally claimed that she "lo-
oked" at the driver of the suspects van for about "2" minutes,
she then re-estimated that calculation to "10" seconds or more,
and stated" it seemed like forever at the time,"(see, 3 RT.
1231, 1236, 1237). Thus, testimony from an expert in regards to
these factors would have supported the jury.

suggestions (Id., at pp. 54-87), and the effects on recall of bias or cues in identification procedures or methods of questioning (Id. at pp. 89-99; see generally Hall et al., Post event Information and changes in Recollection for a natural event, in Eyewitness Testimony: Psychological Perspectives, pp. 124-141).

Thus, Rule 702 of the Federal Rules of Evidence authorizes the admisstion of expert testimony so long as it is rendered by a "qualified expert" and is "helpfull" to the trier of fact (See United States -v- Stevens, 935 F.2d 1380, 1397 (3rd Cir. 1991) (citation omitted). (FN 1) In United States -v- Downing, 753 F.2d 1224 (3rd Cir. 1985), the court of Appeals for the Third Circuit recognized that Rule 702 may permit a defendant in a criminal prosecution to adduce, from a expert in the field of human perception and memory, testimony concerning the reliability of eyewitness identifications. (Id. at 1226).

In so holding, the Downing Court held that the determination whether to admit such testimony requires an examination of the following criteria:

First, the evidence must survive preliminary scruting in the course of an in limine proceeding conducted by the district judge. This threshold inquiry, which was derived from the helpfulness standard of Rule 702, which is essentially a balancing test centering on two factors:

(1) the reliability of the scientific principles upon which the expert testimony rests, hence the potential of the testimony to "aid" the jury in reaching an accurate resolution of a disputed issue; and (2) the likelihood that the introduction of the

testimony may in some way overwhelm or mislead the jury. Second, admission depends upon the fit, i.e., upon a specific proffer showing that scientific research has established that particular features of the eyewitness identifications involved may have impaired the accuracy of those identifications. The district courts' assessment of these factors will guide it's discretion in deciding whether to admit the evidence under Fed. R. Evid. 702, 28 U.S.C.A.

Additionally, rule 702 standard usually "favors admissibility,"(See In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238, 279 (3rd Cir. 1983). Several courts of Appeals have upheld the exclusion of expert testimony on eyewitness perception and memory because the testimony would involve questions that can be adequately addressed in cross-examination and that the jury can adequately weigh.., through common-sense evaluation (United States -v- Thevis, 665 F.2d 616, 641 (5th Cir. 1982); United States -v- Brown, 540 F.2d 1048, 1054 (10th Cir. 1976).

However, the Downing Court correctly stated: "we have serious doubts about whether the conclusion reached by those courts is consistent with the liberal standard of admissibility mandated by Rule 702 (Downing, 753 F.2d 1224 at pp. 1229-1230). Instead the Downing court found-persuasive more recent cases in which courts have found that under certain circumstances, this type of expert testimony can satisfy the helpfulness test of Rule 702. For example, in State -v- Chapple, 135 Ariz. 281, 660 P.2d 1208 (1983) (applying Arizona's version of the Federal

Rules of Evidence), the Supreme Court of Arizona set aside a jury's guilty verdict and ordered a new trial on the ground that the trial court had erroneously excluded an expert on eyewitness identification offered by the defendant. In addressing the question whether the expert's testimony would have been "helpful" to the jury in reaching an informed decision, the court noted several specific factual "variables" that were present in that case which, the defendant's expert was prepared to testify, reduced the eyewitnesses ability to perceive and remember accurately. The Prooffer stated that the expert would testify concerning:

1) The "forgetting curve", i.e., the fact that memory does not diminish at a uniform rate;

2) The fact that: contrary to common understanding," "Stress" causes inaccuracy of perception and distorts one's subsequent recall;

3) The "assimilation factor", which indicates that witnesses frequently incorporate into their identifications inaccurate information gathered after the event and confused with the event;

4) The "feedback factor," which indicates that where identification witnesses discuss the case with each other--they can unconsciously reinforce their individual identifications; AND,

5) The fact that studies demonstrate the absence of a relationship between the "confidence" a witness has in his or her identification and the actual accuracy

1    of that identification.

2    Each of the "variables" goes beyond what an overage

3    juror might know as a matter of "commom knowledge,

4    and indeed some of them directly contradict "common

5    sense."

6    For this reason, the Arizona Supreme Court concluded that

7    the expert's testimony would have assisted the jury in reaching

8    a "correct decision." (Id. at P. 1219-24. See also infra note

9    24.) Fed. R. Evid. 704, 28 U.S.C.A. in fact, specifically prov-

10   ides that:

11   Testimony in the form of an opinion or inference otherwise

12   admissible "is not" objectionable because it embraces an ultim-

13   ate issue to be decided by the "trier of fact."

