identifications of petitioner.

7. ["FEEDBACK FACTOR"]:

WHEREBY WITNESSES WHO DISCUSS THE CASE WITH EACH OTHER AFTER THE EVENT CAN UNCONSCIOUSLY REINFO- RCE MISTAKEN IDENTIFICATIONS AND THEIR CERTAINTY IN THESE IDENTIFICATIONS. (UNITED STATES -V- MOORE, 786 F.2d 1308, 1311 '5th Cir. 1986); CHA- PPLE, 660 p. 2d at 1221).

In the case at bar, Robles admitted that he "told" all of his friends and family that petitioner was the driver, however, Carlos Lopez and Albert Segundo were two of the friends Robles told. M. Renteria was "told" that the person who was on trial was the person driving the suspects van. Unidentified members of the NC Gang were showing people a year-book picture of petitio- ner and were "telling" them that petitioner was envolved in the crime.

Furthermore, the time lapse between when Segundo, Lopez, and Renteria first identified petitioner, compared to when the crime occurred, gave them ample opportunity to take in rumors and information from other sources, thus, unconsciously reinfo- rcing their mistaken identification. Thestmony on the feedback factor is sufficiently tied to the facts of this case and would have aided the jury.

Furthermore, strong emotions at the time of observation or later reports tend to increase the probability of error, (See Anastasi, Field of Applied Psychology, p. 548 (1974).) Even in cases in which the initial perceptions were good, the memory be- gins a "rapid" decline (See Clifford, The Relevance of Psycholo- gical Investigation to Legal Issues in Testimony and identifica- tion, (1979) Crim. L. Rev. 153 (1979).) This applies directly to

M. Renteria who admitted that she saw but didn't really see because she was "in shock" (3 RT. 1228), and on top of which her first identification of petitioner was three (3) years later in court after the crime...But yet: "she identifies someone that she "didn't pay any particular attention to (Petitioner) (3 RT. 1236), and further admits that she was "told" that the person who was on trial was the person who was driving the suspects van (3 RT. 1248, 1249), however, she was told this before she identified petitioner).

In People -v- Shirley, Elizabeth F. Loftus, Ph. D., a highly experienced investigator in the field of memory discusses several factors in which affects the accuracy of eyewitness identification. She explains that time between an event and a witness recollection of that event, a period often called the "retention interval", the bits and pieces of information that were acquired through perception do not passively reside in memory waiting to be pulled out like fish from water. Rather, they are subject to "numerous" influences. External information provided from the outside can introduce into the witness memory, as can his own thoughts, and "both can cause dramatic changes in his recollection", (People -v- Shirley (1982) 181 Cal.Rptr. 243, 31 Cal.3d 18 at p. 268.)

Elizabeth F. Loftus's reasons for this view deserve close attention. On the basis of her research--Dr. Loftus identifies a number of influences that can cause a memory to change during the retention interval without the witness awareness: the witness may "compromise" the memory with a subsequently learned but

inconsistent fact; he or she may "incorporate" into the memory a noneexistent object or event casually "mentioned" by another party (Shirley, supra, 268).

In the present case, when Lopez, Renteria, and Segundo were told by Robles that petitioner was the driver of the suspects van, "post-event information may change the way the witness "feels" about the original incident, e.g., may affect his impression of how noisy or how violent it was, because a witness is under a great social pressure to be complete and accurate and may fill in gaps in his memory by guessing, and thereafter "recall" those "guesses" as part of the memory; and if the witness is subjected to repeated questioning, any erroneous statement he made early on may be "frozen into" the memory and reappear later as a fact. There is no way to tell, weather any given detail recalled by the witness comes from his original perception or from external information that he or she subsequently acquired. (Shirley, supra, at 268-269). From these studies, "Dr. Loftus has no doubt that post-event experiences can alter "any witness" memory, subtly but irreversibly. In a final stage of the memory process, known as "retrieval", the accuracy of the witness memory may be adversely affected by outside factors even as he or she recalls it.

Again Dr. Loftus identifies some of those influences as follows: "the witness may subsconsciously tailor his recall to conform to expectations implied by the person questioning him; those expectation may be conveyed, intentionally or not, either by such conduct of the questioner as tone of voice, emphasis,

1  pauses, facial expression and other "body language", or by the

2  particular method of interview used or precise form of question

3  asked; and the witness may be more likely to respond to such

4  cues if the questioner is a status figure, (doctor or a law enf-

5  orcement official), than if he is merely a passerby inquiring

6  what happened. (Shirley, supra, at pp. 269-270). All witnesses

7  in the case at bar were subjected to post-event experiences that

8  may have affected their identification. (See, PP. 51-54, 59-63, 55,56

9  66 , 69-70, of this petition.

10     Lastly, Dr. Loftus warns there is no clear correlation bet-

11  ween the witness confidence in the accuracy of his or her recall

12  and its accuracy in fact: indeed, studies have shown that in some

13  circumstances "People" can be more confident about their wrong

14  answers than their right ones. To be cautious, one should not

15  take high confidence as any absolute guarantee of anything." The

16  final distorting influence on memory retrieval, then, is a well-

17  documented phenomenon: "most people, including eye-winesses, are

18  motivated by a desire to be correct, to be observant, and to

19  avoid looking foolish." (Shirley, supra, at p. 270).

20     In the present case, when the prosecution's witnesses iden-

21  tified petitioner as being the driver envolved in the shooting

22  death of Jose Robles. The witness, so as not to look foolish,

23  and due to a desire to be correct, instead of stating that their

24  identifications was and is based upon assumption, rumors, post-

25  event information, and/or post-event experiences, etc., the wit-

26  ness's identifications, and testimony was unconsciously or cons-

27  ciously fabricated. "A line between valid retrieval and unconsc-

28

1  ious fabrication is easily crossed (Shirley, supra, at 270). We can

2  not honestly conclude that the average juror would be aware of the

3  many variable s concerning eyewitness identifications, thus, coun-

4  sel's failing to secure the services of a Psychologist, depriving

5  the jurors of the benefit of scientific research on eyewitness test-

6  imony forced the jurors to search for the truth without full knowle-

7  dge and opportunity to evaluate the strength of the evidence. This

8  deprivation prevented the jurors from having the best possible degree

9  of "understanding the subject" toward which the law of evidence str-

10  ives. (Note, supra, 29 Stan. L. Rev. at 1017-18). Considering Rule

11  702 of federal rules of evidence, whether the situation is a proper

12  one for the use of expert testimony is to be determined on the basis

13  of assisting the trier. There is no more certain test for determining

14  when experts may be used than the common sense inquiry, whether the

15  untrained layman would be qualified to determine intelligently and to

16  the best possible degree the particular issue without enlightenment

17  from those having a specialized understanding of the subject involved

18  in the dispute. (Ladd, Expert Testimony, 5 Vand. L. Rev. 414, 418

19  (1952). When opinions are excluded, it is because they are unhelpful

20  and therefore superfluous and a waste of time (7 Wigmore §1918), con-

21  trary to the case at bar were eyewitness testimony constituted the

22  only evidence connecting petitioner to the crime. The jury instructi-

23  ons given on eyewitness identification's does not even begin to con-

24  vey to the jury the specific data on the eyewitness identification

25  process that the testimony from an expert would have provided, a task

26  in any event is beyond the function of instruction as set out in Pen.

27

28

p. 103

Code, § 1127 ["either party may present to the court any written charge on the law, but not with respect to matters of fact"].)

Petitioner reiterates, had the jury been informed on the psychological factors bearing on eyewitness identifications, a result more favorable would have occurred (Strickland -v- Washington, supra, 466 U.S. at pp. 688, 690-92; People -v- Watson (1956) 46 Cal.2d 818, 836 [299 p. 2d 243].)

Thus, counsel's failure to secure the services of a Psychologist deprived petitioner of a crucial or potentially meritorious defense (Pope, supra, 23 Cal.3d at pp. 415, 424-425.)

VIII

    TRIAL COUNSEL DEPRIVED PETITIONER OF A
    CRUCIAL OR POTENTIALLY MERITIOUS DEFENSE BY FAIL-
    ING TO PUT ON DEMONSTRATIVE EVIDENCE, AND OR FAI-
    LING TO MOTION THE COURT TO HAVE THE JURY TAKEN
    TO THE SCENE AND PLACED UNDER THE SAME IDENTIFY-
    ING CIRCUMSTANCES AS THE PROSECUTION WITNESSES.IN
    WHICH WOULD HAVE PROVE THAT ALL OF THE WITNESSES
    LIED AND FABRICATED THEIR STORIES AGAINST THE PE-
    TITIONER.

Albert Segundo claimed to have had a "clearer" view of the person driving the suspects van as he sat parked behind it, after having followed the suspects (3 RT. 1564, 1565, 1571,1572, 1577, 1578; see also Police Report, pg. 165 attached hereto.), and he identifies an eyebrow piercing on the "left" side of the drivers face.) Segundo's identification of the driver was at a distance of approximately 100-feet or more (3 RT. 1572; 4 RT. 1859). He did not have a view of the drivers entire face, Segundo saw "half" of it (3 RT. 1572). A crucial point in which counsel failed to present, including the fact that throughout the investigation of this case it was made clear that the windows of

p.104

the suspects van was described as being "tinted" dark (See Police Report, pgs. 8, 9, 29, 31, 39, attached hereto), and with it having been "at night", this fact would have further shown that Segundo could not have possibly been able to see what he claimed to have saw, especially having to look through the back tinted windows of a van. Additionally, had counsel sought to place the jury under the same identifying circumstances as Segundo, "there is a reasonable probability the jury would have concluded that: Segundo could not have possibly seen the driver of the suspects van well enough to make a positive identification under the circumstances described.

Demonstrative evidence would have been crucially helpful in recreating Segundo's identifying circumstances. Words alone are inadequate to take the jury's attention from the sterile environment of the courtroom and focus it on the scene of the crime so that they can see, hear, and feel as the witness did at the time of the occurrence. This could have been achieved through demonstrative evidence. Demonstrative evidence also plays an important role in maintaining the jury's interest in counsel's case. Few people have the ability to verbally describe a scene so that all listeners create the same image in their minds.

When a picture is used, however, everyone knows what the witness is talking about (criminal Law Procedure and Practice section 29.12, 7th Ed.) For example:

Counsel should have brought into the courtroom a "dark tinted window", "the figure of a face "wearing an eyebrow piercing", chairs, and other items to best demonstrate a figure in a van

1  with tinted windows. Then counsel should have had the jury pla-

2  ced approximately 120 feet behind the demonstrative van, with

3  lighting that would at least be close to light simulating it

4  being 9:00 p.m. (at night).

5      After placing the jury under the same identifying circumst-

6  ances as Segundo, the jury may have concluded that Segundo could

7  not possibly have been able to see the driver of the suspects

8  van under such circumstances, especially with having little time

9  to observe. The jury may have further concluded that, Segundo

10  could not possibly have been able to see and identify an "eyeb-

11  row piercing" on the "left side" of the drivers face **by looking**

12  **through the right side of the head to the left side),** and that

13  Segundo simply accused and identified petitioner 3-years after

14  the crime because he already knew how petitioner looked before

15  the incident, and/or because of the Psychological factors that

16  impairs an eyewitness's identification; thus, his in court iden-

17  tification was not, is not, and could not have been founded on

18  what he actually saw.

19      If recreating the identifying circumstances of Segundo pro-

20  ved difficult for counsel because of limited courtroom space,

21  lighting adjustment and other factors, counsel should have moti-

22  oned the court to have the jury taken to the location where Seg-

23  undo made his "clearer" observation of the driver. Once taken to

24  that location, counsel should have placed the jury under the

25  same identifying circumstances as Segundo and after doing so,the

26  jury would have concluded that: Segundo could not have possibly

27  been able to see what he claimed to have saw, thus, discrediting

28

his identification. Additionally, since Segundo's "clearer" obse-

rvation of the driver was when he sat parked **behind**" the suspe-

cts van at a distance of "100-feet" or more, "at night,"LOOKING

through dark "tinted windows," allegedly seeing "half" of the

drivers face for just a brief moment, any other alleged observat-

ion was seriously impossible based on his claime to have had a

better view of the driver at that point. Thus, Segundo's identif-

ication could have been disscredited.

    Petitioner contends, that based on all of the aforesaid, co-

unsel's failures resulted in the withdrawal of a crucial or pot-

entially meritorious  defense (Pope, supra, 23 Cal.3d at p. 425,

152 Cal.Rptr. 732, 590 p. 2d 859, fn. omitted.) We must judge the

reasonableness of counsel's challenged conduct on the facts of

the particular case, viewed as of the time of counsel's conduct

(Strickland -v- Washington, supra, 466 U.S. at p. 690, 104 S.Ct.

2052).

    Furthermore, we must consider the seriousness of the char-

ges against the defendant in assessing counsel's performance.

(In re Jones (1996) 13 Cal. 4th 552, 566, 54 Cal.Rptr.2d 52, 917

P.2d 1175), the prosecution of a murder case is clearly a serious

charge against petitioner "and "he now suffers a "life" sentence.

However, had counsel asserted the aforesaid crucial or potentia-

lly meritorious defense a result more favorable would have occu-

red (Pope, supra, 23 Cal.3d at p. 415; Strickland -v- Washington,

supra, 466 U.S. at pp. 688, 690-92; People -v- Watson, supra, 46

Cal.2d at p. 836, and cases cited therein.

p. 107

IX

### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE ADEQUATELY THE LEGAL AND FACTUAL GROUNDS TO MOTION THE COURT FOR THE EXCLUSION OF CARLOS LOPEZ'S IDENTIFICATION, THUS, DEPRIVING PETITIONER OF A CRUCIAL OR POTENTIALLY MERITORIOUS DEFENSE:

Petitioner contends that had trial counsel conducted an adequate investigation both factual and legal, counsel could have successfully motioned the court to exclude Lopez's in court identification evidence. As was previously pointed out, (1) Lopez was "told" that the driver of the suspects van was "Jofama" (Petitioner) before he had spoken to any officers; (2) he first implicated that same "name" approximately "5 days after" the incident; (3) his original statements to officers shows that he could not have actually seen the driver of the suspects van; (4) he knew about the previous confrontation between petitioners' younger brother and the victim; (5) he claimed to have seen petitioner 4 times in the past in "passing", (6) he was "never" shown a six-pac photo line-up; (7) his "first" identification was in court "3 years after" the incident as petitioner was the only person who sat next to counsel; and (8) the in court identification was suggestive and/or prejudicial because the prosecutor practically pointed out and highlighted where petitioner was seated in court so that Lopez would identify petitioner with the prosecutor's help (See pps. 59-65, of this petition).

Reasonably competent assistance of an attorney would have motion the court to have petitioner sit amongst the spectators in the audience wearing street clothing among other individuals of the same general appearance; this would have strategically

p.108

1  avoided the suggestiveness in petitioner being the only person

2  seated next to counsel (United States -v- Brown (1983) 699 F.2d

3  585, 593-94; United States -v- Thoreen, 653 F.2d 1332 (9th Cir.

4  1981) at p. 1343).

5      In the Archibald case, the second Circuit stated that an in

6  court identification during which the defendant is seated next

7  to counsel is "obviously suggestive to witnesses", (734 F.2d at

8  p. 941). And with the added suggestiveness on the part of the

9  prosecutor pointing out petitioner for Lopez, therefore, it can

10  be said that Lopez's in court identification was not founded on

11  what "he" saw, and was highly suggestive. Reasonably competent

12  assistance of an attorney would have objected to such a suggist-

13  ive in court identification, thus, counsel failed to make a cru-

14  cial or potentially meritorious objection.

15      Furthermore, since an objection to Lopez's identification

16  evidence would have been adjudicated outside the presence of the

17  jury, there could be no satisfactory tactical reason for not ma-

18  king a potentially meritorious objection (People -v Nation,

19  supra, 26 Cal.3d at p. 179, 161 Cal.Rptr. 299, 604 p.2d 1051.)

20      Additionally, since (1) Lopez's perception at the time that

21  he observed the suspects van appears to have been impared; (2)

22  Psychological factors may have impared the accuracy of his iden-

23  tification; (3) the prosecutor prejudized the in court identifi-

24  cation by practically telling Lopez who to identify; and (4)

25  Lopez was contaminated in many ways, such as "when Robles" told

26  him Jofama (Petitioner) was the driver, while at the same token,

27  NC Gang members went around the neighborhood showing people a

28

p. 109

1    yearbook picture of petitioner and were telling them "Jofama"

2    (petitioner) did the crime, therefore, it is unlikely that any

3    later identification of petitioner by Lopez could be cured of the

4    the taint's,(People -v- Caruso, supra, 68 Cal.2d 183, 189-190,

5    65 Cal.Rptr. 336, 436 p.2d 336).

6      It is contended that based on all of the aforesaid, coun-

7    sel's failures surrounding Lopez's in court identification evi-

8    dence deprived petitioner of a crucial or potentially meritori-

9    ous defense (People -v- Farley (Cal.App.2d. Dist (1979) 153 Cal.

10    Rptr. 695, 90 Cal.App.3d 851 at pp. 859, 865; Pope, supra, 23

11    Cal.3d 412 at p. 415)

12      Petitioner further contends, that Lopez's in court identif-

13    ication "did not" come from independent origins. Counsel's fail-

14    ure to adequately object to Lopez's identification evidence dep-

15    rived petitioner of an adjudication of the stronger of two pot-

16    ential defenses, thus, resulting in the deprivation of constitu-

17    ionally adequate assistance (Pope, supra, 23 Cal.3d 412, 425,

18    fn. 15, 152 Cal.Rptr. 732, 739, fn. 15, 590 p. 2d 859, fn. 15).

19      Petitioner further contends, that based on all of the afore

20    said--even if counsel had been asked to provide an explanation

21    for his failure to make the suppression of evidence motion disc-

22    ussed herein, there simply could be no satisfactory explanation

23    (See Pope, supra, 23 Cal.3d 412, 425, 152 Cal.Rptr. 732, 590 p.

24    2d 859). And since Lopez's in court identification is contamina-

25    ted, and likely incurably, petitioner's conviction should be

26    ordered vacated and reversed with the exclusion of Lopez's iden-

27    tification evidence. (People -v- Caruso, supra, 68 Cal.2d 183,

28

189-190, 65 Cal.Rptr. 336, 436 P.2d 336.)

X

TRIAL COUNSEL PROVIDED INEFFECTIVE ASSIST-
ANCE BY FAILING TO MOTION THE COURT TO EXCLUDE RENT-
ERIA'S IDENTIFICATION EVIDENCE: HER IDENTIFICATION
OF PETITIONER WAS COMPLETELY FALSE AND FABRICATED
FOR REASONS UNKNOWN TO PETITIONER.

