MAY 12, 2003                          -9-                    003-04469-0372-011

believed initially that he might know who the shooter was, as he resembled an individual he knew by the moniker of "Willie" from the "DPG" or "Dog Pound" tagger crew. He said that Willie lives on 105th Street between Denker and Normandie Avenue.

Witness Segundo went on to say that after the shooting he spoke with the victim's brother Adrian, and the two talked about what they had seen. He indicated that Adrian told him that he believed the driver was individual he knew as "Jofama" and said that "Jofama" was actually the driver and that it was one of his brothers who was the shooter. Witness Segundo went on to describe one of Jofama's other brothers who he knows by the name "Jeremy," who was not involved in this shooting. He said that Jeremy was the only brother of Jofama's that he was familiar with and did not know the name or moniker of any other brothers related to Jofama.

Witness Segundo described the driver of the suspect vehicle as a male Black, approximately 18 to 19 years of age, bald and wearing a black T-shirt. He said that he is familiar with Jofama because the two attended the same school, that being George Washington Preparatory High School and said the suspect in the driver's seat strongly resembled Jofama.

Witness Segundo said he saw Jofama driving a similarly described vehicle in the area of 101st Street. He said when he saw him driving this van, there were five other individuals riding in the van with Jofama. He could not specifically identify anyone riding in the van on this occasion. He said Jofama was driving the van and had attempted to rundown several of his (Segundo's) friends on 105th Street. Witness Segundo said this crime was never reported to law enforcement. He said that he also saw Jofama on a couple of other occasions, and at one time tried to jump Victim Robles after school for some sort of a personal beef that the two had, the details of which he was unaware.

Witness Segundo said that he knew Jofama's nickname is "Illusion" and described him as having a piercing to his left eyebrow.

Witness Segundo said that after the shooting, he approached a friend and the two followed the suspect vehicle shortly after the shooting. He said that his friend Andres Sandoval drove his Camero and he was seated in the passenger's seat. He said they followed the suspect vehicle east on 101st Street to Vermont Avenue, where they turned south on Vermont Avenue. He said the vehicle continued south on Vermont Avenue to 104th Street, where they turned eastbound. He said the vehicle continued eastbound on 104th Street to Baring Cross, where the vehicle turned northbound, and then traveled eastbound on 103rd Street. He said as he and Andres turned onto 103rd Street following the suspect vehicle, the suspect vehicle stopped at the end of the block at Hoover Street.

Witness Segundo said that Andres stopped the Camero in approximately the middle of the block, at which time the passenger in the van exited the van and began running towards their



MAY 13, 2003                              -4-                    003-04469-0372-011

gang members. Anthony stated that his older brother, Jesse, indicated the owner of the van was Jofama Coleman.

Anthony further described the pistol as being blue steel in color and could not provide Detectives with any further details.

At 1820 hours, Detectives contacted Witness **JESSE ROBLES**, MH/15, DOB: 08-18-1987. Jesse is the younger brother of Victim Jose Rodolfo Robles.

Jesse indicated to Detectives that when the incident occurred he was in the back yard / rear driveway area of his home. He stated he heard one shot, a short pause and then several other shots. Upon hearing those shots he said he ran down his driveway towards the front yard area of his home. At that time he saw a van going eastbound on 101st Street directly in front of his home.

Jesse stated that the driver of this van was a neighborhood man he knew from prior contact as Jofama Coleman. (He stated that Jofama was wearing a long sleeved black hooded sweatshirt with the hood down. Anthony stated the passenger in the front seat of the van was also wearing a black hooded sweatshirt but that the hood was up and he could not further describe him by either race or any other details.

Jesse stated that as the van sped down 101st Street, he watched it turn southbound on Vermont Avenue.

Jesse described the van as being white in color with wood trim on the side. He stated the wheels appeared to be stock and the van had tinted windows. He also stated there was wood paneling on the side of the van. It was his impression the driver side door did have wood paneling on it. Detectives had previously contacted other witnesses who indicated the driver side door was in fact missing the wood paneling and appeared to be a replacement door.

Jesse went on to tell Detectives that approximately one year ago, in either January or February of 2002, he was confronted for the first time by Jofama Coleman. He stated at that time he was with a friend of his from a rival gang identified by the initials "SAP." He did not know what SAP stood for.

He stated Jofama was from the rival gang "Notorious Graffiti Artists" and that because of this Jofama appeared to pick on him (Jesse). He stated Jofama was insisting he surrender a bicycle that Jesse was in possession of at that time. Jesse said he did not want to be beat up or assaulted in any manner. He surrendered the bicycle and watched as Jofama put it into the trunk of a white Ford Thunderbird he was driving. He indicated this incident occurred on approximately 107th Street between Budlong Avenue and Vermont Avenue in an alley.

3 DVD's

bunny
tender!

MAY 13, 2003                              -6-                    003-04469-0372-011

Jesse was positive in his identification of seeing Jofama Coleman driving the van away that was involved in the murder incident regarding his brother.

At 1840 hours, Jesse was put on tape and repeated the previous information as described by Detectives. A copy of this tape will be maintained by Detectives and made a permanent part of the case file.

At 1850 hours, Detective Lillienfeld contacted Witness MARIA ISABEL RENTERIA, DOB: 08-10-1974. Maria stated she lives on the same piece of property as the victim and has known him for several years.

Witness Renteria said she and her brother were just arriving home in their vehicle when they saw the white van parked in the street. She said she saw a male Black adult standing at the rear of the van and shooting in a northerly direction into what she thought was a car. It was not until several moments later that she realized it was a man who got shot.

Witness Renteria described the shooter as being a male Black, 16 to 25 years old, 5 feet 8 inches tall with an average build. She stated she thought he was wearing a beanie and that he had on a long sleeve flannel shirt which was similar to a pendleton type shirt. She stated the shirt was tan with light grey squares or green with dark brown squares.

Witness Renteria further indicated she thought the gun was in the suspect's right hand and that it was black in color.

Witness Renteria described the van as being white and said her brother who was with her told her it was a Dodge Caravan.

At 1900 hours, Detective Lillienfeld contacted Maria's brother identified as Witness **STEVEN BURCIAGA**, MH, DOB: 10-06-1982. Steven told Detectives that as he and his sister pulled up to the street, they saw a van parked facing eastbound on 101st Street with the headlights on. He said there was a male Black outside the van at the rear shooting a handgun.

Witness Burciaga described the van as being a white 1989 to 1990 Dodge Caravan with stock wheels and no roof rack.

Witness Burciaga stated the man he saw shooting was a male Black, 23 to 24 years of age, 5 feet 9 inches tall with a thin build and short hair. He was not sure, but thought he was possibly wearing a black beanie. He further indicated the suspect was wearing a long sleeve buttoned down flannel shirt and possibly Levis.

MAY 18, 2003                          -12-                003-04469-0372-011

Joshua further indicated that his brother, Erick Torres, was not available at the time for interview but that he worked at the Neutrogena Cooperation in the afternoons. Detective Lillienfeld ultimately learned that Suspect Coleman's girlfriend, Evelyn Medina, also works at Neutrogena Cooperation on the same shift.

On 05-15-2003, Thursday, at 1450 hours, Detective Lillienfeld contacted Witness **JESSE MEDINA**, MH/11, DOB: 12-29-1992. Jesse is the younger brother of Evelyn Medina. He lives in a home on 98th Street with his mother, sisters and brother, David Medina.

Jesse indicated that on Saturday evening, he was in Jofama's car parked on the street in front of his home watching television. He stated also in the car was his sister, Evelyn, as well as his brother, David, and Jofama. Jesse indicated that David only comes home on the weekends and that during the week he lives in some type of a youth correctional facility.

Jesse stated that prior to sitting in the car during the evening and watching movies, he, Jofama, Evelyn and David had all gone to a Jack in the Box somewhere west of their home. He stated that after obtaining food, they went to Jofama's home and ate.

It was after that they went back to his house and sat in the car watching movies. Jesse then corrected himself and said that the Jack in the Box visit actually was after they had watched movies in the car.

Jesse indicated that earlier in the evening when Jofama first arrived, they were going to go out to a movie theater to watch a movie. They then decided to go to a Block Buster and rent some DVD's. After that, they went to a Jack in the Box, then Jofama's house and then back to his, Jesse's, house. When asked what time is was that they got to his own home, Jesse asked his mother, who indicated it was around 2100 hours. Jesse stated that it was "a little bit dark, barely dark."

Jesse indicated that he was familiar with both Jeremy Coleman and Deandre Coleman. He stated that somewhere he heard that Jeremy was beat up. He said that a girl across the street, subsequently identified as Jessie Latrice Schufford, had talked about Jeremy getting beat up. He indicated that he was present when Jessie Schufford was talking to Jofama about Jeremy getting beat up. He stated that Jofama's attitude was that it was Jeremy's fault for getting beaten up because he should not have been out on the street.

Jesse stated that he heard gunshots while watching television with Jofama in his car. He stated that also present was his sister, Evelyn, as well as Jofama's brothers, Deandre and Jeremy, as well as his brother, David Medina. He stated that he heard approximately eight gunshots and that this occurred sometime on Saturday night.



MAY 18, 2003                          -18-                    003-04469-0372-011

On 05-15-2003, Thursday, at 1746 hours, Detective Lillienfeld contacted Maria's brother, **JOSE ROBERTO LOPEZ,** MH, DOB: 04-29-1984. Jose told Detective Lillienfeld he was friends with the victim.

Jose stated that on Saturday, the victim left his home around 1500 to 1600 hours. He stated that he was home when the confrontation occurred between the victim and Jeremy. He was in the house looking out into the street and did not hear what happened but he saw Jeremy and the victim talking for 2 to 3 minutes.

He stated that after they spoke, Jeremy left, walking eastbound down the street, and the victim returned to his, the witness's, home. At that time the victim ( Robles ) said that Jeremy was "talking shit and was gonna get his brother." Jose stated that Jeremy then went home.

