1  since it already provides that the jury must return a special sepa-

2  rate verdict on the issue of the prior conviction.

3      A bifurcated procedure would be at least as economical of court

4  time as the unitary practice. Such a procedure "does not offend any

5  principle of orderly procedure nor tend to delay justic. In fact it

6  might well expedite justice, for if a defendant is acquitted on the

7  substantive charge, there is no occasion to take time to present

8  evidence of prior criminal history such as arrest record and/or

9  prior convictions."(State -v- Stewart (1946) 110 Utah 203, 171 P.2d.

10  383, 387.)

11      Petitioner contends that he was entitled to both the right to

12  a jury trial of the validity of the arrest record and the validity

13  of the prior conviction (art. I, § 16: People -v- Ford (1964) 60 Cal.

14  2d. 772, 794, 36 Cal.Rptr. 620, 388 P.2d. 892) and he was also enti-

15  tled to the right to a fair trial (art. I, § 15) which are guarant-

16  eed by the California Constitution. Under the unitary procedure, a

17  defendant is forced to choose between the "equally unappealing alte-

18  rnatives" of admitting the prior convictions and losing his opportu-

19  nity to contest their validity or denying them and being faced with

20  the certainty that the state will attempt to prove them at trial,

21  subjecting him to resulting prejudice. (See 40 N.Y.U.L.Rev., supra,

22  at p. 338.) As the ABA Advisory Committee pointed out in criticizing

23  this California procedure: "Given the alternative procedures which

24  might be used, there is no real reason to confront...defendants with

25  the real possibility that they will be prejudiced by their failure

26  to enter a stipulation." (ABA Stds., supra, at p. 105.) "(T)he courts

27  should not participate in, or encourage, a procedure which obliges

28

p. 18

the accused to forfeit one constitutional right in order to retain the protection of another." (Allegrezza -v- Superior Court (1975) 47 Cal.App.3d. 948, 952, 121 Cal.Rptr. 245.)

Furthermore, though our Supreme Court has not specifically addressed this issue, we cannot reconcile the continuation of this unitary procedure with the protections our Supreme Court has otherwise accorded [119 Cal.App.3d. 654] defendants against potential prejudice resulting from informing the jury of a defendant's prior criminal activity. In People -v- Hall, supra, 28 Cal.3d. 143, 167 Cal. Rptr. 844, 616 P.2d. 826, our Supreme Court (nearly three "decades ago) held that in a prosecution for possession of a firearm by an ex-felon, if the defendant is willing to stipulate to ex-felon status, the jury may not even be told that a prior felony conviction is an element of the offense. Underlying its decision was the express view that unless nondisclosure would "legitimately impair the prosecutor's case," the court was "compelled" to totally bar any mention of both "the nature and the fact of the prior conviction" in order "to avoid any prejudice which might result from informing the jury that (defendant) had been convicted of a felony." (Id., at pp. 156-157, 167 Cal.Rptr. 844, 616 P.2d. 826.) (Italics in original.)

Our Supreme Court has found the potential for prejudic from evidence of a defendant's prior criminal activity so great that the trial court must exercise its discretion before determining whether or not to admit such evidence even when the evidence is specifically made admissible by statute. (See, e.g., People -v- Thompson, supra, 27 Cal.3d. 303, 317-318, 165 Cal.Rptr. 289, 611 P.2d. 883 (evidence of other crimes admissible under Evid. Code, § 1101, subd.(b));

1 People -v- Beagle, supra, 6 Cal.3d. 441, 452-453, 99 Cal.Rptr. 313,

2 492 P.2d. 1 (evidence of prior felony conviction admissible for imp

3 eachment under Evid. Code, § 788).)

4     Accordingly, it is appropriate to now adopt a rule that when-

5 ever. in any future trial, a defendant pleads not guilty of priors

6 and a jury trial thereof is waived, he is entitled to a bifurcated

7 proceeding wherein the jury is not informed of his prior convictions,

8 either "through allegations in the charge or by the introduc ion of

9 evidence, until it has found the defendant guilty. As our Supreme

10 Court said in People -v- Aranda (1965) 63 Cal.2d. 518, 530, 47 Cal.

11 Rptr. 353, 407 P.2d.265, in a similar situation: "Whether or not it

12 is constitutionally permissible, the practice is prejudicial and

13 unfair to the defendant and must be altered. (I)n criminal actions,

14 where life or liberty is at stake, courts should not adhere to pre-

15 cedents unjust to the accused. it is never too late to mend. (United

16 States -v- Delli Paoli (2d Cir.) 229 F.2d. 319, 323 (Frank, J.,

17 dissenting).) In the absence, however, of a holding by the United

18 States Supreme Court, that the due process clause requires such cha-

19 nge, (FN6)) the rules we now adopt are to be regarded, not as const-

20 itutionally [119 Cal.App.3d. 655] compelled, but as judicially decl-

21 ared rules of practice....(Fn. omitted.)"

