1    the very ones' who sought to convict, and did **wrongfully convict**

2    petitioner, in violation of the 14th Amendment of the United

3    States Constitution.

4        Trial counsel further provided ineffective assistance and

5    deprived petitioner of a crucial or potentially meritorious def-

6    ense by:

7        1) Failing to conduct an investigation into the prosecution

8           witnesses ability to see;

9        2) Failing to put on demonstrative evidence during trial,

10          or request that the jury be allowed to observe the situ-

11          ation under the same identifying circumstances as each

12          of the witnesses, i.e., Albert Segundo, Maria Renteria,

13          Carlos Lopez, and Jesse Robles;

14       3) Failing to file a Pitchess Motion;

15       4) Failing to attack the credibility of Carlos Lopez and

16          Jesse Robles with the use of their past acts of criminal

17          misconduct; AND,

18       5) Failing to sufficiently question detective Valento in

19          regards of Valento failing to document what was said or

20          stated when the two of them (Carlos Lopez and detective

21          Valento) discussed aspects of the case.

22       Petitioner contends that attacking the prosecution witnes-

23   ses' credibility and ability to see what they said they saw was

24   crucial towards creating reasonable doubt in the minds of the

25   jury, and discrediting a prosecution witness includes the detec-

26   tives who investigated the case at bar.

27       Eyewitness testimony constituted the only evidence connect-

28

1    ing petitioner to the crime, and such evidence is not corrobora-

2    ted by any independent evidence. Therefore, counsel failed to

3    adequately investigate, prepare, and challenge the prosecution's

4    witnesses' ability to see exactly ehat was impossible to see.

5    Superman himself would not have been able to see what these wit-

6    nesses claimed to have saw. Trial counsel also failed to put on

7    demonstrative evidence, failed to seek impeachment evidence, and

8    failed to utilize information concerning the credibility of the

9    only evidence connecting petitioner to the crime which contribu-

10   ted to the denial of the effective assistance of counsel and a

11   crucial or potentially meritorious defense.

12       The right to evidence which impeaches the credibility of

13   prosecution witnesses is guaranteed by the United States Consti-

14   tution. The California Supreme Court ruled that the basic princ-

15   iple underlying defense discovery in a criminal case stems from

16   the fundamental proposition that an accused is entitled to a

17   fair trial and an intelligent defense in light of all relevant

18   and reasonably accessible information (Pitchess -v- Superior

19   Court (1974) 11 Cal.3d 531, 535; City of Santa Cruz -v- Munici-

20   pal Court (1989) 49 Cal.3d 74, 84). A legitimate goal of disco-

21   very is to obtain information for possible use to impeach or

22   cross-examine an adverse Witness (Foster -v- Superior Court

23   (1980) 107 Cal.App.3d 218, 227, 165 Ca.Rptr. 701)

24       Additionally, other courts have held that Pictches Motions

25   are proper for issues relating to credibilty (Larry E. -v- Sup-

26   erior Court (1987) 194 Cal.App.3d 25, 28 _33, 239 Cal.Rptr. 264

27   [motion seeking discovery of complaints for "improper police

28

p. 44

1  tactics, dishonesty, and racial or class prejudice" was relevant

2  to show officers had a motive to lie and could show potential

3  bias which would affect the officer's credibility as a witness];

4  People -v- Hustead (1999) 74 Cal.App.4th 410, 417).

5      The codification of the Pitchess principles of discovery as

6  they relate to police personnel records (still commonly referred

7  to as "Pictchess discovery") Served not only to reaffirm, but

8  expand, the principles of criminal discovery articulated by the

9  Pitchess Court, (Santa Cruz, supra, 49 Cal.3d at 84).

10     Because a defendant's right to evidence which impeaches the

11 credibility of prosecution witnesses is a right guaranteed by the

12 United States Constitution, however, nothing in these California

13 Pitchess statutes may be interpreted to procedurally or substan-

14 tively deprive a defendant of access to material evidence in

15 police personnel files. Indeed, the California Supreme Court has

16 recognized that "this procedural mechanism for criminal defense

17 discovery must be viewed against the larger background of the

18 prosecution's constitutional obligation to disclose to a defend-

19 ant material exculpatory evidence so as not to infringe the def-

20 endant's right to a fair trial," (People -v- Mooc (2001) 26 Cal.

21 4th 1216, 1225-1226).

22     The California Supreme Court has made it clear that the Pi-

23 tchess discovery statutes in no way limit's discovery under

24 Brady. To the extent that Brady material exists within the mate-

25 rials responsive to a defendant's Pitchess Motion, it must be

26 provided to the defendant." Because Brady's constitutional mate-

27 rility standard is narrower than Pitchess requirments, any citi-

28

P. Po. 45

1  zen complaint that meets Brady's test of materiality necessarily

2  meets the relevance standard for disclosure under Pitchess

3  (Brandon, supra, 29 Cal.4th at 10.)

