1  of the suspects van was rolled up but untinted (3 RT. 1621, 1622)

2  however, throughout the course of the investigation of this case,

3  the suspects van windows were described as being "TINTED" (See

4  attached Police Report, p. 8, 9, 29, 31, 39).

5      Petitioner contends that the prosecution witnesses easily

6  fabricated their stories to make it sound and appear as though

7  their identifications were based on what they saw, however, that

8  was not the case, "because petitioner's "name" became the target

9  to blame based upon assumption, rumors, post event contamination,

10  and/or other Psychological factors. Petitioner's name was convi-

11  cted from the start, not his face. The reality of this matter

12  is that anyone could have actually committed this crime (See

13  Police Note attached as Exhibit  R  ; 4 RT. 1862, 1896; 3 RT.

14  1558, 1559).

15      Trial counsel did not even seek to investigate whether any

16  of the prosecution witnesses wore eye glasses, and if so--was

17  he or she wearing them, or did they have any vision problems.

18      Petitioner contends that this shows that trial counsel

19  failed to conduct an adequate investigation, if any, into the

20  prosecution witnesses' ability to see.

21  The Third (3rd) Witness...,"Albert Segundo".

22      Segundo never implicated or identified petitioner as being

23  the driver envolved in the crime until trial "three years" after

24  the crime," (3 RT. 1565). In Segundo's original statements to

25  officer's - he described the suspects van as having "TINTED

26  windows", and the "driver of the van as a Male hispanic", the

27  shooter possibly male "hispanic" from MKA (Mexicans Kickin Ass),

28

p. 69

MMB

1   (see Police Report, Pg. 10). Petitioner is a male black.

2       In a second statement Segundo stated that the "driver" of

3   the van might be "Pelon" from D.P.G. (Dog Pound Gangsters), and

4   the shooter might have been "Willie" from D.P.G., both are male

5   hispanics (see Police Report, Pg. 19, 20 attached hereto; 3 RT.

6   1547, 1548).

7       In a third statement to officer's, Segundo stated that he

8   originally believed that the shooter was Willie because Willie

9   resembled the shooter, then after having been "Told" by another

10  person (Jesse Robles), that "Jofama" (petitioner, was the driver,

11  Segundo then changed his own description of the driver to a male

12  black, bald, wearing a black T-shirt (see Police Report, pgs,

13  31, 32, attached hereto).

14      And although Segundo changed his identification of the dri-

15  ver to resemble petitioner, "after" he was "told" by Jesse Rob-

16  les that petitioner was allegedly the driver, however, Segundo

17  did not accuse petitioner as being the driver.

18      In one of Segundo's final statements which was on March 4th,

19  2004, approximately "Ten (10) months after the homocide", Segu-

20  ndo stated that he recognized "ONE" of the suspects (the shoo-

21  ter). Segundo claimed the shooter was A.K.A. Drips from E.K.

22  Gang and he was 100% certain that it was Abel Soto (A.K.A.Drips).

23  At that point detective Valento "brought up" petitioner's name

24  and asked Segundo if he knew who an individual named "Jofama"

25  was, "Segundo still doesn't identify petitioner as the driver,

26  but states that the driver looked like him; Segundo went on to

27  say that Jesse Robles "told him" the driver was Jofama. Segundo

28

p.69

1  suggested that he lied in the past because he was afraid for his

2  families safty, but was then telling the truth (Poplece Report,

3  pg. 162, 163, 164, attached hereto.)

4      On March 7, 2004, Segundo added to his story and stated it

5  was "after" the murder when he and Andres chased the van to

6  103rd street and Hoover Avenue. He remembered seeing the male

7  black driver as having a metal piercing in his right eyebrow(See

8  Police Report, pg, 165 attached hereto; 3 RT. 1564, 1565, 1577,

9  1578). And although Jesse Robles described the driver as wearing

10 a long hanging type beanie about a foot long, Segundo claimed he

11 seen that the driver was bald headed (3 RT. 1563). With super-

12 natural abilities, not only did Segundo claime to see that the

13 driver was bald headed, but also claimed to have been able to

14 see that the driver had an "eyebrow piercing", which would have

15 been covered by a long hanging type beanie.

16     Furthermore, according to Segundo, it was after he and San-

17 doval followed the suspects van to 103rd and Hoover, that he

18 got a "clear look at the drivers face as he sat parked behind

19 the suspects van approximately five to six car lenghts behind

20 (3 RT. 1571, 1572; 4 RT. 1859). Throughout the course on the

21 investigation on this case, the suspects van was described as

22 having "dark-Tinted windows" (Police Report, pg. 9, 29, 31, 39,

23 attached hereto). And although Jesse Robles described the driver

24 as wearing a long hanging type black beanie that was about a

25 foot long, Segundo claimed he seen that the driver was bald hea-

26 ded (3 RT. 1563). It would have been impossible for Segundo to

27 identify and have a "clearer" view of the driver "at night",

28

from approximately "100 to 125 feet behind" the suspects van, through "tinted windows", while the driver was wearing a long hanging type beanie that would have covered an eyebrow piercing and obstructed and/or covered part of the drivers head and face.

