1  other sources.

2     The very act of explicitly making an identification in its-

3  elf appears to augment certainty, with witness confidence incre-

4  asing with each subsequent report, though he may be merely conf-

5  irming himself in his error. That is, the very process of attem-

6  pting to recall can generate the illusion of familiarity, a phe-

7  nomenon utterly independent of accuracy; with each rehearsal and

8  report, the witness becomes increasingly committed to his judgm-

9  ent (See Exhibit _S_ Crime Justice & Ame. p. 26).

10     b.] TO CHOOSE.

11     Studies have shown that many witnesses feel obliged to ide-

12  ntify someone, and may do so even though the individual known to

13  be the perpetrator is not present in the photo array, and desp-

14  ite admonitions that they need not select anyone. Demonstrably

15  false identifications have also been observed in labratory stud-

16  ies and in staged crime experiments simulating a criminal inves-

17  tigation. Thus, a sincere desire to be useful may cause some

18  witnesses to be entirely too helpful (Exhibit _S_, p. 26).

19     c.] TO MEET ONE'S EXPECTATIONS.

20     If a witness has reason (however unfounded) to believe that

21  the person he is now identifying is in fact the perpetrator, his

22  actual memory of the perpetrator will start to change so as to

23  more resemble the person being identified, particularly if the

24  original perception was brief, incomplete, or hazy. That is,

25  exposure to a new face which one has been persuaded is that of

26  the perpetrator can have the effect of making memory of the per-

27  petrator's face "better", when in fact, it is being rendered

28

p.93
plato pulole

1  less correct, i.e., a weak correct memory is being replaced by a
2  stronger incorrect one, (Exhibit  S  ,p. 26).

3      In the case at bar, no one implicated or identified petiti-
4  oner as the driver envolved in the crime the night of the incid-
5  ent. However, as time had passed Robles, Lopez, Segundo, and Ren-
6  teria may have made their identification after reassureing them-
7  selves by going over the index event in his or her mind, "fill-
8  ing in gaps," and "reconstructing details," thus inadvertently
9  altering the original recollections so as to eliminate conflicts
10 and inconsistencies between information in memory," and that ac-
11 quired from other sources," such as when Jesse Robles told all
12 his friends and family that petitioner was the driver envolved
13 in the crime (2 RT. 944, 955-958). And Renteria was told that the
14 the person who was on trial for Jose Robles's death is the per-
15 son that was driving the suspects van (3 RT. 1248, 1249). Though
16 the passage of time, psychological rehearsal's and subsequent
17 report/information, witnesses may have been merely confirming
18 themselves in their error. That is, the very process of attempt-
19 ing to recall can generate the illusion of familiarily, a pheno-
20 menon utterly independent of accuracy; with each reherarsal and
21 report, the witnesses may have became increasingly committed to
22 his or her judgment (Exhibit  S  , p. 26)

23       d.] TO CHOOSE:

24    Renteria, Lopez, and Segundo were all "told" that petitio-
25 ner was the driver of the suspects vehicle before trial, based
26 on--they may have felt obliged to identify petitioner at trial
27 on the witness stand, and dispite admonitions that they need not
28

P. 94

1  select anyone. Demonstrably, false identifications have also been

2  observed in labratory studies and in staged crime experiments

3  simulating a criminal investigation. (Exhibit _S_ , p. 26.

4        e.¶ TO MEET ONE'S EXPECTATIONS:

5     After Segundo, Lopez, and Renteria were told by others that

6  petitioner was the driver of the suspects vehicle, they may have

7  believed the person that they then identified (petitioner),was

8  the perpetrator. However, their actual memory of the perpetrator

9  started to "change" so as to more resemble the person being acc-

10  used. For example, Segundo originally accused "two male hispan-

11  ics", (Police Report, pg. 10, attached hereto.). He then accused

12  Willie and Pelon from DPG (Dog Pound Ganster's), both are male

13  hispanics (See Police Report, pgs. 19-20, attached; 3 RT. 1547,

14  1548).

15     However, after being "told" by Jesse Robles that petitioner

16  was the driver of the suspects van, Segundo "changes" his descr-

17  iption of the driver to "resemble" petitioner, a male black (see

18  Police Report, pgs. 31, 32, attached hereto.). That is, of cou-

19  rse, exposure to a new face which one has been persuaded is that

20  of the perpetrator can have the effect of making memory of the

21  perpetrator's face better, when in fact, it is being rendered

22  less correct, i.e., a weak correct memory is being replaced by

23  a stronger incorrect one. (Exhibit _S_ ,P. 26, attached hereto.)

24     Carlos Lopez was "told" by Jesse Robles, that petitioner

25  was the driver of the suspects van (2 RT. 944, 991-994). After

26  which, Lopez jumped on the same ban-wagon of accusing the "name"

27  Jofama (petitioner), but never makes an identification until

28

trial (3-years after the crime) as petitioner was the only person who sat next to counsel, and that identification itself was based upon the prosecutor's suggestive questioning, in which practically highlighted and told Lopez who to identify (See pp. 61-63 of this petition).

