1  night of the murder (2 RT. 983); Segundo admitted he lied to the

2  police when he identified two other men as the shooter and the

3  van driver. (3 RT. 1547.) Both of their lies directly related to

4  their identification of petitioner as the driver. And, according

5  to Sergeant Katz, Lopez testified that he never saw the white van

6  before but had previously told the police that he had almost been

7  run over by petitioner in a similar white van. (5 RT. 2438.) The

8  jury could have reasonably believed that these three witnesses,

9  all members of the NC tagging crew, collaborated with each other

10 to name petitioner as the driver. Notably, none of these three

11 witnesses identified petitioner to the police on the night of the

12 murder or the following day. (See 2 RT. 982-983, 3 RT. 1319-1320,

13 1509-1510, 1547, 1625.)

14     Renteria was the only witness of the four witnesses who ide-

15 ntified petitioner as the driver who did not know petitioner, was

16 not a NC member, and who appeared to be unbiased. Renteria's tes-

17 timony, thus, bolstered the credibility of the three NC witnes-

18 ses' testimonies. The prosecutor strongly relied on that fact.

19     During opening statements she told the jury, "you will hear

20 a witness by the name of Maria Renteria--who had nothing to do

21 with either of the tagging crews in this case; she just lived at

22 that location...like I said, she had nothing to do with any of

23 the tagging crews in this case. (2 RT. 908-909.) During closing

24 argument, she told the jury," "One thing that's really notewor-

25 thy about Miss Renteria, she doesn't have anything to do with

26 NC. She doesn't have anything to do with NGA. She doesn't have

27 anything to do with anybody, so she's kind of an important wit-

28

1  ness because she confirms, first of all, that the driver of the van

2  was a male, black..She was unable to identify out of the photographic

3  six packs, but then, lo-and-behold, she comes to court and she iden-

4  tifies the defendant. She, like Jesse Robles, saw directly into the

5  van with her headlights. Had Renteria's identification of petitioner

6  been discredited as her identification of the shooter was discribed

7  at Soto's trial, there is a reasonable probability that the jury

8  would have reached a more favorable result. The subquent in court id-

9  entification testimony of each witness, including Renteria, was unre-

10 liable and only served to deny petitioner due process of law.

11      (1) the trial court convicted petitioner of first degree murder

12 in part based on the false testimony of a prosecution witness, Rente-

13 ria, who falsely testified she saw petitioner driving the white van

14 in which was used as the get away vehicle following the shooting and

15 killing of Chino. Immediately after the shooting of Chino, Renteria

16 was showed a photographic six pack by the police, however, she was

17 unable to identify petitioner in the photo lineup. (3 RT. 1502-1503.)

18 At trial, the prosecutor asked Renteria to look at petitioner who was

19 sitting at the end of counsel table. She asked Renteria if petitioner

20 looked like the driver of the white van. Renteria answered "yes." (3

21 RT. 1227.) Defense counsel did not expect Renteria's answer.(Exh. C.)

22      During trial counsel's cross-examination, he asked Renteria

23 where she had parked. (3 RT. 1232-1233.) She said she was right next

24 to the Robles house. but was not sure. She guessed," I would say

25 like in the middle, I think probably." (3 RT. 1233.) Trial counsel

26 did not ask her about the distance between her car and the white van

27 nor did he ask her to locate her car in the crime scene photos. Trial

28

P.119

1  counsel did not present any evidence of the distance between the Ro-

2  bles house and the location where Chino was shot.

3      (2) Renteria's testimony should have been excluded because she

4  testified that she parked her car past the Roble's driveway towards

5  Budlong Street. (Exh. E 1804.) She saw Chino walking towards his

6  home. (Exh. E 1818.) What caught her attention was a white van driv-

7  ing on the wrong side of the street coming towards her with the lig-

8  hts off. (Exh. E 1804-1805.) It stopped, the passenger got out of

9  the car, walked in front of the van, and started shooting, (Exh. E

10  1805.) She was about the distance from the witness box to the back

11  of the courtroom [35 feet] from the white van, a little over two car

12  lengths away. (Exh. E 1806.)

13      When she heard the gunshot she was shocked. (Exh. E 1807.) She

14  said she saw the driver as the van drove past her after the shooting.

15  (Exh. E 1810-1811.) She turned away after looking at the driver bec-

16  ause she did not want him to know that she saw him. (Exh. E 1811.)

17  When she looked at People's Exhibits Nos. 6 and 9, photos of the

18  cars contained within the crime scene area, she could not find her

19  car. (Exh. E 1813.)

20      During cross-examination, the prosecutor asked her to look at

21  the crime scene photos and point to her car. She pointed to her car

22  on People's Exhibit No. 58 and marked the location of her car with

23  "MR." (Exh. A 3.) On People's Exhibit No. 61, the photo shows her

24  car parked behind a large work truck. (Exh. A 6; Exh. E 1823-1824.)

25      The prosecutor asked Renteria, "Did you know it's about 160

26  feet from the shooting site to the Robles' residence?" (Exh. E 1826.)

27  Renteria admitted that she was not good a estimating distance. (Ibid.)

28

p. 120

1  On redirect, Renteria agreed it was possible that she was about

2  five car lengths away from the shooting. (Exh. E 1827.) According to

3  Sergeant Katz, Chino was killed on the western property line of the

4  lot with the railing depicted in People's Exhibit Nos. 6 and 9.

5  (Exh. A 1 & 2, Exh. E 1845-1846.) Renteria was parked on the west

6  perimeter of the Robles residence property line. (Exh. E 1847.) She

7  would have to look past the large work truck, a driveway, a SUV, and

8  two other cars to see the murder. (Ibid.; Exh. A 1.)

9  People's Exh. 6 has a mark "RR" on the house between the Robles

10 house and the house with the railing. (Exh. A 1.) Renteria agreed

11 with the prosecutor that the house with the "RR" was the Robles

12 house. (Exh. E 1816.) However, the Robles house is actually one

13 house further to the east. (Exh. A 3 [marked with "R"].) Renteria

14 correctly identified the Robles's house on People's Exhibit No. 58

15 with a "R". (Exh. A 3; Exh. E 1823.)

