5.    I found a website that shows what a person could see in the daylight at 100 feet at www.prisonpolicy.org/zones/thousand_feet.html.  Exhibit G is a true and correct copy of the 100 feet photo from that website.

6.    I also conducted an investigation on what a normal person would be able to see at night.

Around 9:00 p.m., on August 12, 2008, I parked my car by a sidewalk on a straight road and had another person drive on the wrong side of the road facing me at a distance of about five car lengths away.  There were street lamps on both sides of the street between the other car and my car.  I could not see the face of the driver of the car at all when both vehicles had the headlights on.

7.    When the driver turned his headlights off, I still could not see his face because my headlights did not illuminate the interior of his vehicle at that distance.

8.    I had the driver turn on the interior lights of his car.  I could not see his face well.

9.    I measured off 100 feet.  I had someone stand *in the daylight* 100 feet away from me.  I could not make out his facial features clearly from that distance.

10.    Before I did this investigation, I had no idea how far away 100 feet is or what is visible at that distance.  However, several people I know who have participated in sports, taught children in school, or dealt with real estate, say they know how far 100 feet is between two points.  It is my belief that had trial counsel presented evidence that Renteria was 128 feet away from the white van, it would have been within the common knowledge and experience of some of the jurors that it is physically impossible to get a good look at a person's face at that distance in any type

2

of light with normal vision.  However, it would have been better to show the jury what is visible at 100 feet.

11.    Exhibit A is a true and correct copy of photographic exhibits from Abel Soto's trial.  On Exhibit A 2 (People's Exh. No. 9) Sergeant Katz marked the location where Jose Robles was shot with a "v" surrounded with a circle.  Because the mark was not visible on the copy, I marked it with a light colored sticker.  I have requested transmission of the original exhibits to the Court of Appeal.

12.    Exhibits B and C are true and correct copies of the declarations I received from Jofama Coleman and Ronald White, Esq. Exhibit E are pages from the reporter's transcript of Abel Soto's trial proceedings.  I did not renumber those pages because the original page numbering will facilitate comparison with the original.  I have omitted pages 1829 to 1844 from Sergeant Katz's testimony.

14.    At my request, Mr. White sent me part of his trial file.  I did not find any photos of the crime scene in the file.  I sent two letters to Mr. White asking him if the prosecution provided the defense with crime scene photos of the vehicles in the area of the shooting.  I have not received a response to this question yet.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 15th day of August, 2008 at Irvine, California.

Patricia Ihara

3

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

```
--------------------------------------------- )
                                              )
THE PEOPLE OF THE STATE OF CALIFORNIA,        )
                                              )
                  PLAINTIFF-RESPONDENT,       )
                                              )
           VS.                                )  SUPERIOR COURT
                                              )  NO. YA 064697
ABEL SOTO,                                    )
                                              )
                  DEFENDANT-APPELLANT.        )   NOV 2 8 2007
--------------------------------------------- )
```

APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY

HONORABLE FRANCIS J. HOURIGAN, JUDGE PRESIDING

REPORTERS' TRANSCRIPT ON APPEAL

TUESDAY, AUGUST 7, 2007

APPEARANCES:

FOR PLAINTIFF-RESPONDENT:  EDMUND G. BROWN, JR.
                           STATE ATTORNEY GENERAL
                           300 SOUTH SPRING STREET
                           NORTH TOWER, SUITE 1701
                           LOS ANGELES, CALIFORNIA 90013

FOR DEFENDANT-APPELLANT:  IN PROPRIA PERSONA

VOLUME 4 OF 5
PAGES 1501 THROUGH 1676/1800, INCL.



