*JUNE 3, 2003*

| W#9: | COLEMAN, DEANDRE A. | MB, DOB: 09-05-1984 |
| W#10: | QUIROA, LOUIS | MH, DOB: 07-10-1986 |
| W#11: | TORRES, ERICK | MH, DOB: 02-02-1982 |
| W#12: | MALDONADO, JUAN CARLOS | MH, DOB: 03-04-1983 |
| W#13: | BARRERA, DAVID MEDINA | MH, DOB: 09-25-1985 |

*******************************************************************

On 05-20-2003, Tuesday, at 1600 hours, Detectives contacted Witness **LINDA SHARIE HALL**. FB, DOB: 11-04-1980. Witness Hall is the manager for the Blockbuster video store located at 8811 South Western Avenue in the city of Los Angeles, California 90047. The telephone number at this location is (323) 750-2947.

Witness Hall told Detectives that video surveillance at the location is changed on a daily basis with an individual tape being assigned to each successive day. These tapes are also rotated on a 90-day cycle and held for that period of time.

Witness Hall directed Detectives to the security recording system in the rear office of the Blockbuster video store. Detectives noted that the time registered on the security system indicated 1601 hours and the date of 05-20-2003. The actual time, however, was 1607 hours and the date was in fact 05-20-2003.

Along with Witness Hall, Detectives viewed the security tape from 05-10-2003. On the security video Detectives saw Witness Hall in view at the cash register. Also seen in view at the cash register was Suspect Jofama Coleman. The suspect was seen wearing a black short sleeved shirt with a white shirt underneath and a pair of black pants. The time on the security video tape when Suspect Coleman was seen indicated 2140 hours.

Witness Hall queried the computer system at Blockbuster and located the purchase and/or rental agreement and items checked out by Suspect Coleman on the date in question, that being 05-10-2003. The records indicate Suspect Coleman was helped by employee Letricia Davis and that the transaction took place at 2141 hours, 1 hour and 43 minutes after the murder.

(67)

P.5

JUNE 3, 2003

Witness Hall released to Detectives the security video tape for the day in question and
printed out copies of the rental on Suspect Coleman's account for the day in question.
These items will be retained by Detectives and made a permanent part of the case file.

It should be noted the original video tape has marking on it indicating the number 10 and the
letter C. Detectives left this location at 1625 hours.

On 05-20-2003, Tuesday, at 1700 hours, Detectives contacted Witness **PATRICIA LOUISE
SERMONS**, FB, DOB: 01-22-1964. Witness Sermons is the mother of Suspect Jofama
Coleman. She resides at 10320 South Vermont Avenue, Los Angeles, California 90044.
The phone number at this location is (323) 756-6597.

Witness Sermons said she has lived at this location with her seven children for the last 11
years. She said her oldest son is named James. She indicated Jofama Coleman is her
second oldest son. She indicated Jeremy is her fourth child, who also lives at the location.
Witness Sermons said she does not work and raises her children.

Witness Sermons said she recalled the day of the murder, that being Saturday, 05-10-2003.
She said she was told of the murder by her son, Jofama Coleman. She said she was not
aware of a shooting which occurred one day following the murder at the residence in which
Jofama previously resided before moving in with his mother.

Witness Sermons said her son, who she referred to by his middle name Rio, told her about
the murder, after his girlfriend had called him at his place of employment indicating she
heard he was responsible for the murder of Victim Robles. She indicated her son then
called her and explained to her what his girlfriend told him. She also indicated she was
concerned her own home might be attacked as a result of her son now living at the
residence with her.

Witness Sermons said several people came to her home with food on Saturday evening.
She indicated that Rio ( Suspect Coleman ), his girlfriend, Evelyn, her son, Jeremy, and her
son, Deandre, were also present at the residence; however, she does not remember the
specific time they arrived. She indicated all of these individuals remained at her residence
for the rest of the evening. She said the suspect's girlfriend, Evelyn, stayed the night.
Previous investigation indicated that this event occurred hours after the murder.

Also contacted at this time was Suspect Coleman's brother, **JEREMY LASHON COLEMAN**,
MB/15, DOB: 06-21-1987. Witness Jeremy Coleman indicated he is in the 9th grade at
Washington Preparatory High School.

 p. 6

Q      AND THAT BLOCKBUSTER VIDEO, WAS THAT LOCATED AT 8811 SOUTH WESTERN AVENUE, IN THE CITY OF LOS ANGELES?

A      YES.

