## LOS ANGELES SHERIFF'S DEPARTMENT - SUPPLEMENTAL REPORT

**Date:** 12-13-05

**File:** 405-23990-0453-048

**Crime:** Car Jacking, 215 PC

**Action** Active Additional Information/Complaint Sought

Possession Of A Controlled Substance, 11377(a) HS

Possession Of Burglary Tools, 466 PC

**V/1:** Garcia, Joseph

**S/1:** Robles, Jesse

LARCIS √

### Narrative

On December 13th, 2005 Suspect Robles was arrested for possession of a controlled substance, methamphetamine and possession of burglary tools (shaved keys) under file number 405-24068-0452-184. Deputy Suh admonished Suspect Robles his Miranda Waiver which he said he understood, waived and agreed to speak to him without an attorney present.

The suspect told Deputy Suh he had been involved in the car jacking that had taken place on December 12th, 2005 under the above file number. Incident to arrest, Suspect Robles was found in possession of a wooden leg of a chair approximately six inches in length which the suspect said he uses to simulate being armed with a gun.

On December 14th, 2005 I interviewed Suspect Robles at Norwalk Sheriff's Station. I admonished him of his Miranda Rights which he said he understood, waived and agreed to speak to me without an attorney present.

I asked Suspect Robles about the shaved keys and shot gun shells that were found in his possession. He told me his cousin Daniel Sitan owns a Honda so he took some of his extra keys and shaved them down. He said he knows shaved keys are used for burglarizing or stealing cars and that it is illegal to possess. He said he took the shot gun shells from his friend "Gizmo" who lives in Los Angeles. He would not provide any further information and said he did not know what he was going to do with the shells but just wanted them.

I asked Suspect Robles about the wooden furniture leg that he had. He told me he uses it to simulate a gun while holding it in his sweatshirt pocket. I asked him if that is what he did during the time of the car jacking and he said, "Yes".

1

"EXHIBIT P"

Carlos Lopez Past drug charge

Case 2:10-cv-02343-VBF-RNB   Document 10-19   Filed 10/12/10   Page 3 of 25   Page ID #:627

LOS ANGELES COUNTY
CONSOLIDATED CRIMINAL HISTORY REPORTING SYSTEM        Date: 04/06/2006   Time: 0437
===============================================================================

CRIMINAL HISTORY TRANSCRIPT FOR OFFICIAL USE ONLY
UNAUTHORIZED USE IS A CRIMINAL OFFENSE

INFORMATION FINGERPRINT VERIFIED UNLESS OTHERWISE NOTED BY AN ASTERISK ( * )

(C) Copyright 1996, County of Los Angeles
All Rights Reserved

Key Name: (1) LOPEZ,CARLOS AGUSTO          Date Name First Used: 04/18/2000

SID/CII: A21586477   MAIN: 30091863   FBI: 336848NB1   LAPD:
===============================================================================

Requested By: SH 292886 Src-TTY: LXT0 Dest-TTY: LXT0   ACHS Data Included: YES
Agency:       CA0190040  LASD - ACADEMY ADVANCED TRAINING BUREAU
Reason:       LOPEZ                                 Multi-State Record: NO

DEPT. OF JUSTICE AND DMV MAY HAVE ADDITIONAL INFORMATION

===============================================================================
                                 SUMMARY
Bookings       Convictions     Juvenile        Warrants Issued     Probation
---------      -----------     --------------  -----------------   ----------
Felony:  0     Felony:   0     Sustained:   0  Bench:          0   Open:     0

Misd:    1     Misd:     0     Dismissed:   0  Arrest:         0   Expired:  0

                                               Infract.(FTA):  0

===============================================================================
                           LATEST INFORMATION
===============================================================================
Latest Name: (1) LOPEZ,CARLOS AGUSTO         Date Name Last Used: 09/08/2003

Sex  Race                  Hair     Eyes        Hgt  Wgt  DOB         Updated
---  ------------------    ------   ----------  ---  ---  ----------  ----------
 M   HISPANIC              BLACK    BROWN       507  140  ~~~~~~~~~~  09/08/2003

