petitioner's constitutional rights to due process and fair trial were violated due to the totality of the circumstances surrounding the presentation of Renteria's false testimony. A new trial is required **"if there is any reasonable likelihood that the false evidence could have affected the judgment of the jury", (Brown v. Borg,(C.A.9(Cal.)1991), 951 F.2d 1011, 1015.).** In Brown v. Borg, the Court correctly stated, the Supreme Court has stated:

> It is established that a conviction obtained through use of false evidence, known to be such by representatives of the state, must fall under the Fourteenth Amendment. **"The same result obtains when the state although not soliciting false evidence, allows it to go un-corrected when it appears".** The principle that a state may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, is implicit in any concept of ordered liberty....

**(quoting Napue v. Illinois, 360 U.S. at 269, 79 S.Ct. at 1177).**

Under the totality of the circumstances surrounding petitioner's false evidence claim, there is a reasonable likelihood that the false evidence could have affected the judgment to the jury,**(Brown v. Borg, supra, 1015).** Although Respondent states Renteria's credibility was

ultimately a matter for the jury to decide (Resp. Answer at p.17), It is submitted and contended that, one way to test credibility is to see how the testimony fits with known facts, (Brown v. Borg, supra, 951 F.2d at 1016). In view of this, the "fact" that, (1) there was indeed a large dump truck with wooden siding around the truck bed, an SUV, and two other cars parked in front of Renteria's vehicle, (2) the headlights of Renteria's vehicle could not have "illuminated the inside interior" of the suspect's van allowing Renteria and Robles to see given the layout of the crime scene and location of the vehicles and witnesses, (3) Renteria could not have seen what she claimed to have seen when she was in fact at a distance of about "160 feet" at night, (4) Jesse Robles could not have been able to see "with the aid of Renteria's headlights under the totality of the circumstances, and (5) Segundo could not have been able to see what he claimed to have saw from a distance of about Six car lengths away  "behind" the suspects van "at night" [which was after Segundo and his friend followed the suspects van to another location, and it was at this point Segundo testified to having his "clearest" observation of the driver.]. At an evidentiary hearing these factors can be proven, which would entitle petitioner to relief. In the case at bar, the jury was deprived of these facts, therefore, the jury could not and/or was deprived of the ability to test the credibility of the witnesses by seeing how there testimony fit with known facts,(Brown v. Borg, supra, 951 F.2d at 1016). This is especially so where as here, the prosecution's case rested solely

on eyewitness testimony [there credibility was crucial]. The jury in the case at bar was mislead and could not make an accurate and reliable credibility determination under the totality of the circumstances surrounding this case, which discounts fundamental fairness as guaranteed by the 14th Amendment to the U.S. Constitution.

Renteria's testimony contributed to petitioner's conviction under the totality of the circumstances here. The characterization on the part of Respondent, characterizing the impact of Renteria's testimony towards the conviction as "minimally significant" is unguided speculation, and is somewhat similar to calculating the amount of prejudice arising from the error. Furthermore, and it cannot be ignored that, any witness, such as Renteria, who makes an in court identification, **no matter how dubious,** will substantially "influence" a jury's decision. Indeed, it appears that no single piece of evidence makes a deeper impression on jurors minds than an eyewitness identification. This has been shown by cases where overwhelming proof of a defendant's innocence has been disregarded by the jury in favor of eyewitness testimony of incredible weakness. **(Katz & Reid, Expert Testimony on the Fallibility of Eyewitness Identification (1977) 1 Crim.Just.J. 177, 195.).** Thus, Renteria's testimony contributed to the conviction under the totality of the circumstances of this case.

Respondent points to the testimony of Carlos Lopez, Jesse Robles, and Albert Segundo in support of the evidence being overwhelming, and further claims any error is harmless. However, such evidence does not make the error harmless in this case. Lopez, Robles, and Segundo were

