475, 526; People v. Hill (1998) 17 Cal.4th 800, 822-823; 14th Amend. U.S. Const.). The totality of the circumstances surrounding this matter "tipped the scales against the petitioner", which discounts fundamental fairness. Furthermore, the Chapman standard can be applied regarding petitioner's claims, and is respectfully submitted and contended that it should. (Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).). Petitioner's trial was fundamentally unfair given the totality of the circumstances, which should not be ignored. Notably, although respondent states tagging crews will commit violence against rival tagging crews, it is submitted that, Deputy Valento explained, "a tagger's mission is to tag, not commit acts of violence. (See 4 RT. 2138).

E. PETITIONER'S INEFFECTIVE ASSISTANCE OF

COUNSEL CLAIM IN GROUND EIGHT IS EXHAUSTED

AND DOES INDEED HOLD MERIT...

As stated in the Petition for Review that was filed in the California Supreme Court, the jury, the prosecutor, "trial counsel", and the trial court can all be said to have erred. (See Petition for Review at p.13). There was citation to Strickland v. Washington (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 80 L.Ed.2d 674] standard of prejudice, the error was not harmless (Id. at 17,26), is clearly a case involving Ineffective Assistance of Counsel. Under Strickland v. Washington, the error was not harmless. The main gist of the error, however, is not who did it, but whether any member of the jury was improperly influenced by evidence of petitioner's prior arrest and criminal history.

Due Process [as well as the Sixth Amendment] means a jury capable and willing to decide the case solely on the evidence before

it, (People v. Nesler, supra, 16 Cal.4th at 578, quoting Smith v. Phillips (1982) 455 U.S. 209, 217 [102 S.Ct. 940, 946, 71 L.Ed.2d 78]; Hughes v. Borg (9th Cir.1990) 898 F.2d 695, 700; U.S. Const. 5th and 14th Amend; Field v. Brown (9th Cir.2005) 431 F.3d 1186, 1192 [Six Amendment].). Where, as here, in a case "entirely" based on witness testimony, evidence about petitioner's prior criminal history and arrest being introduced during deliberation was prejudicial and requires reversal.

Although a fair assesment of an attorney's performance requires that every effort be made to eliminate the distorting effects of hindsight (Strickland, supra, at 2065), however, **"just as hindsight cannot be used to condemn counsel's performance, it cannot be used to justify it",** (Thomas v. Lockhart, (C.A.8(Ark.)1984), F.2d 304, at 309).

**Applying do novo review, this honorable court should determine that this claim has merit.**

A failure to entertain this claim would result in a fundamental miscarriage of justice. As the court explained, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally "unjust incarceration", such as the one here. (Murray v. Carrier, 477 U.S. 478, 496 (1986) (quoting Engle v. Isaac, 456 U.S. 107, 135 (1982).).

AN EVIDENTIARY HEARING SHOULD BE GRANTED....

Trial counsel has not provided an explanation for many of the errors.

At an evidentiary hearing, petitioner would be able to present demonstrative evidence that will prove the prosecution witnesses could not see what they claimed to have saw under there identifying

circumstances. Additionally, the court can be placed under the same identifying circumstances, which would prove the witnesses testomonial statements false, unreliable, and/or not possible.

Petitioner was not provided full and fair hearing regarding his false evidence claim in the state court. there has not been an evidentiary hearing held in regards to any of his claims. Where the petitioner establishes a colorable claim for relief and has never been afforded a state or federal hearing on this claim, we must hold an evidentiary hearing. (Earp v. Stokes 423 F.3d 1024, 1032 (9th Cir.2005).).

Based on the Amended Petition and all other filings on petitioner's behalf, an evidentiary hearing should be held and the relief sought should be granted.

*Respectfully Submitted,*

*Jafama Coleman*

3.22.12

CV-10-2343 AHM (RNB)

I, Jofama Coleman, declare that I am over the legal age of eighteen (18) years of age and am the Petitioner to the above action.

