## CONTENTION

Coleman contends the trial court committed reversible error in denying his motion for a new trial, asserting juror No. 5's letter itself demonstrates the prejudicial nature of the inadvertent disclosure of the booking information and the testimony of other jurors confirms the information was seen by most jurors. Coleman also contends that prejudice was compounded by the prosecutor's allegedly inadvertent reference to booking information while examining a witness, which itself constituted prejudicial prosecutorial misconduct.[6]

## DISCUSSION

1. *Standard of Review of a Motion for a New Trial Based on Juror Misconduct*

A criminal defendant may move for a new trial on the ground "the jury has received any evidence out of court, other than that resulting from a view of the premises, or of personal property." (Pen. Code, § 1181, subd. 2.) "A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense," is nonetheless improper. (*In re Hamilton* (1999) 20 Cal.4th 273, 294-295; see *People v. Holloway* (1990) 50 Cal.3d 1098, 1108, 1110 disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [whether the receipt of extrajudicial material was deliberate or inadvertent, it is misconduct for jury to receive information "in connection with the subject-matter of the trial which would be at all likely to influence jurors in the performance of [their] duty"].)[7]

"'As a general rule, juror misconduct "raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted." [Citations.]' (*In re Hitchings* (1993) 6 Cal.4th 97, 118.) In determining whether misconduct occurred, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if

---

[6] On August 20, 2008 Coleman filed a petition for writ of habeas corpus that we summarily deny by separate order. (See *In re Coleman*, B210118 (order filed December 30, 2008).)

[7] The parties agree the booking information was not admissible evidence. (See *People v. Anderson* (1978) 20 Cal.3d 647, 650-651 [evidence of mere arrests is inadmissible because it suggests "bad character"].)

8

supported by substantial evidence. [Citations.] Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination. [Citations.]' (*People v. Nesler* (1997) 16 Cal.4th 561, 582 (lead opn. of George, C. J.).)" (*People v. Majors* (1998) 18 Cal.4th 385, 417; accord, *People v. Danks* (2004) 32 Cal.4th 269, 303 (*Danks*).) Moreover, as the Supreme Court has repeatedly cautioned, "We emphasize that before a unanimous verdict is set aside, the likelihood of bias . . . must be *substantial*. [T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. The jury system is fundamentally human, which is both a strength and a weakness. [Citation.] Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic." (*In re Carpenter* (1995) 9 Cal.4th 634, 654-655 (*Carpenter*); see *Danks*, at p. 304.)

The People contend the court properly concluded the inadvertent disclosure of the booking information did not constitute jury misconduct, pointing to the Supreme Court's analysis of a similar instance of inadvertent jury contamination: "When, as in this case, a jury innocently considers evidence it was inadvertently given, there is no misconduct. The situation is the same as any in which the court erroneously admits evidence. The fact that the evidence was inadvertently admitted and then withdrawn does not elevate the error to one of misconduct. There has been merely 'an error of law . . . such as . . . an incorrect evidentiary ruling.' [Citation.] Such error is reversible only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error." (*People v. Cooper* (1991) 53 Cal.3d 771, 836.)

More recently, however, in *People v. Nesler, supra,* 16 Cal.4th 561 and *Danks, supra,* 32 Cal.4th 269, the Supreme Court reasoned inadvertence in disclosure should not alter the analysis of a juror's exposure to extraneous information. As the Court summarized in *Danks,* "We have previously held that 'a juror's inadvertent receipt of information that [has] not been presented in court falls within the general category of

9

"juror misconduct.'" (*Nesler*, [at p. ]579'.) 'Although inadvertent exposure to out-of-court information is not blameworthy conduct, as might be suggested by the term "misconduct," it nevertheless gives rise to a presumption of prejudice, because it poses the risk that one or more jurors may be influenced by material that the defendant has had no opportunity to confront, cross-examine, or rebut.' (*Ibid.*)" (*Danks*, at p. 307.) Accordingly, we treat the disclosure here, inadvertent as it concededly was, under the rubric of juror misconduct.

