1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16

| | |
|---|---|
| JOFAMA COLEMAN, ) Petitioner, ) vs. ) KATHLEEN ALLISON, Acting ) Warden, ) Respondent. ) | Case No. CV 10-2343-AHM (RNB) PARTIAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |

17
18
19
20

This Partial Report and Recommendation is submitted to the Honorable A. Howard Matz, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

21
22

**PROCEEDINGS**

23
24
25
26
27
28

On March 31, 2010, petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Pet.") herein.  The Petition purported to allege six grounds for relief that, according to the Petition, had previously been exhausted in a Petition for Review to the California Supreme Court.  Concurrently with the filing of the Petition, petitioner filed a "Motion to Stay Adjudication of Habeas Corpus Petition to Allow Petitioner to Properly Exhaust Unexhausted Federal Claims."  The

1

Motion to Stay listed nine additional ineffective assistance of trial counsel claims that petitioner indicated he wanted to raise herein, but were not yet properly exhausted.

Although petitioner stated in the Motion to Stay that his stay-and-abeyance request was being made pursuant to Rhines v. Weber, 544 U.S. 269, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005), under the Ninth Circuit's decision in King v. Ryan, 564 F.3d 1133 (9th Cir.), cert. denied, 130 S. Ct. 214 (2009), the Court's consideration of the motion to stay petitioner's fully exhausted petition was not governed by Rhines. Rather, petitioner's stay motion was governed by the stay and abeyance procedure approved in Calderon v. United States Dist. Court (Taylor), 134 F.3d 981, 987-88 (9th Cir.), cert. denied, 525 U.S. 920 (1998), and Kelly v. Small, 315 F.3d 1063, 1070 (9th Cir. 2004), overruled on other grounds by Robbins v. Carey, 481 F.3d 1143, 1149 (9th Cir. 2007). Thus, the fact that petitioner had not even purported to make the showing of good cause required under Rhines was not dispositive of petitioner's stay motion, since the Rhines "good cause" limitation does not apply to the "Kelly procedure." Under the Kelly procedure, a federal district court has the discretion to stay and hold in abeyance a fully exhausted petition in order to provide the petitioner with the opportunity to proceed to state court to exhaust his unexhausted claims. Then, once the claims have been exhausted in state court, the petitioner may return to federal court and amend his stayed federal petition to include the newly-exhausted claims. See Kelly, 315 F.3d at 1070-71; see also Jackson v. Roe, 425 F.3d 654, 661 (9th Cir. 2005); James v. Pliler, 269 F.3d 1124, 1126-27 (9th Cir. 2001); Anthony v. Cambra, 236 F.3d 568, 575 (9th Cir. 2000), cert. denied, 533 U.S. 941 (2001); Taylor, 134 F.3d at 987-88.[1]

Prior to ruling on petitioner's Motion to Stay, the Court decided to afford

---

[1] However, for purposes of satisfying the one-year statute of limitations imposed by 28 U.S.C. § 2244(d), the newly exhausted claims do not necessarily relate back to the filing of the original Petition. See King, 564 F.3d at 1140-41; see also Mayle v. Felix, 545 U.S. 644, 664, 125 S. Ct. 2562, 162 L. Ed 2d 852 (2005).

respondent the opportunity to be heard.  Accordingly, the Court ordered service of the Petition and petitioner's Motion to Stay on respondent.

In her ensuing opposition, respondent contended that petitioner's  Motion to Stay should be denied because, for statute of limitations purposes, the nine additional ineffective assistance of trial counsel claims that petitioner indicated in his Motion to Stay he wanted to raise herein did not relate back to the exhausted claims alleged in the Petition, and a stay therefore would be futile.  However, respondent was not contending that any of petitioner's unexhausted ineffective assistance of counsel claims currently were time barred.  According to respondent, the one-year limitation period did not commence running until June 30, 2009.  Consequently, it appeared to the Court that, when petitioner filed the first of his two pending California Supreme Court habeas petitions on February 1, 2010, five months of the limitation period still remained.  Moreover, respondent had conceded that "the period of limitations appear[ed] to be tolled presently."  Accordingly, unless the California Supreme Court expressly denied both pending habeas petitions for untimeliness, it appeared to the Court that petitioner would have five months from the denial of those petitions to amend his pending federal habeas petition to add any of the newly exhausted claims that currently were pending before the California Supreme Court.

While it was conceivable that, by the time petitioner sought leave to amend his pending federal habeas petition, the limitations period **might** have run with respect to one or more of the claims that petitioner was seeking leave to add, it could not be said with certainty as of the time the opposition was filed that a stay would be futile. Nor did it make any difference that petitioner's currently pending California Supreme Court habeas petitions did not include all nine of the ineffective assistance of counsel claims that petitioner indicated in his stay motion he wanted to raise herein.  Since the limitation period still had nearly two months to run, petitioner still had time to either add those claims to one of his pending California Supreme Court habeas petitions or file a new California Supreme Court habeas petition that included those claims.

3

1    Accordingly, the Court decided to exercise its discretion under <u>Kelly</u> with
2    respect to petitioner's stay motion, by granting the motion on certain conditions that
3    were specified in an Order issued on May 7, 2010.  The Court stated in its Order that
4    the granting of petitioner's motion was without prejudice to respondent opposing a
5    later motion to amend by petitioner on the ground that one or more of the claims that
6    petitioner was seeking to add was time barred.

7    On October 12, 2010, petitioner filed a document captioned "Motion to Amend
8    Petitioner's Habeas to Add Newly Exhausted Claims."  Concurrently, petitioner
9    lodged what the Court presumed was intended as his proposed Amended Petition.
10   However, it was unclear to the Court from its review of the proposed Amended
11   Petition whether petitioner had decided to abandon the six grounds for relief alleged
12   in his original Petition.  It also was unclear to the Court precisely what claims
13   petitioner now was purporting to allege.  The Court therefore issued an Order on
14   October 19, 2010 requiring petitioner to lodge a revised proposed Amended Petition
15   that: (a) set forth all of his grounds for relief in the habeas form itself, and (b) if the
16   proposed Amended Petition form referenced any attached writ or supporting
17   memorandum in setting forth any of those grounds, specified the pages in the attached
18   document that applied to each of the stated grounds for relief.

19   On November 17, 2010, petitioner lodged another proposed Amended Petition
20   (hereinafter "Am. Pet.") that rectified the deficiencies about which the Court had
21   apprised petitioner in its October 19, 2010 Order re Further Proceedings.
22   Accordingly, the Court set deadlines for respondent to file either opposition to
23   petitioner's Motion to Amend or a notice of non-opposition thereto, and for petitioner
24   to file a reply if respondent did file opposition.

25   Respondent filed opposition to the Motion to Amend on December 21, 2010.
26   Petitioner filed a Reply thereto on January 20, 2011.  On February 9, 2011, the Court
27   issued a Report and Recommendation in which it recommended that petitioner's
28   Motion to Amend be granted in part and denied in part.  The Court found that: (a)

4

except for Grounds 11 and 19, none of the new claims alleged in the Amended Petition related back to the filing of petitioner's original Petition; (b) unless a basis for tolling the statute existed, petitioner's last day to file a federal habeas petition containing his unrelated claims was June 30, 2010; (c) petitioner had not met his burden of demonstrating that statutory tolling rendered the lodging for filing of the Amended Petition herein timely; and (d) petitioner was not entitled to any equitable tolling of the limitation period.  The Court further found that recent Ninth Circuit precedent, including Lee v. Lampert, 610 F.3d 1125, 1128-31 (9th Cir. 2010), foreclosed petitioner's reliance on an "actual innocence" exception to the AEDPA statute of limitations.  Accordingly, the Court recommended that petitioner's Motion to Amend be granted with respect to Grounds 1-9, 11, and 19 of the proposed Amended Petition and denied with respect to Grounds 10, 12-18, and 20-21 of the proposed Amended Petition.

The Court was unaware at the time it issued its Report and Recommendation that, the day before, the Ninth Circuit had decided to rehear en banc the Lee case and decreed that the panel decision could not be cited as precedent in this Circuit.  The Court therefore concluded that it would be necessary to issue a Supplemental Report and Recommendation further addressing petitioner's actual innocence claim (which would also apply to respondent's contention in respondent's Opposition Memorandum that petitioner's claims were procedurally defaulted).  Accordingly, on February 10, 2011, the Court issued a Minute Order requiring respondent to file a Supplemental Opposition Memorandum addressing the following issue:

> Whether, if the AEDPA statute of limitations is subject to a "fundamental miscarriage of justice" exception, any of the evidence referenced in the Reply that was not presented at trial, including in particular the forensic analysis of the Blockbuster surveillance security tape that ostensibly shows when petitioner arrived at the video store and with whom (see Reply at 9, 17, 18, 19-20), is sufficient to either (a)

1     satisfy petitioner's burden of showing the requisite "actual innocence,"

2     or (b) entitle petitioner to an evidentiary hearing on his actual innocence

3     claim under Majoy v. Roe, 296 F.3d 770, 775-76 (9th Cir. 2002).

4

5     Based on the ensuing Supplemental Opposition Memorandum filed by

6 respondent and petitioner's Supplemental Reply Memorandum thereto, the Court

7 issued an Order re Further Proceedings on June 20, 2011. The Order advised of the

8 Court's conclusion that petitioner might be able "to muster a plausible factual case

9 meeting the exacting gateway standard established by the Supreme Court in Schlup

10 for overriding a petitioner's clear failure to meet deadlines and requirements for filing

11 a timely petition in federal court" and that petitioner's actual innocence claim

12 therefore could not be determined without the Court conducting an evidentiary

13 hearing. See Majoy, 296 F.3d at 775. The Court noted that, if it held such an

14 evidentiary hearing and concluded that petitioner had met his burden under Schlup,

15 such conclusion would also be dispositive of respondent's contention that petitioner's

16 additional claims were procedurally defaulted because the law was well established

17 that there was an actual innocence exception to the procedural default doctrine.

18 However, the need to conduct an evidentiary hearing on petitioner's actual innocence

19 claim (which would necessitate the appointment of counsel for petitioner) and to

20 reach the merits of his additional claims would be obviated if the Ninth Circuit were

21 to issue its en banc decision in Lee v. Lampert in the meantime and rule that there was

22 no actual innocence exception to the AEDPA statute of limitations. The Court further

23 noted that Grounds 1-6 of petitioner's original Petition, which now corresponded to

24 Grounds 1-9 of petitioner's proposed Amended Petition, (a) were not subject to a time

25 bar defense, and (b) were subject to the AEDPA standard of review since those claims

26 were adjudicated on the merits. The Court further noted that the AEDPA required

27 that the Court evaluate the reasonableness of the California court's adjudication of

28 those claims on the basis of the record before the state courts. Accordingly, the Court

6

advised, it had decided to: (a) defer ruling on petitioner's Motion to Amend the Petition to add 12 new claims, and (b) instead bifurcate the proceeding by first adjudicating petitioner's original 6 claims (which corresponded to Grounds 1-9 of his proposed Amended Petition). The Court therefore granted petitioner's Motion to Amend, but only to the extent that it sought to amend Grounds 1-6 of petitioner's original Petition by realleging instead Grounds 1-9 of petitioner's proposed Amended Petition.

Petitioner subsequently filed objections to the June 20, 2011 Order re Further Proceedings. While his objections were pending before the District Judge, the Ninth Circuit issued its *en banc* decision in <u>Lee v. Lampert</u>, 653 F.3d 929 (9th Cir. 2011). The Ninth Circuit ruled that a credible claim of actual innocence did constitute an exception to the AEDPA statute of limitations. Based on the *en banc* decision, the District Judge issued a Minute Order on October 13, 2011 wherein he noted that the Ninth Circuit *en banc* decision vitiated this Court's rationale for deferring its ruling on the part of petitioner's Motion to Amend seeking to add Grounds 10-21 of the proposed Amended Petition. To that extent, the District Judge sustained petitioner's objections to the June 20, 2011 Order and remanded the matter back to this Court for further proceedings based on the *en banc* decision in <u>Lee</u>.