14   To the extent that a mistaken witness may retain great con-

15   fidence in an inaccurate identification, "Cross - examination can

16   hardly be seen as an effective way to reveal the weaknesses in

17   a witness recollection of an event."(Downing, 753 F.2d 1224,

18   at p. 1244).

19   If there is one thing known about eyewitness identificati-

20   ons, it is that common sense "misleads" more often than it helps

21   (See, United States -v- Brown, 471 F.3d 802 (7th Cir. 2006); see

22   also, e.g., Gary L. Wells & D.M. Murray, what can Psychology say

23   about the Neil -v- Biggers criteria for judging eyewitness iden-

24   tification accuracy?, 68 J. Applied Psych. 347 (1983); Timothy

25   P. O'Toole & Giovanna Shay, Manson -v- Brathwaite Revisited: To-

26   wards a New Rule of Decision for Due Process Challenges to Eyew-

27   itness identification Procedure, 41 Val. U.L. Rev. 109 (2006).)

28

The vagaries of eyewitness identifications"; C. Ronald Huff et al., guilty until proven Innocent: wrongful conviction and public policy, 32 Crime & Deling, 518, 524 (1986),"the single most important factor leading to wrongful convictions in the United States is eyewitness misidentification." The recent availability of post-conviction DNA tests demonstrate that there have been an overwhelming number of false convictions stemming from uninformed reliance on eyewitness misidentifications. In 209 out of 328 cases (64%) of wrongful convictions identified by a recent exoneration study, at least one eyewitness misidentified the defendant. (Samuel R. Gross., et al., Exonerations in the United States: 1989-2003, 95 J. Crim. L. & Criminology 523, 542 (2004). In fact, "mistaken eyewitness identifications are responsible for more wrongful convictions than all other causes combined/" (A. Daniel Yarmey, Expert Testimony: Does Eyewitness Memory Research Have Probative Value for the Courts? 42 Canadian Psychology 92, 93 (May 2001).)

Eyewitness evidence presented even from well-meaning and confident citizens is highly persuasive but, at the same time, is among the least reliable forms of evidence.

Even more problematic, "Jurors seldom enter a courtroom with the knowledge that eyewitness identifications are unreliable,"(Rudolf Koch, Note, Process -v- Outcome: The Proper Role of Corroborative Evidence in Due Process Analysis of Eyewitness Identification Testimony, 88 Cornell L. Rev. 1097, 1099 n. 7 (2003).) Thus, while science has firmly established the "inherent unreliability of human perception and memory", Id. at 1102

(internal quotations omitted), this reality is outside "the jury's common knowledge," and often contradicts jurors' "common-sense" understandings, id. at 1105 n. 48 (internal quotations omitted). To a jury, there is almost nothing more convincing than a live humam being who takes the stand, points a finger at the defendant, and says," Thats the one!" (Watkins -v- Sowders, 449 U.S. 341, 352, 101 S.Ct. 654, 66 L.Ed. 2d 549 (1981) (Brennan, J. dissenting) (Emphasis in original)).

Therefore, it is contended that when there is significant relevant information that will assist the jury in reaching a "correct" decision, trial counsel should assert that stronger defense. The body of information available on the "Psychological factors" which generally affect the accuracy of eyewitness identifications, would have placed before the jury, "vital" information that would have assisted them in reaching a "correct" decision. This would have eliminated the probability or likelihood of the jury fully relying on convincing unreliable and/or inaccurate finger pointing evidence.

Trial counsel's inactions left open a reasonable probability of a wrongful conviction by depriving the jury of vital information at trial. Failing to assert such a crucial or potentially meritorious defense could not possibly have been tacticle.

The jury could have made an inteligent and correct decision had they been informed of the Psychological factors which generally affect the accuracy of eyewitness identifications. Thus, testimony introduced by a qualified Psychologist may not only assist the jury, but may also refute the jury's otherwise common

assumptions about the reliability of eyewitness identifications (<u>United States -v- Stevens,</u> 736 F.2d 1103, 1106 (6th Cir. 1984). Although jurors may not be totally unaware of the Psuchological factors bearing on eyewitness identifications, the body of information now available on these matters is "<u>sufficiently beyond common experience</u>," therefore, expert testimony could at least assist the trier of fact (Fed. Rule. Evid. 702; <u>People -v- McDonald</u> (1984) 37 Cal.3d 351, at p. 369).

Petitioner contends, that based on all of the aforesaid, trial counsel denied petitioner a crucial or potentially meritorious defense, by depriving the jury of vital information that could have assisted them on a crucial issue, the accuracy of eyewitness identifications. Thus, since there was no other evidence connecting petitioner to the crime, there could be no satisfactory or tacticle explanation for counsel's failures.