As petitioner previously pointed out, that Maria Renteria's
"first" identification of petitioner was three (3) years after
the crime and her false identification of petitioner was made in
court as petitioner was the only person who sat next to counsel
in court, however, shortly after the crime she was shown a six
pac photo line-up and was unable to make an identification of
petitioner (3 RT. 1502, 1503). Renteria never seen the person
who she saw inside the suspects van before (3 RT. 1226).

Renteria admitted that she was in "shock" and had no parti-
cular reason to pay attention to the Driver (3 RT. 1228, 1236).

However, Renteria stated that petitioner was the driver of
the suspects van, and it seemed like forever that she was look-
ing at the driver (3 RT. 1229, 1237, 1244, 1245). Renteria's
observation of the driver was from a distance of approximately
120-feet or more at night as she was sitting inside her vehicle,
and that it was "before" the shooting that she saw the driver,
but when the shooter re-entered the suspects van and headed in
her direction "she turned away" (3 RT. 1236-1238). Before Rente-
ria's in court identification, "she was "told" that the person
who was on trial for Jose Robles's death is the person that was
driving the suspects vehicle (3 RT. 1248, 1249). Renteria clai-
med to have had a "good view" of the suspects because there were

no big vehicles or many vehicles in front of her so she could see (3 RT. 1250), she also claimed that the headlights of her vehicle "hit" the "inside interior" of the suspects van allowing her a good view of the driver (3 RT. 1233, 1245). "After petitioner's conviction, it was discovered that Renteria's van was parked behind a large dump working truck and several other vehicles, which proves her identification was impossible and her statements was false (See attached petition, #B210118). Trial counsel admitted her testimony was unexpected, however, counsel was unprepared to cross-examine Renteria (See Exhibit C.).

Petitioner contends that under the circumstances of Renteria's identification, reasonably competent assistance of an attorney would have sought to avoid the suggestiveness in petitioner being the only person sitting next to counsel by motioning the court to have petitioner sit amongst "the spectators" in the audience wearing street clothing (United States -v- Brown (1983) 699 F.2d 585, 593-94; see also, United State -v- Thoreen (1981) 653 F.2d 1332, at p. 1343). However, with Renteria having been told that the person who is on trial was the person driving the suspects van, and with petitioner being the only person sitting next to counsel, it can be said that Renteria's in court identification was highly suggestive and tainted.

In Archibald case, the second Circuit correctly stated that an in court identification during which the defendant is seated next to defense counsel is "obviously suggestive" to witnesses (737 F.2d at 941). Thus, counsel's lack of preparation deprived petitioner of effective representation. It is unlikely that Ren-

p.112

teria would have been able to make an identification of petitio-
ner, had counsel would have motioned the court to have
petitioner sit amongst the spectators in the audience. And with
Renteria having been told before trial, that the person who is
on trial is the driver of the suspects van, it can not be said
in all honesty and with full certainty that her identification
is untainted and it cannot be said that its founded on independ-
ent evidence, origins.

Furthermore, since an objection to Renteria's identificat-
ion evidence would have been adjudicated outside the presence of
the jury, there could be no satisfactory tactical reason for not
making a potentially meritorious objection (People -v- Nation,
supra, 26 Cal.3d at p. 179, 161 Cal.Rptr. 299, 604 p.2d 1051).

Petitioner contends that after having already been contami-
nated, "it is unlikely that any later identification of petitio-
ner by Renteria could be cured of the taint (People -v- Caruso,
supra, 68 Cal.2d 183, 189-190, 65 Cal.Rptr. 336, 436 P.2d 336).

Petitioner contends that based on all of the aforesaid--his
trial counsel failed to make a potentially meritorious objection,
deprived petitioner of a crucial or potentially meritorious def-
ense (Pope, supra, 23 Cal. 3d 412, 425, fn. 15, 152 Cal.Rptr.
732, 739, fn. 15; 590 P.2d 859, fn. 15.)

Petitioner contends that Renteria's false identification
evidence contributed to petitioner's conviction, and the prosec-
utor repeatedly emphasized to the jury that four witnesses iden-
tified petitioner as the driver AND Renteria was one of those
witnesses). The prosecutor stated: "the defense will try to make

1  you believe that you didn't see four witnesses in this case; four

2  witnesses identified that man there as the driver. If it were

3  just Albert Segundo, maybe you'd be right not to convict, but are

4  you seriously going to say that you don't believe four witnesses

5  who identified him as the driver of the van?" (5 RT. 2760-2761).

6  The prosecutor also emphasized that Renteria had nothing to do

7  with NC or NGA tagging crews and that she did not know petitio-

8  ner, thus making Renteria appear unbias (2 RT. 908-909). Thus,

9  it can be said that Renteria's identification evidence contribu-

10 ted to petitioner's conviction.                               .

11      Had trial counsel made a potentially meritorious objection

12 "there is a reasonably probability that the jury would have rea-

13 ched a more favorable result. (People -v- Watson, supra, 46 Cal.

14 2d at p. 836; Strickland -v- Washington, supra, 466 U.S. at pp.

15 688, 690-692; Const., 5th, 6th and 14th Amends.)

16      Petitioner contends that Renteria's identification evidence

17 did not come from independent origins. Thus, evidence of Rente-

18 ria's identification must be ordered void due to being contamin-

19 ated and the conviction must be reversed.

20      Petitioner contends, that the evidence in this case was all

21 but none, and although the prosecutor argued the evidence was

22 overwhelming because four witnesses identified petitioner as the

23 driver (2 CT. 252), the record shows numerous inconsistencies in

24 those witnesses' testimonies. Three of the four, Jesse Robles,

25 Albert Segundo, and Lopez were impeached as liars. Jesse admit-

26 ted he lied when he testified at the preliminary hearing that he

27 had identified petitioner as the driver to the police on the

28

p. 114

night of the murder (2 RT. 983); Segundo admitted he lied to the police when he identified two other men as the shooter and the van driver. (3 RT. 1547.) Both of their lies directly related to their identification of petitioner as the driver. And, according to Sergeant Katz, Lopez testified that he never saw the white van before but had previously told the police that he had almost been run over by petitioner in a similar white van. (5 RT. 2438.) The jury could have reasonably believed that these three witnesses, all members of the NC tagging crew, collaborated with each other to name petitioner as the driver. Notably, none of these three witnesses identified petitioner to the police on the night of the murder or the following day. (See 2 RT. 982-983, 3 RT. 1319-1320, 1509-1510, 1547, 1625.)

Renteria was the only witness of the four witnesses who identified petitioner as the driver who did not know petitioner, was not a NC member, and who appeared to be unbiased. Renteria's testimony, thus, bolstered the credibility of the three NC witnesses' testimonies. The prosecutor strongly relied on that fact.

During opening statements she told the jury, "you will hear a witness by the name of Maria Renteria--who had nothing to do with either of the tagging crews in this case; she just lived at that location...like I said, she had nothing to do with any of the tagging crews in this case. (2 RT. 908-909.) During closing argument, she told the jury," "One thing that's really noteworthy about Miss Renteria, she doesn't have anything to do with NC. She doesn't have anything to do with NGA. She doesn't have anything to do with anybody, so she's kind of an important wit-

1 ness because she confirms, first of all, that the driver of the van
2 was a male, black..She was unable to identify out of the photographic
3 six packs, but then, lo-and-behold, she comes to court and she iden-
4 tifies the defendant. She, like Jesse Robles, saw directly into the
5 van with her <u>headlights</u>. Had Renteria's identification of petitioner
6 been discredited as her identification of the shooter was discribed
7 at Soto's trial, there is a reasonable probability that the jury
8 would have reached a more favorable result. The subquent in court id-
9 entification testimony of each witness, including Renteria, was unre-
10 liable and only served to deny petitioner due process of law.

11     (1) the trial court convicted petitioner of first degree murder
12 in part based on the false testimony of a prosecution witness, Rente-
13 ria, who falsely testified she saw petitioner driving the white van
14 in which was used as the get away vehicle following the shooting and
15 killing of Chino. Immediately after the shooting of Chino, Renteria
16 was showed a photographic six pack by the police, however, she was
17 unable to identify petitioner in the photo lineup. (3 RT. 1502-1503.)
18 At trial, the prosecutor asked Renteria to look at petitioner who was
19 sitting at the end of counsel table. She asked Renteria if petitioner
20 looked like the driver of the white van. Renteria answered "<u>yes</u>." (3
21 RT. 1227.) Defense counsel did not expect Renteria's answer.(Exh. C.)

22     During trial counsel's cross-examination, he asked Renteria
23 where she had parked. (3 RT. 1232-1233.) She said she was right next
24 to the Robles house. <u>but was not sure.</u> She guessed," I would say
25 like in the middle, I think probably." (3 RT. 1233.) Trial counsel
26 did not ask her about the distance between her car and the white van
27 nor did he ask her to locate her car in the crime scene photos. Trial
28

1  counsel did not present any evidence of the distance between the Ro-

2  bles house and the location where Chino was shot.

3      (2) Renteria's testimony should have been excluded because she

4  testified that she parked her car past the Roble's driveway towards

5  Budlong Street. (Exh. E 1804.) She saw Chino walking towards his

6  home. (Exh. E 1818.) What caught her attention was a white van driv-

7  ing on the wrong side of the street coming towards her with the lig-

8  hts off. (Exh. E 1804-1805.) It stopped, the passenger got out of

9  the car, walked in front of the van, and started shooting, (Exh. E

10 1805.) She was about the distance from the witness box to the back

11 of the courtroom [35 feet] from the white van, a little over two car

12 lengths away. (Exh. E 1806.)

13     When she heard the gunshot she was shocked. (Exh. E 1807.) She

14 said she saw the driver as the van drove past her after the shooting.

15 (Exh. E 1810-1811.) She turned away after looking at the driver bec-

16 ause she did not want him to know that she saw him. (Exh. E 1811.)

17 When she looked at People's Exhibits Nos. 6 and 9, photos of the

18 cars contained within the crime scene area, she could not find her

19 car. (Exh. E 1813.)

20     During cross-examination, the prosecutor asked her to look at

21 the crime scene photos and point to her car. She pointed to her car

22 on People's Exhibit No. 58 and marked the location of her car with

23 "MR." (Exh. A 3.) On People's Exhibit No. 61, the photo shows her

24 car parked behind a large work truck. (Exh. A 6; Exh. E 1823-1824.)

25     The prosecutor asked Renteria, "Did you know it's about 160

26 feet from the shooting site to the Robles' residence?" (Exh. E 1826.)

27 Renteria admitted that she was not good a estimating distance. (Ibid.)

28

On redirect, Renteria agreed it was possible that she was about five car lengths away from the shooting. (Exh. E 1827.) According to Sergeant Katz, Chino was killed on the western property line of the lot with the railing depicted in People's Exhibit Nos. 6 and 9. (Exh. A 1 & 2, Exh. E 1845-1846.) Renteria was parked on the west perimeter of the Robles residence property line. (Exh. E 1847.) She would have to look past the large work truck, a driveway, a SUV, and two other cars to see the murder. (Ibid.; Exh. A 1.)

People's Exh. 6 has a mark "RR" on the house between the Robles house and the house with the railing. (Exh. A 1.) Renteria agreed with the prosecutor that the house with the "RR" was the Robles house. (Exh. E 1816.) However, the Robles house is actually one house further to the east. (Exh. A 3 [marked with "R"].) Renteria correctly identified the Robles's house on People's Exhibit No. 58 with a "R". (Exh. A 3; Exh. E 1823.)

At petitioner's trial, Renteria testified that she saw Chino cross the street to the north side of the street. (3 RT. 1249.) "She pulled over and parked her car in front of the Robles house. (3 RT. 1232-1233, 1249.) She saw a white van on the wrong side of the street with its headlights on. (3 RT. 1249.) Then they turned the lights off (3 RT. 1250.) Her headlights hit the white van and she had a good view of the driver. (3 RT 1245.) When she looked at petitioner _nothing unusual was happening and she was not "paying him any particular attention."_ (3 RT. 1236.) She looked at petitioner's face just a little bit." When the prosecutor asked her it it was a minute, she answered "about 2 minutes," and "it seemed like forever at that time." (3 RT. 1230.) On cross, she changed her time estimate to more than 10

1   seconds. (3 RT. 1237.)

2       Renteria said she saw the shooter get in front of the blue car

3   and go up to the victim who was on the sidewalk. (3 RT. 1246-1247.)

4   She saw the victim fall. He was on the ground when the shooter went

5   up to him. (3 RT. 1247, 1250.) She said, "there was not a lot of cars

6   in front. You could see there was not like big cars, vehicles. So You

7   could see." (3 RT. 1250.)

8       After the shooting, the white van drove toward her she turnd

9   away so the occupants would not see her looking at them. (3 RT 1238.)

10  She agreed she did not tell the police she had seen Chino cross the

11  street or that she had seen him fall to the ground. (3 RT. 1251.)

12      (3) Renteria's testimony should have been excluded on the gro-

13  und that at petitioner's trial, Renteria's testimony intruduced false

14  evidence that was substantially material and probative on the issue

15  of petitioner's guilt. It would have been physically impossible to

16  get a "good view" of the face of the driver of the van "if Renteria

17  was parked near the curb over 100 feet away from the white van; even

18  more so if she was behind the large work truck in People's Exhibit

19  Nos. 6 and 61. (Exh. A 1, 6, Exh. D & G.) It would also have been

20  physically impossible for her to see Chino fall on the sidewalk if

21  she were sitting in the driver's seat of her vehicle with the large

22  truck, the SUV, and the two other cars blocking her view. (Exh. E

23  1847.)

24      (4) Renteria's testimony should have been excluded on the gro-

25  und that she testified falsely when she said: "there was not a lot

26  of cars in front. You could see there was not like big cars, vehic-

27  les. So you could see." (3 RT. 1250.) The police photos taken on the

28  night of the murder clearly show her statement was false. Chino was

1 killed in front of a blue car. There was another car behind that car,

2 a SUV, and a driveway. To the east of the driveway was the large

3 work truck. Renteria's van was behind that truck. (Exh. A 1, 2, 6.)

4     Renteria falsely testified that she observed petitioner's face

5 before the shooting for more than 10-seconds. (3 RT. 1226, 1230-

6 1231, 1237.) When the prosecutor asked Renteria what petitioner was

7 wearing, she answered," I didn't really see. I was - I seen him, but

8 I--like I was in shock when I heard the gun shots." (3 RT. 1228.)

9 That was the most credible statement she made.Therefore, Renteria's

10 in court identification testimony was unreliable as to deny petitio-

11 ner due process of law under the Fourteenth Amendment to the United

12 States Constitution.

13     Any witness, such as Renteria, who makes an identification in

14 court, no matter how dubious, will substantially influence a jury's

15 decision. Indeed, it appears that no single piece of evidence makes

16 a deeper impression on jurors' minds than an eyewitness identifica-

17 tion. This has been shown by cases where overwhelming proof of a

18 defendant's innocence, such as petitioner's innocence, has been dis-

19 regarded by the jury in favor of eyewitness (false) testimony of

20 incredible weakness." (Katz & Reid, Expert Testimony on the Fallibi-

21 lity of Eyewitness Identification (1977) 1 Crim. Just. J. 177, 195.)

22     (5) Renteria's testimony should have been excluded on the gro-

23 und that the evidence shows that the distance between the Robles

24 property and the crime scene made it impossible for Renteria to have

25 seen anything concerning the crime at night. For example, each prop-

26 erty lot is 64 feet wide. Based on Renteria's testimony that she was

27 parked in front of the Robles house and the crime scene photos, Ren-

28

p.120

1  teria was at least 128 feet away from where the white van had sto-

2  pped.(xh. F; 3 RT. 1233.) Therefore, it was and is physically impos-

3  sible to recognize a known person sitting inside a vehicle during

4  the daylight at that distance. (See Exh. G.) It would have been imp-

5  ossible for Renteria to get a good look at a strange with non-disti-

6  nctive features similar to petitioner's and recognize him three

7  years later. (See Exh. D.)

8      Petitioner contends that the levelof certainty demonstrated by

9  the witness at the confrontation (in court three years later), has

10  been shown over and over to be the weakest factor in an identificat-

11  ion. Simply put, there is "little correlation between the accuracy

12  of an eyewitness identification and the eyewitness's confidence in

13  her selection. More than any other piece of research, this finding

14  indicates a need for courts to take heed of current developments in

15  social psychological research and proceed cautiously in accepting

16  eyewitness testimony." (Headley, Long on Substance, Short on Proc-

17  ess: an Appeal for Process Long Overdue In Eyewitness Lineup Proced-

18  ures (2002) 53 Hastings L.J. 681, 686, citing C.A. Elizabeth Luus

19  & Gary L. Wells, Eyewitness Identification Confidence, in Adult Eye-

20  witness Testimony 348, 358-359 (David F. Ross et al. eds., 1994);

21  And it is this weakest factor, a witness's certainty, that juries

22  repeatedly rely upon, often convicting innocent persons, such as

23  petitioner in this case.

24      (6) Renteria's testimony should have been excluded on the gro-

25  und that she was much farther away from the crime scene than she

26  had initially stated, plus, she was behind a large work truck that

27  blocked part of her view of the street ahead as well as the illumin-

28

1  ation from her headlights. (Exh. E 1823-1824.) It would have been

2  impossible for Renteria or any other person, including the defense

3  counsel, the prosecutor, and the trial judge to see details of a

4  person's face from over 160 feet away at night under any light cond-

5  itions without binoculars. (Exh. D.) This issue alone should have

6  discredited Renteria's false testimony that she had a good view of

7  the driver who she had never seen before that night, and could reco-

8  gnize him three years later. Yet, when the prosecutor asked Renteria

9  what was petitioner wearing, she answered," I didn't really see. I

10  was - I seen him, but I - like I was in shock when I heard the gun

11  shots." (3 RT. 1228.)

12      Petitioner contends that this was also relevant to discredit

13  Albert Segundo's false in court identification testimony that he saw

14  petitioner's profile "real clearly" when the dome light of the van

15  flashed on. He was in Sandolval's car that was five to six car len-

16  gths behind the white van. (See 3 RT. 1572, 4 RT. 1850.) It was never

17  established how Segundo could see in the van while sitting in a car

18  that is much lower while five or six car lengths behind. Even if the

19  car was right behind the van, Segundo would be hard put to streach

20  his neck to see into the van by looking through the back door window,

21  much less being five or six car lengths behind.