Jose said that at approximately 1800 hours, he and his brother, Carlos, went over to the victim's house for a barbeque. He stated that while there he and a girl were walking towards the street from the back of Jeremy's home. He said that the victim was on the sidewalk and that he heard several gunshots and turned around running back towards the victim's house.

Jose indicated that he saw a van facing eastbound, directly in front of the victim's home. He stated this van was white with what he thought were blueish stripes. He said that after the gunshots, the van sped off east, and was of an unknown make.

Jose Lopez told Detective Lillienfeld that he had a vision problem and prescription glasses but rarely wore them. He stated that he could read and write but that his vision for details like numbers and letters was poor without his glasses. He did indicate he did not have problems recognizing people without them. He stated that he thought the driver was a male Black adult, wearing a black beanie.

Jose further stated that he was told by others that it was actually Deandre Coleman, although, he did not know that to be a fact. He also indicated that he felt the shooter was the oldest brother of Jeremy Coleman, whom he knew as Jofama Coleman. He stated that when the incident occurred, that was the first time he had ever seen Jofama Coleman, if in fact it was him.

He did state that after the incident occurred, he was shown a photograph that was cut out of a yearbook and he confirmed that the person in the photo was the person he had seen shoot the victim. He stated that he was shown this photo by some unidentified members of the NC tagging crew and they told him that it was Jofama Coleman.

MAY 18, 2003                              -19-                        003-04469-0372-011

Jose further stated that he had heard Jeremy Coleman had lied to his older brother, Jofama, about the incident saying that he had been punched by Victim Robles during their confrontation. Jose thought that this lie was an attempt to enrage Jofama Coleman.

On 05-15-2003, Thursday, at 1758 hours, Detective Lillienfeld contacted Witness **CARLOS AUGUSTO LOPEZ**, MH, DOB: 08-06-1985. Carlos told Detective Lillienfeld he has known the victim for approximately one year.

Carlos stated he was familiar with some of the members of the NC tagging crew, and he believed Victim Robles was a member of that crew.

He stated that Jeremy Coleman used to hang around NGA crew members because his older brother, Jofama Coleman, was a member. He described Jofama as driving a green Toyota Camry, with tinted windows.

Carlos indicated that the last contact with the victim ( Robles ) was Saturday afternoon from 1200 to 1300 hours at his house. He stated that the victim left his home, but prior to doing so, the victim told him that Jeremy Coleman had called him a bitch.

The victim told Jeremy "whatever" in a sarcastic response to this. He stated that Jeremy then left, and the victim ( Robles )came over to his, (Carlos) house, and related what had occurred.

After the victim left his home, Jeremy and his brother, Jofama Coleman, arrived in a green Toyota Camry. He stated that Jeremy was in the backseat, Jofama was driving, and there was an unidentified male Black adult in the front passenger's seat. He described this man as being 19 to 20 years old, wearing a blue cap and a white T-shirt. He further indicated that this man had a slight goatee.

Carlos said that when they pulled up, Jofama Coleman said, "Which one of you was trying to fight my brother?" He said that because of traffic and not receiving a response, Jofama only stayed in front of his house for approximately 30 seconds and then drove away.

At approximately 1530 hours, Carlos stated he was invited to the victim's home for a barbeque and he left to go over there.

His sister Maria later told him that after he left, Jeremy returned.

He stated that he, his brother Jose, and his other brother, Enrique, all went to the victim's home, arriving at approximately 1630 hours.

MAY 18, 2003                    -20-                    003-04469-0372-011

He said several hours later, between 2000 and 2030 hours, Victim Robles left to go to the store. Carlos said he was in the victim's front yard when he heard several gunshots.

He said that two houses east of the house is where the incident actually occurred. As he looked in that direction, he saw a white Chrysler product van, ( Chrysler/Dodge/Plymouth ) with wood paneling, in the street facing eastbound.

Carlos said that the driver sped off eastbound and that he could clearly see that the driver was the same man he saw driving the green Toyota Camry several hours earlier, identified as Suspect Jofama Coleman. He said at that time the driver was wearing a black T-shirt. He did not see the shooter.

Carlos told Detective Lillienfeld he had seen Jofama Coleman on at least four prior occasions and was sure it was him that was driving the white van. He said that after the shooting, he saw his father and other people crowding around his brother attempting to give him aid. He described the van as being a Chrysler product and estimated its year of manufacture somewhere between 1987 and 1991. He further stated that he heard two shots, a pause of a second and a half, and then nine to ten shots.

At this point in time Carlos indicated he had nothing further to add, and the interview was terminated.

During the course of this investigation, Detective Lillienfeld received information from **GILDARDO ROBLES**, MH, DOB: 12-26-1977, that he had possibly seen the suspect vehicle.

Gildardo is the uncle of the victim and the brother of Rudy Robles, the victim's father. Gildardo provided Detective Lillienfeld with a license plate of 3KXR570 and stated that it belonged to a white Dodge van that had wood paneling and similar markings as the one described in the shooting of his nephew.

Follow-up investigation by Detective Lillienfeld ultimately determined that this van was not involved in the incident. The owner of the van, Juan Galan, was ultimately contacted, and photos of the van were taken. Mr. Galan was able to provide a corroborated story regarding where he and the van were at the time of the incident.

An arrest warrant charging Suspect Jofama Coleman with murder will be sought by Detectives. The facts of this case will be submitted to the District Attorney for consideration and filing.

Investigation continuing, with further reports to follow.



SH-R-77 (RED TIP) REV. for WP6.0 11/94

## COUNTY OF LOS ANGELES-SHERIFF'S DEPARTMENT-SUPPLEMENTARY REPORT

DATE:    03-04-04                                    FILE:    003-04469-0372-011

C:    MURDER; 187(A) P.C.                           ACTION:    ACTIVE/ADDTL.
                                                               INFO./WITNESS
                                                               INTERVIEW

V:    ROBLES, JOSE MH/18

S:

### NARRATIVE

On 03-04-04, Deputy Valencia #440010 and I met with W/ Segundo and conducted a tape recorded interview at his residence along with his stepfather, Gustavo Rivera.  The purpose of this meeting was to interview W/ Segundo with regards to the murder of V/ Robles.  The following is a synopsis of this interview.

I told W/ Segundo that I was at his residence because I believed he had information with regards to who had killed V/ Robles.  He told me he did know who killed V/ Robles but did not tell Homicide Investigators because he was afraid for his family and scared the night of the murder.  It should be noted W/ Segundo's father and grandmother still reside in a residence not far from the murder scene.

W/ Segundo stated on the day of the murder he was at the residence of V/ Robles and was visiting with him, when he (Segundo) decided to walk across the street with a fellow "No Control" member street named "Liklo" (N.F.D.)  As they were walking across the street, W/ Segundo noticed a van "creeping" down the street.  I asked W/ Segundo what raised his suspicions about the van, and he replied it was the way the occupants looked at him and the way the van "crept" up.

As the van passed by W/ Segundo, he yelled out, What's up?" and displayed the "No Control" gang sign.  The occupants of the van did not do anything, however the passenger, who he recognized, laughed.  As he continued to stand in front of 1154 W. 101st Street, he watched as the van traveled southbound on Budlong Avenue and out of view.

APPROVED: SGT. ROBERT LAWRENCE #213661              BY: DET. VALENTO #292886
ASSIGNED: HOMICIDE

162

**Report Continued**                                                                    **Page 2**
File # 003-04469-0372-011

After the van had left, V/ Robles exited his residence and W/ Segundo told him (Robles) to be aware because he thought the occupants in the van were from the rival gang "E.K." (Evil Klan) or "M.K.A." (Mexicans Kicking Ass) because he recognized one of them.

A few seconds later, as W/ Segundo remained outside of 1154 W. 101st Street talking to "Fuichi" (Luis Sandoval) and "Dumbo" (Andres Sandoval), V/ Robles walked up to them and stated he had just observed a car drive by which had rival gang members from the "E.K." gang inside of it. V/ Robles told them the vehicle was "Pee Wee's" and had "Raton" and "Youngster" inside. (It should be noted I have spoken with an individual named Jessie Fujino from the "E.K." gang who has the moniker "Raton" and I am familiar with Sergio Soto a.k.a. "Pee Wee" who is from the "M.K.A." gang). W/ Segundo then walked to the corner of 101st Street and Budlong Avenue and saw the vehicle V/ Robles was talking about. W/ Segundo began extending his middle finger at the vehicle as it drove away. W/ Segundo described "Pee Wee's" vehicle as a white Chevy Monte Carlo.

As W/ Segundo walked back towards 1154 W. 101st Street, V/ Robles told him he would be at his (Robles) residence if he needed to find him. As W/ Segundo was standing in front of 1154 W. 101st Street with "Dumbo" (Andres Sandoval) he heard two gunshots. As W/ Segundo turned around, he saw the same van that had driven by earlier, stopped in the middle of the street. He also saw V/ Robles holding onto a wrought iron fence with one hand and his chest with the other hand. W/ Segundo watched as an individual, who was standing approximately three to four feet away from V/ Robles, began shooting at him (Robles) as he was falling towards the ground. W/ Segundo stated the suspect fired approximately eight times at V/ Robles and remembers seeing the muzzle flash and one of the bullets striking V/ Robles in the head. W/ Segundo stated the suspect was holding the gun in his right hand and the weapon was the same color as my duty 92F Beretta handgun, but slightly larger in size.

W/ Segundo told me the shooter was "Drips" from the "E.K." gang, who is short and fat in stature, with long hair to the shoulders, wearing a white colored "Ecko" sweater, with the hood pulled over the head, white shoes, shorts that went down to his knees, white shoes, and white socks pulled up to his knees. W/ Segundo stated after the shooting, he saw "Drip's" face as he ("Drips") turned to enter the passenger side of the van. When he did this, he saw for a 100% certainty it was "Drips" from the "E.K." gang. He stated "Drips" had a first name of Abel, lived on 106th Street between Budlong Avenue and Vermont Avenue in Los Angeles, had a brother named "Chuckie" and a sister named Juana.