22     Petitioner contends that the application of the unitary proced-

23 ure in this particular case at bar has resulted in such prejudice

24 that it constituted as abuse of discretion and operated in fact to

25 deny petitioner due process of law. Not only was petitioner portra-

26 yed in argument by the prosecutor, in essence, as a professional

27 crook, but, in a case where his credibility was crucial to his def-

28

1   ense (FN 8) His credibility was impeached by evidence of his arrest

2   record and prior conviction (without him testifying in his own be-

3   half, but such evidence was given to the jury before it found peti-

4   tioner guilty of the charged offense which otherwise would have

5   been excluded under any court's acknowledgement of a Beagle motion.

6       Petitioner contends that the unitary procedure needlessly exp-

7   osed him to serious potential prejudice by revealing his prior cri-

8   minality without advancing any legitimate state interest. West's

9   Ann. Const. Art. 1, §§ 15, 16.

10       Most importantly, the two counts of carrying a loaded firearm,

11   the one count of carrying a concealed weapon in a vehicle with a

12   prior felony conviction would have been four counts in which would

13   have been inadmissible for impeachment purposes because petitioner

14   was accused at this trial of being connected with identical eleme-

15   nts, i.e., firearm (People -v- Fries, 24 Cal.3d at pp. 230-231,155

16   Cal.R½tr. 194, 594 P.2d 19; People -v- Spearman, supra, 25 Cal.3d

17   at p. 116, 157 Cal.Rptr. 883, 599 p.2d 74.) The prejudicial effect

18   of the admission of documented evidence of these offenses cannot be

19   discounted. As our Supreme Court has pointed out: "A jury which is

20   made aware of a similar prior conviction will inevitably feel pres-

21   sure to conclude that if an accused committed the prior crime he

22   likely committed the crime charged. (People -v- Fries, supra, 24

23   Cal.3d at p. 230, 155 Cal.Rptr. 194, 594 p.2d 19, italics in origi-

24   nal.)

25       The judgment attacked should be reversed and the cause should

26   be remanded for further proceedings consistent with the views above

27   expressed. Petitioner was denied his constitutional rights to an

28

p. 21

impartial jury and to due process of law when the jury received Pre-judicial information about petitioner's criminal history that had not been presented at trial during its deliberations.

Petitioner contends that the prosecution should not have resorted in its case in chief to any kind of evidence of petitioner's evil character to establish probability of his guilt. There is no presumption of petitioner's good character. The petitioner's charac-ther, disposition and reputation is closed on the prosecution's case in chief.

The state should not have shown petitioner's prior trouble with the law, specific criminal acts, or ill name among his neighbors, though such facts might logically be persuasive that he is by prop-ensity a probable perpetrator of alleged crime, except when prior crime is an element of later offense or where evidence as to other transactions or a course of fraudulent conduct is admitted to estab-lish fraudulent intent as an element of the crime charged.

Inquiry regarding petitioner's character on the prosecution's case in chief is not rejected because character is irrelevant but because the inquiry weighs too much with the jury, and cause them to pre-judge one with a bad general record, thus denying him a fair opportunity to defend against particular charge.

The overriding policy of excluding evidence of petitio-ner's character, disposition and reputation on the prosecution's case in chief, despite its admitted probative value, is the practi-cal experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice. Inquiry as to petitio-ner's character, disposition and reputation, denied to the state on

p. 22

1  its case in chief, is and was open to petitioner because character

2  is relevant in resolving probabilities of guilt.

3      Petitioner might have been intending to introduce affirmative

4  testimony that general estimate of his character is so favorable

5  that the jury might would have infered that he would not be likely

6  to commit offense charged. Character testimony alone, in some circu-

7  mstances, may be enough to raise a reasonable douby of guilt, and

8  in proper case, jury should be so instructed. Permitting petitioner

9  to introduce evidence of his good character, so-called character

10  witnesses might not would have based his or her testimony on anyth-

11  ing but hearsay and what commonly is called "character evidence" is

12  only such when "character" is employed as a synonym for "reputation".

13      Character witnesses called by petitioner might not have testi-

14  fied about petitioner's specific acts or courses of conduct or his

15  possession of a particular disposition or of benign mental and moral

16  traits, not could he have testified that his own acquaintance, obse-

17  rvation and knowledge of petitioner leads to his independent opinion

18  that petitioner possesses a good general or specific character, inc-

19  onsistent with commission of acts charged, but witness or witnesses

20  may summarize what he has heard in the community, though much of it

21  may have been said by persons less qualified to judge than himself.

22      Petitioner contends that any character witness must qualify to

23  give an opinion by showing such acquaintance with petitioner, the

24  community in which he has lived and the circles in which he has

25  moved, as to speak with authority of the terms in which generally,

26  he is regarded. Character witness is permitted to testify that he

27  has heard nothing against petitioner, upon assumption that, if no

28

p.23

1  ill is reported of one, his reputation must be good but such an ans-

2  wer is accepted only from a witness whose knowledge of petitioner's

3  habitat and surroundings is intimate enough so that his failure to

4  hear of any relevant ill repute is an assurance that no ugly rumors

5  were about.