4      The federal courts have also addressed the issue of the dis-

5  covery of exculpatory evidence within officer's personnel files,

6  holding that prosecuting attorney's are required to provide such

7  evidence from officers personnel records (United States -v- Hent-

8  horn (9th Cir. 1991) 931 F.2d 29, 30-31 (prosecutor is obligated

9  to review and provide material evidence of perjurous conduct and

10 other like dishonesty from officers personnel records upon requ-

11 est); United States -v- Brooks (D.C. Cir. 1992) 966 F.2d 1500,

12 1503 (duty to search for and provide evidence that might bear on

13 the conduct and character of an officer extends to information

14 in the police department's homicide and Internal Affairs Divis-

15 ion files.)

16     Moreover, because of the importance of the constitutional

17 right to a fair trial and the concomitant right to disclosure

18 of Brady evidence, a court in responding to a Pitchess Motion

19 may under-take to review complaints or other confidential docum-

20 ents outside the purview of those materials responsive to the

21 motion (See, Brandon, supra, 29 Cal.4th at 15.) If those materi-

22 als contain Brady material, the court may order their disclosure

23 as well (Id.) Thus, records that are older than the five years

24 from the date of the incident that is the subject of a Pitchess

25 motion may be ordered disclosed (Id. at 13-15).

26     In the case at bar, detective Michael Valento conversed and/

27 or discussed aspects of this case with witness "Carlos Lopez"

28

1  while **transporting** "Lopez" to court to testify against petitioner

2  (4 RT. 2158), but failed to document what was stated and/or said

3  during the conversation between them, therefore, providing the

4  probability or open the door for Valento to coach Lopez on what

5  to say on the witness stand.

6      The question is: "how much of Lopez's testimony did detect-

7  ive Valento influence Lopez to testify to?

8      Detective Michael Valento was also a prosecution witness in

9  this case, therefore, a prosecution witness transported a prose-

10  cution witness (Carlos Lopez) to court to testify against petiti-

11  oner. The two witnesses (one a detective and the other gang mem-

12  ber, and both of them is Mexican and petitioner himself is a

13  black man, and yet, the two witnesses, Valento and Lopez, discu-

14  ssed the case in route to court to testify against petitioner,

15  therefore, the prosecution roled the dice and played a game of

16  Russial Roulette with petitioner's liberty.

17      Detective Valento's failure to document what was stated/and

18  or said between Lopez and himself about the crime and what to

19  say against petitioner, clearly provided the possibility that

20  the two of them as prosecution witnesses, conspired with one an-

21  other so that Lopez's testimony would be framed to falsely go

22  against petitioner so that he would be falsely found guilty.

23      Trial counsel did not question Valento sufficiently to det-

24  ermine what was discussed between Lopez and Valento, furthermore,

25  if detective Valento has a history of acting in a cover-up of

26  evidence or improperly coaching or influencing witnesses, it

27  would have been relevant at that point, due to Valento failing

28

p. 47

1    to document what was stated, said, and/or discussed.

2        Counsel's failure to raise these crucial points, or assert

3    such a crucial defense, deprived the jury of information that

4    could have casted reasonable doubt in their minds, which in turn

5    contributed to the denial of crucial or potentially meritorious

6    defense (Pope, supra, 23 Cal.3d at p. 415). Thus, counsel was

7    ineffective for failing to file a Pitchess Motion. Furthermore,

8    DETECTIVE Steven Katz, the lead detective who investigated and

9    handled the case at bar "acted in a cover-up of evidence in the

10   past." The family of Christopher Wallace (A.K.A. Notorious

11   B.I.G., rap Artist), had long contended "cops" were responsible

12   for their Son's death. The evidence in which "detective Steven

13   Katz" hid were statements linking the killing of Christopher

14   Wallace to rogue cops, "David A. Mack, (who is serving a 14-year

15   prison sentence for bank robbery), and Rafael Perez (the Central

16   figure in the 1998 corruption scandal) that rocked the Los Ange-

17   les Police Department.

18       Katz's explanation for the oversight was found to be "utte-

19   rly unbelievable", his actions were intentional and willfull,

20   Judge Florence Marie Cooper stated. The concealed evidence came

21   to light "only" through an anonymous tip and "after" the

22   L.A.P.D. Internal affairs investigators searched through the De-

23   partment's Robbery Homicide Division on the night of June 24,

24   2005. Much of the material turned up in the desk or cabinet of

25   Detective "Steven Katz", (Exh. N 1-10 ).

26       It would be erroneous for petitioner to be forced to "hope

27   on an anonymous tip" and an internal affairs investigation to

28

PTS p.48

1  discover the existence of undisclosed exculpatory evidence after

2  having been rail-roaded to prison wouldn't it?