Furthermore, the driver of the suspects van was facing the passenger that was to his "right", therefore, Segundo would have been looking at the "right-side" of the drivers face, but yet he claimed that he saw an eyebrow piercing that was on the "left side" of petitioners face. Additionally, Segundo would be hard streached to be able to clearly see the driver of the suspects van who was seated in the driver's seat, while there is normally two back rows of seats in a van, especially when there was poss-ibly two other people in the rear seats of the van (3 RT. 1256).

Segundo would have been looking in an up-wards angle beca-use he sat parked in a grey car (Camaro), and the suspects vehi-cle was a van, therefore, Segundo did not have a direct view of the driver (3 RT. 1567). In fact, Albert Sandoval, the person who was with Segundo admitted that it was too dark to see inside the van, and would not lie in court in regards to identifying the suspects (3 RT. 1855, 1856, 1860, 1861). However, to down-play previous statements to officers and to support his fabric-ated trial testimony, Segundo claimed that he lied in the past because he was in fear for his families safty," but yet," Segu-ndo was never threatened or harassed as a result of him implic-ating people into this crime. Each person who Segundo accused were real people from real gangs, and Segundo admitted that tel-ling on all of these other individuals "would be exposing his

P. 71

Exhibit

1  family and himself to danger (3 RT. 1560, 1561).

2      Petitioner contends that all of the aforesaid shows that

3  Segundo's identification is likely founded on assumption, rum-

4  ors, and/or Psychological factors. The people in which Segundo

5  accused were "Willie" from D.P.G. (Dog Pound Gangster's),Pelon

6  from D.P.P.G. (Dog Pound Gangster's), Male hispanic from MKA,

7  and "Drips" from E.K. (evil Klan) (3 RT. 1556, 1559-1561, 1566),

8  all of which are real people from real gangs.

9      Segundo's very first identification of petitioner as the

10  driver of the suspects van at trial was 3-years after the crime,

11  and was easily fabricated under the circumstances of this case.

12  The Fourth (4th) Witness..." Maria Renteria.

13      Renteria's first identification was in court "three (3)

14  years" after the crime as petitioner was the only person who sat

15  next to trial counsel. Shortly after the crime she was shown a

16  Six pac photo line-up and she did not identify petitioner in the

17  photo line-up (3 RT. 1502, 1503). Renteria never seen the person

18  who she saw inside the suspects van before (3 RT. 1226). She ad-

19  mitted that she was "in shock" and had no particular reason to

20  pay attention to the driver (3 RT. 1228, 1236).

21      However, she stated petitioner was the driver, and it see-

22  med like forever that she was looking at the driver (3 RT. 1229,

23  1237, 1244, 1245). Renteria's observation of the driver that was

24  in the suspects van, was over 120 feet away at night "before"

25  the shooting, when the van headed in her direction after the sh-

26  ooting she turned away (3 RT. 1236-1238). "Before" Renteria's

27  in court identification, she was told that the person who was

28

p.72

1  on trial for Jose Robles's death is the person that was driving

2  the suspects vehicle (3 RT. 1248, 1249). Renteria made it appear

3  as though she had a "good view" of the suspects by claiming that

4  there were no big vehicles or many vehicles in front of her so

5  she could see (3 RT. 1250), she also claimed that the headlights

6  of her vehicle hit the inside interior of the suspects van," al-

7  lowing her a good view of the driver" (3 RT. 1233, 1245). After

8  petitioner's conviction, it was discovered that the headlights

9  of Renteria's van could not have possibly illuminated the inside

10  of the suspects van because there was a large dump working truck

11  parked in front of her vehicle, as well as other vehicles, com--

12  mon sense tells us that Renteria's headlights hit the tail end

13  of the dump truck.

14       Furthermore, the distance from her vehicle and the suspects

15  was over 120 feet (See Petition #B210118, attached hereto). Ren-

16  teria's false testimony contributed to petitioner's conviction,

17  therefore, trial counsel provided ineffective assistance for

18  failing to motion the court to exclude Renteria's identificat-

19  ion.

20       Petitioner contends that attacking the prosecution witnes-

21  ses ability to see was crucial towards creating reasonable doubt

22  in the minds of the jury, and counsel's failures in challenging

23  their ability to see contributed to the denial of a crucial or

24  potentially meritorious defense.

25       Furthermore, counsel's failure to secure the services of a

26  Psychologist regarding the "Psychological" factors that genera-

27  lly affect the accuracy of eyewitness identifications, deprived

28

p. 13

the jury of vital information that could have assisted them on a crucial issue, "the "accuracy" of eyewitness identifications. Thus, trial counsel's failures in this matter contributed to the denial of a crucial or potentially meritorious defense.