Renteria was also "told" that the person standing trial was the person driving the suspects vehicle. She was told this before she made her in-court identification (3 RT. 1248, 1249). Renteria then jumped on the same ban-wagon, and made an in-court identification of petitioner for the first time. Obviously she may have believed that petitioner was the perpetrator because of being "told" that petitioner was the driver of the suspects van, in which may have led to her in-court identification.

Renteria was shown a six-pac photo line-up shortly after the crime and she did not identify petitioner, because she identified someone else (3 RT. 1502, 1503.) Thus, when Renteria was exposed to a new face at trial, after being persuaded it was that of the perpetrator, which can have the effect of making memory of the perpetrators face better; when in fact, it is being rendered less correct, a weak correct memory is being replaced by a stronger incorrect one (Exhibit S , p. 26). Therefore, Renteria jumpes on the ban-wagon of identifying petitioner, who was the only person sitting next to counsel; someone who Renteria had never seen before (3 RT. 1226).

Jesse Robles, identified petitioner two days after the crime, which provided Robles plenty of time to reassure hisself by going over the index event in his mind, filling in gaps, and

p. 96

1  reconstructing details, thus, inadvertently altering the origi-

2  nal recollections so as to eliminate conflicts and inconsistenc-

3  ies between information in memory and that acquired from other

4  sources (Exhibit __S__ ,P. 26).

5      Additionally, when officers came to Robles with a "single"

6  photo he may have felt obliged to identify petitioner as the

7  suspect, despite admonitions that he need not select anyone. As

8  was previously stated, "in matters of great importance. However,

9  most people would be far more comfortable with certainty than

10  with doubt (Exhibit __S__ , p. 26). Thus, instead of Robles stating

11  that he could not be sure about who was envolved, and that he

12  only "__thinks__" petitioner could have been envolved because of the

13  earlier confrontation, "instead, Robles may have turned a belief

14  into comfortable certainty.

15      Furthermore, Robles admittedly stated that he did not want

16  to implicate petitioner, but then he did so because "__his family__"

17  wanted him to (2 RT. 983), which may have placed additional pre-

18  ssures on Robles to simply accuse and identify petitioner. Thus,

19  testimony from a qualified expert backed with references of exp-

20  erimental studies on Psychological Pressures to reduce uncertai-

21  nty, would have assisted the jury, and is sufficiently tied to

22  the facts of this case.

23          5.["__POST-EVENT CONTAMINATION__"]:

24  WHEREBY INFORMATION ACQUIRED AFTER THE FACT MAY THEN
BE INADVERTENTLY INTERGRATED INTO MEMORY FOR THE EV-

25  ENT ITSELF. ONCE THIS HAPPENS IT MAY BE IMPOSSIBLE
TO TEAR "THEM" APART. (EXHIBIT __S__ CRIME JUSTICE & AM-

26  ERICA, P. 25; E. LOFTUS, EYEWITNESS TESTIMONY (1979),
PP. 70-78).

27  News-paper reports, "__the comments of other witnesses__," and

1  "leading questions" are typical sources of such post-event conta-

2  mination. The more impoverished the original information, the

3  more remote the event in time (relative to that point in which

4  new information is acquired) and the more "reasonable" the new

5  information, the more likely post-event data will be intergrated

6  into memory (Exhibit  S  PP. 25-26).

7      As previously stated "the comments of other witnesses" and

8  leading questions are typical sources of post-event contaminat-

9  ion (Exhibit  S  , PP. 25-26).

10     In the present case, Jesse Robles admitted that he told all

11 of his friends and family that petitioner was the driver of the

12 suspects van. (2 RT. 944, 991-994).

13     Carlos Lopez and Albert Segundo were two of the friends

14 that were "told" that Petitioner (Jofama) was the driver of the

15 suspects van, and both of them eventually jumped on the ban-wa-

16 gon of accusing petitioner. And although Segundo originally ide-

17 ntified two male hispanics as being envolved in the crime (See

18 Police Report, pp. 10, 19-20; 3 RT. 1547, 1548), after he was

19 "told" by Jesse Robles that petitioner was the driver, and after

20 detective Valento's suggestive questioning that first brought up

21 petitioner's name (See Police Report, p. 164, attached hereto.

22 However, Segundo changes his very own description of the driver

23 to that it "resemble" petitioner.

24     Petitioner contends that this shows how post--event data

25 may have been intergrated into memory. Additionally, adding to

26 the post-event contamination were unidentified members of the NC

27 Gang who went around showing a year-book picture of petitioner

28

p. 98 avav avav

1   and "telling" them that petitioner was the person who done the

2   crime (See Police Report, p. 62 attached hereto).