16 At petitioner's trial, Renteria testified that she saw Chino

17 cross the street to the north side of the street. (3 RT. 1249.) "She

18 pulled over and parked her car in front of the Robles house. (3 RT.

19 1232-1233, 1249.) She saw a white van on the wrong side of the street

20 with its headlights on. (3 RT. 1249.) Then they turned the lights off

21 (3 RT. 1250.) Her headlights hit the white van and she had a good

22 view of the driver. (3 RT 1245.) When she looked at petitioner noth-

23 ing unusual was happening and she was not "paying him any particular

24 attention." (3 RT. 1236.) She looked at petitioner's face just a lit-

25 tle bit." When the prosecutor asked her it it was a minute, she answ-

26 ered "about 2 minutes," and "it seemed like forever at that time."

27 (3 RT. 1230.) On cross, she changed her time estimate to more than 10

28

p.121

1   seconds. (3 RT. 1237.)

2   Renteria said she saw the shooter get in front of the blue car

3   and go up to the victim who was on the sidewalk. (3 RT. 1246-1247.)

4   She saw the victim fall. He was on the ground when the shooter went

5   up to him. (3 RT. 1247, 1250.) She said, "there was not a lot of cars

6   in front. You could see there was not like big cars, vehicles. So You

7   could see." (3 RT. 1250.)

8   After the shooting, the white van drove toward her she turnd

9   away so the occupants would not see her looking at them. (3 RT 1238.)

10  She agreed she did not tell the police she had seen Chino cross the

11  street or that she had seen him fall to the ground. (3 RT. 1251.)

12  (3) Renteria's testimony should have been excluded on the gro-

13  und that at petitioner's trial, Renteria's testimony intruduced false

14  evidence that was substantially material and probative on the issue

15  of petitioner's guilt. It would have been physically impossible to

16  get a "good view" of the face of the driver of the van "if Renteria

17  was parked near the curb over 100 feet away from the white van; even

18  more so if she was behind the large work truck in People's Exhibit

19  Nos. 6 and 61. (Exh. A 1, 6, Exh. D & G.) It would also have been

20  physically impossible for her to see Chino fall on the sidewalk if

21  she were sitting in the driver's seat of her vehicle with the large

22  truck, the SUV, and the two other cars blocking her view. (Exh. E

23  1847.)

24  (4) Renteria's testimony should have been excluded on the gro-

25  und that she testified falsely when she said: "there was not a lot

26  of cars in front. You could see there was not like big cars, vehic-

27  les. So you could see." (3 RT. 1250.) The police photos taken on the

28  night of the murder clearly show her statement was false. Chino was

killed in front of a blue car. There was another car behind that car, a SUV, and a driveway. To the east of the driveway was the large work truck. Renteria's van was behind that truck. (Exh. A 1, 2, 6.)

Renteria falsely testified that she observed petitioner's face before the shooting for more than 10-seconds. (3 RT. 1226, 1230-1231, 1237.) When the prosecutor asked Renteria what petitioner was wearing, she answered," I didn't really see. I was - I seen him, but I--like I was in shock when I heard the gun shots." (3 RT. 1228.) That was the most credible statement she made.Therefore, Renteria's in court identification testimony was unreliable as to deny petitioner due process of law under the Fourteenth Amendment to the United States Constitution.

Any witness, such as Renteria, who makes an identification in court, no matter how dubious, will substantially influence a jury's decision. Indeed, it appears that no single piece of evidence makes a deeper impression on jurors' minds than an eyewitness identification. This has been shown by cases where overwhelming proof of a defendant's innocence, such as petitioner's innocence, has been disregarded by the jury in favor of eyewitness (false) testimony of incredible weakness." (Katz & Reid, Expert Testimony on the Fallibility of Eyewitness Identification (1977) 1 Crim. Just. J. 177, 195.)

(5) Renteria's testimony should have been excluded on the ground that the evidence shows that the distance between the Robles property and the crime scene made it impossible for Renteria to have seen anything concerning the crime at night. For example, each property lot is 64 feet wide. Based on Renteria's testimony that she was parked in front of the Robles house and the crime scene photos, Ren-

1  teria was at least 128 feet away from where the white van had sto-

2  pped.(xh. F; 3 RT. 1233.) Therefore, it was and is physically impos-

3  sible to recognize a known person sitting inside a vehicle during

4  the daylight at that distance. (See Exh. G.) It would have been imp-

5  ossible for Renteria to get a good look at a strange with non-disti-

6  nctive features similar to petitioner's and recognize him three

7  years later. (See Exh. D.)

8       Petitioner contends that the levelof certainty demonstrated by

9  the witness at the confrontation (in court three years later), has

10  been shown over and over to be the weakest factor in an identificat-

11  ion. Simply put, there is "little correlation between the accuracy

12  of an eyewitness identification and the eyewitness's confidence in

13  her selection. More than any other piece of research, this finding

14  indicates a need for courts to take heed of current developments in

15  social psychological research and proceed cautiously in accepting

16  eyewitness testimony." (Headley, Long on Substance, Short on Proc-

17  ess: an Appeal for Process Long Overdue In Eyewitness Lineup Proced-

18  ures (2002) 53 Hastings L.J. 681, 686, citing C.A. Elizabeth Luus

19  & Gary L. Wells, Eyewitness Identification Confidence, in Adult Eye-

20  witness Testimony 348, 358-359 (David F. Ross et al. eds., 1994);

21  And it is this weakest factor, a witness's certainty, that juries

22  repeatedly rely upon, often convicting innocent persons, such as

23  petitioner in this case.