DENISE K. NAGAO, CSR NO. 7722
OFFICIAL REPORTER

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

**EXHIBIT E**

①

1803

| | | |
|---|---|---|
| 1 | A | THE NIGHTTIME. |
| 2 | Q | WAS IT LIGHT OR DARK? |
| 3 | A | IT WAS ALREADY KIND OF DARK. |
| 4 | Q | IT WAS ALREADY DARK. |
| 5 | | WHERE DID YOU LIVE AT THAT TIME? |
| 6 | A | BEHIND THE ROBLES.  I WAS RENTING.  FROM |
| 7 | THE ROBLES. | |
| 8 | Q | YOU LIVED BEHIND THE ROBLES' HOUSE? |
| 9 | A | YES. |
| 10 | Q | ON THE SAME PROPERTY? |
| 11 | A | THE SAME PROPERTY. |
| 12 | Q | BUT IN ANOTHER DWELLING? |
| 13 | A | YES. |
| 14 | Q | WAS THAT AT 1115 101ST STREET? |
| 15 | A | YES. |
| 16 | Q | DID YOU ARRIVE AT THAT SCENE AFTER DARK |
| 17 | THAT NIGHT? | |
| 18 | A | YES. |
| 19 | Q | AND WHAT WERE YOU DRIVING? |
| 20 | A | BROWN ASTROVAN. |
| 21 | Q | BROWN ASTROVAN? |
| 22 | A | LIGHT BROWN AND BURGUNDY. |
| 23 | Q | WHERE HAD YOU BEEN BEFORE THEN? |
| 24 | A | FROM WORK. |
| 25 | Q | SO YOU WERE COMING HOME FROM WORK? |
| 26 | A | YES. |
| 27 | Q | DID YOU PARK THE CAR?  AT ALL? |
| 28 | A | YES. |

```
 1        Q        SO IT WAS COMING TOWARDS YOU, LIGHTS OFF,
 2  ON THE WRONG SIDE OF THE STREET?
 3        A        YES.
 4        Q        DID THAT ATTRACT YOUR ATTENTION?
 5        A        YES.
 6        Q        WHAT DID YOU SEE HAPPEN?
 7        A        THE VAN, THE VAN PULLED -- STOPPED.  AND
 8  THE PASSENGER GOT OUT OF THE CAR.  AND WALKED TOWARDS --
 9  THE CAR, AND STARTED SHOOTING.
10        Q        WELL, LET'S GO BACK A LITTLE BIT.
11                 THIS WAS A VAN THAT WAS COMING DOWN THE
12  STREET?
13        A        YES.  IT WAS A WHITE VAN.
14        Q        THE PASSENGER GOT OUT OF WHICH SIDE OF THE
15  CAR?
16        A        OF THE PASSENGER SIDE.
17        Q        PASSENGER SIDE.
18                 AND DID HE GO IN FRONT OR IN BACK OF THE
19  VAN?
20        A        IN FRONT OF THE VAN.
21        Q        NOW, THE FRONT OF THE VAN WAS FACING
22  TOWARDS YOU?
23        A        YES.
24        Q        SO HE THEN WALKED IN FRONT OF WHERE YOU
25  WERE SOME FEET AWAY?
26        A        YES.
27        Q        ABOUT HOW FAR AWAY FROM THE VAN WERE YOU
28  WHEN THAT MAN GOT OUT OF THAT VAN?
```

```
 1        Q       ALL RIGHT.

 2                CHINO WAS WALKING?

 3        A       WALKING.

 4        Q       DO YOU KNOW WHO CHINO IS?

 5        A       YES.

 6        Q       WHO IS CHINO?

 7        A       HE'S THE FATHER, WELL, THE -- HE'S THE

 8   GRANDSON OF THE PEOPLE, OF THE ROBLES I WAS RENTING

 9   FROM.

10        Q       SO HIS NAME LAST NAME IS ROBLES?

11        A       YEAH.

12        Q       WERE YOU RENTING FROM HIS GRANDPARENTS?

13        A       YES.

14        Q       DO YOU KNOW, DOES JOSE ROBLES -- DOES THAT

15   SOUND LIKE HIS REAL NAME?  OR DID YOU KNOW HIS REAL

16   NAME?

17        A       WELL, I MEAN, I JUST ALWAYS KNOWN HIM AS

18   CHINO.

19        Q       SO THIS MAN WHO GOT OUT OF THE VAN WAS

20   SHOOTING AT CHINO?

21        A       YES.

22        Q       WHAT DID YOU DO?

23        A       I WAS JUST, I WAS JUST IN SHOCK.  I WAS

24   JUST -- COULDN'T BELIEVE --

25        Q       COULDN'T BELIEVE IT WAS HAPPENING IN FRONT

26   OF YOU?

27        A       YES.

28        Q       HOW MANY SHOTS, DO YOU RECALL?
```

```
 1        A        AROUND THE SAME HEIGHT.

 2        Q        AND HOW WOULD YOU DESCRIBE THE BUILD OF THE

 3   PERSON?

 4        A        MUSCULAR.  STOCKY.  LIKE -- HEAVY BUILT.

 5        Q        HEAVY BUILT.  YOU SAID MUSCULAR.

 6                 WHAT MADE YOU THINK OF MUSCULAR?

 7        A        LIKE HE WORKS OUT.  LOOKED LIKE HE WORKS

 8   OUT.

 9        Q        YOU'RE POINTING TO YOUR SHOULDERS, MOVED

10   YOUR ARMS?

11        A        LIKE STOCKY BECAUSE --

12        Q        TRY NOT TO TALK AT THE SAME TIME.  I'LL TRY

13   NOT TO TALK AT THE SAME TIME.

14                 I SAW YOU MOVE YOUR SHOULDERS UP AND YOUR

15   ARMS UP.  WHAT DID YOU MEAN BY THAT?

16        A        STOCKY.  LIKE THEY WORK OUT.  THE WAY THEIR

17   BODIES -- LIKE BUFF.

18        Q        BUFF?

19        A        YES.

20        Q        AND WHEN YOU DID YOUR ARMS UP AND YOUR

21   SHOULDER, DO YOU MEAN THEY LOOKED LIKE HE HAD WORKED

22   OUT, SOME TYPE OF WORKOUT, AND HE WAS MUSCULAR IN THAT

23   AREA?

24        A        FROM HIS SHOULDERS, THE PART RIGHT HERE,

25   YES, IT DID.

26        THE COURT:  THE WITNESS TOUCHED THE TOPS OF HER

27   SHOULDERS.

28        THE WITNESS:  JUST BUFF, LIKE -- JUST BIG.
```

```
 1      Q      WAS THIS AFTER THE SHOOTING, THEN?

 2      A      YES.

 3      Q      SO EXPLAIN HOW THAT HAPPENED.

 4      A      AFTER -- AFTER -- THE SHOOTING TOOK PLACE,

 5   HE GOT BACK IN THE CAR, HE WENT IN FRONT OF THE CAR, AND

 6   GOT BACK INSIDE.  AND THEY DROVE PAST ME.

 7             I ONLY LOOKED AS -- LIKE BEFORE -- HOW CAN

 8   I EXPLAIN.  WE LIKE UP TO HERE, MAYBE, THEN I TURNED

 9   AWAY.

10        THE COURT:  ALL RIGHT.

11             AGAIN YOU POINTED AT SOMETHING.

12        THE WITNESS:  LIKE UP TO --

13        THE COURT:  POINTED ABOUT TWO FEET AWAY.

14      Q      BY MR. YOUNG:  WHY DID YOU TURN AWAY AFTER

15   LOOKING AT THE DRIVER?

16      A      BECAUSE I HAD MY KIDS IN MY CAR, AND I WAS

17   SCARED.  I DIDN'T WANT THEM TO KNOW I HAD SEEN WHAT THEY

18   DID.

19      Q      YOU DIDN'T WANT THE DRIVER TO SEE YOU

20   STARING AT HIM?

21      A      YES.

22      Q      DID YOU SEE ENOUGH OF THE FACE OF THE

23   DRIVER TO RECOGNIZE HIM?

24      A      YEAH.

25      Q      DID YOU IDENTIFY THE DRIVER AT A LATER

26   DATE?

27      A      YES.  AT THE TRIAL.

28      Q      YOU WERE YOU ASKED TO GIVE A DESCRIPTION OF
```

```
 1        Q      YOU HAVE TO SPEAK UP, MA'AM.

 2        A      YES.

 3        Q      AND IS THAT 101ST STREET THAT NIGHT?

 4        A      YES.

 5        Q      IS YOUR CAR DEPICTED ON THERE ANYWHERE?

 6        A      I DON'T SEE IT.

 7        Q      CAN YOU TELL IF THE CAR THAT YOU WERE

 8   DRIVING WAS THERE?

 9        A      I WAS THERE, BUT I DON'T SEE IT.

10        Q      OKAY.  THERE ARE SOME CARS BLOCKING THE

11   VIEW, HERE.  LOOKING AT PEOPLE'S 9, ARE ANY OF THOSE

12   CARS YOURS?

13        A      NO.

14        Q      SO THIS SUV IS NOT YOURS?

15        A      NO.

16        Q      ALL RIGHT.

17               IN THE BACK OF THE PHOTOGRAPH, CAN YOU MAKE

18   OUT THOSE CARS, ANY OF THOSE BACK THERE TO SEE IF

19   THEY'RE YOURS?

20        A      I CAN'T TELL.

21        Q      OKAY.

22               NOW, DO YOU THINK THAT THAT SHOOTER COULD

23   HAVE BEEN A MEXICAN OR HISPANIC PERSON?

24        A      NO.

25        Q      YOU'RE CERTAIN IT WAS AFRICAN AMERICAN?

26        A      YES.

27        Q      DO YOU HAVE AN IDEA OF THE GENERAL AGE

28   RANGE AT ALL?  AS OPPOSED TO AN OLD GUY LIKE ME, OR
```