Q      AND ABOUT HOW FAR, DRIVE TIME WISE, WOULD YOU SAY THIS IS FROM THE SCENE OF THE HOMICIDE, LATE HOUR?  IN OTHER WORDS, LIKE AT NIGHTTIME?

A      TIME WISE?

Q      YEAH.  FIVE MINUTES?  TEN MINUTES?

A      ANYWHERE BETWEEN FIVE, SEVEN MINUTES, I WOULD SAY YOU CAN MAKE IT.

Q      WITH REGARDS TO THAT PARTICULAR BLOCKBUSTER STORE, DID YOU REVIEW A VIDEOTAPE OF THE LOCATION THAT INDICATED THAT IT WAS AT 2140 HOURS.

A      YES.

Q      AND WHEN YOU LOOKED AT THE VIDEOTAPE, IN LIVE-TIME AND COMPARED IT TO YOUR WATCH, WAS THE VIDEOTAPE ACTUALLY ABOUT SIX MINUTES BEHIND WHAT THE REAL TIME WAS?

A      YES.

Q      OKAY.  SO IN OTHER WORDS, WHAT WOULD CORRESPOND TO 2140 HOURS, WOULD BE 2146 HOURS?

A      YES.

Q      NOW.  IN LOOKING AT THE VIDEOTAPE AT THAT BLOCKBUSTER LOCATION, DID YOU SEE THE DEFENDANT ON THAT VIDEOTAPE AT 21 -- WHAT WOULD -- 2146 HOURS ON MAY 10TH, OF THE YEAR 2003?

A      YES.

Q      AND COULD YOU TELL US FROM THE VIDEOTAPE, COULD YOU DESCRIBE WHAT HE WAS WEARING WHILE ON THAT

1892

```
 1        MS. WILLIAMS:  NOTHING FURTHER.

 2                    RECROSS-EXAMINATION

 3   BY MR. WHITE:

 4        Q    SERGEANT KATZ, THE BLOCKBUSTER VIDEO SHOWS

 5   MR. COLEMAN INSIDE BLOCKBUSTER.  IS HE THE ONLY INDIVIDUAL,

 6   YOU SEEN ON THE TAPE?  THE TAPE SHOWS HIM CHECKING OUT,

 7   RIGHT?

 8        A    YES, SIR.

 9        Q    SO WHEN YOU SAY THAT HE WAS SEEN ON THE TAPE

10   AT 2146 HOURS, THAT WOULD HAVE BEEN 9:46; RIGHT?

11        A    YES.

12        Q    MORE OR LESS.  AND THIS WAS ABOUT 40 -- ABOUT

13   45 MINUTES AFTER THE SHOOTING, THE SHOOTING TOOK PLACE A

14   MINUTE OR TWO -- AT LEAST IT WAS PHONED IN ABOUT A MINUTE OR

15   TWO, 2058 HOURS, I THINK, WAS THE RECORDED TIME, WHICH IS

16   LIKE TWO MINUTES TO 9:00?

17        A    YES, SIR.

18        Q    AND, SO, YOU SEE HIM AT BLOCKBUSTER, 45

19   MINUTES AFTER THE SHOOTING.  DO YOU SEE WHEN HE COMES INTO

20   BLOCKBUSTER?  SO IN OTHER WORDS, DO WE KNOW HOW LONG HE BEEN

21   IN BLOCKBUSTER BEFORE HE'S PAYING FOR HIS ITEMS?

22        A    NO.

23        Q    CAN YOU TELL FROM LOOKING AT THE VIDEOTAPE, IF

24   HE'S ALONE OR ANY OTHER INDIVIDUALS ARE WITH HIM WHILE

25   CHECKING OUT?

26        A    I BELIEVE OTHERS WITH HIM.

27        Q    CAN YOU TELL HOW MANY?

28        A    I DON'T REMEMBER IF THERE WAS ONE OR TWO OTHER
```