Latest Address:    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~            04/18/2000

Latest Occupation:

Type      Start Date End Date   Charge/Description       Case Number    Updated
--------- ---------- ---------- ------------------------ -------------- ----------



===============================================================================

"EXHIBIT - P"

```
                              DESCRIPTORS
                           #/Names/AKAs/Count
                           ------------------
    (1) LOPEZ, CARLOS AGUSTO          2

                           Dates of Birth/Count
                           --------------------
08/06/1985  2
```

```
==================================================================================
                           Other Identifiers
                           -----------------
FBI    336848NB1          JAIN  01694919          PDJ    P194332
OMAN   30191264

                           Addresses/Count
                           ---------------
2607 HOOPER AVE LOS ANGELES CA                                              1

                           Birth Places/Count
                           ------------------
CASACRAME                  1     YY                                         1
```

```
==================================================================================
                      JUVENILE SUSTAINED PETITIONS
==================================================================================
                        No Juvenile Information.

                        CONVICTIONS/ACTIVE DIVERSIONS
                     No Convictions/Active Diversions Found.

                     PENDING CASES OR UNKNOWN DISPOSITIONS
==================================================================================
                           No Pending Cases.
```

```
==================================================================================
                  ARRESTS/CASES/CUSTODY NOT REPORTED ABOVE
Arr Date     Name   Arresting Agency                 Booking Number
----------   ----   -------------------------------  --------------------
04/18/2000    1     LAPD - R&I  WARR                  006432887

             Sex    Race                Hair      Eyes      Hgt   Wgt   DOB
             ---    ------------------  -------   --------   ---   ---   ----------
              M     HISPANIC            BLACK     BROWN      507   140   08/06/1985

Cnt   Arrest Charges      Dispo Date   Result
---   ------------------  ----------   ------------------
 1    HS 11357(E)                      UNKNOWN
      MARIJUANA - POSSESSION
```

```
File Date  Name  Case Number/County     Last Dept/Div           Warrants Issued
---------- ----  ---------------------- -------------           ---------------
```

                 (NO CASE FILING INFORMATION FOUND IN L.A. COUNTY)

```
===============================================================================

===============================================================================
```

```
Arr Date    Name  Arresting Agency                      Booking Number
----------  ----  -------------------------------       --------------------
04/18/2000        LAPD - NEWTON DIVISION                006432887

            Sex   Race                Hair    Eyes      Hgt  Wgt  DOB
            ---   ------------------  -------  ---------- ---  ---  ----------
```

```
Cnt  Arrest Charges       Dispo Date  Result
---  -------------------- ----------  -------------------------------------
     HS 11357(E)          05/30/2000  CLT
     MARIJUANA - POSSESSION
```

```
File Date  Name  Case Number/County     Last Dept/Div           Warrants Issued
---------- ----  ---------------------- -------------           ---------------
```

                 (NO CASE FILING INFORMATION FOUND IN L.A. COUNTY)

```
===============================================================================
```

                          END OF TRANSCRIPT

RE: QHY.CA0190003.21586477.VALEMNT       DATE:20060406 TIME:04:38:40
RESTRICTED-DO NOT USE FOR EMPLOYMENT,LICENSING OR CERTIFICATION PURPOSES
ATTN:VALEMNTO-INV

    *     *     *                      *     *     *
RECORD DELETED FROM AUTOMATED SYSTEM/PURGED
    *     *     *    END OF MESSAGE     *     *     *

CARLOS LOPEZ

"EXHIBIT - Q"

Declaration of Jofama Coleman

# "DECLARATION"

I Jofama Coleman declar the following to be true and correct to the best of my knowledge.

Due to not having credit, Laura Marquez purchased my cell phone for me. When i wanted to purchase a newer model phone or pay my bill; i had to go through Laura Marquez when doing so. When i purchased a newer model phone, it would come to Laura Marquez's home, in the mail.