impeached as liars. Jesse Robles admitted he lied when he testified at the preliminary hearing that he had identified petitioner as the driver to the police on the night of the murder,(2 RT. 983); Segundo admitted he lied to the police when he identified two other man [which were real people from real gangs]_as the shooter and the van's driver. And, according to Sergeant Steven Katz, Lopez testified that he never saw the white van before but had previously told police that he had almost been run over by petitioner in a similar white van,(5 RT. 2438). The jury could have reasonably believed that these three witnesses, all members of the NC Gang, collaborated with each other to name petitioner as the driver. The jury could have also reasonably believed that these three witnesses didn't really see the driver or could not have seen the driver well enough to make an accurate and reliable identification of the petitioner; or there ability to blame the petitioner for a crime he did not commit was easy based on there prior knowledge of petitioner, and was easily, inaccurately, falsely, or unreliably constructed based on rumors, what they were told by others, prior knowledge, information acquired after the crime, assumption that petitioner was envolved based on the confrontation between Chino and petitioner's younger brother. Thus, the jury could have reasonably concluded that the prosecution has not met it's burden requiring proof beyond a reasonable doubt. The Due Process Clause of the Fourteenth Amendment protects the accused in a criminal case against conviction **"except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged".(In re Winship, 397**

U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).). Notably, none of these three witnesses [Jesse, Lopez, or Segundo] identified petitioner to the police on the night of the murder or the following day, (4 RT. 982-983; 3 RT. 1319-1320, 1509-1510, 1547, 1625).

The four eyewitnesses, Maria Renteria, lived in the same house as the victim and his family, (3 RT. 1231-1232). They all knew each other will. Segundo's identification appeared the strongest because he testified he saw half of petitioner's face "real clearly" (3 RT. 1572), and described a pierced eyebrow, (3 RT. 1546)--an unusual identifying feature of petitioner's face.[7] However, Segundo knew about petitioner's eyebrow prior to the night of the crime, (3 RT. 1550, 1577-1578). Segundo testified that he saw half of petitioner's face "real clearly" in the light of the interior van light when Soto opened the door and petitioner turned towards Soto, (3 RT. 1571-1572). That would necessarily have been the "right side" of petitioner's face because Segundo was "behind" the suspect's van, five to six car lengths away at -night, (3 RT. 1859). While it is hard to believe that Segundo was able to get a clear view [quote, "clearest view"] of the driver from that distance when there were possibly two people in the back seat of the suspect's van (3 RT. 1256), and when his focus would normally be on the person getting out of the van with a gun, it is harder to believe that he could see petitioner's "left eyebrow piecing" when he was looking

---

[7] Deputy Marella testified that a month before the shooting, he saw petitioner's pierced **"left"** eyebrow. It was a good size piercing and petitioner was wearing a straight metal bar through it. (3 RT. 1529).

at the "right" side of the driver's face through the rear windows of the suspect's van. (See Appendix B pp. 8,9,29,31,39 attached hereto) [The record should be expanded to include appendix B for a fair determination as to Segundo's testimony regarding his clearest view of the driver, Segundo's testimony would prove impossible in this regard]. This factor is crucial towards the courts determination is to the weight of the evidence.

Of these three witnesses---Renteria, who claimed to have had a good look at the driver in the headlights of her car (3 RT. 1231), Jesse, and Lopez---none of these witnesses mentioned seeing anything unusual near the driver's left eye. Jesse and Lopez would have seen the left side of the driver's face as the van "sped by" his home. However, even though they claimed to have seen his clothing (2 RT. 942, [Jesse--white T-shirt, beanie on his head]; 3 RT. 1617, 1621 [Lopez--black T-shirt, no beanie and "bald headed"],), they did not mention the eyebrow piercing. Notably, with there conflicting description of the driver, they could have been describing two different people.

When Jesse and his friend instigated a prior confrontation with petitioner by crossing out petitioner's tags, petitioner did not attack Jesse, he simply threw his bicycle over a gate.(2 RT. 947-950). Notably, this crossing out of the tags occurred over ten months prior to the incident in question. Petitioner's other confrontations with the NC involved NC member jumping him and attacking his younger brother with a bat.(3 RT. 1588, 1637, 1643). On the night of the murder, Chino was going into known enemy territory with a knife. (3 RT. 1539). Chino was an NC Gang member who had several enemies, and as Andres Sandoval stated,

"anyone could have been involved, (4 RT. 1862, 1896; 3 RT. 1558-59.). Thus, the evidence tended to show that it was the NC crew who were violent and the aggressors of the attacks, not petitioner.

While the prior attacks on petitioner and his brother provided the prosecution with a retaliation motive, at the same time it provided the NC's a motive to blame petitioner for a murder he was not involved in to get rid of him. According to Segundo, petitioner was NGA's leader, (4 RT. 1557). By pinning the murder on petitioner, the NC was able to wield a mortal blow to their rivals by removing the leader. Notably, there was no physical evidence that connected petitioner to the murder, and petitioner had alibi witnesses who testified he was with them at the time of the shooting.