On March 22, 2012, I served the following:

TRAVERSE IN RESPONSE TO RESPONDENT'S ANSWER TO AMENDED PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

on the below enlisted party(ies) by placing a true and correct copy thereof into a prepaid/pre-addressed First Class envelope and depositing said contents into the U.S. Mail in the City of Corcoran [County of Kings], California, addressed as follows:

David E. Madeo
Deputy Attorney General
300 South Spring Street
Suite 1702
Los Angeles, California,
90013

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 22 day of March, 2012.

By: _Jofama Coleman_
(Jofama Coleman)
Petitioner/Declarant
In Pro Se

PURSUANT TO THE "MAIL BOX" RULE, THIS DOCUMENT IS TIMELY FILED... (See Houston v. Lack, (1988) 487 U.S. 266, 101 L.Ed 2d 245, 108 S.Ct. 2379.).

56.
78

APPENDIX "A"

APPENDIX "A"

APPENDIX "A"

APPENDIX "A"

APPENDIX "A"

APPENDIX "A"

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) Case No. B202597 |
| | ) |
| Plaintiff and Respondent, | ) |
| | ) |
| v. | ) |
| | ) |
| JOFAMA COLEMAN, | ) |
| | ) |
| Defendant and Appellant. | ) |
| In re JOFAMA COLEMAN, | ) Case No. B210118 |
| on Habeas Corpus. | ) |

APPEAL FROM THE JUDGMENT OF
THE SUPERIOR COURT OF LOS ANGELES COUNTY
THE HONORABLE ERIC C. TAYLOR, JUDGE
Superior Court Case No. YA059765

APPELLANT'S PETITION FOR REHEARING

Patricia Ihara S.B. #180290
PMB 139, 5319 University Dr.
Irvine, California 92612
Tel/Fax (949) 733-0746
Attorney for Appellant
Jofama Coleman

By appointment of Court
of Appeal under the
California Appellate Project
Independent Case Program

# TABLE OF CONTENTS

| | |
|---|---|
| MISSTATEMENT OF FACTS | 1 |
| CONCLUSION | 10 |
| WORD COUNT | 10 |
| SLIP OPINION | |
| ORDER | |
| PROOF OF SERVICE | |

# TABLE OF AUTHORITIES

## Federal Cases

| | |
|---|---|
| *Lawson v. Borg* (9th Cir. 1995) 60 F.3d 608, 612 | 8 |

## State Cases

| | |
|---|---|
| *In re Martin* (1987) 44 Cal.3d 1, 51 | 8 |
| *People v. Cardenas* (1982) 31 Cal.3d 897, 907 | 8 |
| *People v. Cooper* (1991) 53 Cal.3d 771, 837 | 9 |
| *People v. Holloway* (1990) 50 Cal.3d 1098 | 7 |
| *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 | 9 |
| *People v. Price* (1991) 1 Cal.4th 324, 431 | 8 |
| *People v. Stanbury* (1995) 9 Cal.4th 824 | 7 |
| *People v. Williams* (1971) 22 Cal.App.3d 34, 38-40 | 9 |

## State Statutes

| | |
|---|---|
| Evidence Code section 1150 | 7 |

## CALJIC

| | |
|---|---|
| CALJIC No. 1.03 | 8 |
| CALJIC No. 2.50 | 8 |

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) Case No. B202597 |
| | ) |
| | ) Sup. Ct. No. YA059765 |
| Plaintiff and Respondent, | ) |
| | ) |
| v. | ) |
| | ) |
| JOFAMA COLEMAN, | ) |
| | ) |
| Defendant and Appellant. | ) |
| In re JOFAMA COLEMAN, | ) Case No. B210118 |
| on Habeas Corpus. | ) |

A rehearing should be granted because the opinion and the order denying Coleman's petition for writ of habeas corpus rely on incorrect facts and facts that are not supported by the record to find that Coleman was not prejudiced by juror misconduct.

## MISSTATEMENT OF FACTS

1.      "Jesse [] ran to the street when he heard shots and saw the van speed away; Jesse's friend, Carlos Lopez, [] also ran to the street when shots were fired . . . ." (Slip opinion p. 3, lines 6-8.)

"Jesse . . . raced to the street" (slip opinion p. 3 lines 25-26), and "Lopez . . . ran after Jesse Robles to the street, arriving in time to see the white van drive by." (Slip opinion p. 4, lines 12-13.)