### 2. *The Trial Court Did Not Err in Denying the Motion for a New Trial on the Ground of Jury Misconduct*

The standard for determining whether the inadvertent disclosure to jurors of Coleman's previous booking information was prejudicial and required the granting of a new trial is well established. "'[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways.'" (*Danks, supra,* 32 Cal.4th at p. 303.)

"'First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror.' (*Carpenter, supra,* 9 Cal.4th at p. 653.) 'Under this standard, a finding of "inherently" likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment. Application of this "inherent prejudice" test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information.' (*Ibid.*)" (*Danks*, at p. 303.) "Second, 'even if the extraneous information was not so prejudicial, in and of itself, as to cause "inherent" bias under the first test,' the nature of the misconduct and the 'totality of the circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose.' (*Carpenter, supra,* 9 Cal.4th at pp. 653-654.) 'Under this second, or "circumstantial," test, the trial record is not a dispositive consideration, but neither is it

irrelevant. All pertinent portions of the entire record, including the trial record, must be considered. "The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, *upon examining the entire record,* that there is no substantial likelihood that the complaining party suffered actual'" bias. (*Id.* at p. 654.)" (*Danks, supra,* 32 Cal.4th at p. 303.)

At the outset, we concur with the trial court's assessment of the booking information as not inherently prejudicial to the jurors' deliberation. The overwhelming evidence against Coleman more than rebuts the presumption he was unduly prejudiced by the disclosure of the information. In a different -- and closer -- case, we might conclude the jurors' exposure to a defendant's booking information, from which they could have gleaned he had a prior felony conviction and was carrying concealed firearms when he was arrested with stolen property worth more than $400, improperly infected the jury's deliberations. But this is not a close case. Coleman was identified as the driver of the van by three witnesses who knew him well. These same witnesses knew Robles had recently antagonized Coleman by picking on his younger brother and had heard Coleman threaten revenge. The trial court obviously viewed the case the same way and concluded the evidence against Coleman was overwhelming.

The jurors' statements concerning their reaction to the booking information confirms their focus properly remained on the evidence before them and not on the information he had previously been arrested on a weapons charge. Their comments reveal the jurors appeared to have discerned Coleman had been previously arrested for carrying a gun, but few, if any, appeared to understand the detail of the charges. Moreover, the impact of the information itself appeared minimal. It is evident only fleeting references were made to the information by one or two small groups of jurors. Nearly half of the jurors did not even recall knowing about the prior arrest. Unlike the offending juror in *Nesler*, who repeatedly and intentionally interjected outside information into deliberations when she disagreed with the positions of other jurors (see *People v. Nesler, supra,* 16 Cal.4th at p. 583), the jurors here who saw the booking

11

information mentioned Coleman's prior arrest only in passing and appeared to follow the court's instruction to consider only the evidence presented at trial.

Based upon our independent review of the evidence, therefore, we see no substantial prejudice resulting from the jurors' inadvertent review of the booking information.

3. *There Was No Prosecutorial Misconduct Warranting a New Trial*

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'"" (*People v. Navarette* (2003) 30 Cal.4th 458, 506.)

Coleman contends the People's failure to ensure its exhibit was properly redacted to exclude the booking information, coupled with the prosecutor's repeated reference to booking information she knew was not admissible, rise to the level of prosecutorial misconduct warranting a new trial. We disagree.

First, there is no evidence whatsoever the failure to redact the booking information was intentional or deceptive. While the error may have been careless on the part of the prosecutor, either party could have reviewed the exhibits prior to their submission to the jury to ensure the information was properly excluded.

We are more troubled by the prosecutor's use of the term "booking" or "booked" during her examination of the sheriff's deputy who arrested Coleman on April 5, 2003. The People called the deputy as a witness solely to introduce evidence of Coleman's distinctive eyebrow piercing, a detail that was noticed by Segundo and Jesse Robles on the night of the murder. Although the People had agreed not to mention Coleman had been arrested when he was contacted by police on the night of April 5, 2003, the prosecutor referred to Coleman having been booked that night a total of seven times.