On remand from the District Judge, the Court issued another Order re Further Proceedings on October 19, 2011. The Court advised therein that it remained the Court's view that, in order to rule on petitioner's Motion to Amend (and specifically the portion as to which the Court previously deferred ruling), it was necessary to conduct an evidentiary hearing on petitioner's actual innocence claim. The Court therefore appointed the Federal Public Defender to represent petitioner for purposes of such evidentiary hearing. The Court further advised that it also remained the Court's view that the need to conduct an evidentiary hearing on petitioner's actual innocence claim had no bearing on the Court's determination of Grounds 1-6 of petitioner's original Petition, which now corresponded to Grounds 1-9 of petitioner's

proposed Amended Petition.  Accordingly, the Court advised that its appointment of counsel for petitioner did not extend to those claims, which were not subject to a time bar defense or a procedural default defense, and which appeared to be subject to the AEDPA standard of review on the basis of the record before the state courts.  The Court also advised that the part of the Court's June 23, 2011 Order granting petitioner's Motion to Amend, to the extent that the Motion to Amend sought to amend Grounds 1-6 of petitioner's original Petition by realleging instead Grounds 1-9 of petitioner's Amended Petition, would stand.  Further, the Court advised, since the Court ultimately would have to reach the merits of those claims, no matter how it decided petitioner's actual innocence claim, there was no reason to delay the briefing of those claims.

Respondent filed an Answer to Grounds 1-9 of the Amended Petition ("Ans.") on December 12, 2011, accompanied by a Memorandum of Points and Authorities ("Ans. Mem.").  Following multiple extensions of time, petitioner filed a "Traverse in Response to Respondent's Answer to Amended Petition" on April 3, 2012 ("Trav.").  Petitioner then filed, on April 25, 2012, a Motion to Expand the Record.

Thus, the issue of petitioner's entitlement to habeas relief with respect to Grounds 1-9 of the Amended Petition now is ready for decision.  For the reasons discussed hereafter, the Court recommends that those grounds for relief be denied.[2]

## PROCEDURAL HISTORY

On April 28, 2006, petitioner was convicted by a Los Angeles County Superior Court jury of first degree murder.  (See 5 Reporter's Transcript on Appeal ["RT"] 3603-06; 1 Clerk's Transcript ["CT"] 186-88.)  On August 16, 2007, after hearing and denying petitioner's motion for a new trial based on juror misconduct and

_____

[2]    The Court also recommends that petitioner's Motion to Expand the Record and his request for an evidentiary hearing be denied.

insufficiency of the evidence, the trial court sentenced petitioner to state prison for an indeterminate term of 25 years to life.  (See 5 RT 3901-09; 2 CT 302-04.)

Petitioner appealed from the judgment of conviction, raising claims generally corresponding to the third, fourth, fifth, and sixth grounds for relief alleged in petitioner's original Petition herein (which encompass Grounds 4-9 of petitioner's Amended Petition). (See respondent's Notice of Lodging, Lodged Document ["LD"] A, C.) On December 30, 2008, in an unpublished decision, the California Court of Appeal rejected petitioner's claims and affirmed the judgment.  (See LD D, E.)

While his direct appeal was pending, petitioner (through counsel) filed a petition for writ of habeas corpus in the California Court of Appeal, in which he alleged claims generally corresponding to the first and second grounds for relief alleged in petitioner's original Petition herein (which encompass Grounds 1-3 of petitioner's Amended Petition).  (See LD F.)  Following respondent's filing of an informal response at the Court of Appeal's direction (see LD G), and petitioner's letter reply thereto (see LD H), the Court of Appeal issued an Order on December 30, 2008 (the same date as its decision on direct appeal) denying petitioner's habeas petition, in part with a reasoned decision.  (See LD I.)[3]

On February 11, 2009, petitioner (through counsel) petitioned the California Supreme Court for review of the Court of Appeal's decision on direct appeal.  (See LD J.)  Concurrently, he also (through counsel) petitioned the California Supreme Court for review of the Court of Appeal's denial of his habeas petition.  (See LD L.)

---

[3]     Petitioner (through counsel) also filed a Petition for Rehearing of the order denying petitioner's habeas petition in the Court of Appeal on January 13, 2009, which apparently was denied on January 23, 2009.  Petitioner argued therein that the order relied on "incorrect facts and facts that are not supported by the record to find that [petitioner] was not prejudiced by juror misconduct."  (See Trav. at 7, Exh. A at 1; LD J at 1 (in his Petition for Review to the California Supreme Court, counsel states that the Petition for Rehearing was denied on January 23, 2009).)

1    On April 1, 2009, the California Supreme Court issued separate orders summarily

2    denying both petitions without comment or citation of authority.  (See LD K, M, N.)

3         On or about December 1, 2009, petitioner constructively filed a pro se motion

4    in the trial court requesting post-conviction discovery, which the trial court denied

5    on December 7, 2009.  (See Exhibits to LD O.)  Petitioner then constructively filed

6    a pro se habeas petition in the California Supreme Court on January 6, 2010 (proof

7    of service date),[4] in which the sole claim alleged was that the trial court had erred in

8    denying petitioner's motion for post-conviction discovery.  (See LD O.)  This claim

9    generally corresponds to Ground 21 of the proposed Amended Petition herein.

10        While that California Supreme Court habeas petition was pending, petitioner

11   constructively filed another habeas petition in the California Supreme Court on or

12   about March 25, 2010 (signature date).  Petitioner alleged therein claims that

13   generally correspond to Grounds 10-20 of petitioner's proposed Amended Petition

14   herein.  (See LD Q.)

15        While both of his California Supreme Court habeas petitions were pending,

16   petitioner filed his original Petition herein on March 31, 2010.  The signature date on

17   the Petition, and thus the earliest date on which it could have been turned over to the

18   prison authorities for mailing, was March 25, 2010.

19        In two separate orders issued on September 15, 2010, the California Supreme

20   Court summarily denied both of petitioner's habeas petitions, citing both times In re

21   Clark, 5 Cal. 4th 750 (1993).  (See LD T, U.)[5]

22   _____

23        [4]    The Ninth Circuit has held that the prison mailbox rule applies to a pro
24   se habeas petitioner's state and federal filings.  See, e.g., Smith v. Duncan, 297 F.3d
     809, 814 (9th Cir. 2002); Huizar v. Carey, 273 F.3d 1220, 1223 (9th Cir. 2001).
25

26        [5]    On November 1, 2011, petitioner constructively filed another pro se
27   habeas petition in the California Supreme Court, which the California Supreme Court
     summarily denied on March 14, 2012 with citations to In re Robbins, 18 Cal. 4th 770,
28                                                                    (continued...)

1      **SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL**

2           Because petitioner is not challenging the sufficiency of the evidence to support

3      the conviction, the following summary is taken from the "Factual and Procedural

4      Background" of the California Court of Appeal opinion (<u>see</u> LD D at 2-6 (footnotes

5      7-9 in original), E)[6]:

6

7      *1. The Murder*

8           *On the evening of May 10, 2003 Jose "Chino" Robles and his family were*

9      *hosting a barbecue in their backyard on 101st Street in south Los Angeles. Around*

10     *9:00 p.m. Robles, who was a member of a tagging crew known as "No Control" or*

11     *"NC," decided to walk to a nearby liquor store. On the way down 101st Street, he*

12     *met another member of NC, Albert Segundo, who was heading to the Robles*

13     *barbecue. Segundo had just seen Coleman, the leader of the rival tagging crew*

14     *"NGA," accompanied by another rival gang member known as "Drips," driving*

15     ─────────────────

16          [5](...continued)

17     780 (1998) and <u>In re Clark</u>, 5 Cal. 4th at 767-69. Those citations signified that the
       petition was being denied for untimeliness. <u>See, e.g.</u>, <u>Bennett v. Mueller</u>, 322 F.3d

18     573, 581-83 (9th Cir.) (recognizing California's untimeliness bar is represented by

19     citations to <u>Robbins</u> and <u>Clark</u>), <u>cert. denied</u>, 540 U.S. 938 (2003). In any event, it
       appears from the Court's review of the petition that it was not directed to the same

20     Superior Court conviction underlying the Petition herein. (<u>See</u> LD X.)

21
            [6]     The Court notes that recent Ninth Circuit cases have accorded the factual

22     summary set forth in a state court appellate opinion a presumption of correctness

23     pursuant to 28 U.S.C. § 2254(e)(1). <u>See</u> <u>Vasquez v. Kirkland</u>, 572 F.3d 1029, 1031

24     n.1 (9th Cir. 2009), <u>cert. denied</u>, 130 S. Ct. 1086 (2010); <u>Slovik v. Yates</u>, 556 F.3d
       747, 749 n.1 (9th Cir. 2009); <u>Moses v. Payne</u>, 555 F.3d 742, 746 n.1 (9th Cir. 2009);

25     <u>Tilcock v. Budge</u>, 538 F.3d 1138, 1141 (9th Cir. 2008), <u>cert. denied</u>, 555 U.S. 1112

26     (2009); <u>Mejia v. Garcia</u>, 534 F.3d 1036, 1039 n.1 (9th Cir. 2008), <u>cert. denied</u>, 555
       U.S. 1117 (2009). Petitioner has the burden of rebutting the presumption of

27     correctness by clear and convincing evidence. Here, petitioner does not purport to

28     rebut the presumption.

1  slowly along the street in a white van with wood paneling.[7]  Segundo warned Robles
2  the liquor store was in "enemy territory."  Robles shrugged off the warning, replying
3  he would be fine because he had his knife.

4      Segundo walked across the street from the Robles home to pick up a friend,
5  crossed the street back to the sidewalk in front of the Robles home and, seconds later,
6  heard two gunshots.  Segundo turned and saw Robles holding onto a fence rail as
7  Drips fired additional shots at Robles. Segundo watched as Drips reentered the van
8  through the passenger door.  After the van sped past the Robles home, Segundo and
9  his friend hurried to a car and gave chase.  At a stop sign a couple of streets away,
10  Drips got out of the van and pointed a blue steel semiautomatic gun at Segundo's
11  friend's car.  Segundo's friend turned the car around and returned to the Robles
12  home.

13

14      **2. The Identification of Coleman**

15      At trial four witnesses identified Coleman as the driver of the white van:
16  Segundo, who attended high school with Coleman and estimated he had seen him
17  hundreds of times before the shooting; Robles's younger brother, Jesse, who ran to
18  the street when he heard shots and saw the van speed away; Jesse's friend, Carlos
19  Lopez, who also ran to the street when shots were fired and was standing next to
20  Jesse when the van drove by; and Maria Renteria, who rented the house behind the
21  Robles home and had just parked her own van near the Robles home when the
22  shooting began.

23      a. _Albert Segundo_

24      Segundo testified he recognized Coleman when the white van passed him

25

26  ───────────────

27      [7]    Segundo testified he had flashed an NC sign at Coleman and Drips as
   they drove by.  Sensing there might be trouble, he warned another friend, Miko, to
28  take some young women who were standing in the street back into the Robles home.

1     *before the shooting and again when the shooter, Drips, opened the door to climb*

2     *back into the van after the shooting.  Segundo explained that opening the door*

3     *illuminated the van's interior.  Segundo again recognized Coleman after the chase*

4     *when Drips pointed his gun at Segundo and his friend.  According to Segundo,*

5     *Coleman's head was shaved; he was wearing a black T-shirt; and he had a steel bar*

6     *piercing his left eyebrow.  Segundo testified he was 100 percent certain Coleman was*

7     *the driver of the van.*

8     *Coleman's counsel sought to impeach Segundo by eliciting testimony Segundo*

9     *had initially blamed two local Hispanic gang members for the shooting in an*

10     *interview with Los Angeles Sheriff deputies.  Segundo admitted he had lied to the*

11     *deputies but claimed he had been afraid of retaliation from Coleman and his crew.[8]*

12     **b. *Jesse Robles***

13     *Jesse Robles was at the barbecue in his family's backyard when he heard two*

14     *shots and raced toward the street.  As he ran, he heard another 13 shots.  The*

15     *shooting had ended by the time he reached the gate of the driveway.  He was soon*

16     *joined by his friend, Carlos Lopez.  Jesse, who estimated he had seen Coleman*

17     *(whom he knew by his moniker "Illusion") more than 50 times in the neighborhood,*

18     *recognized Coleman both when Drips reentered the passenger side of the van and*

19     *when the van drove past him.  As Jesse and Lopez stood there, they acknowledged to*

20     *each other Coleman was the driver.  Jesse was certain the driver was Coleman even*

21     *though Coleman usually drove a green Camry and he had never seen Coleman*

22     *driving a white van.*

23     *Although Jesse told Lopez he recognized Coleman the night of the shooting,*

24     *he did not tell sheriff's deputies he knew the attackers until two days after the*

25     *shooting.  He claimed he wanted to avoid testifying at trial and decided to come*

26

27     [8]   *In order to compel Segundo to testify, the court issued a body warrant*

28 *authorizing his arrest and detention pending completion of his testimony.*

1  *forward only when his family asked him to do so.*

2          *c.  Carlos Lopez*

3      *Carlos Lopez was at the Robles barbecue when the first shots were fired.  He*