Petitioner contends that, had the jury been informed on the "Psychological" factors which generally affect the accuracy of eyewitness identifications, a result more favorable would have occurred (<u>People -v- Nation</u> (1980) 26 Cal.3d 169, 179; <u>Strickland -v- Washington,</u> <u>supra,</u> 466 U.S. at pp. 688, 690-92; <u>People -v- Watson,</u> <u>supra,</u> 46 Cal.2d at p. 836). Furthermore, Evidence Code section 730, authorizes the trial court to appoint an expert to render advice and to testify as a witness, evidence Code section 731 and Government Code section 29603 state that the County must pay for those court ordered expenses. (<u>Corenevsky -v- Superior Court,</u> <u>supra,</u> 36 Cal.3d 307, 318-319, 204 Cal. Rptr. 165, 682 p.2d 360 (appointment of jury selection expert); <u>People</u>

1  -v- Hurley (1979) 95 Cal.App.3d 895, 898, 157 Cal.Rptr. 364

2  [appointment of expert on eyewitness identification].) Moreover,

3  the right to effective assistance of counsel entitles indigent

4  defendants to access to public funds for expert services. Ake

5  -v- Oklahoma (1985) 470 U.S. 68, 76-85, 105 S.Ct. 1087, 1092-

6  1097, 84 L.Ed.2d 53; Corenevsky -v- Superior Court, supra, 36

7  Cal.3d at p. 319, 204 Cal.Rptr. 165, 682 p.2d 360; People -v-

8  Young (1987) 189 Cal.App.3d 891, 902, 234 Cal.Rptr. 819.)

9      Additional Statutes providing authority for requesting pub-

10 lic funds for ancillary defenses services include Penal Code §

11 987.9; § 55.11; 987.8(f)(1). Furthermore, Penal Code section

12 987.9 is not limited to situations in which counsel has been

13 appointed for an indigent defendant, "the test of indigency for

14 purposes of funding investigators and experts is "financial

15 means to secure these services", (Anderson -v- Justice Court

16 (1979) 99 Cal.3d 398, 403, 160 CR 274). Thus, there could be no

17 tacticle or satisfactory explanation for counsel's failure's.

18     The "FIT" and "Helpfulness" of the proposed expert testim-

19 ony: Specified Variables/Phenomeno:

20         1. ["CONFIDENCE - ACCURACY CORRELATION"]:
        THE LACK OF CORRELATION BETWEEN CONFIDENCE OF A WIT-
21      NESS AND THE ACCURACY OF THE WITNESS'S IDENTIFICAT-
        ION.

22     In the present case, the prosecution's witnesses expressed

23 "confidence" in their identifications, "Jesse Robles (2 RT.959,

24 962); Maria Renteria (3 RT. 1229, 1245); Albert Segundo (3 RT.

25 1550, 1554); and Carlos Lopez (3 RT. 1615, 1616). But the deg-

26 ree of confidence an eyewitness expresses in his or her identi-

27 fication and the accuracy of that identification," are differ-

28

ent." Numerous investigations of the lack of correlation between the two have been conducted: the majority of studies have found no statistically significant correlation between confidence and accuracy, and in a number of instances the correlation is negative, "the more certain the witness, the more likely he or she is mistaken," (Wells & Murray, Eyewitness Confidence, in Eyewitness Testimony: "Psyvhological Perspectives, PP. 159-162), leading the cited authors to conclude that "the eyewitness accuracy-confidence relationship is weak under good laboratory conditions and functionally useless in forensically representative settings (Id. at p. 165; see also Deffenbacher, Eyewitness Accuracy and Confidence: Can we Infer Anything About Their Relationship? (1980) 4 Law & Human Behav. 243.).

The average juror, however, remains unaware of thses findings: "A number of researchers using a variety of methods have found that people intuitively believe that eyewitness confidence is a valid predictor of eyewitness accuracy." (Wells & Murray, supra, at p. 159, citing five studies). Therefore, the "confidence--Accuracy Correlation" is relevant and could have assisted the jury in this case, and since a mistaken witness may retain great confidence in an inaccurate identification, cross-examination can hardly be seen as an effective way to reveal the weakness in a witness recollection of an event (Downing, 753 F.2d at 1230-31 n. 6.), thus, expert testimony on the "confidence Accuracy correlation" is suffiecently tied to the facts of this

1    case.

2              2. ["UNCONSCIOUS TRANSFER, FAMILIARITY"]

3        FAMILIARITY, (UNCONSCIOUS TRANSFER): WHEREBY A WITNESS
         CONFUSES A PERSON SEEN IN ONE SITUATION WITH A DIFFER-
4        ENT PERSON SEEN IN ANOTHER.

5        According to Martin Blinder, Forensic Psychiatrist, Califor-

6    nia Past Adjunct Professor of Law." Contrary to expectations,"

7    past or subsequent familiarity with a suspect may disable, rather

8    than enhance, the accuracy of an eye-witness identification. A

9    witness may unconsciously transpose a face familiar for mundane

10   reasons to someone at the scene of a crime ("especially if the

11   perpetrator in fact resembles the more familiar face".) That is,

12   the witness has the right face, but the wrong place (See attached

13   Exhibit S Crime Justice & America, p. 26.)

14       People often have difficulty remembering the context in

15   which they first encountered a piece of information. Thus,"it is

16   possible for a witness to correctly identify a person as one

17   whom he has met, while incorrectly placing that person in another

18   situation."