22      Renteria's ability to see was crucial to the credibility of her

23  identification of petitioner as the driver. There were four witne-

24  sses who identified petitioner as the driver of a white van **in** which

25  petitioner have **never been connected to. Three of the identifying**

26  **witnesses were members of Chino's tagging crew and rivals of petiti-**

27  **oner's tagging crew. (2 RT. 948, 994, 3 RT. 1536, 1541, 1630.) They**

28

1  all had past contacts with petitioner, had a motive to implicate him,

2  and had ample opportunity to confer with each other before they ide-

3  ntified petitioner as the driver to the police. (See 2 RT. 982-983,

4  3 RT. 1319-1320, 1509-1510, 1547, 1625.) They had all been impeached

5  with lies they told to the police. (See 2 RT. 983, 3 RT. 1547, 5 RT.

6  2438), and also may have been affected by Psychological factors.

7     Renteria was the only unaffiliated eyewitness who had never seen

8  petitioner before the night of the shooting. (3 RT. 1226.) Her false

9  testimony corroborated and bolstered the identifications of the other

10 biased witnesses. Had Renteria's false identification of petitioner

11 as the driver been discredited, there is a reasonable probability

12 that the jury would have reached a more favorable result. (People -v-

13 Watson (1956) 56 Cal.2d 818, 836.)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

p. 123

1    _____    Petitioner contends Renteria's testimony con-

2    tributed to petitioner's conviction; had it not been for her false

3    testimont and had trial counsel secured the services of a psychol-

4    ogist to testify to the psychological factors which generally aff-

5    ect the accuracy of eye-witness identifications, a result more fa-

6    vorable would have occurred.

7    The jury need not be wholly ignorant of the subject matter of

8    expert opinions in order to justify its admission; if that were

9    the test, little expert opinion testimony would ever be heard. In-

10    stead, the statute declares that even if the jury has some knowle-

11    dge of the matter, expert opinion may be admitted whenever it would

12    "assist" the jury.It will be excluded only when it would add noth-

13    ing at all to the jury's common found of information, when "the

14    subject of inquiry is one of such common knowledge that men of or-

15    dinary education could reach a conclusion as intelligently as the

16    witness (People -v- Cole (1956) 47 Cal.2d 99, 103 [301 p.2d 854,

17    56 A.L.R.2d 1435].) It is doubtless true that from personal exper-

18    ience and intuition all jurors know that an eyewitness identifica-

19    tion can be mistaken, and also know the more obvious factors that

20    can affect it's accuracy, such as lighting, distance, and duration.

21    It appears from the professional literature, however, that

22    other factors bearing on eyewitness identification may be known

23    only to some jurors, or may be imperfectly understood by many, or

24    may be contrary to the intuitive beliefs of most. In People -v-

25    McDonald a Dr. Shomer (Psychologist) would have testified to the

26    RESULTS OF STUDIES OF RELEVANT FACTORS THAT APPEAR TO BE EITHER

27    not widely known to lay-persons or not fully appreciated by them,

28

p.124

1 such as the effects on perception of an eyewitness, personal or cu-
2 ltural expectations or beliefs (see Loftus, eyewitness testimony
3 (1979) pp. 36-48), the effects on "memory" of the witness." expos-
4 ure to subsequent information or suggestions, and the affects on
5 recall of bias or cues in identification procedures or methods of
6 questioning and cross racial identification (Id. at pp. 89-99; see
7 generally Hall, et al., Post event information and changes in reco-
8 llection for a natural events, in eyewitness testimony: Psycholog-
9 ical perspective, pp. 124-141); (People -v- McDonald (1984) 37 Cal.
10 3d 351; 208 Cal. Rptr. 236, 290 p.2d 709).

11     In the instant case many witnesses were exposed to subsequent
12 information, three of the four did not identify petitioner until
13 trial (3) years after the incident; witnesses were shown a single
14 picture of petitioner; N.C. Gang members were showing witnesses a
15 year book picture of petitioner and telling them petitioner done
16 the crime, the incident was at night, and officer's way of questi-
17 oning were suggestive as was the prosecutor when she examined Car-
18 los Lopez during (402) hearing.

19     The information that could have been provided by a psycholo-
20 gist falls well within the broad statutory description of "any ma-
21 tter that has any tendency in reason" to bear on the credibility
22 of a witness (Evid. Code, § 780).

23     Petitioner contends that the Supreme Court has held that pre-
24 judice need not be shown on some claims of ineffective assistance
25 of counsel because the right to have the assistance of counsel is
26 too fundamental and absolute to allow courts to indulge in nice
27 calculations as to the amount of prejudice arising from its denial."
28

1  (Glasser -v- United States, 315 U.S. 60, 76, 62 S.Ct. 457, 467

2  (1942).

3      The third and Sixth Circuits have followed this lead in expre-

4  ssly holding that prejudice need not be shown on an ineffective

5  assistance of counsel claim (Moore -v- United States, 432 F.2d 730,

6  737 (3rd Cir. 1970); see also, Beasley -v- United States, 491 F.2d

7  687, 696 (6th Cir. 1974.)

8      The Circuit will not inquire into prejudice where substantial

9  incompetence was shown. (Tolliver -v- United States, 563 F.2d 1117

10 (4th Cir. 1977).

11     However, in Cooper, the 9th Circuit, held that where an ineff-

12 ective assistance of counsel claim is founded upon specific acts

13 and omissions of defense counsel at trial, the accused must estab-

14 lish that counsel's errors prejudiced the defense. (Cooper gave two

15 reasons for imposing a prejudice requirement, neither of which is

16 applicable to the present case. First, the errors alleged in Cooper

17 could only have been considered on direct appeal as plain error,

18 which would have required a showing of prejudice. (Cooper held that

19 the prejudice requirement could not be avoided simply by alleging

20 the errors under the claim of ineffective assistance of counsel in

21 a 28 U.S.C. Section 2254 petition.This reasoning is not applicable

22 to the present case. The failures alleged here can only be asserted

23 by an ineffectiveness of counsel claim. Therefore, there is no risk

24 that a prejudice requirement which would otherwise be imposed could

25 be circumvented by asserting the errors in the incompetence of cou-

26 sel context (Cooper also adopted the prejudice requirement because

27 the court considered the Cooper facts to be distinguishable from

28

those cases in the Supreme Court which did not require a prejudice showing.

In Cooper, the appellant contended he did not have effective assistance of counsel because his attorney erred in specific respects in the course of trial. (Cooper, supra, at p. 1332.) The defense attorney in Cooper allegedly failed to move to suppress evidence, to object to evidence, and to stipulate to a prior conviction. Therefore, the court found that the case was more like the common situation where the harmless error rule is applied when the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the errors naturally affected the deliberations of the jury. (Id. at 1332, quoting Holloway -v- Arkansas, 435 U.S. 475, 490 (1978.)

However, Cooper stated that prejudice should not be required in cases where the evil lies in what the attorney does not do, and is either not readily apparent in the record, or occures at a time when no record is made. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation. (See, Cooper, supra, at 1332 (emphasis added.)

It is contended that Cooper only stated that under 28 U.S.C. section 2254 relief will not be granted where an ineffective assistance of counsel claim is based on specific errors or omissions at trial unless a showing is made that counsel's conduct prejudiced the defense. (See, Champman -v- California, 386 U.S. 18 (1967) its use was urged by the dissent in Cooper. Cooper, at p. 1341 (dissent). Counsel's duty to investigate carefully all defenses of

1  fact and of law that may be available to defendant, and if his fai-

2  lure to do so results in withdrawing a crucial defense from the

3  case, the defendant has not had the assistance to which he is ent-

4  itled (People -v- Ibarra, 60 Cal.2d 460, 464 (1963). Traditional

5  standards burden the defendant with the duty of proving that the

6  lack of effective assistance resulted in a denial of the fundamen-

7  tal fairness required by due process.

8      It has been deemed not sufficient to merely allege that the

9  attorney's tactics were poor, or that the case might have been ha-

10  ndled more effectively (Citations omitted) Rather, the defendant

11  must affirmatively show that the omissions of defense counsel inv-

12  olved a critical issue, and that the omissions cannot be explained

13  on the basis of any knowledgeable choice of tactics (People -v-

14  Floyd, 1 Cal.3d 194, 709 (1970).

15      At the very out set of these proceedings we are confronted

16  with the employment of an "evil purpose" which have resulted in

17  the unlawful confinement which deprived petitioner of his liberty

18  contrary to law. Petitioner was represented by counsel at trial,

19  and that counsel was appointed by the court, but counsel provided

20  ineffective assistance.

21      (1) defense counsel at trial was ineffective by failing to
file a motion to exclude the testimony of Renteria, who was immed-
22  iately after the shooting of Chino, showed a photographic six pack
by the police, but she was unable to identify petitioner in the
23  photo lineup (3 RT. 1502-1503.)

24      (2) defense counsel at trial was ineffective by failing to
file a motion to exclude the false testimony of Renteria, who tes-
25  tified that she saw the shooter get in front of the blue car and
go up to the victim who was on the sidewalk. (3 RT. 1246-1247.)
26  She saw the victim fall. He was on the ground when the shooter
went up to him. (3 RT. 1247, 1250.) She said, "there was not a lot
27  of cars in front. You could see there was not like big cars, vehi-
cles. So you could see." (3 RT. 1250.) Defense counsel know or sh-

28

p.128

1   ould have known that it was 8:58 P.M. at the time the victim was
2   shot and killed; it was about 160 feet from the shooting site to
    where Renteria was parked and sitting in her vehicle, and that she
3   would have to look past the large work truck, a driveway, a SUV,
    and two other cars to see the murder. Defense counsel knew or sho-
4   uld have known that it was highly impossible for Renteria to have
    seen the murder. Defense counsel also knew that Renteria did not
5   tell the police she had seen Chino cross the street or that she
    had seen him fall to the ground (3 RT 1251.)

6       (3) defense counsel at trial was ineffective by failing to
    file a motion to exclude the testimony of Renteria, who's testimony
7   was false where it would have been physically impossible to get a
    "good view" of the face of the driver of the get away vehicle if
8   Renteria was parked near the curb over 100 feet away from the white
    van; even more so where she was behind the large work truck in Peo-
9   ple's Exh. Nos. 6 and 61. (Exh. A 1, 6 Exh. D & G.) Defense coun-
    sel also knew or should have known that it would also have been
10  physically impossible for her to see Chino fall on the sidewalk if
    she were sitting in the driver's seat of her vehicle with the la-
11  rge truck, the SUV, and the two other cares blocking her view.(Exh.
    E 1847.)

12      (4) defense counsel at trial wes ineffective by failing to
    file a motion to exclude the testimony of Renteria, who testified
13  falsely when she said: "there was not a lot of cars in front. You
    could see there was not like big cars, vehicles. So you could see.
14  (3 RT. 1250.) The police photos taken on the night of the murder
    she that Reteria's testimont was false. The victim, Chino, was
15  killed in front of a blue car. There was another car behind that
    car, a SUV, and a drive way. To the east of the driveway was the
16  large work truck. Renteria's van was behind that truck. (Exh. A 1,
    2, 6.) Renteria falsely testified that she observed petitioner's
17  face before the shooting for more that 10 seconds. (3 RT. 1226,
    1230-1231, 1237.) When the prosecutor asked Renteria what petitio-
18  ner was wearing, she answered, "I didn't really see. I was - I seen
    him, but I - like I was in shock when I heard the gun shots." (3
19  RT 1228.) That was the most credible statement she made.

20      (5) defense counst at trial was ineffective for failing to
    present physical evidence of the distance between the Robles prop-
21  erty and the crime scene. It was the distance of two property lots.
    (Exh. A 2; Exh. E 1847; 1 CT. 51.) Each property lot is 64 feet
22  wide. Based on Renteria's testiony that she was parked in front of
    the house and the crime scene protos, Renteria was at least 128
23  feet away from where the white van had stopped. (Exh. F; 3 RT 1233.
    It is physically impossible to recognize a known person sitting
24  inside a vehicle during the daylight at that distance. (See Exh.
    G.) It would have been impossible for her to get a good look at a
25  stranger with-non-distinctive features similar to petitioner's and
    recognize him three years later. (See Exh. D.) Therefore, trial
26  counsel was ineffective for failing to present physical evidence
    of the distance between the Robles property and the crime scene.

27      (6) defense counsel at trial was ineffective for failing to
28  have Renteria point out where her vehicle was parked in relation-

1  ship to the van and the shooting.Renteria was much farther away from
   the crime scene then she had initially stated, and that she was beh-
2  ind a large work truck that would have blocked part of her view of
   the street ahead as well as the illumination from her headlights.
3  (Exh. E 1823-1824.)
       Furthermore, trial counsel was ineffective for failing to prod-
4  uce evidence that it would have been impossible for a person to see
   details of a person's face from over 100 feet away at night under any
5  light conditions without binoculars. (Exh. D.) This was relevant to
   discredit Renteria's false testimony that she had a good view of the
6  driver who she had never seen before that night, and could recognize
   him three years later. This is also relevant to discredit Albert Seg-
7  undo's testimony that he saw petitioner's profile "real clearly"when
   the dome light of the van flashed on; he was in Sandolval's car that
8  was five to six car lengths behind the white va. (See 3 RT 1572, 4
   RT. 1859.)
9      (7) defense counsel at trial was ineffective by failing to file
   a motion to exclude the testimony of Renteria because her in trial
10 identification of petitioner as the driver was prejudicial. Renter-
   ia's testimony was substantially material and probative. This was an
11 eyewitness identification case. There were four witnesses who identi-
   fied petitioner as the driver. Three of the witnesses were members
12 of Chino's tagging crew and rivals of petitioner's tagging crew.(2 RT.
   948, 994, 3 RT. 1536, 1541, 1630.) They all had past contacts with
13 petitioner; had a motive to implicate him, and had ample opportunity
   to confer with each other before they identified petitioner as the
14 drriver to the police. (See 2 RT 982-983, 3 RT. 1319-1320, 1509-1510,
   1547, 1625.) They had all been impeached with lies ther told to the
15 police. (See 2 RT. 983, 3 RT. 1547, 5 RT. 2438. Renteria was the only
   eyewitness who had never seen petitioner before the night of the sho-
16 oting. (3 RT 1226.) Her false testimony corroborated and bolstered
   the identifications of the other biased witnesses. Had Renteria's
17 false identification of petitioner as the driver been discredited,
   there is a reasonable probability that the jury would have reached a
   more favorable result.

18     (8) defense counsel at trial provided ineffective assistance of
   counsel by failing to investigate and assert a crucial or potentially
19 meritorious defense, by failing to discover what time petitioner arr-
   ived at the Block-Buster Video Store and failing to investigate the
20 circumstances surrounding his arrival.)
       On May 10, 2003, Jose Robles (A.K.A. Chino) was shot and killed
21 around 9:00 at night on 101st Street a few houses west of his home
   in Los Angeles (2 RT. 937, 938, 945.) Although the shooting occurred
22 around 9:00 P.M., however, after the shooting, two prosecution witne-
   sses followed the white van and it's occupants that were involved in
23 the crime to another location." This means that sometime later, after
   9:00 p.m., two witnesses still had sight of the actual suspects envo-
24 lved. Albert Segundo and Andres Sandoval followed the white van and
   it's occupapants down 101st street eastbound towards Vermont where it
25 made a right turn, then drove up to 104th street on Vermont where
   there is a stop sign you have to yield at before making a left turn,
26 they made a left heading east on 104th street, then another left on
   the first upcoming street off 104th; they continued straight until
27 reaching 102nd street where they made a right turn heading east on
   102nd street, then continued straight until ending up on 102nd street

28                                    p. 130

and Hoover (3 RT. 1570-1571). At this point the van stopped at the stop sign. Segundo and Andres then stop their vehicle in the middle of the street so--as not to get too close to the van. The passenger of the van opens his side of the door causing the dome lights to come on. According to Segundo the dome lights provided him the opportunity to see the drivers face real clear. The passenger of the van exit's and points a gun in their direction causing Segundo and Andres to take off back to the scene (3 RT. 1571) At trial a Blockbuster Surveillance tape was played before the jury which showed petitioner inside the store at 9:41 P.M (5 RT. 2469). The video store is located at 8811 South Western Avenue in the City of Los Angeles; according to detective Steven Katz you could make it "from the crime scene to Blockbuster from 5 to 10 minutes" (Vol. 4 of 5, RT. 1890).

However, no evidence supports the white van and its occupants drove from the crime scene to the Blockbuster video store. The complete opposite is supported when the prosecution witness Albert Segundo testified that after the crime occurred he and a friend followed the van and its occupants, which is opposite of the direction of the video store (3 RT. 1570-1572). At trial it was unknown what time petitioner arrived at the video store (4 RT. 1892). Detectives obtained the surveillence tape from the video store, a copy of the tap was played at petitioner's trial under the control of detective Steven Katz. The tape showed petitioner inside the store at 9:35 P.M., the shooting occurred around 9:00 P.M. (5 RT.2469). However, according to the detective (Steven Katz) the tape is Six (6) minutes slow, making the time petitioner was first seen on Camera at 9:41 P.M. (5 RT. 2469) Additionally detective Steven Katz testified that petitioner was at the video store about 40 minutes after the shooting (5 RT. 2435). At trial the tape was not played on the proper system. There is a special player called a multiplexor that allows you to play the tape on the "SEE" different images; the system fuses several different views in a repeated cycle and if you were to show the video in court it would just look all garbled and views would change on a time sequence (5 RT. 2442.) "As for as the detective could tell, petitioner was in the store for five minutes" (5 RT. 2462). He could not find where petitioner entered the store on the tape (5 RT. 2469). Thus, the tape did not support petitioner's mistaken identity defense. Per-Petitioner's request, his appellate counsel (Patricia Ihara) filed a motion after the court of Appeal affirmed petitioner's conviction, however, the Superior Court for the County and City of Los Angeles granted that motion which requested an order for a complete copy of the Blockbuster Surveillance tape in evidence.

After receiving a copy of the Blockbuster Surveillance tape, petitioner had it sent to GEORGE REIS, an Imaging Forensic who was able to discover what time petitioner arrived at the Blockbuster video store. The Imaging Forensic demultiplexed the Surveillance tape and discovered petitioner walked into the video store at 9:25 P.M. And also entering the store at 9:25 P.M. with petitioner is Evelyn Medina and Jesse Medina, which is 16 minutes before the time it was concluded at trial that petitioner was at the video store. The significance in this matter is that the 25 minutes window of opportunity could have been broken down tramerdously," ultimately creating a serious degree of reasonable doubt, undermining confidence in a guilty verdict. Clearly time did not come to a stop after the crime occurred around 9:00 P.M. However, after the crime, time continued to pass as

1 | Albert Segundo and Andres Sandoval followed the suspects to another location opposite the direction of the Video store that petitioner
2 | had gone to with his wife and little brother-in-law.