I asked W/ Segundo if this was the same person in the van the first time it had driven by. He replied it was, and that "Drips" had the "Ecko" sweatshirt hood halfway on at that time, allowing him to see his hair and face.

After the shooting he and Andres Sandoval got into Andres' car and they began chasing the van. Prior to doing so, they pulled up next to V/ Robles and saw that his family had come outside of the house to help him.

**Report Continued**                                                          Page 3
File # 003-04469-0372-011

They chased the van to the area of 103rd Street and Hoover Avenue, where it stopped in the middle of the street. The passenger, "Drips," got out holding a gun in his right hand, which was down at his side. W/ Segundo stated "Drips" kept walking towards their car and then would stop. Andres Sandoval then initiated a u-turn and fled the area. W/ Segundo stated the van had three letters in the license plate, and one of the middle letters was a "Z." In addition he stated one of the doors to the van was beige in color.

W/ Segundo stated when "Drips" exited the van to confront them, the interior dome light illuminated the inside of the vehicle. This allowed him to see that the driver speaking with "Drips," as he stood outside of the van, was a male black. I asked W/ Segundo if he knew who an individual named Jofama was, and he replied that he did, because Jofama had tried to run him down in a vehicle three times in the past. I asked him if it was Jofama who was driving the van and he replied he could not be 100% certain that it was, but did stated it looked like him. W/ Segundo went on to say that V/ Robles' brother, Jesse, who was looking out a window at the time of the murder, told him the driver was indeed Jofama.

W/ Segundo told me the last time he had seen "Drips" was approximately two months prior to the murder, when "Drips" shot at him from a vehicle driven by "Raton," which was never reported to the police. He also stated he has had other altercations with "Drips" and other "E.K." and "M.K.A." gang members, prior to the murder.

W/ Segundo stated he has had no contact with "Drips" since the murder and had never seen the van prior to, or after, the murder. In addition, he believed V/ Robles was a specific target because he had fought the brother of Jofama earlier. He also added he did not see the Chevy Monte Carlo belonging to "Pee Wee" anywhere in the area during or after the murder.

W/ Segundo told me he is willing to testify but is worried about the safety of his family who lives on 107th Street, not far from the scene of the murder.

Prior to leaving, I showed W/ Segundo two six pack mug show-ups (1A and 1B) which contained the photos of Louis and Omar Carpio, who I had believed may have been involved in the murder, prior to speaking with W/ Segundo. Prior to viewing these six packs, I advised him with regards to the admonishment to viewing photographic line-ups. He stated he understood the admonishment and signed the form.

W/ Segundo identified the photo of Omar Carpio (photo #5 of 1A) as an individual he knew from the streets. He went on to say Omar Carpio had brandished a handgun at 104th Street and Normandie Avenue in the past at him, but he was not involved in the murder of V/ Robles.

W/ Segundo did not identify the photo of Louis Carpio in line up 1B, but did identify an unrelated photograph (#1) as an individual he knew from either the "N.G.A.," "E.K." or "M.K.A." gang and reiterated he was not involved in the murder of V/ Robles.

**Report Continued**                                                                   **Page 4**
File # 003-04469-0372-011

On 03-06-04, I utilized the L.A.C.R.I.S. system in an effort to identify "Drips." I placed the first name of Abel into the name field, and conducted a check. The display indicated 50 booking photos of various individuals with the first name of Abel. I saw that one of these booking photos displayed the name of Abel Soto under booking number 7998752. I saw this booking photo depicted an individual with long hair and the home address of ~~███████████~~ in Los Angeles. Both of these details, were describe as being attributed to Abel, by W/ Segundo.

Based on the above, I prepared a six pack mug show-up utilizing the photo of Abel Soto and five others of similar looking appearance. In addition, I also prepared six pack mug show-ups containing the photos of Jofama Coleman, Jesses Fujino and Sergio Soto.

On 03-07-04, I met with W/ Segundo and his father, Gustavo Rivera in order to show W/ Segundo the six pack mug show-ups I had prepared. Prior to showing him these show-ups, I advised him of the witness admonishment associated to viewing mug show-ups, which he stated he understood and signed.

The first show-up (2A) containing the photo of Jessie Fujino (photo #4), did not result in an identification. W/ Segundo did circle photo #5 which he believed may have been an unknown "E.K." gang member. It should be noted the individual in photo #5 had no relationship to this investigation.

In show-up 2B, which contained the photo of Sergio Soto (photo #3), W/ Segundo made an identification of Mr. Soto and circled his photo, indicating it was "Pee Wee."

In show-up 2C, containing the photo of Abel Soto, W/ Segundo pointed to the picture of Abel Soto (photo #3) and stated the hair depicted in the photo was the same as that of Abel, and that it could be him but was unsure. W/ Segundo circled this photo and wrote the aforementioned to the right of the photo. W/ Segundo told me he was unsure if the photo was that of "Drips" because it was not in color, and the nose in the photograph looked somewhat different then what he remembered Abel as having. W/ Segundo went on to say that he could positively identify "Drips" if he saw him in person and reiterated "Drips" lived on 106th Street near some white apartments between Budlong Avenue and Vermont Avenue. He also added that he went to Henry Clay Middle School with "Drips."

In show-up 2D, containing the photo of Jofama Coleman (photo #2), W/ Segundo pointed to photo #2 and stated it was Jofama Coleman a.k.a. "Illusion." W/ Segundo stated after the murder, when he and Andres chased the van to 103rd Street and Hoover Avenue, he remembered seeing the male black driver as having a metal piercing in his right eyebrow. He stated he had seen Jofama, on occasions prior to the murder, wearing the same type of metal piercing.

I asked W/ Segundo what the time span was on the day of the murder between when "Raton," "Pee Wee" and "Youngster" drove by, and the time the murder occurred. He stated the time span was approximately two minutes apart.
On 03-09-04, in an effort to corroborated the information W/ Segundo provided me that Abel Soto

"EXHIBIT N" 1-8

Information Concerning Detective
Steven Katz's past act of
concealing Evidence.

EXHIBIT N " 1 - 8

# Judge Rules Three LAPD Detectives Accused of Cover-Up Can Be Added as Defendants...

Mon Nov 26, 2007 9:44pm EST

Email | Print |
Share
Reprints · Single Page

[-] Text [+]

Judge Rules Three LAPD Detectives Accused of Cover-Up Can Be Added as
Defendants in Notorious B.I.G. Case

LOS ANGELES, Nov. 26 /PRNewswire/ -- In a major victory for the family of
murdered rap superstar Christopher Wallace (better known as the Notorious
B.I.G.), U.S. District Court Judge Florence-Marie Cooper ruled today that
Detectives Stanley Nalywaiko and Stuart Maislin of the Los Angeles Police
Department's Risk Management Group, along with Detective Steven Katz, whose
concealment of evidence led to a 2005 mistrial, can be added as defendants in
the Wallace family's wrongful death lawsuit against the City of Los Angeles.
    As Judge Cooper noted in her ruling, the Wallace family has charged that
"in their capacity as supervisors in the Risk Management Group, [Nalywaiko,
Katz, and Maislin] failed to supervise or directly participated in the
concealment of evidence in this case."
    The Wallace family's lead attorney, Perry R. Sanders, Jr., has long
maintained that the case involved an LAPD cover-up. )"Judge Cooper's ruling
today gives the family a chance to prove to the world that police were
involved in the murder -- and that high officials have covered up for those
officers," Sanders said. "The family is extremely pleased to have the
opportunity to hold accountable some of the key the people involved in the
cover-up."
    In 2005, Judge Cooper declared a mistrial in the Wallace case after
finding that Detective Katz hid statements linking the killing of Christopher
Wallace to rogue cops David A. Mack and Rafael Perez. Noting that "the
attempted concealment of evidence and failure to respond to officer
wrongdoing
is a central issue in this case" -- and that such evidence did not come to
light until "after the 2005 mistrial" -- Judge Cooper said there was no
reason
not to grant the family's request to amend its lawsuit to add the three
detectives as defendants.
    In her 11-page ruling, Judge Cooper denied on technical grounds the
Wallace family's request also to add other defendants, noting that separate
suits could be brought against those individuals. Said Sanders: "The
prosecution of criminals should be the job of the police. The victim's family
is trying to hold the LAPD accountable for facilitating crime and then
covering it up -- and they hope this will be the only lawsuit they ever need
to bring to a conclusion."
SOURCE  Estate of Christopher Wallace

Allan Mayer or Kelly Mullens, both of 42West, +1-310-477-4442, for the Estate
of Christopher Wallace

RedOrbit NEWS | Slain rapper's family to renew case against L.A.                    Page 1 of 2



# Slain rapper's family to renew case against L.A.

LOS ANGELES (Reuters) - Relatives of slain rap star Notorious B.I.G. vowed on Thursday to renew their wrongful death suit against the city of Los Angeles after a U.S. judge declared a mistrial and accused police of concealing evidence.

U.S. District Judge Florence-Marie Cooper said that previously undisclosed documents implicating two former Los Angeles police officers in the rapper's 1997 shooting death were found days ago in police possession as the result of an anonymous tip.

Much of the material turned up in the desk or cabinet of LAPD Detective Steven Katz, the lead murder investigator, who testified he forgot the papers were there.

In a scathing rebuke, Cooper said she found Katz's explanation for the oversight "utterly unbelievable."

"The detective, acting alone or in concert with others, made a decision to conceal from the plaintiffs in this case information which would have supported their contention that (ex-officer) David Mack was responsible for the...murder," Cooper wrote.

She said the newly disclosed documents also established links in the slaying to former officer Rafael Perez, the central figure in a 1998 corruption scandal that rocked the LAPD.

City attorneys said they were surprised by the revelation but that the material at issue was of questionable value.

Cooper ordered the city to reimburse the family of Notorious B.I.G., whose real name was Christopher Wallace, for legal costs.