6      Where petitioner or any other defendant has put his reputation

7  in issue, his own character witness is suject to cross-examination

8  as to the contents and extent of the hearsay on which he bases his

9  conclusions, and the witness may be required to disclose rumors and

10  reports that are current even if they do not affect his own conclus-

11  ion, and the sufficiency of his knowledge may be tested by asking

12  what stories were circulating concerning events, such as one's arr-

13  est, about which people normally comment and speculate. Although the

14  law gives petitioner the option to show as a fact that his reputat-

15  ion reflects a life and habit incompatible with commission of offe-

16  nse charged, it subjects his proof to tests of credibility designed

17  to prevent him from profiting by mere parade of partisans.

18      Common sense dictats it was the prosecutor's responsibility to

19  redact the inadmissible information about petitioner's prior arrest

20  because she proffered that exhibit. The prosecutor had ample notice

21  that when an exhibit combines admissible and inadmissible evidence

22  the inadmissible part should be removed. Earlier in the trial, the

23  defense objected to the prosecutor's exhibit that combined a receipt

24  from Blockbuster with a receipt from Jack in the Box into a single

25  exhibit--both were copied onto the same sheet of paper. Because no

26  evidence had been presented relating to the Jack in the Box receipt

27  the trial court sustained the defense objection to it. When the pro-

28

p. 24

1  secutor explained it was on the same page as the Blockbuster receipt,

2  the trial court told her, "Cut it off." (5 RT. 2446-2447.) It would

3  have been a simple matter to use the same pair of scissors to cut

4  off the inadmissible booking information.

5      It is not necessary for the prosecutor to act in bad faith.

6  Even unintentional acts may constitute misconduct (People -v- Hill

7  (1998) 17 Cal.4th 800, 822-823.) The focus of inquiry is on the pot-

8  ential injury to the defendant, not the motive of the prosecution.

9  (People -v- Sanders (1995) 11 Cal.4th 475, 526.)

10     The record shows the prosecutor's improper placement of the ar-

11  rest information before the jury was not an isolated act. During the

12  prosecutor's examination of Deputy Steven Marella, the prosecutor

13  asked him if, on April 5, 2003, when he had contact with petitioner,

14  he had petitioner take a booking photograph? Marella answered "Yes."

15  The prosecutor followed that with several questions using the word

16  "booked" or "booking" seven times. (3 RT. 1529-1530.) A reasonable

17  juror would have inferred from the "booking" references that petiti-

18  oner had been arrested at that time. (See 3 RT. 1531.)

19     Petitioner was denied his constitutional rights to an impartial

20  jury and to due process of law when the jury received the prejudicial

21  information about petitioner's criminal history that had not been pr-

22  esented at trial during its deliberations.

23     For all of the foregoing reasons, petitioner urges this Court

24  to reverse the judgment of conviction in this case without unnecess-

25  are delay.

26

27

28

p. 25

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

II

TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE
BY FAILING TO INVESTIGATE AND ASSERT A CRU-
CIAL OR POTENTIALLY MERITORIOUS DEFENSE, SUR-
ROUNDING THE TIME "PETITIONER" ARRIVED AT THE
BLOCKBUSTER VIDEO STORE

On May 10, 2003, Jose Robles (A-K-A. Chino) was shot and ki-
lled around 9:00 P.M., on 101st Street in Los Angeles a few houses
West of his home (2 RT. 937, 938, 945). Although the shooting occ-
urred around 9:00 P.M., however, "after the shooting two prosecut-
ion witnesses followed the white van and the suspects to another
location," which shows that "sometime after 9:00 p.m. these two
witnesses still had sight of the actual suspects envolved. The two
witnesses, Albert Segundo and Andres Sandoval followed the white
van and its occupants down 101st Street eastbound towards Vermont
where they made a right turn, then drove up to 104th Street on Ve-
rmont where there is a stop sign in which you have to yield at be-
before making a left turn, they made a left heading east on 104th
Street, then another left on the first upcoming street off 104th,
however, they continued straight until reaching 102nd street where
they made a right turn, on 102nd street. They continued eastbound
until ending on 102nd and Hoover (3 RT. 1570, 1571). The van then
came to a stop at the stop sign. Segundo and Sandoval then stoped
their vehicle in the middle of the street so as not to get to
close to the suspects van.

The passenger of the suspects van opens his door causing the
dome lights to come on, according to Segundo - the dome lights al-
lowed him to see the drivers profile real clear, (identified an

P. 26

1   eyebrow peircing on the left side of the drivers face). The passe-

2   nger of the van then exits and points a gun in Segundo's direction

3   causing them to flee back to the scene (3 RT. 1571).

4       At petitioner's trial a Blockbuster surveillance tape was pl-

5   ayed before the jury by detective Steven Katz, however, the tape

6   showed petitioner inside the store at "9:41" P.M. (5 RT. 2469).

7   The video store is where petitioner had gone the night of the inci-

8   dent (5 RT. 2439). The store is located at 8811 South Western Ave-

9   nue in Los Angeles; according to detective Katz "you could make it

10  "from the crime scene to Blockbuster from 5 to 10 minutes" (4 RT.