3      It is fundamentally unfair to petitioner, to be forced to

4  trust and rely on detective Steven Katz handing over all relev-

5  ant and exculpatory evidence.

6      Trial counsel was ineffective for failing to discover dete-

7  ctive Katz's past acts of misconduct for impeachment purposes,

8  and for not making an adequate effort to discover the existence

9  of exculpatory evidence. It can not be said that petitioner rec-

10 eived all exculpatory evidence guaranteed by the constitution.

11 Thus, petitioner should have been, and should be afforded such

12 fairness. A foul cop is a foul cop, that should not have been

13 the lead detective on this case, for it provided Katz the open

14 door to act in a cover-up in the case at bar. A foul cop would

15 not have a problem with coaching witnesses, thus, the prosecut-

16 ion's evidence is questionable. Therefore, it is necessary to

17 ask the question: "why was Steven Katz working in law enforcem-

18 ent at all?

19     How could one uncontaminate that in which may be contamina-

20 ted? Especially when the evidence favors prosecution, is bias,

21 dislikes petitioner, likely will not admit to being coached,

22 and/or may have simply sought to please the prosecution at the

23 point of taken the stand at trial.

24     Petitioner contends that in a case where the record reveals

25 counsel's explanation for the challenged acts or omissions, the

26 court must inquire whether the explanation shows whether counsel

27 was behaving in a reasonably competent, conscientious, and dili-

28

p. 49

1  gent fashion.

2      In the present case, many of counsel's reasons for his acts

3  and omissions at trial are not apparent from the record. When the

4  record reveals no explanation for counsel's acts or omissions,

5  the case will be affirmed on appeal, but counsel's reasons will

6  be inquired into in an evidentiary hearing on a writ of habeas

7  corpus. If there simply could be no satisfactory explanation,

8  the case should be reversed even on appeal. (People -v- Pope,

9  supra, 23 Cal.3d at p. 426.) In the present case, defense counsel

10  failed and refused to be diligent in the preparation of the peti-

11  tioner's case. Trial counsel failed to discover exculpatory mate-

12  rial for impeachment purposes. Detective Katz was the "lead" de-

13  tective who conducted an investigation on this case, information

14  barring on his credibility was crucial. Especially since there

15  is no physical evidence connecting petitioner to the crime, the

16  prosecution's case was solely based on eyewitness testimony. The-

17  erefore, if any of the detectives or officers who conducted an

18  investigation on this case has a past of improperly coaching wi-

19  tnesses, fabricating evidence, improper police tactics, dishone-

20  sty, racial, or class prejudice, it should have been used to

21  cross-examine and/or attack their credibility on the witness

22  stand (People -v- Hustead (1999) 74 Cal.App.4th 410, 417.)Since

23  the prosecutions case was solely based on eyewitness testimony,

24  the detectives having a history of coaching witnesses is crucial,

25  argueing that these witnesses were possibly coached could have

26  casted reasonable doubt in the minds of the jury. Thus, trial

27  counsel's failure to investigate and seek impeachment evidence

28

p. 50

anru

1   for possible use to impeach, and cross-examine and/or attack the

2   credibility of prosecution witnesses contributed to denial of a

3   crucial or potentially meritorious defense (Pope, supra, 23 Cal.

4   3d 412 at 415).

5       Jesse Robles was in possession of "Crystaline methampheta-

6   mine" (See Exhibit _O-1_ attached hereto), a drug in which he

7   possibly uses, sells, or both. Carlos Lopez has a past history

8   of being in possession of "marijuana" (See Exhibit _P-1_ attached

9   hereto.)

10      Trial counsel did not attempt to utilize Robles's and

11  Lopez's past acts of illegal drug possession for cross-examinat-

12  ion, impeachment, and/or credibility purposes. In violation of

13  petitioner's Sixth Amendment right to effective assistance of

14  counsel.

15                          III

16      TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COU-
        SEL FOR FAILING TO SECURE THE SERVICES OF A PSYCHOLO-
17      GIST, REGARDING THE "PSYCHOLOGICAL" FACTORS WHICH GE-
        NERALLY AFFECT THE ACCURACY OF EYEWITNESS IDENTIFICA-
18      TIONS.

19      In the case at bar, petitioner contends that he has been

20  wrongfully convicted of being the driver of a white van envolved

21  in the shooting death of Jose Robles. Eyewitness testimony cons-

22  tituted the only evidence connecting petitioner to the crime,and

23  such evidence was not corroborated by any other evidence giving

24  the testimonies reliability (3 RT. 1515-1516).

25      There are factors in the eyewitnesses testimony and police

26  reports which could have raised reasonable doubt in the minds of

27  the jury as to the accuracy of the eyewitness identifications.

28

                          p. 51

1    At trial four witnesses identified petitioner as the driver

2  envolved in the crime (5 RT. 2760-2761)."Three out of the four

3  witnesses never" identified" petitioner as the driver until app-

4  roximately three (3) years "after" the crime, which was at trial

5  as petitioner was the only person who sat next to his attorney.