A Psychologist would have testified to the "Psychological" factors that generally affect the accuracy of eyewitness identifications. In the present case, eyewitness testimony constituted the "only evidence" connecting petitioner to the crime, therefore, counsel's failure to secure the services of a Psychologist was not tacticle, nor could there be a satisfactor explanation for depriving the jury of vital information that could have assisted them on a crucial issue, the "accuracy" of eyewitness identifications.

Petitioner contends that a witness can be impeached by discrediting his or her capacity to perceive, recollect, or **communicate**(**Evid. Code Sec. 780 Subd.(c).**The expert would not have testified that any particular prosecution witness lacked the capacity to perceive, remember, and relate; rather he would simply have informed the jury of certain "Psychological" factors that may impare the accuracy of an eyewitness identification, such as the emotions of excitement or fear, stress, cross-race, resemblance, post-event contamination or suggestiveness, familiarity (unconscious transference), Psychological pressures to reduce uncertainty, forgetting curve (memory), Relation Back phenomena, suggestiveness, confidence--accuracy correlation, and exposure duration; such phenomena's would have been supported by the testimony of a qualified Psychologist, backed with referen-

P.74

1  ces of experimental studies of each phenomena.

2      While it may be true that from personal experience and intu-

3  ition all jurors know that an eyewitness identification can be

4  mistaken, and also know the more obvious factors that can affect

5  it's accuracy, such as lighting, distance, and duration.[1]/Other

6  factors bearing on eyewitness identification may be known only

7  to some jurors, or may be imperfectly understood by many, or may

8  be contrary to the intuitive beliefs of most. A few relevant fa-

9  ctors that appear to be either not widely known to lay-persons or

10 not fully appreciated by them, are,____the effect on perception

11 of an eyewitness, personal or cultural expectations or beliefs);

12 see, Loftus, eyewitness testimony (1979) pp. 36-48), the effects

13 on memory of the witness, exposure to subsequent information or

14

1/ Even with respect to these factors, expert psychological tes-
15 timony may be "helpful" in appropriate cases. For example, the
   length of time that an eyewitness observes the person he later
16 identifies is often given significant weight by the jury. But in
   virtually every such case the only evidence of that duration is
17 the witness's own estimate. Studies show that witnesses consist-
   ently overestimate the length of brief periods of time, especia-
18 lly in the presence of stressful stimuli: "during sudden, action
   packed events such as crimes, people almost always overestimate
19 the length of time involved because the flurry of activity leads
   them to conclude that a significant amount of time passed." (Ex-
20 pert Psychological testimony, p. 977; see also Schiffman & Bobko
   effects of stimulus complexity on the perception of Brief tempo-
21 ral Durations (1974) 103 J. Experimental Psychology 156.). In
   the case at bar, Maria Renteria originally claimed that she "lo-
22 oked" at the driver of the suspects van for about "2" minutes,
   she then re-estimated that calculation to "10" seconds or more,
23 and stated" it seemed like forever at the time,"(see, 3 RT.
   1231, 1236, 1237). Thus, testimony from an expert in regards to
24 these factors would have supported the jury.

25

26

27

28

                        P.75
                       RUZ

1    suggestions (Id., at pp. 54-87), and the effects on recall of

2    bias or cues in identification procedures or methods of questio-

3    ning (Id. at pp. 89-99; see generally Hall et al., Post event

4    Information and changes in Recollection for a natural event, in

5    Eyewitness Testimony: Psychological Perspectives, pp. 124-141).

6         Thus, Rule 702 of the Federal Rules of Evidence authorizes

7    the admisstion of expert testimony so long as it is rendered by

8    a "qualified expert" and is "helpfull" to the trier of fact (See

9    United States -v- Stevens, 935 F.2d 1380, 1397 (3rd Cir. 1991)

10   (citation omitted). (FN 1) In United States -v- Downing, 753 F.

11   2d 1224 (3rd Cir. 1985), the court of Appeals for the Third Cir-

12   cuit recognized that Rule 702 may permit a defendant in a crimi-

13    al prosecution to adduce, from a expert in the field of human

14   perception and memory, testimony concerning the reliability of

15   eyewitness identifications. (Id. at 1226).

16        In so holding, the Downing Court held that the determinat-

17   ion whether to admit such testimony requires an examination of

18   the following criteria:

19        First, the evidence must survive preliminary scruting in

20   the course of an in limine proceeding conducted by the district

21   judge. This threshold inquiry, which was derived from the helpf-

22   ulness standard of Rule 702, which is essentially a balancing

23   test centering on two factors:

24        (1) the reliability of the scientific principles upon which

25   the expert testimony rests, hence the potential of the testimony

26   to "aid" the jury in reaching an accurate resolution of a dispu-

27   ted issue; and (2) the likelihood that the introduction of the

28

ruvos p. 76

1  testimony may in some way overwhelm or mislead the jury. Second,

2  admission depends upon the fit, i.e., upon a specific proffer

3  showing that scientific research has established that particular

4  features of the eyewitness identifications involved may have im-

5  paired the accuracy of those identifications. The district cou-

6  rts' assessment of these factors will guide it's discretion in

7  deciding whether to admit the evidence under Fed. R. Evid. 702,

8  28 U.S.C.A.