3   Furthermore, Renteria was "told" that the person who was on

4   trial for Jose Robles's (Chino's) death, is the person that was

5   driving the suspects vehicle (3 RT. 1248, 1249). All of the afo-

6   resaid forms of post-event contamination's were calculated to en-

7   sure everyone was on the same ban wagon of accusing and/or iden-

8   tifying petitioner. It is even diffecult to say that the taint

9   could be cured.

10  An additional common form of such post-event contamination

11  in criminal proceedings occurs when the witness erroneously ide-

12  ntifies a defendant on a phtot line-up with that "photograph"

13  now clear in the witness(s) mind; he then identifies the defend-

14  ant with great certainty and conviction at preliminary hearing

15  and trial (Exhibit _S_ p. 26).

16  In the present case, Jesse Robles was shown a "single" ph-

17  oto of petitioner by detectives (see Police Report, p. 40 attac-

18  hed hereto). With that photograph now clear in his mind, he then

19  identifies petitioner with great certainty and conviction at pre-

20  liminary hearing and trial. With that single" photo clear in Ro-

21  bles's mind, identifying that clear photo in a Six-pac photo

22  line-up was very easy after being shown a "single" photo earlier,

23  therefore, identifying petitioner at the preliminary hearing and

24  trial was also easy after such suggestiveness on the part of the

25  detective who showed the "Single" photo. And also, the photo

26  itself was and is actually a form of contaminating post-event

27  information. In other words, showing Robles a "single" photo was

28

p.99

unnecessary because there was no emergency or exigent circumstances for showing a single photo, and the showing of a single photo was suggestive and evidence as to the photograph should have been excluded (Manson -v- Brathwaite (1977) 432 U.S. 98, 53 L. Ed.2d 140, 97 S.Ct. 2243 at pp. 2245, 2247-49), Thus, counsel was ineffective for failing to object to said evidence, which would have made the time of confrontation 10-months "after" the crime.

Thus, testimony from a qualified expert backed with experimental studies on "post-event" contamination" is sufficiently tied to the facts of this case and would have "assisted" the jury.

6. ["CROSS-RACE AND/OR AGE DIFFERENCE"]·

WHEREBY CROSS-RACIAL IDENTIFICATIONS ARE LESS ACCURATE THAN SAME-RACE IDENTIFICATIONS.

In laboratory experiments, it is common for own-race/other race recognition rates to differ by as much as 30-percent (Cross Racial identification Errors, pp. 942-943). The studies also reveal two aspects of the matter that will probably be "contrary" to most jurors intuitions: First, that witnesses who are not racially prejudiced are just as likely to be mistaken in making a "cross-racial" identification as those who are prejudiced; and second, that witnesses who have had considerable social contact with blacks may be no better at identifying them than those who have not (Id. at pp. 943-944). Finally, some jurors may deny the existence of the own-race effect in the misguided belief that it is merely a racist myth exemplified by the derogatory remark, "they all look alike to me", while others

P. 100

1   may believe in the reality of this effect but be reluctant to di-

2   scuss it in deliberations for fear of being seen as bigots. (Id.

3   at p. 969; see also Wells, A Reanalysis of the expert testimony

4   issue, in Eyewitness testimony: Psychological Perspectives, p.

5   309.)

6       In the present case, Segundo, Lopez, Renteria, and Jesse

7   Robles are of a different race (hispanic), and the petitioner is

8   (black", 20-years of age) As stated by Dr. Robert Shomer, a pro-

9   fessor of psychology of almost 20-years experience, in People

10  -v- McDonald, 37 Cal.3d 351, at p. 361,all eyewitness identific-

11  ation begins with the observer's initial perception of the event.

12  Perception may be affected by such factors as the observer's

13  state of mind, his expectations, his focus of attention at the

14  time, the suddenness of the incident, the stressfulness of the

15  situation, and differences in the race and/or age of the obser-

16  ver and the observed, there are substantial decreases in accur-

17  acy when the two persons are of different races or ages.Therefore,

18  ore, since Segundo, Lopez, Renteria, and Robles are of a differ-

19  ent race and age, Segundo (hispanic, 15-years of age) (See Pol-

20  ice Report, pg. 19   ,attached hereto); Lopez (hispanic, 17

21  years of age)(See Police Report, pg. 63, attached hereto); Rent-

22  eria (hispanic, 27-years of age)(see Police Report, pg.41, atta-

23  ched hereto); Robles (hispanic, 15-years of age)(see Police Rep-

24  ort, pg. 39, attached hereto); therefore, testimony from a qual-

25  ified expert backed with references of experimental studies on

26  "cross-Race", would have "aided" the jury and is sufficiently

27  tied to the facts of this case. Each of the witnesses made false

28

identifications of petitioner.

7. ["FEEDBACK FACTOR"]:

WHEREBY WITNESSES WHO DISCUSS THE CASE WITH EACH OTHER AFTER THE EVENT CAN UNCONSCIOUSLY REINFORCE MISTAKEN IDENTIFICATIONS AND THEIR CERTAINTY IN THESE IDENTIFICATIONS. (UNITED STATES -V- MOORE, 786 F.2d 1308, 1311 '5th Cir. 1986); CHAPPLE, 660 p. 2d at 1221).