24       (6) Renteria's testimony should have been excluded on the gro-

25  und that she was much farther away from the crime scene than she

26  had initially stated, plus, she was behind a large work truck that

27  blocked part of her view of the street ahead as well as the illumin-

28

purau
p.124

1  ation from her headlights. (Exh. E 1823-1824.) It would have been

2  impossible for Renteria or any other person, including the defense

3  counsel, the prosecutor, and the trial judge to see details of a

4  person's face from over 160 feet away at night under any light cond-

5  itions without binoculars. (Exh. D.) This issue alone should have

6  discredited Renteria's false testimony that she had a good view of

7  the driver who she had never seen before that night, and could reco-

8  gnize him three years later. Yet, when the prosecutor asked Renteria

9  what was petitioner wearing, she answered," I didn't really see. I

10 was - I seen him, but I - like I was in shock when I heard the gun

11 shots." (3 RT. 1228.)

12      Petitioner contends that this was also relevant to discredit

13 Albert Segundo's false in court identification testimony that he saw

14 petitioner's profile "real clearly" when the dome light of the van

15 flashed on. He was in Sandolval's car that was five to six car len-

16 gths behind the white van. (See 3 RT. 1572, 4 RT. 1850.) It was never

17 established how Segundo could see in the van while sitting in a car

18 that is much lower while five or six car lengths behind. Even if the

19 car was right behind the van, Segundo would be hard put to streach

20 his neck to see into the van by looking through the back door window,

21 much less being five or six car lengths behind.

22      Renteria's ability to see was crucial to the credibility of her

23 identification of petitioner as the driver. There were four witne-

24 sses who identified petitioner as the driver of a white van in which

25 petitioner have never been connected to. Three of the identifying

26 witnesses were members of Chino's tagging crew and rivals of petiti-

27 oner's tagging crew. (2 RT. 948, 994, 3 RT. 1536, 1541, 1630.) They

28

p.125 ausa

1  all had past contacts with petitioner, had a motive to implicate him,

2  and had ample opportunity to confer with each other before they ide-

3  ntified petitioner as the driver to the police. (See 2 RT. 982-983,

4  3 RT. 1319-1320, 1509-1510, 1547, 1625.) They had all been impeached

5  with lies they told to the police. (See 2 RT. 983, 3 RT. 1547, 5 RT.

6  2438), and also may have been affected by Psychological factors.

7      Renteria was the only unaffiliated eyewitness who had never seen

8  petitioner before the night of the shooting. (3 RT. 1226.) Her false

9  testimony corroborated and bolstered the identifications of the other

10  biased witnesses. Had Renteria's false identification of petitioner

11  as the driver been discredited, there is a reasonable probability

12  that the jury would have reached a more favorable result. (People -v-

13  Watson (1956) 56 Cal.2d 818, 836.)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Petitioner contends Renteria's testimony con-
2  tributed to petitioner's conviction; had it not been for her false
3  testimont and had trial counsel secured the services of a psychol-
4  ogist to testify to the psychological factors which generally aff-
5  ect the accuracy of eye-witness identifications, a result more fa-
6  vorable would have occurred.

7    The jury need not be wholly ignorant of the subject matter of
8  expert opinions in order to justify its admission; if that were
9  the test, little expert opinion testimony would ever be heard. In-
10  stead, the statute declares that even if the jury has some knowle-
11  dge of the matter, expert opinion may be admitted whenever it would
12  "assist" the jury.It will be excluded only when it would add noth-
13  ing at all to the jury's common found of information, when "the
14  subject of inquiry is one of such common knowledge that men of or-
15  dinary education could reach a conclusion as intelligently as the
16  witness (People -v- Cole (1956) 47 Cal.2d 99, 103 [301 p.2d 854,
17  56 A.L.R.2d 1435].) It is doubtless true that from personal exper-
18  ience and intuition all jurors know that an eyewitness identifica-
19  tion can be mistaken, and also know the more obvious factors that
20  can affect it's accuracy, such as lighting, distance, and duration.

21    It appears from the professional literature, however, that
22  other factors bearing on eyewitness identification may be known
23  only to some jurors, or may be imperfectly understood by many, or
24  may be contrary to the intuitive beliefs of most. In People -v-
25  McDonald a Dr. Shomer (Psychologist) would have testified to the
26  RESULTS OF STUDIES OF RELEVANT FACTORS THAT APPEAR TO BE EITHER
27  not widely known to lay-persons or not fully appreciated by them,

28

p. 127

1  such as the effects on perception of an eyewitness, personal or cu-

2  ltural expectations or beliefs (see Loftus, eyewitness testimony

3  (1979) pp. 36-48), the effects on "memory" of the witness." expos-

4  ure to subsequent information or suggestions, and the affects on

5  recall of bias or cues in identification procedures or methods of

6  questioning and cross racial identification (Id. at pp. 89-99; see

7  generally Hall, et al., Post event information and changes in reco-

8  llection for a natural events, in eyewitness testimony: Psycholog-

9  ical perspective, pp. 124-141); (People -v- McDonald (1984) 37 Cal.

10 3d 351; 208 Cal. Rptr. 236, 290 p.2d 709).

11      In the instant case many witnesses were exposed to subsequent

12 information, three of the four did not identify petitioner until

13 trial (3) years after the incident; witnesses were shown a single

14 picture of petitioner; N.C. Gang members were showing witnesses a

15 year book picture of petitioner and telling them petitioner done

16 the crime, the incident was at night, and officer's way of questi-

17 oning were suggestive as was the prosecutor when she examined Car-

18 los Lopez during (402) hearing.

19      The information that could have been provided by a psycholo-

20 gist falls well within the broad statutory description of "any ma-

21 tter that has any tendency in reason" to bear on the credibility

22 of a witness (Evid. Code, § 780).

23      Petitioner contends that the Supreme Court has held that pre-

24 judice need not be shown on some claims of ineffective assistance

25 of counsel because the right to have the assistance of counsel is

26 too fundamental and absolute to allow courts to indulge in nice

27 calculations as to the amount of prejudice arising from its denial"

28

p.128

1    (Glasser -v- United States, 315 U.S. 60, 76, 62 S.Ct. 457, 467

2    (1942).