1815

```
 1        A       YES, IT IS.
 2        Q       AND DID YOU TELL DETECTIVES THAT THE SHIRT
 3   WAS TAN WITH LIGHT GRAY SQUARES, OR GREEN WITH DARK
 4   BROWN SQUARES?
 5        A    . NO, I TOLD THEM IT WAS LIKE A BROWN SHIRT
 6   WITH TAN.
 7        Q       SO IF DETECTIVE KATZ WROTE THAT THE SHIRT
 8   WAS TAN WITH LIGHT GRAY SQUARES, OR GREEN WITH DARK
 9   BROWN SQUARES, THAT'S WRONG?
10        A       I ALWAYS SAID IT WAS BROWN CHECKERS TAN.
11   THAT'S WHAT I SAID.
12        Q       DO YOU REMEMBER WHAT COLOR THE GUN WAS?
13        A       BLACK.
14        Q       OKAY.  AND YOUR TESTIMONY IS THAT THE
15   SHOOTER GOT OUT OF THE VAN AND WALKED AROUND THE FRONT
16   OF THE VAN?
17        A       YES.
18        Q       ARE YOU SURE ABOUT THAT?
19        A       YES, I AM.
20        Q       OKAY.  SO IF THE OTHER WITNESSES TESTIFIED
21   THAT THE SHOOTER GOT OUT AND WALKED AROUND THE BACK OF
22   THE VAN, THEY'RE ALL MISTAKEN?
23        A       YES.  I SEEN --
24      . Q       OKAY.  YOU WERE PARKED IN YOUR VEHICLE; IS
25   THAT CORRECT?
26        A       YES.
27        Q       AND YOUR VEHICLE IS NOT DEPICTED IN THESE
28   PHOTOGRAPHS; CORRECT?
```