1  PEOPLE THAT APPEARED TO BE WITH HIM.

2       Q     NOW, YOU TESTIFIED, THAT HE WAS WEARING A

3  BLACK T-SHIRT WITH A WHITE T-SHIRT UNDER IT.  ISN'T IT TRUE

4  HE WAS ACTUALLY WEARING A BLACK SHIRT WITH A WHITE T-SHIRT

5  UNDERNEATH IT -- I MEAN, IT ACTUALLY HAD A COLOR TO IT.  A

6  WHITE T-SHIRT UNDERNEATH IT?

7       A     I DON'T RECALL IF IT WAS A COLORED SHIRT, IT

8  CERTAINLY COULD HAVE BEEN.

9       Q     BUT HE CERTAINLY WAS NOT WEARING A BLACK SWEAT

10  SHIRT WITH A HOODIE, RIGHT?

11       A     NO, I DON'T REMEMBER.

12       Q     DID -- HE DIDN'T HAVE A BLACK KNIT HAT ON HIS

13  HEAD, DID HE?

14       A     NO.

15       Q     COULD YOU TELL OR DID THE SURVEILLANCE TAPE

16  EVER HAVE A VIEW FROM OUTSIDE OF THE CAR SO YOU CAN SEE WHAT

17  HE ARRIVED IN, VEHICLE?

18       A     I DON'T RECALL THERE BEING CAMERAS OVER A VIEW

19  TO THE PARKING LOT FROM THAT TAPE.

20       Q     I LIKE TO ASK YOU A FEW QUESTIONS ABOUT

21  MR. SEGUNDO.  MR. SEGUNDO MADE SEVERAL STATEMENTS THAT ARE

22  CONTAINED INSIDE OF THE DOCUMENTS THAT YOU PROVIDED ME WITH;

23  IS THAT CORRECT?

24       A     YES, SIR.

25       Q     NOW, IN ONE OF THE DOCUMENTS IN THE LAST

26  INTERVIEW THAT YOU HAD WITH HIM WHERE HE DID THE

27  PHOTOGRAPHIC IDENTIFICATION, DO YOU RECALL HIM DESCRIBING

28  THE SHOOTING THAT'S OCCURRING IN SEEING JESSIE, THE YOUNGER

2442

1    HEAD, DID HE?

2         A    NOT IN THAT VIDEO, NO.

3         MR. WHITE:  NO OTHER QUESTIONS.

4         THE COURT:  ANYTHING ELSE?

5

6                    RECROSS EXAMINATION

7

8         Q    BY MS. WILLIAMS:  THE VIDEO FROM BLOCKBUSTER,

9    IS IT ONE OF THOSE VIDEOS THAT DOES A BUNCH OF DIFFERENT

10   CAMERA ANGLES AT THE SAME TIME?

11        A    YES.  IT'S ON WHAT THEY CALL A MULTIPLEXOR.

12   IT FUSES SEVERAL DIFFERENT VIEWS TOGETHER IN A REPEATING

13   CYCLE.

14        Q    AND YOU HAVE A SPECIAL PLAYER THAT YOU ARE

15   ALLOWED -- YOU CAN PLAY THAT ON AND SEE THE DIFFERENT

16   IMAGES?

17        A    YES, OR SOMETIMES WE ACTUALLY USE THE

18   EQUIPMENT.  THERE ARE A VARIETY OF VENDORS THAT SELL

19   THIS EQUIPMENT.  SOMETIMES YOU HAVE TO USE THE EQUIPMENT

20   AT THE SITE OR THE LOCATION.

21        Q    OKAY.  SO IF WE WERE TO SHOW THE VIDEO IN

22   COURT, IT WOULD JUST LOOK ALL GARBLED TO US?

23        A    IT WOULD LOOK -- THERE WOULD BE -- VIEWS WOULD

24   CHANGE AND, DEPENDING ON THE TIME SEQUENCE THAT THEY

25   HAVE THE CAMERA SET TO CHANGE TO.

26        Q    AND IS IT HARD TO WATCH -- I MEAN IS IT HARD

27   TO FOLLOW WHEN IT'S ON A REGULAR VIDEO?

28        A    IT'S HARDER TO DO THAT.  IT'S A LITTLE BIT

1   OUT?

2       A   CORRECT.

3       Q   SO AS FAR AS YOU COULD TELL, THE TOTAL TIME

4   THE DEFENDANT WAS IN THE STORE WAS 5 MINUTES?

5       A   APPROXIMATELY.

6       Q   AND --

7   MR. WHITE:   OBJECTION; FOUNDATION.