Jofama Coleman
Jofama Coleman
March, 23. 2010

## "EXHIBIT - Q"

"EXHIBIT-R"

"Denver Lane Blood Gang",
Possible Involved.

"EXHIBIT-R"

DET. TRIP    INGLEWOOD PD
~~[redacted]~~
DENVER LANE BLOOD
POSS INVOLVEMENT
HART OR STEINDORFF

05/12/03 / MONDAY / 1230

= DICTATION =

"MIC/KO"  NC  OR "HUERO"
POSSIBLE WITNESS
& GIRL WITH HIM IS
A POSS. WIT

APPEARS ALBINO.

JOFAMA 103  B/T VMT & BUDLONG

"EXHIBIT- S"

Crime Justice & America, By
Martin Blinder, Forensic
Psychiatrist  pp. 22 - 26.....



# EYEWITNESS TESTIMONY:
## The Most Highly Esteemed, And The Least Reliable

by Martin Blinder
Forensic Psychiatrist,
San Anselmo, California
Past Adjunct Professor
of Law, Hastings
Coillege of the Law

"EXHIBIT-S"

The eyewitness offers the sort of testimony most highly esteemed by juries, yet paradoxically, by any objective standard, is perhaps the least reliable. Time and time again cases are reported in which several eyewitnesses positively identify a criminal defendant at the scene of the offense and in subsequent mug shots, and juries convict – *in the face of the defendant's iron-clad evidence that he was miles away at the time of the crime.* Recent studies by the Department of Justice and others reveal that 80-90% of incarcerated felons freed by DNA evidence had been convicted largely through testimony from sincere, persuasive but hugely mistaken eyewitnesses. Only on that rare occasion when the true culprit – bearing resemblance to the man wrongly convicted – is belatedly apprehended might an eyewitness be able to admit uncertainty, albeit grudgingly, and sometimes, not even then.

---

Given the questionable reliability of eyewitness testimony, defense counsel historically has been unduly handicapped by yet another paradox: until quite recently, in many jurisdictions judges had consistently allowed eyewitnesses to testify freely, yet denied defense counsel's motion to use experts knowledgeable about studies on eyewitness fallibility on grounds that the proposed testimony lacked scientific standing or invaded the jury's province. As a result, many defendants have been forced to rely on hopes that cross-examination might repair any damage the witness (and the court's recalcitrance) had done to their case.

But even the best cross often cannot cure deeply ingrained bias. Jurors were still left ignorant of all the ways an eyewitness can get things wrong, and would retire to their deliberations believing them to be intrinsically accurate. Thus, the impact of eyewitness testimony has been greatly disproportionate to its probative value.

## ADMISSIBILITY OF EXPERT TESTIMONY

With a uniquely instructive 1984 opinion, the California Supreme Court joined the small number of jurisdictions that hold a refusal to allow use of expert testimony on the accuracy of eye-witness identification to be prejudicial error.

Ruling unanimously on in a case of first impression, the Court threw its considerable jurisprudential weight behind what has become a trend in narrowly expanding the right of the criminal defendant by upholding the trial court's exercise of discretion to admit testimony as to how "certain aspects of everyday . . . experience can affect human perception and memory. . ."

When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be understood by the jury, *it will ordinarily be error to exclude their testimony.*

Writing for the majority, Justice Stanley Mosk emphasized that expert opinion as to the accuracy of a *particular* witness's memory is not probative [that is, valid as evidence]; what would be inordinately useful to the jury, however, are explanations of: how such recollections are conceived, stored, organized, and subsequently expressed; the contextual factors influencing and potentially distorting each of these components; and contradictions between "common sense" assessments of eyewitness reliability and scientifically determined probabilities.

Mosk found exclusion of this scientific evidence to be erroneous because such clinical and laboratory data go well beyond the jury's common knowledge or experience. "The jury need not be wholly ignorant of the subject matter of the [scientific] opinion in order to justify its admission; if that were the test, little expert opinion would ever be heard." By the same token, scientific evidence need not (and probably will never) be unanimous to be of value.