Additionally, although Respondent claims Jesse told the police that petitioner was the driver, "the next day" [that being the day after the crime], (Resp. Answer at p.18). Jesse actually implicated petitioner's name "two days" after the crime, (2 RT. 945). All other witnesses, Carlos Lopez, Maria Renteria, and Albert Segundo did'nt "identify" petitioner as the driver until trial three years after the crime, (3 RT. 1245,1248,1249,1265,1613,1615,1616.). These identifications came after Jesse Robles "had told" all his friends and family who he claimed the driver was, (2 RT. 944, 955-958). It was not until ten(10) months after the crime that Jesse was shown a six-pack photo line-up, (2 RT. 958-961). Unidentified members of the NC gang were going around showing a single yearbook picture of the petitioner, and upon showing this picture the NC members were telling people that the petitioner

was the person who done the crime, (See Appendix B p. 62 attached hereto).The totality of the circumstances simply ensured everyone would jump and/or be on the same ban-wagon of accusing the petitioner for a crime he did not commit.

Additional factors in support as to the evidence not being overwhelming and/or the evidence "questionable", are as follows:

The length in time Jesse Robles had to make an observation of the person speeding by his home in the suspect's van was likely within "3-4 seconds" under the circumstances here, and within these likely seconds Jesse's focus and attention appears to have been focused on the van and other factors. Jesse described the suspect's van in great detail, and also described other factors such as what his father was doing as the suspect's "sped by".

JESSE DESCRIBED ALL OF THE FOLLOWING WITH ONLY AN OPPORTUNITY OF APPROXIMATELY 3-4 SECONDS,

1.) A white van with wood paneling.

2.) Driver's door missing the wood paneling.

3.) Wheels appeared to be stock.

4.) Windows of the van were tinted, (See Appendix B pp. 8,9,29,31,39 attached hereto).

5.) The passenger was wearing a long sleeved black hooded sweat-shirt with the hood of the shirt up.

6.) Driver was wearing a long sleeved black hooded Sweat-shirt with the hood down.

7.) Robles also saw that his father was not paying attention

to the van as it sped by because his attention was focused up the street where the crime had occurred. (2 RT. 973, 974).

8.) The driver was also wearing a "long hanging" type beanie, [which would mean a portion of the driver's head and face was covered].(2 RT. 976-977).

Furthermore, Robles found this entire matter to be funny (2 RT. 981), and his testimony was riddled with contradictions. (2 RT. 978-996).

### CARLOS LOPEZ...

Here, Lopez never actually "identified" petitioner as the driver of the suspect's van until trial three (3) years after the crime [he simply implicated petitioner's name "five days" after the crime], which was well after Jesse "had told" all his friends and family that the petitioner/Jofama was the driver of the suspect's van [and Lopez was one of those friends]. (2 RT. 991-994). Additionally, and as mentioned before, NC Gang members were going around showing a single yearbook photo of petitioner, and upon doing so the NC Gang members were telling people that Jofama/Petitioner was the person who had done the crime. (See Appendix B p. 62 attached). Lopez was never shown a six-pack photo line-up by any officers or detectives. Lopez merely claimed to have seen the petitioner approximately 3 or 4 times in the past [these prior observations of the petitioner were "in passing" as the petitioner was driving his green Toyota Camry that had tinted windows.]. (3 RT. 1617). Although Lopez never stated to detectives that he personally knew petitioner [he merely claimed to have seen the

petitioner 3 or 4 times in passing, in the past.], the detective, Steven
Katz, decided not to show Lopez a six-pack photo line-up for
"identification" purposes, because the detective himself felt Lopez
knew the petitioner. (4 RT 1896-1899). Implicating a name everyone in
the neighborhood could have learned of in the neighborhood due to rumors
and Jesse telling "all his friends and family" that petitioner was the
driver of the suspect's van, did not prove Lopez could or would have
been able to make an identification of petitioner in a six-pack photo
line-up, nor did it prove Lopez knew petitioner. Furthermore, in a 402
hearing prior to Lopez's testimony before the jury, the prosecutor
practically pointed out and told Lopez who to identify in court three
years after the crime. The prosecutor stated:

**"DO YOU RECOGNIZE THE INDIVIDUAL AT THE END OF COUNSEL'S TABLE HERE
?" (3 RT. 1600-1601).**

"Like renteria", Lopez likely or it's reasonable to believe,
Lopez knew that the person who was on trial was the person who was being
accused of being the driver involved in the crime, "the name" Jofama
[Someone who did not need a face by the time of trial under the
circumstances of this case]. (3 RT. 1248-1249). Surprisingly, Renteria
admitted that, she was "told before she came in to testify", that the
person who was standing trial was the person that was driving the van
involved in the crime. (3 RT. 1248-1249). Additionally, by the time
Lopez made it to the front yard from the back of the Robles residence,
the suspect's van had likely already "sped by", because as Lopez stated,
the incident actually occurred two houses "east" of his location, the

vehicle was facing east, and the suspect's sped eastbound [left] towards Vermont Street. (Appendix B p. 64). East is correctly being described as being to the left of the Robles residence. Lopez clearly knew that he was describing east as his left, so when he stated that the incident "actually occurred" about two houses to his left and the van took off in that direction, it indicates that the suspects had already passed, and he initially believed the incident occurred based on the fact that's where the van was when he made it to the front yard. Thus, Lopez would have had to be able to see the driver's face by looking at the back-end of the vehicle. Notably, the windows of the suspect's van was continuously described as being "tinted dark". Lopez described east three times, it makes reasonable sense that by the time Lopez made it to the front yard, the suspect's had already sped by, because:

a.) Jesse Robles and his father were the "only ones" running to the front yard, "everyone else was walking", (2 RT. 937,938,972,973).

b.) It wasn't until the shots had stopped that Lopez went out to the front yard, Jesse was ahead of Lopez, (3 RT. 1614,1627).

c.) The suspect's were "speeding" in the van heading towards Vermont,(2 RT. 942,973,985; Appendix B p. 64).

At "night" at some distance with very little time to observe [likely less than three (3) seconds], Lopez could not have been able to make an accurate and reliable identification of the petitioner under the totality of the circumstances. Additionally, Lopez's attention was not fully focused on the driver's face under the circumstances he described and had to observe, because he to described other things. He described the suspect's vehicle as being a white Chrysler product

van with wood paneling. (Appendix B p. 64 att.). Thus the totality of the errors "tipped the scales against the petitioner".

Additionally, the lengthy jury deliberation demonstrates the evidence was not overwhelming and the totality of the circumstances surrounding the introduction of Renteria's false testimony was a factor that "tipped the scales against the petitioner". (Kennedy v. Lockyer, 379 F.3d 1041, 1056, n.18 (9th Cir.2004); United States v. Velarde-Gomez, 269 F.3d 1023, 1036 (9th Cir. 2001); Lawson v. Borg (9th Cir.1995) 60 F.3d 608, 612 ["Nine hours of deliberations deemed protracted"].). Here, the jury deliberated for over two full days to reach its verdict. (5 RT. 2768, 3301-3302, 3601; 1 CT. 128, 131-132, 187). Notably, Respondent's claim that Renteria's trial testimony, both in her instant trial testimony and her testimony at Soto's trial, would not be unexpected, given that Renteria testified at petitioner's trial nearly three years after the shooting. (Resp. Answer at p. 17). The salient fact is that Renteria never identified the driver of the van before she testified at trial. Petitioner was a stranger to Renteria. she saw him for possibly 10 seconds at night from over 115 feet away 3 years before she testified at trial. What was unexpected and unbelievable was her cross-racial identification testimony at trial--her testimony that she got a good look at the driver, remembered what he looked like, given the totality of information presented in Soto's trial. The totality of the circumstances requires reversal of the conviction. (U.S. v. Tory, (CA.9 1995) 52 F.3d 207,211). It is submitted and contended that, petitioner's pro se allegations must be accepted as true, unless they are clearly frivolous. (United States v. Baynes, (3rd. Cir. 1980) 622

F.2d 66, 68; Earp v. Stokes, (9th Cir. 2005) 423 F.3d 1024,1032). The allegations alleged if true, allows for an evidentiary hearing. (Davis v. Lambert, (7th Cir.2004) 388 F.3d 1052,1066; Bryan v. Mullin, (10th Cir.2003) 335 F.3d 1207.).

D. THE FACTS AND CIRCUMSTANCES OF GROUND THREE SETS FOURTH SUFFICIENT
GROUNDS FOR WHICH RELIEF CAN BE GRANTED PURSUANT TO 28 U.S.C. 2254
AND ESTABLISHED FEDERAL LAW.