Jesse and Lopez did not run to the street, the record shows they ran to the front yard of the Robles house.  (2RT 938.)  A gate

1

separated the front yard from the back yard.  The gate was not on the street, there was a front yard area between the gate and the street. (Exh. 1, 2RT 940-941.)  Jesse and Lopez stood at the gate.  (2RT 941.)  According to Jesse, the distance between the gate where he was standing and the van was about 28 feet.  (Exh. 1, 2RT 940, 985.) Thus, he was farther from the street than stated and did not get a close look at the driver as the van sped past the house.

2.    "Segundo again got a close look at Coleman when the van drove past the Robles home immediately after the shooting . . . ." (Slip opinion p. 3, lines 15-16.)

Segundo did not get a close look, nor did he see Coleman when the van drove past the Robles home immediately after the shooting. The record shows that when Chino was shot, Segundo was standing next to Sandoval near Sandoval's house.  Sandoval's house was located on the south side of 101st Street, closer to Budlong, two and a half houses west of the white van.  (See 3RT 1539, 1568, 4RT 1840-1842, 1854.)  Chino was shot on the north side of the street, to the east of Sandoval's house.  (3RT 1296, 4RT 1840-1842.)  After the shooting, the van drove east.  (2RT 974.)  Therefore, he was looking at the back end of the van and the driver's side was facing away from him.  (4RT 1856.)  It would have been impossible for him to see the driver during the shooting or after the shooting from where he was standing.

The only witnesses that claimed to have seen Coleman when the van drove past the Robles home immediately after the shooting were Jesse Robles and Carlos Lopez.  (2RT 941-943, 3RT 1614-1616.)

2

3.    "Jesse . . . recognized Coleman <u>both when Drips reentered the</u> <u>passenger side of the van</u> and when the van drove past him." (Slip opinion, p. 4, lines 1-4.)

Jesse said he recognized Coleman when the van drove past the Robles house. (2RT 938, 941-942, 977.) He did not say that he saw the driver when Drips reentered the van. Jesse said the gunshots stopped as he was coming up the driveway. He did not see the passenger/shooter. (2RT 976.) He saw the van as it sped by the house. (2RT 972-973.)

4.    "According to Lopez, <u>the van was illuminated by the headlights</u> <u>of another van,</u> allowing him to see Coleman, <u>whom he too knew as</u> <u>the leader of NGA.</u>" (Slip opinion p. 4, lines 13-15.)

The record does not support this statement. Lopez did not testify that the van was illuminated by the headlights of another van. He did not testify that he knew Coleman as the leader of NGA. (See 3RT 1608-1627.)

5.    "Lopez was contacted by sheriff's deputies <u>the day after the</u> <u>shooting</u> and identified Coleman as the shooter." (Slip opinion, p. 4, lines 16-17.)

The record shows that Lopez said he was contacted a day or two later. (3RT 1625.)

There is no evidence that Lopez identified Coleman "as the shooter." He testified that he did not see the shooting. He identified Coleman as <u>the driver</u> of the van. (3RT 1614, 1616-1617, see also 4RT 1897-1898 [Sergeant Katz testifies that Lopez identified Coleman as the <u>driver</u> by name].)

6.    "From the light of her headlights <u>and the interior light of the van when the shooter climbed back in,</u> [Renteria] was able to see the driver." (Slip opinion p. 4, lines 23-24.)

There is no evidence in the record that Renteria saw the driver when the interior light of the van went on when the shooter climbed back in.

7.    "Coleman drove up with his brother, <u>Jeremy,</u> and challenged Jesse and his friend, asking why they were crossing out his 'hood.' Jesse's friend ran, chased by <u>Jeremy.</u>" (Slip opinion, p. 5, lines 2-4.)

Jesse did not testify that Jeremy was with Coleman. He said Coleman was with his brother but he did not know which brother it was because "[t]hey look alike." (2RT 947-948.) The record shows that Coleman had two brothers, Deandre and Jeremy. (4RT 1887.) At the preliminary hearing, Jesse said he did not know if it was Jeremy or Deandre. (1CT 12.)