Defense counsel elected not to object at the time and waited until the conclusion of the deputy's testimony to alert the court to the prosecutor's violation of their agreement. The prosecutor immediately agreed she had "screwed up" and apologized for her misstep. Asked whether he would like a curative instruction, defense counsel declined so as to not call more attention to the arrest. That decision was, of course, within his discretion but it underscores the passing nature of the prosecutor's comments.

Having already determined the jurors' receipt of the booking information during deliberations did not improperly infect their deliberations, we see no additional prejudice resulting from the prosecutor's references to Coleman having been booked on the night of April 5, 2003. Again, were this a closer case, we might have reached a different conclusion. In light of the strength of the evidence against Coleman, however, he was not substantially prejudiced by the prosecutor's statements. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1133 [reversal for prosecutorial misconduct warranted only if reasonably probable defendant would have received more favorable verdict absent such remarks].)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

PERLUSS, P. J.

We concur:

ZELON, J.

JACKSON, J.

13

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

COURT OF APPEAL - SECOND DIS
FILED
DEC 30 2008
JOSEPH A. LANE       Clerk

In re

JOFAMA COLEMAN,

on Habeas Corpus.

B210118

(Los Angeles County
Super. Ct. No. YA059765)

(Eric C. Taylor, Judge)

**ORDER**

THE COURT*:

The petition for writ of habeas corpus filed herein August 20, 2008 and the People's informal response filed September 2, 2008 have been read and considered. The court has also examined the file in proceeding number B202597, petitioner Jofama Coleman's direct appeal from the judgment in Los Angeles County Superior Court case number YA059765.

In his petition Coleman contends his conviction for the first degree murder of Jose Robles was secured by false testimony, which was discovered only after Coleman's confederate, Abel Soto, was subsequently tried and convicted for the same murder. During Soto's trial Soto's counsel effectively impeached Maria Renteria, one of the witnesses who had identified Coleman at his trial, by eliciting evidence that her view of the perpetrators had been obstructed by a large truck and other cars between her van and the shooting and that she was much farther away from the murder site than she claimed at Coleman's trial. Based on this impeachment evidence, Coleman claims Renteria

effectively gave false testimony that improperly prejudiced his conviction in the earlier trial. He requests we order a new trial.

Having reviewed Renteria's testimony in each trial, we do not agree the impeachment evidence conclusively establishes Renteria lied at Coleman's trial. Even if her view was impeded and at an unlikely distance, we cannot conclude it was physically impossible for her to have seen Coleman in the illuminated front seat of the van.

Moreover, Renteria's identification of Coleman added little to the already overwhelming evidence against Coleman, which consisted of three other eyewitness identifications by individuals who had known Coleman over an extended period of time. While Coleman insists these witnesses were motivated to lie and framed him for Robles's murder, the trial court was in a far better position to evaluate their credibility and referred to the strength of this evidence in support of its denial of Coleman's new trial motion.

The petition is summarily denied.

---

\*PERLUSS, P. J.,          ZELON, J.,          JACKSON, J.

# PROOF OF SERVICE

I am a citizen of the United States, over the age of 18 years, employed in the County of Orange, and not a party to the within action; my business address is: PMB 139, 5319 University Dr., Irvine, CA 92612.

On January 13, 2009, I served the within **APPELLANT'S PETITION FOR REHEARING** in this action, by placing a true copy thereof enclosed in a sealed envelope, addressed as follows and deposited in the United States Mail at Irvine, California.

| | |
|---|---|
| Jerry Brown, Attorney General<br>300 South Spring Street<br>Fifth Floor, North Tower<br>Los Angeles, CA 90013 | Respondent |
| Jofama Coleman V27659<br>L4/D5/122 up<br>CSATF, P.O. Box 7100<br>Corcoran, CA 93212 | Appellant |
| Ronald White, Esq.<br>762 West El Segundo<br>Gardena, CA 90247 | Trial Counsel |
| Dara E. Williams, D.D.A.<br>District Attorney<br>Hardcore Gang Division<br>1 Regent St., Rm. 600<br>Inglewood, CA 90301 | District Attorney |
| California Appellate Project<br>Los Angeles Office<br>520 S. Grand Ave., Ste. 400<br>Los Angeles, CA 90071 | Hon. Eric C. Taylor<br>Superior Court of CA<br>825 Maple Ave.<br>Torrance, CA 90503 |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 13th day of January, 2009, at Irvine, California.