4  *ran after Jesse Robles toward the street, arriving in time to see the white van drive*

5  *by.  According to Lopez, the van was illuminated by the headlights of another van,*

6  *allowing him to see Coleman, whom he too knew as the leader of NGA.  Coleman had*

7  *a shaved head and was wearing a black T-shirt.  Lopez was contacted by sheriff's*

8  *deputies soon after the shooting and identified Coleman as the shooter.*

9          *d.  Maria Renteria*

10      *As Maria Renteria parked her van near the Robles driveway, her headlights*

11  *illuminated the white van, which was stopped in the middle of 101st Street some*

12  *distance down the street.  Renteria watched as a dark-skinned man got out of the*

13  *white van, crossed in front of it and began shooting at what she thought was a car*

14  *parked on the side of the street.  From the light of her headlights and the interior*

15  *light of the van when the shooter climbed back in, she was able to see the driver,*

16  *whom she described as a Black man.  Although she was unable to identify Coleman*

17  *in a photographic lineup, at trial she testified he "looked like" the driver.*

18

19      ***3.  Corroboration of Coleman's Identification and Motive***

20      *To establish preexisting animosity between Coleman and Robles, the People*

21  *elicited testimony about three previous incidents.  First, Jesse testified that, sometime*

22  *before the shooting, he was in an alley watching a friend tag a wall with the acronym*

23  *"SAP" and cross out the tag "NGA."  Coleman drove up with his brother, Jeremy,*

24  *and challenged Jesse and his friend, asking why they were crossing out his "hood."*

25  *Jesse's friend ran, chased by Jeremy.  Coleman approached Jesse, took his bicycle*

26  *and threw it over a gate.*

27      *Second, Segundo testified he saw Robles and some others "jump" Coleman*

28  *around the corner from the Robles home a month or two before the shooting.*

*Third*, three witnesses, including Lopez, testified about an incident involving Coleman and Robles that occurred on the afternoon of the murder. During the early afternoon, Robles and some friends were standing in front of a home on 102nd Street around the corner from the Robles home. To their surprise, Jeremy Coleman walked by on his way to visit his girlfriend. Jeremy asked Robles where he was from, meaning to what tagging crew did he belong; but Robles did not answer. Jeremy identified himself as NGA; and Robles laughed at him, prompting Jeremy to threaten to get his brother. Robles then identified himself as NC and said, "Fuck NGA." When Jeremy started to walk away, Robles chased him and hit him on the arm with a baseball bat. Robles later told Lopez Jeremy had called him a "bitch."

About 30 minutes after the confrontation, Coleman and Jeremy drove to the home on 102nd Street in Coleman's green Camry. Robles was no longer there. Coleman asked Lopez, "Which one of you was trying to fight my brother?" When no one answered, Jeremy asked where Robles had gone. After he was told Robles had returned to his house, Jeremy threatened "to get Chino or anybody from NC."[9] According to Lopez, Coleman was wearing a black T-shirt.

The People also introduced a surveillance videotape from a video store located five to ten minutes from the crime scene, taken at 9:46 p.m. on the night of the shooting, which showed Coleman wearing a black T-shirt over a white T-shirt.

//

//

//

//

---

[9]     Jeremy, who testified under a grant of immunity, disputed Lopez's account and denied he had ever challenged Robles. Jeremy also claimed he had been with Coleman at the time of the shooting, but a sheriff's deputy impeached Jeremy's testimony with his prior statement Coleman had dropped him off earlier in the evening.

**GROUNDS 1-9 OF PETITIONER'S AMENDED PETITION**

The claims alleged in petitioner's Amended Petition to which this Partial Report and Recommendation is directed are Grounds 1-9 (which respondent has conceded encompass the six grounds for relief alleged by petitioner in his original Petition herein). Those first nine grounds for relief are as follows:

1.    False evidence was introduced at trial during the testimony of prosecution witness Maria Renteria, entitling petitioner to habeas relief under Cal. Penal Code § 1473. (See Am. Pet. at 5; see also Attached Memorandum of Points and Authorities ("Am. Pet. Attach.") at 27-31; Trav. at 10-24.)

2.    The prosecutor's knowing presentation of Renteria's false testimony violated petitioner's federal constitutional right to due process and a fair trial under Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). (See Am. Pet. at 5; see also Am. Pet. Attach. at 31-32; Trav. at 24-39.)

3.    Trial counsel provided ineffective assistance by failing to adequately question Renteria about her ability to see the driver of the van and failing to investigate and produce evidence that it would have been physically impossible for her to see the driver under the circumstances she described. (See Am. Pet. at 6; see also Am. Pet. Attach. at 32-37; Trav. at 39-44.)

4.    Evidence of petitioner's prior arrest and criminal history was inadmissible under California law because it was more prejudicial than probative. (See Am. Pet. at 6; see also Am. Pet. Attach. at 37-39; Trav. at 44-46.)

5.    Petitioner was denied his federal constitutional rights to an impartial jury and due process by the jury's receipt during deliberations of prejudicial information about petitioner's criminal history that had not

16

been presented at trial. (<u>See</u> Am. Pet. at 6; <u>see also</u> Am. Pet. Attach. at 40-46; Trav. at 46-52.)

6.    The jury's "inadvertent exposure to out-of-court information" constituted jury misconduct under California law. (<u>See</u> Am. Pet. at 6a; <u>see also</u> Am. Pet. Attach. at 46-48; Trav. at 46-52.)

7.    The prosecutor's placement before the jury of the unredacted exhibit containing petitioner's arrest information, coupled with the prosecutor's repeated reference to petitioner having been booked during the examination of Deputy Steven Marella, constituted prosecutorial misconduct in violation of petitioner's federal constitutional right to due process. (<u>See</u> Am. Pet. at 6a; <u>see also</u> Am. Pet. Attach. at 48-52; Trav. at 52-53.)

8.    Trial counsel provided ineffective assistance in failing to object to the prosecutorial misconduct. (<u>See</u> Am. Pet. at 6a; <u>see also</u> Am. Pet. Attach. at 52-54; Trav. at 53-54.)

9.    The error, whether by the trial court, the jury, the prosecutor, or trial counsel, violated petitioner's federal constitutional right to an impartial jury and due process of law. (<u>See</u> Am. Pet. at 6b; <u>see also</u> Am. Pet. Attach. at 54-65.)

**STANDARD OF REVIEW**

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application

1    of, clearly established Federal law, as determined by the Supreme Court

2    of the United States; or (2) resulted in a decision that was based on an

3    unreasonable determination of the facts in light of the evidence

4    presented in the State court proceedings."

5

6    Under the AEDPA, the "clearly established Federal law" that controls federal habeas

7    review of state court decisions consists only of holdings (as opposed to dicta) of U.S.

8    Supreme Court decisions "as of the time of the relevant state-court decision."

9    Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); see

10    also Carey v. Musladin, 549 U.S. 70, 74, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).

11    Although a particular state court decision may be both "contrary to" and "an

12    unreasonable application of" controlling Supreme Court law, the two phrases have

13    distinct meanings. See Williams, 529 U.S. at 391, 413. A state court decision is

14    "contrary to" clearly established federal law if the decision either applies a rule that

15    contradicts the governing Supreme Court law, or reaches a result that differs from the

16    result the Supreme Court reached on "materially indistinguishable" facts. See Early

17    v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam);

18    Williams, 529 U.S. at 405-06. When a state court decision adjudicating a claim is

19    contrary to controlling Supreme Court law, the reviewing federal habeas court is

20    "unconstrained by § 2254(d)(1)." See Williams, 529 U.S. at 406. But the state court

21    need not cite or even be aware of the controlling Supreme Court cases, "so long as

22    neither the reasoning nor the result of the state-court decision contradicts them." See

23    Early, 537 U.S. at 8.

24    State court decisions that are not "contrary to" Supreme Court law may be set

25    aside on federal habeas review only "if they are not merely erroneous, but 'an

26    unreasonable application' of clearly established federal law, or are based on 'an

27    unreasonable determination of the facts.'" See Early, 537 U.S. at 11 (citing 28 U.S.C.

28    § 2254(d)) (emphasis added). A state-court decision that correctly identified the

governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. See Williams, 529 U.S. at 406-10, 413 (e.g., the rejected decision may state the Strickland standard correctly but apply it unreasonably); Woodford v. Visciotti, 537 U.S. 19, 24-27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." Visciotti, 537 U.S. at 24-27; Williams, 529 U.S. at 413. An "unreasonable application" is different from an erroneous or incorrect one. See Williams, 529 U.S. at 409-10; Visciotti, 537 U.S. at 25; Bell v. Cone, 535 U.S. 685, 699, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). Moreover, as the Supreme Court recently held in Cullen v. Pinholster, – U.S. –, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011), review of state court decisions under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits."

As the Supreme Court recently explained in Harrington v. Richter, - U.S. -, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011):

> "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here [i.e., where there was no reasoned state-court decision], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."

Furthermore, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87.

//

19

1    **DISCUSSION**

2   A.    <u>**Habeas relief is not warranted with respect to petitioner's claims arising**</u>

3         <u>**from the introduction of allegedly false evidence.**</u>

4         1.    <u>The record below</u>

5         At petitioner's trial in April 2006, the prosecution presented the testimony of

6   Maria Renteria, a woman who resided in a rental unit behind the victim's family

7   home.  Renteria testified that she knew the victim, Jose Robles, and that she was

8   "friends" with the Robles family.  (<u>See</u> 3 RT 1225, 1231-32.)  On May 10, 2003, the

9   night of the murder, Renteria had just parked her van on the street in front of the

10  Robles home, but she had not yet turned off her headlights when she saw a van, "like

11  a white Dodge Caravan," facing the wrong way on the street in front of her.  Renteria

12  testified that the two vans were facing each other and that she could see a "Black

13  male" inside of the white van.  This man was the driver.  (<u>See</u> 3 RT 1225-26, 1228-

14  29, 1232.)

15        Renteria testified that she saw a man next to the white van firing a weapon and

16  described that man as between 18 and 20, "kind of tall, like 5' 8," heavy build, and

17  wearing a flannel shirt with checkers.  The shooter was wearing a beanie and had

18  Jheri curls under the beanie that hung down to just above his shoulders.  (<u>See</u> 3 RT

19  1228-29, 1239.)  Renteria agreed that the shooter was "a Black guy."  (<u>See</u> 3 RT

20  1235-36.)  Renteria saw the shooter get out of the white van, and, after the shooting

21  had stopped, she saw the shooter get back inside the van.  The white van started

22  driving toward her, and then it drove past her.  Renteria testified that "after it went

23  past" her, she "turned away so they wouldn't see that I had seen."  (<u>See</u> 3 RT 1229-

24  30.)  Her headlights shone inside the white van "until they left."  (<u>See</u> 3 RT 1230.)

25        Renteria testified that she had never seen the driver of the white van before that

26  night.  When asked by the prosecutor if "the person sitting here at the end of counsel

27  table" was the "person that [she] saw in the car," Renteria responded that "[i]t looks

28  like him."  (<u>See</u> 3 RT 1226-27, 1229-30.)  Renteria admitted that she could not

20

remember being able to identify the driver prior to trial.  (See 3 RT 1227, 1238–39.)
She first testified that she had about "2 minutes" to see the driver's face before she
focused on the shooter, but she then revised her estimate to "more than 10 seconds"
during cross examination.  She confirmed that she had a "good view of the person"
in the driver's seat.  (See 3 RT 1230-31, 1236-37, 1245.)  Renteria testified that she
did not remember whether the driver had anything on his head, nor could she
remember any details of his appearance or what he was wearing.  (See 3 RT 1229,
1239-41, 1244.)  Renteria admitted that she had told the police at the time that she
was not able to describe the driver beyond the fact that he was a Black male.  (See 3
RT 1252.)  But Renteria agreed that she "had a good view" of the driver when her
headlights "hit the other van."  (See 3 RT 1245.)

During cross examination, Renteria testified that she was parked "like in the
middle" of the block between Budlong and Vermont, but she could not recall whether
she was "a little bit up or [a] little backwards" from the Robles house.  (See 3 RT
1232-33.)  Renteria clarified that the white van was "straight ahead" of her, but on the
wrong side of the street, pointing toward her, and facing Vermont.  (See 3 RT 1226,
1233-34, 1241-42.)  She had parked facing Budlong, "right next to the Robles house."
(See 3 RT 1241.)  She testified that she saw the shooter exit the passenger side of the
white van, but he stood by the driver's side while shooting.  (See 3 RT 1242.)  When
the shooter returned to the white van, he crossed in front of the van and opened the
side door of the van before climbing back into the van.  (See 3 RT 1243.)