19       An unconscious transference occurs when a witness confuses

20   a person seen in one situation with someone seen in a different

21   situation (United States -v- Harris, 995 F.2d 532, 535 n. 2 (4th

22   Cir. 1993); E. Loftus, Eye-witness Testimony (1980) at pp. 36-

23   48.)

24       In the present case, Jesse Robles had past familiarity with

25   petitioner. Additionally, Robles was present on 102nd street

26   when he observed petitioner confront a group of people earlier

27   in the day of May 10, 2003, asking "who was messing with petiti-

28

oner's younger brother"! (2 RT. 953-955). Additionally, Robles stated that there were about four people in petitioner's car at that time but he did not know who the other people were; Robles only recognized petitioner's car (2 RT. 955).

Petitioner contends that Robles may have placed petitioner on 102nd street simply because he "recognized petitioner's car," which would explain why he was unable to make an identification of any of the alleged passenger's. Furthermore, Robles may have unconsciously transposed petitioner's familiar face for mundane reasons, to a different person seen in the suspects "speeding" van-fleeing the scene, especially if the perpetrator in fact resembled petitioner (see Exhibit _S_, p. 26 attached hereto) Also, Robles stated that "Petitioner and all of his brothers "look alike" (2 RT. 948), and Albert Segundo also stated that in the past, the driver of the suspects van "resembled" petitioner (3 RT. 1574, 1577; see Police Report, Pg. 162-164, attached hereto).

As petitioner previously pointed out: "it was "at night", from 28 feet away, while the suspects van was "speeding", giving Robles approximately "3" seconds to make an observation, while the driver of the suspects van was wearing a long hanging type beannie that covered part of the drivers face and head, "that Robles claimed to have been able to see. However, Robles was able to describe the suspects van in great detail and also saw that his father was not paying attention to the suspects van because his attention was up the road where the incident occurred (See, pp. 56-59 of this writ). Thus, although not actually being able to positively and accurately identify the driver of

the suspects van, under the circumstances Robles described, howe-

ver, Robles may have unconsciously transfered petitioner's face

to a different person driving the suspects van. The two day win-

dow between the night of the crime and when Robles first spoke

to officers, provided Robles ample opportunity to assume, specul-

ate, and unconsciously transpose petitioner's face to a differ-

ent face fleeing the crime scene. Robles hearing about the prev-

ious confrontation between the victim and petitioner's younger

brother, and seeing petitioner's car earlier that same day, may

have impaired his perception. Perception may be affected by such

factors as the observer's "state of mind," his expectations,"his

focus of attention at the time, the suddenness of the incident,

stress, cross-race and/or age differences of the observer and

the observed (People -v- McDonald, 37 Cal.3d 351, at p. 361).

Although not honestly able to see the driver of the suspe-

ct's vehicle well enough to make an accurate and positive ident-

ification, Robles's state of mind may have impaired his percept-

ion. The earlier situations may have placed Robles in the "mind

state" that it had to be Jofama (petitioner) because of the pre-

vious confrontations, Robles also may have "expected" petitio-

ner's envolvment based on the earlier situations, which in tern

led him to accuse petitioner, based on his original impaired pe-

rception. There is also a race and age difference between petit-

ioner and Robles. For example, petitioner is black, and Robles

is hispanic, and there is a five year age difference. "petitio-

ner was 20-years old at the time and Robles was 15-years old at

the time. (see Police Report attached hereto, p. 39). Thus,

Robles may have had the right face but the wrong place.

Carlos Lopez also may have unconsciously transferred petitioner's face, to a different person driving the suspects van fleeing the scene of the crime. Lopez was present when petitioner confronted a group of people earlier that day (3 RT. 1603-1605). Lopez allegedly seen petitioner four times in the past (3 RT. 1617). His perception was impaired (See pp. 59-61 of this petition), and Jesse Robles "told" Lopez, that petitioner was driving the suspects van (2 RT. 944, 991-994). Additionally, his first identification was three (3) years after the crime (SEE pp. 60-62, of this petition), which gave Lopez plenty of time to reconstruct details, assume, speculate, and unconsiously transfer petitioner's face to a different person driving the suspects speeding van fleeing from the scene of the crime.

Furthermore, there is a race and age difference between Lopez and petitioner. Lopez is male "hispanic", and he was 17-years old at the time, however, petitioner is male "black" and was 20-years old at the time). All of which maye led Lopez to unconsciously transfer petitioner's face to a different person envolved in the crime, who may have in fact resembled petitioner (2 RT. 948; 3 RT. 1574, 1577; see Police Report, p. 162-164, attached hereto.).