    According to Segundo, after he and his friend followed the sus-
3 | pects a second event occurred. Segundo and his friend sat parked in the middle of the street when the van came to a stop at a stop sign
4 | after having been followed. There was a brief conversation between the shooter and driver of the suspects vehicle, the shooter then
5 | exit's the vehicle and points a gun in the direction of Segundo and his friend.

6 | Petitioner drives a green Toyota Camry (2 RT. 953; 5 RT. 2432). However, no one bothered to take the position that who would be so
7 | naive to believe that petitioner was stupid enough to have been driving this so called white van in the same area the shooting occurred;
8 | such conduct would have been too bold and brave, for example, the petitioner lives right up the street on 104th and Vermont (4 RT.
9 | 1891). The prosecutor falsely led the jurors to believe that the sus-pects drove towards the territory of notorious Graffiti Artist and
10 | falsely led the jurors to believe that petitioner lived on 103rd street, for example, the prosecutor stated: "the defendant drove the
11 | van heading towards 103rd street which is exactly where the defendant lived" (V.5 of RT. 2703). The suspects actually drove past petitio-
    | ner's home and not towards the territory of NGA (3 RT. 1570-1571).

12 | Had trial counsel conducted an investigation and adequately pre-pared for petitioner's trial, "these factors could have been shown,
13 | therefore, trial counsel was ineffective for failing to do so. How-ever, had the suspects been driving this white van in the area where
14 | petitioner lives or the places he had gone, the suspects would have been pulled over and arrested by police officers since a crime broad-
15 | cast would have went out on the dispatch radeo giving a description of the van and suspects, therefore, do they really think that petiti-
16 | oner is actually stupid? Furtherermore, the prosecution would have had to talke the position that after Segundo and Andres followed the
17 | suspects to another location opposite the direction of the video store that petitioner had been; petitioner, within a 25-minute window,
18 | dropped off the accused shooter somewhere, got rid of the white van somewhere, picked up his green Toyota Camry, picked up his wife and
19 | little brother-in-law, then drove to the Blockbuster video store, after having been followed by Segundo and Andres; all within 25-min-
20 | utes.

    (9)' defense counsel at trial was ineffective for failing to inv-
21 | estigate and argue that petitioner was not, and could not have been the driver of the white van envolved in the murder. The following
22 | questions should have been asked by trial counsel: (1) where did pet-itioner get the van? (2) did petitioner steal the van? (3) who did
23 | petitioner steal the van from, if anybody? (4) where was the van par-ked at the time it was stolen, if it was parked any-place? (5) was
24 | the van reported stolen, if so, by who? (6) where was the van repor-ter stolen from? (7) to whom was the van reported stolen? (8) did the
25 | owner of the van loan it to petitioner? (9) why did he or she loan the van to petitioner? (10) where was the van when it was loaned to
26 | petitioner?(11) what was the race of the person who loaned the van to petitioner? (12) did petitioner own the white van? (13) how long
27 | did he own the van? (14) When did he buy the van? (15) from whom did

28 |                          p. 132

he buy the van? (16) did he buy the white van from a car dealer or a private party? (17) did he buy the van in the state of California? (18) was petitioner connected to this so called white van?

Petitioner contends that the witnesses, the police, the detectives, the prosecutor, the trial judge, and petitioner's then trial counsel not only used false testimony, but also used an imaginary white van by claiming that petitioner was driving it to get away from the scene of the crime. This was all false in order to convict petitioner.

For the reasons stated above, petitioner urges this court to reverse the judgment of conviction.

16

THE "CUMULATIVE" EFFECT OF THE ERRORS COMPLAINED OF OPERATED TO PRODUCE A TRIAL THAT WAS FUNDAMENTALLY UNFAIR, VIOLATING PETITIONER'S RIGHT TO DUE PROCESS OF LAW, UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.

Petitioner contends that the totality of errors--petitioner suffers from the denial of due process of law, in violation of the 14th Amendment to the United States Constitution. The cumulative effect of the errors complained of in this writ is sufficient to warrant the conclusion of an unfair trial occurred in this case, and that it was very much a miscarriage of justice (People -v- Hill (1998) 17 Cal.4th 800, 844, 847, 72 C.R. 2d 656, 952 p.2d 673 (number of instances of prosecutorial misconduct, considred with other errors, created negative effect that made overall unfairness greater than some of the individual errors and required reversal]; 9 Cal. Proc. (4th), Appeal, §443).

When considering the errors complained of cumulatively, the errors produced a trial setting that was fundamentally unfair (See Walker -v- Engle, 703 F.2d 959, 963 (6th Cir, cert. denied.

P.133

1  464 U.S. 951, 104 S.Ct. 396, 78 L.Ed.2d 338 (1983); Cooper -v-

2  Sowders (1988) 837 F.2d 284 at p. 288).

3      It still remains a fundamental value determination of our

4  society that it is far worse to convict an innocent man than to

5  let a guilty man go free (In re Winship, 397 U.S. 358, 372, 90

6  S. Ct. 1068, 1076, 25 L.Ed.2d 368 (1970)(concurring opinion).)

7  Have we as Americans lost our way?

8      Before us is a case in which the district attorney's office

9  originally decided not to prosecute due to insufficient evidence.

10 Two months after the crime (July 1, 2003), the detective submit-

11 ted it's case to the district attorney's office, it was specifi-

12 cally stated, "defendant is identified as the driver of a van

13 where the right front passenger got out shot/killed the victim,

14 and two of the victims' friends (1 brother and 1 friend) make

15 the positive identification. Defendant has approximately 5 witn-

16 esses who corroborate his alibi that he was somewhere else." No

17 physical evidence connects defendants to the murder, if the Van

18 is located, process it. If defendants fingerprints are found in

19 the van ressubmit (See att. Exhibit   T.   ) Charge evaluation

20 worksheet, pp. 94,95 of police report).

21     The district attorney's office informed the investigating

22 officers, that if any "physical evidence is discovered that con-

23 nects petitioner to the crime, resubmit. However, with "no pys-

24 ical evidence," No van," and "no new evidence," prosecution was

25 sought on petitioner (2 years and 2 months after the crime(See

26 Exhibit   U  ,minute order att.) It is contended a review of pet-

27 itioner's case and/or the record leads the conclusion that the

28

prosecution's evidence is questionable. Thus, this was a close case, so close the prosecution waited 2-years and 2-months after the evidence against petitioner was first compiled before it elected to prosecute (see Exh. __U__ ). As the court stated in Cooper -v- Sowders, much of the prosecution's evidence was questionable, and indeed close because the prosecution waited two (2) years after the evidence against the accused was first compiled before it elected to prosecute (Cooper -v- Sowders, 837 F. 2d 284 at p. 288)

In the case at bar: "what evidence did the prosecution have 2-years and 2-months after the crime that it did not have at the time the district attorney's office originally refused to seek prosecution for lack of evidence? NONE." Additional indications of a close case is the lengthy jury deliberations. (E.g. In re Martin (1987) 44 Cal.3d 1, 51; People -v- Cardenas (1982) 31 Cal. 3d 897, 907 [12 hours of deliberations is evidence of a close case]; Lawson -v- Borg (9th Cir. 1995) 60 F.3d 608, 612 [nine hours of deliberations deemed protracted].

In the present case, the jury deliberated for over two full days to reach its verdict (5 RT. 2768, 3301-3302, 3601, 1 CT. 128, 131-132, 187) While the Supreme court has indicated that lengthy deliberations are not significant in a complex case (People -v- Cooper (1991) 53 Cal.3d 771, 837), this was not a complex case; it involved one count of aiding and abetting a murder and the jury basically had to determine just one main fact: "whether petitioner was the person who drove the van.

The jury's request for readback of testimony also establi-

1    shes that this was a close case (People -v- Pearch (1991) 229

2    Cal.App. 3d 1282, 1295 [juror questions and request to have tes-

3    timony reread are indications the deliberations were close]; see

4    People -v- Williams (1971) 22 Cal.App.3d 34, 38-40 [request for

5    readback of critical testimony].)

6        In the case at bar, the jury requested total readbacks of

7    prosecution witnesses only (1 CT. 130). Despite the courts comm-

8    ent that it would take a substantial amount of time to prepare

9    and readback all the testimonies; the jury had all the requested

10   testimonies readback to it (See, 1 CT. 131-132). Thus this was

11   a close case.

12       Furthermore, the points, facts, and/or issues raised in

13   this petition, undermines the prosecution's evidence, leading

14   to the conclusion that the prosecutions evidence is questionable,

15   thus making this a close case. Therefore, petitioner contends

16   that the cumulative errors complained of was "not" harmless, and

17   warrants a reversal (Chapman -v- California (1967) 386 U.S. 18,

18   24 [87 S.Ct. 824, 17 L.Ed.2d 705], is before a federal constitu-

19   tional error can be held harmless, the court must be able to de-

20   clare a belief that it was harmless beyond a reasonable doubt

21   (Id. at p. 828.); Strickland -v- Washington, supra, at pp. 466,

22   U.S. at pp. 688, 690-692; People -v- Watson (1956) 46 Cal.2d 818

23   at. p. 836).

24       If this honorable court finds itself in grave doubt about

25   whether the errors of federal constitutional law had substantial

26   and injurious effect or influence in determining the jury's ver-

27   dict, that error is not harmless and petitioner must win (See

28

1  O'Neal -v- McAninch (U.S. Ohio 1995), 513 U.S. 432; 130 L.Ed.2d

2  947, 63 USLW 4126, 115 S.Ct.992, at pp. 994, 995).

3      A legal rule requiring issuance of the writ will at least

4  often avoid the grievious wrong of holding a person in custody

5  in violation of the Constitution and will thereby both protect

6  individuals from unconstitutional convictions and help to guar-

7  antee the integrity of the criminal process by assuring that

8  trials are fundamentally fair. (Id. at p. 993.)

9                          CONCLUSION

10     For the foregoing reasons, an order to show cause should be

11  issued as to why the judgment against petitioner should not be

12  reversed, and an evidentiary hearing should be granted.

13  DATED: March. 24 (2010)              Respectfully submitted,

14                                  /s/_____

15                                      Jofama Coleman,

16                                          Petitioner.

17

18

19

20

21

22

23

24

25

26

27

28

                                              p. 136

# INDEX of EXHIBITS

Exhibit A – Photographic Exhibits from Abel Soto's trial

Exhibit B – Declaration of Jofama Coleman

Exhibit C – Declaration of Ronald White, Esq.

Exhibit D – Declaration of Patricia Ihara

Exhibit E – Excerpts from the Reporter's Transcript of Abel
Soto's trial

Exhibit F – Assessor's Plot Map

Exhibit G – 100 Feet Photograph

Exhibit I, 1-16-Request For A complete Copy of The
Security Tape in Evidence.

Exhibit J1-Order For Complete Copy of The
Security Tape in Evidence

Exhibit K1-Imaging Forensics Discovery, indicating
what time Petitioner enters and leaves
The Blockbuster Video Store

Exhibit L- Declaration of Jofama Coleman

Exhibit M- Police Report; pp. 7,8,9,10,18,19,20,29,31,39,41,56,62,63,64,~
162,162,164

Exhibit N. 1-8 - Information concerning Detective Steven
Katz's Past Acts of Concealing/hiding
"Evidence"

Exhibit O, 1-Jesse Robles's Prior History of Drug's and
Crime

Exhibit P. 1- Carlos Lopez's Prior History of Drug
Possession

Exhibit Q-Declaration of Jofama Coleman

Exhibit R-Police Notes

Exhibit S-22-26. Crime Justice & America, By Martin
Blinder, Forensic Psychiatrist, California
Past Adjunct Professor of Law.

Exhibit T,- Charge Evaluation Worksheet, pp. 94,95.

Exhibit U. Minute Order, information filed.



**EXHIBIT A**















DECLARATION OF JOFAMA COLEMAN

1   I Jofama Coleman declare the
2   following:
3
4   I am the defendant currently housed
5   at CSATF/STATE PRISON, P.O. BOX 7100.
6   CORCORAN, CA. 93212. Patricia Ihara,
7   P.M.B# 139  is counsel for appellant.
8   The statement below is true and
9   correct to the best of my knowledge.
10
11   I descovered through Abel Soto that
12   in his second trial the prosecutor
13   introduced evidence that contained
14   impeachment value in regards to the
15   testimony and identification of Ms.
16   Renteria. The material was that of a
17   large truck blocking her view.
18   I had a verbal conversation with
19   trial attorney Ronald White in
20   regards to this issue. His response
21   was to the following affect.
22   "I did not follow Abel's case, If
23   theres an issue with the D.A not
24   handing over evidence then thats something
25   for your appeal".
26   I declare under penalty of perjury
27   that the foregoing is ~~is~~ true and
    Correct.

    Executed on this day 7. 29. 2008
    *Jofama Coleman*

at CSATF.

**EXHIBIT B**

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 98 10924

## DECLARATION OF RONALD WHITE, ESQ.

I, RONALD WHITE, declare as follows:

1.    I am an attorney at law duly admitted and licensed to practice before courts of this State.  I was trial counsel for Jofama Coleman in Superior Court Case No. YA059765.

2.    The facts contained herein are true of my own knowledge and if called as a witness I could testify competently thereto.

3.    The prosecution's witness Maria Renteria told the police she was parking her car when the shooting occurred in the street.  She saw the driver of the van and the shooter but was unable to pick Mr. Coleman's photo out from the photo line-up.

4.    When Ms. Renteria testified at trial, she said Mr. Coleman looked like the van driver.  Her identification testimony was unexpected.

5.    Abel Soto's trial took place after Mr. Coleman's trial.  When Mr. Coleman informed me that Ms. Renteria's testimony was impeached at Mr. Soto's trial – she was parked much farther away from the van and behind a large truck that would have obstructed her view – I told him it would help his appeal.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 22nd day of July 2008 at Gardena, California.

_Ronald White_
Ronald White

**EXHIBIT C**

## DECLARATION OF PATRICIA IHARA, ESQ.

I, PATRICIA IHARA, declare as follows:

1.     I am an attorney at law duly admitted and licensed to practice before courts of this State.  I was appointed to represent petitioner Jofama Coleman in his appeal from his conviction in Court of Appeal Case B202597, Superior Court Case No. YA059765.

2.     The facts contained herein are true of my own knowledge and if called as a witness I could testify competently thereto.

3.     I went to the Google homepage and clicked on maps.  I typed the Robles's address [1115 W. 101st Street, Los Angeles, CA] into the search box.  I then clicked on "street view."  Using copies of People's Exhibits 6, 9, 58 and 59 from Abel Soto's trial, I located the Robles house. I then clicked on the white arrow and moved the street view west.  I found the location where the victim was shot.

I also typed in the address across the street from the Robles house [1117 W. 101st Street, Los Angeles, CA] into the search box.  I then clicked on "street view."  This street scene shows the location of the street lamp on the south side of the street.

4.     I then went to the Los Angeles county assessor maps at http://maps.assessor.lacounty.gov and typed into the search box the intersection of Budlong and 101st Street.  Exh. F is a true and correct copy of the plot maps showing the length and width of the lots.  I compared the plot map to the "street view" on Google maps and the assessor records.  I determined that lot 13 is where the Robles house was located.  According to Sergeant Katz, Jose Robles was killed on the west perimeter of lot 15.  The plot map shows that if Renteria was parked on the west perimeter of lot 13 and Jose Robles was shot at the west perimeter of lot 15, the closest distance between Renteria's vehicle and the white van would have been 128 feet.

## EXHIBIT D

5.    I found a website that shows what a person could see in the daylight at 100 feet at www.prisonpolicy.org/zones/thousand_feet.html. Exhibit G is a true and correct copy of the 100 feet photo from that website.

6.    I also conducted an investigation on what a normal person would be able to see at night.

Around 9:00 p.m., on August 12, 2008, I parked my car by a sidewalk on a straight road and had another person drive on the wrong side of the road facing me at a distance of about five car lengths away. There were street lamps on both sides of the street between the other car and my car. I could not see the face of the driver of the car at all when both vehicles had the headlights on.

7.    When the driver turned his headlights off, I still could not see his face because my headlights did not illuminate the interior of his vehicle at that distance.

8.    I had the driver turn on the interior lights of his car. I could not see his face well.

9.    I measured off 100 feet. I had someone stand *in the daylight* 100 feet away from me. I could not make out his facial features clearly from that distance.

10.    Before I did this investigation, I had no idea how far away 100 feet is or what is visible at that distance. However, several people I know who have participated in sports, taught children in school, or dealt with real estate, say they know how far 100 feet is between two points. It is my belief that had trial counsel presented evidence that Renteria was 128 feet away from the white van, it would have been within the common knowledge and experience of some of the jurors that it is physically impossible to get a good look at a person's face at that distance in any type

of light with normal vision. However, it would have been better to show the jury what is visible at 100 feet.

11.     Exhibit A is a true and correct copy of photographic exhibits from Abel Soto's trial. On Exhibit A 2 (People's Exh. No. 9) Sergeant Katz marked the location where Jose Robles was shot with a "v" surrounded with a circle. Because the mark was not visible on the copy, I marked it with a light colored sticker. I have requested transmission of the original exhibits to the Court of Appeal.

12.     Exhibits B and C are true and correct copies of the declarations I received from Jofama Coleman and Ronald White, Esq. Exhibit E are pages from the reporter's transcript of Abel Soto's trial proceedings. I did not renumber those pages because the original page numbering will facilitate comparison with the original. I have omitted pages 1829 to 1844 from Sergeant Katz's testimony.

14.     At my request, Mr. White sent me part of his trial file. I did not find any photos of the crime scene in the file. I sent two letters to Mr. White asking him if the prosecution provided the defense with crime scene photos of the vehicles in the area of the shooting. I have not received a response to this question yet.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 15th day of August, 2008 at Irvine, California.

Patricia Ihara

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

```
----------------------------------------)
THE PEOPLE OF THE STATE OF CALIFORNIA,  )
                                        )
              PLAINTIFF-RESPONDENT,     )
                                        )
          VS.                           )   SUPERIOR COURT
                                        )   NO. YA 064697
ABEL SOTO,                              )
                                        )
              DEFENDANT-APPELLANT.      )   NOV 2 8 2007
----------------------------------------)
```

APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY

HONORABLE FRANCIS J. HOURIGAN, JUDGE PRESIDING

REPORTERS' TRANSCRIPT ON APPEAL

TUESDAY, AUGUST 7, 2007

APPEARANCES:

FOR PLAINTIFF-RESPONDENT: EDMUND G. BROWN, JR.
                          STATE ATTORNEY GENERAL
                          300 SOUTH SPRING STREET
                          NORTH TOWER, SUITE 1701
                          LOS ANGELES, CALIFORNIA 90013

FOR DEFENDANT-APPELLANT:  IN PROPRIA PERSONA

VOLUME 4 OF 5
PAGES 1501 THROUGH 1676/1800, INCL.