Wallace's relatives have said they brought their suit to shed light on the rap star's unsolved murder, which has been widely attributed to a long-running feud between East and West Coast record labels.

The family's lawyer, Perry Sanders, said he would seek a deposition from Los Angeles Police Chief William Bratton.

LAPD spokesman Paul Vernon said Bratton agreed the newly discovered documents should have been turned over sooner, but disagreed with the judge's "conclusions about any type of a deliberate cover-up."

Wallace was gunned down six months after Tupac Shakur, another leading rapper, was shot to death in Las Vegas. The Wallace family has contended that Mack, who is in prison for robbery, was tied to Shakur's music label, Death Row Records, and arranged for a college friend to shoot Wallace -- signed to rival Bad Boy Entertainment -- in retaliation.

p. 2

RedOrbit NEWS | Slain rapper's family to renew case against L.A.                    Page 2 of 2

The newly found documents center on police interviews with a jailhouse informant who said Perez had told him about his and Mack's involvement with Death Row Records and their activities at the scene of Wallace's slaying, the judge said.

Story from REDORBIT NEWS:
http://www.redorbit.com/news/display/?id=167873

Published: 2005/07/07 19:58:22 CDT

© RedOrbit 2005

p. 3

Advertisement



PRINTER FRIENDLY

URL: http://www.rollingstone.com/news/story/9176074/big_family_paid_11_million

**Rollingstone.com**

Back to B.I.G. Family Paid $1.1 Million

# B.I.G. Family Paid $1.1 Million
*Civil case to be retried later in 2006*

**ALEX MAR**

Posted Jan 23, 2006 12:00 AM

A Los Angeles federal judge ordered the city to pay $1.1 million to the family of late rapper the Notorious B.I.G. (born Christopher Wallace) as sanctions for intentionally withholding evidence during the family's civil lawsuit trial.

ADVERTISEMENT



Brought to you by
 ꞏ ꞏMobile ꞏ

Though this is less than the $2 million the family sought, the judge has left open the possibility of an additional $300,000.

United States District Judge Florence-Marie Cooper declared a mistrial in the civil case last summer, after ruling that Los Angeles Police Department detective Steven Katz had withheld statements linking former LAPD officers David Mack and Rafael Perez to the rapper's still unsolved 1997 slaying. This information came to light through an anonymous tip to attorneys for the rapper's family.

Along with producer Sean "Puffy" Combs (now "Diddy") and his Bad Boy label, Brooklyn native B.I.G. recorded his debut, 1994's *Ready to Die*, and 1997's *Life After Death* (released weeks after his death), both hit-packed hip-hop milestones. He was killed when shots were fired into his car on a Los Angeles road shortly after midnight on March 9, 1997.

In December, *Duets: The Final Chapter* became Biggie's third Top Ten album since his death. The record takes unused material from the legendary rapper's vault to create collaborations with artists ranging from hip-hop luminaries Jay-Z, Eminem and Snoop Dogg to R&B stars Mary J. Blige and Biggie widow Faith Evans.

A retrial in the civil case is set for later this year.

P. 4



# Judge Orders L.A. to Pay B.I.G. Family

**Friday , July 08, 2005**

Associated Press

LOS ANGELES —

A federal judge has ordered the city and police department to pay slain rap star **Notorious B.I.G.'s** (search) family "fees and costs incurred as a result of defendants' misconduct" in the family's wrongful death lawsuit.

U.S. District Judge Florence-Marie Cooper declared a mistrial in the case, rejecting the city's argument that LAPD Detective Steven Katz had forgotten about documents in his desk drawer until his office was searched last month.

The documents detail Katz's investigation of a prison informant's claim that corrupt former LAPD officers **Rafael Perez** (search) and **David Mack** (search) were involved in the 1997 killing of the chart-topping New York rapper, whose real name was Christopher Wallace. Cooper said the LAPD still has not turned over other files to the plaintiffs, including about 15 personnel complaint investigations into Mack.

ADVERTISEMENT

**What is your 2009 Credit Score?**

| Excellent | 750 - 840 |
| Good | 660 - 749 |
| Fair | 620 - 659 |
| Poor | 340 - 619 |
| I Don't Know | ???? |

**Find out instantly!**

freescore.com

"The detective, acting alone or in concert with others, made a decision to conceal from the plaintiffs in this case information which could have supported their contention that David Mack was responsible for the Wallace murder," Cooper wrote in an order released Thursday affirming the family's request for a mistrial and sanctions.

Attorney Perry Sanders Jr. said the family would refile the suit, but he didn't know when. It is expected to accuse the LAPD of racketeering and to name Perez as a defendant.

Wallace's mother Voletta also spoke publicly about her son's death for the first time in years.

"Eight years, three months and 29 days (ago) today, my son was murdered in this town, in this city. For all that time I've labored with pain and sweat just to find out the truth of what happened," she said, adding that her suit "was not about money."

"It was about honesty. It was about integrity. It was about cover-up," she said, jabbing a finger in the air to emphasize each point. "It had nothing to do with dollars and cents."

Police Chief William Bratton, in a separate news conference, forcefully denied the department had covered for Mack, currently serving a 14-year prison sentence for bank robbery, or his one-time partner Perez, the key figure in the LAPD Rampart corruption scandal.

"What the hell do we want to protect those two scumbags for?" Bratton said, noting that LAPD and FBI investigations failed to implicate either man. He added that the department was investigating Katz's "oversight."

Wallace's family claims Death Row Records founder **Marion "Suge" Knight** (search) ordered Mack to kill the rapper, and that Mack's college roommate was the gunman.

The link to Perez emerged only after an anonymous tip during trial. LAPD documents show that Kenny Boagni, who became

P. 5

FOXNews.com - Judge Orders L.A ᵗᵒ Pay B.I.G. Family - Celebrity Gossip | ᵗ ᵗertainm...    Page 2 of 2

friends with Perez in prison, told detectives in 2000 and 2001 that Perez had acknowledged moonlighting in a security role for Death Row on the night Wallace was killed, and had called Mack just before the shooting.

Perez's attorney, Winston McKesson, said that if the Wallace family sues his client, he will respond by suing them for malicious prosecution.

SEARCH                                                                          GO

**Click here for FOX News RSS Feeds**

**Advertise on FOX News Channel, FOXNews.com and FOX News Radio**
Jobs at FOX News Channel.
Internships At Fox News (Summer Application Deadline is March 15, 2007)
Terms of use.  Privacy Statement.  For FOXNews.com comments write to
foxnewsonline@foxnews.com;  For FOX News Channel comments write to
comments@foxnews.com
© Associated Press. All rights reserved.
This material may not be published, broadcast, rewritten, or redistributed.

Copyright 2009 FOX News Network, LLC. All rights reserved.
All market data delayed 20 minutes.

p. 6

Case 2:10-cv-02343-VBF-RNB     Document 1-3     Filed 03/31/10     Page 19 of 47     Page
Notorious B.I.G. Judge Considers Mistrial - News of Music, Celebrity, Art News | ...     Page 1 of 2
ID #:319


Rhapsody
Music
Without Limits
FREE TRIAL

Jul 6 2005 9:35 AM EDT

# Judge Considering Mistrial In Notorious B.I.G. Civil Case

Ruling, expected Thursday, could grant rapper's family a default judgment.

By Chris Harris

| Views | 76 |
| Comments | 0 |
| Rating | 0% |

Rate this Article

Add to My Profile
Print
ShareThis



Notorious B.I.G. (file)
Photo: Bad Boy

Refusing to accept a Los Angeles detective's assertion that he innocently forgot to turn over some of his personal case notes to the court — and characterizing the action as "a deliberate concealment of information" — the judge in the Notorious B.I.G. wrongful-death trial said on Tuesday that she would entertain a motion from attorneys representing the slain rapper's family requesting a mistrial or default judgment.

According to *The Associated Press*, U.S. District Judge Florence-Marie Cooper blasted the detective's claim that he simply forgot about notes he'd scratched down about a prison informant, saying it "defies credulity." Cooper is expected to rule on Biggie family attorney Brad Gage's petition on Thursday.

"I do not believe it," Cooper said, according to the *AP*. "It certainly looks to the court, at first blush, that this was a deliberate concealment of information. Some sanction at this stage appears very appropriate."

Attorney Vincent Marella, who is defending the city and its police department in the civil trial, refuted the suggestion that there was a deliberate effort to withhold documents, and asked that the trial resume on Thursday. According to the wire service, Marella described key details contained within police documents unearthed in late June as "a regurgitation of second- and sometimes third-hand information by yet another jailhouse informant."

The trial grinded to a halt on June 27, following the eleventh-hour emergence of a jailhouse informant's statement to police stating that two of the trial's central figures — a pair of Los Angeles cops — moonlighted as guards for Marion "Suge" Knight's Death Row Records (see "Notorious B.I.G. Wrongful-Death Trial Halted After New Informant Surfaces"); the delay provided both sides time to assess the informant's statement and conduct-related depositions.

The informant, identified as Kenny Boagni, claimed to have shared a cell with former Los Angeles police officer Rafael Perez, who was, at one time, partnered up with Los Angeles Police Department cop David Mack. The federal lawsuit filed by the late rapper's family contends Mack, acting on orders from Knight, orchestrated the murder of Biggie (born Christopher Wallace); lawyers for the Wallace family have been trying to establish a link between Mack, Knight and his Death Row empire, as well as provide evidence of a department-wide cover-up of Mack's criminal involvement (see "Former FBI Informant Links Death Row To Biggie Slaying").

At its heart, the Wallace family's suit seeks to lay blame for the New York rapper's death in the collective hands of the city of Los Angeles; the suit is seeking unspecified damages against the municipality.

According to the *AP*, Los Angeles Detective Steven Katz's notes reveal he'd met with Boagni in 2001, as well as meeting with numerous department officials regarding Biggie's still-unsolved homicide. Those notes, however, weren't provided to the Wallace family's attorneys until the trial was underway.