11  1890). However, no evidence supports that the white van and it's

12  occupants drove from the crime scene to Blockbuster, and, in fact,

13  the complete opposite is supported when two prosecution witnesses

14  (Segundo and Sandoval), testified that after the crime they follo-

15  wed the white van to another location; a location in which was in

16  the opposite direction of the video store that petitioner was at

17  (3 RT. 1570-1572; 5 RT. 2759). At trial it was unknown what time

18  petitioner arrived at the video store (4 RT. 1892). When the surv-

19  eillence tape was played at trial it showed petitioner inside the

20  store at 9:35 p.m., the shooting occurred around 9:00 p.m. (5 RT.

21  2469).

22      According to detective Steven Katz the tape is six (6) minutes

23  slow, making the time petitioner was first seen on camera (9:41

24  P.M. (5 RT. 2469). Detective Katz testified that petitioner was at

25  the video store about 40 minutes "after" the shooting (5 RT.2435).

26      At trial the tape was not played on the proper system that al-

27  lows a person to view the different images simultaneously, on a

28

1    multiplexor. If you were to show the video in court it would just

2    look all garbled and views would change on a time sequence (5 RT.

3    2442). "As far at the detective could tell, petitioner was in the

4    store for five (5) minutes" (5 RT. 2462). Thus, the tape did not

5    support petitioner's mistaken identity defense.

6        Per petitioner's request previous appellant counsel filed a

7    motion requesting an order for a complete copy of the Blockbuster

8    surveillence tape in evidence, that motion was granted, "the mot-

9    ion was filed to the Superior Court after the Court of Appeals af-

10   firmed petitioner's conviction (See attached Exhibit I1-16 and J1).

11   After receiving a copy of the surveillence tape petitioner had it

12   sent to a George Reis, an Imaging Forensic who was able to disco-

13   ver what time petitioner arrived at the video store. The Imaging

14   Forensic demultiplexed the tape and discovered that petitioner en-

15   tered the video store at "9:25 p.m. (See attached Exh. K1). Also

16   entering the store at 9:25 p.m. "with petitioner" is Evelyn Medina

17   and Jesse Medina [1]/(5 RT. 2467; 4 RT. 1892, 1893; see attached

18   Exh. **L** ) Petitioner is in view on camera entering the video store

19   Sixteen (16) minutes "before" the time it was concluded at trial

20   that petitioner was at the store." Petitioner contends that the

21   twenty five (25) minutes window of opportunity could have been

22   broken down tramendously, creating a serious degree of reasonable

23   doubt in the minds of the jury, undermining confidence in a guilty

24   verdict. Clearly time did not come to a freez after the shooting

25   was committed around 9:00 p.m., time continued to pass as Segundo

26   and Andres followed the suspects to another location "opposite"

27   the direction of the video store petitioner was at. Detective Katz

28

1  stated you could make it from the crime scene to the video store

2  from five to ten minutes, however, if Segundo and Sandoval still

3  had sight of the actual suspects at 9:10 p.m., when the Second

4  event occurred after following the white van, then obviously the

5  five (5) to ten (10) minutes it would have taken to get from the

6  crime scene to the video store "was not" the case, and the dista-

7  nce from where the suspects van was last seen, had to have been

8  longer because Segundo and Andres followed the van in a direction

9  that was opposite the video store.

10      FOR EXAMPLE:

11  a) Crime occurs around "9:00 p.m."

12  b) Segundo and Sandoval follows the suspects to another location

13  "opposite" the direction of the video store; at that location ano-

14  ther event occurred, "at this point it's around "9:10 p.m.".

15  c) The distance from where the white van was "last seen" to the

16  video store become longer, approximately "15 to 20 minutes." If 20

17  minutes, "then petitioner would have had to be seen in view on the

18  surveillence tape "AFTER" 9:30 p.m. and "NOT BEFORE".

19  d) Petitioner discovered he is seen in view entering the video

20  store at "9:25 p.m., with his X-wife and wife's little brother,

21  Jesse Medina."

22      Furthermore, petitioner drives a green Toyota Camry and there

23  is no connection between petitioner and a van of any sort (2 RT.

24  953; 5 RT. 2432; 3 RT. 1515, 1516). Another factor that plays into

---

25  1/ Evelyn Medina is the X-wife of petitioner and Jesse Medina is

26  Evelyn's younger brother who was an eleven (11) year old chilt at the time.

27

28

1 showing petitioner was not the driver of the white van envolved in

2 the crime, is the fact that petitioner is in view on the security

3 tape entering the video store "with his x-wife and her little bro-

4 ther at 9:25 p.m." The prosecutor would have had to take the unbe-

5 lievable position that: "AFTER" Segundo and Sandoval followed the

6 suspects to a location "opposite" the direction of the video store,

7 petitioner was able to:

    8     1) Drop of the shooter somewhere;

    9     2) Get rid of the white van somewhere or somehow;

10     3) Pick up his green Toyota Camry somewhere;

11     4) Drive over to pick up his girlfriend and her little

12        brother at their home;

13     5) Change his close at some-point; and,

14     6) Finally drive to the video store to be seen on camera

15       at "9:25 p.m."