6    The three witnesses who identified petitioner for the first

7  time in court 3-years after the incident, as petitioner was the

8  only person sitting next to counsel. However, the three people

9  who falsely identified petitioner 3-years after the incident

10  were:

11    1) Maria Renteria;

12    2) Albert Segundo; AND,

13    3) Carlos Lopez.

14  (See 3 RT. 1245, 1248, 1249, 1265, 1613, 1615, 1616).

15    These three witnesses identified petitioner as the driver

16  will after Jesse Robles had "told all his friends and family

17  members" who he "think" the driver of the suspects van was, acc-

18  ording to himself(Jesse Robles,; 2 RT. 944). No one identified

19  petitioner as the driver the night of the crime, and although

20  they had the opportunity to do so, but did not, however, Jesse

21  Robles claimed he did speak with officers the night of the crime

22  but there are no reports supporting his claim (2 RT. 979-984;

23  3 RT. 1508-1510). The first witness who accused petitioner of

24  being the driver envolved in the crime was Jesse Robles, who did

25  so "two (2) days" after the Crime (2 RT. 945).

26    The crime occurred around 9:00 P.M. "at night" on May 10,

27  2003. Earlier that same day there was a confrontation between

28

p. 52

vaver

the victim and petitioner's younger brother (5 RT. 2432). Petiti-
oner drove over to 102nd street where the confrontation occurred
and asked a group of people who was messing with his brother,
Jose Robles (the victim) was amongst the group of people that
petitioner asked, and no one responded to petitioner's question
and nothing occurred and petitioner simply left, and told his
brother," there is a lot of people here on 102nd street and no-
one's saying anything, so just don't go around that area anymore,
petitioner was in his green Toyota Camry (3 RT. 1613, 1614,1619;
4 RT. 2111, 2112). After which, petitioner carried on with his
normal day.

Petitioner drove all the way to a Burger-King in Culver-
City which is where his friend Karen Hernandez worked, and they
talked about going to the movie theater's later on at night; pe-
titioner was with his two brother's Deandre and Jeremy Coleman,
and also with petitioner was Aaron Arellano, Aaron Arellano and
petitioner drove to Culver-City from Los Angeles in seperate
cars (4 RT. 1881-1884).

From Burger King in Culver-City petitioner drove back to
Los Angeles to visit another friend at a McDonald's; Laura Marq-
uez was an employee at that McDonald's and petitioner had gone
there to exchange his cell phone to a newer model phone; petiti-
oner's phone was in her name because of having not established
credit for himself to make the purchasing price of the phone
more afforDABLE. Therefore, when petitioner wanted to up-grade
his cell phone to a newer model, he had to go through his friend
Laura Marquez, because the newer model phone came in mail to her

1  address. Aaron Arellano showed up as petitioner was at McDona-

2  ld's changing the phone casing (3 RT. 1636-1642; see attached

3  Declaration as Exhibit____Q____). After leaving McDonald's, peti-

4  tioner left to get together with other friends and family--to

5  get ready to go to the movies; everyone eventually met and was

6  together on 98th street between Budlong and Vermont, which is

7  where petitioner's girlfriend lived (5 RT. 2407-2411, 2419,

8  2420, 2430, 2432). It was getting too late and petitioner deci-

9  ded to simply rent movies from a Blockbuster video store (5 RT.

10  2425, 2426.)

11      After renting three (3) D.V.D's, petitioner drove to get

12  food at a Jack-n-the box (See Police Report, pg. 56). Petitioner

13  was in his green Toyota Camry the entire day and was not driving

14  a white van (5 RT. 2406, 2407; 5 RT. 2432.) Petitioner's actions

15  through-out the day shows that he was not plotting some elaber-

16  ate murder.

17      On this same day, but at night, Jose Robles (A.k.A. Chino)

18  was shot and killed on 101st street a few houses west of his

19  home. The victim was an"NC gang member"with several enemies, as

20  the victims own friend stated: "anyone could have been involved

21  (4 RT. 1862, 1896; 3 RT. 1558-59; see Police note attached as

22  Exhibit____R____); Police Report, pp. 10,18, 20). Coincidently

23  Chino was shot and killed on the same day that he had gotten

24  into a confrontation with petitioner's younger brother. Petiti-

25  oner contends that it is probable or likely that because of this

26  previous confrontation and since petitioner had asked a group of

27  people on 102nd street earlier that day:"who is messing with his

28

p. 54
PG54

younger brother, therefore, Jesse Robles and many others in the neighborhood "assumed" and/or believed petitioner was responsible for Chino's death.

Jose Robles (A.K.A. Chino) was amongst the group of People on 102nd street when petitioner asked them who was messing with his younger brother and nothing occurred, and petitioner simply left and told his brother just to stay away from that area.