9      Additionally, rule 702 standard usually "favors admissibil-

10  ity,"(See In re Japanese Electronic Products Antitrust Litigat-

11  ion, 723 F.2d 238, 279 (3rd Cir. 1983). Several courts of Appe-

12  als have upheld the exclusion of expert testimony on eyewitness

13  perception and memory because the testimony would involve quest-

14  ions that can be adequately addressed in cross-examination and

15  that the jury can adequately weigh.., through common-sense eval-

16  uation (United States -v- Thevis, 665 F.2d 616, 641 (5th Cir.

17  1982); United States -v- Brown, 540 F.2d 1048, 1054 (10th Cir.

18  1976).

19      However, the Downing Court correctly stated: "we have seri-

20  ous doubts about whether the conclusion reached by those courts

21  is consistent with the liberal standard of admissibility manda-

22  ted by Rule 702 (Downing, 753 F.2d 1224 at pp. 1229-1230). Inst-

23  ead the Downing court found-persuasive more recent cases in

24  which courts have found that under certain circumstances, this

25  type of expert testimony can satisfy the helpfulness test of

26  Rule 702. For example, in State -v- Chapple, 135 Ariz. 281, 660

27  P.2d 1208 (1983) (applying Arizona's version of the Federal

28

Rules of Evidence), the Supreme Court of Arizona set aside a jury's guilty verdict and ordered a new trial on the ground that the trial court had erroneously excluded an expert on eyewitness identification offered by the defendant. In addressing the question whether the expert's testimony would have been "helpful" to the jury in reaching an informed decision, the court noted several specific factual "variables" that were present in that case which, the defendant's expert was prepared to testify, reduced the eyewitnesses ability to perceive and remember accurately. The Prooffer stated that the expert would testify concerning:

 1) The "forgetting curve", i.e., the fact that memory does not diminish at a uniform rate;

 2) The fact that: contrary to common understanding," "Stress" causes inaccuracy of perception and distorts one's subsequent recall;

 3) The "assimilation factor", which indicates that witnesses frequently incorporate into their identifications inaccurate information gathered after the event and confused with the event;

 4) The "feedback factor," which indicates that where identification witnesses discuss the case with each other--they can unconsciously reinforce their individual identifications; AND,

 5) The fact that studies demonstrate the absence of a relationship between the "confidence" a witness has in his or her identification and the actual accuracy

1    of that identification.

2        Each of the "variables" <u>goes beyond what an average</u>

3    <u>juror might know as a matter of "commom knowledge,</u>

4    <u>and indeed some of them directly contradict "common</u>

5    sense."

6        For this reason, the Arizona Supreme Court concluded that

7    the expert's testimony would have assisted the jury in reaching

8    a "<u>correct decision</u>." (<u>Id</u>. at P. 1219-24. See also infra note

9    24.) Fed. R. Evid. 704, 28 U.S.C.A. in fact, specifically prov-

10   ides that:

11       Testimony in the form of an opinion or inference otherwise

12   admissible "<u>is not</u>" objectionable because it embraces an ultim-

13   ate issue to be decided by the "<u>trier of fact</u>."

14       To the extent that a mistaken witness may retain great con-

15   fidence in an inaccurate identification, "<u>Cross - examination can</u>

16   <u>hardly be seen as an effective way to reveal the weaknesses in</u>

17   a witness recollection of an event."(<u>Downing</u>, 753 F.2d 1224,

18   at p. 1244).

19       If there is one thing known about eyewitness identificati-

20   ons, it is that <u>common sense "misleads"</u> more often than it helps

21   (See, <u>United States -v- Brown</u>, 471 F.3d 802 (7th Cir. 2006); see

22   also, e.g., Gary L. Wells & D.M. Murray, what can Psychology say

23   about the <u>Neil -v- Biggers</u> criteria for judging eyewitness iden-

24   tification accuracy?, 68 J. Applied Psych. 347 (1983); Timothy

25   P. O'Toole & Giovanna Shay, <u>Manson -v- Brathwaite</u> Revisited: To-

26   wards a New Rule of Decision for Due Process Challenges to Eyew-

27   itness identification Procedure, 41 Val. U.L. Rev. 109 (2006).)

28

                              ntw p.79

1    The vagaries of eyewitness identifications"; C. Ronald Huff
2    et al., guilty until proven Innocent: wrongful conviction and
3    public policy, 32 Crime & Deling, 518, 524 (1986),"the single
4    most important factor leading to wrongful convictions in the
5    United States is eyewitness misidentification." The recent avai-
6    lability of post-conviction DNA tests demonstrate that there
7    have been an overwhelming number of false convictions stemming
8    from uninformed reliance on eyewitness misidentifications. In
9    209 out of 328 cases (64%) of wrongful convictions identified
10   by a recent exoneration study, at least one eyewitness misident-
11   ified the defendant. (Samuel R. Gross., et al., Exonerations in
12   the United States: 1989-2003, 95 J. Crim. L. & Criminology 523,
13   542 (2004). In fact, "mistaken eyewitness identifications are
14   responsible for more wrongful convictions than all other causes
15   combined/" (A. Daniel Yarmey, Expert Testimony: Does Eyewitness
16   Memory Research Have Probative Value for the Courts? 42 Canadian
17   Psychology 92, 93 (May 2001).)