In the case at bar, Robles admitted that he "told" all of his friends and family that petitioner was the driver, however, Carlos Lopez and Albert Segundo were two of the friends Robles told. M. Renteria was "told" that the person who was on trial was the person driving the suspects van. Unidentified members of the NC Gang were showing people a year-book picture of petitioner and were "telling" them that petitioner was envolved in the crime.

Furthermore, the time lapse between when Segundo, Lopez, and Renteria first identified petitioner, compared to when the crime occurred, gave them ample opportunity to take in rumors and information from other sources, thus, unconsciously reinforcing their mistaken identification. Thestmony on the feedback factor is sufficiently tied to the facts of this case and would have aided the jury.

Furthermore, strong emotions at the time of observation or later reports tend to increase the probability of error, (See Anastasi, Field of Applied Psychology, p. 548 (1974).) Even in cases in which the initial perceptions were good, the memory begins a "rapid" decline (See Clifford, The Relevance of Psychological Investigation to Legal Issues in Testimony and identification, (1979) Crim. L. Rev. 153 (1979).) This applies directly to

p.102

1  M. Renteria who admitted that she saw but didn't really see bec-

2  ause she was "in shock" (3 RT. 1228), and on top of which her

3  first identification of petitioner was three (3) years later in

4  court after the crime...But yet: "she identifies someone that

5  she "didn't pay any particular attention to (Petitioner) (3 RT.

6  1236), and further admits that she was "told" that the person

7  who was on trial was the person who was driving the suspects van

8  (3 RT. 1248, 1249), however, she was told this before she ident-

9  ified petitioner).

10     In People -v- Shirley, Elizabeth F. Loftus, Ph. D., a high-

11  hly experienced investigator in the field of memory discusses

12  several factors in which affects the accuracy of eyewitness ide-

13  ntification. She explains that time between an event and a witn-

14  ess recollection of that event, a period often called the "rete-

15  ntion interval", the bits and pieces of information that were

16  acquired through perception do not passively reside in memory

17  waiting to be pulled out like fish from water. Rather, they are

18  subject to "numerous" influences. External information provided

19  from the outside can introduce into the witness memory, as can

20  his own thoughts, and "both can cause dramatic changes in his

21  recollection", (People -v- Shirley (1982) 181 Cal.Rptr. 243, 31

22  Cal.3d 18 at p. 268.)

23     Elizabeth F. Loftus's reasons for this view deserve close

24  attention. On the basis of her research--Dr. Loftus identifies

25  a number of influences that can cause a memory to change during

26  the retention interval without the witness awareness: the witn-

27  ess may "compromise" the memory with a subsequently learned but

28



1   inconsistent fact; he or she may "incorporate" into the memory

2   a nonexistent object or event casually "mentioned" by another

3   party (Shirley, supra, 268).

4      In the present case, when Lopez, Renteria, and Segundo were

5   told by Robles that petitioner was the driver of the suspects

6   van, "post-event information may change the way the witness

7   "feels" about the original incident, e.g., may affect his impre-

8   ssion of how noisy or how violent it was, because a witness is

9   under a great social pressure to be complete and accurate and may

10   fill in gaps in his memory by guessing, and thereafter "recall"

11   those "guesses" as part of the memory; and if the witness is su-

12   bjected to repeated questioning, any erroneous statement he made

13   early on may be "frozen into" the memory and reappear later as a

14   fact. There is no way to tell, weather any given detail recalled

15   by the witness comes from his original perception or from exter-

16   nal information that he or she subsequently acquired. (Shirley,

17   supra, at 268-269). From these studies, "Dr. Loftus has no doubt

18   that post-event experiences can alter "any witness" memory, sub-

19   tly but irreversibly. In a final stage of the memory process,

20   known as "retrieval", the accuracy of the witness memory may be

21   adversely affected by outside factors even as he or she recalls

22   it.

23      Again Dr. Loftus identifies some of those influences as fo-

24   llows: "the witness may subsconsciously tailor his recall to co-

25   nform to expectations implied by the person questioning him;

26   those expectation may be conveyed, intentionally or not, either

27   by such conduct of the questioner as tone of voice, emphasis,

28



1  pauses, facial expression and other "body language", or by the

2  particular method of interview used or precise form of question

3  asked; and the witness may be more likely to respond to such

4  cues if the questioner is a status figure, (doctor or a law enf-

5  orcement official), than if he is merely a passerby inquiring

6  what happened. (Shirley, supra, at pp. 269-270). All witnesses

7  in the case at bar were subjected to post-event experiences that

8  may have affected their identification. (See, PP. 51-54, 59-63, 55,56

9  66 , 69-70, of this petition.