3         The third and Sixth Circuits have followed this lead in expre-

4    ssly holding that prejudice need not be shown on an ineffective

5    assistance of counsel claim (Moore -v- United States, 432 F.2d 730,

6    737 (3rd Cir. 1970); see also, Beasley -v- United States, 491 F.2d

7    687, 696 (6th Cir. 1974.)

8         The Circuit will not inquire into prejudice where substantial

9    incompetence was shown. (Tolliver -v- United States, 563 F.2d 1117

10   (4th Cir. 1977).

11        However, in Cooper, the 9th Circuit, held that where an ineff-

12   ective assistance of counsel claim is founded upon specific acts

13   and omissions of defense counsel at trial, the accused must estab-

14   lish that counsel's errors prejudiced the defense. (Cooper gave two

15   reasons for imposing a prejudice requirement, neither of which is

16   applicable to the present case. First, the errors alleged in Cooper

17   could only have been considered on direct appeal as plain error,

18   which would have required a showing of prejudice. (Cooper held that

19   the prejudice requirement could not be avoided simply by alleging

20   the errors under the claim of ineffective assistance of counsel in

21   a 28 U.S.C. Section 2254 petition.This reasoning is not applicable

22   to the present case. The failures alleged here can only be asserted

23   by an ineffectiveness of counsel claim. Therefore, there is no risk

24   that a prejudice requirement which would otherwise be imposed could

25   be circumvented by asserting the errors in the incompetence of cou-

26   sel context (Cooper also adopted the prejudice requirement because

27   the court considered the Cooper facts to be distinguishable from

28

P.129  RN206

1   those cases in the Supreme Court which did not require a prejudice

2   showing.

3        In Cooper, the appellant contended he did not have effective

4   assistance of counsel because his attorney erred in specific resp-

5   ects in the course of trial. (Cooper, supra, at p. 1332.) The def-

6   ense attorney in Cooper allegedly failed to move to suppress evid-

7   ence, to object to evidence, and to stipulate to a prior convict-

8   ion. Therefore, the court found that the case was more like the

9   common situation where the harmless error rule is applied when the

10  error occurs at trial and its scope is readily identifiable. Acco-

11  rdingly, the reviewing court can undertake with some confidence

12  its relatively narrow task of assessing the likelihood that the

13  errors naturally affected the deliberations of the jury. (Id. at

14  1332, quoting Holloway -v- Arkansas, 435 U.S. 475, 490 (1978.)

15       However, Cooper stated that prejudice should not be required

16  in cases where the evil lies in what the attorney does not do, and

17  is either not readily apparent in the record, or occures at a

18  time when no record is made. Thus, an inquiry into a claim of har-

19  mless error here would require, unlike most cases, unguided specu-

20  lation. (See, Cooper, supra, at 1332 (emphasis added.)

21       It is contended that Cooper only stated that under 28 U.S.C.

22  section 2254 relief will not be granted where an ineffective assi-

23  stance of counsel claim is based on specific errors or omissions

24  at trial unless a showing is made that counsel's conduct prejudi-

25  ced the defense. (See, Champman -v- California, 386 U.S. 18 (1967)

26  its use was urged by the dissent in Cooper. Cooper, at p. 1341

27  (dissent). Counsel's duty to investigate carefully all defenses of

28

                            p.130  PULLEN

fact and of law that may be available to defendant, and if his fai-

lure to do so results in withdrawing a crucial defense from the

case, the defendant has not had the assistance to which he is ent-

itled (People -v- Ibarra, 60 Cal.2d 460, 464 (1963). Traditional

standards burden the defendant with the duty of proving that the

lack of effective assistance resulted in a denial of the fundamen-

tal fairness required by due process.

It has been deemed not sufficient to merely allege that the

attorney's tactics were poor, or that the case might have been ha-

ndled more effectively (Citations omitted) Rather, the defendant

must affirmatively show that the omissions of defense counsel inv-

olved a critical issue, and that the omissions cannot be explained

on the basis of any knowledgeable choice of tactics (People -v-

Floyd, 1 Cal.3d 194, 709 (1970).

At the very out set of these proceedings we are confronted

with the employment of an "evil purpose" which have resulted in

the unlawful confinement which deprived petitioner of his liberty

contrary to law. Petitioner was represented by counsel at trial,

and that counsel was appointed by the court, but counsel provided

ineffective assistance.

(1) defense counsel at trial was ineffective by failing to
file a motion to exclude the testimony of Renteria, who was immed-
iately after the shooting of Chino, showed a photographic six pack
by the police, but she was unable to identify petitioner in the
photo lineup (3 RT. 1502-1503.)

(2) defense counsel at trial was ineffective by failing to
file a motion to exclude the false testimony of Renteria, who tes-
tified that she saw the shooter get in front of the blue car and
go up to the victim who was on the sidewalk. (3 RT. 1246-1247.)
She saw the victim fall. He was on the ground when the shooter
went up to him. (3 RT. 1247, 1250.) She said, "there was not a lot
of cars in front. You could see there was not like big cars, vehi-
cles. So you could see." (3 RT. 1250.) Defense counsel know or sh-

p.131. purous

ould have known that it was 8:58 P.M. at the time the victim was shot and killed; it was about 160 feet from the shooting site to where Renteria was parked and sitting in her vehicle, and that she would have to look past the large work truck, a driveway, a SUV, and two other cars to see the murder. Defense counsel knew or should have known that it was highly impossible for Renteria to have seen the murder. Defense counsel also knew that Renteria did not tell the police she had seen Chino cross the street or that she had seen him fall to the ground (3 RT 1251.)