1  OFF BY POLICE OFFICERS.

2             SO LET ME ASK YOU THIS.  DID YOU MOVE YOUR

3  CAR AFTER THE MURDER, OR DID YOU LEAVE IT THERE?

4        A       NO, I PROBABLY MOVED -- I CAN'T REMEMBER,

5  BECAUSE I WAS THERE.  AND I DON'T SEE THE CAR THERE.

6  BUT THAT'S WHERE I WAS PARKED.

7        Q       OKAY.  WELL, I DON'T WANT YOU TO GUESS.

8  AFTER THE MURDER HAPPENED, DID YOU MOVE YOUR CAR?  DID

9  YOU GO SOMEPLACE?

10        A       I CAN'T REMEMBER.

11        Q       WELL -- IT'S PRETTY IMPORTANT.

12             DID YOU STAY AND --

13       MR. YOUNG:  OBJECTION.  ARGUMENTATIVE.

14       THE COURT:  THE FIRST PORTION IS ARGUMENTATIVE.

15             PLEASE REPHRASE YOUR QUESTION.

16        Q       BY MS. BARNES:  YOU WATCHED THE SHOOTING,

17  THEN WHAT DID YOU DO?

18        A       I JUST SAT THERE.

19        Q       HOW LONG DID YOU SIT THERE?

20        A       FOR A LONG TIME.  UNTIL THEY LEFT.

21        Q       UNTIL THE SHOOTER LEFT?

22        A       YES.  UNTIL THEY DROVE PAST ME, AND THEY

23  TURNED ON VERMONT.

24        Q       THEN WHAT DID YOU DO?

25        A       ME AND MY KIDS AND MY BROTHER, WE GOT OUT

26  OF THE CAR.

27        Q       WHERE DID YOU GO?

28        A       WE WENT TO THE HOUSE.

```
 1   WALKING TOWARDS --

 2        A       TOWARDS, YES.

 3        Q       WELL -- IF SO THE OTHER WITNESSES TESTIFIED

 4   CHINO IS WALKING THE OPPOSITE DIRECTION TO GO TO THE

 5   STORE, THEY WOULD BE WRONG?

 6        A       YES.

 7        Q       WHAT WAS CHINO WEARING?

 8        A       CAN'T REMEMBER.

 9        Q       OKAY.  SO YOU SAW THE SHOOTER.  WHAT DID

10   YOU SEE IN THE SHOOTER'S FACE?

11        A       HE WAS BLACK.  AND -- JUST I REMEMBER HIM

12   HAVING A LONG JHERI CURL WITH A BEANIE ON.

13        Q       SO WHEN YOU SAY JHERI CURL, DOES THAT MEAN

14   HE HAD LONGER HAIR?

15        A       LIKE -- SHOULDER LENGTH.  LIKE MAYBE UP TO

16   HERE.

17        THE COURT:  THE WITNESSES HAS PLACED HER LEFT HAND

18   JUST TO THE TOP OF HER SHOULDER, HER LEFT SHOULDER.

19        Q       BY MS. BARNES:  IT WAS CURLY?

20        A       YES.

21        Q       WAS IT WAVY, OR TIGHT CURLS?

22        A       NOT JUST -- NOT TIGHT, THE -- I MEAN --

23   JUST KIND OF -- NOT TIGHT, AND NOT LOOSE.  JUST -- I

24   DON'T KNOW.  HARD TO EXPLAIN TO YOU.

25        Q       WHAT COLOR WAS THE HAIR?

26        A       IT WAS BLACK.

27        Q       THE PERSON HAD A BEANIE; IS THAT CORRECT?

28        A       YES.
```