8   MS. WILLIAMS:   WELL, YOU KNOW WHAT, I'LL WITHDRAW

9   IT.

10      THE COURT:   OKAY.

11      MS. WILLIAMS:   AND REPHRASE IT.

12      Q   THE AMOUNT OF TIME FROM THE TIME YOU COULD

13  FIRST SEE HIM ON THE VIDEOTAPE TO THE TIME THAT HE

14  CHECKED OUT, WAS THAT 5 MINUTES?

15      A   APPROXIMATELY.

16      Q   COULD YOU SHOW US THE VIDEOTAPE WHERE YOU

17  FIRST SEE HIM COMING INTO THE STORE -- LET ME ASK YOU

18  THIS: AS YOU VIEWED THE VIDEOTAPE, DID YOU TRY TO FIND

19  THE PLACE WHERE THE DEFENDANT CAME INTO THE STORE?

20      A   YES.

21      Q   AND YOU WERE UNABLE TO FIND THAT?

22      A   CORRECT.

23      Q   AND IS IT FAIR TO SAY THAT THE CAMERA PANS

24  AROUND THE STORE SO A PERSON, FROM WHAT YOU COULD SEE,

25  COULD WALK IN, MAY NOT BE CAUGHT ON THAT CAMERA BUT

26  MIGHT BE CAUGHT ON THE NEXT CAMERA?

27      A   YES.

28      Q   AND THE ONE CAMERA IS AT THE ENTRANCE OF THE

2463

1    STORE?

2         A    IT FOCUSES ON THE INSIDE OF THE DOORS.

3         Q    OF THE ENTRANCE?

4         A    OF THE ENTRANCE, YES.

5         Q    AND THEN THE NEXT CAMERA GOES TO A PLACE RIGHT

6    BY, NEAR WHERE ONE WOULD CHECK OUT; IS THAT FAIR TO SAY?

7         A    YES.

8         Q    SO AS ONE IS WALKING IN THE STORE, THROUGH --

9    LOOKING AT THE CAMERA, AS ONE IS LOOKING AT THE STORE IF

10   THE CAMERA DOESN'T CATCH YOU AT THE ENTRANCE, THEN IT

11   MIGHT CATCH YOU RIGHT THERE AT THE PLACE WHERE YOU CHECK

12   OUT OF THE STORE?

13        A    CORRECT.

14        Q    THE FIRST TIME YOU SAW THE DEFENDANT, WAS THAT

15   ON THE SECOND CAMERA RIGHT BY THE COUNTER AS YOU GO IN?

16        A    IT'S ACTUALLY -- YES.

17        Q    WE CAN CLARIFY IT WHEN WE LOOK AT THE TAPE,

18   BUT THEN THERE'S A COUNTER AND THERE'S A DISPLAY NEXT TO

19   THE COUNTER.  IS IT BY THE DISPLAY NEXT TO THE COUNTER?

20        A    CORRECT.

21        Q    IF YOU COULD SHOW US THE VIDEOTAPE STARTING AT

22   THE POINT WHERE YOU SAW THE DEFENDANT ENTER.  AND, ALSO,

23   TO EXPLAIN IT, WITH REGARD TO THE VIDEOTAPE, IF YOU JUST

24   PLAY THE VIDEOTAPE, IS IT JUST A JUMBLE?

25        A    AGAIN, IT DEPENDS HOW QUICKLY SOMEONE SET TO

26   CYCLE.  IT RECORDS ON THE TAPE AT THE CYCLE THAT IT'S

27   SET TO SWITCH CAMERAS.  I'LL BE USING A PAUSE BUTTON SO

28   WE WILL SEE EACH SHOT FOR AN EXTENDED PERIOD OF TIME

1    RATHER THAN WHAT YOU WOULD NORMALLY SEE IF IT WERE IN

2    THE FULL PLAY MODE AND IT WOULD BE VERY DIFFICULT TO

3    SEE.  IT WOULD BE GRAINY AND YOU MAY NOT ACTUALLY SEE

4    ANYTHING AT ALL.

5         Q    COULD YOU DO THAT IN THE PAUSE MODE STARTING

6    AT WHERE IT IS AND ENDING AT THE POINT WHERE THE

7    DEFENDANT CHECKS OUT.

8              CAN THE COURT INQUIRE AS TO CAN EVERYONE SEE

9    THE TV BECAUSE I CAN MOVE IT BACK THAT WAY.

10        THE COURT:  IS THAT OKAY FOR EVERYBODY?  EVERYONE

11   SEEMS TO BE OKAY.