He furthermore opined that such testimony in no way usurps the jury's traditional role and function as the arbiter of credibility, "but is limited to exploring the potential effect of circumstances on the powers of observation and recollection of a typical eyewitness. The jurors retain both the power and the duty to judge credibility and weight of all testimony in the case . . . [footnote omitted]."

> "In the wake of this case, People v. McDonald, other jurisdictions seem to be recognizing the unfairness of relying on unreliable testimony. 'To the extent that a mistaken witness may retain great confidence in an inaccurate identification, cross-examination can hardly be seen as an effective way to reveal the weaknesses in a witness's recollection of an event.'" United States v. Downing (1985, CA3 Pa)" –author's name

The possibility that a jury could be confused by admittedly complex psychiatric data is foreclosed by the trial court's unimpaired power to set limits on the presentation of evidence. And certainly, "evidence that is relevant to the prime theory of defense cannot be excluded in wholesale fashion merely because the trial would be simpler without it."

It would be equally gratuitous to exclude such testimony out of fear it might unduly impress jurors, who, in fact, "are far more likely to be unduly impressed by the eyewitness testimony itself."

## THE VULNERABILITY OF EYE WITNESS TESTIMONY

Memory is a composite of retrieved actual perceptions ("I felt the rain, I heard tires squeal, I saw a Volkswagen under a big red truck") and unconscious reconstruction (or invention) of events *not* actually perceived, so as to form a coherent logical whole: ("This Volkswagen skidded on the west street, and crashed under a big red truck.")

Often what an eyewitness "remembers" is largely a product of how a question is asked. Compare "How fast was the Volkswagen going when it smashed into the truck?" versus "What was the speed of the Volkswagen when the two vehicles met?"

> "The pejorative cliché 'they all look the same to me' is, unfortunately, based on fact; studies demonstrate that members of one race have great difficulty discerning subtle distinctions between members of another race. The effect is strongest when white witnesses attempt to recognize black subjects" – author's name

The accuracy of an eyewitness' recollection is suspect when: there was little time for observation; the witness was under the influence of alcohol or drugs; the witness was in a highly emotional state; the witness would have had no reason to take particular notice of the incident (e.g., did not know a crime was taking place); there was a substantial time lapse between observation and first identification; there was a marked discrepancy between the identifying witness' *original description* and the *actual appearance* of the defendant; the witness initially expressed doubt he could make an identification, or first made a patently erroneous one, or reported other details that later proved incorrect; there is steady "improvement" of memory and confidence from first identification through subsequent statements, grand jury testimony, and trial; the witness fails to recognize the defendant when next encountered; the witness and the defendant are of different ethnic groups/races;" the witness demonstrates bias or prejudice ("blacks can be awfully violent," "women are such careless drivers," etc.); the witness has an emotional need to see what s/he expects to see or report; and/or the witness manifests a high need to conform to, defer to, or please authority figures.

> "Law enforcement agencies will sometimes use hypnosis to enhance the recollection of eyewitnesses. Unfortunately,

controlled studies show that while hypnosis may increase the degree of confidence the subject feels in recollections, it does nothing for accuracy. Instead, it provides the subject a sense of security to make guesses he might not otherwise make, and provides subtle, unconscious incentives to incorporate any interviewer bias he may discern from the questions put to him." –author's name

Standard mug-shot and lineup procedures unfortunately provide good illustration of how memory is commonly distorted. Typically, photographs (or lineup participants) shown to a prospective witness are all of persons suspected of the same crime as the offense under investigation, rather than of persons fitting descriptions originally given by witnesses. Thus, there tends to be a wide discrepancy in appearance among the suspects viewed, heightening the probability that the witness will identify the *one* face (relative to the others) that at least somewhat *resembles* the witness's original perceptions. The police frequently use the photograph of the one *they* believe to be the perpetrator again and again in different displays, whereas the other faces reappear far less often; repetition alone can increase the witness' conviction that the suspect's face is familiar.