A defendant's right to assistance of counsel both the Sixth
Amendment to the United States Constitution and Article I, section 15
of the California Constitution, "entitles the defendant not to some
bar assistance but to the effective assistance, [Citations].
Specifically, it entitles him to "the reasonable competent assistance
of an attorney acting as his diligent conscientious advocate" to protect
the defendant's right s to a trial that is both fair in the proceeding
and reliable in the result. (United States v. DeCoster,(D.C.Cir.1973)
487 F.2d 1197, 1202; Strickland v. Washington (1984) 466 U.S. 668, 688
[104 S.Ct. 2052, 80 L.Ed.2d 674]; People v. Ledesma (1987) 43 Cal.3d.
171, 215). This right requires that "before counsel undertake to act
at all he will make a rational and informed decision on strategy and
tactics founded on adequate investigation and preparation.(Ibid). In
determining whether trial counsel fell below the standard of
reasonableness, the court provides a presumption of competence. A
reviewing court "generally defers to trial counsel" and avoids second
guessing counsel as to matter of strategy and tactics. However, "a claim
of strategy and tactics is irrelevant if an action is taken without
benefit of substantial inquiry, is based on ignorance of the law, or
if there could be no satisfactory explanation for the actions". **(Williams
v. Washington, (C.A.7(Ill.)1995), 59 F.3d 673, 680-681; People v.
Frierson (1979) 25 Cal.3d. 142, 162-63).** Because representation of an
accused murderer is a mammoth responsibility, "the seriousness of the
charges against the defendant is a factor that must be considered in

assessing counsel's performance". **(House v. Balcom, (C.A.11(Ga.)1984) 725 F.2d 608, 615; In re Jones (1996) 13 Cal.4th 552, 556).**

Although a fair assessment of an attorney's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time. (Strickland, supra, 104 S.Ct. at 2065). However, it is submitted and contended that, **"just as hindsight cannot be used to condemn counsel's performance, it cannot be used to justify it". (Thomas v. Lockhart, (C.A.8(Ark.)1984), 738 F.2d 304, at 309).** As in the case at bar, a verdict or conclusion only weakly supported by the record is more likely to have been affected by the error(s) than one with overwhelming record support. (U.S. v. Gray, (C.A.3(Pa.)1989), 878 F.2d 702, at 711; Strickland, 466 U.S. at 695-96, 104 S.Ct. 2052). Additionally, the Federal Court has and should in the present case, conclude that cumulative prejudice from trial counsel's deficiencies amounts to sufficient grounds for a finding of ineffectiveness of counsel. **(Silva v. Woodford, 64 F.3d 1432,1438 (9th Cir.1995) (holding that the cumulative impact of multiple deficiencies in defense counsel's performance prejudice the defendant in his trial); Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir.1992) ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death".).** In Henry v. Scully, the court correctly stated, we express no view regarding whether one or two of these errors would

have constituted ineffective assistance, for the aggregate effect of these three instances of inaction by defense counsel convinces us that the magistrate judge and district judge were correct in finding that the petitioner received ineffective assistance of counsel. **(See Henry v. Scully (C.A.2(N.Y)1996),78 F.3d 51, at 53; U.S. v. Bigeleisen,(C.A.8(Minn.)1980), 625 F.2d 203, at 207).**

Here, there is no reasonable argument that counsel satisfied Strickland's standard of reasonableness. Counsel admitted that Renteria's in-court identification of petitioner as the driver at trial was "unexpected". (Exhibit C of Amend. Pet.). Consequently, Counsel was unprepared to cross-examine Renteria. Counsel's explanation cannot be reasonable or tactical, thus, trial counsel was ineffective for failing to adequately investigate the facts, to present evidence of the distance between Renteria's car and the crime scene, and to present evidence that a person with normal eyesight would be unable to see a person's face from 128 feet away in the daylight, let alone in the driver's seat of an oncoming vehicle "at night". It was not possible for Renteria to have seen the driver's face well enough under the circumstances she described to be able to identify petitioner as the driver three years after the crime. (Exhibit D & G of Amend. Pet.). Evidence showing that Renteria could not have seen petitioner's face clearly from 120 feet away would have also discredited Segundo's testimony that he could clearly see petitioner's profile when the van's dome light flashed on from the distance of five to six car lengths away. (3 RT. 1572; 4 RT. 1859). Jesse Robles's testimony that the headlights of Renteria's vehicle "illuminated" the inside of the suspect's van "allowing him to see"

(2 RT. 952-53), could have also been discredited based on the lay-out of the crime scene, the vehicles on the road of 101st Street, and the location of the vehicles. The inside interior of the suspect's van could not have been "illuminated" by the headlights of Renteria's vehicle under the totality of the circumstances. The prosecutor also capitalized on the false facts surrounding Renteria's testimony. (5 RT. 2733-2734).