8.    "About 30 minutes [later], Coleman and Jeremy drove to the home . . . <u>Robles was no longer there.  Coleman asked Lopez,</u> 'Which one of you was trying to fight my brother?'" (Slip opinion p. 5, lines 18-20.)

The record shows that Lopez testified Robles was there;  Lopez, Robles, and "somebody else" were there [three people]. (3RT 1605.) He later said his brothers, Robles, and one or two other friends were there with him [five to six people]. (3RT 1619.) Coleman asked the question to all of them, not just to Lopez. (3RT 1604-1605.)

9.    "These same witnesses . . . had heard <u>Coleman</u> threaten revenge." (Slip opinion p. 11, lines 14-16.)

4

The record shows that it was Coleman's brother Jeremy who had threatened revenge, not Coleman. (See slip opinion p. 5, line 22; 3RT 1598, 1634.)

10.    "Their comments reveal the jurors appeared to have discerned Coleman had been previously arrested for carrying a gun, but <u>few, if any, appeared to understand the detail of the charges.</u>" (Slip opinion p. 11, lines 20-23.)

The record does not show that all the jurors did not understand the details of the charges. Importantly, the record shows that several of the jurors discerned from the booking report that Coleman had a criminal history.

Juror No. 2 testified that she did not know when it was said, but "a couple times people said, 'Well, neither of these felons were choir boys, the victim nor the accused.'" (4AugRT M17.) Juror No. 2's comment reveals that appellant was referred to as a "felon" a couple of times. "Felon" is defines as "A person who has committed a felony." (American Heritage Dict. (2d college ed. 1985) p. 496, col. 2.) The only evidence to support that "fact" was the notation in the booking report that read, "12025(A)(1) / PC / F / CCW IN VEH W/PR FEL CONV." (Exh. 3.)

Juror No. 5 indicated she did not understand all the abbreviations relating to the charges, but inferred from the text that appellant had been charged with having stolen property; having a loaded firearm that was probably prohibited; and carrying a loaded firearm. (4AugRT L16.)

Juror No. 10 read the back of Exhibit 3 and understood it was about another offense. (4AugRT M6.)

Juror No. 8 saw the backside of the exhibit and remembered it was some kind of criminal record. (4AugRT N6-7.) Exhibit No. 3 had given her the impression that appellant had a previous criminal record. (4AugRT N8-9.)

Juror No. 11 saw the backside of Exhibit No. 3 and was aware that appellant might have had a past criminal history. (4AugRT N11-12.)

11.    "The jurors' statements concerning their reaction to the booking information confirms their focus properly remained on the evidence before them and not on the information he had previously been arrested on a weapons charge." (Slip opinion p. 11, lines 18-20.)

Only two of the six jurors who remembered looking at the booking report downplayed the effect of the evidence. One juror said it was a "small item" (4AugRT M17), another juror said "[I]t did not really play much of a role. We were just using the facts that were given to us during the trial." (4AugRT N11-12.)   However, she also said, "Somebody did notice it. I don't recall who, but somebody did notice it among the vast array we had to look at." (4AugRT M18.)

Juror No. 5 testified that while there was, at most, a general discussion about the prior arrest, "[I]t's kind of like a white elephant in the room that you don't talk about." (4AugRT L12.) The three other jurors did not make any statements concerning their reaction to the booking information. Juror No. 10 said the jury did not discuss it (4AugRT M6); Juror No. 4 said one juror expressed surprise that it had been admitted as evidence (4AugRT N4); Juror No. 8 did not recall any discussion about it. (4AugRT N6-7.)

6

Notwithstanding, even if the jury did not actively discuss the information contained in the booking record, Juror No. 5's "white elephant" comment was close to an admission that it was an influential factor for her during the jury deliberations.

12.    "Nearly half of the jurors did not even recall knowing about the prior arrest." (Slip opinion p. 11, line 25.)

The record shows six jurors – half of the jury – remembered seeing the booking information; Jurors Nos. 2, 4, 5, 8, 10, and 11 saw the booking report and knew what it was. (See 4AugRT L12, M6, M14, 17, N3, 6-9, 11-12.)