*/s/ Patricia Ihara*
Patricia Ihara

APPENDIX "B"

APPENDIX "B"

APPENDIX "B"

APPENDIX "B"

APPENDIX "B"

LEROY D. BACA, SHERIFF

COUNTY OF LOS ANGELES - SHERIFF'S DEPARTMENT

DETECTIVE DIVISION - HOMICIDE BUREAU

FILE NO.    003-04469-0372-011

CLASSIFICATION: MURDER - 187 P.C.

VICTIM(S): ROBLES, JOSE RODOLFO   MH/16

SUSPECT(S): COLEMAN, JOFAMA REO   MB/20

DATE/TIME: 05-10-2003 (SATURDAY) AT 2058 HOURS

LOCATION: 1131 WEST 101ST STREET, LOS ANGELES

INVESTIGATORS: S. KATZ/M. LILLIENFELD

COPY

WE CONTACTED WITNESSES AT THE INCIDENT AND THEY TOLD US THE FOLLOWING.

I CONTACTED W/1 ROBLES (FATHER), AND HE STATED THAT HE WAS STANDING IN THE FRONT YARD OF HIS RESIDENCE TALKING WITH OTHER FAMILY MEMBERS. W/1 ROBLES SAID HE HEARD APPROXIMATELY (2) GUNSHOTS COMING FROM TWO HOUSES JUST WEST OF HIS RESIDENCE. HE WALKED ONTO THE SIDEWALK, LOOKED WESTBOUND, AND SAW AN UNKNOWN MALE HISPANIC (LATER IDENTIFIED AS THE VICTIM) LAYING ON THE NORTHSIDE SIDEWALK ON 101ST STREET. W/1 ROBLES SAW ANOTHER UNKNOWN MALE HISPANIC EXIT THE PASSENGER SIDE DOOR OF A WHITE COLORED ASTRO VAN (TINTED WINDOWS, WOOD PANELLING) WHICH WAS STOPPED FACING EASTBOUND IN 101ST STREET. THE SUSPECT APPROACHED THE VICTIM ON FOOT, STOOD APPROXIMATELY TWO FEET SOUTH OF THE VICTIM, AND BEGAN TO SHOOT HIM MULTIPLE TIMES.

| REPORT CONTINUATION NARRATIVE | URN | |
|---|---|---|

W/1 ROBLES SAID HE SAW THE SUSPECT RETURN TO THE VEHICLE AND THE DRIVER OF THE VEHICLE SPED OFF EAST BOUND 101st ST TO VERMONT AVE AND OUT OF VIEW.

I CONTACTED W/2 SEGUNDO, AND HE SAID HE AND THE VICTIM WERE WALKING WEST BOUND 101st STREET ON THE NORTH BOUND SIDEWALK TOWARDS BUDLONG AVE. THEY WERE WALKING TO THE LIQUOR STORE (ON CENTURY BLVD / BUDLONG AV), WHEN THE VICTIM CHANGED HIS MIND AND BEGAN WALKING BACK HOME, EASTBOUND 101st STREET ON THE NORTH BOUND SIDEWALK. W/2 SEGUNDO SAID THE TWO DEPARTED AND THEN HE BEGIN WALKING ACROSS THE STREET TO THE SOUTH SIDE SIDEWALK, THEN WEST BOUND TOWARD BUDLONG AVE. W/2 SEGUNDO SAID AS HE APPROACHED 1154 101st STREET HE SAW A WHITE CHEVY ASTRO VAN WITH BROWN WOOD SIDE PANELS (ON THE LOWER PORTION OF THE VEHICLE ON THE PASSENGER SIDE), AND TINTED WINDOWS PASS HIM DRIVING EASTBOUND 101st STREET.