During redirect examination, Renteria testified that she first noticed that the
white van was parked on the wrong side of the street.  (See 3 RT 1244-45.)  Renteria
testified during further cross examination that she first saw Jose, the victim, "cross
the street"and that he was walking toward his house.  She then saw Jose fall.  (See 3
RT 1249-50.)  Renteria admitted that she had not told the police at the time that she
had seen Jose either cross the street or fall to the sidewalk during the shooting.  (See
3 RT 1250-52.)  She further testified that the white van had its lights on at first, but

1    then the lights were turned off.  (See 3 RT 1249-50.)  Renteria explained that "there

2    was not a lot of cars in front.  You could see there was not like big cars, vehicles.  So

3    you could see." (See 3 RT 1250.)  Renteria, however, did not give an estimate of the

4    distance between her vehicle and the white van.

5        Following the guilty verdict against petitioner on April 28, 2006, Maria

6    Renteria testified on August 7, 2007, at the separate trial of Abel Soto, the man

7    subsequently convicted of being the shooter during the incident.  At Soto's trial, she

8    was called as a witness for the defense.  Renteria testified that she had parked her van

9    "past the driveway" of the Robles house, toward Budlong.  (See Am. Pet., Exh. E at

10   1802-04.)[10]   Renteria saw the white van coming toward her "driving on the wrong

11   side of the street" with its lights off.  (See Id. at 1804.)  After the van stopped, she

12   saw the passenger get out and walk in front of the white van.  Renteria testified that

13   she was about 35 feet away, or about two car lengths.  (See Id. at 1805-06.)  Renteria

14   described the shooter as a Black man, around 5' 10," heavy build and muscular,

15   wearing a black beanie and a dark flannel shirt.  She was sure that he was not

16   Hispanic and that he had black shoulder-length hair with a Jheri curl.  (See Id. at

17   1808-10, 1813, 1819.)  Renteria testified that she saw the driver "when they passed"

18   after the shooting.  (See Id. at 1810-11.)  She said that she turned away because she

19   was scared and did not want them to know that she had seen the shooting.  Renteria

20   testified that she was able to recognize the driver and that she had identified him at

21   his earlier trial. (See Id. at 1811.)

22

23   ⎯⎯⎯⎯⎯⎯⎯⎯⎯

24        [10]    Exhibits A through G that are attached to petitioner's Amended Petition
     herein are the same exhibits petitioner attached to his first state court habeas petition
25   to the Court of Appeal, and of which he sought review in the California Supreme
     Court.  (See LD F, Exhs. A - G; LD L.)  Accordingly, these exhibits are part of the
26   record that was before the state courts.  See Pinholster, 131 S. Ct. at 1398 (review of
     state court decisions under § 2254(d)(1) "is limited to the record that was before the
27   state court that adjudicated the claim on the merits").

28

                                              22

During cross examination by the prosecutor[11] in Soto's case, Renteria was presented with several crime scene photographs that the prosecutor said were "taken right after the murder" and asked to locate her car. Renteria testified that she remembered that she had "parked past" the Robles' driveway, but she did not see her car in the photographs. Following the shooting, she got out of her car and went to her house. She testified that she did not recall moving her van, although she said that she had been planning to go to the store. (See Id. at 1816-18.) After looking at other photographs of the crime scene, Renteria located her van. It was parked further away, "before the Robles' residence," and behind a truck and an SUV. (See Id. at 1821-24.) Renteria, however, continued to insist that she had parked "past the driveway" of the Robles' house, and again said that she "was not so far from where the shooting took place." (See Id. at 1826.)

In April 2007, petitioner filed a motion for a new trial based on allegations of juror misconduct. Petitioner also raised a conclusory argument that the evidence was insufficient to support the verdict. (See 2 CT 210-11, 225-26.) A hearing was held on the motion for a new trial in connection with petitioner's sentencing on August 16, 2007. No argument was made in the moving papers or at the hearing concerning the then recent testimony of Renteria at Soto's trial. (See 2 CT 210-26; 5 RT 3901-08.) The trial court denied petitioner's motion for a new trial, finding, in relevant part, that "there was overwhelming evidence presented at trial to support the jurors' verdict and special finding." (See 5 RT 3909.)

Petitioner first raised his claims pertaining to Renteria's testimony in his habeas petition to the California Court of Appeal, to which the state filed an informal response. (See LD F-H.) The Court of Appeal rejected petitioner's claims,

---

[11]     The prosecutor at petitioner's trial was Dara Williams (See 2 RT 1), while the prosecutor at Soto's trial was a "Ms. Barnes" (See Am. Pet., Exh. E at 1814).

concluding in relevant part (See LD I at 2)[12]:

> [W]e do not agree the impeachment evidence conclusively establishes Renteria lied at [petitioner's] trial. Even if her view was impeded and at an unlikely distance, we cannot conclude it was physically impossible for her to have seen [petitioner] in the illuminated front seat of the van.
>
> Moreover, Renteria's identification of [petitioner] added little to the already overwhelming evidence against [petitioner], which consisted of three other eyewitness identifications by individuals who had known [petitioner] over an extended period of time. While [petitioner] insists these witnesses were motivated to lie and framed him for Robles's murder, the trial court was in a far better position to evaluate their credibility and referred to the strength of this evidence in support of its denial of [petitioner's] new trial motion.
>
> The petition is summarily denied.

### 2.    Ground 1 of the Amended Petition

In his Ground 1, petitioner claims that he is entitled to habeas relief pursuant to Cal. Penal Code § 1473 based on the introduction of the allegedly false evidence

_____

[12]    As noted in the Procedural History section above, petitioner then filed a Petition for Review of the Court of Appeal's rejection of his habeas petition in the California Supreme Court, which the California Supreme Court summarily denied without comment or citation of authority. (See LD L-N.) Under Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991), it may be presumed that the California Supreme Court, by its silent denial of petitioner's Petition for Review, did not intend to change the Court of Appeal's reasoned decision rejecting petitioner's claims pertaining the allegedly false evidence. See also Williams v. Cavazos, 646 F.3d 626, 635-36 (9th Cir. 2011), cert. granted in part, 132 S. Ct. 1088 (Jan. 13, 2012).

by Maria Renteria.  (See Am. Pet. at 5; see also Am. Pet. Attach. at 27; Trav. at 10-24.)  However, in order to be entitled to federal habeas relief, petitioner must show that he is in custody in violation of the Constitution or laws or treaties of the United States.  See 28 U.S.C. § 2254(a); see also Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); Smith v. Phillips, 455 U.S. 209, 221, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) ("A federally issued writ of habeas corpus, of course, reaches only convictions obtained in violation of some provision of the United States Constitution."); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) (federal habeas courts "do not review questions of state evidence law").  To the extent that petitioner is contending that the trial court should not have admitted the allegedly false evidence, or that he is entitled to habeas relief, pursuant to state law, such claims are not even cognizable on federal habeas review.

### 3.    Ground 2 of the Amended Petition

#### a.    *petitioner's claim*

In his Ground 2, petitioner claims that the prosecutor's knowing presentation of Renteria's false testimony violated his federal constitutional right to due process and a fair trial.  (See Am. Pet. at 5; see also Am. Pet. Attach. at 31-32; Trav. at 12-14, 24-39.)  Petitioner contends that Renteria's testimony at his trial was false because her testimony at the subsequent trial of Soto differed from her testimony at petitioner's trial in the following respects: (a) at Soto's trial, Renteria testified that the driver of the white van turned off the headlights; (b) at Soto's trial, Renteria changed her testimony concerning at what point during the incident she got a good look at the driver's face; (c) at Soto's trial, Renteria estimated the distance between her vehicle and the white van to be 35 feet, and it was said to be about 160 feet by the prosecutor based on the crime scene photographs, whereas at petitioner's trial, Renteria did not

1  estimate the distance and said that she had parked close enough to get a good look;

2  (d) at Soto's trial, Renteria identified her vehicle in a photograph in which she was

3  parked behind a large truck and several other vehicles, but she testified at petitioner's

4  trial that no large vehicles were in front of her; and (e) Renteria testified that she had

5  seen the victim fall to the ground, but at Soto's trial, evidence was introduced that she

6  had parked about four vehicles and a driveway-length away from the location of the

7  shooting.  In addition, petitioner's post-trial investigation showed that the distance

8  between where Renteria's vehicle is shown parked in the photographs from Soto's

9  trial and the shooting was about 128 feet, and it would have been "physically

10 impossible for Renteria to see petitioner's face through the windshield of his vehicle

11 from that distance at night." (See Am. Pet. Attach. at 29-30; Trav. at 10-14, 18, 25-

12 27, 37.)  Further, petitioner claims that the jury in Soto's trial did not find Renteria's

13 testimony credible because it convicted Soto, despite the fact that Renteria had been

14 called by the defense because her description of the shooter did not match Soto.

15 Petitioner contends that Sergeant Katz, the investigating officer who testified at

16 petitioner's trial, should have known that Renteria's identification of petitioner could

17 not have been based on what she saw that night because it would not have been

18 possible for Renteria to identify petitioner from the distance at which she had parked

19 her van. (See Am. Pet. Attach. at 30-31.)

20

21          *b.     applicable legal authority*

22          The Supreme Court has held that "a conviction obtained through use of false

23 evidence, known to be such by representatives of the State" violates the defendant's

24 right to due process. See Napue, 360 U.S. at 269, Alcorta v. Texas, 355 U.S. 28, 78

25 S. Ct. 103, 2 L. Ed. 2d 9 (1957); Mooney v. Holohan, 294 U.S. 103, 55 S. Ct. 340, 79

26 L. Ed. 791 (1935).  Napue encompasses the knowing presentation of false evidence

27 even where the witness used to transmit the false information was unaware of its

28 falsity. See Hayes v. Brown, 399 F.3d 972, 980-81 (9th Cir. 2005) (en banc).  In

26

order to prevail on such a due process claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material."  See United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003), cert. denied, 540 U.S. 1208 (2004).

In assessing materiality under Napue, the Court determines whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury."  See Hayes, 399 F.3d at 985 (noting that the materiality standard of United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), a forerunner of Kyles v. Whitley, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1955), applies to Napue claims); see also Murtishaw v. Woodford, 255 F.3d 926, 959 (9th Cir. 2001), cert. denied, 535 U.S. 935 (2002).  The "touchstone of materiality" is a "reasonable probability" of a different result.  See Kyles, 514 U.S. at 434-35.  The impact of the withheld or perjured evidence "must be evaluated in the context of the entire record."  See Agurs, 427 U.S. at 112.[13]

c.    *analysis*

The record reflects that, during petitioner's trial, Renteria was not asked, and did not specify, exactly where she was parked, nor did she give an estimate of the distance between her vehicle and where the white van had stopped.  Further, the record does not reflect at what time the photographs subsequently introduced at Soto's trial in which Renteria identified her parked vehicle were taken, nor does the record reflect any evidence that all of the vehicles depicted in those photographs were present and parked in the same locations as shown in the photographs at the time of the murder.  Renteria was consistent in her testimony at both trials, insisting at Soto's

---

[13]    When applying the materiality analysis, "there is no need for a separate harmless error review."  Kyles, 514 U.S. at 423; Hayes, 399 F.3d at 984-85.

trial that "I just remember I was parked past the Robles. Past their driveway." In addition, after being presented at Soto's trial with the photographs of her vehicle parked behind other vehicles (including a truck) and at some distance from the Robles' house, Renteria continued to deny that she had been parked further away from the shooting than the Robles' residence, and she specifically denied that she had parked behind a "large truck." (See Am. Pet., Exh. E at 1816-17, 1822-24.) Petitioner argues that "the prosecutor at petitioner's trial had to have known that Renteria was parked too far from the white van to have been able to get a good look at the driver" (See Trav. at 23), but petitioner has failed to adduce any evidence that the prosecutor or the investigating detective who testified at petitioner's trial were aware that Renteria's testimony at petitioner's trial was not consistent with some of the photographs taken at the crime scene, or that any evidence existed from which the distance at which Renteria had parked her van at the time of the shooting could be determined.

In any event, mere inconsistencies in testimony are insufficient to establish that the testimony of a witness was false (see United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997); United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.), cert. denied, 516 U.S. 945 (1995), overruled on other grounds by Valerio v. Crawford, 306 F.3d 742, 764 (9th Cir. 2002) (en banc)), or that the prosecutor knowingly presented perjured testimony (see, e.g., United States v. Sherlock, 962 F.2d 1349, 1364 (9th Cir.), cert. denied, 506 U.S. 958 (1992); United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir. 1989)).