Albert Segundo had past familiarity with petitioner (3 RT. 1550). Segundo originally stated that the driver of the suspects van "resembled" the petitioner (Police Report, p. 162-164). It has also been pointed out that Segundo's perception was impaired (See pp. 65-69 of this petition), and that his first identi-

fication implicating petitioner as the driver of the suspects van was "at trial, three (3) years after the crime". Thus, Segundo was provided plenty of time to reconstruct details, assume, speculate, and unconsiously transfer petitioner's face to a different person envolved in the crime. Segundo may have had the right face but the wrong place.

Therefore, testimony relating to unconscious transfer is sufficiently tied to the facts of this case and could have assisted the jury.

3. ["FORGETTING CURVE, (MEMORY)"]:

THE TENDENCY OF MEMORY TO FADE VERY RAPIDLY AT FIRST, AND THEN MORE SLOWLY.

According to the "forgetting curve phenomenon", memory weakent at a none-constant rate with the passage of time, with most of the forgetting taking place within the first hours following the event, and certainly with the first few days following the event" (United States -v- Norwood (1996), 939 F. Supp. 1132, at p. 1138). Memory is a composite of retrieved actual perceptions, for example, ("I felt the rain, I heard tires squeal, I saw a Volkswagen under a big red truck") an unconscious reconstruction (or "invention) of events not actually perceived, so as to form a coherent logical whole: "This Volkswagen skidded on the west street and chashed under a big red truck.")

Often what an eyewitness "remembers" is largely a product of how a question is asked. Compare "how-fast was the Volkswagen going when it smashed into the truck?" versus, "what was the speed of the Volkswagen when the two vehicles met?"

The accuracy of an eyewitness recollection is suspect when:

"there was little time for observation", the witness was under the influence of alcohol or drugs; the witness was in a highly emotional state; the witness would have had no reason to take particular notice of the incident (e.g., did not know a crime was taking place); there was a substantial time lapse between observation and first identification; the witness intitially expressed doubt he could make an identification, or first made a patently erroneous one, or reported other details that later proved incorrect. there is steady improvement of memory and confidence from first identification through subsequent statements, preliminary hearing testimony, and trial; the witness and the defendant are of different ethnic groups/races; the witness demonstrates bias or prejudice; the witness has an emotional need to see what he or she expects to see or report; and/or the witness manifests a high need to conform to, defer to, or please authority figures (See crime Justice & America, pg. 24-25, attached hereto as exhibit ___S___).

Witnesses may further be influenced by an unconscious wish to please the police and/or by the police's unconsciously directing identification towards a suspect they are sincerely convinced is the guilty party. Thus, while the confidence of the eyewitness improves with the passage of time, recollections are fading and becoming ever less reliable (See, E. Loftus, Eyewitness Testimony (1979) pp. 36-48, the effects on memory of the witness exposure to subsequent information or suggestions (id. at pp. 54-87), and the effects on recall of bias or cues in identification procedures or methods of questioning (Id. at pp. 89-99; see

generally Hall, et al., Post-event Information and Changes in Recolection for a natural event, in Eyewitness Testimony: "Psychological Perspectives, pp. 124-141).

In the present case, there was some passage of time between the incident alleged and the eyewitness identifications. Jesse Robles's identification was "two (2) days" after the incident (see p.49 of this petition); Carlos Lopez, Albert Segundo, and Maria Renteria's "identification" of the alleged driver envolved in the crime was "three (3) years" after the incident (see, pp. 49 , of this petition). As explained in U.S. -v- Norwood (1996) at p. 1138, memory weakens at a none-constant rate with the passage of time," with most" of the forgetting taking place within the "first hours" following the event, and certainly within the "first few days" following the event. Thus, the "forgetting Curve Phenomenon" is sufficiently tied to the facts of this case.

Additionally, since often what an eyewitness remembers is largely a product of how a question is asked (Loftus, 1979, pp. 72-99), it can be said the forgetting Curve phenomenon is relevant and could have assisted the jury. As petitioner pointed out, detective Valento "first" brought up "petitioner's name" when he interview Albert Segundo. Valento asked Segundo if he knew who an individual named "Jofama" was. Valento then asked Segundo if "Jofama" was the driver, and Segundo responded that he did know petitioner and added that he "could not" be 100% certain that it was, but stated it "looked like" him (See Police Report, pg. 164, attached hereto). Compare Valento's line of questioning

1  to the following example:

2     Mr. Segundo please explain to me everything you were able to

3  identify starting with the vehicle, how did the vehicle look?"