DENISE K. NAGAO, CSR NO. 7722
OFFICIAL REPORTER

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

**EXHIBIT E**

①

1803

```
 1        A      THE NIGHTTIME.

 2        Q      WAS IT LIGHT OR DARK?

 3        A      IT WAS ALREADY KIND OF DARK.

 4        Q      IT WAS ALREADY DARK.

 5               WHERE DID YOU LIVE AT THAT TIME?

 6        A      BEHIND THE ROBLES.  I WAS RENTING.  FROM

 7   THE ROBLES.

 8        Q      YOU LIVED BEHIND THE ROBLES' HOUSE?

 9        A      YES.

10        Q      ON THE SAME PROPERTY?

11        A      THE SAME PROPERTY.

12        Q      BUT IN ANOTHER DWELLING?

13        A      YES.

14        Q      WAS THAT AT 1115 101ST STREET?

15        A      YES.

16        Q      DID YOU ARRIVE AT THAT SCENE AFTER DARK

17   THAT NIGHT?

18        A      YES.

19        Q      AND WHAT WERE YOU DRIVING?

20        A      BROWN ASTROVAN.

21        Q      BROWN ASTROVAN?

22        A      LIGHT BROWN AND BURGUNDY.

23        Q      WHERE HAD YOU BEEN BEFORE THEN?

24        A      FROM WORK.

25       •Q      SO YOU WERE COMING HOME FROM WORK?

26        A      YES.

27        Q      DID YOU PARK THE CAR?  AT ALL?

28        A      YES.
```

1    Q    SO IT WAS COMING TOWARDS YOU, LIGHTS OFF,

2  ON THE WRONG SIDE OF THE STREET?

3    A    YES.

4    Q    DID THAT ATTRACT YOUR ATTENTION?

5    A    YES.

6    Q    WHAT DID YOU SEE HAPPEN?

7    A    THE VAN, THE VAN PULLED -- STOPPED.  AND

8  THE PASSENGER GOT OUT OF THE CAR.  AND WALKED TOWARDS --

9  THE CAR, AND STARTED SHOOTING.

10   Q    WELL, LET'S GO BACK A LITTLE BIT.

11        THIS WAS A VAN THAT WAS COMING DOWN THE

12  STREET?

13   A    YES.  IT WAS A WHITE VAN.

14   Q    THE PASSENGER GOT OUT OF WHICH SIDE OF THE

15  CAR?

16   A    OF THE PASSENGER SIDE.

17   Q    PASSENGER SIDE.

18        AND DID HE GO IN FRONT OR IN BACK OF THE

19  VAN?

20   A    IN FRONT OF THE VAN.

21   Q    NOW, THE FRONT OF THE VAN WAS FACING

22  TOWARDS YOU?

23   A    YES.

24   Q    SO HE THEN WALKED IN FRONT OF WHERE YOU

25  WERE SOME FEET AWAY?

26   A    YES.

27   Q    ABOUT HOW FAR AWAY FROM THE VAN WERE YOU

28  WHEN THAT MAN GOT OUT OF THAT VAN?

1807

```
1         Q       ALL RIGHT.

2                 CHINO WAS WALKING?

3         A       WALKING.

4         Q       DO YOU KNOW WHO CHINO IS?

5         A       YES.

6         Q       WHO IS CHINO?

7         A       HE'S THE FATHER, WELL, THE -- HE'S THE

8   GRANDSON OF THE PEOPLE, OF THE ROBLES I WAS RENTING

9   FROM.

10        Q       SO HIS NAME LAST NAME IS ROBLES?

11        A       YEAH.

12        Q       WERE YOU RENTING FROM HIS GRANDPARENTS?

13        A       YES.

14        Q       DO YOU KNOW, DOES JOSE ROBLES -- DOES THAT

15  SOUND LIKE HIS REAL NAME?  OR DID YOU KNOW HIS REAL

16  NAME?

17        A       WELL, I MEAN, I JUST ALWAYS KNOWN HIM AS

18  CHINO.

19        Q       SO THIS MAN WHO GOT OUT OF THE VAN WAS

20  SHOOTING AT CHINO?

21        A       YES.

22        Q       WHAT DID YOU DO?

23        A       I WAS JUST, I WAS JUST IN SHOCK.  I WAS

24  JUST -- COULDN'T BELIEVE --

25        Q       COULDN'T BELIEVE IT WAS HAPPENING IN FRONT

26  OF YOU?

27        A       YES.

28        Q       HOW MANY SHOTS, DO YOU RECALL?
```

1809

```
 1        A       AROUND THE SAME HEIGHT.

 2        Q       AND HOW WOULD YOU DESCRIBE THE BUILD OF THE

 3   PERSON?

 4        A       MUSCULAR.  STOCKY.  LIKE -- HEAVY BUILT.

 5        Q       HEAVY BUILT.  YOU SAID MUSCULAR.

 6                WHAT MADE YOU THINK OF MUSCULAR?

 7        A       LIKE HE WORKS OUT.  LOOKED LIKE HE WORKS

 8   OUT.

 9        Q       YOU'RE POINTING TO YOUR SHOULDERS, MOVED

10   YOUR ARMS?

11        A       LIKE STOCKY BECAUSE --

12        Q       TRY NOT TO TALK AT THE SAME TIME.  I'LL TRY

13   NOT TO TALK AT THE SAME TIME.

14                I SAW YOU MOVE YOUR SHOULDERS UP AND YOUR

15   ARMS UP.  WHAT DID YOU MEAN BY THAT?

16        A       STOCKY.  LIKE THEY WORK OUT.  THE WAY THEIR

17   BODIES -- LIKE BUFF.

18        Q       BUFF?

19        A       YES.

20        Q       AND WHEN YOU DID YOUR ARMS UP AND YOUR

21   SHOULDER, DO YOU MEAN THEY LOOKED LIKE HE HAD WORKED

22   OUT, SOME TYPE OF WORKOUT, AND HE WAS MUSCULAR IN THAT

23   AREA?

24        A       FROM HIS SHOULDERS, THE PART RIGHT HERE,

25   YES, IT DID.

26        THE COURT:  THE WITNESS TOUCHED THE TOPS OF HER

27   SHOULDERS.

28        THE WITNESS:  JUST BUFF, LIKE -- JUST BIG.
```

1811

```
 1        Q      WAS THIS AFTER THE SHOOTING, THEN?

 2        A      YES.

 3        Q      SO EXPLAIN HOW THAT HAPPENED.

 4        A      AFTER -- AFTER -- THE SHOOTING TOOK PLACE,

 5   HE GOT BACK IN THE CAR, HE WENT IN FRONT OF THE CAR, AND

 6   GOT BACK INSIDE.  AND THEY DROVE PAST ME.

 7               I ONLY LOOKED AS -- LIKE BEFORE -- HOW CAN

 8   I EXPLAIN.  WE LIKE UP TO HERE, MAYBE, THEN I TURNED

 9   AWAY.

10        THE COURT:  ALL RIGHT.

11               AGAIN YOU POINTED AT SOMETHING.

12        THE WITNESS:  LIKE UP TO --

13        THE COURT:  POINTED ABOUT TWO FEET AWAY.

14        Q      BY MR. YOUNG:  WHY DID YOU TURN AWAY AFTER

15   LOOKING AT THE DRIVER?

16        A      BECAUSE I HAD MY KIDS IN MY CAR, AND I WAS

17   SCARED.  I DIDN'T WANT THEM TO KNOW I HAD SEEN WHAT THEY

18   DID.

19        Q      YOU DIDN'T WANT THE DRIVER TO SEE YOU

20   STARING AT HIM?

21        A      YES.

22        Q      DID YOU SEE ENOUGH OF THE FACE OF THE

23   DRIVER TO RECOGNIZE HIM?

24        A      YEAH.

25        Q      DID YOU IDENTIFY THE DRIVER AT A LATER

26   DATE?

27        A      YES.  AT THE TRIAL.

28        Q      YOU WERE YOU ASKED TO GIVE A DESCRIPTION OF
```

1813

```
 1        Q        YOU HAVE TO SPEAK UP, MA'AM.

 2        A        YES.

 3        Q        AND IS THAT 101ST STREET THAT NIGHT?

 4        A        YES.

 5        Q        IS YOUR CAR DEPICTED ON THERE ANYWHERE?

 6        A        I DON'T SEE IT.

 7        Q        CAN YOU TELL IF THE CAR THAT YOU WERE

 8    DRIVING WAS THERE?

 9        A        I WAS THERE, BUT I DON'T SEE IT.

10        Q        OKAY.  THERE ARE SOME CARS BLOCKING THE

11    VIEW, HERE.  LOOKING AT PEOPLE'S 9, ARE ANY OF THOSE

12    CARS YOURS?

13        A        NO.

14        Q        SO THIS SUV IS NOT YOURS?

15        A        NO.

16        Q        ALL RIGHT.

17                 IN THE BACK OF THE PHOTOGRAPH, CAN YOU MAKE

18    OUT THOSE CARS, ANY OF THOSE BACK THERE TO SEE IF

19    THEY'RE YOURS?

20        A        I CAN'T TELL.

21        Q        OKAY.

22                 NOW, DO YOU THINK THAT THAT SHOOTER COULD

23    HAVE BEEN A MEXICAN OR HISPANIC PERSON?

24        A        NO.

25        Q        YOU'RE CERTAIN IT WAS AFRICAN AMERICAN?

26        A        YES.

27        Q        DO YOU HAVE AN IDEA OF THE GENERAL AGE

28    RANGE AT ALL?  AS OPPOSED TO AN OLD GUY LIKE ME, OR
```

1815

```
 1        A       YES, IT IS.

 2        Q       AND DID YOU TELL DETECTIVES THAT THE SHIRT

 3   WAS TAN WITH LIGHT GRAY SQUARES, OR GREEN WITH DARK

 4   BROWN SQUARES?

 5        A       NO, I TOLD THEM IT WAS LIKE A BROWN SHIRT

 6   WITH TAN.

 7        Q       SO IF DETECTIVE KATZ WROTE THAT THE SHIRT

 8   WAS TAN WITH LIGHT GRAY SQUARES, OR GREEN WITH DARK

 9   BROWN SQUARES, THAT'S WRONG?

10        A       I ALWAYS SAID IT WAS BROWN CHECKERS TAN.

11   THAT'S WHAT I SAID.

12        Q       DO YOU REMEMBER WHAT COLOR THE GUN WAS?

13        A       BLACK.

14        Q       OKAY.  AND YOUR TESTIMONY IS THAT THE

15   SHOOTER GOT OUT OF THE VAN AND WALKED AROUND THE FRONT

16   OF THE VAN?

17        A       YES.

18        Q       ARE YOU SURE ABOUT THAT?

19        A       YES, I AM.

20        Q       OKAY.  SO IF THE OTHER WITNESSES TESTIFIED

21   THAT THE SHOOTER GOT OUT AND WALKED AROUND THE BACK OF

22   THE VAN, THEY'RE ALL MISTAKEN?

23        A       YES.  I SEEN --

24        Q       OKAY.  YOU WERE PARKED IN YOUR VEHICLE; IS

25   THAT CORRECT?

26        A       YES.

27        Q       AND YOUR VEHICLE IS NOT DEPICTED IN THESE

28   PHOTOGRAPHS; CORRECT?
```

1   OFF BY POLICE OFFICERS.

2          SO LET ME ASK YOU THIS.  DID YOU MOVE YOUR

3   CAR AFTER THE MURDER, OR DID YOU LEAVE IT THERE?

4      A    NO, I PROBABLY MOVED -- I CAN'T REMEMBER,

5   BECAUSE I WAS THERE.  AND I DON'T SEE THE CAR THERE.

6   BUT THAT'S WHERE I WAS PARKED.

7      Q    OKAY.  WELL, I DON'T WANT YOU TO GUESS.

8   AFTER THE MURDER HAPPENED, DID YOU MOVE YOUR CAR?  DID

9   YOU GO SOMEPLACE?

10      A    I CAN'T REMEMBER.

11      Q    WELL -- IT'S PRETTY IMPORTANT.

12          DID YOU STAY AND --

13   MR. YOUNG:  OBJECTION.  ARGUMENTATIVE.

14   THE COURT:  THE FIRST PORTION IS ARGUMENTATIVE.

15          PLEASE REPHRASE YOUR QUESTION.

16      Q    BY MS. BARNES:  YOU WATCHED THE SHOOTING,

17   THEN WHAT DID YOU DO?

18      A    I JUST SAT THERE.

19      Q    HOW LONG DID YOU SIT THERE?

20      A    FOR A LONG TIME.  UNTIL THEY LEFT.

21      Q    UNTIL THE SHOOTER LEFT?

22      A    YES.  UNTIL THEY DROVE PAST ME, AND THEY

23   TURNED ON VERMONT.

24      Q    THEN WHAT DID YOU DO?

25      A    ME AND MY KIDS AND MY BROTHER, WE GOT OUT

26   OF THE CAR.

27      Q    WHERE DID YOU GO?

28      A    WE WENT TO THE HOUSE.

```
 1   WALKING TOWARDS --

 2        A      TOWARDS, YES.

 3        Q      WELL -- IF SO THE OTHER WITNESSES TESTIFIED

 4   CHINO IS WALKING THE OPPOSITE DIRECTION TO GO TO THE

 5   STORE, THEY WOULD BE WRONG?

 6        A      YES.

 7        Q      WHAT WAS CHINO WEARING?

 8        A      CAN'T REMEMBER.

 9        Q      OKAY.  SO YOU SAW THE SHOOTER.  WHAT DID

10   YOU SEE IN THE SHOOTER'S FACE?

11        A      HE WAS BLACK.  AND -- JUST I REMEMBER HIM

12   HAVING A LONG JHERI CURL WITH A BEANIE ON.

13        Q      SO WHEN YOU SAY JHERI CURL, DOES THAT MEAN

14   HE HAD LONGER HAIR?

15        A      LIKE -- SHOULDER LENGTH.  LIKE MAYBE UP TO

16   HERE.

17        THE COURT:  THE WITNESSES HAS PLACED HER LEFT HAND

18   JUST TO THE TOP OF HER SHOULDER, HER LEFT SHOULDER.

19        Q      BY MS. BARNES:  IT WAS CURLY?

20        A      YES.

21        Q      WAS IT WAVY, OR TIGHT CURLS?

22        A      NOT JUST -- NOT TIGHT, THE -- I MEAN --

23   JUST KIND OF -- NOT TIGHT, AND NOT LOOSE.  JUST -- I

24   DON'T KNOW.  HARD TO EXPLAIN TO YOU.

25        Q      WHAT COLOR WAS THE HAIR?

26        A      IT WAS BLACK.

27        Q      THE PERSON HAD A BEANIE; IS THAT CORRECT?

28        A      YES.
```

1821

1   I?

2       THE COURT:  AFTER YOU MARK THEM, PLEASE SHOW THEM

3   TO MR. YOUNG.

4       MS. BARNES:  OKAY.  THESE ARE THE PART OF THE

5   ORIGINAL DISCOVERY.  BUT I'LL SHOW HIM THE ONES I'M

6   USING.  I'LL PUT A P-50.

7       THE COURT:  NO, 58, PLEASE.

8       MS. BARNES:  58?  THANK YOU.

9       THE COURT:  AND THREE BY FIVE COLOR PHOTO.

10      MS. BARNES:  YES, I HAVE FOUR OF THEM.

11      THE COURT:  THEY'LL BE MARKED 58, 59, 60, AND 61.

12

13          (PEOPLE'S EXHIBITS 58 THRU 61,

14           PHOTOGRAPHS, WERE MARKED FOR

15           IDENTIFICATION.)

16

17      MS. BARNES:  PEOPLE'S 60, AND PEOPLE'S 61.

18          COUNSEL, YOU WANT TO SEE THE ONES I'M

19   SHOWING?

20      MR. YOUNG:  YES, PLEASE.

21

22          (A DISCUSSION WAS HELD

23           OFF THE RECORD.)

24

25      Q    BY MS. BARNES:  I'M GOING TO SHOW YOU A SET

26   OF PHOTOGRAPHS.  THESE ARE DIFFERENT ONES.  I'VE JUST

27   MARKED PEOPLE'S 58 THROUGH 61.

28              IF YOU WANT TO LOOK AT THESE PICTURES.  LET

1823

```
 1        Q      BY MS. BARNES:  CAN YOU MARK R FOR THE
 2   ROBLES' RESIDENCE?
 3        A      (THE WITNESS COMPLIES.)
 4        THE COURT:  THE WITNESS PUT AN R ON PEOPLE'S 58.
 5        Q      BY MS. BARNES:  I'M GOING TO SHOW YOU
 6   ANOTHER PHOTOGRAPH, PEOPLE'S 61.  DO YOU SEE YOUR VAN
 7   PARKED BEHIND THIS LARGE TRUCK BEHIND -- YOUR VAN PARKED
 8   BEHIND THE LARGE TRUCK ON PEOPLE'S 61?
 9        A      YES.
10        Q      OKAY.
11               CAN YOU PUT YOUR INITIALS THERE?
12        A      (THE WITNESS COMPLIES.)
13        THE COURT:  THE WITNESS HAS INITIALED 61 IN THE
14   POSITION WHERE SHE SAYS HER CAR IS.
15        MS. BARNES:  THANK YOU.
16        Q      SO REVIEWING THESE PICTURES, IT ACTUALLY
17   APPEARS YOU PARKED YOUR CAR BEFORE THE ROBLES'
18   RESIDENCE, FURTHER AWAY FROM THE SHOOTING THAN THE
19   ROBLES' RESIDENCE; IS THAT TRUE?
20        A      NO.
21        Q      AND YOU PARKED YOUR CAR BEHIND A LARGE
22   TRUCK, LOOKS LIKE IT MAY BE SOME KIND OF A LARGE DUMP
23   TRUCK OR --
24        A      NO.
25        Q      STORAGE TRUCK?
26        A      I DON'T KNOW.
27        Q      WELL, THAT'S YOUR CAR PARKED BEHIND THE
28   TRUCK; RIGHT?
```