During a deposition last week, Katz claimed he'd blanked on the notes, forgetting he'd left them in one of his desk's drawers. Gage told the *AP* that if the mistrial motion is granted, the lawsuit would be refiled, naming Perez as a defendant; additionally, it would include a Racketeer Influenced and Corrupt Organizations (RICO) claim of racketeering within the department.

## TOP STORIES

50 Cent Taunts Rick Ross: 'You're So Unimportant'

Diddy Says 'Hip-Hop Is In A Recession': Mixtape Monday

Vanessa Hudgens Will Not Play Leah Clearwater In 'New Moon'

Erykah Badu, Jay Electronica Blog Child's Birth In Real Time On Twitter

Jennifer Hudson Lip-Synched Super Bowl Performance

Jay-Z Kept Grammy-Nominated *American Gangster* Under Wraps

Killers Talk About White House Visit

Whitney Houston Is 'Sounding Great,' Says Songwriter Sean Garrett

Will Britney Spears Cancel Tour If She Can't Take Her Kids?

Demi Lovato: 'I Feel Bad For Miley!'

## RELATED STORIES


Biggie's Mom Tells Lil' Kim To 'Get A Life' And Back Off 'Notorious'


Juelz Santana Ready To 'Warm The Streets Up' With Videos, Mixtapes, LP


Diddy, Swizz Beatz Celebrate Damion 'D-Roc' Butler's Freedom At NYC Party


Taylor Swift Continues *Fearless* Billboard Reign


'Notorious' Gets Seal Of Approval From Biggie Friend Dream Hampton

## RELATED ARTISTS

we are one



for all for ever

p.7

Los Angeles Times: Murkiness Reigns in Rapper Death Trial                Page 1 of 1



Los Angeles Times

http://www.latimes.com/news/local/los_angeles_metro/la-me-big6jul06,1,6627520.story?coll=la-common-los_angeles_metro
From the Los Angeles Times

# Murkiness Reigns in Rapper Death Trial

Three weeks into their civil case, lawyers for Notorious B.I.G.'s family have failed to prove an LAPD link to the star's 1997 slaying.
By Andrew Blankstein
Times Staff Writer

July 6, 2005

Ever since rapper Notorious B.I.G. was fatally wounded in a car-to-car shooting on Wilshire Boulevard eight years ago, rumors have swirled in the music world and on the internet about the possible involvement of off-duty Los Angeles police officers.

When his family filed a wrongful-death suit against the Los Angeles Police Department in federal court, attorneys promised to unravel the conspiracy theories and prove that officers working for a rival rap label, Death Row Records, played a role in the killing of Christopher Wallace, B.I.G.'s real name.

But with the trial now in its third week, exactly what role — if any — officers had in the slaying remains more unclear than ever.

The trial has been filled with dramatic moments that only seemed to add to the confusion.

First, two jailhouse informants backed off of earlier claims that former LAPD Officer David A. Mack had orchestrated Wallace's killing.

Then, the plaintiffs' attorneys told the judge they had received an anonymous tip that an LAPD informant had told detectives that former Officer Rafael Perez, a major figure in the Rampart police corruption scandal, participated in the killing along with Mack.

That prompted LAPD internal affairs investigators to sweep through the department's Robbery Homicide Division on the night of June 24, seizing tapes and transcripts of conversations between the informant and two detectives.

Chastened LAPD officials turned over the information to the court, and Police Chief William J. Bratton questioned why the information had not been included in files previously turned over to Wallace family lawyers.

City attorneys also struggled to explain last week why they had not turned over hundreds of pages of other police personnel and disciplinary files that the plaintiffs had sought before the trial.

Officials said the records had been "misplaced" and found just last week.

But what this all means remains in dispute.

Wallace family lawyers say the revelations show that the LAPD has been covering up key facts in the case and cannot be trusted. Attorneys for the city, however, say there is no substance to the plaintiffs' case.

None of the information was purposely withheld, they say, and there is no evidence linking LAPD officers to Wallace's killing.

U.S. District Judge Florence-Marie Cooper said Tuesday that she found the withheld evidence "very disturbing" and said it appeared that one detective, Steven Katz, participated in "a deliberate concealment of information."

The trial stems from the shooting death of Wallace on the night of March 9, 1997, after a music industry party at the Petersen Automotive Museum in the Miracle Mile district.

The family is suing the city of Los Angeles for allegedly covering up police involvement in the killing, which they say was part of a violent feud between Los Angeles-based Death Row Records chief Marion "Suge" Knight and Wallace's label, Bad Boy Entertainment of New York.

No one has been charged in the killing, which remains under investigation.

Cooper is requiring Wallace family attorneys to first prove that Mack, in his police capacity, orchestrated the killing before they can try to implicate the city in a coverup.

The plaintiffs allege that top LAPD officials, including former Chief Bernard C. Parks, tried to scuttle the Wallace investigation because it threatened to expose Rampart-related police corruption.

Parks had a personal stake in seeing the case go away, they added, after a photograph of his daughter was allegedly found in the home of a Compton gang member. Parks has flatly denied any involvement, and the plaintiffs have not produced the photo in court.

None of the witnesses called by the Wallace family have conclusively said that Mack worked for Death Row Records, but some said that the ex-officer was present at some events involving the label.

Mack, Perez and Knight have denied any involvement in the shooting.

One of the family's most promising witnesses failed to buttress their case. Kevin Hackie, a former Death Row Records bodyguard and onetime FBI informant, recanted statements he made under oath that Mack worked in a "covert capacity" for Death Row. Mack told the Los Angeles Times last week that plaintiffs' attorneys had offered him inducements to change his testimony — something the lawyers deny.

Legal observers said that regardless of how important the withheld evidence is to the case, it can't help but hurt the city's defense.

Defense lawyer Carl Douglas said the Police Department "shot themselves in the foot" by failing to turn over information. "It is stunning that, at this hour in trial, there would be this amount of relevant and seemingly important information."

The evidence issue has already delayed the trial by a week. Cooper said Tuesday that she would consider declaring a mistrial, which would allow the plaintiffs time to review the new documents and potentially change the direction of their case.

While the trial itself is mired in delays, a dramatization of the Wallace investigation is moving ahead. HBO plans to make a movie based on an LAPD detective's investigation of the killing. Sylvester Stallone will reportedly be the star.

If you want other stories on this topic, search the Archives at latimes.com/archives.

TMSReprints
Article licensing and reprint options

Copyright 2005 Los Angeles Times | Privacy Policy | Terms of Service
Home Delivery | Advertise | Archives | Contact | Site Map | Help

partners  ktla:cw  Hoy

p. 8

EXHIBIT O

Prior Drug History of
Jesse Robles

"EXHIBIT - O"

## LOS ANGELES SHERIFF'S DEPARTMENT - SUPPLEMENTAL REPORT

**Date:** 12-18-05

**File:** 405-23990-0453-048

**Crime:** Carjacking, 215 PC

**Action** Active Additional Information

Possession Of A Controlled
Substance, 11377(a) HS

Possession Of Burglary Tools, 466
PC

**V/1:** Garcia, Joseph

**S/1:** Robles, Jesse

LARCIS √

### Narrative

The purpose of this report is to provide active additional information regarding the recovery of the victim's vehicle.

During the interview on December 13th, 2005 Suspect Garcia said after stealing the victim's vehicle and driving to Los Angeles, he returned to Norwalk. Suspect Garcia said he left the victim's vehicle parked near his mothers residence located at 13911 Norwalk Blvd, Norwalk and went inside.

Detective J. Broad #413279
Norwalk Station
Approved By: Sgt T. Capsell #160001
Assigned: Norwalk Station D.B.

12-21-05

1

## LOS ANGELES SHERIFF'S DEPARTMENT - SUPPLEMENTAL REPORT

**Date:** 12-13-05

**File:** 405-23990-0453-048

**Crime:** Car Jacking, 215 PC

**Action** Active Additional
Information/Complaint Sought

Possession Of A Controlled
Substance, 11377(a) HS

Possession Of Burglary Tools, 466
PC

**V/1:** Garcia, Joseph

| LARCIS √ |

**S/1:** Robles, Jesse

### Narrative

On December 13th, 2005 Suspect Robles was arrested for possession of a controlled substance, methamphetamine and possession of burglary tools (shaved keys) under file number 405-24068-0452-184. Deputy Suh admonished Suspect Robles his Miranda Waiver which he said he understood, waived and agreed to speak to him without an attorney present.

The suspect told Deputy Suh he had been involved in the car jacking that had taken place on December 12th, 2005 under the above file number. Incident to arrest, Suspect Robles was found in possession of a wooden leg of a chair approximately six inches in length which the suspect said he uses to simulate being armed with a gun.

On December 14th, 2005 I interviewed Suspect Robles at Norwalk Sheriff's Station. I admonished him of his Miranda Rights which he said he understood, waived and agreed to speak to me without an attorney present.

I asked Suspect Robles about the shaved keys and shot gun shells that were found in his possession. He told me his cousin Daniel Sitan owns a Honda so he took some of his extra keys and shaved them down. He said he knows shaved keys are used for burglarizing or stealing cars and that it is illegal to possess. He said he took the shot gun shells from his friend "Gizmo" who lives in Los Angeles. He would not provide any further information and said he did not know what he was going to do with the shells but just wanted them.

I asked Suspect Robles about the wooden furniture leg that he had. He told me he uses it to simulate a gun while holding it in his sweatshirt pocket. I asked him if that is what he did during the time of the car jacking and he said, "Yes".