16     Petitioner contends that it was not possible based on all of

17 the above circumstances, especially with there being no time to do

18 so as shown in petitioner's example above and on the previous

19 pages. These matters would have created a serious degree of reaso-

20 nable doubt in the minds of the jury. The second event that occur-

21 red after the shooting was on 102nd street and Hoover, that is

22 where Segundo and Sandoval followed the suspects to, however, at

23 that location Segundo observed a brief conversation between the

24 shooter and driver. The passenger opens the van door causing the

25 dome lights of the van to come on, which according to Segundo all-

26 owed him to see the drivers profile real clear. The passenger of

27 the van then exits and head in the direction of Segundo pointing

28

1  a gun (See Police Report, page 164, attached.) Segundo was in Sand-

2  oval's car that was five (5) to six (6) car lengths behind the

3  white van when this second event occurred (3 RT. 1572; 4 RT. 1859).

4  A crime broadcast went out via hand radio giving a discription of

5  suspects and vehicle to look for, however, had the actual suspects

6  been driving this white van in the places petitioner was, they

7  would have been caught and arrested (See Police Report, page 7,

8  attached.).

9      Petitioner lived on "104th street and Vermont" (4 RT. 1873,

10  1891). However, without an objection, the prosecutor falsely sta-

11  ted and/or misled the jury, by stating the suspects were being fo-

12  llowed towards petitioner's "home" and towards the territory of

13  Nortorious graffiti artist," she stated the suspects were headed

14  towards 103rd street which is exactly where the defendant lived"

15  (5 RT. 2703). Such a false and misleading statement made petitio-

16  ner appear guilty, it made it seem as though the suspects fled to

17  petitioner's "home". The prosecutor's false and misleading statem-

18  ents did not end there; the prosecutor also falsely stated and/or

19  misled the jury by stating and/or claiming that petitioner was

20  inside the Blockbuster video store for "only five (5) minutes."The

21  prosecutor stated: "He was there for 5-minutes and picked out 3-

22  movies. You ask yourself when was the last time you were able to

23  go to Blockbuster and pick out 3-movies in 5-minutes.

24      He did is so that he could establish an alibi and that's why

25  hes only in that store for 5-minutes and picked out 3-movies," (5

26  RT. 2741). The prosecutor's false and misleading comments were

27  prejudicial, for they made it appear as though petitioner "Rushed"

28

P2-31

1   while in the store because of having done something wrong, (the mu-

2   rder).

3   The prosecutors comments in regards to the blockbuster issue,

4   and comments that told the jury the suspects were headed exactly

5   where petitioner lived, makes petitioner's actual time of arrival

6   more significant. Such false and misleading comments were prejudi-

7   cial and violated petitioner's constitutional right to due process

8   of law (U.S.C.A. Const.Amend. 14; Constitutional law 268(8)). The

9   prosecutor's improper assertions and insinuations were calculated

10  to mislead the jury. (Berger -v- U.S. (1935), 295 U.S. 78, 79 L.

11  Ed. 1314, at p. 633).

12  Due to the prosecutor's improper assertions and insinuations

13  in the case at bar, the jury was invited to conclude that the sus-

14  pects drove to petitioner's home, and territory of NGA (Nortorious

15  Graffitti Artist). The jury was further invited to conclude that

16  petitioner was inside the video store for only "five minutes" and

17  picked out "3-D.V.D's," rushing because of having done something

18  wrong (the murder). A prosecutor has an obligation to govern impa-

19  rtially, this obligation to govern impartially is as compelling as

20  its obligation to govern at all; therefore, in a criminal prosecu-

21  tion is not that it shall win a case, but that justice shall be

22  done (Id. at 633). The twofold aim of which is that guilt shall

23  not escape or innocence suffer. She may prosecute with earnestness

24  and vigor indeed, she should do so. But, "while she may strike

25  hard blows, she is not at liberty to strike foul ones." It is as

26  much her duty to refrain from improper methods calculated to pro-

27  duce a wrongful conviction as it is to use every legitimate means

28

1    to bring about a just one (Id. at 633; Mooney -v- Holohan, 294 U.S.

2    103, 112, 55 S.Ct. 340, 79 L.Ed. 791; Pyle -v- State of Kansas,

3    317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214). It is fair to say that

4    the average jury, in a greater or less degree, has confidence that

5    these obligations, which so plainly rest upon the prosecuting att-

6    orney, will be faithfully observed. Consequently, improper sugges-

7    tions, insinuations, and especially, assertions of personal knowl-

8    edge "are apt to carry much weight against the accused" when they

9    should properly carry none. (Berger, supra, 629 at 633). Thus, the

10   prosecutors comments were prejudicial. The fact that petitioner is

11   seen entering the video store at 9:25 p.m. with his x-wife and br-

12   other-in-law, versus the prosecution claiming petitioner was in

13   the store for "only five minutes", when in fact petitioner was in-

14   side the store for approximately 16-minutes, is significant. It

15   shows petitioner was not- "rushing" and was not inside the video

16   store for "only five minutes". Petitioner enters the store at

17   9:25 p.m. and leaves at 9:41 p.m. ( Exhibit K1 attached ).

18       Although petitioner enters the store at 9:25 p.m. it should

19   be taken into account that the parking lot is located to the rear

20   of the Blockbuster, not directly in front, thus, it would take

21   another minute or two for petitioner to walk from the parking lot

22   to the front entrance of the video store.