Petitioner contends that the prosecution witnessess's identifications are likely or may be products of assumption, rumors, improper police questioning, including an unconscious wish to please the police or prosecutor, officers, and detectives unconsciously directing identification towards a suspect they are sincerely convinced is the guilty party, pre-event and/or post-event contamination, and/or Psychological factors which generally affect the accuracy of eyewitness identifications as will be discussed in this case at bar, for such factors apply to petitioner's case, i.e., the case at bar.

The first witness to identify petitioner as the driver of the suspects white van, was Jesse Robles. [1st witness: Jesse Robles]..."

Robles heard about the previous confrontation between the victim and petitioner's younger brother," two days" following this confrontation and the death of Jose Robles, "Jesse Robles implicates petitioner as the driver of the suspects van (2 RT. 945, 955-958). Robles "told" all his friends and family members that petitioner was the driver of the suspects van (2 RT. 944, 991-994). Robles told everyone: "Jofama" was the driver well

p. 55

before anyone else identified petitioner as the driver of this imaginary white van. "Carlos Lopez and Albert Segundo" were two (2) of the friends that Robles told that petitioner was the driver of the white van. Lopez and Segundo eventually jumped on the ban-wagon implicating petitioner as the driver. Two days after the crime, Jesse Robles implicated petitioner by name because detective Steven Katz showed Robles a single photograph of petitioner. This was an improper procedure, and should have been excluded, regardless of reliability, because the showing of the single photograph was unnecessary and suggestive, and that the identification was unreliable in any event, and simply because Robles implicated a "name," did not show or prove that he knew petitioner, nor did it prove that he would have been able to "identify" petitioner in a Six Pac photo line-up at that time.

Robles claimed to have seen petitioner about fifty times in the past (2 RT. 943). He was 15-years of age when he talked to the detectives (See, Police Report, pg. 39). After having already seen a "single photo" of petitioner, however, Robles was shown a Six pac-photo line-up and was asked if he "recognized" anyone, and he was shown this Six-pac photo line-up approximately "Ten (10) months" after the homicide (2 RT. 958-961). Robles stated that at first he didn't want to implicate petitioner, but then he did so because "his family" wanted him to (2 RT. 983).

No one has ever threatened or attempted to do anything to Jesse Robles as a result of him testifying or falsely accusing petitioner of having been the driver of the suspects vehicle (2 RT. 970, 971, 983). Petitioner contends that the two (2) day

p. 56
para 23

1  time period between the night of the crime and when Robles first

2  spoke to officers, gave Robles and others plenty of time to go

3  over the index event in his mind, fill in gaps, reconstruct det-

4  ails, thus altering the original recollections so as to eliminate

5  inconsistencies between information in memory, and that acquired

6  from other sources. Ultimately, petitioner became the person to

7  blame.

8      Robles heard about the confrontation between the victim and

9  petitioner's younger brother, and knew petitioner had asked the

10  victim and his friends earlier that day, who was messing with

11  his younger brother, therefore, Robles's false allegations aga-

12  inst petitioner may be based on that fact, therefore, Jesse Rob-

13  les, may have assumed and/or believed petitioner was the person

14  responsible for his brother's death. This in turn may have led

15  Robles to tell "all his friends and family about who he believed

16  was behind his brother's death, and explained why he held such a

17  belief. As Robles clearly stated: "he did not want to implicate

18  petitioner but then he did so because "his family" wanted him

19  too.

20      After Robles had told his family about what he thought and

21  explained why, "his family became convinced that petitioner was

22  behind the death of Jose Robles, which may be why his family

23  told him to say that it was petitioner. Doing so was extreamly

24  easy since Robles was shown a single photo by officers, however,

25  this is the same witness who stated that petitioner and all his

26  brother's "look alike" (2 RT. 948).

27      In laboratory experiments, it is common for own-race/other

28

P. 57

1  race recognition rates to differ by as much as 30-per-cent.

2      (Cross-Racial Identification Errors at pp. 942-943). Even

3  for those who have considerable social contact with blacks may

4  be no better at identifying them than those who have not (Id. at

5  pp. 943-944). Some jurors may deny the existance of the own-race

6  effect in the misguided belief that it is merely a racist myth

7  exemplified by the derogatory remark, "they all look alike to

8  me", while others may believe in the reality of this effect but

9  may be reluctant to discuss it in deliberations for fear of

10  being seen as bigots (cross-Racial Id errors, at p. 969; see

11  also Wells, A Reanalysis of the Expert Testimony Issue, in Eye-

12  witness Testimony: Phychological Perspectives, p. 309). This in-

13  formation could have assisted the jurors on their fact finding

14  task.