18   Eyewitness evidence presented even from well-meaning and
19   confident citizens is highly persuasive but, at the same time,
20   is among the least reliable forms of evidence.

21   Even more problematic, "Jurors seldom enter a courtroom
22   with the knowledge that eyewitness identifications are unrelia-
23   ble,"(Rudolf Koch, Note, Process -v- Outcome: The Proper Role
24   of Corroborative Evidence in Due Process Analysis of Eyewitness
25   Identification Testimony, 88 Cornell L. Rev. 1097, 1099 n. 7
26   (2003).) Thus, while science has firmly established the "inher-
27   ent unreliability of human perception and memory", Id. at 1102

28

Potter p. 80

(internal quotations omitted), this reality is outside "the jury's common knowledge," and often contradicts jurors' "common-sense" understandings, id. at 1105 n. 48 (internal quotations omitted). To a jury, there is almost nothing more convincing than a live humam being who takes the stand, points a finger at the defendant, and says," Thats the one!" (Watkins -v- Sowders, 449 U.S. 341, 352, 101 S.Ct. 654, 66 L.Ed. 2d 549 (1981) (Brennan, J. dissenting) (Emphasis in original)).

Therefore, it is contended that when there is significant relevant information that will assist the jury in reaching a "correct" decision, trial counsel should assert that stronger defense. The body of information available on the "Psychological factors" which generally affect the accuracy of eyewitness identifications, would have placed before the jury, "vital" information that would have assisted them in reaching a "correct" decision. This would have eliminated the probability or likelihood of the jury fully relying on convincing unreliable and/or inaccurate finger pointing evidence.

Trial counsel's inactions left open a reasonable probability of a wrongful conviction by depriving the jury of vital information at trial. Failing to assert such a crucial or potentially meritorious defense could not possibly have been tacticle.

The jury could have made an inteligent and correct decision had they been informed of the Psychological factors which generally affect the accuracy of eyewitness identifications. Thus, testimony introduced by a qualified Psychologist may not only assist the jury, but may also refute the jury's otherwise common

assumptions about the reliability of eyewitness identifications (<u>United States -v- Stevens,</u> 736 F.2d 1103, 1106 (6th Cir. 1984). Although jurors may not be totally unaware of the Psuchological factors bearing on eyewitness identifications, the body of info-rmation now available on these matters is "<u>sufficiently beyond common experience</u>," therefore, expert testimony could at least assist the trier of fact (Fed. Rule. Evid. 702; <u>People -v- McDonald</u> (1984) 37 Cal.3d 351, at p. 369).

Petitioner contends, that based on all of the aforesaid, trial counsel denied petitioner a crucial or potentially merito-rious defense, by depriving the jury of vital information that could have assisted them on a crucial issue, the accuracy of eyewitness identifications. Thus, since there was no other evi-dence connecting petitioner to the crime, there could be no sat-isfactory or tacticle explanation for counsel's failures.

Petitioner contends that, had the jury been informed on the "Psychological" factors which generally affect the accuracy of eyewitness identifications, a result more favorable would have occurred (<u>People -v- Nation</u> (1980) 26 Cal.3d 169, 179; <u>Strickl-and -v- Washington</u>, <u>supra</u>, 466 U.S. at pp. 688, 690-92; <u>People -v- Watson</u>, <u>supra</u>, 46·Cal.2d at p. 836). Furthermore, Evidence Code section 730, authorizes the trial court to appoint an exp-ert to render advice and to testify as a witness, evidence Code section 731 and Government Code section 29603 state that the County must pay for those court ordered expenses. (<u>Corenevsky -v- Superior Court</u>, <u>supra</u>, 36 Cal.3d 307, 318-319, 204 Cal. Rptr. 165, 682 p.2d 360 (appointment of jury selection expert); <u>People</u>

1  -v- Hurley (1979) 95 Cal.App.3d 895, 898, 157 Cal.Rptr. 364

2  [appointment of expert on eyewitness identification].) Moreover,

3  the right to effective assistance of counsel entitles indigent

4  defendants to access to public funds for expert services. Ake

5  -v- Oklahoma (1985) 470 U.S. 68, 76-85, 105 S.Ct. 1087, 1092-

6  1097, 84 L.Ed.2d 53; Corenevsky -v- Superior Court, supra, 36

7  Cal.3d at p. 319, 204 Cal.Rptr. 165, 682 p.2d 360; People -v-

8  Young (1987) 189 Cal.App.3d 891, 902, 234 Cal.Rptr. 819.)

9      Additional Statutes providing authority for requesting pub-

10  lic funds for ancillary defenses services include Penal Code §

11  987.9; § 55.11; 987.8(f)(1). Furthermore, Penal Code section

12  987.9 is not limited to situations in which counsel has been

13  appointed for an indigent defendant, "the test of indigency for

14  purposes of funding investigators and experts is "financial

15  means to secure these services", (Anderson -v- Justice Court

16  (1979) 99 Cal.3d 398, 403, 160 CR 274). Thus, there could be no

17  tacticle or satisfactory explanation for counsel's failure's.