10  Lastly, Dr. Loftus warns there is no clear correlation bet-

11  ween the witness confidence in the accuracy of his or her recall

12  and its accuracy in fact: indeed, studies have shown that in some

13  circumstances "People" can be more confident about their wrong

14  answers than their right ones. To be cautious, one should not

15  take high confidence as any absolute guarantee of anything." The

16  final distorting influence on memory retrieval, then, is a well-

17  documented phenomenon: "most people, including eye-winesses, are

18  motivated by a desire to be correct, to be observant, and to

19  avoid looking foolish." (Shirley, supra, at p. 270).

20  In the present case, when the prosecution's witnesses iden-

21  tified petitioner as being the driver envolved in the shooting

22  death of Jose Robles. The witness, so as not to look foolish,

23  and due to a desire to be correct, instead of stating that their

24  identifications was and is based upon assumption, rumors, post-

25  event information, and/or post-event experiences, etc., the wit-

26  ness's identifications, and testimony was unconsciously or cons-

27  ciously fabricated. "A line between valid retrieval and unconsc-

28

P. 105

ious fabrication is easily crossed (Shirley, supra, at 270). We can
not honestly conclude that the average juror would be aware of the
many variable s concerning eyewitness identifications, thus, coun-
sel's failing to secure the services of a Psychologist, depriving
the jurors of the benefit of scientific research on eyewitness test-
imony forced the jurors to search for the truth without full knowle-
dge and opportunity to evaluate the strength of the evidence. This
deprivation prevented the jurors from having the best possible degree
of "understanding the subject" toward which the law of evidence str-
ives. (Note, supra, 29 Stan. L. Rev. at 1017-18). Considering Rule
702 of federal rules of evidence, whether the situation is a proper
one for the use of expert testimony is to be determined on the basis
of assisting the trier. There is no more certain test for determining
when experts may be used than the common sense inquiry, whether the
untrained layman would be qualified to determine intelligently and to
the best possible degree the particular issue without enlightenment
from those having a specialized understanding of the subject involved
in the dispute. (Ladd, Expert Testimony, 5 Vand. L. Rev. 414, 418
(1952). When opinions are excluded, it is because they are unhelpful
and therefore superfluous and a waste of time (7 Wigmore §1918), con-
trary to the case at bar were eyewitness testimony constituted the
only evidence connecting petitioner to the crime. The jury instructi-
ons given on eyewitness identification's does not even begin to con-
vey to the jury the specific data on the eyewitness identification
process that the testimony from an expert would have provided, a task
in any event is beyond the function of instruction as set out in Pen.



Code, § 1127 ["either party may present to the court any written charge on the law, but not with respect to matters of fact"].)

Petitioner reiterates, had the jury been informed on the psychological factors bearing on eyewitness identifications, a result more favorable would have occurred (Strickland -v- Washington, supra, 466 U.S. at pp. 688, 690-92; People -v- Watson (1956) 46 Cal.2d 818, 836 [299 p. 2d 243].)

Thus, counsel's failure to secure the services of a Psychologist deprived petitioner of a crucial or potentially meritorious defense (Pope, supra, 23 Cal.3d at pp. 415, 424-425.)

VIII

TRIAL COUNSEL DEPRIVED PETITIONER OF A CRUCIAL OR POTENTIALLY MERITIOUS DEFENSE BY FAILING TO PUT ON DEMONSTRATIVE EVIDENCE, AND OR FAILING TO MOTION THE COURT TO HAVE THE JURY TAKEN TO THE SCENE AND PLACED UNDER THE SAME IDENTIFYING CIRCUMSTANCES AS THE PROSECUTION WITNESSES IN WHICH WOULD HAVE PROVE THAT ALL OF THE WITNESSES LIED AND FABRICATED THEIR STORIES AGAINST THE PETITIONER.

Albert Segundo claimed to have had a "clearer" view of the person driving the suspects van as he sat parked behind it, after having followed the suspects (3 RT. 1564, 1565, 1571, 1572, 1577, 1578; see also Police Report, pg. 165 attached hereto.), and he identifies an eyebrow piercing on the "left" side of the drivers face.) Segundo's identification of the driver was at a distance of approximately 100-feet or more (3 RT. 1572; 4 RT. 1859). He did not have a view of the drivers entire face, Segundo saw "half" of it (3 RT. 1572). A crucial point in which counsel failed to present, including the fact that throughout the investigation of this case it was made clear that the windows of

the suspects van was described as being "tinted" dark (See Police Report, pgs. 8, 9, 29, 31, 39, attached hereto), and with it having been "at night", this fact would have further shown that Segundo could not have possibly been able to see what he claimed to have saw, especially having to look through the back tinted windows of a van. Additionally, had counsel sought to place the jury under the same identifying circumstances as Segundo, "there is a reasonable probability the jury would have concluded that: Segundo could not have possibly seen the driver of the suspects van well enough to make a positive identification under the circumstances described.

Demonstrative evidence would have been crucially helpful in recreating Segundo's identifying circumstances. Words alone are inadequate to take the jury's attention from the sterile environment of the courtroom and focus it on the scene of the crime so that they can see, hear, and feel as the witness did at the time of the occurrence. This could have been achieved through demonstrative evidence. Demonstrative evidence also plays an important role in maintaining the jury's interest in counsel's case. Few people have the ability to verbally describe a scene so that all listeners create the same image in their minds.