(3) defense counsel at trial was ineffective by failing to file a motion to exclude the testimony of Renteria, who's testimony was false where it would have been physically impossible to get a "good view" of the face of the driver of the get away vehicle if Renteria was parked near the curb over 100 feet away from the white van; even more so where she was behind the large work truck in People's Exh. Nos. 6 and 61. (Exh. A 1, 6 Exh. D & G.) Defense counsel also knew or should have known that it would also have been physically impossible for her to see Chino fall on the sidewalk if she were sitting in the driver's seat of her vehicle with the large truck, the SUV, and the two other cares blocking her view.(Exh. E 1847.)

(4) defense counsel at trial wes ineffective by failing to file a motion to exclude the testimony of Renteria, who testified falsely when she said: "there was not a lot of cars in front. You could see there was not like big cars, vehicles. So you could see. (3 RT. 1250.) The police photos taken on the night of the murder she that Reteria's testimont was false. The victim, Chino) was killed in front of a blue car. There was another car behind that car, a SUV, and a drive way. To the east of the driveway was the large work truck. Renteria's van was behind that truck. (Exh. A 1, 2, 6.) Renteria falsely testified that she observed petitioner's face before the shooting for more that 10 seconds. (3 RT. 1226, 1230-1231, 1237.) When the prosecutor asked Renteria what petitioner was wearing, she answered, "I didn't really see. I was - I seen him, but I - like I was in shock when I heard the gun shots." (3 RT 1228.) That was the most credible statement she made.

(5) defense counst at trial was ineffective for failing to present physical evidence of the distance between the Robles property and the crime scene. It was the distance of two property lots. (Exh. A 2; Exh. E 1847; 1 CT. 51.) Each property lot is 64 feet wide. Based on Renteria's testiony that she was parked in front of the house and the crime scene protos, Renteria was at least 128 feet away from where the white van had stopped. (Exh. F; 3 RT 1233. It is physically impossible to recognize a known person sitting inside a vehicle during the daylight at that distance. (See Exh. G.) It would have been impossible for her to get a good look at a stranger with-non-distinctive features similar to petitioner's and recognize him three years later. (See Exh. D.) Therefore, trial counsel was ineffective for failing to present physical evidence of the distance between the Robles property and the crime scene.

(6) defense counsel at trial was ineffective for failing to have Renteria point out where her vehicle was parked in relation-

p.132 พงษ์

1  ship to the van and the shooting.Renteria was much farther away from
the crime scene then she had initially stated, and that she was beh-
2  ind a large work truck that would have blocked part of her view of
the street ahead as well as the illumination from her headlights.
3  (Exh. E 1823-1824.)

   Furthermore, trial counsel was ineffective for failing to prod-
4  uce evidence that it would have been impossible for a person to see
details of a person's face from over 100 feet away at night under any
5  light conditions without binoculars. (Exh. D.) This was relevant to
discredit Renteria's false testimony that she had a good view of the
6  driver who she had never seen before that night, and could recognize
him three years later. This is also relevant to discredit Albert Seg-
7  undo's testimony that he saw petitioner's profile "real clearly"when
the dome light of the van flashed on; he was in Sandoval's car that
8  was five to six car lengths behind the white va. (See 3 RT. 1572, 4
RT. 1859.)

9     (7) defense counsel at trial was ineffective by failing to file
a motion to exclude the testimony of Renteria because her in trial
10 identification of petitioner as the driver was prejudicial. Renter-
ia's testimony was substantially material and probative. This was an
11 eyewitness identification case. There were four witnesses who identi-
fied petitioner as the driver. Three of the witnesses were members
12 of Chino's tagging crew and rivals of petitioner's tagging crew.(2 RT.
948, 994, 3 RT. 1536, 1541, 1630.) They all had past contacts with
13 petitioner; had a motive to implicate him, and had ample opportunity
to confer with each other before they identified petitioner as the
14 drriver to the police. (See 2 RT 982-983, 3 RT. 1319-1320, 1509-1510,
1547, 1625.) They had all been impeached with lies ᵗher told to the
15 police. (See 2 RT. 983, 3 RT. 1547, 5 RT. 2438. Renteria was the only
eyewitness who had never seen petitioner before the night of the sho-
16 oting. (3 RT 1226.) Her false testimony corroborated and bolstered
the identifications of the other biased witnesses. Had Renteria's
17 false identification of petitioner as the driver been discredited,
there is a reasonable probability that the jury would have reached a
   more favorable result.

18    (8) defense counsel at trial provided ineffective assistance of
counseˡ by failing to investigate and assert a crucial or potentially
19 meritorious defense, by failing to discover what tim꞉ petitioner arr-
ived at the Block-Buster Video Store and failing to investigate the
20 circumstances surrounding his arrival.)

   On May 10, 2003, Jose Robles (A.K.A. Chino) was shot and killed
21 around 9:00 at night on 101st Street a few houses west of his home
in Los Angeles (2 RT. 937, 938, 945.) Although the shooting occurred
22 around 9:00 P.M., however, after the shooting, two prosecution witne-
sses followed the white van and it's occupants that were involved in
23 the crime to another location." This means that sometime later, after
9:00 p.m., two witnesses still had sight of the actual suspects envo-
24 lved. Albert Segundo and Andres Sandoval followed the white van and
it's occupapants down 101st street eastbound towards Vermont where it
25 made a right turn, then drove up to 104th street on Vermont where
there is a stop sign you have to yield at before making a left turn,
26 they made a left heading east on 104th street, then another left on
the first upcoming street off 104th; they continued straight until
27 reaching 102nd street where they made a right turn heading east on
102nd street, then continued straight until ending up on 102nd street

28

                              PW480
                              P. 133

1   and Hoover (3 RT. 1570-1571). At this point the van stopped at the
    stop sign. Segundo and Andres then stop their vehicle in the middle
2   of the street so--as not to get too close to the van. The passenger
    of the van opens his side of the door causing the dome lights to
3   come on. According to Segundo the dome lights provided him the oppo-
    ortunity to see the drivers face real clear. The passenger of the
4   van exit's and points a gun in their direction causing Segundo and
    Andres to take off back to the scene (3 RT. 1571) At trial a Block-
5   buster Surveillance tape was played before the jury which showed pet-
    itioner inside the store at 9:41 P.M (5 RT. 2469). The video store
6   is located at 8811 South Western Avenue in the City of Los Angeles;
    according to detective Steven Katz you could make it "from the crime
7   scene to Blockbuster from 5 to 10 minutes" (Vol. 4 of 5, RT. 1890).