1  I?

2        THE COURT:  AFTER YOU MARK THEM, PLEASE SHOW THEM

3  TO MR. YOUNG.

4        MS. BARNES:  OKAY.  THESE ARE THE PART OF THE

5  ORIGINAL DISCOVERY.  BUT I'LL SHOW HIM THE ONES I'M

6  USING.  I'LL PUT A P-50.

7        THE COURT:  NO, 58, PLEASE.

8        MS. BARNES:  58?  THANK YOU.

9        THE COURT:  AND THREE BY FIVE COLOR PHOTO.

10       MS. BARNES:  YES, I HAVE FOUR OF THEM.

11       THE COURT:  THEY'LL BE MARKED 58, 59, 60, AND 61.

12

13            (PEOPLE'S EXHIBITS 58 THRU 61,

14             PHOTOGRAPHS, WERE MARKED FOR

15             IDENTIFICATION.)

16

17       MS. BARNES:  PEOPLE'S 60, AND PEOPLE'S 61.

18            COUNSEL, YOU WANT TO SEE THE ONES I'M

19  SHOWING?

20       MR. YOUNG:  YES, PLEASE.

21

22            (A DISCUSSION WAS HELD

23             OFF THE RECORD.)

24

25       Q    BY MS. BARNES:  I'M GOING TO SHOW YOU A SET

26  OF PHOTOGRAPHS.  THESE ARE DIFFERENT ONES.  I'VE JUST

27  MARKED PEOPLE'S 58 THROUGH 61.

28            IF YOU WANT TO LOOK AT THESE PICTURES.  LET

1823

```
 1        Q      BY MS. BARNES:  CAN YOU MARK R FOR THE
 2   ROBLES' RESIDENCE?
 3        A      (THE WITNESS COMPLIES.)
 4        THE COURT:  THE WITNESS PUT AN R ON PEOPLE'S 58.
 5        Q      BY MS. BARNES:  I'M GOING TO SHOW YOU
 6   ANOTHER PHOTOGRAPH, PEOPLE'S 61.  DO YOU SEE YOUR VAN
 7   PARKED BEHIND THIS LARGE TRUCK BEHIND -- YOUR VAN PARKED
 8   BEHIND THE LARGE TRUCK ON PEOPLE'S 61?
 9        A      YES.
10        Q      OKAY.
11               CAN YOU PUT YOUR INITIALS THERE?
12        A      (THE WITNESS COMPLIES.)
13        THE COURT:  THE WITNESS HAS INITIALED 61 IN THE
14   POSITION WHERE SHE SAYS HER CAR IS.
15        MS. BARNES:  THANK YOU.
16        Q      SO REVIEWING THESE PICTURES, IT ACTUALLY
17   APPEARS YOU PARKED YOUR CAR BEFORE THE ROBLES'
18   RESIDENCE, FURTHER AWAY FROM THE SHOOTING THAN THE
19   ROBLES' RESIDENCE; IS THAT TRUE?
20        A      NO.
21        Q      AND YOU PARKED YOUR CAR BEHIND A LARGE
22   TRUCK, LOOKS LIKE IT MAY BE SOME KIND OF A LARGE DUMP
23   TRUCK OR --
24        A      NO.
25        Q      STORAGE TRUCK?
26        A      I DON'T KNOW.
27        Q      WELL, THAT'S YOUR CAR PARKED BEHIND THE
28   TRUCK; RIGHT?
```