12        MS. WILLIAMS:  SORRY, YOUR HONOR.  WE HAD IT AT THE

13   RIGHT PLACE, BUT THE TAPE STOPPED.

14        THE WITNESS:  I'M GOING TO HAVE TO BACK IT UP.

15        THE COURT:  DO YOU WANT THEM TO CLOSE THEIR EYES?

16        MR. WHITE:  THERE'S NO OBJECTION ON THE TAPE.  IT'S

17   JUST A MATTER OF WASTING OUR TIME.  WHEN IT GOES FAST,

18   IT JUST MAKES YOU SICK.

19

20             (THE TAPE, PEOPLE'S EXHIBIT NO. 52,

21             COMMENCED PLAYING BEFORE THE JURY.)

22

23        Q    BY MS. WILLIAMS:  IS IT FAIR TO SAY THAT AT

24   2135.51 IS WHERE YOU SEE THE DEFENDANT RIGHT AT THE

25   PLACE WHERE THIS SECOND CAMERA WOULD BE AFTER SOMEBODY

26   WALKED IN?

27        A    YES.

28        Q    THEN, COULD YOU SHOW US THEN, IN THAT

2469

1   TELL US WHAT TIME MR. COLEMAN ENTERED THE BLOCKBUSTER

2   BECAUSE YOU DON'T HAVE ANY FRAME THAT SHOWS WHEN HE AND

3   WHOEVER MIGHT HAVE BEEN WITH HIM ACTUALLY ENTERED THE

4   STORE; IS THAT CORRECT?

5       A   YES.  I COULDN'T FIND THAT.

6       Q   SO YOUR TESTIMONY IS JUST OF YOUR FIRST SEEING

7   MR. COLEMAN WITH SOME OTHER INDIVIDUAL ON THE TAPE THAT

8   DEPICTS 2135 HOURS; IS THAT CORRECT?

9       A   YES.

10      MR. WHITE:  THAT'S ALL I HAVE.

11

12                  REDIRECT EXAMINATION

13

14      Q   BY MS. WILLIAMS:  SO IF THE TAPE IS 6 MINUTES

15  SLOW, THAT MEANS THAT 2140 IS REALLY 946?

16      A   CORRECT.

17      MS. WILLIAMS:  NOTHING FURTHER.

18      THE COURT:  ANYTHING ELSE?

19      MR. WHITE:  NO, I DON'T HAVE ANYTHING -- OH, I'M

20  SORRY.

21

22                  RECROSS EXAMINATION

23

24      Q   BY MR. WHITE:  DID YOU EVER HAVE THE

25  OPPORTUNITY TO CHECK YOUR WATCH AGAINST THE RECEIPT FROM

26  THE CASH REGISTER OR THE CASH REGISTER CLOCK OR WATCH TO

27  SEE IF IT WAS ACCURATE?

28      A   I DID NOT.

2470

Q    TO THE BEST THAT WE KNOW, AT LEAST THE
REGISTER RECEIPT WHICH IS DEPICTED IN PEOPLE'S 50
INDICATES THAT MR. COLEMAN PAID FOR HIS PURCHASE AT
9:38; IS THAT CORRECT?

A    YES, SIR.

Q    THANK YOU.

THE COURT:  PEOPLE?

MS. WILLIAMS:  I HAVE NO FURTHER WITNESSES.  I
WOULD LIKE TO MARK THE TAPE AS PEOPLE'S NEXT IN ORDER.
I BELIEVE THAT WOULD BE 52.


        (MARKED FOR IDENTIFICATION, TAPE,
        PEOPLE'S EXHIBIT NO. 52.)


THE COURT:  YOU WILL GET THE JURY INSTRUCTIONS
NEXT.  WE ARE GOING TO NEED ABOUT 25 MINUTES, SO WHY
DON'T YOU COME BACK AT 20 MINUTES TILL AND WE'LL GET TO
JURY INSTRUCTIONS.  AFTER THAT, WE'LL HEAR CLOSING
ARGUMENTS.  THANK YOU.


        (THE FOLLOWING PROCEEDINGS WERE
        HELD IN OPEN COURT OUT OF THE
        PRESENCE OF THE JURY:)


THE COURT:  LET'S TALK ABOUT INSTRUCTIONS FOR A
MOMENT.  THE JURORS ARE GONE.

I'VE READ THROUGH THE JURY INSTRUCTIONS.  THE
ONLY THING THAT I HAD A QUESTION ABOUT WAS 3.31.5 AND 10

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is: PMB 139, 5319 University Drive, Irvine, CA 92612.