> Police sketch artist Michael Streed defends eyewitness testimony in an article appearing in issue 10 of *Crime, Justice & America*, online at http://www.cja.us

If an eyewitness *erroneously* chooses a mug shot after the initial lineup viewing, he is likely to choose that very same incorrect face once again at a later time, even though the correct face is also available for choosing. That is, a witness is much more likely to identify

in a real lineup that face he or she may have previously seen in a mug-shot lineup, than that actually seen at the time of the initial identification, and in a subsequent recall is likely to remain committed to his or her error.

Lineups may be much smaller functionally than they appear if they contain many persons who can be easily ruled out as suspects. (To make my point, let me create an improbably obvious example of the raped woman who reports that her assailant was a black man but who is then shown a lineup wherein three of the men are white. This trio of poorly fitting individuals would thus contribute to the nominal, but not the functional, size of the lineup group.)

Witnesses may further be influenced by an unconscious wish to please the police and/or by the police's unconsciously directing identification towards a suspect they are sincerely convinced is the guilty party. Thus, while the *confidence* of the eyewitness improves with the passage of time, *recollections are fading and becoming ever less reliable.*

Data given an eyewitness *after his* viewing on participating in the event in question can systematically bias previously stored information. In one study, subjects who learned after an incident that the offender, upon conviction, might be treated severely, were much more likely to make an identification of *someone* in a police lineup than those who were told the offender might receive lenient treatment. The biasing effect of this "impetus to be helpful" in cases of serious crime was apparent in the increased incidence of identification, *even when the perpetrator was not in the lineup.*

By contrast, when the crime was not considered serious, as evinced by the possibility of only mild punishment, viewers of a lineup appeared far less eager to "nail" *someone* as a criminal; such caution was reflected in their pronounced disinclination to make an identification, *even when the perpetrator was in fact present.*

Let us now study the seven factors that I find most commonly confound the eyewitness in a criminal trial.

## EYEWITNESS VULNERABILITY

### Stress

The more stressful an event, the more likely that *the event occurred* will be remembered; but the accuracy of remembered details *within the event* still remains inversely proportionate to the stress involved. Thus, the fact of a double homicide occurring right before the witness' eyes is likely to be remembered forever, but such *discriminating details* as subtle facial characteristics of those parties involved are far *less* well-remembered. So dramatic an event is likely to be further ingrained as the witness goes over it again and again in his or her mind, but such rehearsal does not increase the accuracy of details that were initially perceived incorrectly; unfortunately, all that rehearsal does is increase *confidence.*

### Attention To the Unusual

Essentially, one perceives and remembers items or events that draw out attention. Few of us can recall which three letters go with which numbers on a telephone dial, even though we have seen them together many times because we've never paid attention to them. Further, rarely can we attend to more than one thing at a time, so that if there are many things happening at once, attention is divided and as a consequence, nothing is remembered very well.

Attention is drawn to the unusual. Thus, a witness will readily remember that a perpetrator had a large scar or a tattoo, or that he or she was of a different race, e.g., "a big black dude," yet recall little about the myriad facial details. In a sense, the odd feature robs the many usual ones of their share of attention.

### Cross-race

Many, though not all, studies indicate that cross-racial identifications are 10-15% less accurate than same-race ones. This phenomenon has been studied most extensively for black versus Caucasian identifications, but has been found with other race mismatches as well. Disparity is less in adults who have close friends of the other race involved.

### Resemblance

Unsurprisingly, miscarriages of justice are most likely to occur when a hapless but innocent defendant does in fact resemble the perpetrator. The tendency to select from a photo lineup the face that merely most *resembles* the perpetrator can best be countered by replacing the typical simultaneous presentation of photographs with a sequential one. The latter promotes *absolute* judgments wherein the witness must compare each photo with his memory of the *actual* perpetrator's face as opposed to simultaneous presentation which promotes *relative* judgments amongst numerous faces, none of which may belong to the perpetrator.

### Post-event Contamination

Information acquired after the fact may then be inadvertently integrated into memory for the event itself. Once this happens it may be impossible to tease them apart. Newspaper reports, the comments of other witnesses, and leading questions are typical sources of such contamination. The more impoverished the original information, the more remote the event in time (relative to that point in which new information

is acquired) and the more "reasonable" the new information, the more likely post-event data will be integrated into memory.