Respondent speculates as defense counsel's decision not to call particular witnesses at trial, and claims defense counsel decision is justified, however, defense counsel has provided no explanation for his decision for the Respondent to claim Counsel is justified. Respondent states that counsel could have reasonably decided that any such witnesses were not credible. (Resp. Answer. at 21). However, Respondent ignores the fact that counsel admitted Renteria's testimony "was unexpected".(Exh. C of Amend. Pet.). Thus, Counsel was unprepared to cross-examine Renteria or present evidence undermining the testimony/credibility of Jesse Robles, Renteria, and Albert Segundo. Given the totality of the circumstances surrounding this matter, it can be concluded, counsel was ineffective and the error(s) surrounding this matter was prejudicial.(Silva v. Woodford, supra, 279 F.3d at 834-836; Mak v. Blodgett, 970 F.2d at 622; Henry v. Scully, supra, 78 F.3d at 53; U.S v. Bigeleisen, 625 F.2d 207.). Here, petitioner was deprived of his constitutional right to the effective assistance of counsel and a fair trial. As argued and/or demonstrated previously, the evidence against the petitioner is not overwhelming, and therefore, the error(s) were not harmless. (Se ante, pp. 28-37.; and pages 36-37, 60-64 of Amended Petition.). Petitioner's claim in Ground Three must prevail,

42.

for trial counsel's falures in the preparation of petitioner's case, and do to counsel being unprepared to cross-examine Renteria and failing to investigate the circumstances surrounding her testimony [in which was unexpected according to trial counsel], the totality of counsel's failures constituted no counsel at all. A defendant's need for a lawyer is nowhere better stated than in the moving words of Mr. Justice Sutherland in Powell v. Alabama:

...The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with a crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. **(Powell v. Alabama (1932) 287 U.S. 45, 68-69, 53 S.Ct. 55, 64, 77 L.Ed. 158; quoted in Gideon v. Wainwright, (U.S.Fla.1963) 83 S.Ct. 792, 797, 372 U.S. 335 U.S. 335, 344-345).** The totality of the circumstances surrounding the error(s) regarding Renteria's false testimony, **"tipped the scales against the petitioner".** It was not reasonable for counsel to fail to investigate or develop evidence and facts undermining the

witnesses ability to see. **(Williams v. Washington, (C.A.7(Ill.)1995),**
**59 F.3d 673, at 681-682; House v. Balkcom, (C.A.11(Ga.)1984), 725 F.2d**
**608, 618).** The result of the proceeding is unreliable given the totality
of the circumstances. **(Tejeda v. Dubois, (C.A.1(Mass.)1998), 142 F.3d**
**18, 23).**

### THE FACTS AND CIRCUMSTANCES OF GROUND FOUR SETS FORTH SUFFICIENT GROUNDS FOR WHICH RELIEF CAN BE GRANTED PURSUANT TO 28 U.S.C. § 2254 AND ESTABLISHED FEDERAL LAW.

Ground Four of the Amended Petition is cognizable and does
indeed present a federal question.

Juror No. 5 informed the court that **"several"** jurors had looked
at an exhibit that contained information about petitioner's criminal
history during deliberations. She was not sure this was proper. (3 AugRT
H4-5; 4AugRT L7-8; 2 CT. 229). exhibit No. 3 is an 8½ x 11 inch--sheet
of paper with petitioner's booking photo on the right half of the page.
(See Att. 1 of Amend. Pet.). The page was folded in half with the booking
photo on the front and the arrest information on the back. The photo
was admitted into evidence; **"the parties had agreed the arrest**
**information would be removed"**. However, the entire page was sent into
the jury room. (4 AugRT L-10).