In *People v. Holloway* (1990) 50 Cal.3d 1098 [disapproved on other grounds in *People v. Stanbury* (1995) 9 Cal.4th 824, 830, fn. 1], the court explained, it could not "overlook the fact that 1 juror went through the entire guilt phase contaminated by knowledge of what had been judicially determined to be inadmissible and prejudicial information. His silence exacerbated matters because it prevented the court and counsel from taking any action to remedy the situation." (*Id.* at p. 1111.) The Court held that because it could not know, "and may not discover under Evidence Code section 1150" if the improper information had any influence on that juror, or what influence he had on the other jurors, the presumption of prejudice had not been rebutted. (*Id.* at pp. 1111-1112.) Here, there were at least four jurors [Jurors Nos. 2, 5, 8, and 10] who cannot be said to have not been contaminated by knowledge of what had been judicially determined to be inadmissible and prejudicial information.

13.    "[T]he jurors . . . appeared to follow the court's instruction to consider only the evidence presented at trial." (Slip opinion p. 12, lines 1-2.)

The instruction in CALJIC No. 1.03 told the jury, "You must decide all questions of fact in this case from the evidence received in this trial and not from any other source." (1CT 138.) Juror No. 5's letter to the court shows that she did not know if the booking information was part of the evidence presented at trial. (2CT 229.) Moreover, according to the prosecutor, the jury would have been justified in believing it could consider that evidence because it was given to them. (2CT 251.)

No jury instruction told the jury, "[O]ther crimes" evidence "if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes." (CALJIC No. 2.50; see e.g. *People v. Price* (1991) 1 Cal.4th 324, 431.)

14.    "[T]his was not a close case." (Slip opinion p. 11, line 13.)

The jury's lengthy deliberations and the jury's request for readback of all the prosecution identification witnesses shows this case was close. The most obvious indication of a close case is lengthy jury deliberations. (E.g. *In re Martin* (1987) 44 Cal.3d 1, 51; *People v. Cardenas* (1982) 31 Cal.3d 897, 907 [12 hours of deliberations is evidence of a close case]; *Lawson v. Borg* (9th Cir. 1995) 60 F.3d 608, 612 [nine hours of deliberations "deemed protracted"].) Here, the jury deliberated for over two full days to reach its verdict. (5RT 2768, 3301-3302, 3601, 1CT 128, 131-132, 187.) While the Supreme Court has indicated that lengthy deliberations are not significant in a

8

complex case (*People v. Cooper* (1991) 53 Cal.3d 771, 837), this was case was not complex; it involved one count of aiding and abetting a murder and the jury basically had to determine just one main fact – whether appellant was the person who drove the van.

The jury's request for readback of testimony also establishes that this was a close case. (See *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 ["[j]uror questions and requests to have testimony reread are indications the deliberations were close"]; *People v. Williams* (1971) 22 Cal.App.3d 34, 38-40 [request for readback of critical testimony].) Here, the jury requested "total readbacks" of prosecution witnesses: Jesse Robles, Maria Renteria, Maria Perez, Albert Segundo, Andres Sandoval, Adrian Robles, and Carlos Lopez. (1CT 130.) The request for readback of all of these witnesses' testimonies shows that the jury was not overwhelmingly convinced that the identification testimony by the victim's family members and fellow crew members was entirely credible or reliable.

Furthermore, this case was close because the three key witnesses who identified Coleman as the driver [Jesse Robles, Segundo, and Lopez] were members of the same tagging crew, were all at Chino's party the night he was murdered, and were all Coleman's enemies. The significant inconsistencies in their statements posed a reasonable doubt about whether they had actually seen Coleman driving the white van. (See AOB pp. 35-38.)

15.    Last, in the court's order denying Coleman's petition for writ of habeas corpus, it incorrectly states, "During Soto's trial <u>Soto's counsel</u> effectively impeached Maria Renteria . . . ." (Order p. 1.)

The petition shows that *the prosecutor* impeached Renteria.

9

Renteria was *a defense witness* in Soto's case. The prosecutor took an inconsistent position about Renteria's testimony in the two trials. Renteria's ability to observe as an eyewitness was used to convict Coleman as the driver, but was impeached when she testified that Soto was not the shooter at Soto's trial.