⑨

MAY 12, 2003 -6- 003-04469-0372-011

In addition, Deputy Allen described the mini van driven by the suspects as a white mini van with dark tinted windows.

Deputy Allen will document his actions and observations in the first report and any additional supplemental report(s).

The scene location is described as the street and sidewalk area directly in front of 1131 West 101st Street, Los Angeles. This is an unincorporated Los Angeles County area described as the Vermont District which falls under the policing jurisdiction of Lennox Sheriff's Station. 101st Street is an east/west street which is bordered by Vermont Avenue to the east and Budlong Avenue to the west. It is paralleled by Century Boulevard to the north and 102nd Street to the south. The location is general comprised of single-family residences.

Detectives arrived on scene and found the weather to be clear and cool. The area was well lit by standard utility streetlights.

Detectives observed the victim's clothing (Evidence Item #18), a button appearing to have been detached from the victim's clothing (Evidence Item #19) and a volume of blood on the north sidewalk directly in front of 1131 West 101st Street. Detectives noted in this immediate area and adjacent to the clothing and volume of blood were Evidence Items #14, 15, 16 and 17, identified as expended projectiles. It should also be noted that during the examination of the victim's shirt (Evidence Item #18), Detectives recovered Evidence Item #20, one expended projectile, which fell from the shirt as it was picked up. Detectives additionally observed Evidence Items #2 and 4, expended projectiles, and recovered these items from the street in front of the location. Detectives additionally noted 11 expended 9mm cartridge cases which were recovered in the street directly in front of 1131 West 101st Street. These expended cartridge cases were subsequently held as Evidence Items #1, 3, 5, 6, 7, 8, 9, 10, 11, 12 and 13. For exact locations of the above described evidence, refer to the evidence list.

All evidence was marked, identified, photographed and ultimately collected by Detective Smith and Forensic Identification Specialist (FIS) Martin Mutuc from the Sheriff's Crime Lab. FIS Mutuc ultimately maintained possession of all evidence which was transported to the Crime Lab for a more detailed examination.

Detectives noted the following vehicles in the crime scene area:

    A brown Chevy Tahoe, California License #4VIE517, parked along the north curb line directly in front of 1131 West 101st Street. The vehicle was facing west.

    A blue Ford Taurus, four-door, California License #2HYP610, parked along the north curb line directly in front of 1131 West 101st Street. The vehicle was facing west.

MAY 12, 2003                                -7-                          003-04469-0372-011

A blue four-door Oldsmobile, California License #3COB470, parked along the north curb line directly in front of 1131 West 101st Street. The vehicle was facing west.

A gold Kia Sephia, four-door, parked along the north curb line directly in front of 1131 West 101st Street. The vehicle was facing west. Detectives noted traffic collision damage to the driver's door and driver's side passenger's door of this vehicle. It was undetermined at the time of this investigation if this damage was recent; however, it did not appear that the damage occurred in the area where this vehicle was parked, as there was a lack of corresponding debris or evidence beneath the vehicle.

A blue Nissan, two-door, California License #3PSL487, parked along the south curb line directly in front of 1140 West 101st Street. The vehicle was facing east.

A blue Nissan Sentra, California License #3SMX336, parked along the south curb line directly in front of 1136 West 101st Street. The vehicle was facing east. It should be noted that this vehicle was removed from the scene at 2331 hours, prior to photographs being taken, with Detectives' permission. The driver of this vehicle was identified as Lorenzo Ocampo Quezada, MH, DOB: 11-08-1975.

A red Ford Mustang, California License #3JFC342, parked along the south curb line directly in front of 1136 West 101st Street. The vehicle was facing east.

A black Ford Taurus, California License #3UVA999, parked along the south curb line directly in front of 1122 West 101st Street facing east.