Additionally, the Court rejects petitioner's argument that it was impossible for the headlights of Renteria's van to have illuminated the interior of the white van from where she was parked in the photographs and that her "false" testimony impacted Jesse Robles's testimony that Renteria's headlights assisted Jesse in seeing the inside of the white van. (See Trav. at 18-22; 2 RT 952-53.) Jesse Robles testified on the first day of petitioner's trial that he could see petitioner seated inside the white van

1  in part because his neighbor "was coming back home and she had her lights on." (See

2  2 RT 952, 975.)  Jesse Robles denied having spoken to Renteria about the case or

3  about Renteria's forthcoming testimony.  (See 2 RT 953.)  Petitioner has offered no

4  evidence to support that Jesse Robles's testimony about seeing Renteria's headlights

5  also was false or that Jesse coordinated his testimony prior to trial with Renteria.

6  Rather, Jesse Robles's independent testimony serves to corroborate Renteria's later

7  testimony that her headlights illuminated the interior of the white van at the time of

8  the shooting.

9      The Court therefore finds that petitioner has failed to meet his burden of

10 showing that the Court of Appeal's conclusion that the impeachment evidence did not

11 establish that Renteria's testimony at petitioner's trial was actually false, or that it

12 would have been impossible for Renteria to have seen petitioner in the front seat of

13 the illuminated van, "was so lacking in justification that there was an error well

14 understood and comprehended in existing law beyond any possibility for fairminded

15 disagreement." Richter, 131 S. Ct. at 786-87.

16     The Court also finds that petitioner has failed to meet his burden of showing

17 that the Court of Appeal's conclusion that, when viewed in the context of the

18 "overwhelming evidence" against petitioner, Renteria's allegedly false testimony was

19 not material  (see LD I at 2) "was so lacking in justification that there was an error

20 well understood and comprehended in existing law beyond any possibility for

21 fairminded disagreement."   The record reflects that Renteria's credibility was

22 questionable in light of the extensive cross examination conducted by petitioner's

23 counsel that highlighted significant problems and inconsistencies with Renteria's

24 identification of petitioner, such as her testimony that it was the gunshots that drew

25 her attention to the white van and that she was "looking at the shooter doing all the

26 shooting"; that she was not paying any particular attention to the driver of the white

27 van before the shooting began; that her time estimate of how long she had looked at

28 the driver was inaccurate; that she had not identified petitioner in any photograph

previous to identifying petitioner at trial; that she could not remember what the driver was wearing or what he looked like; that she had not provided the police with any identifying information about the driver; and that her testimony at trial that she had seen the victim being shot and falling to the sidewalk was inconsistent with what she had told the police she had seen during the incident.  (See 3 RT 1231-44, 1248-52.)  Further, the Court concurs with the Court of Appeal that "Renteria's identification of [petitioner] added little" to the overwhelming evidence against petitioner.  (See LD I at 2.)  Although the testimony of all four eyewitnesses  who identified petitioner as the driver of the white van was generally consistent, Renteria's identification was the weakest of the four.  Each of the other three eyewitnesses, Jesse Robles, Carlos Lopez, and Albert Segundo, described a white van parked in the same general location as that described by Renteria, each of the men knew petitioner (a Black male) by name, and each identified petitioner to the police by name.  (See 2 RT 942-43, 946, 962, 967-68; 3 RT 1318-20, 1536-38, 1548-50, 1569-71, 1614-16; 4 RT 1891, 1893.)  Each of the other three eyewitnesses also identified petitioner at trial as the driver of the white van, and each of the other three testified at trial that he was certain of his identification.  (See 2 RT 943, 962; 3 RT 1537-38, 1550, 1615-16.)  In contrast, Renteria never provided a description of the driver beyond the fact that he was a Black male, and she only testified at trial that petitioner "looks like him."  (See 3 RT 1227.)  Finally, other evidence was presented from several witnesses that petitioner had been looking for Jose Robles that day because Jose had gotten into an argument with petitioner's brother Jeremy earlier on the day of the murder.  (See 3 RT 1608-16, 1629-31, 1633-34, 1637; 4 RT 1870-76, 1881-83.)

### 4.    Ground 3 of the Amended Petition

#### a.    *petitioner's claim*

In his Ground 3, petitioner claims that trial counsel provided ineffective assistance by failing to adequately question Maria Renteria about her ability to see

the driver of the white van and for failing to investigate and produce evidence that it would have been impossible for Renteria to see the driver under the circumstances she described.  (See Am. Pet. at 6; see also Am. Pet. Attach. at 32-37; Trav. at 39-44.) Petitioner contends that his trial counsel rendered ineffective assistance in failing to: (a) "question Renteria about the distance between her van and the crime scene" and ask her to identify her van on the crime scene photographs; (b) adequately investigate the facts and to present evidence of the distance between Renteria's car and the crime scene; and (c) present evidence that a person would not have been able to see petitioner's face from 128 feet away at night and that it would have been physically impossible for Renteria to identify petitioner as the driver.  (See Am. Pet. Attach. at 33-34.)  Petitioner contends that his counsel was "surprised" by Renteria's in-court identification of petitioner and was "unprepared to cross-examine [her] about her ability to see what she said she saw."  Petitioner asserts that counsel should have requested that Renteria was "subject to recall," and that he should have sent an investigator to the crime scene to measure the distances.  (Id. at 34.) Petitioner argues that Renteria's testimony was important because she was the only one of the four witnesses to identify petitioner who did not know him and who "appeared to be unbiased," and that "petitioner was a stranger to Renteria."  Petitioner contends that Renteria's testimony "bolstered the credibility of the three NC witnesses."  Petitioner cites the prosecutor's emphasis in closing that Renteria "had nothing to do with either of the tagging crews in this case," that Renteria was "kind of an important witness," and the strength of having four witnesses identify petitioner.  (See Am. Pet. Attach. at 35-36; Trav. at 37.)  Finally, petitioner argues that "[t]his was a close case" based on the length of the jury deliberations and that fact that the jury requested a readback of the complete testimony of seven witnesses.  (See Am. Pet. Attach. at 36-37.)

//

//

//

1

### b.    *applicable legal authority*

2    In Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d

3    674 (1984), the Supreme Court held that there are two components to an ineffective

4    assistance of counsel claim: "deficient performance" and "prejudice." "Deficient

5    performance" in this context means unreasonable representation falling below

6    professional norms prevailing at the time of trial. See Strickland, 466 U.S. at 688-89.

7    To show "deficient performance," petitioner must overcome a "strong presumption"

8    that his lawyer "rendered adequate assistance and made all significant decisions in the

9    exercise of reasonable professional judgment." Id. at 690. Further, petitioner "must

10    identify the acts or omissions of counsel that are alleged not to have been the result

11    of reasonable professional judgment." Id. The reviewing court must then "determine

12    whether, in light of all the circumstances, the identified acts or omissions were

13    outside the range of professionally competent assistance." Id. The Supreme Court

14    in Strickland recognized that "it is all too easy for a court, examining counsel's

15    defense after it has proved unsuccessful, to conclude that a particular act or omission

16    of counsel was unreasonable." Id. at 689. Accordingly, to overturn the strong

17    presumption of adequate assistance, petitioner must demonstrate that "the challenged

18    action cannot reasonably be considered sound trial strategy under the circumstances

19    of the case." Lord v. Wood, 184 F.3d 1083, 1085 (9th Cir. 1999), cert. denied, 528

20    U.S. 1198 (2000).

21    To meet his burden of showing the distinctive kind of "prejudice" required by

22    Strickland, petitioner must affirmatively "show that there is a reasonable probability

23    that, but for counsel's unprofessional errors, the result of the proceeding would have

24    been different. A reasonable probability is a probability sufficient to undermine

25    confidence in the outcome." Strickland, 466 U.S. at 694.

26    //

27    //

28    //

1          *c.*    *analysis*

2          Petitioner raised an ineffective assistance of counsel claim corresponding to

3    Ground 3 of the Amended Petition herein in his first state court habeas petition. (See

4    LD F at 28-35, LD H at 4-6.)  The California Court of Appeal rejected that petition

5    with a reasoned decision addressing a claim by petitioner that corresponds generally

6    to petitioner's Grounds 1and 2 of the Amended Petition herein.  The Court of Appeal

7    did not explicitly address petitioner's ineffective assistance of counsel claim,

8    although it did state at the end of its brief reasoned decision that, "The petition is

9    summarily denied." (See LD I.)  As noted above, petitioner did not raise his claims

10   in an original habeas petition to the California Supreme Court.  Instead, he filed a

11   Petition for Review seeking "review of the order denying his petition for writ of

12   habeas corpus which was filed on the same day as an unpublished opinion on his

13   appeal" (see LD L at 1), which the California Supreme Court proceeded to summarily

14   deny (see LD M, N).

15         Accordingly, the standard of review applicable to Ground 3 of the Amended

16   Petition is not clear.  The Ninth Circuit recently held in Williams that a California

17   Court of Appeal's reasoned opinion rejecting a state law claim that did not address,

18   "obliquely or otherwise," petitioner's related but separate federal constitutional claim

19   did not constitute an adjudication of the federal constitutional claim on the merits.

20   See Williams, 646 F.3d at 636, 638 & n.7, 639 n.10. In such cases, the Ninth Circuit

21   held, the AEDPA's deferential standard of review does not apply, and the federal

22   constitutional claim must be reviewed de novo.  See id. at 641; see also Nulph v.

23   Cook, 333 F.3d 1052, 1056 (9th Cir. 2003) (finding that "AEDPA's deferential

24   standard" does not apply "because the state court did not reach the merits" of the

25   federal due process claim); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002)

26   (holding that "when it is clear that a state court has not reached the merits of a

27   properly raised issue, we must review it de novo"), cert. denied, 539 U.S. 916 (2003).

28   However, the Supreme Court recently granted a petition for writ of certiorari to

33

address this part of the <u>Williams</u> decision.  <u>See</u> <u>Cavazos v. Williams</u>, 132 S. Ct. 1088, 181 L. Ed. 2d 806 (Jan. 13, 2012) (granting petition for writ of certiorari "limited to Question 1 presented by the petition"); <u>Cavazos v. Williams</u>, 2011 WL 4874095 (Appellate Pet., Motion and Filing) (Oct. 10, 2011) (presenting Question 1 as: "Whether a habeas petitioner's claim has been 'adjudicated on the merits' for purposes of 28 U.S.C. § 2254(d) where the state court denied relief in an explained decision but did not expressly acknowledge a federal-law basis for the claim.").

In any event, as discussed hereafter, even applying a de novo standard of review to petitioner's Ground 3, the Court finds that habeas relief is not warranted on this ineffective assistance of counsel claim.  It follows that the state courts' rejection of the claim necessarily was reasonable under the more deferential AEDPA standard of review, if that standard of review applies.  <u>See</u> <u>Berghuis v. Thompkins</u>, - U.S. -, 130 S. Ct. 2250, 2264, 176 L. Ed. 2d 1098 (2010).

First, as set forth above, the record reflects that counsel's extensive cross examination of Renteria highlighted problems with Renteria's testimony in general and with her in-court identification of petitioner in particular.  Not only does the record belie petitioner's contention that counsel was unprepared for his cross examination of Renteria, but it reflects that Renteria's credibility was called into question. Second, as the Court found above, Renteria's testimony that petitioner cites from the subsequent trial of Soto did not prove that it was impossible for Renteria to have seen petitioner in the driver's seat of the white van either while her vehicle was parked where she testified that she had parked it, or while the white van was driving toward her and before she had turned away.  Third, as the Court also found above, Renteria's tentative and belated identification of petitioner was not reasonably likely to have carried more weight with the jury than those of the other three eyewitnesses, each of whom identified petitioner by name to the police after the shooting and positively identified petitioner in court.  Petitioner contends that Renteria was the only "unbiased" witness, but the record reflects that Renteria testified that she knew

the victim and that she was friends with his family, who were her landlords at the time of the murder.[14]   Indeed, during closing arguments, petitioner's counsel argued that Renteria was biased because she lived with the victim.   Petitioner's counsel also argued in closing that Renteria would not have been able to identify petitioner because her headlights were not directly pointing into the white van, that her description of the shooting was inconsistent with that of the other witnesses, that she had failed to identify petitioner from a photo she was shown soon after the shooting, and that "she could not be relied upon for the accuracy of what she's telling us." (See 5 RT 2750-51.)   Thus, the jury was well aware of the problems with Renteria's testimony in general and with her in-court identification of petitioner in particular.