4  how many people were envolved in the crime? can you please desc-

5  ribe the individuals envolved and explain their roll in the

6  crime; do you know the individuals envolved. Therefore, an unco-

7  nscious reconstruction (or invention)may have taken place when

8  detective Valento purposely or unconsciously directed Segundo to

9  identify, or change his description of the driver to resemble

10 petitioner, through his line of questioning. Furthermore, Post-

11 event Information such as when Segundo, Lopez, and Renteria

12 "was told: "Jofama" (petitioner) was the driver envolved in the

13 crime, and may have unconsciously led the  to accuse and/or ide-

14 ntifu petitioner (see, Generally Hall, et al., Postevent Inform-

15 ation and changes in recolection for a Natural Event, in Eyewit-

16 ness Testimony: Psychological Perspectives, pp. 124-141). Thus,

17 testimony from a qualified expert backed with references of exp-

18 erimental studies on such phenomenon would have assisted the

19 jury.

20         4. ["PSYCHOLOGICAL PRESSURES TO
                 REDUCE UNCERTAINTY"]

21     Whereby in matters of great importance most people would

22 be far more comfortable with certainty than with doubt. And so

23 it is that as time passes, the eyewitness tends to reassure him-

24 self by going over the index event in his mind, "filling in gaps,

25 and "reconstructing details," thus inadvertently altering the

26 original recollections so as to eliminate conflict and inconsis-

27 tencies between information in memory, and that acquired from

28

other sources.

The very act of explicitly making an identification in itself appears to augment certainty, with witness confidence increasing with each subsequent report, though he may be merely confirming himself in his error. That is, the very process of attempting to recall can generate the illusion of familiarity, a phenomenon utterly independent of accuracy; with each rehearsal and report, the witness becomes increasingly committed to his judgment (See Exhibit _S_ Crime Justice & Ame. p. 26).

b.] TO CHOOSE.

Studies have shown that many witnesses feel obliged to identify someone, and may do so even though the individual known to be the perpetrator is not present in the photo array, and despite admonitions that they need not select anyone. Demonstrably false identifications have also been observed in labratory studies and in staged crime experiments simulating a criminal investigation. Thus, a sincere desire to be useful may cause some witnesses to be entirely too helpful (Exhibit _S_ , p. 26).

c.] TO MEET ONE'S EXPECTATIONS.

If a witness has reason (however unfounded) to believe that the person he is now identifying is in fact the perpetrator, his actual memory of the perpetrator will start to change so as to more resemble the person being identified, particularly if the original perception was brief, incomplete, or hazy. That is, exposure to a new face which one has been persuaded is that of the perpetrator can have the effect of making memory of the perpetrator's face "better", when in fact, it is being rendered

1  less correct, i.e., a weak correct memory is being replaced by a
2  stronger incorrect one, (Exhibit  S  ,p. 26).
3      In the case at bar, no one implicated or identified petiti-
4  oner as the driver envolved in the crime the night of the incid-
5  ent. However, as time had passed Robles, Lopez, Segundo, and Ren-
6  teria may have made their identification after reassureing them-
7  selves by going over the index event in his or her mind, "fill-
8  ing in gaps," and "reconstructing details," thus inadvertently
9  altering the original recollections so as to eliminate conflicts
10 and inconsistencies between information in memory," and that ac-
11 quired from other sources," such as when Jesse Robles told all
12 his friends and family that petitioner was the driver envolved
13 in the crime (2 RT. 944, 955-958). And Renteria was told that
14 the person who was on trial for Jose Robles's death is the per-
15 son that was driving the suspects van (3 RT. 1248, 1249). Though
16 the passage of time, psychological rehearsal's and subsequent
17 report/information, witnesses may have been merely confirming
18 themselves in their error. That is, the very process of attempt-
19 ing to recall can generate the illusion of familiarily, a pheno-
20 menon utterly independent of accuracy; with each reherarsal and
21 report, the witnesses may have became increasingly committed to
22 his or her judgment (Exhibit  S  , p. 26)
23      d.] TO CHOOSE:
24     Renteria, Lopez, and Segundo were all "told" that petitio-
25 ner was the driver of the suspects vehicle before trial, based
26 on--they may have felt obliged to identify petitioner at trial
27 on the witness stand, and dispite admonitions that they need not

p. 91

select anyone. Demonstrably, false identifications have also been observed in labratory studies and in staged crime experiments simulating a criminal investigation. (Exhibit _S_ , p. 26.

   e.] TO MEET ONE'S EXPECTATIONS:

After Segundo, Lopez, and Renteria were told by others that petitioner was the driver of the suspects vehicle, they may have believed the person that they then identified (petitioner), was the perpetrator. However, their actual memory of the perpetrator started to "change" so as to more resemble the person being acc- used. For example, Segundo originally accused "two male hispan- ics", (Police Report, pg. 10, attached hereto.). He then accused Willie and Pelon from DPG (Dog Pound Ganster's), both are male hispanics (See Police Report, pgs. 19-20, attached; 3 RT. 1547, 1548).

However, after being "told" by Jesse Robles that petitioner was the driver of the suspects van, Segundo "changes" his descr- iption of the driver to "resemble" petitioner, a male black (see Police Report, pgs. 31, 32, attached hereto.). That is, of cou- rse, exposure to a new face which one has been persuaded is that of the perpetrator can have the effect of making memory of the perpetrator's face better, when in fact, it is being rendered less correct, i.e., a weak correct memory is being replaced by a stronger incorrect one. (Exhibit _S_ ,P. 26, attached hereto.)