1 BUILDER, OR JUST HEAVY-SET, AND YOU SAID THE PERSON WAS

2 JUST HEAVY-SET?

3       A       WELL, I MEAN -- BODY BUILDERS, THERE'S

4 DIFFERENT TYPES OF BODY BUILDERS.

5       Q       DID YOU SEE THE PERSON'S ARMS TO SEE IF

6 THEY WERE MUSCULAR, OR JUST BIG?

7       A       I WAS TALKING ABOUT LIKE FROM THE

8 SHOULDER -- FROM THIS, AND THE CHEST, THE WAY IT LOOKS.

9 THAT'S THIS WAY MY HUSBAND LOOKS.  THAT'S WHY I KNOW.

10      THE COURT:  THE WITNESS POINTED TO HER OWN

11 SHOULDERS, MOVED HER HAND SLIGHTLY DOWN HER UPPER CHEST.

12      Q       BY MS. BARNES:  COULD HE HAVE JUST BEEN

13 SOMEONE WHO WAS FAT OR STOCKY IN HIS SHOULDER AREA?

14      A       NO.

15      Q       WELL, DID YOU SEE HIS ACTUAL CHEST, OR YOU

16 SAW HIM WITH CLOTHES ON?

17      A       THE WAY -- I KNOW BECAUSE, THE WAY MY

18 HUSBAND LOOKS.  THAT'S WHY I'M ABLE TO TELL.

19      Q       OKAY.  AND YOU SAID THAT THE DISTANCE

20 BETWEEN YOUR CAR AND THE SHOOTING WAS 35 FEET; IS THAT

21 CORRECT?

22      A       YES.

23      THE COURT:  WELL, AGAIN, SO WE'RE CLEAR, YOU

24 INDICATED THE BACK WALL; IS THAT CORRECT?

25      THE WITNESS:  YES.

26      THE COURT:  THAT IS 35 FEET.

27      Q       BY MS. BARNES:  YOU'RE SAYING YOU PARKED

28 RIGHT IN FRONT OF THE ROBLES' RESIDENCE?

1827

1   THEY COULDN'T SEE YOU?

2        A     NO.

3        Q     DID YOU SEE -- DID YOU SEE THERE WAS

4   SOMEONE, DID YOU SEE SOMEONE SITTING IN ONE OF THE CARS?

5   A BLACK MALE SITTING IN ONE OF THE CARS?

6        A     NO.

7        MS. BARNES:  NO FURTHER QUESTIONS.

8        THE COURT:  MR. YOUNG, REDIRECT.

9

10               REDIRECT EXAMINATION

11   BY MR. YOUNG:

12        Q     IS IT POSSIBLE YOU WERE ABOUT FIVE CAR

13   LENGTHS AWAY FROM THE SHOOTING?

14        A     MAYBE.  I DON'T KNOW.

15        Q     NOW, THIS VAN THAT THE SHOOTER CAME FROM,

16   YOU SAID IT WAS COMING ON THE WRONG SIDE OF THE STREET;

17   IS THAT RIGHT?

18        A     YES.

19        Q     SO IT WOULD HAVE BEEN FACING YOU, BUT ON --

20   ACTUALLY WOULD HAVE BEEN YOUR SIDE OF THE STREET IF YOU

21   HAD BEEN TRAVELING ON THE STREET INSTEAD OF PARKED AT

22   THE CURB?

23        A     YES.

24        Q     THIS EVENT BURNED IN YOUR MEMORY?

25        A     WHAT WAS THAT?

26        Q     DID THIS EVENT BURN IN YOUR MEMORY THAT

27   NIGHT?  THE SHOCK YOU SAID YOU WENT THROUGH?

28        A     YES.

1845

1   HERE, PEOPLE'S 6 AND THEN PEOPLE'S 9, DO YOU RECOGNIZE

2   THESE PICTURES?

3         A       YES.

4         Q       AND YOU TESTIFIED EARLIER WHEN THERE'S A

5   MURDER, THE CRIME SCENE IS SECURED BY THE FIRST DEPUTIES

6   ON SCENE AS SOON AS THEY CAN; IS THAT CORRECT?

7         A       YES.

8         Q       AND PEOPLE ARE NOT ALLOWED TO DRIVE IN AND

9   OUT OF THE CRIME SCENE?

10        A       CORRECT.

11        Q       AND WOULD IT BE FAIR TO SAY THAT MOST

12  PEOPLE ARE BEING INTERVIEWED ANYWAY, SO THEY'RE NOT

13  REALLY LEAVING THE SCENE?

14        A       YES.

15        Q       NOW, THE PHOTOGRAPH PEOPLE'S 6, THE MURDER

16  HAPPENED ACTUALLY RIGHT IN FRONT OF THIS BLUE CAR; IS

17  THAT CORRECT?

18        A       THE OLDSMOBILE, YES.

19        Q       CAN YOU PUT THE INITIALS THERE OF

20  MR. ROBLES, KIND OF WHERE IT WOULD BE IN THERE IF HE HAD

21  IN FACT BEEN DEPICTED IN THAT PHOTOGRAPH?

22        A       THE VICTIM?

23        Q       YES.  JOSE ROBLES.

24        A       (THE WITNESS COMPLIES.)

25        THE COURT:  THE WITNESS MADE A MARK ON THE

26  PHOTOGRAPH AS REQUESTED.

27        Q       BY MS. BARNES:  THANK YOU.

28                IN THE NEXT PHOTOGRAPH, PEOPLE'S 9, CAN YOU

1847

1  CORRECT?

2       A      YES.

3       Q      AND FINALLY, THE LAST PICTURE SHOWS ANOTHER

4  ANGLE THAT'S PEOPLE'S 61 OF HER CAR BEHIND THE WORK

5  TRUCK; IS THAT CORRECT?

6       A      YES.  IT'S IN THE -- TOWARDS THE RIGHT

7  SIDE, ALMOST THE CENTER LINE OF THAT PHOTOGRAPH.

8       Q      IS THAT 35 FEET AWAY FROM WHERE THE MURDER

9  HAPPENED?

10      A      NO.

11      Q      THAT'S ACTUALLY FURTHER AWAY FROM WHERE THE

12 ROBLES RESIDENCE IS; IS THAT CORRECT?

13      A      I WOULD SAY THAT IT'S -- ALMOST -- IT'S

14 ALMOST PARKED AT THE -- WHAT WOULD BE THE WEST PERIMETER

15 OF WHAT THE ROBLES RESIDENCE WOULD HAVE BEEN.  THE WEST

16 PERIMETER LINE OF THE PROPERTY LINE.

17      Q      SO MISS RENTERIA WOULD HAVE HAD TO LOOK

18 PAST THE LARGE WORK TRUCK, PAST THE CHEVY BLAZER, AND

19 THEN THE TWO OTHER CARS IN ORDER TO SEE THE MURDER; IS

20 THAT CORRECT?

21      A      YES.  AND THERE'S SPACE IN BETWEEN THOSE AS

22 WELL, BECAUSE THERE'S DRIVEWAYS FOR EACH OF THOSE

23 RESIDENCES.  SO IT'S FURTHER.

24      MS. BARNES:  YOUR HONOR, BECAUSE OF THE SIZE OF

25 THE PHOTOS, I'D ASK THE COURT TO PUBLISH THEM TO THE

26 JURY NOW.  JUST THE TWO, PEOPLE'S 58 AND 61.

27      THE COURT:  CAN I TALK TO BOTH OF YOU AT SIDE BAR

28 BEFORE WE DO THAT?



**EXHIBIT F**



**EXHIBIT G**

" EXHIBIT - I " ... 1-16

Request For a complete copy
of The security Tape in
Evidence.

EXHIBIT- I

1  Patricia Ihara, SB#180290
2  PMB 139
3  5319 University Drive
4  Irvine CA, 92612
5  (949) 733-0746
6
7  Attorney for Appellant
8  Jofama Coleman
9
10
11           SUPERIOR COURT OF THE STATE OF CALIFORNIA
12
13               FOR THE COUNTY OF LOS ANGELES
14
15  THE PEOPLE OF THE STATE OF CALIFORNIA,)   Case No. YA059765
16                                          )
17         PLAINTIFF and RESPONDENT          )
18                                          )
19  vs.                                     )
20                                          )
21  JOFAMA COLEMAN,                         )   REQUEST FOR ORDER
22                                          )   FOR A COMPLETE
23         DEFENDANT and APPELLANT.         )   COPY OF THE
24                                          )   SURVEILLANCE TAPE
25                                          )   IN EVIDENCE
26
27      TO THE HONORABLE ERIC C. TAYLOR, SUPERIOR COURT

28  JUDGE:

29      Defendant Jofama Coleman respectfully requests this Court issue an order

30  to the Los Angeles Police Department to make a complete copy of the original

31  Blockbuster Video surveillance videotape that was played for the jury during his

32  trial. This belated request is based new information that viewing the tape on a

33  multiplex player will simultaneously show views from the multiple cameras inside

34  the store and may possibly include images from a camera that was located outside

35  the store.

36      At trial, Detective Steven Katz testified that when he viewed the

37  surveillance tape he was only able to find Coleman on camera when Coleman was

38  at the cashier's desk renting tapes around 9:40 p.m., about 40 minutes after the

1   shooting death of Jose Robles. Coleman believes that a careful examination of the
2   first part of the tape from around 30 minutes before he was seen checking out
3   would show when he and his friends had arrived at the store and that they were
4   there for 15 to 25 minutes before they rented the tapes. This evidence would have
5   supported his defense that he was not the driver of the van involved in the shooting
6   that occurred around 9:00 p.m. that night.

7       Appellate counsel recognizes that this request is being made after the
8   Court of Appeal's decision affirming Coleman's appeal and petition for writ of
9   habeas corpus. The significance of the existing surveillance tape was recently
10  brought to my attention after Coleman reviewed the transcripts of Detective
11  Katz's testimony about the surveillance tape and spoke to an investigator about
12  the multiplexor player and security system. Because the gist of this request is
13  ineffective assistance of counsel and it is likely that the original tape will soon be
14  destroyed, it is imperative that a copy of this tape be preserved so that Coleman
15  can have a competent investigator review it.

16      This request is made in compliance with appellate counsel's duty to
17  investigate all reasonably arguable issues suggested by review of the record and
18  consultations with trial counsel and with appellant. (See *People v. Gaston* (1978)
19  20 Cal.3d 476, 482-484; *People v. Silva* (1978) 20 Cal.3d 489, 493; *People v.*
20  *Barton* (1978) 21 Cal.3d 513, 518, 520.)

21      DECLARATION OF PATRICIA IHARA IN SUPPORT
22      I, PATRICIA IHARA, declare under penalty of perjury:
23      I am appointed counsel to represent appellant, Jofama Coleman, on appeal
24  in the above-entitled matter.
25  1.   All of the factual statements made in this request are true and correct to
26  the best of my knowledge. The material sought to be included in the record is
27  necessary for a proper determination of Coleman's petition for writ of habeas
28  corpus.
29  2.   From the beginning of my representation of Coleman, he has maintained

REQUEST FOR ORDER

P. 2

1  there was a camera in the parking lot at Blockbuster Video that would show that he

2  and his girlfriend arrived at Blockbuster Video in his vehicle about 30 minutes

3  before they left the store. The record shows that the only part of the surveillance

4  videotape [Exhibit No. 52] that was played to the jury showed Coleman and his

5  girlfriend renting tapes about 44 minutes after the shooting. (4RT 1890, 1892.)

6  According to Detective Steven Katz who had viewed the tape, as far as he could

7  tell, Coleman was in the store for five minutes. (5RT 2462.) He could not find

8  where Coleman entered the store on the tape. (5RT 2469.) Thus, the tape did not

9  support Coleman's mistaken identity defense.

10  3.    At trial, the videotape was played to the jury on a regular VCR player which

11  had to be slowed down in order to view the tape. (See 5RT 2463.) Trial counsel

12  commented that when the tape is played at regular speed (fast) it makes you sick.

13  (5RT 2463-2464.) The video fuses several different views together from multiple

14  camera angles in a repeating cycle. It is more difficult to watch the video on a

15  regular video player; special multiplexor equipment shows the fused images at the

16  same time. (See 5RT 2442.)

17        Mr. Coleman informed me that he recently spoke with an investigator who

18  has experience with surveillance camera systems and has various types of

19  equipment to review the tape. The investigator believes that the camera that was

20  located outside the store may possibly be on the tape. Detective Katz's testimony

21  at trial did not preclude this possibility. He could not recall "there being cameras

22  over a view to the parking lot from that tape." (4RT 1893.)

23  4.    I had asked trial counsel in three letters whether he had investigated the

24  matter about the surveillance tape. He did not respond to this question. He sent me

25  Mr. Coleman's trial file which included the police reports, transcripts, other

26  documents, a videotape of a polygraph test, and three CDs. There was no copy of

27  the Blockbusters surveillance tape and no notes about it by trial counsel's

28  investigator. Appellate counsel believes that trial counsel and/or his investigator

29  did not properly review the surveillance tape before it was played to the jury and

REQUEST  FOR  ORDER

p. 3

1  admitted into evidence.

2  5.      There are two Detective Steven Katzs at L.A.P.D.  I was informed by

3  Detective Steven Katz that I will need a court order to get a copy of the tape from

4  the L.A.P.D. and that the original may be destroyed at some point or may have

5  already been destroyed.

6  6.      I spoke with the District Attorney Dara Williams last week and with the

7  other Detective Steven Katz who was the investigating officer on this case.  Ms.

8  Williams and Detective Katz were not adverse to my request.

9  7.      I believe that it is necessary to obtain a complete copy of the surveillance

10  videotape before it is destroyed.  This is the only physical evidence that may

11  possibly contain evidence that would support Coleman's case.

12  8.      The reason this request was not made earlier is that Coleman recently

13  realized the significance of Detective Katz's testimony about the multiplex player.

14  Coleman then spoke with an investigator who told him what may be on the

15  videotape and then called me to explain the need for the tape.  Coleman's belief

16  that there is something on the videotape is consistent with everything he has told

17  me and with his statements to the police a couple of weeks after the murder.

18        I declare under penalty of perjury under the laws of the State of California

19  that the foregoing is true and correct. Executed on this 10th day of February,

20  2009 at Irvine, California.

21                                            Respectfully submitted,

22  Dated: February 10, 2009          By: _Patricia Ih_____

23                                            Patricia Ihara, attorney

24                                            for Appellant

25                                            Jofama Coleman

REQUEST FOR ORDER                    p. 4

JUNE 3, 2003

| W#9: | COLEMAN, DEANDRE A. | MB, DOB: 09-05-1984 |
| W#10: | QUIROA, LOUIS | MH, DOB: 07-10-1986 |
| W#11: | TORRES, ERICK | MH, DOB: 02-02-1982 |
| W#12: | MALDONADO, JUAN CARLOS | MH, DOB: 03-04-1983 |
| W#13: | BARRERA, DAVID MEDINA | MH, DOB: 09-25-1985 |

**************************************************************

On 05-20-2003, Tuesday, at 1600 hours, Detectives contacted Witness **LINDA SHARIE HALL**. FB, DOB: 11-04-1980. Witness Hall is the manager for the Blockbuster video store located at 8811 South Western Avenue in the city of Los Angeles, California 90047. The telephone number at this location is (323) 750-2947.

Witness Hall told Detectives that video surveillance at the location is changed on a daily basis with an individual tape being assigned to each successive day. These tapes are also rotated on a 90-day cycle and held for that period of time.

Witness Hall directed Detectives to the security recording system in the rear office of the Blockbuster video store. Detectives noted that the time registered on the security system indicated 1601 hours and the date of 05-20-2003. The actual time, however, was 1607 hours and the date was in fact 05-20-2003.

Along with Witness Hall, Detectives viewed the security tape from 05-10-2003. On the security video Detectives saw Witness Hall in view at the cash register. Also seen in view at the cash register was Suspect Jofama Coleman. The suspect was seen wearing a black short sleeved shirt with a white shirt underneath and a pair of black pants. The time on the security video tape when Suspect Coleman was seen indicated 2140 hours.

Witness Hall queried the computer system at Blockbuster and located the purchase and/or rental agreement and items checked out by Suspect Coleman on the date in question, that being 05-10-2003. The records indicate Suspect Coleman was helped by employee Letricia Davis and that the transaction took place at 2141 hours, 1 hour and 43 minutes after the murder.

P.5



*JUNE 3, 2003*

Witness Hall released to Detectives the security video tape for the day in question and printed out copies of the rental on Suspect Coleman's account for the day in question. These items will be retained by Detectives and made a permanent part of the case file.

It should be noted the original video tape has marking on it indicating the number 10 and the letter C. Detectives left this location at 1625 hours.

On 05-20-2003, Tuesday, at 1700 hours, Detectives contacted Witness **PATRICIA LOUISE SERMONS**, FB, DOB: 01-22-1964. Witness Sermons is the mother of Suspect Jofama Coleman. She resides at 10320 South Vermont Avenue, Los Angeles, California 90044. The phone number at this location is (323) 756-6597.

Witness Sermons said she has lived at this location with her seven children for the last 11 years. She said her oldest son is named James. She indicated Jofama Coleman is her second oldest son. She indicated Jeremy is her fourth child, who also lives at the location. Witness Sermons said she does not work and raises her children.

Witness Sermons said she recalled the day of the murder, that being Saturday, 05-10-2003. She said she was told of the murder by her son, Jofama Coleman. She said she was not aware of a shooting which occurred one day following the murder at the residence in which Jofama previously resided before moving in with his mother.

Witness Sermons said her son, who she referred to by his middle name Rio, told her about the murder, after his girlfriend had called him at his place of employment indicating she heard he was responsible for the murder of Victim Robles. She indicated her son then called her and explained to her what his girlfriend told him. She also indicated she was concerned her own home might be attacked as a result of her son now living at the residence with her.

Witness Sermons said several people came to her home with food on Saturday evening. She indicated that Rio ( Suspect Coleman ), his girlfriend, Evelyn, her son, Jeremy, and her son, Deandre, were also present at the residence; however, she does not remember the specific time they arrived. She indicated all of these individuals remained at her residence for the rest of the evening. She said the suspect's girlfriend, Evelyn, stayed the night. Previous investigation indicated that this event occurred hours after the murder.

Also contacted at this time was Suspect Coleman's brother, **JEREMY LASHON COLEMAN**, MB/15, DOB: 06-21-1987. Witness Jeremy Coleman indicated he is in the 9th grade at Washington Preparatory High School.

    p. 6

1890

Q      AND THAT BLOCKBUSTER VIDEO, WAS THAT LOCATED
AT 8811 SOUTH WESTERN AVENUE, IN THE CITY OF LOS ANGELES?

A      YES.