1

"EXHIBIT P"

Carlos Lopez Past drug charge

```
PAGE 01   04/06/06   04:37:35 L  ? PRINT REQUESTED BY TERMI. L LXT0
TO: LXT0    FROM: CCHRS   CJRAPSHT        04/06/06   04:37:33
.148
LOS ANGELES COUNTY
CONSOLIDATED CRIMINAL HISTORY REPORTING SYSTEM      Date: 04/06/2006   Time: 0437
===============================================================================

           CRIMINAL HISTORY TRANSCRIPT FOR OFFICIAL USE ONLY
              UNAUTHORIZED USE IS A CRIMINAL OFFENSE

   INFORMATION FINGERPRINT VERIFIED UNLESS OTHERWISE NOTED BY AN ASTERISK ( * )

                              (C) Copyright 1996, County of Los Angeles
                                   All Rights Reserved
Key Name: (1) LOPEZ,CARLOS AGUSTO      Date Name First Used: 04/18/2000

SID/CII:  A21586477     MAIN: 30091863     FBI: 336848NB1    LAPD:
===============================================================================

Requested By: SH 292886 Src-TTY: LXT0 Dest-TTY: LXT0      ACHS Data Included: YES
Agency:      CA0190040  LASD - ACADEMY ADVANCED TRAINING BUREAU
Reason:      LOPEZ                                   Multi-State Record: NO

        DEPT. OF JUSTICE AND DMV MAY HAVE ADDITIONAL INFORMATION


===============================================================================
                              SUMMARY
Bookings        Convictions    Juvenile        Warrants Issued    Probation
-----------     -----------    ---------       ---------------    ---------
Felony:  0      Felony:   0    Sustained:  0   Bench:       0     Open:    0

Misd:    1      Misd:     0    Dismissed:  0   Arrest:      0     Expired: 0

                                               Infract.(FTA): 0


===============================================================================
                         LATEST INFORMATION
===============================================================================
Latest Name: (1) LOPEZ,CARLOS AGUSTO      Date Name Last Used: 09/08/2003

Sex Race                    Hair     Eyes        Hgt  Wgt  DOB        Updated
--- ----                    ------   ----------  ---  ---  ----------  ----------
 M  HISPANIC                BLACK    BROWN       507  140              09/08/2003

Latest Address:                                                       04/18/2000

Latest Occupation:

Type      Start Date End Date Charge/Description    Case Number    Updated
--------- ---------- -------- --------------------  -------------  ----------


===============================================================================
```

"EXHIBIT - P"

```
PAGE 02
  Registration          Reg Number    Location                                   Reg Date
  --------------------  ------------   --------------------------------------     ----------


                              DESCRIPTORS
                           #/Names/AKAs/Count
                           ------------------
    (1) LOPEZ, CARLOS AGUSTO             2

                           Dates of Birth/Count
                           --------------------
08/06/1985   2



===============================================================================
                           Other Identifiers
                           -----------------
FBI    336848NB1           JAIN   01694919            PDJ    P194332
OMAN   30191264

                           Addresses/Count
                           ---------------
2607 HOOPER AVE LOS ANGELES CA                                                     1

                           Birth Places/Count
                           ------------------
   CASACRAME                    1      YY                                          1



===============================================================================
                        JUVENILE SUSTAINED PETITIONS
===============================================================================
                          No Juvenile Information.

                     CONVICTIONS/ACTIVE DIVERSIONS
                     No Convictions/Active Diversions Found.

                    PENDING CASES OR UNKNOWN DISPOSITIONS
===============================================================================
                            No Pending Cases.



===============================================================================
                   ARRESTS/CASES/CUSTODY NOT REPORTED ABOVE
  Arr Date    Name   Arresting Agency                          Booking Number
  ----------  ----   ---------------------------------------   -------------------
  04/18/2000    1    LAPD - R&I WARR                           006432887

              Sex    Race                  Hair     Eyes      Hgt  Wgt  DOB
              ---    ------------------    -------  ---------  ---  ---  ----------
               M     HISPANIC              BLACK    BROWN      507  140  08/06/1985

Cnt  Arrest Charges          Dispo Date    Result
---  --------------------    ----------    --------------------------------------
  1  HS 11357(E)                           UNKNOWN
     MARIJUANA - POSSESSION
```

PAGE 03

```
 File Date   Name   Case Number/County        Last Dept/Div              Warrants Issued
 ----------  ----   ----------------------    -------------              ---------------
                    (NO CASE FILING INFORMATION FOUND IN L.A. COUNTY)

===========================================================================

===========================================================================

 Arr Date    Name   Arresting Agency                              Booking Number
 ----------  ----   ----------------------------------------      --------------------
 04/18/2000         LAPD - NEWTON DIVISION                        006432887

             Sex    Race                      Hair      Eyes      Hgt   Wgt   DOB
             ---    ------------------        -------   ----------  ---   ---   ----------

 Cnt   Arrest Charges          Dispo Date   Result
 ---   ---------------------   ----------   ----------------------------------------
       HS 11357(E)             05/30/2000   CLT
       MARIJUANA - POSSESSION

 File Date   Name   Case Number/County        Last Dept/Div              Warrants Issued
 ----------  ----   ----------------------    -------------              ---------------
                    (NO CASE FILING INFORMATION FOUND IN L.A. COUNTY)


===========================================================================


                         END OF TRANSCRIPT
```

```
PAGE 01  04/06/06  04:38:50 I  P PRINT REQUESTED BY TERMI  L LXT0
TO: LXT0  FROM: CLETS                04/06/06  04:38:40
4AYKNLXT0L.IH      <I⊐↓

RE: QHY.CA0190003.21586477.VALEMNT      DATE:20060406 TIME:04:38:40
RESTRICTED-DO NOT USE FOR EMPLOYMENT,LICENSING OR CERTIFICATION PURPOSES
ATTN:VALEMNTO-INV


     *    *    *                  *    *    *
RECORD DELETED FROM AUTOMATED SYSTEM/PURGED
     *    *    *       END OF MESSAGE      *    *    *
```

CARLOS LOPEZ

"EXHIBIT-Q"

Declaration of Jofama Coleman

"DECLARATION"

I Jofama Coleman declar the following to be true and correct to the best of my knowledge.

Due to not having credit, Laura Marquez purchased my cell phone for me. When i wanted to purchase a newer model phone or pay my bill; i had to go through Laura Marquez when doing so. When i purchased a newer model phone, it would come to Laura Marquez's home, in the mail.

Jofama Coleman
Jofama Coleman
March, 23. 2010

"EXHIBIT - Q"

"EXHIBIT - R"

"Denver Lane Blood Gang"
Possible Involved.

"EXHIBIT-R"

DET. TRIP   INGLEWOOD PD
(~~~~~~~~~~~~~~~~~~~~~~)
DENVER LANE BLOOD
POSS INVOLVEMENT
HART OR STEINOFF

05/12/03 / MONDAY / 1230

= DICTATION =

"MIC/KO" NC   or "HUERO"
POSSIBLE WITNESS
& GIRL WITH HIM IS
A POSS. WIT

APPEARS ALBINO.

JOTAMA 103 B/T VMT & BUDLONG

"EXHIBIT - S"

Crime Justice & America, By
Martin Blinder, Forensic
Psychiatrist  pp. 22 - 26......~



# EYEWITNESS TESTIMONY:
## The Most Highly Esteemed, And The Least Reliable

by Martin Blinder
Forensic Psychiatrist,
San Anselmo, California
Past Adjunct Professor
of Law, Hastings
Coillege of the Law

"EXHIBIT-S"

The eyewitness offers the sort of testimony most highly esteemed by juries, yet paradoxically, by any objective standard, is perhaps the least reliable. Time and time again cases are reported in which several eyewitnesses positively identify a criminal defendant at the scene of the offense and in subsequent mug shots, and juries convict – *in the face of the defendant's iron-clad evidence that he was miles away at the time of the crime*. Recent studies by the Department of Justice and others reveal that 80-90% of incarcerated felons freed by DNA evidence had been convicted largely through testimony from sincere, persuasive but hugely mistaken eyewitnesses. Only on that rare occasion when the true culprit – bearing resemblance to the man wrongly convicted – is belatedly apprehended might an eyewitness be able to admit uncertainty, albeit grudgingly, and sometimes, not even then.

---

Given the questionable reliability of eyewitness testimony, defense counsel historically has been unduly handicapped by yet another paradox: until quite recently, in many jurisdictions judges had consistently allowed eyewitnesses to testify freely, yet denied defense counsel's motion to use experts knowledgeable about studies on eyewitness fallibility on grounds that the proposed testimony lacked scientific standing or invaded the jury's province. As a result, many defendants have been forced to rely on hopes that cross-examination might repair any damage the witness (and the court's recalcitrance) had done to their case.

But even the best cross often cannot cure deeply ingrained bias. Jurors were still left ignorant of all the ways an eyewitness can get things wrong, and would retire to their deliberations believing them to be intrinsically accurate. Thus, the impact of eyewitness testimony has been greatly disproportionate to its probative value.

## ADMISSIBILITY OF EXPERT TESTIMONY

With a uniquely instructive 1984 opinion, the California Supreme Court joined the small number of jurisdictions that hold a refusal to allow use of expert testimony on the accuracy of eye-witness identification to be prejudicial error.

Ruling unanimously on in a case of first impression, the Court threw its considerable jurisprudential weight behind what has become a trend in narrowly expanding the right of the criminal defendant by upholding the trial court's exercise of discretion to admit testimony as to how "certain aspects of everyday . . . experience can affect human perception and memory. . ."

When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be understood by the jury, *it will ordinarily be error to exclude their testimony.*

Writing for the majority, Justice Stanley Mosk emphasized that expert opinion as to the accuracy of a *particular* witness's memory is not probative [that is, valid as evidence]; what would be inordinately useful to the jury, however, are explanations of: how such recollections are conceived, stored, organized, and subsequently expressed; the contextual factors influencing and potentially distorting each of these components; and contradictions between "common sense" assessments of eyewitness reliability and scientifically determined probabilities.

Mosk found exclusion of this scientific evidence to be erroneous because such clinical and laboratory data go well beyond the jury's common knowledge or experience. "The jury need not be wholly ignorant of the subject matter of the [scientific] opinion in order to justify its admission; if that were the test, little expert opinion would ever be heard." By the same token, scientific evidence need not (and probably will never) be unanimous to be of value.