23       Petitioner contends the "totality" of circumstances surround-

24   ing the actual time petitioner arrived at the video store and with

25   whom, is crucial. Had trial counsel asserted such a crucial or po-

26   tentially meritorious defense, there is a reasonable probability a

27   result more favorable would have occurred (Pope, supra, 23 Cal.3d

28

A0033

1  at p. 415; <u>Strickland -v- Washington</u>, <u>supra</u>, 466 U.S. at pp. 688,

2  690-92; <u>People -v- Watson</u>, <u>supra</u>, 46 Cal.2d at p. 836).

3      Petitioner contends that detective Steven Katz, taking the

4  position that the security tape is six (6) minutes slow, such a

5  claim can -not be relied upon as being accurate when the time was

6  being compared to the detective's very own wrisk watch (5 RT. 2440,

7  2441). It is not uncommon for the average working person to set

8  his or her watch ahead of the actual time. Additionally, this pos-

9  ition is coming from the same detective who appears to have had

10  trouble calculating time in regards to when petitioner was in view

11  on the security tape, and, in fact, in the police reports it sta-

12  tes the defendant was seen in view on the camera "<u>1 hour and 43</u>

13  <u>minutes after the incident,</u>" (See Police Report, at pg. 67, atta-

14  ched.)

15      Furthermore, detective Katz's word can-not be relied on with

16  him having a past of hideing evidence, his acts of concealing evi-

17  dence occurred around the same time period he was investigating

18  the case at bar (See attached Exh. N 1-10 ). As U.S. District

19  Judge Florence Marie Cooper stated, she found Katz's explanation

20  for the oversight "<u>utterly unbelievable</u>," (<u>Exh N-2</u>). Thus, petitio-

21  ner contends detective Steven Katz acted in a cover-up by:

22      1) Claiming the Security tape was 6 minutes slow;

23      2) Claining petitioner was at the video store 41 minutes

24         "after" the crime;

25      3) Making it appear as though petitioner was inside the store

26  for only "five minutes";

27      4) Claiming to have been unable to determine what time peti-

28

1 | tioner arrived at the video store; and,

2 |     5) During the testimony of Maria Retteria who testified

3 |       petitioner was the driver envolved in the crime (3 RT.

4 |       1227, 1228, 1229; See petition #B210118 pp. 10-17, 21-26)

5 |     Petitioner contends it is crucial and relevant to refere-

6 | nce to petition number B210118 so as to show the "cumulative"

7 | acts in a cover-up, for the "cumulative" acts in a cover-up when

8 | considering it's effect on petitioner's right to a fair trial,

9 | "Collectively" as opposed to individually, it can be said petit-

10 | ioner's right to a fair trial were violated. (U.S.C.A. Const.

11 | Amend. 5, 14; ABA Rules of Prof. Conduct, Rule 3.8(d); United

12 | States -v- Bagley, 473 U.S. 667, at 675 and n. 7, 105 S.Ct., at

13 | 3380, and n. 7).

14 |     Detective Katz's acts in a cover-up deprived the jury of

15 | information, facts, and/or evidence in which petitioner contends

16 | there is a reasonable probability that had the jury been infor-

17 | med of such facts, information, and/or evidence, and had it not

18 | been for the prosecutors false and misleading comments, there is

19 | a reasonable probability a result more favorable would have occ-

20 | urred (Pepe, supra, 23 Cal.3d at p. 415; People -v- Watson,

21 | supra, 46 Cal.2d at p. 836).

22 |     The error's also fall under the catagory of ineffective

23 | assistance of counsel:

24 |     Petitioner contends a defense attorney "must" explore pote-

25 | ntially meritorious defenses even if there are legitimate tact-

26 | ical reasons for introducing no evidence (In re Cordero (1988)

27 | 46 C.3d 161, 181, 249 CR 342). Therefore, it is contended that

28 |

trial counsel provided ineffective assistance of counsel by fai-
ling to investigate and assert a crucial or potentially meritor-
ious defense by:

    1) Failing to discover that petitioner arrived at the Bloc-
       kbuster video store at "<u>9:25 p.m.</u>";

    2) Failing to investigate and discover what time it was
       when Segundo and Sandoval last seen the suspects after
       following the white van to another location;

    3) Failing to show the distance between where the suspects
       was last seen and Blockbuster was longer than "<u>5 to 10</u>
       <u>minutes</u>";

    4) Failing to show that petitioner enters the video store
       "<u>with his x-wife and her 11-year old brother</u>" at "9:25
       P.M.;

    5) Failing to Secure the Services of a video expert, that
       could have discovered when petitioner arrived at the
       video store, and with whom;

    6) Failing to show that petitioner was inside the video
       store "<u>longer then 5 minutes</u>," thereby contradicting
       the prosecutions' claim;

    7) Failing to investigate and show that the suspect's did
       not drive towards petitioner's home, and did not drive
       towards the territory of the "<u>notorious graffiti artist</u>;

    8) Failing to investigate and discover possible bias, fals-
       ifying information, planting evidence, improperly coach-
       ing witnesses, lieing, or acts in covering-up of evide-
       nce on the part of detectives who investigated the case

at bar;

   9) Failing to object to the prosecution claiming that the
      blockbuster Security tape was 6 minutes slow, and fail-
      ing to object to the prosecutors false and misleading
      statements;

   10) Failing to interview prosecution witnesses before trial
       for adequate trial preparation;

   11) Faling to Secure the Services of an investigator for
       full and adequate investigation and trial preparation;

AND,12) Failing to Secure the Services of a "Psychologist," re-
        garding the <u>Psychological factors</u> that generally affect
        the accuracy of eyewitness identifications.