15      Although not actually being able to clearly see the driver

16  under the circumstances Robles had to observe, however, Robles

17  was able to make petitioner be the driver based on his word and

18  contaiminating the neighborhood by telling all his friends and

19  family members that petitioner was the driver of the suspects

20  white van. Heartless inside, Robles had not a care in the world

21  about blaiming the wrong person or a person who he did not get

22  along with, and may have unconscious Transfered petitioner's

23  face from the earlier situation to the driver of the suspects

24  van in the later situation, "Robles found this matter to be "FU-

25  NNY" (2 RT. 981).

26      In addition to Robles telling all his friends and family

27  that petitioner was the driver of the suspects van, unidentified

28

MSB P. 58

1    members of the "NC Gang" was going around the neighborhood "show-

2    ing a single yearbook photo of petitioner," up showing people

3    this yearbook picture the NC Gang members were <u>telling them that</u>

4    <u>"Jofama (petitioner) was the person who done the crime</u>, this

5    form of contamination was to ensure everyone was on the same ban

6    wagon of accusing "Jofama (petitioner) (see Police Report, pg.

7    62 attached hereto.), a "<u>NAME</u>" everyone in the neighborhood be-

8    came familure with.

9        Petitioner contends there are additional factors showing

10   that the prosecution witnesses simply blaimed and/or blaiming

11   the petitioner, therefore, such identifications are not founded

12   upon what they actually saw or seen. For example, the crime occ-

13   urred "<u>at night</u> around 9:00 p.m. (2 RT. 937).

14       Jesse Robles described the suspects van as having "<u>tinted</u>

15   <u>windows</u>," (See, Police Report, pg. 39 attacted hereto.) Robles

16   did not see the actual shooting, "the shots had already stopped

17   as he ran from the back-yard to the front yard gate and seen the

18   white van "<u>speeding</u>" eastbound passing his home (2 RT. 972). <u>At</u>

19   <u>trial</u> Robles described the driver as wearing a "<u>white T-Shirt</u>

20   and a <u>long hanging type beanie</u> that fit snug on a persons head,"

21   which shows a portion of the drivers <u>head and face was covered</u>

22   (2 RT. 976).

23       Robles stated he never identified the driver as wearing a

24   long sleeved black hooded sweat-shirt with the hood down, and he

25   also claimed that he never seen the passenger, but contradicted

26   himself by describing what the passenger was wearing (2 RT. 984-

27   985). However, it's documented that Jesse Robles described a

28

1  white van with wood paneling, drivers door missing the wood pan-
2  eling, wheels of the suspects van appeared to be stock, van had
3  "tinted windows," the passenger had a long sleeved black hooded
4  sweat-shirt with the hood up, and the "driver was wearing a long
5  sleeved black hooded sweat-shirt with the hood down, and a bea-
6  nie on his head," (See Police Report, Pg. 39 attached hereto.

7      The beanie was about a foot long, which shows a good port-
8  ion of the drivers head and face was covered (Vol. 1 of 2, Prel-
9  iminary Transcript, Pg. 26).

10     Robles made his observation from "28 feet away at night as
11 the suspects van "sped by going fast," (2 RT. 942, 973, 985).

12     Petitioner contends that from the point Robles first saw
13 the white van as it was "speeding" by, the length of time
14 Robles had to observe was likely under "four (4) seconds."Partly
15 obstructing Robles's view was Renteria's van which was parked on
16 the Western perimeter line of the Robles home; Renteria parked
17 her van there "before" the shooting (3 RT. 1225, 1232; see
18 Soto's trial transcript, attached hereto as Exhibit E 1816).

19     Robles stated the "headlights" of Renteria's van illuminated
20 the inside of the suspects van "allowing him to see petitioner's
21 face (2 RT. 952-953), which was and is impossible based upon the
22 fact that Renteria had parked her van on the "Western" perimeter
23 line of the Robles home "before" the shooting, and also parked
24 in front of Renteria's van was a large dump working truck (3 RT.
25 1225, 1232; see Soto's trial transcript attached hereto as Exh-
26 ibit E 1818; see Petition #B-210118; see Photo Exhibit A1-A6).

27     Petitioner contends Renteria's front headlights could not

28

WRIT P. 60

1   have possibly illuminated the inside of the suspects van under

2   the circumstances discussed above, and furthermore, Renteria's

3   "tail" lights could not have substituted for the headlights. Com-

4   mon sense tells us that Renteria's headlights hit the rear end

5   of the dump truck parked in front of her vehicle, and did not

6   illuminate the inside of the suspects van that was off-set from

7   her vehicle traveling towards Vermont. The Western perimiter

8   line of the Robles home is basically the "right" side of their

9   drive way, therefore, when Jesse Robles was in the front yard,

10  Renterias vehicle was to his right. Also another factor that

11  shows that Robles falsely accused the petitioner and could not

12  have actually identified the driver, is the fact that--"within

13  a total of approximately three (3) seconds," from "twenty-eight

14  (28) feet away", at "night", as the suspects were "speeding by",

15  Robles described and/or identified" all" of the following:

16      1) A white van with wood paneling;