18      The "FIT" and "Helpfulness" of the proposed expert testim-

19  ony: Specified Variables/Phenomeno:

20          1. ["CONFIDENCE - ACCURACY CORRELATION"]:
           THE LACK OF CORRELATION BETWEEN CONFIDENCE OF A WIT-

21         NESS AND THE ACCURACY OF THE WITNESS'S IDENTIFICAT-
           ION.

22      In the present case, the prosecution's witnesses expressed

23  "confidence" in their identifications, "Jesse Robles (2 RT.959,

24  962); Maria Renteria (3 RT. 1229, 1245); Albert Segundo (3 RT.

25  1550, 1554); and Carlos Lopez (3 RT. 1615, 1616). But the deg-

26  ree of confidence an eyewitness expresses in his or her identi-

27  fication and the accuracy of that identification," are differ-

28

_ent_." Numerous investigations of the lack of correlation between the two have been conducted: the majority of studies have found no statistically significant correlation between confidence and accuracy, and in a number of instances the correlation is negative, "the more certain the witness, the more likely he or she is mistaken," (Wells & Murray, Eyewitness Confidence, in Eyewitness Testimony: "Psyvhological Perspectives, PP. 159-162), leading the cited authors to conclude that "the eyewitness accuracy-confidence relationship is weak under good laboratory conditions and functionally useless in forensically representative settings (Id. at p. 165; see also Deffenbacher, Eyewitness Accuracy and Confidence: Can we Infer Anything About Their Relationship? (1980) 4 Law & Human Behav. 243.).

The average juror, however, remains unaware of thses findings: "A number of researchers using a variety of methods have found that people intuitively believe that eyewitness confidence is a valid predictor of eyewitness accuracy." (Wells & Murray, supra, at p. 159, citing five studies). Therefore, the "confidence--Accuracy Correlation" is relevant and could have assisted the jury in this case, and since a mistaken witness may retain great confidence in an inaccurate identification, cross-examination can hardly be seen as an effective way to reveal the weakness in a witness recollection of an event (Downing, 753 F.2d at 1230-31 n. 6.), thus, expert testimony on the "confidence Accuracy correlation" is suffiecently tied to the facts of this

ANNEX p.84

case.

        2. ["UNCONSCIOUS TRANSFER, FAMILIARITY"]

    FAMILIARITY, (UNCONSCIOUS TRANSFER): WHEREBY A WITNESS
    CONFUSES A PERSON SEEN IN ONE SITUATION WITH A DIFFER-
    ENT PERSON SEEN IN ANOTHER.

    According to Martin Blinder, Forensic Psychiatrist, Califor-
nia Past Adjunct Professor of Law." Contrary to expectations,"
past or subsequent familiarity with a suspect may disable, rather
than enhance, the accuracy of an eye-witness identification. A
witness may unconsciously transpose a face familiar for mundane
reasons to someone at the scene of a crime ("especially if the
perpetrator in fact resembles the more familiar face".) That is,
the witness has the right face, but the wrong place (See attached
Exhibit S Crime Justice & America, p. 26.)

    People often have difficulty remembering the context in
which they first encountered a piece of information. Thus,"it is
possible for a witness to correctly identify a person as one
whom he has met, while incorrectly placing that person in another
situation."

    An unconscious transference occurs when a witness confuses
a person seen in one situation with someone seen in a different
situation (United States -v- Harris, 995 F.2d 532, 535 n. 2 (4th
Cir. 1993); E. Loftus, Eye-witness Testimony (1980) at pp. 36-
48.)

    In the present case, Jesse Robles had past familiarity with
petitioner. Additionally, Robles was present on 102nd street
when he observed petitioner confront a group of people earlier
in the day of May 10, 2003, asking "who was messing with petiti-

AWBR p. 85

1  oner's younger brother"! (2 RT. 953-955). Additionally, Robles

2  stated that there were about four people in petitioner's car at

3  that time but he did not know who the other people were; Robles

4  only recognized petitioner's car (2 RT. 955).