When a picture is used, however, everyone knows what the witness is talking about (criminal Law Procedure and Practice section 29.12, 7th Ed.) For example:

Counsel should have brought into the courtroom a "dark tinted window", "the figure of a face "wearing an eyebrow piercing", chairs, and other items to best demonstrate a figure in a van

with tinted windows. Then counsel should have had the jury placed approximately 120 feet behind the demonstrative van, with lighting that would at least be close to light simulating it being 9:00 p.m. (at night).

After placing the jury under the same identifying circumstances as Segundo, the jury may have concluded that Segundo could not possibly have been able to see the driver of the suspects van under such circumstances, especially with having little time to observe. The jury may have further concluded that, Segundo could not possibly have been able to see and identify an "eyebrow piercing" on the "left side" of the drivers face **by looking through the right side of the head to the left side), and** that Segundo simply accused and identified petitioner 3-years after the crime because he already knew how petitioner looked before the incident, and/or because of the Psychological factors that impairs an eyewitness's identification; thus, his in court identification was not, is not, and could not have been founded on what he actually saw.

If recreating the identifying circumstances of Segundo proved difficult for counsel because of limited courtroom space, lighting adjustment and other factors, counsel should have motioned the court to have the jury taken to the location where Segundo made his "clearer" observation of the driver. Once taken to that location, counsel should have placed the jury under the same identifying circumstances as Segundo and after doing so, the jury would have concluded that: Segundo could not have possibly been able to see what he claimed to have saw, thus, discrediting



p.109

his identification. Additionally, since Segundo's "clearer" obse-
rvation of the driver was when he sat parked behind" the suspe-
cts van at a distance of "100-feet" or more, "at night,"LOOKING
through dark "tinted windows," allegedly seeing "half" of the
drivers face for just a brief moment, any other alleged observat-
ion was seriously impossible based on his claime to have had a
better view of the driver at that point. Thus, Segundo's identif-
ication could have been disscredited.

Petitioner contends, that based on all of the aforesaid, co-
unsel's failures resulted in the withdrawal of a crucial or pot-
entially meritorious  defense (Pope, supra, 23 Cal.3d at p. 425,
152 Cal.Rptr. 732, 590 p. 2d 859, fn. omitted.) We must judge the
reasonableness of counsel's challenged conduct on the facts of
the particular case, viewed as of the time of counsel's conduct
(Strickland -v- Washington, supra, 466 U.S. at p. 690, 104 S.Ct.
2052).

Furthermore, we must consider the seriousness of the char-
ges against the defendant in assessing counsel's performance.
(In re Jones (1996) 13 Cal. 4th 552, 566, 54 Cal.Rptr.2d 52, 917
P.2d 1175), the prosecution of a murder case is clearly a serious
charge against petitioner "and "he now suffers a "life" sentence.
However, had counsel asserted the aforesaid crucial or potentia-
lly meritorious defense a result more favorable would have occu-
red (Pope, supra, 23 Cal.3d at p. 415; Strickland -v- Washington,
supra, 466 U.S. at pp. 688, 690-92; People -v- Watson, supra, 46
Cal.2d at p. 836, and cases cited therein.



## IX

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE ADEQUATELY THE LEGAL AND FACTUAL GROUNDS TO MOTION THE COURT FOR THE EXCLUSION OF CARLOS LOPEZ'S IDENTIFICATION, THUS, DEPRIVING PETITIONER OF A CRUCIAL OR POTENTIALLY MERITORIOUS DEFENSE:

Petitioner contends that had trial counsel conducted an adequate investigation both factual and legal, counsel could have successfully motioned the court to exclude Lopez's in court identification evidence. As was previously pointed out, (1) Lopez was "told" that the driver of the suspects van was "Jofama" (Petitioner) before he had spoken to any officers; (2) he first implicated that same "name" approximately "5 days after" the incident; (3) his original statements to officers shows that he could not have actually seen the driver of the suspects van; (4) he knew about the previous confrontation between petitioners' younger brother and the victim; (5) he claimed to have seen petitioner 4 times in the past in "passing", (6) he was "never" shown a six-pac photo line-up; (7) his "first" identification was in court "3 years after" the incident as petitioner was the only person who sat next to counsel; and (8) the in court identification was suggestive and/or prejudicial because the prosecutor practically pointed out and highlighted where petitioner was seated in court so that Lopez would identify petitioner with the prosecutor's help (See pps. 62-68, of this petition).

Reasonably competent assistance of an attorney would have motion the court to have petitioner sit amongst the spectators in the audience wearing street clothing among other individuals of the same general appearance; this would have strategically

p.111

avoided the suggestiveness in petitioner being the only person seated next to counsel (United States -v- Brown (1983) 699 F.2d 585, 593-94; United States -v- Thoreen, 653 F.2d 1332 (9th Cir. 1981) at p. 1343).