8        However, no evidence supports the white van and its occupants
    drove from the crime scene to the Blockbuster video store. The comp-
9   lete opposite is supported when the prosecution witness Albert Segu-
    ndo testified that after the crime occurred he and a friend followed
10  the van and its occupants, which is opposite of the direction of the
    video store (3 RT. 1570-1572). At trial it was unknown what time pet-
11  itioner arrived at the video store (4 RT. 1892). Detectives obtained
    the surveillence tape from the video store, a copy of the tap was
12  played at petitioner's trial under the control of detective Steven
    Katz. The tape showed petitioner inside the store at 9:35 P.M., the
13  shooting occurred around 9:00 P.M. (5 RT.2469). However, according
    to the detective (Steven Katz) the tape is Six (6) minutes slow, ma-
14  king the time petitioner was first seen on Camera at 9:41 P.M. (5 RT.
    2469) Additionally detective Steven Katz testified that petitioner
15  was at the video store about 40 minutes after the shooting (5 RT.
    2435). At trial the tape was not played on the proper system. There
16  is a special player called a multiplexor that allows you to play the
    tape on the "SEE" different images; the system fuses several differ-
17  ent views in a repeated cycle and if you were to show the video in
    court it would just look all garbled and views would change on a time
18  sequence (5 RT. 2442.) "As for as the detective could tell, petitio-
    ner was in the store for five minutes" (5 RT. 2462). He could not
19  find where petitioner entered the store on the tape (5 RT. 2469).
    Thus, the tape did not support petitioner's mistaken identity defe-
20  nse. Per-Petitioner's request, his appellate counsel (Patricia Ihara)
    filed a motion after the court of Appeal affirmed petitioner's conv-
21  iction, however, the Superior Court for the County and City of Los
    Angeles granted that motion which requested an order for a complete
22  copy of the Blockbuster Surveillence tape in evidence.
        After receiving a copy of the Blockbuster Surveillence tape, pe-
23  titioner had it sent to GEORGE REIS, an Imaging Forensic who was able
    to discover what time petitioner arrived at the Blockbuster video
24  store. The Imaging Forensic demultiplexed the Surveillence tape and
    discovered petitioner walked into the video store at 9:25 P.M. And
25  also entering the store at 9:25 P.M. with petitioner is Evelyn Medina
    and Jesse Medina, which is 16 minutes before the time it was conclu-
26  ded at trial that petitioner was at the video store. The significa-
    nce in this matter is that the 25 minutes window of opportunity could
27  have been broken down tramerdously," ultimately creating a serious
    degree of reasonable doubt, undermining confidence in a guilty verd-
28  ict. Clearly time did not come to a stop after the crime occurred
    around 9:00 P.M. However, after the crime, time continued to pass as

                        p. 134  printed

Albert Segundo and Andres Sandoval followed the suspects to another location opposite the direction of the Video store that petitioner had gone to with his wife and little brother-in-law.

According to Segundo, after he and his friend followed the suspects a second event occurred. Segundo and his friend sat parked in the middle of the street when the van came to a stop at a stop sign after having been followed. There was a brief conversation between the shooter and driver of the suspects vehicle, the shooter then exit's the vehicle and points a gun in the direction of Segundo and his friend.

Petitioner drives a green Toyota Camry (2 RT. 953; 5 RT. 2432). However, no one bothered to take the position that who would be so naive to believe that petitioner was stupid enough to have been driving this so called white van in the same area the shooting occurred; such conduct would have been too bold and brave, for example, the petitioner lives right up the street on 104th and Vermont (4 RT. 1891). The prosecutor falsely led the jurors to believe that the suspects drove towards the territory of notorious Graffiti Artist and falsely led the jurors to believe that petitioner lived on 103rd street, for example, the prosecutor stated: "the defendant drove the van heading towards 103rd street which is exactly where the defendant lived" (V.5 of RT. 2703). The suspects actually drove past petitioner's home and not towards the territory of NGA (3 RT. 1570-1571).

Had trial counsel conducted an investigation and adequately prepared for petitioner's trial, "these factors could have been shown, therefore, trial counsel was ineffective for failing to do so. However, had the suspects been driving this white van in the area where petitioner lives or the places he had gone, the suspects would have been pulled over and arrested by police officers since a crime broadcast would have went out on the dispatch radeo giving a description of the van and suspects, therefore, do they really think that petitioner is actually stupid? Furtherermore, the prosecution would have had to talke the position that after Segundo and Andres followed the suspects to another location opposite the direction of the video store that petitioner had been; petitioner, within a 25-minute window, dropped off the accused shooter somewhere, got rid of the white van somewhere, picked up his green Toyota Camry, picked up his wife and little brother-in-law, then drove to the Blockbuster video store, after having been followed by Segundo and Andres; all within 25-minutes.

(9) defense counsel at trial was ineffective for failing to investigate and argue that petitioner was not, and could not have been the driver of the white van envolved in the murder. The following questions should have been asked by trial counsel: (1) where did petitioner get the van? (2) did petitioner steal the van? (3) who did petitioner steal the van from, if anybody? (4) where was the van parked at the time it was stolen, if it was parked any-place? (5) was the van reported stolen, if so, by who? (6) where was the van reporter stolen from? (7) to whom was the van reported stolen? (8) did the owner of the van loan it to petitioner? (9) why did he or she loan the van to petitioner? (10) where was the van when it was loaned to petitioner?(11) what was the race of the person who loaned the van to petitioner? (12) did petitioner own the white van? (13) how long did he own the van? (14) When did he buy the van? (15) from whom did

P. 135

he buy the van? (16) did he buy the white van from a car dealer or a private party? (17) did he buy the van in the state of California? (18) was petitioner connected to this so called white van?