1    BUILDER, OR JUST HEAVY-SET, AND YOU SAID THE PERSON WAS

2    JUST HEAVY-SET?

3        A    WELL, I MEAN -- BODY BUILDERS, THERE'S

4    DIFFERENT TYPES OF BODY BUILDERS.

5        Q    DID YOU SEE THE PERSON'S ARMS TO SEE IF

6    THEY WERE MUSCULAR, OR JUST BIG?

7        A    I WAS TALKING ABOUT LIKE FROM THE

8    SHOULDER -- FROM THIS, AND THE CHEST, THE WAY IT LOOKS.

9    THAT'S THIS WAY MY HUSBAND LOOKS.  THAT'S WHY I KNOW.

10       THE COURT:  THE WITNESS POINTED TO HER OWN

11   SHOULDERS, MOVED HER HAND SLIGHTLY DOWN HER UPPER CHEST.

12       Q    BY MS. BARNES:  COULD HE HAVE JUST BEEN

13   SOMEONE WHO WAS FAT OR STOCKY IN HIS SHOULDER AREA?

14       A    NO.

15       Q    WELL, DID YOU SEE HIS ACTUAL CHEST, OR YOU

16   SAW HIM WITH CLOTHES ON?

17       A    THE WAY -- I KNOW BECAUSE, THE WAY MY

18   HUSBAND LOOKS.  THAT'S WHY I'M ABLE TO TELL.

19       Q    OKAY.  AND YOU SAID THAT THE DISTANCE

20   BETWEEN YOUR CAR AND THE SHOOTING WAS 35 FEET; IS THAT

21   CORRECT?

22       A    YES.

23       THE COURT:  WELL, AGAIN, SO WE'RE CLEAR, YOU

24   INDICATED THE BACK WALL; IS THAT CORRECT?

25       THE WITNESS:  YES.

26       THE COURT:  THAT IS 35 FEET.

27       Q    BY MS. BARNES:  YOU'RE SAYING YOU PARKED

28   RIGHT IN FRONT OF THE ROBLES' RESIDENCE?

```
 1   THEY COULDN'T SEE YOU?
 2        A      NO.
 3        Q      DID YOU SEE -- DID YOU SEE THERE WAS
 4   SOMEONE, DID YOU SEE SOMEONE SITTING IN ONE OF THE CARS?
 5   A BLACK MALE SITTING IN ONE OF THE CARS?
 6        A      NO.
 7        MS. BARNES:  NO FURTHER QUESTIONS.
 8        THE COURT:  MR. YOUNG, REDIRECT.
 9
10                    REDIRECT EXAMINATION
11   BY MR. YOUNG:
12        Q      IS IT POSSIBLE YOU WERE ABOUT FIVE CAR
13   LENGTHS AWAY FROM THE SHOOTING?
14        A      MAYBE.  I DON'T KNOW.
15        Q      NOW, THIS VAN THAT THE SHOOTER CAME FROM,
16   YOU SAID IT WAS COMING ON THE WRONG SIDE OF THE STREET;
17   IS THAT RIGHT?
18        A      YES.
19        Q      SO IT WOULD HAVE BEEN FACING YOU, BUT ON --
20   ACTUALLY WOULD HAVE BEEN YOUR SIDE OF THE STREET IF YOU
21   HAD BEEN TRAVELING ON THE STREET INSTEAD OF PARKED AT
22   THE CURB?
23        A      YES.
24        Q      THIS EVENT BURNED IN YOUR MEMORY?
25        A      WHAT WAS THAT?
26        Q      DID THIS EVENT BURN IN YOUR MEMORY THAT
27   NIGHT?  THE SHOCK YOU SAID YOU WENT THROUGH?
28        A      YES.
```