On February 9, 2009, I served the foregoing document described as REQUEST FOR ORDER FOR A COMPLETE COPY OF THE SURVEILLANCE TAPE IN EVIDENCE on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

Jofama Coleman V27659
L4/D5/122 up
CSATF, P.O. Box 7100
Corcoran, CA 93212

Dara E. Williams, D.D.A.
c/o Hardcore Gang Division
1 Regent St., Rm. 600
Inglewood, CA 90301

California Appellate Project
Los Angeles Office
520 S. Grand Ave., Ste. 400
Los Angeles, CA 90071

I deposited such envelope in the mail at Irvine, California. The envelope was mailed with postage thereon fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 10th day of February 2009, at Irvine, California.

Patricia Ihara

"EXHIBIT J1"

Patricia Ihara S.B. #180290
PMB 139
5319 University Drive
Irvine CA, 92612
Tel: (949) 733-0746
Attorney for Defendant/Appellant
Jofama Coleman

FILED
LOS ANGELES SUPERIOR COURT

FEB 20 2009

JOHN A. CLARKE, CLERK
BY _____ DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, )<br><br>PLAINTIFF and RESPONDENT )<br><br>vs. )<br><br>JOFAMA COLEMAN, )<br><br>DEFENDANT and APPELLANT. )<br>_____ ) | Case No. YA059765<br><br>ORDER FOR A<br>COMPLETE COPY<br>OF THE<br>SURVEILLANCE<br>TAPE IN EVIDENCE |

GOOD CAUSE HAVING BEEN SHOWN, THIS COURT HEREBY

ORDERS the Los Angeles Police Department to provide appellate counsel

with a complete copy of the original Blockbuster Video Surveillance tape,

dated May 10, 2003, with markings on it of "10" and "C."

Dated:

2-20-09

_____
Judge of the Superior Court
ERIC C. TAYLOR

ORDER FOR EXPERT FEES

"EXHIBIT K1"

"EXHIBIT K 1"



**Imaging Forensics**

Date: April 20, 2009
To:   Jofama Coleman
From: George Reis
      Imaging Forensics, Inc.
RE:   Blockbuster Security Video
CC:   Patricia Ihara

Per your request, I have demultiplexed the video from the Blockbuster security tape to separate it into four separate movies, each representing the four separate cameras of the system. I made a DVD that enables you to view each camera as a separate movie. The original recording was made at approximately 1 frame per second for each camera view – and these movies will play at 1 frame per second.

Camera 01 is blank. The reason for this could be that the camera was disconnected or malfunctioning, or that there was no camera attached.

Camera 02 is of the entrance/exit to the store from the interior.

Camera 03 is of the interior of the store.

Camera 04 is of the cash register area.

You are visible at several times on Cameras 02, 03, and 04. On Camera 02, you enter the store at 21:25:34 (9:25 pm) and leave the store at 21:41:05 (9:41 pm).

I have returned the videotape you provided to me to Patricia Ihara.

Should you need anything else, feel free to contact me at your convenience.

George Reis

"EXHIBIT - L"

# "DECLARATION"

I Jofama Coleman declare under the penalty of perjury the following to be true and correct to the best of my knowledge.

On July, 17. 2009 i Jofama Coleman was escorted to R&R (Receiving and Release) by correctional officer Knight. At R&R i was given the VHS tape and D.V.D's of the Blockbuster surveillence. Upon receiving these items i was then escorted back to D.yard to the education room for the purpose of viewing the surveillence D.V.D's, demultiplexed by George Reis (Imaging Forensic). When i watched the D.V.D's i was able to see Jesse Medina (the little brother of petitioner's girlfriend at the time), entering the video store at 21:25 (9:25p.m). Jesse Medina arrived at the Blockbuster video store with Petitioner and Evelyn Medina (Petitioner's girlfriend at the time).

sign ........., Jofama Coleman
print........, Jofama Coleman
date........, Feburary, 24. 2010

"EXHIBIT- M"

Police Reports, following

| REPORT CONTINUATION   NARRATIVE | URN 9?? ?? ?? -0372 -011 |

UNDER T-E DIRECTION OF CAPTAIN BOWEL, ARRIVED ON SCENE AND BEGAN TREATING THE VICTIM FOR HIS WOUNDS. DUE TO NUMEROUS FAMILY MEMBERS AND FRIENDS ATTEMPTING TO COME TO THE VICTIMS AID, I REQUESTED ADDITIONAL LENNOX UNITS TO MY LOCATION RE: CROWD CONTROL.