A common form of such post-event contamination in criminal proceedings occurs when the witness erroneously identifies a defendant on a photo lineup. With that photograph now clear in the witness' mind, he then identifies the defendant with great certainty and conviction at the preliminary hearing and trial. Here, the photo lineup itself is actually a form of contaminating post-event information.

> "For example, if the witness was 95% certain of an identification after a show up but 100% certain after a line up, it is important to know to what specific event the witness attributes this increase in confidence. For example, did the police confirm the identification? Did other witnesses? Was the witness asked to confirm the identification before the grand jury in a way that made apparent the prosecution's belief that the eyewitnesses' opinion was consistent with the prosecutor's? Resolutely pursuing these facts can ultimately fuel an argument that the witnesses' confidence is evidence of the witness' environment more than evidence of the witness' accuracy." - Eyewitness Testimony, 3d, Elizabeth Loftus and James Doyle, Lexus Law Publisher, Charlottesville, VA 1997

## Familiarity (Unconscious Transference)

Contrary to expectations, past or subsequent familiarity with a suspect may *disable*, rather than *enhance*, the accuracy of an eye witness identification. A witness may unconsciously transpose a face familiar for mundane reasons to someone at the scene of a crime (especially if the perpetrator in fact resembles the more familiar face. That is, the witness has the *right face*, but the *wrong place*. Or, a witness may identify at line-

up persons whose faces were seen only in a book of mug shots one week later, but were not at the crime scene.

Special difficulty arises in cases involving multiple perpetrators; witnesses may have a strong bias to label *any* person they recognize as not just being in some way involved, but as having been the *principal assistant*.

## Psychological Pressures To reduce uncertainty

In matters of great importance most of us would be far more comfortable with certainty than with doubt. And so it is that as time passes, the eye witness tends to reassure himself by going over the index event in his mind, filling in gaps, and reconstructing details, thus inadvertently altering the original recollections so as to eliminate conflicts and inconsistencies between information in memory, and that acquired from other sources.

The very act of explicitly making an identification in itself appears to augment certainty, with witness confidence increasing with each subsequent report, though he may be merely confirming himself in his error. That is, the very process of attempting to recall can generate the illusion of familiarity, a phenomenon utterly independent of accuracy; with each rehearsal and report, the witness becomes increasingly committed to his judgment.

### b. To choose

Studies have shown that many witnesses feel obliged to identify *someone*, and may do so even though the individual *known* to be the perpetrator is not present in the live lineup or photo array, and despite admonitions that they need not select anyone. Demonstrably false identifications have also been observed in laboratory studies and in staged crime experiments simulating a criminal investigation. Thus, a sincere desire

to be useful may cause some witnesses to be entirely too helpful.

### c. To meet one's expectations

If a witness has reason (however unfounded) to believe that the person he is now identifying is in fact the perpetrator, *his actual memory of the perpetrator will start to change* so as to more resemble the person being identified, particularly if the original perception was brief, incomplete, or hazy. That is, exposure to a new face which one has been persuaded is that of the perpetrator can have the effect of making memory of the perpetrator's face "better," when in fact, it is being rendered less correct, i.e., a weak correct memory is being replaced by a stronger incorrect one. ■

©2007 by Dr. Blinder The second half of this article will appear in the next issue of Crime, Justice & America.

## ATTENTION READERS!

*Crime, Justice & America* only allows a few select advertisers in our local editions. Their services can mean the difference between jail and freedom, or doing time versus living life. Call them to get out of jail or to represent you in court. Don't call them to ask for 3-way phone calls, or after you're sentenced to see whether you got a good deal. Don't ask them for free advice: They spend a lot of time on each of their cases, which you need and deserve. Your family and friends are the best resources for hiring experts to help your situation. Have them call the advertisers to help you faster!