The jury's improper receipt of petitioner's arrest information
was brought to the trial court's attention in the period following the
jury verdict but prior to sentencing. The court received a letter from
Juror No. 5 who exposed and wrote in part:

"There was one concern about the deliberation process that

still resonates in my mind and i would like to know whether it was a normal procedure in order to put my conscious at rest--at ease, rather. During the hearing, a picture of Mr. Coleman was presented as evidence. Later when this picture of Mr. Coleman was presented in the jury room it entailed information about the defendant "detailing" a prior arrest which occurred a month before the incident "in question". **I know for a fact that the details of his prior arrest influenced the jury's decision in determining the final verdict.** Since Mr. Coleman's past was not brought up during the hearing, I have been wondering whether the information about his previous arrest should have been presented to the jury during the deliberation process. I have pondered this question for awhile and I would like to have an answer for my peace of mind.(3 Aug.RT. H4-5; 2 CT. 229).

In Respondent's reference to the court of appeal's denial, it continues to rely on mis-statements of material facts. It is stated, "Petitioner" threatened revenge. (Resp. Answer at p.27). It was alleged on the record, that Coleman's brother Jeremy who had threatened revenge, "not petitioner".(3 RT. 1598, 1634). It is also stated in Respondent's Answer, nearly half of the jurors did not even recall knowing about the prior arrest. (Resp. Answer at 27). It is submitted and contended that, the record shows **"six-jurors"--half-of-the-jury**--remembered seeing the booking information; Juror's Numbers 2,4,5,8,10, and 11 saw the booking report and knew what it was. (See 4 AugRT L12, M6, M14, 17, N3, 6-9, 11-12).

B. PETITIONER'S EVIDENTIARY CLAIM IN GROUND FOUR IS COGNIZABLE...

Petitioner is being held in violation of the Constitution,

laws, and/or treaties of the united states. The totality of the circumstances surrounding the introduction to the jury of petitioner's criminal history was error. Here, "the parties had agreed the arrest information would be removed",(4 AugRT L-10). However, it was not.

It is submitted and contended that, the duty rest upon the federal court to decide for itself facts or constructions upon which federal constitutional issues rest. (Kern-Limerick v. Scurlock, (U.S.Ark.1954) 74 S.Ct. 403, 410, 347 U.S. 110). The State Courts, which are obliged, equally with the courts of the Union,...to guard, enforce, and protect every right granted or secured by the Constitution of the United States. **(Irvine v. Dowd, 359 U.S. 394, 404, 79 S.Ct. at 831 (1959) (quoting Robb v. Connolly, Ill. U.S. 624, 637, 4 S.Ct. 544, 551, 28 L.Ed. 542 (1884).).** Here, Petitioner's introduction of inadmissible information about petitioner's criminal history during it's deliberation, is clearly in the mainstream of constitutional litigation, is the assertion of a claim in term so particular as to call to mind a specific right protected by the constitution, and the cases cited within Ground Four of petitioner's amended petition employ constitutional analysis in like fact situations. thus, petitioner is entitled to federal relief on this claim. Additionally, the arguments surrounding the introduction of petitioner's criminal history are all interwoven/connected. Thus, petitioner is entitled to relief.

### THE FACTS AND CIRCUMSTANCES OF GROUND FIVE, SIX AND SEVEN SETS FORTH SUFFICIENT GROUNDS FOR WHICH RELIEF CAN BE GRANTED PURSUANT TO 28 U.S.C. 2254 AND ESTABLISHED FEDERAL LAW...

Respondent incorrectly states, even assuming that the

inadvertent admission of petitioner's prior arrest and criminal history into the jury room constituted jury misconduct, petitioner cannot show that it had substantial and injurious effect or influence on the verdict. Respondent also incorrectly states, the juror's statements indicate that their focus remained properly on the evidence before them and not on the booking information. (Resp. Answer at 29).

It is submitted and contended that, only two of the six jurors who remembered looking at the booking report downplayed the effect of the evidence. One juror said it was a small item (4AugRT M17), another juror said it did not really play much of a role. (4AugRT N 11-12). However, she also said, "somebody did notice it. I don't recall who, but somebody did notice it among the vast array we had to look at. (4AugRT M18).