In this case, the prosecutor claimed that Renteria could see appellant and the shooter from where her van was parked. (5RT 2728-2729.)[1] Conversely, in Soto's case, the prosecutor claimed that Renteria could not have seen what she said she saw. Her view of the perpetrators had been obstructed by a large work truck, an SUV, and two other cars between Renteria's van and the shooting, and she was much farther away than she thought she was. (Pet. for Writ of Habeas Corpus, Exh. E, p. 1847.)

All of the above-mentioned errors of fact show that identification evidence against appellant was not so overwhelming as to rebut the presumption of prejudice from the jury misconduct.

## CONCLUSION

For the foregoing reasons, appellant respectfully requests this court grant a rehearing.

Respectfully submitted,

DATED: January 13, 2009

Patricia Ihara, S.B. #180290
Attorney for Appellant
Jofama Coleman

---

[1] Contrary to the prosecutor's argument, Renteria did not say that she saw the driver as the van drove past. She said that she turned her head away so the driver of the van would not see her. (3RT 1230, 1238.)

## CERTIFICATE OF WORD COUNT

I hereby certify based upon the word-count of the Microsoft Word program, the length of the foregoing brief, including footnotes but not including tables, is 2,628.

Patricia Ihara

Filed 12/30/08  P. v. Coleman CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B202597 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. YA059765) |
| JOFAMA COLEMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eric C. Taylor, Judge.  Affirmed.

Patricia Ihara, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

Jofama Coleman appeals from the judgment and order denying his motion for new trial after a jury convicted him of first degree murder (Pen. Code § 187, subd. (a)). Coleman contends the jurors' inadvertent review of information that disclosed he had a prior felony conviction and had been arrested for carrying a concealed weapon one month before the crime for which he was being tried constituted prejudicial misconduct warranting reversal of his underlying conviction. Although we agree the jurors' review of the inadmissible booking information was misconduct, we affirm the order denying the new trial and the underlying judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Murder*

On the evening of May 10, 2003 Jose "Chino" Robles and his family were hosting a barbecue in their backyard on 101st Street in south Los Angeles. Around 9:00 p.m. Robles, who was a member of a tagging crew known as "No Control" or "NC," decided to walk to a nearby liquor store. On the way down 101st Street, he met another member of NC, Albert Segundo, who was heading to the Robles barbecue. Segundo had just seen Coleman, the leader of the rival tagging crew "NGA," accompanied by another rival gang member known as "Drips," driving slowly along the street in a white van with wood paneling.[1] Segundo warned Robles the liquor store was in "enemy territory." Robles shrugged off the warning, replying he would be fine because he had his knife.

Segundo walked across the street from the Robles home to pick up a friend, crossed the street back to the sidewalk in front of the Robles home and, seconds later, heard two gunshots. Segundo turned and saw Robles holding onto a fence rail as Drips fired additional shots at Robles. Segundo watched as Drips reentered the van through the passenger door. After the van sped past the Robles home, Segundo and his friend hurried to a car and gave chase. At a stop sign a couple of streets away, Drips got out of the van

---

[1]    Segundo testified he had flashed an NC sign at Coleman and Drips as they drove by. Sensing there might be trouble, he warned another friend, Miko, to take some young women who were standing in the street back into the Robles home.

and pointed a blue steel semiautomatic gun at Segundo's friend's car. Segundo's friend turned the car around and returned to the Robles home.

### 2. *The Identification of Coleman*

At trial four witnesses identified Coleman as the driver of the white van: Segundo, who attended high school with Coleman and estimated he had seen him hundreds of times before the shooting; Robles's younger brother, Jesse, who ran to the street when he heard shots and saw the van speed away; Jesse's friend, Carlos Lopez, who also ran to the street when shots were fired and was standing next to Jesse when the van drove by; and Maria Renteria, who rented the house behind the Robles home and had just parked her own van near the Robles home when the shooting began.

#### a. *Albert Segundo*

Segundo testified he recognized Coleman when the white van passed him before the shooting and again when the shooter, Drips, opened the door to climb back into the van after the shooting. Segundo explained that opening the door illuminated the van's interior. Segundo again got a close look at Coleman when the van drove past the Robles home immediately after the shooting and a fourth time after the chase, when Drips pointed his gun at Segundo and his friend. According to Segundo, Coleman's head was shaved; he was wearing a black T-shirt; and he had a steel bar piercing his left eyebrow. Segundo testified he was 100 percent certain Coleman was the driver of the van.