A white Chevy Monte Carlo with no license plates and a VIN of 1GZ37ZXFR136577, parked along the south curb line directly in front of 1122 West 101st Street facing east.

On 05-11-2003, Sunday, at 0010 hours, Detective Katz interviewed Witness **ALBERT SEGUNDO** at Lennox Sheriff's Station. Albert is a student at George Washington Preparatory High School and is in the 10th grade. Witness Segundo said he watched as his friend, Victim Jose Robles, was shot and killed on 101st Street. He said he has known the victim since he was about 8 years old and knows him by the moniker of "Chino." He said that both he and the victim are members of the "No Control" tagging crew. He is known by the moniker of "Clown."

Witness Segundo said he was walking west on 101st Street on the south side of the street when he saw the victim walking west on the north side of 101st Street. Witness Segundo said that the victim had told him he was going to walk to the liquor store at 99th Street and Budlong Avenue. He said that the liquor store is in the turf or area of control of several different tagging

(30)

crews in that general area. He identified the names of these crews as the "Mexicans Kicking Ass" or "MKA's," the "Evil Kings" or EK's," and the "Notorious Graffiti Artists" or "NGA's." Witness Segundo asked the victim if he wanted him to go along with him to the liquor store, and he said that the victim told him no.

Witness Segundo said he stopped at a friend's house at 1154 West 101st Street, where he spoke with his friend, Andres Sandoval. He said that Andy is also a member of the No Control tagging crew. He said the victim continued walking west on 101st Street towards Budlong Avenue. He said that at this time he saw a van traveling westbound on 101st Street towards Budlong Avenue. He described the van as being a white mini van with imitation wood paneling on the lower portion of the vehicle, stretching from the front of the vehicle to the rear of the vehicle. He said that the paneling was approximately 10 inches wide and that the windows on this vehicle were tinted. He described the vehicle as having a white license plate and believed that there was a letter "Z" somewhere at the front portion of the license plate; however, he did not see the entire license plate number and was not sure of the exact positioning of that letter.

Witness Segundo said as the van passed, he became concerned and shouted out a warning to another friend of his who was also walking on the south side of 101st Street, approximately two houses west of where he was talking to his friend. He said that he told his friend, "Huero," to watch out for the van. He said that Huero was talking to a girl as the van passed. Witness Segundo said that as he spoke with his friend, he watched as the van made a left turn southbound onto Budlong Avenue. He said that he was not paying attention at that point and continued to talk to his friend. He said that he last saw the victim standing at the northeast corner of Budlong Avenue and 101st Street.

Witness Segundo said as he was talking with his friend Andy, he heard two shots ring out from behind and east of his location. He said he looked in that direction and saw a male Black exit the passenger's side of the same white van he had just seen pass him. The van was stopped facing east in the westbound lane of 101st Street. He said he saw the male Black passenger walk around the back of the van and raise a handgun in his right hand pointing it at the victim who was down on the ground just north of the street. He said he watched as the suspect shot the victim approximately eight more times.

Witness Segundo described the suspect as a male Black, wearing oversized navy blue shorts made of a jean or denim type material. He said the suspect was wearing white knee-high socks, white "Jordan" tennis shoes and a white beanie type cap. He described the shirt the suspect was wearing as a white sweatshirt and believed that it might have been and "Echo" brand of sweatshirt with the "Echo" logo on the front. He went on to describe the suspect as being approximately 5 feet 8 inches tall, 120 pounds, with a very dark complexion and described him as being between 16 and 17 years old. Witness Segundo said that he

MAY 13, 2003 -4- 003-04469-0372-011

gang members. Anthony stated that his older brother, Jesse, indicated the owner of the van was Jofama Coleman.

Anthony further described the pistol as being blue steel in color and could not provide Detectives with any further details.

At 1820 hours, Detectives contacted Witness **JESSE ROBLES**, MH/15, DOB: 08-18-1987. Jesse is the younger brother of Victim Jose Rodolfo Robles.