Second, there is Ninth Circuit authority for the proposition that the length of the jury deliberations is one factor to be considered in the determination of Strickland's prejudice prong. See, e.g., Jennings v. Woodford, 290 F.3d 1006, 1019 (9th Cir. 2002), cert. denied, 539 U.S. 958 (2003); United States v. Velarde-Gomez, 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc).   However, the Court disagrees with petitioner that the length of jury deliberations here reflects that this was "a close case." (See Am. Pet. Attach. at 36-37.)   Rather, the record reflects that the jury was sworn in and commenced their deliberations only late in the afternoon on April 25, 2006. The following morning, April 26, 2006, deliberations resumed at 9:15 a.m, and the jury requested a readback of significant portions of the testimony less than two hours later.   The jury made a single request for the readback of seven witnesses, and the readbacks were conducted at different times over the course of that afternoon and during the following day.   The record further reflects that the jury retired for the

---

[14]   The Court notes that petitioner argues that "Maria Renteria lived in the same house as the victim and his family.   They all knew each other well." (See Trav. at 30.)   The record reflects that, although she testified that she was friends with the victim's family, Renteria rented a house behind the house in which the victim's family lived.   (See 3 RT 1231-32.)

evening immediately after the second readback was completed on April 26, 2006, and then reached a verdict within an hour and fifteen minutes of the last readback on the third day, April 27, 2006.  (See 5 RT 2767-3602; 1 CT 130-32, 186.)

The Court therefore finds that petitioner has not met his burden of showing that, but for counsel's failure to investigate and further question Renteria regarding the exact location of her parked vehicle and/or failure to further call into question the credibility of Renteria's tentative in-court identification of petitioner, there is a reasonable probability that petitioner would not have been convicted.  As the Supreme Court recently observed in Richter, 131 S. Ct. at 791, "In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently."  Rather, "the likelihood of a different result must be substantial, not just conceivable."  See id. at 792.  Moreover, the Court's finding that petitioner has failed to make the requisite showing of prejudice renders it unnecessary to address Strickland's deficient performance prong.  See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."); Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the Strickland test obviates the need to consider the other."); Williams v. Calderon, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995), cert. denied, 516 U.S. 1124 (1996) (disposing of an ineffective assistance of counsel claim without reaching the issue of deficient performance because petitioner failed to make the requisite showing of prejudice).

//
//
//
//
//

**B.**    **Habeas relief is not warranted with respect to petitioner's claims arising from the jury's exposure to information pertaining to petitioner's prior arrest.**

1.    The record below

On April 6, 2003,[15] approximately one month before the murder, petitioner came into contact with Deputy Marella.  Deputy Marella testified at trial about petitioner's appearance, and the prosecutor asked him, "did you take a booking photograph of him at that time?"  When the deputy responded in the negative, the prosecutor asked, "[d]id you present him for booking so that a photograph was taken?"  During the brief testimony that following concerning petitioner's appearance and his pierced eyebrow, the terms "booked," "booking," "booking photo," and "booking photograph" were used a total of eight times.  (See 3 RT 1528-30.)  Immediately after the deputy's testimony concluded, the court took a break, and, outside the presence of the jury, the following exchange occurred (See 3 RT 1530-32):

> [Counsel]:  Your Honor, as to the testimony of the last witness, I didn't want to object and bring more attention to it at the time.  I knew the purpose that this witness was testifying simply to bring this, the eye piercing thing up because it's going to lead to another witness.  However, it had been indicated to me by [the prosecutor] that she was not going to bring up the fact that my client was arrested at that time.  That she was only going to say that this officer had had contact with him and noticed the eye piercing or something like that.  But then she went into questions of booking and him being booked and a booking photo

---

[15]    The exhibit in question reflects an arrest date of "04-06-2003." (See LD A at Attach. 1.)  During testimony at trial and in subsequent proceedings, an arrest date of April 5, 2003, was used.  At trial, Deputy Marella testified that he came into contact with petitioner "shortly after midnight" on April 5, 2003.  (See 3 RT 1528.)

*and the like. So the whole thing of him being – because I thought it was going to be sanitized. ... I believe this may have been inadvertent on her part.*

*[Prosecutor]: It was my screw up. I apologize. I wasn't thinking about the booking photo and the arrest that's why I asked contact, but I wanted to make it clear that there are photographs and I wanted to make it clear that the jury saw those photographs and that's why. It was my screw up. I apologize for that. I don't know if the jury knows what a booking photo necessarily is.*

*The Court: I think everybody does.*

*[Prosecutor]: Anyway, it was my screw up and I apologize because I didn't want to bring it to their attention, but if the court – if counsel certainly wants a cautionary instruction, you know, with that regard ...*

*[Counsel]: Like I said, I think if I had brought something up, it would have drawn more attention to it so at this junction I don't want to. I'm bringing it up now because I want to make sure that we proceed cautiously every step of the way so that such an error doesn't occur again.*

*[Prosecutor]: I apologize. I should have asked counsel about that because the booking photo was only, if he showed a photograph of him, to show that there was no piercing in the photograph. So I apologize. But as I indicated, if counsel wants a cautionary instruction to the jury, then I'd certainly have no objection to drafting something. ...*

*[Counsel]: ... At this juncture I'm indicating I'm not – unless something else comes up in that fashion or whatever, I'm not asking for anything additional to be done at this junction.*

38

Earlier in the trial, the prosecutor had shown petitioner's booking photograph from the April 2003 arrest to witness Jesse Robles. The booking photograph in question, marked as People's Exhibit 3, had been shown to Jesse during his first interview with the police after he had told Detective Katz that he recognized the driver of the white van and provided Detective Katz with petitioner's name. (See 2 RT 945-46, 967-69.) The photograph was admitted into evidence without any defense objection. (See 4 RT 2173-74.)

Some weeks after petitioner's trial, juror No. 5 wrote a letter to the trial court stating, in part (see 4 Augmentation, Reporter's Transcript on Appeal ["ART"] L-2 to L-3.):

> *There was one concern about the deliberation process that still resonates in my mind, and I would like to know whether it is normal procedure in order to put my conscience at ease. During the hearing, a picture of Mr. Coleman was presented as evidence. Later, when this picture was presented in the jury room it entailed information about the defendant, detailing a prior arrest which occurred a month before the incident in question. I know for a fact that the details of this prior arrest influenced the jury's decision in determining the final verdict. Since Mr. Coleman's past was not brought up during the hearing, I have been wondering whether the information about his previous arrest should have been presented to the jury during the deliberation process.*
>
> *I have pondered this question for awhile, and I would like to have an answer for my peace of mind.*

After conferring with counsel, the court determined that the booking photograph marked as People's Exhibit No. 3 had been folded in half during trial to conceal information pertaining to petitioner's arrest while allowing witnesses to see

a photograph of petitioner.  Inadvertently, the complete exhibit had been sent to the
jury room during deliberations without removing the booking information.  (See 4
ART at L-4.)  Counsel represented to the court that he and the prosecutor had had a
discussion about the exhibit in which it had been agreed that the information about
petitioner's arrest that was included on the folded exhibit was to be cut off or blacked
out before the exhibit was sent to the jury.  The prosecutor did not recall the
discussion, but the record reflects that no objection was raised to the exhibit.  The
prosecutor, however, stated that it had not been her intention to show the arrest
information to the jury.  (See 4 ART at L-21 to L-23.)

The information on the relevant exhibit includes petitioner's name and booking
number, an arrest date of April 6, 2003, his birth date, sex, race, height, weight, and
the charging information recorded as follows: "496(A)/PC/F/REC KNWN STOLN
PROP $400+;  12031(A)(2)(D) /PC/F/C/LOADED F/ARM: PROHIB/ETC;
12031(A)(1)/PC/F/CARY LOAD F/ARM: PUB:S/CIR; 12025(A)(1)/PC/F/CCW IN
VEH W/PR FEL CONV." (See LD A, Attach. 1.)

The jurors were requested to return to court, which eleven did.[16]  Those eleven
jurors were sworn in and testified individually during hearings over several days.
Five of the jurors testified either that they did not see the reverse side of the
photograph, or that they could not recall seeing the information contained on the
reverse side.  (See 4 ART at M-10 to M-11, M-22, O-3, O-8, P-4.)  Six jurors did
recall seeing the information on the reverse side of the photograph.  (See 4 ART at
L-9 to L-11, M-6 to M-7, M-13 to M-14, N-3 to N-4, N-6 to N-7, N-10 to N-11.)
Four of the jurors recalled that another juror, possibly the foreperson, had stated that
the information on the exhibit should not be considered during deliberations or that

---

[16]     When contacted by the court's clerk, one of the jurors stated that the
juror believed that "the right decision was made" and elected not to come in to testify.
(See 4 ART at N-13.)

the jurors should not look at the information. (See 4 ART at L-10, L-12, N-12, O-5,
P-4.)  Even the juror who brought the issue to the court's attention, juror No. 5,
testified, "I think we understand [sic] that we shouldn't … be considering this
information." (See 4 ART  at L-17 to L-18.)  Although five of the jurors understood
that the information related to a prior arrest, a prior offense, or a previous contact
with the police by petitioner, no juror recalled any discussion during deliberations
concerning any prior offense or prior arrest.  Similarly, no juror recalled that any juror
read out loud the information on the reverse side of the photograph.  (See 4 ART at
L-10 to L-12, L-16, M-6 to M-7, M-11, M-12 to M-14, M-19 to M-20, M-22 to M-23,
N-3 to N-4, N-7 to N-8, N-11 to N-12, O-2, O-9 to O-10, P-4.)  None of the jurors
testified that any juror specifically pointed to the information contained on the reverse
side of the photograph during deliberations or that any general discussion of
petitioner's past record or prior contact with the police occurred during deliberations.

In a subsequent motion for a new trial, counsel argued that the introduction of
the information on the exhibit constituted juror misconduct, that it was clear that the
jury had examined the information, and that petitioner was prejudiced by the
introduction of evidence of a criminal record suggesting dishonesty. (See 2 CT 210-
26; 5 RT 3901-08.)  The trial court denied the motion, finding "no juror misconduct
or indication of actual bias or prejudice due to the forwarding of that particular
exhibit with criminal history in its unedited form." (See 5 RT 3908-09.)

2.    The California Court of Appeal's decision

In rejecting petitioner's  related claim on direct appeal, the California Court of
Appeal determined, first, that the disclosure of the "booking information," although
inadvertent, should be considered "under the rubric of juror misconduct," and then
determined, in relevant part, as follows (see LD D at 9-12):

> *At the outset, we concur with the trial court's assessment of the*
> *booking information as not inherently prejudicial to the jurors'*

*deliberation. The overwhelming evidence against [petitioner] more than rebuts the presumption he was unduly prejudiced by the disclosure of the information. In a different – and closer – case, we might conclude the jurors' exposure to a defendant's booking information, from which they could have gleaned he had a prior felony conviction and was carrying concealed firearms when he was arrested with stolen property worth more than $400, improperly infected the jury's deliberations. But this is not a close case. [Petitioner] was identified as the driver of the van by three witnesses who knew him well. These same witnesses knew Robles had recently antagonized [petitioner] by picking on his younger brother and had heard [petitioner] threaten revenge. The trial court obviously viewed the case the same way and concluded the evidence against [petitioner] was overwhelming.*

*The jurors' statements concerning their reaction to the booking information confirms their focus properly remained on the evidence before them and not on the information he had previously been arrested on a weapons charge. Their comments reveal the jurors appeared to have discerned Coleman had been previously arrested for carrying a gun, but few, if any, appeared to understand the detail of the charges. Moreover, the impact of the information itself appeared minimal. It is evident only fleeting references were made to the information by one or two small groups of jurors. Nearly half of the jurors did not even recall knowing about the prior arrest. ... [T]he jurors ... who saw the booking information mentioned [petitioner's] prior arrest only in passing and appeared to follow the court's instruction to consider only the evidence presented at trial. [¶] Based upon our independent review of the evidence, therefore, we see no substantial prejudice resulting from the jurors' inadvertent review of the booking information.*

42

In rejecting petitioner's claim of prosecutorial misconduct, the Court of Appeal determined, in relevant part, as follows (see LD D at 12-13):

*First, there is no evidence whatsoever the failure to redact the booking information was intentional or deceptive. While the error may have been careless on the part of the prosecutor, either party could have reviewed the exhibits prior to their submission to the jury to ensure the information was properly excluded.*

*We are more troubled by the prosecutor's use of the term "booking" or "booked" during her examination of the sheriff's deputy who arrested [petitioner] on April 5, 2003. ... [¶] Having already determined the jurors' receipt of the booking information during deliberations did not improperly infect their deliberations, we see no additional prejudice resulting from the prosecutor's references to [petitioner] having been booked on the night of April 5, 2003. Again, were this a closer case, we might have reached a different conclusion. In light of the strength of the evidence against [petitioner], however, he was not substantially prejudiced by the prosecutor's statements.*

3.    Grounds 4 and 6 of the Amended Petition

In his Ground 4, petitioner claims that evidence of his prior arrest and criminal history was inadmissible under California law because it was more prejudicial than probative. (See Am. Pet. at 6; see also Am. Pet. Attach. at 37-39; Trav. at 44-46.) In his Ground 6, petitioner claims that the jury's "inadvertent exposure to out-of-court information" constituted jury misconduct under California law. (See Am. Pet. at 6a; see also Am. Pet. Attach. at 46-48; Trav. at 46-52.) As set forth above, in order to be entitled to federal habeas relief, petitioner must show that he is in custody in violation of the Constitution or laws or treaties of the United States. To the extent that petitioner is contending that the trial court should have excluded the information

concerning petitioner's prior arrest pursuant to state law, or that the conduct of the jury in considering the information constituted jury misconduct pursuant to California law, such claims are not even cognizable on federal habeas review.[17]

4.    Grounds 5 and 9 of the Amended Petition

a.    *petitioner's claims*

In his Ground 5, petitioner claims that he was denied his federal constitutional rights to an impartial jury and due process by the jury's receipt during deliberations of prejudicial information about petitioner's criminal history that had not been presented at trial. (See Am. Pet. at 6; see also Am. Pet. Attach. at 40-46; Trav. at 46-52.)   In his Ground 9, petitioner claims that the error in the introduction of the information about his criminal history, whether by the trial court, the jury, the prosecutor, or trial counsel, violated petitioner's federal constitutional right to an impartial jury and due process of law.  (See Am. Pet. at 6b; see also Am. Pet. Attach. at 54-65.)