Carlos Lopez was "told" by Jesse Robles, that petitioner was the driver of the suspects van (2 RT. 944, 991-994). After which, Lopez jumped on the same ban-wagon of accusing the "name" Jofama (petitioner), but never makes an identification until

1    trial (3-years after the crime) as petitioner was the only per-

2    son who sat next to counsel, and that identification itself was

3    based upon the prosecutor's suggestive questioning, in which pr-

4    actically highlighted and told Lopez who to identify (See pp. 61-63

5    of this petition).

6       Renteria was also "told" that the person standing trial was

7    the person driving the suspects vehicle. She was told this be-

8    fore she made her in-court identification (3 RT. 1248, 1249).

9    Renteria then jumped on the same ban-wagon, and made an in-court

10    identification of petitioner for the first time. Obviously she

11    may have believed that petitioner was the perpetrator because of

12    being "told" that petitioner was the driver of the suspects van,

13    in which may have led to her in-court identification.

14       Renteria was shown a six-pac photo line-up shortly after

15    the crime and she did not identify petitioner, because she iden-

16    tified someone else (3 RT. 1502, 1503.) Thus, when Renteria was

17    exposed to a new face at trial, after being persuaded it was that

18    of the perpetrator, which can have the effect of making memory

19    of the perpetrators face better; when in fact, it is being rend-

20    ered less correct, a weak correct memory is being replaced by a

21    stronger incorrect one (Exhibit  S , p. 26). Therefore, Renteria

22    jumpes on the ban-wagon of identifying petitioner, who was the

23    only person sitting next to counsel; someone who Renteria had

24    never seen before (3 RT. 1226).

25       Jesse Robles, identified petitioner two days after the cr-

26    ime, which provided Robles plenty of time to reassure hisself

27    by going over the index event in his mind, filling in gaps, and

28

reconstructing details, thus, inadvertently altering the origi-
nal recollections so as to eliminate conflicts and inconsistenc-
ies between information in memory and that acquired from other
sources (Exhibit __S__ , P. 26).

Additionally, when officers came to Robles with a "single"
photo he may have felt obliged to identify petitioner as the
suspect, despite admonitions that he need not select anyone. As
was previously stated, "in matters of great importance. However,
most people would be far more comfortable with certainty than
with doubt (Exhibit __S__ , p. 26). Thus, instead of Robles stating
that he could not be sure about who was envolved, and that he
only "thinks" petitioner could have been envolved because of the
earlier confrontation, "instead, Robles may have turned a belief
into comfortable certainty.

Furthermore, Robles admittedly stated that he did not want
to implicate petitioner, but then he did so because "his family"
wanted him to (2 RT. 983), which may have placed additional pre-
ssures on Robles to simply accuse and identify petitioner. Thus,
testimony from a qualified expert backed with references of exp-
erimental studies on Psychological Pressures to reduce uncertai-
nty, would have assisted the jury, and is sufficiently tied to
the facts of this case.

5. ["POST-EVENT CONTAMINATION"]:

WHEREBY INFORMATION ACQUIRED AFTER THE FACT MAY THEN
BE INADVERTENTLY INTERGRATED INTO MEMORY FOR THE EV-
ENT ITSELF. ONCE THIS HAPPENS IT MAY BE IMPOSSIBLE
TO TEAR "THEM" APART. (EXHIBIT __S__ CRIME JUSTICE & AM-
ERICA, P. 25; E. LOFTUS, EYEWITNESS TESTIMONY (1979),
PP. 70-78).
News-paper reports, "the comments of other witnesses," and

1  "leading questions" are typical sources of such post-event conta-

2  mination. The more impoverished the original information, the

3  more remote the event in time (relative to that point in which

4  new information is acquired) and the more "reasonable" the new

5  information, the more likely post-event data will be intergrated

6  into memory (Exhibit __S__ PP. 25-26).

7      As previously stated "the comments of other witnesses" and

8  leading questions are typical sources of post-event contaminat-

9  ion (Exhibit __S__ , PP. 25-26).

10     In the present case, Jesse Robles admitted that he told all

11  of his friends and family that petitioner was the driver of the

12  suspects van. (2 RT. 944, 991-994).

13     Carlos Lopez and Albert Segundo were two of the friends

14  that were "told" that Petitioner (Jofama) was the driver of the

15  suspects van, and both of them eventually jumped on the ban-wa-

16  gon of accusing petitioner. And although Segundo originally ide-

17  ntified two male hispanics as being envolved in the crime (See

18  Police Report, pp. 10, 19-20; 3 RT. 1547, 1548), after he was

19  "told" by Jesse Robles that petitioner was the driver, and after

20  detective Valento's suggestive questioning that first brought up

21  petitioner's name (See Police Report, p. 164, attached hereto.