Q      AND ABOUT HOW FAR, DRIVE TIME WISE, WOULD YOU
SAY THIS IS FROM THE SCENE OF THE HOMICIDE, LATE HOUR?   IN
OTHER WORDS, LIKE AT NIGHTTIME?

A      TIME WISE?

Q      YEAH.   FIVE MINUTES?   TEN MINUTES?

A      ANYWHERE BETWEEN FIVE, SEVEN MINUTES, I WOULD
SAY YOU CAN MAKE IT.

Q      WITH REGARDS TO THAT PARTICULAR BLOCKBUSTER
STORE, DID YOU REVIEW A VIDEOTAPE OF THE LOCATION THAT
INDICATED THAT IT WAS AT 2140 HOURS.

A      YES.

Q      AND WHEN YOU LOOKED AT THE VIDEOTAPE, IN
LIVE-TIME AND COMPARED IT TO YOUR WATCH, WAS THE VIDEOTAPE
ACTUALLY ABOUT SIX MINUTES BEHIND WHAT THE REAL TIME WAS?

A      YES.

Q      OKAY.   SO IN OTHER WORDS, WHAT WOULD
CORRESPOND TO 2140 HOURS, WOULD BE 2146 HOURS?

A      YES.

Q      NOW.   IN LOOKING AT THE VIDEOTAPE AT THAT
BLOCKBUSTER LOCATION, DID YOU SEE THE DEFENDANT ON THAT
VIDEOTAPE AT 21 -- WHAT WOULD -- 2146 HOURS ON MAY 10TH, OF
THE YEAR 2003?

A      YES.

Q      AND COULD YOU TELL US FROM THE VIDEOTAPE,
COULD YOU DESCRIBE WHAT HE WAS WEARING WHILE ON THAT

P. 7

1892

1        MS. WILLIAMS:  NOTHING FURTHER.

2                    RECROSS-EXAMINATION

3   BY MR. WHITE:

4        Q     SERGEANT KATZ, THE BLOCKBUSTER VIDEO SHOWS

5   MR. COLEMAN INSIDE BLOCKBUSTER.  IS HE THE ONLY INDIVIDUAL,

6   YOU SEEN ON THE TAPE?  THE TAPE SHOWS HIM CHECKING OUT,

7   RIGHT?

8        A     YES, SIR.

9        Q     SO WHEN YOU SAY THAT HE WAS SEEN ON THE TAPE

10  AT 2146 HOURS, THAT WOULD HAVE BEEN 9:46; RIGHT?

11       A     YES.

12       Q     MORE OR LESS.  AND THIS WAS ABOUT 40 -- ABOUT

13  45 MINUTES AFTER THE SHOOTING, THE SHOOTING TOOK PLACE A

14  MINUTE OR TWO -- AT LEAST IT WAS PHONED IN ABOUT A MINUTE OR

15  TWO, 2058 HOURS, I THINK, WAS THE RECORDED TIME, WHICH IS

16  LIKE TWO MINUTES TO 9:00?

17       A     YES, SIR.

18       Q     AND, SO, YOU SEE HIM AT BLOCKBUSTER, 45

19  MINUTES AFTER THE SHOOTING.  DO YOU SEE WHEN HE COMES INTO

20  BLOCKBUSTER?  SO IN OTHER WORDS, DO WE KNOW HOW LONG HE BEEN

21  IN BLOCKBUSTER BEFORE HE'S PAYING FOR HIS ITEMS?

22       A     NO.

23       Q     CAN YOU TELL FROM LOOKING AT THE VIDEOTAPE, IF

24  HE'S ALONE OR ANY OTHER INDIVIDUALS ARE WITH HIM WHILE

25  CHECKING OUT?

26       A     I BELIEVE OTHERS WITH HIM.

27       Q     CAN YOU TELL HOW MANY?

28       A     I DON'T REMEMBER IF THERE WAS ONE OR TWO OTHER

1893

1    PEOPLE THAT APPEARED TO BE WITH HIM.

2            Q      NOW, YOU TESTIFIED, THAT HE WAS WEARING A

3    BLACK T-SHIRT WITH A WHITE T-SHIRT UNDER IT.  ISN'T IT TRUE

4    HE WAS ACTUALLY WEARING A BLACK SHIRT WITH A WHITE T-SHIRT

5    UNDERNEATH IT -- I MEAN, IT ACTUALLY HAD A COLOR TO IT.  A

6    WHITE T-SHIRT UNDERNEATH IT?

7            A      I DON'T RECALL IF IT WAS A COLORED SHIRT, IT

8    CERTAINLY COULD HAVE BEEN.

9            Q      BUT HE CERTAINLY WAS NOT WEARING A BLACK SWEAT

10   SHIRT WITH A HOODIE, RIGHT?

11           A      NO, I DON'T REMEMBER.

12           Q      DID -- HE DIDN'T HAVE A BLACK KNIT HAT ON HIS

13   HEAD, DID HE?

14           A      NO.

15           Q      COULD YOU TELL OR DID THE SURVEILLANCE TAPE

16   EVER HAVE A VIEW FROM OUTSIDE OF THE CAR SO YOU CAN SEE WHAT

17   HE ARRIVED IN, VEHICLE?

18           A      I DON'T RECALL THERE BEING CAMERAS OVER A VIEW

19   TO THE PARKING LOT FROM THAT TAPE.

20           Q      I LIKE TO ASK YOU A FEW QUESTIONS ABOUT

21   MR. SEGUNDO.  MR. SEGUNDO MADE SEVERAL STATEMENTS THAT ARE

22   CONTAINED INSIDE OF THE DOCUMENTS THAT YOU PROVIDED ME WITH;

23   IS THAT CORRECT?

24           A      YES, SIR.

25           Q      NOW, IN ONE OF THE DOCUMENTS IN THE LAST

26   INTERVIEW THAT YOU HAD WITH HIM WHERE HE DID THE

27   PHOTOGRAPHIC IDENTIFICATION, DO YOU RECALL HIM DESCRIBING

28   THE SHOOTING THAT'S OCCURRING IN SEEING JESSIE, THE YOUNGER

P. 9

2442

1   HEAD, DID HE?

2       A    NOT IN THAT VIDEO, NO.

3       MR. WHITE:  NO OTHER QUESTIONS.

4       THE COURT:  ANYTHING ELSE?

5

6                   RECROSS EXAMINATION

7

8       Q    BY MS. WILLIAMS:  THE VIDEO FROM BLOCKBUSTER,

9   IS IT ONE OF THOSE VIDEOS THAT DOES A BUNCH OF DIFFERENT

10  CAMERA ANGLES AT THE SAME TIME?

11      A    YES.  IT'S ON WHAT THEY CALL A MULTIPLEXOR.

12  IT FUSES SEVERAL DIFFERENT VIEWS TOGETHER IN A REPEATING

13  CYCLE.

14      Q    AND YOU HAVE A SPECIAL PLAYER THAT YOU ARE

15  ALLOWED -- YOU CAN PLAY THAT ON AND SEE THE DIFFERENT

16  IMAGES?

17      A    YES, OR SOMETIMES WE ACTUALLY USE THE

18  EQUIPMENT.  THERE ARE A VARIETY OF VENDORS THAT SELL

19  THIS EQUIPMENT.  SOMETIMES YOU HAVE TO USE THE EQUIPMENT

20  AT THE SITE OR THE LOCATION.

21      Q    OKAY.  SO IF WE WERE TO SHOW THE VIDEO IN

22  COURT, IT WOULD JUST LOOK ALL GARBLED TO US?

23      A    IT WOULD LOOK -- THERE WOULD BE -- VIEWS WOULD

24  CHANGE AND, DEPENDING ON THE TIME SEQUENCE THAT THEY

25  HAVE THE CAMERA SET TO CHANGE TO.

26      Q    AND IS IT HARD TO WATCH -- I MEAN IS IT HARD

27  TO FOLLOW WHEN IT'S ON A REGULAR VIDEO?

28      A    IT'S HARDER TO DO THAT.  IT'S A LITTLE BIT

2462

1    OUT?

2          A    CORRECT.

3          Q    SO AS FAR AS YOU COULD TELL, THE TOTAL TIME

4    THE DEFENDANT WAS IN THE STORE WAS 5 MINUTES?

5          A    APPROXIMATELY.

6          Q    AND --

7          MR. WHITE:  OBJECTION; FOUNDATION.

8          MS. WILLIAMS:  WELL, YOU KNOW WHAT, I'LL WITHDRAW

9    IT.

10         THE COURT:  OKAY.

11         MS. WILLIAMS:  AND REPHRASE IT.

12         Q    THE AMOUNT OF TIME FROM THE TIME YOU COULD

13   FIRST SEE HIM ON THE VIDEOTAPE TO THE TIME THAT HE

14   CHECKED OUT, WAS THAT 5 MINUTES?

15         A    APPROXIMATELY.

16         Q    COULD YOU SHOW US THE VIDEOTAPE WHERE YOU

17   FIRST SEE HIM COMING INTO THE STORE -- LET ME ASK YOU

18   THIS:  AS YOU VIEWED THE VIDEOTAPE, DID YOU TRY TO FIND

19   THE PLACE WHERE THE DEFENDANT CAME INTO THE STORE?

20         A    YES.

21         Q    AND YOU WERE UNABLE TO FIND THAT?

22         A    CORRECT.

23         Q    AND IS IT FAIR TO SAY THAT THE CAMERA PANS

24   AROUND THE STORE SO A PERSON, FROM WHAT YOU COULD SEE,

25   COULD WALK IN, MAY NOT BE CAUGHT ON THAT CAMERA BUT

26   MIGHT BE CAUGHT ON THE NEXT CAMERA?

27         A    YES.

28         Q    AND THE ONE CAMERA IS AT THE ENTRANCE OF THE

p. 11

2463

1    STORE?

2        A    IT FOCUSES ON THE INSIDE OF THE DOORS.

3        Q    OF THE ENTRANCE?

4        A    OF THE ENTRANCE, YES.

5        Q    AND THEN THE NEXT CAMERA GOES TO A PLACE RIGHT

6    BY, NEAR WHERE ONE WOULD CHECK OUT; IS THAT FAIR TO SAY?

7        A    YES.

8        Q    SO AS ONE IS WALKING IN THE STORE, THROUGH --

9    LOOKING AT THE CAMERA, AS ONE IS LOOKING AT THE STORE IF

10   THE CAMERA DOESN'T CATCH YOU AT THE ENTRANCE, THEN IT

11   MIGHT CATCH YOU RIGHT THERE AT THE PLACE WHERE YOU CHECK

12   OUT OF THE STORE?

13       A    CORRECT.

14       Q    THE FIRST TIME YOU SAW THE DEFENDANT, WAS THAT

15   ON THE SECOND CAMERA RIGHT BY THE COUNTER AS YOU GO IN?

16       A    IT'S ACTUALLY -- YES.

17       Q    WE CAN CLARIFY IT WHEN WE LOOK AT THE TAPE,

18   BUT THEN THERE'S A COUNTER AND THERE'S A DISPLAY NEXT TO

19   THE COUNTER.  IS IT BY THE DISPLAY NEXT TO THE COUNTER?

20       A    CORRECT.

21       Q    IF YOU COULD SHOW US THE VIDEOTAPE STARTING AT

22   THE POINT WHERE YOU SAW THE DEFENDANT ENTER.  AND, ALSO,

23   TO EXPLAIN IT, WITH REGARD TO THE VIDEOTAPE, IF YOU JUST

24   PLAY THE VIDEOTAPE, IS IT JUST A JUMBLE?

25       A    AGAIN, IT DEPENDS HOW QUICKLY SOMEONE SET TO

26   CYCLE.  IT RECORDS ON THE TAPE AT THE CYCLE THAT IT'S

27   SET TO SWITCH CAMERAS.  I'LL BE USING A PAUSE BUTTON SO

28   WE WILL SEE EACH SHOT FOR AN EXTENDED PERIOD OF TIME

2464

1    RATHER THAN WHAT YOU WOULD NORMALLY SEE IF IT WERE IN

2    THE FULL PLAY MODE AND IT WOULD BE VERY DIFFICULT TO

3    SEE.  IT WOULD BE GRAINY AND YOU MAY NOT ACTUALLY SEE

4    ANYTHING AT ALL.

5        Q    COULD YOU DO THAT IN THE PAUSE MODE STARTING

6    AT WHERE IT IS AND ENDING AT THE POINT WHERE THE

7    DEFENDANT CHECKS OUT.

8            CAN THE COURT INQUIRE AS TO CAN EVERYONE SEE

9    THE TV BECAUSE I CAN MOVE IT BACK THAT WAY.

10       THE COURT:  IS THAT OKAY FOR EVERYBODY?  EVERYONE

11   SEEMS TO BE OKAY.

12       MS. WILLIAMS:  SORRY, YOUR HONOR.  WE HAD IT AT THE

13   RIGHT PLACE, BUT THE TAPE STOPPED.

14       THE WITNESS:  I'M GOING TO HAVE TO BACK IT UP.

15       THE COURT:  DO YOU WANT THEM TO CLOSE THEIR EYES?

16       MR. WHITE:  THERE'S NO OBJECTION ON THE TAPE.  IT'S

17   JUST A MATTER OF WASTING OUR TIME.  WHEN IT GOES FAST,

18   IT JUST MAKES YOU SICK.

19

20           (THE TAPE, PEOPLE'S EXHIBIT NO. 52,

21           COMMENCED PLAYING BEFORE THE JURY.)

22

23       Q    BY MS. WILLIAMS:  IS IT FAIR TO SAY THAT AT

24   2135.51 IS WHERE YOU SEE THE DEFENDANT RIGHT AT THE

25   PLACE WHERE THIS SECOND CAMERA WOULD BE AFTER SOMEBODY

26   WALKED IN?

27       A    YES.

28       Q    THEN, COULD YOU SHOW US THEN, IN THAT

2469

1   TELL US WHAT TIME MR. COLEMAN ENTERED THE BLOCKBUSTER

2   BECAUSE YOU DON'T HAVE ANY FRAME THAT SHOWS WHEN HE AND

3   WHOEVER MIGHT HAVE BEEN WITH HIM ACTUALLY ENTERED THE

4   STORE; IS THAT CORRECT?

5        A    YES.  I COULDN'T FIND THAT.

6        Q    SO YOUR TESTIMONY IS JUST OF YOUR FIRST SEEING

7   MR. COLEMAN WITH SOME OTHER INDIVIDUAL ON THE TAPE THAT

8   DEPICTS 2135 HOURS; IS THAT CORRECT?

9        A    YES.

10       MR. WHITE:  THAT'S ALL I HAVE.

11

12                 REDIRECT EXAMINATION

13

14       Q    BY MS. WILLIAMS:  SO IF THE TAPE IS 6 MINUTES

15  SLOW, THAT MEANS THAT 2140 IS REALLY 946?

16       A    CORRECT.

17       MS. WILLIAMS:  NOTHING FURTHER.

18       THE COURT:  ANYTHING ELSE?

19       MR. WHITE:  NO, I DON'T HAVE ANYTHING -- OH, I'M

20  SORRY.

21

22                 RECROSS EXAMINATION

23

24       Q    BY MR. WHITE:  DID YOU EVER HAVE THE

25  OPPORTUNITY TO CHECK YOUR WATCH AGAINST THE RECEIPT FROM

26  THE CASH REGISTER OR THE CASH REGISTER CLOCK OR WATCH TO

27  SEE IF IT WAS ACCURATE?

28       A    I DID NOT.

2470

Q    TO THE BEST THAT WE KNOW, AT LEAST THE
REGISTER RECEIPT WHICH IS DEPICTED IN PEOPLE'S 50
INDICATES THAT MR. COLEMAN PAID FOR HIS PURCHASE AT
9:38; IS THAT CORRECT?

A    YES, SIR.

Q    THANK YOU.

THE COURT:  PEOPLE?

MS. WILLIAMS:  I HAVE NO FURTHER WITNESSES.  I
WOULD LIKE TO MARK THE TAPE AS PEOPLE'S NEXT IN ORDER.
I BELIEVE THAT WOULD BE 52.


(MARKED FOR IDENTIFICATION, TAPE,
PEOPLE'S EXHIBIT NO. 52.)


THE COURT:  YOU WILL GET THE JURY INSTRUCTIONS
NEXT.  WE ARE GOING TO NEED ABOUT 25 MINUTES, SO WHY
DON'T YOU COME BACK AT 20 MINUTES TILL AND WE'LL GET TO
JURY INSTRUCTIONS.  AFTER THAT, WE'LL HEAR CLOSING
ARGUMENTS.  THANK YOU.


(THE FOLLOWING PROCEEDINGS WERE
HELD IN OPEN COURT OUT OF THE
PRESENCE OF THE JURY:)


THE COURT:  LET'S TALK ABOUT INSTRUCTIONS FOR A
MOMENT.  THE JURORS ARE GONE.

I'VE READ THROUGH THE JURY INSTRUCTIONS.  THE
ONLY THING THAT I HAD A QUESTION ABOUT WAS 3.31.5 AND 10

p.15

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is: PMB 139, 5319 University Drive, Irvine, CA 92612.

On February 9, 2009, I served the foregoing document described as REQUEST FOR ORDER FOR A COMPLETE COPY OF THE SURVEILLANCE TAPE IN EVIDENCE on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

Jofama Coleman V27659
L4/D5/122 up
CSATF, P.O. Box 7100
Corcoran, CA 93212

Dara E. Williams, D.D.A.
c/o Hardcore Gang Division
1 Regent St., Rm. 600
Inglewood, CA 90301

California Appellate Project
Los Angeles Office
520 S. Grand Ave., Ste. 400
Los Angeles, CA 90071

I deposited such envelope in the mail at Irvine, California. The envelope was mailed with postage thereon fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 10th day of February 2009, at Irvine, California.

Patricia Ihara

p. 16

"EXHIBIT J1"

"EXHIBIT J1"

Patricia Ihara S.B. #180290
PMB 139
5319 University Drive
Irvine CA, 92612
Tel: (949) 733-0746
Attorney for Defendant/Appellant
Jofama Coleman

FILED
LOS ANGELES SUPERIOR COURT

FEB 20 2009

JOHN A. CLARKE, CLERK
BY _____ DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

THE PEOPLE OF THE STATE OF CALIFORNIA,)        Case No. YA059765
                                       )
        PLAINTIFF and RESPONDENT       )
                                       )
vs.                                    )
                                       )
JOFAMA COLEMAN,                        )        ORDER FOR A
                                       )        COMPLETE COPY
        DEFENDANT and APPELLANT.       )        OF THE
                                       )        SURVEILLANCE
_____)        TAPE IN EVIDENCE

        GOOD CAUSE HAVING BEEN SHOWN, THIS COURT HEREBY

ORDERS the Los Angeles Police Department to provide appellate counsel

with a complete copy of the original Blockbuster Video Surveillance tape,

dated May 10, 2003, with markings on it of "10" and "C."