He furthermore opined that such testimony in no way usurps the jury's traditional role and function as the arbiter of credibility, "but is limited to exploring the potential effect of circumstances on the powers of observation and recollection of a typical eyewitness. The jurors retain both the power and the duty to judge credibility and weight of all testimony in the case . . . [footnote omitted]."

> "In the wake of this case, People v. McDonald, other jurisdictions seem to be recognizing the unfairness of relying on unreliable testimony. 'To the extent that a mistaken witness may retain great confidence in an inaccurate identification, cross-examination can hardly be seen as an effective way to reveal the weaknesses in a witness's recollection of an event.'" United States v. Downing (1985, CA3 Pa)" –author's name

The possibility that a jury could be confused by admittedly complex psychiatric data is foreclosed by the trial court's unimpaired power to set limits on the presentation of evidence. And certainly, "evidence that is relevant to the prime theory of defense cannot be excluded in wholesale fashion merely because the trial would be simpler without it."

It would be equally gratuitous to exclude such testimony out of fear it might unduly impress jurors, who, in fact, "are far more likely to be unduly impressed by the eyewitness testimony itself."

## THE VULNERABILITY OF EYE WITNESS TESTIMONY

Memory is a composite of retrieved actual perceptions ("I felt the rain, I heard tires squeal, I saw a Volkswagen under a big red truck") and unconscious reconstruction (or invention) of events *not* actually perceived, so as to form a coherent logical whole: ("This Volkswagen skidded on the west street and crashed under a big red truck.")

Often what an eyewitness "remembers" is largely a product of how a question is asked. Compare "How fast was the Volkswagen going when it smashed into the truck?" versus "What was the speed of the Volkswagen when the two vehicles met?"

> "The pejorative cliché 'they all look the same to me' is, unfortunately, based on fact; studies demonstrate that members of one race have great difficulty discerning subtle distinctions between members of another race. The effect is strongest when white witnesses attempt to recognize black subjects" – author's name

The accuracy of an eyewitness' recollection is suspect when: there was little time for observation; the witness was under the influence of alcohol or drugs; the witness was in a highly emotional state; the witness would have had no reason to take particular notice of the incident (e.g., did not know a crime was taking place); there was a substantial time lapse between observation and first identification; there was a marked discrepancy between the identifying witness' *original description* and the *actual appearance* of the defendant; the witness initially expressed doubt he could make an identification, or first made a patently erroneous one, or reported other details that later proved incorrect; there is steady "improvement" of memory and confidence from first identification through subsequent statements, grand jury testimony, and trial; the witness fails to recognize the defendant when next encountered; the witness and the defendant are of different ethnic groups / races;" the witness demonstrates bias or prejudice ("blacks can be awfully violent," "women are such careless drivers," etc.); the witness has an emotional need to see what s/he expects to see or report; and/or the witness manifests a high need to conform to, defer to, or please authority figures.

> "Law enforcement agencies will sometimes use hypnosis to enhance the recollection of eyewitnesses. Unfortunately,

> controlled studies show that while hypnosis may increase the degree of confidence the subject feels in recollections, it does nothing for accuracy. Instead, it provides the subject a sense of security to make guesses he might not otherwise make, and provides subtle, unconscious incentives to incorporate any interviewer bias he may discern from the questions put to him." –author's name

Standard mug-shot and lineup procedures unfortunately provide good illustration of how memory is commonly distorted. Typically, photographs (or lineup participants) shown to a prospective witness are all of persons suspected of the same crime as the offense under investigation, rather than of persons fitting descriptions originally given by witnesses. Thus, there tends to be a wide discrepancy in appearance among the suspects viewed, heightening the probability that the witness will identify the *one* face (relative to the others) that at least somewhat *resembles* the witness's original perceptions. The police frequently use the photograph of the one *they* believe to be the perpetrator again and again in different displays, whereas the other faces reappear far less often; repetition alone can increase the witness' conviction that the suspect's face is familiar.

> Police sketch artist Michael Streed defends eyewitness testimony in an article appearing in issue 10 of *Crime, Justice & America*, online at http://www.cja.us

If an eyewitness *erroneously* chooses a mug shot after the initial lineup viewing, he is likely to choose that very same incorrect face once again at a later time, even though the correct face is also available for choosing. That is, a witness is much more likely to identify

in a real lineup that face he or she may have previously seen in a mug-shot lineup, than that actually seen at the time of the initial identification, and in a subsequent recall is likely to remain committed to his or her error.

Lineups may be much smaller functionally than they appear if they contain many persons who can be easily ruled out as suspects. (To make my point, let me create an improbably obvious example of the raped woman who reports that her assailant was a black man but who is then shown a lineup wherein three of the men are white. This trio of poorly fitting individuals would thus contribute to the nominal, but not the functional, size of the lineup group.)

Witnesses may further be influenced by an unconscious wish to please the police and/or by the police's unconsciously directing identification towards a suspect they are sincerely convinced is the guilty party. Thus, while the *confidence* of the eyewitness improves with the passage of time, *recollections are fading and becoming ever less reliable*.

Data given an eyewitness *after* his viewing on participating in the event in question can systematically bias previously stored information. In one study, subjects who learned after an incident that the offender, upon conviction, might be treated severely, were much more likely to make an identification of *someone* in a police lineup than those who were told the offender might receive lenient treatment. The biasing effect of this "impetus to be helpful" in cases of serious crime was apparent in the increased incidence of identification, *even when the perpetrator was not in the lineup*.

By contrast, when the crime was not considered serious, as evinced by the possibility of only mild punishment, viewers of a lineup appeared far less eager to "nail" *someone* as a criminal; such caution was reflected in their pronounced disinclination to make an identification, *even when the perpetrator was in fact present.*

Let us now study the seven factors that I find most commonly confound the eyewitness in a criminal trial.

## EYEWITNESS VULNERABILITY

### Stress

The more stressful an event, the more likely that *the event occurred* will be remembered; but the accuracy of remembered details *within the event* still remains inversely proportionate to the stress involved. Thus, the fact of a double homicide occurring right before the witness' eyes is likely to be remembered forever, but such *discriminating details* as subtle facial characteristics of those parties involved are far *less* well-remembered. So dramatic an event is likely to be further ingrained as the witness goes over it again and again in his or her mind, but such rehearsal does not increase the accuracy of details that were initially perceived incorrectly; unfortunately, all that rehearsal does is increase *confidence*.

### Attention To the Unusual

Essentially, one perceives and remembers items or events that draw out attention. Few of us can recall which three letters go with which numbers on a telephone dial, even though we have seen them together many times because we've never paid attention to them. Further, rarely can we attend to more than one thing at a time, so that if there are many things happening at once, attention is divided and as a consequence, nothing is remembered very well.

Attention is drawn to the unusual. Thus, a witness will readily remember that a perpetrator had a large scar or a tattoo, or that he or she was of a different race, e.g., "a big black dude," yet recall little about the myriad facial details. In a sense, the odd feature robs the many usual ones of their share of attention.

### Cross-race

Many, though not all, studies indicate that cross-racial identifications are 10-15% less accurate than same-race ones. This phenomenon has been studied most extensively for black versus Caucasian identifications, but has been found with other race mismatches as well. Disparity is less in adults who have close friends of the other race involved.

### Resemblance

Unsurprisingly, miscarriages of justice are most likely to occur when a hapless but innocent defendant does in fact resemble the perpetrator. The tendency to select from a photo lineup the face that merely most *resembles* the perpetrator can best be countered by replacing the typical simultaneous presentation of photographs with a sequential one. The latter promotes *absolute* judgments wherein the witness must compare each photo with his memory of the *actual* perpetrator's face as opposed to simultaneous presentation which promotes *relative* judgments amongst numerous faces, none of which may belong to the perpetrator.

### Post-event Contamination

Information acquired after the fact may then be inadvertently integrated into memory for the event itself. Once this happens it may be impossible to tease them apart. Newspaper reports, the comments of other witnesses, and leading questions are typical sources of such contamination. The more impoverished the original information, the more remote the event in time (relative to that point in which new information

is acquired) and the more "reasonable" the new information, the more likely post-event data will be integrated into memory.

A common form of such post-event contamination in criminal proceedings occurs when the witness erroneously identifies a defendant on a photo line-up. With that photograph now clear in the witness' mind, he then identifies the defendant with great certainty and conviction at the preliminary hearing and trial. Here, the photo lineup itself is actually a form of contaminating post-event information.

> "For example, if the witness was 95% certain of an identification after a show up but 100% certain after a line up, it is important to know to what specific event the witness attributes this increase in confidence. For example, did the police confirm the identification? Did other witnesses? Was the witness asked to confirm the identification before the grand jury in a way that made apparent the prosecution's belief that the eyewitnesses' opinion was consistent with the prosecutor's? Resolutely pursuing these facts can ultimately fuel an argument that the witnesses' confidence is evidence of the witness' environment more than evidence of the witness' accuracy." - Eyewitness Testimony, 3d, Elizabeth Loftus and James Doyle, Lexus Law Publisher, Charlottesville, VA 1997

### Familiarity (Unconscious Transference)

Contrary to expectations, past or subsequent familiarity with a suspect may *disable*, rather than *enhance*, the accuracy of an eye witness identification. A witness may unconsciously transpose a face familiar for mundane reasons to someone at the scene of a crime (especially if the perpetrator in fact resembles the more familiar face. That is, the witness has the *right face*, but the *wrong place*. Or, a witness may identify at line-up persons whose faces were seen only in a book of mug shots one week later, but were not at the crime scene.

Special difficulty arises in cases involving multiple perpetrators; witnesses may have a strong bias to label *any* person they recognize as not just being in some way involved, but as having been the *principal assistant*.

### Psychological Pressures To reduce uncertainty

In matters of great importance most of us would be far more comfortable with certainty than with doubt. And so it is that as time passes, the eye witness tends to reassure himself by going over the index event in his mind, filling in gaps, and reconstructing details, thus inadvertently altering the original recollections so as to eliminate conflicts and inconsistencies between information in memory, and that acquired from other sources.