   Petitioner contends that counsel's failures, when conside-
red collectively as opposed to individually, it can be said that
petitioner was denied the effective assistance of counsel and a
crucial or potentially meritorious defense. The cumulative eff-
ect of counsel's failures is reversible error. (<u>People -v- Pope</u>
(1979) 23 Cal.3d 412, 424-425; U.S.C.A. Const. Amend. 5, 5, 14;
ABA Rules of Prof. Cond. Rule 3.8(d); <u>United States -v- Bagley</u>,
473 U.S. 667 at p. 675 and n. 7, 105 S.Ct., at 3380, and n. 7;
6th Amend. to U.S. Const.; Art. 1, Sec. 15 of the Calif. Const).

   The 6th Amend. entitles petitioner to the reasonably compe-
tent assistance of an attorney acting as his diligent conscient-
ious advocate, to protect the defendant's right to a trial that
is both fair in the proceedings and reliable in the result (see,
<u>People -v- Ledesma</u> (1987) 43 Cal.3d 171, 215, quoting United St-
ates -v- Decoster (D.C. Cir. 1973) 487 F.2d 1197, 1202; <u>Strickl-</u>

1   and -v- Washington (1984) 466 U.S. 668, 688 (104 S.Ct. 2052; 80

2   L.Ed.2d 674). This right requires that before counsel undertakes

3   to act at all, he will make a rational and informed decision on

4   strategy and tactics founded on adequate investigation and prep-

5   aration (People -v- Ledesma, supra, 43 Cal.3d at p. 215).

6       In order to establish ineffective assistance of counsel,the

7   accused must show (1) that counsel's performance was deficient,

8   and that it fell below an objective standard of reasonableness

9   under prevailing professional norms; and (2) that there is a re-

10  asonable probability that, but for counsel's unprefessional err-

11  ors, the result of the proceeding would have been different (See,

12  People -v- Ledesma, supra, at pp. 216-218; Strickland -v- Washsi-

13  ngton, supra, 466 U.S. at pp. 688, 690-692).

14      In dtermining whether trial counsel fell below the standard

15  of reasonableness, the court provides a strong presumption of

16  competence. A reviewing court generally defers to trial counsel

17  and avoids second guessing counsel as to matter's of strategy

18  and tactics.

19      However, a claim of strategy and tactics is irrelevant if

20  an action is taken without benefit of substantial inquiry, is

21  based on ignorance of the law, or if there could be no satisfac-

22  tory explanation for the actions" (see, People -v- Frierson

23  (1979) 25 Cal.3d 142, 162-163; People -v- Bess (1984) 153 Cal.

24  App.3d 1053, 1061; People -v- Guizar (1986) 180 Cal.App.3d 487,

25  492, fn. 3.) Because representation of an accused murderer is a

26  mammoth responsibility (citation), the seriousness of the char-

27  ges against the defendant is a factor that must be considered in

28

1  assessing counsel's performance (Citation), (<u>In re Jones</u> (1996)

2  13 Cal.4th 552, 566).

3      The Sixth Amendment recognizes the right to the assistance

4  of counsel because it envisions counsel playing a role that is

5  critical to the ability of the adversarial system to produce

6  just results.

7      For that reason, the court has recognized that the right to

8  counsel is the right to the effective assistance of counsel (cit-

9  ation).

10     The performance inquire must be whether counsel's assistance

11 was reasonable "<u>considering all the circumstances,</u>"(<u>Strickland</u>,

12 <u>supra,</u> at p. 688). The accused has been denied the effective ass-

13 istance of counsel where his trial attorney has failed to act as

14 a reasonable competent diligent advocate (<u>People -v- Ledesma</u>,

15 (1987) 43 Cal.3d 171, 215-218; <u>People -v- Fosselman</u> (1983) 33

16 Cal.3d 572-584).

17     Ineffective assistance is demonstrated where it is shown

18 that counsel's performance resulted in the withdrawal of a pote-

19 etially meritorious defense (<u>People -v- Nation</u> (1980) 26 Cal.3d

20 169, 179; <u>People -v- Pope</u> (1979) 23 Cal.3d 412, 424-425), or

21 there is a reasonable probability that the accused would have

22 received a better result, had counsel performed to a constituti-

23 onally adequate standard. Whah must be shown in determining cou-

24 nsel's ineffectiveness are in the two elements of the <u>Pope</u> test,

25 (1) counsel failed to act in a manner to be expected of a reaso-

26 nably competent attorney acting as a diligent advocate (<u>Id.</u> at

27 425). The second showing is that counsel's acts or omissions re-

28

1  sulted in the withdrawal of a potentially meritorious defense.