17      2) Drivers door missing the wood paneling;

18      3) Wheels appeared to be stock;

19      4) Windows of the van were "tinted";

20      5) The passenger had a long sleeve black hooded sweatshirt

21         with the hood up;

22      6) Driver wearing a long sleeve black hooded sweatshirt

23         with the hood down, and a long hanging type beanie; AND,

24      7) Robles also seen that his dad was not paying attention

25         as the van "sped" by his home, because Robles' dad's

26         attention was focused up the street where the crime occ-

27         urred (see, Police Report, Pg. 39 , attached hereto; and

28

                    exhibit p.161

2 RT. 973).

This same witness also stated that petitioner and all of his brother's "look alike". (2 RT. 948). While it is hard to believe that Robles could positively identify the driver "within" approximately "three (3) seconds" under the circumstances that he described. It is also hard to believe that the prosecution counted Robles as a credible "unbias" witness, and claim that his identification is reliable.

1) Robles found this matter to be funny (2 RT. 981);

2) He admitted that he identified petitioner only after <u>his family wanted him to</u> (2 RT. 983).;

3) He possibly has a drug addiction, and he does have a criminal history (see, Police Report, pp 1-19 ,attached hereto as Exhibit 0-1 );

4) His statements to officers, and in court testimony were riddled with contradictions and inconsistances;

5) On the witness stand he admitted he lied (2 RT. 983);AND

6) Robles falsely stated that the headlights of Renteria's van, illuminated the inside of the suspects van allowing him to see, which makes the none-disclosure of evidence holding impeachment value more significate, for it would have without a doubt, "contributed to impeaching Robles.

The second (2nd) witness..,"<u>Carlos Lopez</u>" also testified falsely against petitioner.

Lopez first spoke with officers on May 15, 2003," <u>five</u> (5) <u>days after the incident</u>." This was well after Jesse Robles had told Lopez that the driver of the suspects van was Jofama (Peti-

RVGG p.62

1   tioner). However, after having been exposed to rumors, i.e. Ro-

2   bles, telling him that petitioner was envolved, and possibly

3   even shown a single year book photo by NC Gang members who was

4   also telling people Jofama (petitioner) was the person who done

5   the crime, "Lopez jumped on the same ban wagon of falsely accus-

6   ing petitioner of the crime.

7        However, Lopez's original statement's to officer's, show

8   that he wasn't honestly able to see the driver of the suspects

9   van by the time he made it to the front yard from the back yard,

10  because the suspects van had already passed and was two (2) hou-

11  ses east (left) of his location. Lopez stated the incident <u>actu-</u>

12  <u>ally occurred two (2) houses "east" of his location</u>, therefore,

13  <u>the suspect vehicle was facing "east"</u>, and <u>it also sped "Eastb-</u>

14  <u>ound" towards Vermont</u> (see Police Report, pg. 64, attached here-

15  to). However, by the time Lopez made it to the front yard - the

16  van was two (2) houses east of his location. For this reason,

17  Lopez <u>thought</u> the incident occurred East of his location instead

18  of West of his location, however, this his reason for coming to

19  such a conclusion that it occurred to the east.

20       Lopez describes the direction "east" "three (3)" times, and

21  Lopez knew and understood that <u>east</u> was <u>towards Vermont Avenue</u>

22  because he knew the suspects were driving towards that location.

23  (3 RT. 1624). It make sense that by the time Lopez made it to

24  the front yard the suspects van had already sped by--being that

25  Jesse Robles and his father were the only ones <u>"running"</u> to the

26  front," <u>everyone else" was walking</u> (2 RT. 937, 938, 972, 973).

27       Additionally, Lopez stated it wasn't until the shots had

28

P. 63
also

stopped that he went out to the front yard, and Jesse Robles was "<u>ahead</u>" of him (3 RT. 1614, 1627), which also shows that by the time Lopez made it to the front the suspects van was already two (2) houses East of the location. This very same witness also knew about the previous confrontation between petitioner's youn- ger brother and Chino, and he also knew petitioner had asked Jose Robles (Chino) and others on 102nd street a question about who was messing with petitioner's younger brother (3 RT. 1603-1605). All of which may have led Lopez to believe that petitioner was envolved in the crime, "he therefore jumped on the ban-wagon of accusing the "<u>NAME</u>" (Jofama)". Lopez never stated that he knew petitioner; he claimed that he "<u>seen</u>" petitioner four (4) times in the past "driving" his green Toyota Camry (3 RT. 1617), so the times in which Lopez allegedly seen petitioner was <u>brief</u>, <u>in passing</u> while petitioner was "<u>driving</u>" his green Toyota Camry.