5      Petitioner contends that Robles may have placed petitioner

6  on 102nd street simply because he "recognized petitioner's car,"

7  which would explain why he was unable to make an identification

8  of any of the alleged passenger's. Furthermore, Robles may have

9  unconsciously transposed petitioner's familiar face for mundane

10  reasons, to a different person seen in the suspects "speeding"

11  van-fleeing the scene, especially if the perpetrator in fact re-

12  sembled petitioner (see Exhibit___S___, p. 26 attached hereto) Also,

13  Robles stated that "Petitioner and all of his brothers "look

14  alike" (2 RT. 948), and Albert Segundo also stated that in the

15  past, the driver of the suspects van "resembled" petitioner (3

16  RT. 1574, 1577; see Police Report, Pg. 162-164, attached hereto).

17      As petitioner previously pointed out: "it was "at night",

18  from 28 feet away, while the suspects van was "speeding", giving

19  Robles approximately "3" seconds to make an observation, while

20  the driver of the suspects van was wearing a long hanging type

21  beannie that covered part of the drivers face and head, "that

22  Robles claimed to have been able to see. However, Robles was

23  able to describe the suspects van in great detail and also saw

24  that his father was not paying attention to the suspects van be-

25  cause his attention was up the road where the incident occurred

26  (See, pp. 59 - 62 of this writ). Thus, although not actually

27  being able to positively and accurately identify the driver of

28

new p. 86

the suspects van, under the circumstances Robles described, howe-
ver, Robles may have unconsciously transfered petitioner's face
to a different person driving the suspects van. The two day win-
dow between the night of the crime and when Robles first spoke
to officers, provided Robles ample opportunity to assume, specul-
ate, and unconsciously transpose petitioner's face to a differ-
ent face fleeing the crime scene. Robles hearing about the prev-
ious confrontation between the victim and petitioner's younger
brother, and seeing petitioner's car earlier that same day, may
have impaired his perception. Perception may be affected by such
factors as the observer's "state of mind," his expectations, "his
focus of attention at the time, the suddenness of the incident,
stress, cross-race and/or age differences of the observer and the
the observed (People -v- McDonald, 37 Cal.3d 351, at p. 361).

Although not honestly able to see the driver of the suspe-
ct's vehicle well enough to make an accurate and positive ident-
ification, Robles's state of mind may have impaired his percept-
ion. The earlier situations may have placed Robles in the "mind
state" that it had to be Jofama (petitioner) because of the pre-
vious confrontations, Robles also may have "expected" petitio-
ner's envolvment based on the earlier situations, which in tern
led him to accuse petitioner, based on his original impaired pe-
rception. There is also a race and age difference between petit-
ioner and Robles. For example, petitioner is black, and Robles
is hispanic, and there is a five year age difference. "petitio-
ner was 20-years old at the time and Robles was 15-years old at
the time. (see Police Report attached hereto, p. 39). Thus,

PETITION p.87

1   Robles may have had the right face but the wrong place.

2   Carlos Lopez also may have unconsciously transferred petit-

3   ioner's face, to a different person driving the suspects van fl-

4   eeing the scene of the crime. Lopez was present when petitioner

5   confronted a group of people earlier that day (3 RT. 1603-1605).

6   Lopez allegedly seen petitioner four times in the past (3 RT.

7   1617). His perception was impaired (See pp. 62-68 of this petition),

8   and Jesse Robles "told" Lopez, that petitioner was driving the

9   suspects van (2 RT. 944, 991-994). Additionally, his first iden-

10  tification was three (3) years after the crime (SEE pp. 63-65,

11  of this petition), which gave Lopez plenty of time to reconstr-

12  uct details, assume, speculate, and unconsiously transfer petit-

13  ioner's face to a different person driving the suspects speeding

14  van fleeing from the scene of the crime.

15  Furthermore, there is a race and age difference between

16  Lopez and petitioner. Lopez is male "hispanic", and he was 17-

17  years old at the time, however, petitioner is male "black" and

18  was 20-years old at the time). All of which maye led Lopez to

19  unconsciously transfer petitioner's face to a different person

20  envolved in the crime, who may have in fact resembled petitioner

21  (2 RT. 948; 3 RT. 1574, 1577; see Police Report, p. 162-164, at-

22  tached hereto.).

23  Albert Segundo had past familiarity with petitioner (3 RT.

24  1550). Segundo originally stated that the driver of the suspects

25  van "resembled" the petitioner (Police Report, p. 162-164). It

26  has also been pointed out that Segundo's perception was impai-

27  red (See pp. 68-72 of this petition), and that his first identi-

28

1  fication implicating petitioner as the driver of the suspects van

2  was "at trial, three (3) years after the crime". Thus, Segundo

3  was provided plenty of time to reconstruct details, assume, spe-

4  culate, and unconsiously transfer petitioner's face to a differ-

5  ent person envolved in the crime. Segundo may have had the right

6  face but the wrong place.

7  Therefore, testimony relating to unconscious transfer is

8  sufficiently tied to the facts of this case and could have assi-

9  sted the jury.