In the Archibald case, the second Circuit stated that an in court identification during which the defendant is seated next to counsel is "obviously suggestive to witnesses", (734 F.2d at p. 941). And with the added suggestiveness on the part of the prosecutor pointing out petitioner for Lopez, therefore, it can be said that Lopez's in court identification was not founded on what "he" saw, and was highly suggestive. Reasonably competent assistance of an attorney would have objected to such a suggistive in court identification, thus, counsel failed to make a crucial or potentially meritorious objection.

Furthermore, since an objection to Lopez's identification evidence would have been adjudicated outside the presence of the jury, there could be no satisfactory tactical reason for not making a potentially meritorious objection (People -v Nation, supra, 26 Cal.3d at p. 179, 161 Cal.Rptr. 299, 604 p.2d 1051.)

Additionally, since (1) Lopez's perception at the time that he observed the suspects van appears to have been impared; (2) Psychological factors may have impared the accuracy of his identification; (3) the prosecutor prejudized the in court identification by practically telling Lopez who to identify; and (4) Lopez was contaminated in many ways, such as "when Robles" told him Jofama (Petitioner) was the driver, while at the same token, NC Gang members went around the neighborhood showing people a

P. 112

pullea

yearbook picture of petitioner and were telling them "Jofama" (petitioner) did the crime, therefore, it is unlikely that any later identification of petitioner by Lopez could be cured of the taint's, (People -v- Caruso, supra, 68 Cal.2d 183, 189-190, 65 Cal.Rptr. 336, 436 p.2d 336).

It is contended that based on all of the aforesaid, counsel's failures surrounding Lopez's in court identification evidence deprived petitioner of a crucial or potentially meritorious defense (People -v- Farley (Cal.App.2d. Dist (1979) 153 Cal. Rptr. 695, 90 Cal.App.3d 851 at pp. 859, 865; Pope, supra, 23 Cal.3d 412 at p. 415)

Petitioner further contends, that Lopez's in court identification "did not" come from independent origins. Counsel's failure to adequately object to Lopez's identification evidence deprived petitioner of an adjudication of the stronger of two potential defenses, thus, resulting in the deprivation of constituionally adequate assistance (Pope, supra, 23 Cal.3d 412, 425, fn. 15, 152 Cal.Rptr. 732, 739, fn. 15, 590 p. 2d 859, fn. 15).

Petitioner further contends, that based on all of the afore said--even if counsel had been asked to provide an explanation for his failure to make the suppression of evidence motion discussed herein, there simply could be no satisfactory explanation (See Pope, supra, 23 Cal.3d 412, 425, 152 Cal.Rptr. 732, 590 p. 2d 859). And since Lopez's in court identification is contaminated, and likely incurably, petitioner's conviction should be ordered vacated and reversed with the exclusion of Lopez's identification evidence. (People -v- Caruso, supra, 68 Cal.2d 183,

P.113 Rubio

1    189-190, 65 Cal.Rptr. 336, 436 P.2d 336.)

2                                              X

3         TRIAL COUNSEL PROVIDED INEFFECTIVE ASSIST-
     ANCE BY FAILING TO MOTION THE COURT TO EXCLUDE RENT-
4    ERIA'S IDENTIFICATION EVIDENCE: HER IDENTIFICATION
     OF PETITIONER WAS COMPLETELY FALSE AND FABRICATED
5    FOR REASONS UNKNOWN TO PETITIONER.

6         As petitioner previously pointed out, that Maria Renteria's

7    "first" identification of petitioner was three (3) years after

8    the crime and her false identification of petitioner was made in

9    court as petitioner was the only person who sat next to counsel

10   in court, however, shortly after the crime she was shown a six

11   pac photo line-up and was unable to make an identification of

12   petitioner (3 RT. 1502, 1503). Renteria never seen the person

13   who she saw inside the suspects van before (3 RT. 1226).

14        Renteria admitted that she was in "shock" and had no parti-

15   cular reason to pay attention to the Driver (3 RT. 1228, 1236).

16        However, Renteria stated that petitioner was the driver of

17   the suspects van, and it seemed like forever that she was look-

18   ing at the driver (3 RT. 1229, 1237, 1244, 1245). Renteria's

19   observation of the driver was from a distance of approximately

20   120-feet or more at night as she was sitting inside her vehicle,

21   and that it was "before" the shooting that she saw the driver,

22   but when the shooter re-entered the suspects van and headed in

23   her direction "she turned away" (3 RT. 1236-1238). Before Rente-

24   ria's in court identification, "she was "told" that the person

25   who was on trial for Jose Robles's death is the person that was

26   driving the suspects vehicle (3 RT. 1248, 1249). Renteria clai-

27   med to have had a "good view" of the suspects because there were

28

                              p.114
                              ꜱᴜᴀᴜ

1   no big vehicles or many vehicles in front of her so she could

2   see (3 RT. 1250), she also claimed that the headlights of her

3   vehicle "hit" the "inside interior" of the suspects van allowing

4   her a good view of the driver (3 RT. 1233, 1245). "After petiti-

5   oner's conviction, it was discovered that Renteria's van was pa-

6   rked behind a large dump working truck and several other vehic-

7   les, which proves her identification was impossible and her sta-

8   tements was false (See attached petition, #B210118). Trial coun-

9   sel admitted her testimony was unexpected, however, counsel was

10   unprepared to cross-examine Renteria (See Exhibit C.).