Petitioner contends that the witnesses, the police, the detectives, the prosecutor, the trial judge, and petitioner's then trial counsel not only used false testimony, but also used an imaginary white van by claiming that petitioner was driving it to get away from the scene of the crime. This was all false in order to convict petitioner.

For the reasons stated above, petitioner urges this court to reverse the judgment of conviction.

16

THE "CUMULATIVE" EFFECT OF THE ERRORS COMPLAINED OF OPERATED TO PRODUCE A TRIAL THAT WAS FUNDAMENTALLY UNFAIR, VIOLATING PETITIONER'S RIGHT TO DUE PROCESS OF LAW, UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.

Petitioner contends that the totality of errors--petitioner suffers from the denial of due process of law, in violation of the 14th Amendment to the United States Constitution. The cumulative effect of the errors complained of in this writ is sufficient to warrant the conclusion of an unfair trial occurred in this case, and that it was very much a miscarriage of justice (People -v- Hill (1998) 17 Cal.4th 800, 844, 847, 72 C.R. 2d 656, 952 p.2d 673 (number of instances of prosecutorial misconduct, considred with other errors, created negative effect that made overall unfairness greater than some of the individual errors and required reversal]; 9 Cal. Proc. (4th), Appeal, §443).

When considering the errors complained of cumulatively, the errors produced a trial setting that was fundamentally unfair (See Walker -v- Engle, 703 F.2d 959, 963 (6th Cir, cert. denied.

p.136 printers

1  464 U.S. 951, 104 S.Ct. 396, 78 L.Ed.2d 338 (1983); <u>Cooper -v-</u>
2  <u>Sowders</u> (1988) 837 F.2d 284 at p. 288).

3       It still remains a fundamental value determination of our
4  society that it is far worse to convict an innocent man than to
5  let a guilty man go free (<u>In re Winship</u>, 397 U.S. 358, 372, 90
6  S. Ct. 1068, 1076, 25 L.Ed.2d 368 (1970)(concurring opinion).)
7  Have we as Americans lost our way?

8       Before us is a case in which the district attorney's office
9  originally decided not to prosecute due to insufficient evidence.
10 Two months after the crime (July 1, 2003), the detective submit-
11 ted it's case to the district attorney's office, it was specifi-
12 cally stated, "defendant is identified as the driver of a van
13 where the right front passenger got out shot/killed the victim,
14 and two of the victims' friends (1 brother and 1 friend) make
15 the positive identification. Defendant has approximately 5 witn-
16 esses who corroborate his alibi that he was somewhere else." <u>No</u>
17 <u>physical evidence connects defendants to the murder, if the</u> Van
18 is located, process it. If defendants fingerprints are found in
19 the van ressubmit (See att. Exhibit__T.__) Charge evaluation
20 worksheet, pp. 94,95 of police report).

21      The district attorney's office informed the investigating
22 officers, that if any "physical evidence is discovered that con-
23 nects petitioner to the crime, resubmit. However, with "no pys-
24 ical evidence," No van," and "no new evidence," prosecution was
25 sought on petitioner (<u>2 years and 2 months after the crime</u>(See
26 Exhibit__U.__,minute order att.) It is contended a review of pet-
27 itioner's case and/or the record leads the conclusion that the

28

p.137

1  prosecution's evidence is questionable. Thus, this was a close

2  case, so close the prosecution waited 2-years and 2-months after

3  the evidence against petitioner was first compiled before it

4  elected to prosecute (see Exh: __U__ ). As the court stated in

5  Cooper -v- Sowders, much of the prosecution's evidence was ques-

6  tionable, and indeed close because the prosecution waited two

7  (2) years after the evidence against the accused was first comp-

8  iled before it elected to prosecute (Cooper -v- Sowders, 837 F.

9  2d 284 at p. 288)

10      In the case at bar: "what evidence did the prosecution have

11  2-years and 2-months after the crime that it did not have at the

12  time the district attorney's office originally refused to seek

13  prosecution for lack of evidence? NONE." Additional indications

14  of a close case is the lengthy jury deliberations. (E.g. In re

15  Martin (1987) 44 Cal.3d 1, 51; People -v- Cardenas (1982) 31

16  Cal. 3d 897, 907 [12 hours of deliberations is evidence of a

17  close case]; Lawson -v- Borg (9th Cir. 1995) 60 F.3d 608, 612

18  [nine hours of deliberations deemed protracted].

19      In the present case, the jury deliberated for over two full

20  days to reach its verdict (5 RT. 2768, 3301-3302, 3601, 1 CT.

21  128, 131-132, 187) While the Supreme court has indicated that

22  lengthy deliberations are not significant in a complex case

23  (People -v- Cooper (1991) 53 Cal.3d 771, 837), this was not a

24  complex case; it involved one count of aiding and abetting a

25  murder and the jury basically had to determine just one main

26  fact: "whether petitioner was the person who drove the van.

27      The jury's request for readback of testimony also establi-

28

1 | shes that this was a close case (<u>People -v- Pearch (</u>1991) 229

2 | Cal.App. 3d 1282, 1295 [juror questions and request to have tes-

3 | timony reread are indications the deliberations were close]; see

4 | <u>People -v- Williams (</u>1971) 22 Cal.App.3d 34, 38-40 [request for

5 | readback of critical testimony].)

6 |     In the case at bar, the jury requested total readbacks of

7 | prosecution witnesses only (1 CT. 130). Despite the courts comm-

8 | ent that it would take a substantial amount of time to prepare

9 | and readback all the testimonies; the jury had all the requested

10 | testimonies readback to it (See, 1 CT. 131-132). Thus this was

11 | a close case.