1  HERE, PEOPLE'S 6 AND THEN PEOPLE'S 9, DO YOU RECOGNIZE

2  THESE PICTURES?

3       A       YES.

4       Q       AND YOU TESTIFIED EARLIER WHEN THERE'S A

5  MURDER, THE CRIME SCENE IS SECURED BY THE FIRST DEPUTIES

6  ON SCENE AS SOON AS THEY CAN; IS THAT CORRECT?

7       A       YES.

8       Q       AND PEOPLE ARE NOT ALLOWED TO DRIVE IN AND

9  OUT OF THE CRIME SCENE?

10      A       CORRECT.

11      Q       AND WOULD IT BE FAIR TO SAY THAT MOST

12  PEOPLE ARE BEING INTERVIEWED ANYWAY, SO THEY'RE NOT

13  REALLY LEAVING THE SCENE?

14      A       YES.

15      Q       NOW, THE PHOTOGRAPH PEOPLE'S 6, THE MURDER

16  HAPPENED ACTUALLY RIGHT IN FRONT OF THIS BLUE CAR; IS

17  THAT CORRECT?

18      A       THE OLDSMOBILE, YES.

19      Q       CAN YOU PUT THE INITIALS THERE OF

20  MR. ROBLES, KIND OF WHERE IT WOULD BE IN THERE IF HE HAD

21  IN FACT BEEN DEPICTED IN THAT PHOTOGRAPH?

22      A       THE VICTIM?

23      Q       YES.  JOSE ROBLES.

24      A       (THE WITNESS COMPLIES.)

25      THE COURT:  THE WITNESS MADE A MARK ON THE

26  PHOTOGRAPH AS REQUESTED.

27      Q       BY MS. BARNES:  THANK YOU.

28              IN THE NEXT PHOTOGRAPH, PEOPLE'S 9, CAN YOU

1  CORRECT?

2      A      YES.

3      Q      AND FINALLY, THE LAST PICTURE SHOWS ANOTHER

4  ANGLE THAT'S PEOPLE'S 61 OF HER CAR BEHIND THE WORK

5  TRUCK; IS THAT CORRECT?

6      A      YES.  IT'S IN THE -- TOWARDS THE RIGHT

7  SIDE, ALMOST THE CENTER LINE OF THAT PHOTOGRAPH.

8      Q      IS THAT 35 FEET AWAY FROM WHERE THE MURDER

9  HAPPENED?

10     A      NO.

11     Q      THAT'S ACTUALLY FURTHER AWAY FROM WHERE THE

12  ROBLES RESIDENCE IS; IS THAT CORRECT?

13     A      I WOULD SAY THAT IT'S -- ALMOST -- IT'S

14  ALMOST PARKED AT THE -- WHAT WOULD BE THE WEST PERIMETER

15  OF WHAT THE ROBLES RESIDENCE WOULD HAVE BEEN.  THE WEST

16  PERIMETER LINE OF THE PROPERTY LINE.

17     Q      SO MISS RENTERIA WOULD HAVE HAD TO LOOK

18  PAST THE LARGE WORK TRUCK, PAST THE CHEVY BLAZER, AND

19  THEN THE TWO OTHER CARS IN ORDER TO SEE THE MURDER; IS

20  THAT CORRECT?

21     A      YES.  AND THERE'S SPACE IN BETWEEN THOSE AS

22  WELL, BECAUSE THERE'S DRIVEWAYS FOR EACH OF THOSE

23  RESIDENCES.  SO IT'S FURTHER.

24     MS. BARNES:  YOUR HONOR, BECAUSE OF THE SIZE OF

25  THE PHOTOS, I'D ASK THE COURT TO PUBLISH THEM TO THE

26  JURY NOW.  JUST THE TWO, PEOPLE'S 58 AND 61.

27     THE COURT:  CAN I TALK TO BOTH OF YOU AT SIDE BAR

28  BEFORE WE DO THAT?



**EXHIBIT F**



**EXHIBIT G**

"EXHIBIT- I" ... 1-16

Request For a complete copy of The security Tape in Evidence.

EXHIBIT- I

1  Patricia Ihara, SB#180290
2  PMB 139
3  5319 University Drive
4  Irvine CA, 92612
5  (949) 733-0746
6
7  Attorney for Appellant
8  Jofama Coleman
9
10
11         SUPERIOR COURT OF THE STATE OF CALIFORNIA
12
13            FOR THE COUNTY OF LOS ANGELES
14
15  THE PEOPLE OF THE STATE OF CALIFORNIA,)   Case No. YA059765
16                                        )
17         PLAINTIFF and RESPONDENT       )
18                                        )
19  vs.                                   )
20                                        )
21  JOFAMA COLEMAN,                       )   REQUEST FOR ORDER
22                                        )   FOR A COMPLETE
23         DEFENDANT and APPELLANT.       )   COPY OF THE
24                                        )   SURVEILLANCE TAPE
25  _____)   IN EVIDENCE
26
27         TO THE HONORABLE ERIC C. TAYLOR, SUPERIOR COURT
28  JUDGE:
29         Defendant Jofama Coleman respectfully requests this Court issue an order
30  to the Los Angeles Police Department to make a complete copy of the original
31  Blockbuster Video surveillance videotape that was played for the jury during his
32  trial. This belated request is based new information that viewing the tape on a
33  multiplex player will simultaneously show views from the multiple cameras inside
34  the store and may possibly include images from a camera that was located outside
35  the store.
36         At trial, Detective Steven Katz testified that when he viewed the
37  surveillance tape he was only able to find Coleman on camera when Coleman was
38  at the cashier's desk renting tapes around 9:40 p.m., about 40 minutes after the

1  shooting death of Jose Robles.  Coleman believes that a careful examination of the

2  first part of the tape from around 30 minutes before he was seen checking out

3  would show when he and his friends had arrived at the store and that they were

4  there for 15 to 25 minutes before they rented the tapes.  This evidence would have

5  supported his defense that he was not the driver of the van involved in the shooting

6  that occurred around 9:00 p.m. that night.

7       Appellate counsel recognizes that this request is being made after the

8  Court of Appeal's decision affirming Coleman's appeal and petition for writ of

9  habeas corpus.  The significance of the existing surveillance tape was recently

10  brought to my attention after Coleman reviewed the transcripts of Detective

11  Katz's testimony about the surveillance tape and spoke to an investigator about

12  the multiplexor player and security system.  Because the gist of this request is

13  ineffective assistance of counsel and it is likely that the original tape will soon be

14  destroyed, it is imperative that a copy of this tape be preserved so that Coleman

15  can have a competent investigator review it.