WE THEN **RECEIVED** SUSPECT INFORMATION FROM WITNESSES OF THE INCIDENT. DEPUTY ANDREWS INITIATED A CRIME BROADCAST (VIA HIS HAND HELD RADIO). WE SECURED THE CRIME SCENE AND IDENTIFIED (15) EXPENDED 9MM SHELL CASINGS.

AT T-S POINT, THE VICTIM WAS TRANSPORTED TO MARTIN LUTHER KING HOSPITAL BY AMR (AMERICAN MEDICAL RESPONSE) UNIT 4301 (MEDIC JAMES .00 #06).

REPORT CONTINUATION NARRATIVE

WE CONTACTED WITNESSES AT THE INCIDENT AND
THEY SAID OR THE FOLLOWING.

I CONTACTED W/ ROBLES (VICTIM 3), AND HE SAID
THAT HE WAS STANDING IN THE FRONT YARD OF
HIS RESIDENCE TALKING WITH OTHER FAMILY
MEMBERS. W/1 ROBLES SAID HE HEARD APPROXIMATELY
(2) GUNSHOTS COMING FROM TWO HOUSES JUST
WEST OF HIS RESIDENCE. HE WALKED ONTO THE
SIDEWALK, LOOKED WESTBOUND, AND SAW AN
UNKNOWN MALE HISPANIC (LATER IDENTIFIED AS
THE VICTIM) LAYING ON THE NORTH SIDE, SIDEWALK
ON 101ST STREET. W/1 ROBLES SAW ANOTHER UNKNOWN
MALE HISPANIC EXIT THE PASSENGER SIDE DOOR OF A
WHITE COLORED ASTRO VAN (TINTED WINDOWS, WOOD
PANELLING) WHICH WAS STOPPED FACING EASTBOUND IN
101ST STREET. THE SUSPECT APPROACHED THE VICTIM
ON FOOT, STOOD APPROXIMATELY TWO FEET SOUTH OF THE
VICTIM, AND BEGAN TO SHOOT HIM MULTIPLE TIMES.

| REPORT CONTINUATION    NARRATIVE | URN |
|---|---|

W/1 ROMERO SAID HE SAW THE SUSPECT RETURN TO THE

VEHICLE AND THE DRIVER OF THE VEHICLE SPED OFF

_____

I CONTACTED W/2 SEGUNDO AND HE SAID HE AND

THE VICTIM WERE WALKING WESTBOUND _____ STREET

ON THE NORTH BOUND SIDE WALK TOWARDS BUDLONG AVE

THEY WERE WALKING TO THE LIQUOR STORE (ON

CENTURY BLVD / BUDLONG AV) WHEN THE VICTIM CHANGED

HIS MIND AND BEGAN WALKING BACK HOME, EAST BOUND

101ST STREET ON THE NORTH BOUND SIDE WALK,

W/2 SEGUNDO SAID THE TWO DEPARTED AND THEN HE

BEGAN WALKING ACROSS THE STREET TO THE

SOUTH SIDE WALK THEN WEST BOUND TOWARD

BUDLONG AVE.   W/2 SEGUNDO SAID AS HE

APPROACHED 1154 101ST STREET HE SAW A

WHITE CHEVY ASTRO VAN WITH BROWN WOOD SIDE

PANELS (ON THE LOWER PORTION OF THE VEHICLE ON THE

PASSENGER SIDE), AND TINTED WINDOWS PASS HIM DRIVING

EAST BOUND 101ST STREET.

(9)

REPORT CONTINUATION — NARRATIVE

W/2 SEGUNDO SAID APPROXIMATELY 20 SECONDS LATER HE HEARD TWO GUNSHOTS, TURNED AROUND AND SAW THE VICTIM FALL TO THE GROUND. HE THEN SAW AN UNKNOWN MALE HISPANIC EXIT THE PASSENGER SIDE DOOR OF THE VAN AND APPROACH THE VICTIM. W/2 SEGUNDO SAID THE SUSPECT WALKED WITHIN THREE FEET OF THE VICTIMS BODY, POINTED THE GUN AT THE VICTIM, AND FIRED APPROXIMATELY THIRTEEN MORE GUNSHOTS AT THE VICTIM. W/2 SEGUNDO SAID THE SUSPECT RAN BACK INTO THE VAN AND A MALE HISPANIC DRIVER (NFD) DROVE EAST BOUND ON 101ST STREET TOWARD VERMONT AVE, AND OUT OF VIEW.