"EXHIBIT – T"

Charge Evaluation Worksheet

"EXHIBIT -T"

| LOS ANGELES COUNTY<br>DISTRICT ATTORNEY | ☐ Further investigation requested.<br>☐ Probation Violation in lieu of filed.<br>☒ Prosecution declined. | DA CASE NO.<br>23918829 | Page 1 of 1<br>Date: July 1, 2003 |
|---|---|---|---|
| CHARGE EVALUATION WORKSHEET | | POLICE CASE NO. (DR OR URN NO.)<br>003-04469-0372-011 | DA OFFICE CODE<br>INA |

## SUSPECT DATA

| NO. | SUSPECT NAME | BKNG NO. | CHARGE | REASON |
|---|---|---|---|---|
| 01 | COLEMAN, JOFAMA REO | | PC187(a)B - Insufficient evidence | |

**DESCRIPTION**

Defendant is identified as the driver of a van where the right front passenger got out and shotkilled the victim.2 of victim's friends (1 brother and 1 friend) make the positive identification. Defendant has approximately 5 witness who corroborate his alibi that he was somewhere and No physical evidence connects defendants to the murder. If the van is located, process it. If defendants fingerprints are found in the van, resubmit.

(94)

| STEVE COOLEY<br>District Attorney | COMPLAINT DEPUTY (PRINT)<br>JANET WILSON | DEPUTY CODE<br>167125 | COMPLAINT DEPUTY (SIGNATURE) | REVIEWING DEPUTY |
|---|---|---|---|---|

In submitting this matter for consideration of a complaint, written reports of substantially all available evidence (except as to the oral information, if any, purporting to have been given by me and which is fully and correctly stated above) have been submitted to the above-named Deputy (copies of which are attached hereto) except the following:

The disposition of this matter will be final unless the commanding officer requests reconsideration of the case, stating his reasons on the back of this form.

OFFICER - MARK LILLIENFELD

JUL-07-2003  09:30          1310 419 5187          99%

TOTAL P.02
P.02

DISTRICT ATTORNEY

# FACSIMILE COVER SHEET

Date: __7.7.03__     Fax No.: __310.674.7837__

Time: __9:30 am__    Location: DISTRICT ATTORNEY'S OFFICE
                               INGLEWOOD AREA OFFICE
No. of Pages: __2__            1 REGENT STREET, ROOM 405
           (INCLUDING COVER SHEET)    INGLEWOOD, CA 90503

## TO:                          FROM:      JANET M. WILSON
                                           Deputy District Attorney
NAME: __Mark Lillienfeld__      NAME: 
DIVISION/                       DIVISION: __Filing__
COMPANY: __LASD__
                                PHONE NO.: __310.419.5177__
FAX NO.: __323.887.1160__

PHONE NO.:

SUBJECT: __Jofama Coleman__
MESSAGE: __please contact me if__
__you locate the van or__
__some other physical__
__evidence connecting Coleman__
__to the murder.__

NOTE: If the FAX you receive is incomplete or illegible, please contact the FAX

Operator at _____

OA-1854-A—4 90



"EXHIBIT- U"

Minute Order, indicating information was filed when

"EXHIBIT- U"

MINUTE ORDER
SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE PRINTED: 09/12/07                                          000189
----------------------------------------------------------------------
CASE NO. YA059765

THE PEOPLE OF THE STATE OF CALIFORNIA
                        VS.
DEFENDANT 01:  JOFAMA  COLEMAN

----------------------------------------------------------------------

INFORMATION FILED ON 07/27/05.


COUNT 01: 187(A) PC FEL  - MURDER.


ON 05/09/06 AT  130 PM  IN SOUTHWEST DISTRICT DEPT CLK

CASE CALLED FOR EXHIBITS RCVD BY EXHIBIT CLERK

PARTIES: NONE (JUDGE)  NONE  (CLERK)
         NONE        (REP)  NONE  (DDA)

DEFENDANT IS NOT PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL

RECEIVED PEOPLES EXHIBITS 1,2A,2B,3,4,5,6,7,8,8A,8B,8C,8D,8E,8F,
8G,8H,8I,8J,8K,8L,8M,8N,8O,8P,8Q,8R,9,10,11,12,13,14,15,16,17,18
,19,20,21,22,23,24,25,26,27,28,29,30,31,32,33,34,35,36,37,38,39,
40,41,42,43,44,45,46,47,48,49,50,51A,51B,52 AND DEFENDANTS
EXHIBITS A & B. BY B.RUDITIS, EXHIBIT CUSTODIAN.