Here, it was substantially likely that the extraneous material surrounding the introduction of petitioner's criminal history to the jury, substantially likely influenced a juror. Evidence of a defendant's prior arrests and prior criminal history is inadmissible because it is so inherently prejudicial (United States v. Phillips, (7th Cir. 1968) 401 F.2d 301, 305; People v. Thompson, (1980) 27 Cal. 3d 303, 314; Dickson v. Sullivan, 849 F.2d 403, 406 (9th Cir. 1988); United States v. Lewis, 787 F.2d 1318, 1323 (9th Cir. 1986), [observing that it is "extremely difficult for juror to ignore prior convictions when determining guilt"], modified, 798 F.2d 1250). Moreover, the arrest evidence in this case was particularly prejudicial because it was the only evidence that associated petitioner and his activities with a gun—it put a loaded gun in petitioner's hand just a month before the murder and also revealed that the petitioner was "convicted criminal." As Juror No. 5 so aptly stated, it was like a "white elephant in the room (4AugRT L12)(i.e., could not be ignored or forgotten).

Here, one juror knew the jury was not supposed to consider the information about petitioner's arrest and criminal history. That juror's failure to report the matter made certain that the arrest information would not be removed from the jury's purview and permitted other jurors to see the evidence and understand it to be exactly what it was—evidence of petitioner's prior arrest and the criminal history. Consequently, the white elephant was free to roam around the room.

It is evident that the juror who pointed the arrest information

out and said outloud, "Well, he was arrested for carrying a loaded weapon before" (4 AugRT L-12), thought the arrest information was significant. The comment, **"Well, neither of these felons were choir boys"**, shows the juror who said that had incorporated the information about petitioner's prior criminal history into her deliberations. Two other jurors remembered they had looked at something related to petitioner's criminal record. (4 AugRT N3, 6-7). The "totality" of the circumstances shows it was substantially likely that petitioner's prior criminal history influenced some of these jurors in determining petitioner's guilt. Thus, the prosecution has not rebuted the presumption of prejudice in this case. (Dickson v. Sullivan, (C.A.9(Or.)1988), 849 F.2d 403, at pp. 404-407, **[The State bears the burden of proving that Constitutional errors are harmless "beyond a reasonable doubt".]** People v. Nesler, (1997) 16 Cal.4th 561, 590).

It is submitted and contended, "TO TELL A JURY TO IGNORE THE DEFENDANT'S PRIOR CONVICTIONS IN DETERMINING WHETHER HE OR SHE COMMITTED THE OFFENSE BEING TRIED IS TO ASK HUMAN BEINGS TO ACT WITH A MEASURE OF DISPASSION AND EXACTITUDE WELL BEYOND MORTAL CAPACITIES". **(Dickson v. Sullivan, supra, 849 F.2d 403, at 408; See also United States v. Lewis, 787 F.2d 1318, 1323 (9th Cir. 1986), quoting United States v. Daniels, 770 F.2d 1111, 1118 (D.C. Cir.1985.).** This is especially true, where, as in the case at bar, the petitioner was deprived of the opportunity to rebut the evidence, (Dickson, supra, 408).

The evidence against the petitioner is not overwhelming, (see anti pp. _28-37_; See also Amend. Pet. pp. 36,37, and 60-64). In every trial, a defendant has a constitutional right to a fair trial, it cannot

be said with confidence that the petitioner was provided this basic and fundamental right.

### D. THE CALIFORNIA COURT OF APPEAL UNREASONABLY REJECTED PETITIONER'S PROSECUTORIAL MISCONDUCT CLAIM IN GROUND SEVEN.

The improper placement before the jury was not an isolated act. During the prosecutor's examination of Deputy Steven Marella, the prosecutor asked him if, on April 5, 2003, when he had contact with petitioner, he had petitioner take a booking photograph? Marella answered "yes". the prosecutor followed that with "several" questions using the words "booked" or "booking **seven times**". (3 RT. 1529-1530). A reasonable juror would have inferred from the "booking" references that petitioner had been arrested at that time. (3 RT. 1531). Marella's testimony set the stage for the arrest report that was received by the jury, which in tern was used by the prosecutor to persuade the trial court that the arrest report was harmless error. In combination they "infected the trial with such unfairness as to make the conviction a denial of due process". (Darden v. Wainwright, supra, 477 U.S. at 181; U.S. Const., 5th & 14th Amends.). It is submitted and contended that, the prosecution has not proven that the errors complained of was harmless "beyond a reasonable doubt", (Dickson v. Sullivan, supra, 849 F.2d 403 at 405-407). It is not necessary for the prosecutor to act in bad faith. **The focus of inquiry is on the potential injury to the defendant, not on the motive of the prosecution. (People v. Sanders (1995) 11 Cal.4th**