Coleman's counsel sought to impeach Segundo by eliciting testimony Segundo had initially blamed two local Hispanic gang members for the shooting in an interview with Los Angeles Sheriff deputies. Segundo admitted he had lied to the deputies but claimed he had been afraid of retaliation from Coleman and his crew.[2]

#### b. *Jesse Robles*

Jesse Robles was at the barbecue in his family's backyard when he heard two shots and raced to the street. As he ran, he heard another 13 shots. The shooting had ended by the time he reached the gate of the driveway. He was soon joined by his friend,

---

[2]    In order to compel Segundo to testify, the court issued a body warrant authorizing his arrest and detention pending completion of his testimony.

Carlos Lopez. Jesse, who estimated he had seen Coleman (whom he knew by his
moniker "Illusion") more than 50 times in the neighborhood, recognized Coleman both
when Drips reentered the passenger side of the van and when the van drove past him. As
Jesse and Lopez stood there, they acknowledged to each other Coleman was the driver.
Jesse was certain the driver was Coleman even though Coleman usually drove a green
Camry and he had never seen Coleman driving a white van.

Although Jesse told Lopez he recognized Coleman the night of the shooting, he
did not tell sheriff's deputies he knew the attackers until two days after the shooting. He
claimed he wanted to avoid testifying at trial and decided to come forward only when his
family asked him to do so.

### c.  *Carlos Lopez*

Carlos Lopez was at the Robles barbecue when the first shots were fired. He ran
after Jesse Robles to the street, arriving in time to see the white van drive by. According
to Lopez, the van was illuminated by the headlights of another van, allowing him to see
Coleman, whom he too knew as the leader of NGA. Coleman had a shaved head and was
wearing a black T-shirt. Lopez was contacted by sheriff's deputies the day after the
shooting and identified Coleman as the shooter.

### d.  *Maria Renteria*

As Maria Renteria parked her van near the Robles driveway, her headlights
illuminated the white van, which was stopped in the middle of 101st Street some distance
down the street. Renteria watched as a dark-skinned man got out of the white van,
crossed in front of it and began shooting at what she thought was a car parked on the side
of the street. From the light of her headlights and the interior light of the van when the
shooter climbed back in, she was able to see the driver, whom she described as a Black
man. Although she was unable to identify Coleman in a photographic lineup, at trial she
testified he "looked like" the driver.

### 3.  *Corroboration of Coleman's Identification and Motive*

To establish preexisting animosity between Coleman and Robles, the People
elicited testimony about three previous incidents. First, Jesse testified that, sometime

4

before the shooting, he was in an alley watching a friend tag a wall with the acronym "SAP" and cross out the tag "NGA." Coleman drove up with his brother, Jeremy, and challenged Jesse and his friend, asking why they were crossing out his "hood." Jesse's friend ran, chased by Jeremy. Coleman approached Jesse, took his bicycle and threw it over a gate.

Second, Segundo testified he saw Robles and some others "jump" Coleman around the corner from the Robles home a month or two before the shooting.

Third, three witnesses, including Lopez, testified about an incident involving Coleman and Robles that occurred on the afternoon of the murder. During the early afternoon, Robles and some friends were standing in front of a home on 102nd Street around the corner from the Robles home. To their surprise, Jeremy Coleman walked by on his way to visit his girlfriend. Jeremy asked Robles where he was from, meaning to what tagging crew did he belong; but Robles did not answer. Jeremy identified himself as NGA; and Robles laughed at him, prompting Jeremy to threaten to get his brother. Robles then identified himself as NC and said, "Fuck NGA." When Jeremy started to walk away, Robles chased him and hit him on the arm with a baseball bat. Robles later told Lopez Jeremy had called him a "bitch."

About 30 minutes after the confrontation, Coleman and Jeremy drove to the home on 102nd Street in Coleman's green Camry. Robles was no longer there. Coleman asked Lopez, "Which one of you was trying to fight my brother?" When no one answered, Jeremy asked where Robles had gone. After he was told Robles had returned to his house, Jeremy threatened "to get Chino or anybody from NC."[3] According to Lopez, Coleman was wearing a black T-shirt.