Jesse indicated to Detectives that when the incident occurred he was in the back yard / rear driveway area of his home. He stated he heard one shot, a short pause and then several other shots. Upon hearing those shots he said he ran down his driveway towards the front yard area of his home. At that time he saw a van going eastbound on 101st Street directly in front of his home.

Jesse stated that the driver of this van was a neighborhood man he knew from prior contact as Jofama Coleman. (He stated that Jofama was wearing a long sleeved black hooded sweatshirt with the hood down. Anthony stated the passenger in the front seat of the van was also wearing a black hooded sweatshirt but that the hood was up and he could not further describe him by either race or any other details.

Jesse stated that as the van sped down 101st Street, he watched it turn southbound on Vermont Avenue.

Jesse described the van as being white in color with wood trim on the side. He stated the wheels appeared to be stock and the van had tinted windows. He also stated there was wood paneling on the side of the van. It was his impression the driver side door did have wood paneling on it. Detectives had previously contacted other witnesses who indicated the driver side door was in fact missing the wood paneling and appeared to be a replacement door.

Jesse went on to tell Detectives that approximately one year ago, in either January or February of 2002, he was confronted for the first time by Jofama Coleman. He stated at that time he was with a friend of his from a rival gang identified by the initials "SAP." He did not know what SAP stood for.

He stated Jofama was from the rival gang "Notorious Graffiti Artists" and that because of this Jofama appeared to pick on him (Jesse). He stated Jofama was insisting he surrender a bicycle that Jesse was in possession of at that time. Jesse said he did not want to be beat up or assaulted in any manner. He surrendered the bicycle and watched as Jofama put it into the trunk of a white Ford Thunderbird he was driving. He indicated this incident occurred on approximately 107th Street between Budlong Avenue and Vermont Avenue in an alley.

pg. (39)

MAY 18, 2003 -18- 003-04469-0372-011

On 05-15-2003, Thursday, at 1746 hours, Detective Lillienfeld contacted Maria's brother, **JOSE ROBERTO LOPEZ,** MH, DOB: 04-29-1984. Jose told Detective Lillienfeld he was friends with the victim.

Jose stated that on Saturday, the victim left his home around 1500 to 1600 hours. He stated that he was home when the confrontation occurred between the victim and Jeremy. He was in the house looking out into the street and did not hear what happened but he saw Jeremy and the victim talking for 2 to 3 minutes.

He stated that after they spoke, Jeremy left, walking eastbound down the street, and the victim returned to his, the witness's, home. At that time the victim ( Robles ) said that Jeremy was "talking shit and was gonna get his brother." Jose stated that Jeremy then went home.

Jose said that at approximately 1800 hours, he and his brother, Carlos, went over to the victim's house for a barbeque. He stated that while there he and a girl were walking towards the street from the back of Jeremy's home. He said that the victim was on the sidewalk and that he heard several gunshots and turned around running back towards the victim's house.

Jose indicated that he saw a van facing eastbound, directly in front of the victim's home. He stated this van was white with what he thought were blueish stripes. He said that after the gunshots, the van sped off east, and was of an unknown make.

Jose Lopez told Detective Lillienfeld that he had a vision problem and prescription glasses but rarely wore them. He stated that he could read and write but that his vision for details like numbers and letters was poor without his glasses. He did indicate he did not have problems recognizing people without them. He stated that he thought the driver was a male Black adult, wearing a black beanie.

Jose further stated that he was told by others that it was actually Deandre Coleman, although, he did not know that to be a fact. He also indicated that he felt the shooter was the oldest brother of Jeremy Coleman, whom he knew as Jofama Coleman. He stated that when the incident occurred, that was the first time he had ever seen Jofama Coleman, if in fact it was him.

He did state that after the incident occurred, he was shown a photograph that was cut out of a yearbook and he confirmed that the person in the photo was the person he had seen shoot the victim. He stated that he was shown this photo by some unidentified members of the NC tagging crew and they told him that it was Jofama Coleman.