Petitioner argues that six of the jurors remembered seeing information about petitioner's prior arrest, and that, even if the jury did not actively discuss the information, the "white elephant" comment made by Juror No. 5 was "close to an admission that it was an influential factor for her during the jury deliberations." (See Am. Pet. Attach. at 39; Trav. at 45, 47-50.)  Petitioner contends that the "main gist of the error" was "whether any member of the jury was improperly influenced by evidence of petitioner's prior arrest and criminal history."  (See Am. Pet. Attach. at

---

[17]    Moreover, the Court notes that the information in question was never admitted into evidence at trial.  Rather, it was inadvertently included on an exhibit provided to the jury during deliberations.  The parties agreed following trial that the portion of the exhibit containing information about petitioner's prior arrest was not intended to be included on the exhibit when it was admitted into evidence. (See 5 RT 3901-03.)

54.)  Further, petitioner contends that "the receipt of information about a party or a case that was not part of the evidence received at trial, [sic] leads to a presumption that petitioner was prejudiced and may establish juror bias."  He also contends that the "extraneous material was so inherently prejudicial that it was substantially likely to have influenced a juror."  (See Am. Pet. Attach. at 54-55; Trav. at 50-51.)

### b.    *analysis*

Pursuant to the Sixth Amendment, a criminal defendant has the right to confront and cross examine those whose testimony is used against him.  See Pennsylvania v. Ritchie, 480 U.S. 39, 51, 107 S. Ct. 989, 998, 94 L. Ed. 2d 40 (1987).  Accordingly, a verdict in a criminal case must be based solely on evidence presented at trial.  See Turner v. Louisiana, 379 US. 466, 472-73 (1965) ("In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.") (internal quotation marks omitted).  Exposure to information not in evidence may deprive a defendant of his "rights to confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment."  Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995); see also Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir. 1986); Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir.) ("A juror's communication of extrinsic facts implicates the Confrontation Clause."), cert. denied, 554 U.S. 925 (2008); Jeffries v. Wood, 114 F.3d 1484, 1490 (9th Cir.) ("When a juror communicates objective extrinsic facts regarding the defendant or the alleged crimes to other jurors, the juror becomes an unsworn witness within the meaning of the Confrontation Clause."), cert. denied, 522 U.S. 1008 (1997).

Here, the record reflects that at least six of the jurors were exposed during deliberations to extrinsic information concerning petitioner's prior arrest that was not

in evidence.  Although the extrinsic evidence here was not communicated by a juror, the Court concurs with the California Court of Appeal that petitioner's claims pertaining to the jury's exposure to the extrinsic information should be analyzed under the rubric of a juror misconduct claim.

Habeas relief, however, is warranted on a claim of juror misconduct based on the consideration of extrinsic information only where the defendant was prejudiced by the introduction of the extrinsic evidence. See Estrada, 512 F.3d at 1235, 1238; see also Xiong v. Felker, No. 09-16830, slip opinion at 6264-65 (9th Cir. June 5, 2012) ("a jury's consideration of extrinsic evidence does not end at whether misconduct occurred; upon a finding of misconduct, a rebuttable presumption of prejudice applies" but the "Government may overcome the presumption of prejudice with proof that the jury's consideration of extrinsic evidence was harmless" (emphasis in original)).

In deciding whether jury misconduct was prejudicial, the Court determines whether the extrinsic evidence before the jury had a "substantial and injurious effect or influence in determining the jury's verdict." See, e.g., Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)); Fields v. Brown, 503 F.3d 755, 782 n.20 (9th Cir. 2007), cert. denied, 552 U.S. 1314 (2008); see also Blair v. Chrones, 452 Fed. Appx. 752, 753, 2011 WL 4621002, at *1 (9th Cir. Oct. 6, 2011) (finding that the introduction of extrinsic material to the jury, although misconduct, was not prejudicial and quoting Brecht, 507 U.S. at 623) (now citable for its persuasive value pursuant to Ninth Circuit Rule 36-3).

"There is no bright line test for determining whether a defendant has suffered prejudice from an instance of juror misconduct" but great weight is placed "on the nature of the extraneous information that has been introduced into deliberations." See Rodriguez v. Marshall, 125 F.3d 739, 744 (9th Cir. 1997), overruled on other grounds by Payton v. Woodford, 346 F.3d 1204, 1218 n.18 (9th Cir. 2003); Mancuso v.

Olivarez, 292 F.3d 939, 951-52 (9th Cir. 2002); Sassounian, 230 F.3d at 1109. Factors to be considered in evaluating whether extrinsic information prejudicially affected the deliberations include whether and how the extrinsic material was received, the length of time it was available to the jury, the extent to which the jury discussed and considered it, the point in the deliberations that it was introduced, and any other relevant matters. See Estrada, 512 F.3d at 1238; Mancuso, 292 F.3d at 951-52; United States v. Navarro-Garcia, 926 F.2d 818, 822-23 (9th Cir. 1991); Bayramoglu, 806 F.2d at 887. Other relevant matters may include whether the extrinsic information related directly to a material aspect of the case, whether the trial judge gave a curative instruction to the jury or took other steps to alleviate prejudicial impact, whether the allegedly prejudicial information was ambiguously phrased, whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial, the trial context, and whether the statement was prejudicial given the issues and evidence in the case. See Navarro-Garcia, 926 F.2d at 823; Bayramoglu, 806 F.2d at 888; Sassounian, 230 F.3d at 1109.

Here, the extrinsic information to which at least some of the jurors were exposed was ambiguous and only indirectly related to the charges against petitioner. The information on the folded portion of the exhibit reflects only that petitioner was arrested, not that he was convicted on any count. In addition, the charges listed are not clearly specified, and they appear to pertain to receiving stolen property and carrying a loaded firearm, rather than murder as petitioner was charged with in the case before the jury. The record reflects that the jury's exposure to the extrinsic information was limited, and no evidence supports that it was the subject of lengthy consideration by any members of the jury. Indeed, although several jurors testified that they understood that the information on the folded portion of the exhibit related to a prior arrest, other jurors testified that they did not recall hearing or seeing anything about any prior arrest. Further, no juror recalled that any general discussion took place concerning the information about the prior arrest, and no juror testified

1  that any member of the jury referenced the issue of petitioner's prior arrest during
2  deliberations.  Petitioner contends that the "white elephant" comment by juror No. 5
3  was "close to an admission that it was an influential factor for her during the jury
4  deliberations."  (See Am. Pet. Attach. at 39 ("I don't think there was a whole lot of
5  discussion around it, but it's kind of like a white elephant in the room that you don't
6  talk about."); Trav. at 50.)  The Court disagrees.  When taken in the context of juror
7  No. 5's complete  testimony, it is clear that juror No. 5 understood that the
8  information was not part of the evidence, and that the juror believed that the other
9  jurors also understood that the extrinsic information should not be considered.  (See
10  ART at L-10, L-12, L-17 to L-18.)

11        Finally, the record reflects that the jury was instructed that they "must
12  determine what facts have been proved from the evidence received in the trial and not
13  from any other sources," that they "must decide all questions of fact in this case from
14  the evidence presented in the trial and not from any other source," and that they must
15  not "consider or discuss facts as to which there is no evidence."  (See 1 CT 134, 138;
16  5 RT 2478, 2481.)  Here, several jurors testified that at least one juror reminded the
17  other jurors that they should not consider the extrinsic information that was not part
18  of the evidence at trial, and nearly half of the jurors were not even aware of the
19  existence of the extrinsic information.  The Court therefore finds that petitioner has
20  failed to adduce evidence to rebut the presumption that the jurors properly followed
21  the instructions given to them.  See Weeks v. Angelone, 528 U.S. 225, 234, 120 S.
22  Ct. 727, 145 L. Ed. 2d. 727 (2000); Richardson v. Marsh, 481 U.S. 200, 211, 107 S.
23  Ct. 1702, 95 L. Ed. 2d 176 (1987); Hovey v. Ayers, 458 F.3d 892, 913 (9th Cir.
24  2006).

25        Accordingly, the Court finds that, when considered within the context of the
26  overwhelming evidence against petitioner, the jury's inadvertent exposure to extrinsic
27  information concerning petitioner's prior arrest did not have a substantial and
28  injurious effect or influence in determining the jury's verdict.

48

1        5.    Ground 7 of the Amended Petition

2              a.    *petitioner's claim*

3        In his Ground 7, petitioner claims that the prosecutor's placement before the

4   jury of the unredacted exhibit containing the arrest information, coupled with the

5   prosecutor's repeated reference to petitioner having been booked during the

6   examination of Deputy Steven Marella, constituted prosecutorial misconduct in

7   violation of petitioner's federal constitutional right to due process.  (See Am. Pet. at

8   6a; see also Am. Pet. Attach. at 48-52; Trav. at 52-53.)  Petitioner contends that the

9   prosecutor "committed misconduct for placing before the jury inadmissible evidence

10  that infected 'the whole trial with such unfairness as to make the conviction a denial

11  of due process.'"  (See Am. Pet. Attach. at 48.)  Petitioner argues that the unredacted

12  exhibit was "not an isolated act" because of the prosecutor's earlier references  to

13  petitioner's "booking" and "booking photograph" during the testimony of Deputy

14  Marella.  (See Id. at 49-50.)  Petitioner argues that the prosecutor "breached" an

15  agreement to "exclude evidence of petitioner's prior arrest," and contends that the

16  "instances of prosecutorial misconduct must be considered together," including the

17  testimony of Deputy Marella, the arrest record that was not redacted from the exhibit

18  given to the jury, and the prosecutor's argument to the trial court that "the arrest

19  report was harmless error."  (See Id. at 51-53.)

20

21              b.    *applicable legal authority*

22       Federal habeas review of prosecutorial misconduct claims is limited to the

23  narrow issue of whether the alleged misconduct "so infected the trial with unfairness

24  as to make the resulting conviction a denial of due process."  See Donnelly v.

25  DeChristoforo, 416 U.S. 637, 642, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); Hein v.

26  Sullivan, 601 F.3d 897, 912 (9th Cir. 2010), cert. denied, 131 S. Ct. 2093, 179 L. Ed.

27  2d 890 (2011); Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir.), cert. denied, 519

28  U.S. 889 (1996).  Misconduct is reviewed in light of the entire trial record, and relief

49

1    will be granted only if the misconduct by itself infected the trial with unfairness. See
2    Donnelly, 416 U.S. at 639-43; see also Darden v. Wainwright, 477 U.S. 168, 183, 106
3    S. Ct. 2464, 91 L. Ed. 2d 144 (1986); Drayden v. White, 232 F.3d 704, 713 (9th Cir.
4    2000), cert. denied, 532 U.S. 984 (2001); Furman v. Wood, 190 F.3d 1002, 1006 (9th
5    Cir. 1999).