22  However, Segundo changes his very own description of the driver

23  to that it "resemble" petitioner.

24     Petitioner contends that this shows how post--event data

25  may have been intergrated into memory. Additionally, adding to

26  the post-event contamination were unidentified members of the NC

27  Gang who went around showing a year-book picture of petitioner

28

1   and "telling" them that petitioner was the person who done the

2   crime (See Police Report, p. 62 attached hereto).

3       Furthermore, Renteria was "told" that the person who was on

4   trial for Jose Robles's (Chino's) death, is the person that was

5   driving the suspects vehicle (3 RT. 1248, 1249). All of the afo-

6   resaid forms of post-event contamination's were calculated to en-

7   sure everyone was on the same ban wagon of accusing and/or iden-

8   tifying petitioner. It is even diffecult to say that the taint

9   could be cured.

10      An additional common form of such post-event contamination

11  in criminal proceedings occurs when the witness erroneously ide-

12  ntifies a defendant on a phtot line-up with that "photograph"

13  now clear in the witness(s) mind; he then identifies the defend-

14  ant with great certainty and conviction at preliminary hearing

15  and trial (Exhibit S p. 26).

16      In the present case, Jesse Robles was shown a "single" ph-

17  oto of petitioner by detectives (see Police Report, p. 40 attac-

18  hed hereto). With that photograph now clear in his mind, he then

19  identifies petitioner with great certainty and conviction at pre-

20  liminary hearing and trial. With that single" photo clear in Ro-

21  bles's mind, identifying that clear photo in a Six-pac photo

22  line-up was very easy after being shown a "single" photo earlier,

23  therefore, identifying petitioner at the preliminary hearing and

24  trial was also easy after such suggestiveness on the part of the

25  detective who showed the "Single" photo. And also, the photo

26  itself was and is actually a form of contaminating post-event

27  information. In other words, showing Robles a "single" photo was

28

unnecessary because there was no emergency or exigent circumstances for showing a single photo, and the showing of a single photo was suggestive and evidence as to the photograph should have been excluded (Manson -v- Brathwaite (1977) 432 U.S. 98, 53 L. Ed.2d 140, 97 S.Ct. 2243 at pp. 2245, 2247-49), Thus, counsel was ineffective for failing to object to said evidence, which would have made the time of confrontation 10-months "after" the crime.

Thus, testimony from a qualified expert backed with experimental studies on "post-event" contamination" is sufficiently tied to the facts of this case and would have "assisted" the jury.

6. ["CROSS-RACE AND/OR AGE DIFFERENCE"]·

WHEREBY CROSS-RACIAL IDENTIFICATIONS ARE LESS ACCURATE THAN SAME-RACE IDENTIFICATIONS.

In laboratory experiments, it is common for own-race/other race recognition rates to differ by as much as 30-percent (Cross Racial identification Errors, pp. 942-943). The studies also reveal two aspects of the matter that will probably be "contrary" to most jurors intuitions: First, that witnesses who are not racially prejudiced are just as likely to be mistaken in making a "cross-racial" identification as those who are prejudiced; and second, that witnesses who have had considerable social contact with blacks may be no better at identifying them than those who have not (Id. at pp. 943-944). Finally, some jurors may deny the existence of the own-race effect in the misguided belief that it is merely a racist myth exemplified by the derogatory remark, "they all look alike to me", while others

may believe in the reality of this effect but be reluctant to discuss it in deliberations for fear of being seen as bigots. (Id. at p. 969; see also Wells, A Reanalysis of the expert testimony issue, in Eyewitness testimony: Psychological Perspectives, p. 309.)

In the present case, Segundo, Lopez, Renteria, and Jesse Robles are of a different race (hispanic), and the petitioner is (black", 20-years of age) As stated by Dr. Robert Shomer, a professor of psychology of almost 20-years experience, in People -v- McDonald, 37 Cal.3d 351, at p. 361,all eyewitness identification begins with the observer's initial perception of the event. Perception may be affected by such factors as the observer's state of mind, his expectations, his focus of attention at the time, the suddenness of the incident, the stressfulness of the situation, and differences in the race and/or age of the observer and the observed, there are substantial decreases in accuracy when the two persons are of different races or ages.Therefore, since Segundo, Lopez, Renteria, and Robles are of a different race and age, Segundo (hispanic, 15-years of age) (See Police Report, pg. 19   ,attached hereto); Lopez (hispanic, 17 years of age)(See Police Report, pg. 63, attached hereto); Renteria (hispanic, 27-years of age)(see Police Report, pg.41, attached hereto); Robles (hispanic, 15-years of age)(see Police Report, pg. 39, attached hereto); therefore, testimony from a qualified expert backed with references of experimental studies on "cross-Race", would have "aided" the jury and is sufficiently tied to the facts of this case. Each of the witnesses made false