Dated:

        2-20-09                         _____
                                        Judge of the Superior Court
                                        ERIC C. TAYLOR

"EXHIBIT K1"

"EXHIBIT K 1"



**Imaging Forensics**

Date: April 20, 2009
To:    Jofama Coleman
From: George Reis
        Imaging Forensics, Inc.
RE:    Blockbuster Security Video
CC:    Patricia Ihara

Per your request, I have demultiplexed the video from the Blockbuster security tape to separate it into four separate movies, each representing the four separate cameras of the system. I made a DVD that enables you to view each camera as a separate movie. The original recording was made at approximately 1 frame per second for each camera view – and these movies will play at 1 frame per second.

Camera 01 is blank. The reason for this could be that the camera was disconnected or malfunctioning, or that there was no camera attached.

Camera 02 is of the entrance/exit to the store from the interior.

Camera 03 is of the interior of the store.

Camera 04 is of the cash register area.

You are visible at several times on Cameras 02, 03, and 04. On Camera 02, you enter the store at 21:25:34 (9:25 pm) and leave the store at 21:41:05 (9:41 pm).

I have returned the videotape you provided to me to Patricia Ihara.

Should you need anything else, feel free to contact me at your convenience.

George Reis

"EXHIBIT - L"

"EXHIBIT - L"

"DECLARATION"

I Jofama Coleman declare under the penalty of perjury the following to be true and correct to the best of my knowledge.

On July, 17. 2009 i Jofama Coleman was escorted to R&R (Receiving and Release) by correctional officer Knight. At R&R i was given the VHS tape and D.V.D's of the Blockbuster surveillence. Upon receiving these items i was then escorted back to D·yard to the education room for the purpose of viewing the surveillence D.V.D's, demultiplexed by George Reis (Imaging Forensic). When i watched the D.V.D's i was able to see Jesse Medina (the little brother of petitioner's girlfriend at the time), entering the video store at 21:25 (9:25 p.m). Jesse Medina arrived at the Blockbuster Video Store with Petitioner and Evelyn Medina (Petitioner's girlfriend at the time).

sign ........, Jofama Coleman
print........, Jofama Coleman
date......, Feburary, 24. 2010

"EXHIBIT - M"

Police Reports, following

"EXHIBIT-M"

PAGE 2 of 9

| REPORT CONTINUATION   NARRATIVE | URN _____ ___-0272 -011 |
|---|---|

UNDER T_E DIRECTION OF CAPTAIN BOWE_, ARRIVED
ON SCENE AND _EGIN TREATING THE VICTIM FOR
___ INJURIES.    DUE TO NUMEROUS FAMILY MEMB_ _
___ FRIEND_ ATTEMPTING TO COME TO THE VICTIMS
AID, I REQUESTED ADDITIONAL LENNOX UNITS TO MY
LOCATION FOR CROWD CONTROL.


WE THEN **RECEIVED** SUSPECT INFORMATION FROM
WITNESSES OF THE INCIDENT.   DEPUTY ANDREWS
INITIATED A CRIME BROADCAST (VIA HIS HAND HELD
RADIO)   WE SECURED THE CRIME SCENE AND IDENTIFIED
(15) EXPENDED 9MM SHELL CASINGS.


AT THIS POINT, THE VICTIM WAS TRANSPORTED
TO MARTIN LUTHER KING HOSP_TAL BY AMR (AMERICAN
MEDICAL RESPONSE) UNIT 7301 (MEDIC JAMES _00506).

76R2BBM- Sr R 313- PS 10-8_

REPORT CONTINUATION NARRATIVE     URN 00?-044?-0?72-011

WE CONTACTED WITNESSES AT THIS INCIDENT AND THEY DID THE FOLLOWING

I CONTACTED W/ ROBLES (?STER) AND HE ??? THAT HE WAS STANDING IN THE FRONT YARD OF HIS RESIDENCE TALKING WITH OTHER FAMILY MEMBERS. W/1 ROBLES SAID HE HEARD APPROXIMATELY (2) GUNSHOTS COMING FROM TWO HOUSES JUST WEST OF HIS RESIDENCE. HE WALKED ONTO THE SIDEWALK, LOOKED WESTBOUND, AND SAW AN UNKNOWN MALE HISPANIC (LATER IDENIFIED AS THE VICTIM) LAYING ON THE NORTH SIDE, SIDEWALK ON 101ST STREET. W/1 ROBLES SAW ANOTHER UNKNOWN MALE HISPANIC EXIT THE PASSENGER SIDE DOOR OF A WHITE COLORED ASTRO VAN (TINTED WINDOWS, WOOD PANELLING) WHICH WAS STOPPED FACING EASTBOUND ON 101ST STREET. THE SUSPECT APPROACHED THE VICTIM ON FOOT, STOOD APPROXIMATELY TWO FEET SOUTH OF THE VICTIM, AND BEGAN TO SHOOT HIM MULTIPLE TIMES.

PAGE 4 OF 9

| REPORT CONTINUATION    NARRATIVE | URN |

W/ RODLES SAID HE SAW THE SUSPECT RETURN TO THE
VEHICLE AND THE DRIVER OF _____ VEHICLE SPED OFF
_____

_____ CONTACTED W/2 SEGUNDO, AND HE SAID HE AND
_____ VICTIM WERE WALKING W/B _____
ON THE NORTH BOUND SIDE WALK TOWARDS BUDLONG AVE.
THEY WERE WALKING TO THE LIQUOR STORE (ON
CENTURY BLVD / BUDLONG AV) WHEN THE VICTIM CHANGED
HIS MIND AND BEGAN WALKING BACK HOME, EAST BOUND
101st STREET ON THE NORTH BOUND SIDE WALK.
W/2 SEGUNDO SAID THE TWO DEPARTED AND THEN HE
BEGAN WALKING ACROSS THE STREET TO THE
SOUTH OF SIDE WALK THEN EAST BOUND TOWARD
BUDLONG AVE.    W/2 SEGUNDO SAID AS HE
APPROACHED 1154   101st STREET HE SAW A
WHITE CHEVY ASTRO VAN WITH BROWN WOOD SIDE
PANELS (ON THE LOWER PORTION OF THE VEHICLE, ON THE
PASSENGER SIDE), AND TINTED WINDOWS PASS HIM DRIVING
EAST BOUND 101st STREET.

(9)

| REPORT CONTINUATION NARRATIVE | URN |
|---|---|

W/2 SEGUNDO SAID APPROXIMATELY 20 SECONDS LATER HE HEARD TWO GUNSHOTS, TURNED AROUND AND SAW THE VICTIM FALL TO THE GROUND. HE THEN SAW AN UNKNOWN MALE HISPANIC EXIT THE PASSENGER SIDE DOOR OF THE VAN AND APPROACH THE VICTIM. W/2 SEGUNDO SAID THE SUSPECT WALKED TO WITHIN THREE FEET OF THE VICTIM'S BODY POINTED THE GUN AT THE VICTIM AND FIRED APPROXIMATELY THIRTEEN MORE GUNSHOTS AT THE VICTIM. W/2 SEGUNDO SAID THE SUSPECT RAN BACK INTO THE VAN AND A MALE HISPANIC DRIVER (NFD) DROVE EASTBOUND ON 101st STREET TOWARD VERMONT AVE, AND OUT OF VIEW.

W/2 SEGUNDO SAID HE THINKS HE RECOGNIZED THE SHOOTER TO BE A MALE HISPANIC THAT IS INVOLVED WITH A GANG KNOWN AS "MKA" (MEXICAN KICKIN ASS). W/2 SEGUNDO SAYS THIS BECAUSE HE (SEGUNDO), AT ONE TIME, WAS AFFILIATED WITH A GANG CALLED (NO CONTROL), AND "MKA" IS THEIR RIVAL GANG (NFD).

# COUNTY OF LOS ANGELES - SHERIFF'S DEPARTMENT
## SUPPLEMENTARY REPORT

DATE _05-11-03_    TIME _2050_    FILE NO. _003-04469-0372-011_

C. _MURDER - 187 pc_

Action Taken: Active / Additional Information

Victim _ROBLES, JOSE_

Suspect / Subject _UNKNOWN_

Informant

Date of Occurrence: _05-10-03_    Time: _2050_

Location of Occurrence:

The purpose of this Supplemental Report is to provide additional information about _THE MURDER_ _____ _OCCURRED ON THE 100 BLK OF 101ST. ST_

_WE CONTACTED DAVIS, PAMELA FB/A (DOB _____ ) WHO SAID SHE WAS IN HER HOUSE ( _____, LA ) WHEN SHE HEARD 5-6 GUN SHOTS OUTSIDE HER RESIDENCE. DAVIS SAID SHE LOOKED OUT OF HER FRONT DOOR AND SAW A LIGHT BROWN COLORED VAN WITH WOOD PANELING LEAVING THE LOCATION WHERE V/ ROBLES, JOSE LAID ─ (SIDEWALK OF 1131 101ST ST LA. DAVIS SAID SHE DID NOT SEE THE SHOOTING, BUT HAS SEEN THE VAN PASS BY ON PREVIOUS DAYS WITH NUMEROUS SUBJECTS INSIDE YELLING THEIR GANG "MKA" MEXICANS KICKIN ASS. N.F.D._

| | |
|---|---|
| By Deputy: _JUAREZ_ | Employee # _439129_ |
| Deputy: _KIMURA_ | Employee # _404296_ |
| Station: _LENNOX_ | Unit: _32_   Shift: _PM_ |
| Approved By: _SGT. ROBERTS_ _219920_ Time: _0200_ | |
| Assignment: _HOMICIDE BUREAU_ | |
| Special Request Distribution: | |
| TT B/C By:    Date:    Time:    Secty _QV_ | |

| REPORT CONTINUATION - NARRATIVE | URN 003-0169-0378-011 |
| --- | --- |

WE CONTACTED JACKSON, APARA FB/14 (03-03-62 ▓▓▓▓▓▓) WHO SAID SHE ARRIVED AT HER RESIDENCE ( ▓▓▓▓▓▓ LA ) FROM WORK AFTER THE INCIDENT OCCURED, JACKSON SAID SHE LEFT TO WHERE V/ROBLES JOSE WAS LAYING AND JELLED ADMINISTER CPR JACKSON SAID SHE DID NOT SEE OR HEAR ANY PART OF THE INCIDENT.

WE CONTACTED SEGUNDO, ALBERT STEVE ( 10-06-87 ▓▓▓▓ ▓▓▓▓▓▓ LA ) WHO SAID THAT HE SAW V/ROBLES, JOSE WALKING WEST BOUND 101ST TOWARDS BUDLONG. V/ROBLES WAS GOING TO THE LIQUOR STORE. SEGUNDO ASKED V/ROBLES IF HE WANTED HIM TO GO WITH HIM, V/ROBLES SAID NO, SEGUNDO SAID THAT APPROXIMATELY 30 SECONDS LATER THEY BOTH SAW A TAN VAN WITH WOODEN PANELING ON THE SIDE DRIVE SOUTH BOUND ON BUDLONG CROSSING 101ST ST, CONSIDERING THAT V/ROBLES AND SEGUNDO HAVE SEEN THIS VAN BEFORE, AND KNOWING THAT A RIVAL GANG DRIVES THIS VAN, SEGUNDO AGAIN ASKED V/ROBLES IF HE WANTED HIM TO GO WITH V/ROBLES TO THE LIQUOR STORE, V/ROBLES AGAIN STATED "NO", THAT HE'LL BE ALRIGHT.

MINUTES LATER, SEGUNDO HEARD TWO SHOTS WITH ABOUT ONE SECOND BETWEEN SHOTS, SEGUNDO RAN TO THE MIDDLE OF 101ST ST AND SAW A MALE SUSPECT (U/FD) STANDING TO THE REAR OF THE TAN VAN HE

(19)

| REPORT CONTINUATION NARRATIVE | URN 003-XXX61-0372-011 |

SAID EARLIER, WITH THE SUSPECT'S ARM EXTENDED IN FRONT OF HIM AND HOLDING A HANDGUN IN HIS HAND, THE SUSPECT FIRED RAPIDLY AT MEADLES. SEGUNDO SAID THAT IT SEEMED LIKE THE SUSPECT UNLOADED A FULL MAGAZINE. THE SUSPECT THEN RAN TO THE PASSENGER SIDE DOOR OF THE VAN, GOT IN AND LEADED FAST ON 143rd ST.

SEGUNDO TRIED TO FOLLOW THE VAN TO OBTAIN THE LICENSE PLATE, BUT COULD NOT FIND IT. SEGUNDO SAID THE SUSPECT WAS WEARING A WHITE BEENIE, BLUE SHORTS WITH HIGH, WHITE SOCKS N/F/D. SEGUNDO SAID THAT THE DRIVER OF THE VAN MIGHT BE "PELON" FROM "DPG" (DOG POUND GANGSTERS) AND THAT THE SHOOTER MIGHT HAVE BEEN "WILLY" FROM "DPG", BUT SEGUNDO WAS UNSURE.

WE CONTACTED RENTERIA, MARIA, 8-10-74, WHO LIVES WITH THE VICTIM'S FATHER. RENTERIA SAID SHE CAME HOME AND PARKED HER VEHICLE ON THE STREET FACING SOUTH BOUND. BEFORE SHE TURNED HER VEHICLE'S LIGHTS OFF, SHE SAW A MALE BLACK WITH A WHITE BEENIE AND FLANNEL SHIRT, SHOOTING DOWN AT SOMETHING ON THE NORTH SIDE OF THE SIDEWALK. RENTERIA DID NOT KNOW

MAY 12, 2003                              -6-                    003-04469-0372-011

In addition, Deputy Allen described the mini van driven by the suspects as a white mini van with dark tinted windows.

Deputy Allen will document his actions and observations in the first report and any additional supplemental report(s).

The scene location is described as the street and sidewalk area directly in front of 1131 West 101st Street, Los Angeles. This is an unincorporated Los Angeles County area described as the Vermont District which falls under the policing jurisdiction of Lennox Sheriff's Station. 101st Street is an east/west street which is bordered by Vermont Avenue to the east and Budlong Avenue to the west. It is paralleled by Century Boulevard to the north and 102nd Street to the south. The location is general comprised of single-family residences.

Detectives arrived on scene and found the weather to be clear and cool. The area was well lit by standard utility streetlights.

Detectives observed the victim's clothing (Evidence Item #18), a button appearing to have been detached from the victim's clothing (Evidence Item #19) and a volume of blood on the north sidewalk directly in front of 1131 West 101st Street. Detectives noted in this immediate area and adjacent to the clothing and volume of blood were Evidence Items #14, 15, 16 and 17, identified as expended projectiles. It should also be noted that during the examination of the victim's shirt (Evidence Item #18), Detectives recovered Evidence Item #20, one expended projectile, which fell from the shirt as it was picked up. Detectives additionally observed Evidence Items #2 and 4, expended projectiles, and recovered these items from the street in front of the location. Detectives additionally noted 11 expended 9mm cartridge cases which were recovered in the street directly in front of 1131 West 101st Street. These expended cartridge cases were subsequently held as Evidence Items #1, 3, 5, 6, 7, 8, 9, 10, 11, 12 and 13. For exact locations of the above described evidence, refer to the evidence list.

All evidence was marked, identified, photographed and ultimately collected by Detective Smith and Forensic Identification Specialist (FIS) Martin Mutuc from the Sheriff's Crime Lab. FIS Mutuc ultimately maintained possession of all evidence which was transported to the Crime Lab for a more detailed examination.

Detectives noted the following vehicles in the crime scene area:

A brown Chevy Tahoe, California License #4VIE517, parked along the north curb line directly in front of 1131 West 101st Street. The vehicle was facing west.

A blue Ford Taurus, four-door, California License #2HYP610, parked along the north curb line directly in front of 1131 West 101st Street. The vehicle was facing west.

MAY 12, 2003                    -8-                    003-04469-0372-011

crews in that general area. He identified the names of these crews as the "Mexicans Kicking Ass" or "MKA's," the "Evil Kings" or EK's," and the "Notorious Graffiti Artists" or "NGA's." Witness Segundo asked the victim if he wanted him to go along with him to the liquor store, and he said that the victim told him no.

Witness Segundo said he stopped at a friend's house at 1154 West 101st Street, where he spoke with his friend, Andres Sandoval. He said that Andy is also a member of the No Control tagging crew. He said the victim continued walking west on 101st Street towards Budlong Avenue. He said that at this time he saw a van traveling westbound on 101st Street towards Budlong Avenue. He described the van as being a white mini van with imitation wood paneling on the lower portion of the vehicle, stretching from the front of the vehicle to the rear of the vehicle. He said that the paneling was approximately 10 inches wide and that the windows on this vehicle were tinted. He described the vehicle as having a white license plate and believed that there was a letter "Z" somewhere at the front portion of the license plate; however, he did not see the entire license plate number and was not sure of the exact positioning of that letter.

Witness Segundo said as the van passed, he became concerned and shouted out a warning to another friend of his who was also walking on the south side of 101st Street, approximately two houses west of where he was talking to his friend. He said that he told his friend, "Huero," to watch out for the van. He said that Huero was talking to a girl as the van passed. Witness Segundo said that as he spoke with his friend, he watched as the van made a left turn southbound onto Budlong Avenue. He said that he was not paying attention at that point and continued to talk to his friend. He said that he last saw the victim standing at the northeast corner of Budlong Avenue and 101st Street.

Witness Segundo said as he was talking with his friend Andy, he heard two shots ring out from behind and east of his location. He said he looked in that direction and saw a male Black exit the passenger's side of the same white van he had just seen pass him. The van was stopped facing east in the westbound lane of 101st Street. He said he saw the male Black passenger walk around the back of the van and raise a handgun in his right hand pointing it at the victim who was down on the ground just north of the street. He said he watched as the suspect shot the victim approximately eight more times.

Witness Segundo described the suspect as a male Black, wearing oversized navy blue shorts made of a jean or denim type material. He said the suspect was wearing white knee-high socks, white "Jordan" tennis shoes and a white beanie type cap. He described the shirt the suspect was wearing as a white sweatshirt and believed that it might have been and "Echo" brand of sweatshirt with the "Echo" logo on the front. He went on to describe the suspect as being approximately 5 feet 8 inches tall, 120 pounds, with a very dark complection and described him as being between 16 and 17 years old. Witness Segundo said that he