The very act of explicitly making an identification in itself appears to augment certainty, with witness confidence increasing with each subsequent report, though he may be merely confirming himself in his error. That is, the very process of attempting to recall can generate the illusion of familiarity, a phenomenon utterly independent of accuracy; with each rehearsal and report, the witness becomes increasingly committed to his judgment.

### b. To choose

Studies have shown that many witnesses feel obliged to identify *someone*, and may do so even though the individual *known* to be the perpetrator is not present in the live lineup or photo array, and despite admonitions that they need not select anyone. Demonstrably false identifications have also been observed in laboratory studies and in staged crime experiments simulating a criminal investigation. Thus, a sincere desire to be useful may cause some witnesses to be entirely too helpful.

### c. To meet one's expectations

If a witness has reason (however unfounded) to believe that the person he is now identifying is in fact the perpetrator, *his actual memory of the perpetrator will start to change* so as to more resemble the person being identified, particularly if the original perception was brief, incomplete, or hazy. That is, exposure to a new face which one has been persuaded is that of the perpetrator can have the effect of making memory of the perpetrator's face "better," when in fact, it is being rendered less correct, i.e., a weak correct memory is being replaced by a stronger incorrect one. ∎

©2007 by Dr. Blinder The second half of this article will appear in the next issue of Crime, Justice & America.

## ATTENTION READERS!

*Crime, Justice & America* only allows a few select advertisers in our local editions. Their services can mean the difference between jail and freedom, or doing time versus living life. Call them to get out of jail or to represent you in court. Don't call them to ask for 3-way phone calls, or after you're sentenced to see whether you got a good deal. Don't ask them for free advice: They spend a lot of time on each of their cases, which you need and deserve. Your family and friends are the best resources for hiring experts to help your situation. Have them call the advertisers to help you faster!

"EXHIBIT - T"

Charge Evaluation Worksheet

"EXHIBIT - T"

# LOS ANGELES COUNTY DISTRICT ATTORNEY
## CHARGE EVALUATION WORKSHEET

☐ Further investigation requested.
☐ Probation Violation in lieu of filed.
☒ Prosecution declined.

| | |
|---|---|
| DA CASE NO. | 23918829 |
| POLICE CASE NO. (DR OR URN NO.) | 003-04469-0372-011 |
| Page | 1 of 1 |
| Date | July 1, 2003 |
| DA OFFICE CODE | INJA |

## SUSPECT DATA

| NO. | SUSPECT NAME | BKNG NO. | CHARGE | REASON |
|---|---|---|---|---|
| 01 | COLEMAN, JOFAMA REO | | PC187(a)B | Insufficient evidence |

**DESCRIPTION**

Defendant is identified as the driver of a van where the right front passenger got out and shot/killed the victim, 2 of victim's friends (1 brother and 1 friend) make the positive identification. Defendant has approximately 5 witness who corroborate his alibi that he was somewhere el[...] No physical evidence connects defendants to the murder. If the van is located, process it. If defendants fingerprints are found in the van, resubmit.

| STEVE COOLEY District Attorney | COMPLAINT DEPUTY (PRINT) JANET WILSON | DEPUTY CODE 167125 | COMPLAINT DEPUTY (SIGNATURE) | REVIEWING DEPUTY |
|---|---|---|---|---|

OFFICER · MARK LILLIENFELD

In submitting this matter for consideration of a complaint, written reports of substantially all available evidence (except as to the oral information, if any, purporting to have been given by me and which is fully and correctly stated above) have been submitted to the above-named Deputy (copies of which are attached hereto) except the following:

The disposition of this matter will be final unless the commanding officer requests reconsideration of the case, stating his reasons on the back of this form.

(94)



COUNTY OF LOS ANGELES

# DISTRICT ATTORNEY

# *FACSIMILE COVER SHEET*

Date: __7. 7. 03__

Time: __9:30 am__

No. of Pages: __2__
(INCLUDING COVER SHEET)

Fax No.: __310. 674. 7837__

Location: DISTRICT ATTORNEY'S OFFICE
INGLEWOOD AREA OFFICE
1 REGENT STREET, ROOM 405
INGLEWOOD, CA 90503

## TO:

NAME: __Mark Lillienfeld__

DIVISION/COMPANY: __LASD__

FAX NO.: __323.887.1160__

PHONE NO.:

## FROM:

JANET M. WILSON
Deputy District Attorney

NAME:

DIVISION: __Filing__

PHONE NO.: __310.419.5177__

SUBJECT: __Jofama Coleman__

MESSAGE: __please contact me if you can locate the van or some other physical evidence connecting Coleman to the murder.__

NOTE: If the FAX you receive is incomplete or illegible, please contact the FAX

Operator at _____



"EXHIBIT- U"

Minute Order, indicating when information was filed.

"EXHIBIT- U"

MINUTE ORDER
SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE PRINTED: 09/12/07

000189

------------------------------------------------------------------
CASE NO. YA059765

THE PEOPLE OF THE STATE OF CALIFORNIA
                                    VS.
DEFENDANT 01:  JOFAMA  COLEMAN

------------------------------------------------------------------

INFORMATION FILED ON 07/27/05.

COUNT 01: 187(A) PC FEL  - MURDER.

ON 05/09/06 AT  130 PM  IN SOUTHWEST DISTRICT DEPT CLK

CASE CALLED FOR EXHIBITS RCVD BY EXHIBIT CLERK

PARTIES: NONE (JUDGE)  NONE  (CLERK)
         NONE        (REP)  NONE  (DDA)

DEFENDANT IS NOT PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL

RECEIVED PEOPLES EXHIBITS 1,2A,2B,3,4,5,6,7,8,8A,8B,8C,8D,8E,8F,
8G,8H,8I,8J,8K,8L,8M,8N,8O,8P,8Q,8R,9,10,11,12,13,14,15,16,17,18
,19,20,21,22,23,24,25,26,27,28,29,30,31,32,33,34,35,36,37,38,39,
40,41,42,43,44,45,46,47,48,49,50,51A,51B,52 AND DEFENDANTS
EXHIBITS A & B. BY B.RUDITIS, EXHIBIT CUSTODIAN.

NEXT SCHEDULED EVENT:

PROBATION AND SENTENCE HEARING

PAGE NO.   1       EXHIBITS RCVD BY EXHIBIT CLERK
                  HEARING DATE: 05/09/06







**TERRY NAFISI**

District Court Executive
and Clerk of Court

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**
312 North Spring Street, Room G-8  Los
Angeles, CA 90012
Tel: (213) 894-3535

Wednesday, March 31, 2010

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4570

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

JOFAMA COLEMAN
CDC# V-27659
P.O. BOX 5242
CORCORAN, CA 93212

Dear Sir/Madam:

Your petition has been filed and assigned civil case number    CV10- 2343 AHM  (RNB)

Upon the submission of your petition, it was noted that the following discrepencies exist:

☐ 1. You did not pay the appropriate filing fee of $5.00.  Submit a cashier's check, certified bank check, business or corporate check, government issued check, or money order drawn on a major American bank or the United States Postal Service payable to 'Clerk U.S. District Court'.  If you are unable to pay the entire filing fee at this time, you must sign and complete this court's Prisoner's Declaration In Support of Request to Proceed In Forma Pauperis in its entirety.  The Clerk's Office will also accept credit cards (Mastercard, Visa, Discover, American Express) for filing fees and miscellaneous fees.  Credit card payments may be made at all payment windows where receipts are issued.

☒ 2. The Declaration in Support of Request to Proceed in Forma Pauperis is insufficient because:

☐ (a) You did not sign your Declaration in Support of Request to Proceed in Forma Pauperis.

☒ (b) Your Declaration in Support of Request to Proceed in Forma Pauperis was not completed in its entirety.

☒ (c) You did not submit a Certificate of Prisoner's Funds completed and signed by an authorized officer at the prison.

☐ (d) You did not use the correct form.  You must submit this court's current Declaration in Support of Request to Proceed in Forma Pauperis.

☐ (e) Other: _____

Enclosed you will find this court's current Prisoner's Declaration in Support of Request to Proceed in Forma Pauperis, which includes a Certificate of Funds in Prisoner's Account Form.

Sincerely,

Clerk, U.S. District Court

AGRAGERA

By: _____

Deputy Clerk



**TERRY NAFISI**

District Court Executive
and Clerk of Court

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**
312 North Spring Street, Room G-8  Los
Angeles, CA  90012
Tel: (213) 894-7984

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4570

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

Wednesday, March 31, 2010

**JOFAMA COLEMAN**
**CDC# V-27659**
**P.O. BOX 5242**
**CORCORAN, CA 93212**

Dear Sir/Madam:

A ☒ Petition for Writ of Habeas Corpus was filed today on your behalf and assigned civil case number CV10- 2343 AHM (RNB)

A ☐ Motion pursuant to Title 28, United States Code, Section 2255, was filed today in criminal case number _____ and also assigned the civil case number _____

A ☐ Motion for Extension of Time to File Habeas Corpus Petition was filed today on your behalf and assigned civil case number _____

Please refer to these case numbers in all future communications.

Please Address all correspondence to the attention of the Courtroom Deputy for:
☐ District Court Judge _____
☒ Magistrate Judge    **Robert N. Block**_____
at the following address:

☐ U.S. District Court
312 N. Spring Street
Civil Section, Room G-8
Los Angeles, CA  90012

☒ Ronald Reagan Federal
Building and U.S. Courthouse
411 West Fourth St., Suite 1053
Santa Ana, CA  92701-4516

☐ U.S. District Court
3470 Twelfth Street
Room 134
Riverside, CA 92501

The Court must be notified within fifteen (15) days of any address change.  If mail directed to your address of record is returned undelivered by the Post Office, and if the Court and opposing counsel are not notified in writing within fifteen (15) days thereafter of your current address, the Court may dismiss the case with or without prejudice for want of prosecution.

Very truly yours,

Clerk, U.S. District Court

By:  AGRAGERA_____
    Deputy Clerk