2  (Id.) However, this second prong of the Pope test has caused a

3  great deal of confusion among lower appellate courts, with resp-

4  ects to what is meant by a defense and of relevancy, as well as

5  potentially meritorious. As for the latter, the Supreme Court

6  has occasion to clarify what it meant in (People -v- Shaw; see

7  Supreme Court Crim. No. 22443 (Slip opinion filed February 4,

8  1984).

9        In People -v- Farley (1979) 90 Cal.App.3d 851, 865, the

10 Court of Appeals stressed that a defendant is denied the effect-

11 ive assistance of counsel, if by reason of counsel's failure to

12 perform the obligations imposed upon him, defendant is deprived

13 of an adjudication of a crucial or potentially meritorious defe-

14 nse (cited with approval in In re Hall (1981) 30 Cal.3d 408, at

15 p. 434).

16       A crucial defense is not one which if presented, would have

17 resulted inexorably in a defendant's acquittal. Rather, "by fai-

18 ling to obtain an adjudication of the stronger of two potential

19 defenses," trial counsel deprives his client of constitutionally

20 adequate assistance (People -v- Pope, supra, 23 Cal.3d 412, at

21 415).

22       It is well recognized that counsel cannot render effective

23 assistance without having made an adequate investigation. (W.

24 Schwarzer Dealing with Incompetent counsel, The trial Judge's

25 Role, 93 Harv. L. Rev. 633 (1979).) The Supreme Court first enu-

26 nciated this principle in the case of (Powell -v- Alabama, 287

27 U.S. 45, 57-58 (1932).) However, the minimum investigation requ-

28

1  ired is the pursuant of all obvious defenses. The Fourth Circuit

2  imposed this requirement when it stated, counsel must conduct

3  appropriate investigation, both factual and legal, to determine

4  if matters of defense can be developed, and to allow himself en-

5  ough time for reflection and preparation for trial. In any case

6  presenting an ineffective assistance claim, the performance inq-

7  uiry must be whether counsel's assistance was reasonable consid-

8  ering all the circumstances (Strickland, supra, 446 U.S. at p.

9  688).

10      The federal constitution guarantees a criminal defendant

11  the right to effective assistance of counsel. The same standard

12  applies whether counsel is appointed or retained (Cuyley -v- Su-

13  llivan, 466 U.S. 335, 342-345 (1980); People -v- Frierson, 25

14  Cal.3d 142, 160-162 (1979); McMann -v- Richardson, 397 U.S. 759,

15  771 fn. 14 (1970).) AS the Ninth Circuit has expressed, the

16  Sixth Amendment right to counsel is meaningless if counsel is

17  incompetent (United States -v- Tucker, 716 F.3d 576, 579 (9th

18  Cir. 1983).

19      Thus, a criminal defendant has the right to be represented

20  by counsel reasonably likely to render effective assistance

21  (Herring -v-Estelle, 491 F.2d 125, 127 (5th Cir. 1974); see also,

22  Rummell -v- Estelle, 590 F.2d 102, 104 (5th Cir. 1979).) Since

23  adequate investigations and preparation are keys to effective

24  representation (Ledesma, supra, 43 Cal.3d at p. 222), counsel

25  has a duty to interview potential witnesses and make an indepe-

26  ndent examination of the facts, circumstances, pleadings, and

27  laws involved (Von Monltke Gillies, 332 U.S. 708, 721 (1948).)

28      In the case at bar, petitioner contends he was denied a

1  crucial or potentially meritorious defense, and had it not been

2  for counsel's errors, a result more favorable would have occur-

3  red.There could be no satisfactory or tacticle explanation due

4  to the totality of failures on the part of counsel, therefore,

5  petitioner was denied effective representation. Reasonably comp-

6  etent assistance of an attorney would have objected to the pros-

7  ecutors damaging comments, and would have presented the facts

8  (See pp. 25 - 32 of this petition). Thus, counsel provided

9  ineffective assistance by failing to investigate, prepare and

10 assert a crucial or potentially meritorious defense (Pope,supra,

11 23Cal.3d at p. 415; People -v- Watson, supra, 46 Cal.2d at p.

12 836).

13      Trial counsel practically "relied" on the prosecutions' in-

14 vestigation, and the lead detective who investigated the case

15 has a past history of "foul play" such as hideing evidence."

16 However, no effective attorney acting as a diligent advocate

17 would rely on such an investigation, therefore, trial counsel

18 failed to conduct his very own investigation for adequate trial

19 preparation. At this stage, it can not be said in all honesty

20 and with full certainty that petitioner has received all favora-

21 ble/exculpatory relevant evidence. Trial counsel did not make a

22 written request for all Brandy material, and since the lead det-

23 ective (Steven Katz) has a past history of concealing evidence,

24 the only way of ever learning of such evidence is upon persona-

25 lly viewing the entire investigating file (#003-04469-0372-011).

26      Petitioner contends that it is fundamentally unfare to

27 force petitioner to rely on the investigation of the prosecution,

28