Like everyone in the neighborhood "Lopez learned of petiti- oner's "name." This same witness was never shown a Six (6) pac photo-line-up, however, detective Steven Katz took the position that showing Lopez a photo line-up was not necessary because Lopez knew petitioner. This conduct was erroneous because mostly every other witness who implicated petitioner's name were shown a Six-pac-photo line-up to see if they could identify petitioner (4 RT. 1896-1899).

Additionally, implicating a "<u>name</u>" did not show or prove that Lopez knew petitioner, nor does is show or prove that Lopez could have identified petitioner in a Six-pac-photo line-up. The prosecution did not prove Lopez's identification was honestly

RBU P.64

1  based on what he claimed to have seen. As a matter of fact, Lopez

2  claimed to have seen petitioner approximately four (4) times in

3  the past, while petitioner was "driving" his green Toyota Camry

4  that had "tinted WINDOWS", which shows that Lopez's prior obser-

5  vations of petitioner were "brief" in passing" while petitioner

6  was "driving" his car. Officers made a decision not to show

7  Lopez a Six-pac photo line-up, "possibly because his original

8  statement showed that he could not have seen the driver of the

9  suspects White-Van and because he was a witness that was least

10 likely to identify petitioner.

11      Jesse Robles claimed to have seen petitioner fifty (50) or

12 more times, and Albert Segundo claimed to have seen petitioner

13 hundreds' (100's) of times, but yet both were shown Six-pac-

14 photo line-up's (2 RT. 943; 3 RT. 1550). Based on the aforesaid

15 circumstances, it can be said that Lopez's "first (1st) identif-

16 ication" of petitioner was three (3) years "after" the incident,

17 and his identification of petitioner was in court as petitioner

18 was the only person who sat next to his counsel, and that ident-

19 ification itself was suggestive and/or prejudicial. In a 402 he-

20 aring **the prosecutor practically pointed out and told Lopez**

21 **where petitioner was seated before he identified petitioner,** the

22 prosecutor stated:

23      "Do you recognize the individual at the end of coun-

24      sel's table here?," (3 RT. 1600, 1601).

25      Like Renteria, Lopez likely knew that the person who was

26 on trial, was the person who was being accused of being the dri-

27 ver envolved in the crime. The "NAME": Jofama  (3 RT. 1248,

28

araa p. 65

1249).

Based on all of the aforesaid, "trial counsel provided ineffective assistance for the following:

1) Failing to object to the prosecutor's leading and suggestive question that practically pointed out and highlighted petitioner in court so that Lopez would identify petitioner for the first time 3-years after the crime with the prosecutors help; And,

2) Failing to request the magistrate's permission to have petitioner in street clothes sitting in the audience before Lopez attempted to make an in court identification during the 402 hearing.

Please keep in mind that Lopez is the same witness who was "told" by Jesse Robles, that "Jofama" (petitioner was the person driving the suspects van (2 RT. 944, 991-992).

After the prosecutor practically informed Lopez where petitioner was seated in court, before determining if Lopez could make his own identification, Lopez was permitted to testify before the jury. However, Lopez again was asked to make an identification; he responded: "wearing a brown shirt" I guess right there," at that point he still didn't sound sure of himself (3 RT. 1613).

This first identification 3-years after the incident was well after the neighborhood had became tainted by Jesse Robele tellin all of his friends and family members that "Jofama" (Petitioner)was the driver, and also NC Gang members going around

plus p.b6

1   showing people a picture of petitioner and telling them that pe-

2   titioner was envolved. The lead detective who conducted an inve-

3   stigation on this case was "Steven Katz", a detective with a hi-

4   story of concealing evidence and/or acting in a cover-up of evi-

5   dence ( N 1-10   ) This same detective had access to all evide-

6   nce. Petitioner contends that under all of the aforesaid circum-

7   stances and facts, the case at bar can not be relied upon to pr-

8   oduce the truth or fairness to petitioner.

9       Please keep in mind that the witnesses were being asked if

10  they "recognized" anyone they know in the Six-pac photo line

11  up's, in which is different from asking witnesses to ID any all-

12  eged suspects (2 RT. 958, 959; 4 RT. 1849, 1850, 1862, 2143).

13      Furthermore, both Robles and Lopez allegedly observed the

14  suspects van speed by, but both of them could have been describ-

15  ing two different drivers. According to Lopez the driver was

16  wearing a "black shirt", and was "bald-headed". Lopez could see

17  that the driver "was not" wearing a beanie (3 RT. 1617, 1621,

18  1622).

19      Jesse Robles described the driver as wearing a "white T.

20  shirt" and a "long hanging type beanie," which would have cove-

21  red a bald head (2 RT. 976).

22      According to Lopez he and Robles were the only two in the

23  front yard (3 RT. 1623).

24      According to Robles three (3) people were in the front

25  yard, that being himself, Lopez, and Robles's father (2 RT.

26  973, 974).

27      And although Lopez at trial claimed that the front windows

28

p. 67

RKMM