10  3. ["FORGETTING CURVE, (MEMORY)"]:

11  THE TENDENCY OF MEMORY TO FADE VERY RAPIDLY AT
FIRST, AND THEN MORE SLOWLY.

12  According to the "forgetting curve phenomenon", memory wea-

13  kent at a none-constant rate with the passage of time, with most

14  of the forgetting taking place within the first hours following

15  the event, and certainly with the first few days following the

16  event" (United States -v- Norwood (1996), 939 F. Supp. 1132, at

17  p. 1138). Memory is a composite of retrieved actual perceptions,

18  for example, ("I felt the rain, I heard tires squeal, I saw a

19  Volkswagen under a big red truck") an unconscious reconstruction

20  (or "invention) of events not actually perceived, so as to form a

21  coherent logical whole: "This Volkswagen skidded on the west st-

22  reet and chashed under a big red truck.")

23  Often what an eyewitness "remembers" is largely a product

24  of how a question is asked. Compare "how fast was the Volkswagen

25  going when it smashed into the truck?" versus,"what was the

26  speed of the Volkswagen when the two vehicles met?"

27  The accuracy of an eyewitness recollection is suspect when:

28

pupus p.89

"there was little time for observation", the witness was under the influence of alcohol or drugs; the witness was in a highly emotional state; the witness would have had no reason to take particular notice of the incident (e.g., did not know a crime was taking place); there was a substantial time lapse between observation and first identification; the witness intitially expressed doubt he could make an identification, or first made a patently erroneous one, or reported other details that later proved incorrect. there is steady improvement of memory and confidence from first identification through subsequent statements, preliminary hearing testimony, and trial; the witness and the defendant are of different ethnic groups/races; the witness demonstrates bias or prejudice; the witness has an emotional need to see what he or she expects to see or report; and/or the witness manifests a high need to conform to, defer to, or please authority figures (See crime Justice & America, pg. 24-25, attached hereto as exhibit___S___).

Witnesses may further be influenced by an unconscious wish to please the police and/or by the police's unconsciously directing identification towards a suspect they are sincerely convinced is the guilty party. Thus, while the confidence of the eyewitness improves with the passage of time, recollections are fading and becoming ever less reliable (See, E. Loftus, Eyewitness Testimony (1979) pp. 36-48, the effects on memory of the witness exposure to subsequent information or suggestions (id. at pp. 54-87), and the effects on recall of bias or cues in identification procedures or methods of questioning (Id. at pp. 89-99; see

P. 90
Rw 800

generally Hall, et al., Post-event Information and Changes in Recollection for a natural event, in Eyewitness Testimony: "Psychological Perspectives, pp. 124-141).

In the present case, there was some passage of time between the incident alleged and the eyewitness identifications. Jesse Robles's identification was "two (2) days" after the incident (see p. 52 of this petition); Carlos Lopez, Albert Segundo, and Maria Renteria's "identification" of the alleged driver envolved in the crime was "three (3) years" after the incident (see, pp. 52, of this petition). As explained in U.S. -v- Norwood (1996) at p. 1138, memory weakens at a none-constant rate with the passage of time," with most" of the forgetting taking place within the "first hours" following the event, and certainly within the "first few days" following the event. Thus, the "forgetting Curve Phenomenon" is sufficiently tied to the facts of this case.

Additionally, since often what an eyewitness remembers is largely a product of how a question is asked (Loftus, 1979, pp. 72-99), it can be said the forgetting Curve phenomenon is relevant and could have assisted the jury. As petitioner pointed out, detective Valento "first" brought up "petitioner's name" when he interview Albert Segundo. Valento asked Segundo if he knew who an individual named "Jofama" was. Valento then asked Segundo if "Jofama" was the driver, and Segundo responded that he did know petitioner and added that he "could not" be 100% certain that it was, but stated it "looked like" him (See Police Report, pg. 164, attached hereto). Compare Valento's line of questioning

to the following example:

Mr. Segundo please explain to me everything you were able to identify starting with the vehicle, how did the vehicle look?" how many people were envolved in the crime? can you please describe the individuals envolved and explain their roll in the crime; do you know the individuals envolved. Therefore, an unconscious reconstruction (or invention) may have taken place when detective Valento purposely or unconsciously directed Segundo to identify, or change his description of the driver to resemble petitioner, through his line of questioning. Furthermore, Post-event Information such as when Segundo, Lopez, and Renteria "was told: "Jofama" (petitioner) was the driver envolved in the crime, and may have unconsciously led the to accuse and/or identify petitioner (see, Generally Hall, et al., Postevent Information and changes in recollection for a Natural Event, in Eyewitness Testimony: Psychological Perspectives, pp. 124-141). Thus, testimony from a qualified expert backed with references of experimental studies on such phenomenon would have assisted the jury.

### 4. ["PSYCHOLOGICAL PRESSURES TO REDUCE UNCERTAINTY".]

Whereby in matters of great importance most people would be far more comfortable with certainty than with doubt. And so it is that as time passes, the eyewitness tends to reassure himself by going over the index event in his mind, "filling in gaps, and "reconstructing details," thus inadvertently altering the original recollections so as to eliminate conflict and inconsistencies between information in memory, and that acquired from

P.92