11        Petitioner contends that under the circumstances of Rente-

12   ria's identification, reasonably competent assistance of an att-

13   orney would have sought to avoid the suggestiveness in petitio-

14   ner being the only person sitting next to counsel by motioning

15   the court to have petitioner sit amongst "the spectators" in the

16   audience wearing street clothing (United States -v- Brown (1983)

17   699 F.2d 585, 593-94; see also, United State -v- Thoreen (1981)

18   653 F.2d 1332, at p. 1343). However, with Renteria having been

19   told that the person who is on trial was the person driving the

20   suspects van, and with petitioner being the only person sitting

21   next to counsel, it can be said that Renteria's in court identi-

22   fication was highly suggestive and tainted.

23        In Archibald case, the second Circuit correctly stated that

24   an in court identification during which the defendant is seated

25   next to defense counsel is "obviously suggestive" to witnesses

26   (737 F.2d at 941). Thus, counsel's lack of preparation deprived

27   petitioner of effective representation. It is unlikely that Ren-

28

p.115

1 teria would have been able to make an identification of petitio-

2 ner, had counsel would have motioned the court to have

3 petitioner sit amongst the spectators in the audience. And with

4 Renteria having been told before trial, that the person who is

5 on trial is the driver of the suspects van, it can not be said

6 in all honesty and with full certainty that her identification

7 is untainted and it cannot be said that its founded on independ-

8 ent evidence, origins.

9     Furthermore, since an objection to Renteria's identificat-

10 ion evidence would have been adjudicated outside the presence of

11 the jury, there could be no satisfactory tactical reason for not

12 making a potentially meritorious objection (People -v- Nation,

13 supra, 26 Cal.3d at p. 179, 161 Cal.Rptr. 299, 604 p.2d 1051).

14     Petitioner contends that after having already been contami-

15 nated, "it is unlikely that any later identification of petitio-

16 ner by Renteria could be cured of the taint (People -v- Caruso,

17 supra, 68 Cal.2d 183, 189-190, 65 Cal.Rptr. 336, 436 P.2d 336).

18     Petitioner contends that based on all of the aforesaid--his

19 trial counsel failed to make a potentially meritorious objection,

20 deprived petitioner of a crucial or potentially meritorious def-

21 ense (Pope, supra, 23 Cal. 3d 412, 425, fn. 15, 152 Cal.Rptr.

22 732, 739, fn. 15; 590 P.2d 859, fn. 15.)

23     Petitioner contends that Renteria's false identification

24 evidence contributed to petitioner's conviction, and the prosec-

25 utor repeatedly emphasized to the jury that four witnesses iden-

26 tified petitioner as the driver AND Renteria was one of those

27 witnesses). The prosecutor stated: "the defense will try to make

28

p.116

1  you believe that you didn't see four witnesses in this case; four

2  witnesses identified that man there as the driver. If it were

3  just Albert Segundo, maybe you'd be right not to convict, but are

4  you seriously going to say that you don't believe four witnesses

5  who identified him as the driver of the van?" (5 RT. 2760-2761).

6  The prosecutor also emphasized that Renteria had nothing to do

7  with NC or NGA tagging crews and that she did not know petitio-

8  ner, thus making Renteria appear unbias (2 RT. 908-909). Thus,

9  it can be said that Renteria's identification evidence contribu-

10  ted to petitioner's conviction.

11      Had trial counsel made a potentially meritorious objection

12  "there is a reasonably probability that the jury would have rea-

13  ched a more favorable result. (People -v- Watson, supra, 46 Cal.

14  2d at p. 836; Strickland -v- Washington, supra, 466 U.S. at pp.

15  688, 690-692; Const., 5th, 6th and 14th Amends.)

16      Petitioner contends that Renteria's identification evidence

17  did not come from independent origins. Thus, evidence of Rente-

18  ria's identification must be ordered void due to being contamin-

19  ated and the conviction must be reversed.

20      Petitioner contends, that the evidence in this case was all

21  but none, and although the prosecutor argued the evidence was

22  overwhelming because four witnesses identified petitioner as the

23  driver (2 CT. 252), the record shows numerous inconsistencies in

24  those witnesses' testimonies. Three of the four, Jesse Robles,

25  Albert Segundo, and Lopez were impeached as liars. Jesse admit-

26  ted he lied when he testified at the preliminary hearing that he

27  had identified petitioner as the driver to the police on the

28

p.117