12 |     Furthermore, the points, facts, and/or issues raised in

13 | this petition, undermines the prosecution's evidence, leading

14 | to the conclusion that the prosecutions evidence is questionable,

15 | thus making this a close case. Therefore, petitioner contends

16 | that the cumulative errors complained of was "not" harmless, and

17 | warrants a reversal (<u>Chapman -v- California (</u>1967) 386 U.S. 18,

18 | 24 [87 S.Ct. 824, 17 L.Ed.2d 705], is before a federal constitu-

19 | tional error can be held harmless, the court must be able to de-

20 | clare a belief that it was harmless beyond a reasonable doubt

21 | (Id. at p. 828.); <u>Strickland -v- Washington</u>, <u>supra,</u> at pp. 466,

22 | U.S. at pp. 688, 690-692; <u>People -v- Watson (</u>1956) 46 Cal.2d 818

23 | at. p. 836).

24 |     If this honorable court finds itself in grave doubt about

25 | whether the errors of federal constitutional law had substantial

26 | and injurious effect or influence in determining the jury's ver-

27 | dict, that error is not harmless and petitioner must win (See

28 |

1 | O'Neal -v- McAninch (U.S. Ohio (1995), 513 U.S. 432; 130 L.Ed.2d

2 | 947, 63 USLW 4126, 115 S.Ct. 992, at pp. 994, 995).

3 |                I7.

4 |          THERE IS A NEED FOR POST

         CONVICTION DISCOVERY

5 |

6 |    PETITIONER HAS A CONSTITUTIONAL RIGHT TO ALL EXCULPATORY

   EVIDENCE, INCLUDING IMPEACHMENT EVIDENCE, POSSESSED BY

7 |    THE PROSECUTION WHICH INCLUDES THE POIICE AGENCIES IN-

   VOLVED IN PETITIONER'S CASE.

8 |

9 |    In the instant case, the trial court errored in denying pet-

10 | itioner's motion requesting for an order of discovery be provided

11 | to petitioner. Petitionef contends that without the proper record

12 | he can-not conduct and complete an adequate investigation into

13 | his case.

14 |    Good faith efforts to obtain discovery were made unsuccess-

15 | fully (See Exh. V-13, w-1-3, and (X-2-3). Thus, it is necessary

16 | for this court to place petitioner in a position to obtain rele-

17 | vant, impeachment, and/or potentially exculpatory evidence. Howe-

18 | ver, denying access to such discovery denies petitioner his cons-

19 | titutional right to fundamental fairness under the 14th Amendment

20 | of the United States Constitution.

21 |    While conducting an investigation into the instant case, pe-

22 | titioner discovered several prosecution witnesses were recorded

23 | when they were being interviewed by officers, however, none of

24 | the recordings were introduced during trial, nor did counsel seek

25 | to obtain them.

26 |    Petitioner contends that it is crucial that the audio reco-

27 | rdings be provided. The audio tape recorded interviews may "cont-

28 |

1 radict" the prosecution witnesses trial testimony, constituting

2 impearchment evidence. In the case at bar, eyewitness testimony

3 constituted the only evidence connecting petitioner to the crime,

4 thus, evidence undermining such testimony is vital towards petit-

5 ioner's case. In the case of United States -v- Arnold, 117 F.3d

6 1108 (C.A. II(Fla.) 1997), the court properly reversed a vonvict-

7 ion on the grounds that the prosecution withheld "audio tapes"

8 that contradicted witness trial testimony. (Id. at pp. 1308, 1315)

9 Thus, one seeking to present a full and complete defense or case,

10 would conduct a proper and adequate investigation. Such an inves-

11 tigation can not be fulfilled without obtaining the discovery in

12 which petitioner is constitutionally entitled under Brady -v- Ma-

13 ryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and

14 section 1054.1(e) of the California Penal Code. The prosecutor in

15 a criminal prosecution "shall" make timely disclosure to the def-

16 ense of all evidence or information known to the prosecutor that

17 tends to negate the guilt of the accused or mitigate the offense

18 (ABA Model Rule of Professional conduct 3.8(d)(1984).

19     During trial prosecution witness a. Segundo stated and/or

20 suggested that when officers were documenting what he stated,

21 "words probably got mixed up and so forth, suggesting inaccurate

22 documenting on the officers part," (3 RT. 1558). Thus, the audio

23 tape recorded statements of Segundo would have factually shown

24 and proved what all was stated at that time. Additionally, if the

25 tape recorded interview proves inconsistent with Segundo's trial

26 testimony/statements, it clearly should have been used for impea-

27 chment purposes (United States -v- Arnold, supra, at pp. 1308,

28

1315, 1317).

In an audio tape recorded interview, Jesse Robles stated the driver of the suspect's van was wearing a long sleeved black hooded sweat-shirt with the hood down, and the passenger was wearing a long sleeved black hooded sweat-shirt with the hood up (Exh. M, Police Rep. pp. 39-40).

Contraversly, at trial Robles claimed he never identified the driver as wearing a long sleeved black hooded sweat-shirt with the hood down. Robles also claimed he never seen the passenger and "did not say anything to Sergeant Katz about the passenger (2 RT. 984-985)

Thus, if the audio tape "contradicts" Robles's trial testimony, it would be a crucial factor that can support a reversal (U.S. -v- Arnold, supra, at pp. 1308, 1315, 1317). Petitioner contends the audio recordings could have a significant impact on a jury, since it is "physical evidence" that will allow a jury to "hear" exactly what was stated. It is also crucial to have the recordings provided to petitioner for investigative purposes. For the recordings may lead petitioner to investigate other matters favorable to his case, simply put,, one discovered fact may lead to another.

Detective Steven Katz was the lead investigator who investigated this crime, this same detective has a history of acting in a cover-up of evidence (See, Exhibit N, 1-8). Petitioner contends he should not be forced to trust and rely on an investigator who has concealed evidence in the past.

As an act in a cover-up of evidence, the documented statements in the "reports" may be inconsistent with what was stated