16       This request is made in compliance with appellate counsel's duty to

17  investigate all reasonably arguable issues suggested by review of the record and

18  consultations with trial counsel and with appellant.  (See *People v. Gaston* (1978)

19  20 Cal.3d 476, 482-484; *People v. Silva* (1978) 20 Cal.3d 489, 493; *People v.*

20  *Barton* (1978) 21 Cal.3d 513, 518, 520.)

21       DECLARATION OF PATRICIA IHARA IN SUPPORT

22       I, PATRICIA IHARA, declare under penalty of perjury:

23       I am appointed counsel to represent appellant, Jofama Coleman, on appeal

24  in the above-entitled matter.

25  1.   All of the factual statements made in this request are true and correct to

26  the best of my knowledge.  The material sought to be included in the record is

27  necessary for a proper determination of Coleman's petition for writ of habeas

28  corpus.

29  2.   From the beginning of my representation of Coleman, he has maintained

P. 2

1   there was a camera in the parking lot at Blockbuster Video that would show that he

2   and his girlfriend arrived at Blockbuster Video in his vehicle about 30 minutes

3   before they left the store.  The record shows that the only part of the surveillance

4   videotape [Exhibit No. 52] that was played to the jury showed Coleman and his

5   girlfriend renting tapes about 44 minutes after the shooting.  (4RT 1890, 1892.)

6   According to Detective Steven Katz who had viewed the tape, as far as he could

7   tell, Coleman was in the store for five minutes.  (5RT 2462.)  He could not find

8   where Coleman entered the store on the tape.  (5RT 2469.)  Thus, the tape did not

9   support Coleman's mistaken identity defense.

10   3.    At trial, the videotape was played to the jury on a regular VCR player which

11   had to be slowed down in order to view the tape.  (See 5RT 2463.)  Trial counsel

12   commented that when the tape is played at regular speed (fast) it makes you sick.

13   (5RT 2463-2464.)  The video fuses several different views together from multiple

14   camera angles in a repeating cycle.  It is more difficult to watch the video on a

15   regular video player; special multiplexor equipment shows the fused images at the

16   same time.  (See 5RT 2442.)

17        Mr. Coleman informed me that he recently spoke with an investigator who

18   has experience with surveillance camera systems and has various types of

19   equipment to review the tape.  The investigator believes that the camera that was

20   located outside the store may possibly be on the tape.  Detective Katz's testimony

21   at trial did not preclude this possibility.  He could not recall "there being cameras

22   over a view to the parking lot from that tape."  (4RT 1893.)

23   4.    I had asked trial counsel in three letters whether he had investigated the

24   matter about the surveillance tape.  He did not respond to this question.  He sent me

25   Mr. Coleman's trial file which included the police reports, transcripts, other

26   documents, a videotape of a polygraph test, and three CDs.  There was no copy of

27   the Blockbusters surveillance tape and no notes about it by trial counsel's

28   investigator.  Appellate counsel believes that trial counsel and/or his investigator

29   did not properly review the surveillance tape before it was played to the jury and

1   admitted into evidence.

2   5.    There are two Detective Steven Katzs at L.A.P.D.  I was informed by

3   Detective Steven Katz that I will need a court order to get a copy of the tape from

4   the L.A.P.D. and that the original may be destroyed at some point or may have

5   already been destroyed.

6   6.    I spoke with the District Attorney Dara Williams last week and with the

7   other Detective Steven Katz who was the investigating officer on this case.  Ms.

8   Williams and Detective Katz were not adverse to my request.

9   7.    I believe that it is necessary to obtain a complete copy of the surveillance

10  videotape before it is destroyed.  This is the only physical evidence that may

11  possibly contain evidence that would support Coleman's case.

12  8.    The reason this request was not made earlier is that Coleman recently

13  realized the significance of Detective Katz's testimony about the multiplex player.

14  Coleman then spoke with an investigator who told him what may be on the

15  videotape and then called me to explain the need for the tape.  Coleman's belief

16  that there is something on the videotape is consistent with everything he has told

17  me and with his statements to the police a couple of weeks after the murder.

18      I declare under penalty of perjury under the laws of the State of California

19  that the foregoing is true and correct. Executed on this 10th day of February,

20  2009 at Irvine, California.

21                                  Respectfully submitted,

22  Dated:  February 10, 2009        By: _Patricia Ih_

23                                   Patricia Ihara, attorney

24                                   for Appellant

25                                   Jofama Coleman

REQUEST FOR ORDER                          P. 4