W/2 SEGUNDO SAID HE THINKS HE RECOGNIZED THE SHOOTER TO BE A MALE HISPANIC THAT IS ENVOLVED WITH A GANG KNOWN AS "MKA" (MEXICAN KICKIN ASS). W/2 SEGUNDO SAYS THIS BECAUSE HE (SEGUNDO), AT ONE TIME, WAS AFFILIATED WITH A GANG CALLED "NO CONTROL", AND "MKA" IS THEIR RIVAL GANG (NFD).

## COUNTY OF LOS ANGELES - SHERIFF'S DEPARTMENT
## SUPPLEMENTARY REPORT

DATE 05-11-03    TIME 2050    FILE NO. 503-04469-0372-011

C. MURDER - 187 pc

Action Taken: Active / Additional Information

Victim ROBLES, JOSE

Suspect / Subject UNKNOWN

Informant

Date of Occurrence: 05-10-03    Time: 2050

Location of Occurrence:

The purpose of this Supplemental Report is to provide additional information about THE MURDER THAT

OCCURRED ON THE 1100 BLK OF 101ST. ST

WE CONTACTED DAVIS, PAMELA FB/A (DOB ___ ___ ) WHO SAID SHE WAS IN HER HOUSE (___ ___, LA) WHEN SHE HEARD 5-6 GUNSHOTS OUTSIDE HER RESIDENCE. DAVIS SAID SHE LOOKED OUT OF HER FRONT DOOR AND SAW A LIGHT BROWN COLORED VAN WITH WOOD PANELING LEAVING THE LOCATION WHERE V/ ROBLES, JOSE LAID — (SIDEWALK OF 1131 101ST ST LA). DAVIS SAID SHE DID NOT SEE THE SHOOTING, BUT HAS SEEN THE VAN PASS BY ON PREVIOUS DAYS, WITH NUMEROUS SUBJECTS INSIDE YELLING THEIR GANG "MKA" MEXICANS KICKIN ASS. N.F.D.

| | |
|---|---|
| By Deputy: JUAREZ | Employee # 439129 |
| Deputy: KIMURA | Employee # 404296 |
| Station: LENNOX | Unit: 32   Shift: PM |
| Approved By: SGT. ROBERTS 279920   Time: 0200 | |
| Assignment: HOMICIDE BUREAU | |
| Special Request Distribution: | |
| TT B/C By:    Date:    Time:    Secty | |

(18)

| REPORT CONTINUATION - NARRATIVE | URN 003-0X169-0378-011 |
| --- | --- |

WE CONTACTED JACKSON, APARA FB/A (03-03-62 [redacted]) WHO SAID
SHE ARRIVED AT HER RESIDENCE ([redacted] LA.) FROM WORK
AFTER THE INCIDENT OCCURED. JACKSON SAID SHE WENT TO WHERE
V/ROBLES, JOSE WAS LAYING AND HELPED ADMINISTER CPR.
JACKSON SAID SHE DID NOT SEE OR HEAR ANY PART OF
THE INCIDENT.

WE CONTACTED SEGUNDO, ALBERT STEVE (10-06-87 [redacted]
[redacted] LA) WHO SAID THAT HE SAW V/ROBLES, JOSE WALKING
WEST BOUND 101ST TOWARDS BUDLONG. V/ROBLES WAS GOING TO
THE LIQUOR STORE. SEGUNDO ASKED V/ROBLES IF HE WANTED
HIM TO GO WITH HIM. V/ROBLES SAID NO. SEGUNDO SAID
THAT APPROXIMATELY 30 SECONDS LATER THEY BOTH SAW A
TAN VAN WITH WOODEN PANELING ON THE SIDE DRIVE SOUTH BOUND
ON BUDLONG CROSSING 101ST ST. CONSIDERING THAT V/ROBLES
AND SEGUNDO HAVE SEEN THIS VAN BEFORE, AND KNOWING
THAT A RIVAL GANG DRIVES THIS VAN, SEGUNDO AGAIN
ASKED V/ROBLES IF HE WANTED HIM TO GO WITH V/ROBLES
TO THE LIQUOR STORE. V/ROBLES AGAIN STATED "NO, THAT
HE'LL BE ALRIGHT.

MINUTES LATER, SEGUNDO HEARD TWO
SHOTS WITH ABOUT ONE SECOND BETWEEN SHOTS. SEGUNDO
RAN TO THE MIDDLE OF 101ST ST AND SAW A MALE
SUSPECT (W.F?) STANDING TO THE REAR OF THE TAN VAN HE

(19)