NEXT SCHEDULED EVENT:

PROBATION AND SENTENCE HEARING


                                    EXHIBITS RCVD BY EXHIBIT CLERK
          PAGE NO.   1              HEARING DATE: 05/09/06

# EXHIBIT

## V; 1-3

EXHIBIT

DATE : Jan, 15. 2009

TO: RONALD WHITE
.Attorney at law
State Bar No.85723
762 west El Segundo
Gardena, Cal. 90247    ( Related Case # YA059765
                       ) People of the state of
                       ) California
                       )        VS.
                       ( Jofama Coleman, Defendant

## "REQUEST FOR DISCOVERY"

   I Jofama Coleman will be filing a
petition for writ of hebeas corpus, on
my own behalf challenging my criminal
conviction, case # superior-YA059765. so to
discover, raise, and litigate potential issues
the following, is pertinent material, that
i need sent to me as soon as possible.
   Request for a complete copy of the following.
1.) Copies of the 911 recording
2.) Copies of the Blockbuster surveillance tape.
3.) Copies of all Police/Detectiv's Investigation
reports.
4.) Copies of all audio and video recordings.
5.) Preliminary hearing transcripts
   I declare that i Jofama Coleman am
requesting the forsaid material/Dicovery.
Housed at Corcoran state Prison, full

PAPER
CALIFORNIA
(REV. 3-95)
1924

address is as follows :

Jofama Coleman (CDCHv2J1659)
D·5 /122 up
CSATF/State Prison at Corceran
P.O. Box 5242
Corcoran, Cal. 93212

Please send the foresaid discovery to the address adove. It is pertinent to my petition for writ of hebeas corpus.

"REQUEST TO PRESERVE ALL EVIDENCE"

I Jofama Coleman further request that all evidence pertaining to superior case number YA059765 be preserved. Please do not destroy any information, material, or evidence surrounding this case.

Thank you!

- * Jofama Coleman

Jofama Coleman
PLAINTIFF/PETITIONER

CASE NO. YA059765

vs

People of the state of California

DEFENDANT/RESPONDANT

PROOF OF SERVICE BY MAIL

I the undersigned, hereby declare:

(1) I am a citizen of the United States; (2) I am over the age of 18 years. I am a residence of Kings County, in California.

My mailing address is Post Office Box 5242 Corcoran, California 93212-5242

On January 13th, 200 9, I served a true copy or original copy of the following;

Request for discovery, for petition purposes.
Request that all evidence be preserved and not destroyed.

by placing said document (s) in a sealed postage paid envelope into the CSATF/State Prison at Corcoran mail box for delivery to the United States Post Office at Corcoran, California, addressed as followed;

CSATF/State Prison at Corcoran
P.O.B # 5242
Corcoran, Cal. 93212
Name: Jofama Coleman
C.D.C# V.27659
Housing: D.5 / 122 up

by placing said document (s) in a sealed Interdepartmental envelope into the California CSATF Facility Legal Mailbox for inner-institutional delivery to the below listed person(s) at the following addresses;

District Attorney's OFFICE,
Torrance Branch
825 Maple Ave., Room 190
Torrance, California. 90503

District Attorney's OFFICE,
Dara Williams
1 Regent St., room 600
Inglewood, ca. 90301

Ronald White
S.B.# 85723, Trial Attorney
762 West El Segundo
Gardena, Cal. 90247

And that this declaration was executed under the penalty of perjury at Corcoran, California 93212-5242, on January, 13th, 200 9.

Jofama Coleman
PRINTED NAME (DECLARANT)

Jofama Coleman
SIGNATURE    (DECLARANT)