---

[3]    Jeremy, who testified under a grant of immunity, disputed Lopez's account and denied he had ever challenged Robles. Jeremy also claimed he had been with Coleman at the time of the shooting, but a sheriff's deputy impeached Jeremy's testimony with his prior statement Coleman had dropped him off earlier in the evening.

The People also introduced a surveillance videotape from a video store located five to ten minutes from the crime scene, taken at 9:46 p.m. on the night of the shooting, which showed Coleman wearing a black T-shirt over a white T-shirt.

### 4. *The Verdict and Alleged Juror Misconduct*

Coleman was convicted of first degree murder and sentenced to a state prison term of 25 years to life. Some weeks later, in response to a letter from the trial court thanking jurors for their service, juror No. 5 wrote back: "There was one concern about the deliberation process that still resonates in my mind and I would like to know whether it is normal procedure in order to put my consci[ence] at rest -- at ease, rather. During the hearing, a picture of Mr. Coleman was presented as evidence. Later when this picture was presented in the jury room it entailed information about the defendant detailing a prior arrest which occurred a month before the incident in question. I know for a fact that the details of this prior arrest influenced the jury's decision in determining the final verdict. Since Mr. Coleman's past was not brought up during the hearing, I have been wondering whether the information about his previous arrest should have been presented to the jury during the deliberation process. I have pondered this question for awhile and I would like to have an answer for my peace of mind."

After conferring with counsel, the court determined that People's exhibit No. 3, a booking arrest report, had been folded in half during trial to obscure arrest information while allowing the witnesses to see a photograph of Coleman. Inadvertently, the complete exhibit had been sent to the jury room during deliberations without first removing the booking information.[4] The court requested all jurors, including juror No. 5, return to court to investigate the potential impact. Only one juror failed to come. Each of the others testified as to their recollection of the exhibit. Of those 11 jurors, five, including the foreperson of the jury, stated they had not seen the booking information and did not recall any discussion related to the information. The remaining six jurors

---

[4]     No objection to the exhibit appears on the record. However, defense counsel contended, and the prosecutor admitted, they had not intended for the jury to see the booking information.

remembered reading the arrest information and inferred Coleman had been previously arrested for carrying a loaded gun.[5] Only four of the six remembered any discussion of the exhibit. Juror No. 5 recalled one of the jurors commenting Coleman had been previously arrested for carrying a loaded weapon and another responding, "We're not supposed to consider that." She knew other jurors had read the information but did not recall any further conversation, although she described it as "kind of like a white elephant in the room that you don't talk about." Juror No. 2, however, gave a slightly different perspective: She recalled seeing others near her read the information but they spoke only briefly about "the tragedy of people getting in bad situations and neighborhoods and so forth. . . . A couple of us on the jury were raised in that area and we reflected more on those issues, not explicitly what that said." "We all agonized over this, you know, about the tragedies and so on . . . , but it was more in that context." She also overheard a juror, speaking of the victim and the defendant, observe that none of "these felons were choirboys," but the comment was not made directly in reference to the booking information. Juror No. 4 recalled someone expressing surprise the information had been included but did not recall further conversation about it and did not see the exhibit passed around. The only discussion juror No. 11 remembered was someone (he thought the foreperson) reminding jurors the information could not be considered.

Coleman moved for a new trial based on juror misconduct. The court denied the motion, concluding the inadvertent disclosure of the information did not rise to the level of juror misconduct. The court also expressly found the overwhelming evidence against Coleman negated any prejudice and rendered the error harmless.

---

[5]   The booking information includes Coleman's name and booking number, the arrest date of April 6, 2003, his birthdate (January 16, 1983), sex, race, height, weight and charge information recorded as follows: "496(A)/PC/F/REC KNWN STOLN PROP $400+; 12031(A)(2)(D)/PC/F/C/LOADED F/ARM:PROHIB/ETC; 12031(A)(1)/PC/F/CARY LOAD F/ARM:PUB:S/CIR; 12025(A)(1)/PC/F/CCW IN VEH W/PR FEL CONV."