MAY 18, 2003                                -19-                              003-04469-0372-011

Jose further stated that he had heard Jeremy Coleman had lied to his older brother, Jofama, about the incident saying that he had been punched by Victim Robles during their confrontation. Jose thought that this lie was an attempt to enrage Jofama Coleman.

On 05-15-2003, Thursday, at 1758 hours, Detective Lillienfeld contacted Witness **CARLOS AUGUSTO LOPEZ**, MH, DOB: 08-06-1985. Carlos told Detective Lillienfeld he has known the victim for approximately one year.

Carlos stated he was familiar with some of the members of the NC tagging crew, and he believed Victim Robles was a member of that crew.

He stated that Jeremy Coleman used to hang around NGA crew members because his older brother, Jofama Coleman, was a member. He described Jofama as driving a green Toyota Camry, with tinted windows.

Carlos indicated that the last contact with the victim ( Robles ) was Saturday afternoon from 1200 to 1300 hours at his house. He stated that the victim left his home, but prior to doing so, the victim told him that Jeremy Coleman had called him a bitch.

The victim told Jeremy "whatever" in a sarcastic response to this. He stated that Jeremy then left, and the victim ( Robles )came over to his, (Carlos) house, and related what had occurred.

After the victim left his home, Jeremy and his brother, JofamaColeman, arrived in a green Toyota Camry. He stated that Jeremy was in the backseat, Jofama was driving, and there was an unidentified male Black adult in the front passenger's seat. He described this man as being 19 to 20 years old, wearing a blue cap and a white T-shirt. He further indicated that this man had a slight goatee.

Carlos said that when they pulled up, Jofama Coleman said, "Which one of you was trying to fight my brother?" He said that because of traffic and not receiving a response, Jofama only stayed in front of his house for approximately 30 seconds and then drove away.

At approximately 1530 hours, Carlos stated he was invited to the victim's home for a barbeque and he left to go over there.

His sister Maria later told him that after he left, Jeremy returned.

He stated that he, his brother Jose, and his other brother, Enrique, all went to the victim's home, arriving at approximately 1630 hours.

MAY 18, 2003 -20- 003-04469-0372-011

He said several hours later, between 2000 and 2030 hours, Victim Robles left to go to the store. Carlos said he was in the victim's front yard when he heard several gunshots.

He said that two houses east of the house is where the incident actually occurred. As he looked in that direction, he saw a white Chrysler product van, (Chrysler/Dodge/Plymouth) with wood paneling, in the street facing eastbound.

Carlos said that the driver sped off eastbound and that he could clearly see that the driver was the same man he saw driving the green Toyota Camry several hours earlier, identified as Suspect Jofama Coleman. He said at that time the driver was wearing a black T-shirt. He did not see the shooter.

Carlos told Detective Lillienfeld he had seen Jofama Coleman on at least four prior occasions and was sure it was him that was driving the white van. He said that after the shooting, he saw his father and other people crowding around his brother attempting to give him aid. He described the van as being a Chrysler product and estimated its year of manufacture somewhere between 1987 and 1991. He further stated that he heard two shots, a pause of a second and a half, and then nine to ten shots.

At this point in time Carlos indicated he had nothing further to add, and the interview was terminated.

During the course of this investigation, Detective Lillienfeld received information from **GILDARDO ROBLES**, MH, DOB: 12-26-1977, that he had possibly seen the suspect vehicle.

Gildardo is the uncle of the victim and the brother of Rudy Robles, the victim's father. Gildardo provided Detective Lillienfeld with a license plate of 3KXR570 and stated that it belonged to a white Dodge van that had wood paneling and similar markings as the one described in the shooting of his nephew.

Follow-up investigation by Detective Lillienfeld ultimately determined that this van was not involved in the incident. The owner of the van, Juan Galan, was ultimately contacted, and photos of the van were taken. Mr. Galan was able to provide a corroborated story regarding where he and the van were at the time of the incident.

An arrest warrant charging Suspect Jofama Coleman with murder will be sought by Detectives. The facts of this case will be submitted to the District Attorney for consideration and filing.

Investigation continuing, with further reports to follow.