6

7                c.    *analysis*

8        In rejecting petitioner's prosecutorial misconduct claim on direct review, the
9    Court of Appeal's explicit factual finding that "there is no evidence whatsoever the
10   [prosecutor's] failure to redact the booking information was intentional or deceptive"
11   (see LD D at 12), arguably qualifies as a factual finding that is presumed correct
12   unless rebutted by clear and convincing evidence. See 28 U.S.C. 2254(e)(1) (as
13   amended). Petitioner has not even purported to adduce clear and convincing evidence
14   that, considered within the context of the entire case, the jury's exposure to
15   petitioner's booking information was the result of a deliberate act or omission by the
16   prosecutor.

17       Further, the Court concurs with the Court of Appeal that, in light of the
18   strength of the case against petitioner, petitioner was not prejudiced by the
19   prosecutor's passing use of the terms "booking" and "booked," and that the
20   prosecutor's comments did not result in "additional prejudice" in light of the jury's
21   receipt of petitioner's booking information during deliberations. (See LD D at 12-
22   13.) The record reflects that the eight comments occurred within the very brief
23   testimony of Deputy Marella, the record of which constitute less than three pages in
24   the trial transcript. Deputy Marella did not directly testify that petitioner had been
25   arrested or booked; he only used the term "booking cell" once while testifying about
26   the procedure followed before petitioner was photographed. The focus of the
27   deputy's testimony was on petitioner's appearance at the time that Deputy Marella
28   "came into contact" with petitioner shortly before the murder. (See 3 RT 1528.)

                                         50

Deputy Marella testified that petitioner had a "good size piercing with a [straight metal] bar through his left eyebrow" at that time.  Further, Deputy Marella testified that it was standard procedure to remove all jewelry before "booking photos" are taken.  Marella's testimony was offered to explain why petitioner's booking photograph, marked at trial as People's Exhibit 3, shows petitioner without a metal bar in his eyebrow.  (See 3 RT 1529-30; LD A at Attach. 1.)  Albert Segundo subsequently testified that he told police that petitioner had a piercing in his left eyebrow.  (See 3 RT 1546, 1575-76.)  Further, prior to Deputy Marella's testimony, Jesse Robles had testified that he had been shown People's Exhibit 3 by Deputy Katz after Robles had told Deputy Katz that petitioner was the driver of the white van.  (See 2 RT 967; 3 RT 1320.)  As set forth above, the evidence against petitioner was overwhelming, with three eyewitnesses providing positive in-court identifications of petitioner, as well as supporting testimony from multiple witnesses that petitioner had been driving around the neighborhood the day of the murder asking about the whereabouts of the victim because petitioner's brother had been attacked by the victim with a bat earlier on the same day.  Further, the jury was instructed both that statements made by the attorneys are not evidence and that they must decide all questions of fact based solely on the evidence received during trial.  (See 1 CT 134, 137-38; 2 RT 906; 5 RT 2478, 2480-81.)  Once again, the Court finds that petitioner has failed to adduce evidence to rebut the presumption that the jurors properly followed the instructions given to them.

Considering the isolated comments about "booking" and petitioner's "booking photograph" in the context of the entire trial record, even when taken together with the fact that the booking information was not redacted from the reverse side of petitioner's booking photograph when it was viewed by some members of the jury during deliberations, the Court finds that petitioner has failed to meet his AEDPA burden of showing that the Court of Appeal's rejection of this prosecutorial misconduct claim "was so lacking in justification that there was an error well

1  understood and comprehended in existing law beyond any possibility for fairminded
2  disagreement."

3

4      6.    Ground 8 of the Amended Petition

5          a.    petitioner's claim

6      In his Ground 8 of the Amended Petition, petitioner claims that trial counsel
7  provided ineffective assistance in failing to object to the alleged prosecutorial
8  misconduct. (See Am. Pet. at 6a; see also Am. Pet. Attach. at 52-54; Trav. at 53-54.)
9  Petitioner acknowledges that counsel explained, on the record but outside the
10  presence of the jury, that he had not objected to, nor requested a cautionary
11  instruction concerning, the prosecutor's references to petitioner's "booking"
12  photograph during Detective Marella's testimony because counsel did not wish to
13  draw additional attention to petitioner's arrest. (See Am. Pet. Attach. at 50 (citing 3
14  RT 1531-32).) Plaintiff further acknowledges that trial counsel "had no opportunity
15  to object" before the information concerning petitioner's arrest on petitioner's
16  "booking photograph" was provided to the jury because counsel was not aware until
17  after the trial that the information had not been redacted from the photograph. (See
18  Id. at 50, 52-53.)

19      Respondent contends that petitioner's Ground 8 is not exhausted because,
20  although petitioner raised the claim on direct appeal to the Court of Appeal, petitioner
21  did not present the claim to the California Supreme Court in his Petition for Review
22  or in a later habeas petition. Respondent, however, requests that the Court exercise
23  its discretion to deny the claim on the merits. (See Ans. at 2, Ans. Mem. at 31-33.)
24  In his Traverse, petitioner contends the claim is exhausted because he argued in his
25  Petition for Review to the California Supreme Court that "trial counsel" erred, and
26  his Petition for Review twice cited Strickland. (See Trav. at 53 (citing Petition for
27  Review at 13, 17, 26).)

28

52

1          b.    *analysis*

2          As a preliminary matter, the Court concurs with respondent that Ground 8 is

3    not exhausted because, although the claim was raised on direct review to the Court

4    of Appeal, petitioner's subsequent Petition for Review to the California Supreme

5    Court did not fairly present a claim that his trial counsel provided ineffective

6    assistance in failing to object to the alleged prosecutorial misconduct.  In his Petition

7    for Review, petitioner did raise the vague assertion that the "jury, the prosecutor, trial

8    counsel, and the trial court can all be said to have erred" (See LD J at 13), but he did

9    not explicitly claim that his counsel was ineffective for failing to object to the alleged

10   prosecutorial misconduct.  Further, the "Questions Presented" section of the Petition

11   for Review did not include a claim that petitioner's counsel provided ineffective

12   assistance.  Although the Petition for Review included two citations to the Strickland

13   standard of prejudice, those citations arose within the context of petitioner's jury

14   misconduct claim, and it was not clear that the citations might pertain to a separate

15   claim of ineffective assistance of counsel.  (See LD J at 1, 17, 26.)  Moreover,

16   petitioner did not raise this ineffective assistance of counsel claim in any habeas

17   petition to the California Supreme Court.  Regardless, pursuant to 28 U.S.C. §

18   2254(b)(2), the Court has the discretion to deny an unexhausted claim on the merits.

19   See Jackson v. Roe, 425 F.3d 654, 658 n.5 (9th Cir. 2005); Washington v. Lampert,

20   422 F.3d 864, 871 (9th Cir. 2005).  The Ninth Circuit has held that a federal court

21   may deny an unexhausted claim on the merits "only when it is perfectly clear that the

22   applicant does not raise even a colorable federal claim."  Cassett v. Stewart, 406 F.3d

23   614, 624 (9th Cir. 2005).  Here, the Court has decided to exercise its discretion to

24   deny this unexhausted claim on the merits for the following reasons.

25          As petitioner acknowledges, the record reflects that counsel made a tactical

26   decision not to object to the use of the booking photograph prior to the testimony of

27   Deputy Marella because the prosecutor had agreed not to mention petitioner's arrest.

28   Then, when the prosecutor used the term "booking photograph" while questioning the

deputy, counsel made the further tactical decision not to raise a contemporaneous objection because he did not want to draw more attention to the fact that petitioner had been "booked." Counsel did later object outside the presence of the jury, but, for the same reason, counsel rejected the prosecutor's suggestion of a curative instruction for the jury. (See 3 RT 1530-32.) The Court finds that petitioner has failed to make even a colorable showing that counsel's deliberate tactical decisions not to raise a contemporaneous objection to the use of the term "booking" in order not to draw further attention to the fact of petitioner's prior arrest, and not to request a curative instruction thereafter, were outside the wide range of what can reasonably be presumed to be sound trial strategy. See Strickland, 466 U.S. at 689 ("a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"); see also Richter, 131 S. Ct. at 788 ("Even under de novo review, the standard for judging counsel's representation is a most deferential one. … The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.").

Moreover, in light of the overwhelming inculpatory evidence against him, the Court also finds that petitioner has failed to make even a colorable showing of a reasonable probability that the outcome of the trial would have been different, but for counsel's decision not to raise a contemporaneous objection to, or to seek a curative instruction following, the prosecutor's passing references to petitioner having been "booked" and that a booking photograph previously had been taken.

As to counsel's failure to object to the unredacted exhibit, the record reflects that inclusion of the information pertaining to petitioner's prior arrest on People's Exhibit 3 when it was provided to the jury was inadvertent. Because counsel was unaware of the fact that the information had not been redacted as agreed upon before it was presented to the jury, the Court finds that petitioner has failed to make even a colorable showing that counsel's failure to object to the unredacted exhibit amounted

1   to incompetence under prevailing professional norms. This finding renders it

2   unnecessary for the Court to consider whether petitioner has made a colorable

3   showing of prejudice with respect to this part of Ground 8.

4

5   **C.    Petitioner's Motion to Expand the Record and his request for an**

6        **evidentiary hearing should be denied.**

7        Petitioner has requested that this Court conduct an evidentiary hearing with

8   respect to his claims pertaining to the allegedly false testimony of witness Renteria,

9   as well as his claims arising from "jury misconduct." (See Am. Pet. Attach. at 26,

10  220-21; Trav. at 54-55.) Petitioner contends in his Traverse that an evidentiary

11  hearing should be granted to present evidence that the "prosecution witnesses could

12  not see what they claimed" in order to "prove the witnesses [sic] testimonial

13  statements false." (See Trav. at 54-55.)

14      In addition, in his Motion to Expand the Record ("Motion"), petitioner has

15  requested that the Court expand the record pertaining to his Grounds 1 through 9,

16  "even if [the Court] decides to hold an evidentiary" hearing. (Motion at 2.) Petitioner

17  seeks to expand the record to include "the exhibits attached to petitioner's Traverse

18  and exhibits attached to the Amended Petition." (Motion at 4.)

19      To the extent that petitioner is seeking to "expand" the record with filings and

20  orders from his state court cases (see, e.g., his exhibits attached to his Traverse

21  including the Petition for Rehearing of his habeas petition to the Court of Appeal, the

22  Court of Appeal's decision on direct review, and the Court of Appeal's decision

23  rejecting his first habeas petition; and his exhibits to the Amended Petition including

24  the California Supreme Court's denial of two habeas petitions), as well as documents

25  that were attached to petitioner's state court filings (see, e.g., exhibits from the

26  subsequent trial of Soto (see LD F, Exh. A, F, G of petitioner's state habeas petition),

27  a declaration of petitioner (see LD F, Exh. B of petitioner's state habeas petition),

28  excerpts from the trial transcript of Soto's trial (see LD F, Exh. E of petitioner's state

55

1    habeas petition), the unredacted exhibit, including booking information from

2    petitioner's prior arrest, that was provided to the jury during deliberations (see LD A,

3    Attach. 1 to petitioner's opening brief on direct appeal)), the Motion should be denied

4    as unnecessary because these documents already are part of the record.

5          Further, there is no need to expand the record or conduct an evidentiary hearing

6    with respect to Grounds 1, 4, and 6 because those claims are not even cognizable on

7    federal habeas review.

8          As to Grounds 2 and 7, the Court's findings that petitioner failed to meet his

9    burden under 28 U.S.C. § 2254(d)(1) is dispositive of the Motion and petitioner's

10   request for an evidentiary hearing under the Supreme Court's holding in Pinholster,

11   131 S. Ct. at 1398-1401, that the AEDPA requires federal courts to evaluate the

12   reasonableness of state court decisions solely on the basis of the record before the

13   state court.

14         Finally, the Motion and petitioner's request for an evidentiary hearing should

15   also be denied with respect to Grounds 3, 5, 8, and 9 because the Court was able to

16   resolve those claims by reference to the state court record. See Totten v. Merkle, 137

17   F.3d 1172, 1176 (9th Cir. 1998) (holding, in a case pre-dating the Supreme Court's

18   reversal of the Ninth Circuit in Pinholster, that "an evidentiary hearing is not required

19   on issues that can be resolved by reference to the state court record").

20

21                              **RECOMMENDATION**

22         IT THEREFORE IS RECOMMENDED that the District Court issue an Order:

23   (1) approving and accepting this Report and Recommendation; (2) denying

24   petitioner's Motion to Expand the Record and his request for an evidentiary hearing;

25   and (3) denying Grounds 1-9 of the Amended Petition.

26

27   DATED:  June 20, 2012

                                    _____
28                                  ROBERT N. BLOCK
                                    UNITED STATES MAGISTRATE JUDGE