JOFAMA COLEMAN
CDCR# V-27659
CSATF/State Prison @ Corcoran
P.O. Box 5242
Corcoran, CA. 93212
    [In Propria Persona]...



FILED
CLERK, U.S.D.C. SOUTHERN DIVISION

SEP 1 2 2012

CENTRAL DISTRICT OF CALIFORNIA
BY           DEPUTY

## UNITED STATES DISTRICT COURT

### IN AND FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jofama Coleman,<br>        (Petitioner), )<br>)<br>  Vs.         )<br>)<br>Kathleen Allison[1],(acting )<br>warden),         )<br>      (Repondent). )<br>) | Case No. CV-10-2343 AHM (RNB)<br><br>**PETITIONER'S OBJECTION TO THE MAGISTRATE'S PARTIAL REPORT AND RECOMMENDATION DENYING HABEAS CORPUS RELIEF, REPORT AND RECOMMENDATION DATED JUNE 21, 2012 , AND APPLICATION FOR A CERTIFICATE OF APPEALABILITY....** |

TO:    THE   HONORABLE   HOWARD  A.  MATZ,   DISTRICT  JUDGE,  AND RESPONDENT AND/OR COUNSEL FOR RESPONDENT...

### I.

    Jofama Coleman (Hereafter petitioner) proceeds with the instant action in forma pauperis and pro se. Thus, it is respectfully requested that the instant action be liberally construed. (Haines v. Kerner, (1972) 404 U.S. 519; Erickson v. Pardus, (U.S. 2007), 127 S.Ct. 2197, 2200-2201; Rule 8(f) of Federal Rules of Civil Procedure).

---

[1] At the time of petitioner's original filing in this matter, the acting warden was Kathleen Allison. However, the current acting warden is "RALPH DIAZ"..

## II.

Petitioner respectfully request from the court that, a **"de novo determination"** be conducted in regards to the aspects of the magistrate judge's report and recommendations. Simply by objecting in a timely manner, any party aggrieved by the magistrate judge's findings and recommendations may secure a "de novo determination" of any aspect of the magistrate judge's report. (28 U.S.C. sec. 636(b)(1) (2000); Thomas v. Arn, (1985) 474 U.S. 140, at 154 ("Any party that desires plenary consideration by Article III judge of any issue need only ask."). Because the decision not to object to unfavorable portions of a magistrate judge's report may have a decisive impact on a party's rights at both the trial and appellate levels, such a decision requires carful and timely consideration of its short- and long-term consequences.

In the first place, the failure to object to a factfinding, legal conclusion, recommendation, or other "portions of the [magistrate judge's] report" forgoes the petitiner's otherwise unqualified right to insist upon a "de novo determination" of that aspect of the report. (28 U.S.C sec. 636(b)(1) (2000); Rule 8(b) of Rules Governing Section 2254 Cases in the United States District Courts (2005).). To illustrate, by objecting to an aspect of the magistrate judge's report, a party oligs the district judge (1) to review that aspect of the report de novo--whether or not it is a factual or legal matter [See Thomas v. Arn, 474 U.S. 140, 150 & n.8 (1985; McLeod, Alexander, Powel & Apffel, P.C. v. Quarles, 925 F.2d 853, 856 n.5 (5th Cir. 1991).] (2) to substitute the district judge's judgment for that of the magistrate judge on the matter, [See Thomas v. Arn, supra, 474 U.S. at 151 n.10] and to "reject, or modify, in whole or in part" any finding, reasoning, or recommendation with which the district judge disagrees [See U.S.C. sec. 636(b)(1) 200); Rule 8(b) of Rules Governing Section 2254 Cases in United States Dist. Courts 200).] and (3) to consider the need to "receive further evidence or recommit the

matter to the magistrate with instructions. (United States v. Koenig, 912 F.2d 1190, 1191-93 (9th Cir. 1990); Rilling v. Burlington Northern Ry. Co., 909 F.2d 399, 400 (9th Cir. 1990).). The **Magistrates Act** and **Habeas Rule 8(b)** state that the district judge "**shall**" make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objections are made. (28 U.S.C. sec. 636(b)(1) (2000); Rule 8(b) of Rules Governing Section 2254 Cases in the United States Dist. Court (2005) ("The judge must determine de novo any proposed finding or recommendation to which objection is made.").

It is repectfully submitted and contended that, as should be the case here, if the Judge disagrees with the magistrate judge on a matter having to do with the credibility of a witness, the district judge genelly must "recommit the matter to the magistrate with instructions" or conduct a new hearing and personally listen to the witnesses. (United States v. Raddatz, (1980), 477 U.S. 667, at 681 n.7; Jordan v. Harett, 34, F.3d 310, 312-14 (5th Cir. 1994), reh'g en banc granted, 53 F.3d 94 42 F.3d 1483 (5th Cir.), vac'd & remanded on other grounds, 53 F.3d 94 (5th Cir. 1995) (en banc) (per curiam) (district court erred in "rejecting the magistrate's credibility-based fact findings without conducting its own evidentiary hearing"); United States v. Bergera, 512 F.2d 391, 393 (9th Cir. 1975); See also Gomez v. United States, 490 U.S. 858, 874 (1989).). Failure of the district judge to review dispositve matters de novo following objection, to review the record independently, or to conduct or to order new evidentiary proceedings before overturning a factual **(and especially a credibility)** finding by the magistrate judge favorable to a party may amount to a violation not

only of the Magistrates Act and Habeas Rule 8(b), [See Stokes v. Singletary, 952 F.2d 1567, 1576 (11th Cir. 1992); **Hernandez v. Estelle, (5th Cir. 1983), 711 F.2d 619, 620** (remand with directions to conduct **de novo** determination of question subject to "**conflicting testimony**"),], but also of Article III and the Due Process Clause of the 5th Amendment to the United States Constitution. (Gomez v. United States, supra, 490 U.S. at 864, 872 n.25; Louis v. Blackburn, supra, 630 F.2d at 1105-06.).

Ordinarily, the state court's factual findings would be entitled to a presumption of correctness under AEDPA. 28 U.S.C § 2254(e)(1). However, such deference is only warrented if the state court's fact-finding process survives the intrinsic review of **Section 2254(d)(2)**. (See **Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir.2004)**. In other words, the state court decision **must not** be "based on an unreasonable determination of the facts". **28 U.S.C. §2254(d)(2)**. In this case, the state court fact-finding process was fundamentally flawed. The Magistrate errored when it adopted the incorrect, misstated facts, and facts not supported by the record from the state court.

4.

### III.

**DUE TO THE MAGISTRATE JUDGE MISTATING AND/OR IGNORING MANY MATERIAL FACTS FROM THE STATE RECORD, THE MAGISTRATE'S FINDINGS ARE UNREASONABLE ACCORDING NO PRESUMPTION OF CORRECTNESS.**

The Magistrate Judge errored by applying the factual and procedural background taken from the California Court of Appeal opinion, when said opinion contained several mistatements of facts surrounding petitioner's case, therefore, under current procedural law in relation to applying due deference to the state court(s) ruling(s) and/or giving said presumption of correctness to said ruling(s), **no presumption of correctness should be afforded to these findings.** (See Report and Recommendation (hereafter R&R) at page 11, lines 1-5 and n. 6 at page 11 [discussing presumption of correctness doctrine].)

The California Court of Appeal's opinion and Order denying petitioner's Habeas Corpus [Related Case No. B202597 and B210118] relied on incorrect facts and facts that are not supported by the record to find petitioner was not prejudiced by juror misconduct. (See Traverse at pp. 6-7, Exh. "A", Lodged Document ["LD"] J at 1). Consequently, the Magistrate Judge erred in relying on the same misstated and/or incorrect facts and facts that are not supported by the record. From this, no presumption of correctness can attach within the purview of **Taylor v. Maddox 366 F3d 992, 1000, 1001 (9th Cir. Cal. 2004).** Discussing **Miller-El v. Cockrell, 537 U.S. 322 (2003)** in **Taylor supra,** it was recognized that the state court fact-finding process is undermined where the state court has before it, yet ignores evidence

5.

that support petitioner's claim(s). **Taylor, supra, 366 F3d at p.
1001; Miller-El, supra, 537 U.S. at 346).**

Additionally, and as in the case at bar, where the fundamental
liberties of a person are claimed to have been infringed upon, **we
carefully scrutinize the state court record. (See Blackburn v.
Alabama, 361 U.S. 199, 208-209 (1960)).** The duty of the Federal
District Court on habeas corpus is no less exacting. (Ibid.)
Furthermore, Petitioner's burden of proving that a state court(s)
findings are not fairly supported by the record is different from
**"and lower than the burden of proving constitutional insufficiency
of the evidence under Jackson v. Virginia, 443 U.S. 307 (1979),**
which requires proof that no rational factfinder could find
defendant guilty". **(See Parke v. Raley, 506 U.S. 20, 36 (1992)).**

**THE MISSTATED/INCORRECT FACTS AND FACTS NOT SUPPORTED BY THE RECORD.**

**The Magistrate Finds:** Segundo walked across the street from the
Robles home to pick up a friend, <u>crossed the street back to the</u>
<u>sidewalk in front of the Robles home and,</u> seconds later, heard two
gun shots. (See R&R p. 12, lines 4-6).

<u>**THE FACTS:**</u> There is no evidence in the record to support that
Segundo crossed the street "back to the sidewalk in front of the
Robles home". Segundo was with Sandoval at and by his home,
**Segundo was standing next to Andres Sandoval near Sandoval's house.**
Sandoval's house was located on the "South Side" of 101st Street,
"closer to Budlong", two and a half houses **west** of the white van.
(<u>See</u> 3 RT. 1539, 1568; 4 RT. 1840-1842, 1854). Robles's home was
located on the "North Side" of 101st Street "closer to Vermont", two
houses **east** of the white van. (<u>See</u> 3 RT. 1518-1519, 1568).

**The Magistrate Finds:** Robles's younger brother Jesse, who <u>ran to the stree when he heard shots</u> and saw the van speed away; Jesse's friend, Carlos Lopez, who <u>also ran to the street when shots were fired.</u> (See R&R p. 12, lines 17-20).

**THE FACTS:** Jesse Lopez did not run "to the street". The record shows they ran to the front yard of the Robles home. (2 RT. 938). A gate seperated the front yard from the back yard. The gate was not on the street, there was a front yard area between the gate and the street. (2 RT. 940-941). According to Jesse, the distance between the gate where he was standing and the van was about 28 feet. (2 RT. 940, 985). Thus, he was farther from the street than stated and did not get a close look at the driver as the van "sped past" the house "at night", which is crucial in a case based solely on eyewitness testimony [there identifying circumstances, such as witness location, distance, amount of opportunity to view, ect.].

Additionally, it was "after the shots had ended" that Lopez started to head to the front gate "not when" the shots were fired. (3 RT. 1614, 1627). Thus, Lopez's opportunity to see was extremely brief, likely less then four seconds, because the van was speeding.

**The Magistrate Finds:** Jesse who estimated he had seen Coleman (one he knew by the moniker Illusion) more than 50 times in the neighborhood, recognized Coleman <u>both when "Drips" reentered the passenger side of the van</u> and when the van drove past him. (See R&R p.13, lines 16-19).

**THE FACTS:** Jesse said he recognized Coleman when the van "drove past the Robles house".(2 RT. 938, 941-942, 977). He did not say or testify to seeing the driver "when Drips reentered the van". Jesse testified that the gun shots stopped as he was coming up the drive way. He did

not see the passenger/shooter, his first view of the suspect's was as the van sped by. (2 RT. 976, 972-973).

**The Magistrate Finds:** According to Lopez, the van was illuminated by the headlights of another van, allowing him to see Coleman whom he knew as the leader of NGA. (See R&R p.14, lines 5-6).

**THE FACTS:** The record does not support this statement. Lopez did not testify that he knew Coleman as the leader of NGA, nor did Lopez testify that the van was illuminated by the headlights of another van. (See 3 RT. 1608-1627).

**The Magistrate Finds:** Lopez was contacted by sheriff's deputies soon after the shooting and identified Coleman as the shooter. (See R&R p. 14, lines 7-8).

**THE FACTS:** Lopez was contacted by sheriff's "two days" after the shooting. No one identified petitioner (Coleman) to Sheriff's on the night of the shooting or the following day. (See 2 RT. 982-983; 3 RT. 1319-1320, 1509-1510, 1547, 1625). There is no evidence to support Lopez identified petitioner "as the shooter". Lopez testified that he did not see the shooting. He identified Coleman as "the driver" of the van. (See 3 RT. 1614, 1616-1617; 4 RT. 1897-1898).

**The Magistrate Finds:** From the interior light of the van when the shooter climbed back in, she (Maria Renteria) was able to see the driver. (See R&R p.14, lines 14-16).

**THE FACTS:** There is no evidence in the record that Renteria saw the driver with the aid of or when the interior light of the van went on when the shooter climbed back in, Renteria's alleged observation "was befor the shooter got out the vehicle", at which point Renteria started to pay attention to the man with the gun. (See 3 RT. 1226, 1230-1231, 1237).

**The Magistrate Finds:** About 30 minutes after the confrontation, Coleman and Jeremy drove to the home on 102nd Street in Coleman's Green Camry. Jose Robles (victim) was no longer there. Coleman asked Lopez, "Which one of you was trying to fight my brother? When no one answered, Jeremy asked where Robles had gone. After he was told Robles had returned to his house, Jeremy threatened to get Chino or anybody from NC". (See R&R p.15, lines 12-15).

**THE FACTS:** The record shows that Lopez testified Joes Robles (victim) "was still there", Lopez, Jose Robles, and sombody else were there [three people]. (See 3 RT. 1605). He later testified his brother, Robles (victim), and one or two other friends were there with him [five to six people]. (See 3 RT. 1619). Coleman asked the "one question" to all of them [that including Jose Robles, not just to Lopez. (See 3 RT. 1604-1605). Thus, Robles (victim) was still there.

Additionally, when no one responded to the "one question", which one of you was trying to fight my brother, Petitioner and Jeremy simply left. (See 3 RT. 1613-1614). Petitioner simply told his brother Jeremy not to go around there anymore. (See 4 RT. 2112). Thus, when no one answered, Jeremy did not say anything, Jeremy and Petitioner simply left.

It was "on a seperate occasion", according to Perez, after Chino (victim) and the others left for Chino's house, not petitioner, but Jeremy returned in a "black car". (See 3 RT. 1632). Jeremy got out and asked Perez "where is Chino"? Perez told him he went home. (See 3 RT. 1633). Jeremy said he was going to get Chino or anybody from NC. (See RT. 1634). "Perez did not know who was driving the black car". (See 3

RT. 1635). No evidence supports petitioner was with Jeremy during this alleged situation, additionally, there is no evidence associating petitioner with a black car.

**The Magistrate Finds:** Renteria testified that **"after it (the van) went past her",** she turned away so they (the suspects) wouldn't see that I (Renteria) had seen. (See R&R p.20, lines 21-24).

**THE FACTS:** In clarifying when Renteria "turned away", Renteria testified she turned away after the shooter reentered the suspects van, which was **"befor"** the van past her not after. Renteria testified, I would say from here to the table was when I turned away. (See 3 RT. 1238). Renteria's identification of the driver was **"befor the shooting took place",** which was before the shooter reentered the van, she didn't pay the driver any particular attention during her observation. (See 3 RT. 1226, 1230-1231, 1226-1238). She did not testify that she again saw the driver as the suspects headed in her direction.

In the case at bar, there is good reason why this Court should find that, the Court of Appeal's, and the Magistrate's decision and recommendation to deny relief is based on an unreasonbale determination of the facts. The Court of Appeal relied on incorrect facts, misstated facts, and facts not supported by the record, and further ignored facts supporting petitioner's claims, as did the Magistrate Judge. It's decision was based on an unreasonable determination of the facts in light of the evidence presented. **(Harrington v. Richter, 131 S.Ct. 770, at 784 (2011).**

<u>OBJECTIONS</u>

## IV.

### PETITIONER'S CLAIM THAT FALSE EVIDENCE WAS INTRODUCED DURING TRIAL

First, Petitioner states, submits, and contends that, upon reviewing the Amended Petition and the way in which it is formatted, the Court should find that, "Ground One" and that in which is labeled by the Magistrate as "Ground Two", **is actually all one ground**, therefore, petitioner's claim in "Ground One" is cognizable because it presents a federal question, and petitioner did in fact cite federal constitutional right that demanded the state court take different actions. **(See Amend. Pet. at pp. 27-32).** "Section a" of Ground One briefly discusses the law regarding the Claim, "Section b" discusses the facts surrounding Ground One, "Section c" further discusses the law for which Ground One falls under. **(See Id. pp. 27-32).** In this factual view, it is respectfully submitted and contended that petitioner does cite to federal law that demanded the state court to take different action, and petitioner does not merely and fully rely on California Statute, section 1473(b)(1). The dividing of what is actually "One Ground" is unfair to petitioner, And Respondent capitalizes on the situation by arguing petitioner only relies on a California Statute, section 1473(b)(1), which allows relief on habeas corpus where the petitioner shows that "substantially material or porbat-ive" false evidence was introduced against him on the issue of guilt or punishment. Additionally, it is respectfully submitted and contended that, the Magistrate erred in concluding petitioner's factual and lagal claim of presentation of false

11.

evidence within the purview of penal code section 1473 was beyond
the scope of the AEDPA.

B.  **THE MAGISTRATE ERRED IN CONCLUDING
PETITIONER'S FACTUAL AND LEGAL CLAIM
OF PRESENTATION OF FALSE EVIDENCE
WITHIN THE PURVIEW OF PENAL CODE Sec.
1473 WAS BEYOND THE SCOPE OF THE AEDPA**

When the state has in place law(s) that either efect the
substantial right(s) of any citizen and/or create a **"liberty
interest"** for said citizen(s), and said law(s) are applied in a
fashion that could be construed either as an arbitrary and/or
capricious application of said law(s), the United States Supreme
Court has found a **"Due Process violation of the Fourteenth
Amendment viable in Federal Habeas Corpus proceedings. (Hicks v.
Oklahoma, (1980), 447 U.S. 343, 346**[2] . In the instant case, at
the state court level, Petitioner argued, invoking the mandates
of Penal Code Sec. 1473 that habeas corpus relief was/is
available to a petitioner within the purview of subd.(b)(l) of
Sec. 1473 due to **false identification testimony provided by Ms.
Maria Renteria that was probative on the issue of Petitioner's
guilt.** Discussing for the state court, Petitioner factually and
legally alleged **"a reasonable probability of a different result
if Ms. Renteria "had not" provided said false identification
testimony against petitioner claiming she had a "good view of the
driver"** who was driving a white van in which was used in the

---

[2] While the Hicks analysis is relevant, it is limited to the fact
Penal Code Sec. 1473 is a state statute, **But the application of
this statute as it is currently used by the state is guided by
United States Supreme Court precedent.**

murder".Especially in light of the following facts, **(1)** One way to test credibility is to see how the testimony fits with known facts [here, the jury was not provided the accurate facts to do so], **(Brown v. Borg, (C.A.9(Cal.) 1991), 951 F.2d 1011, at 1016),** **(2)** the prosecutor greatly relied on Renteria's testimony to bolster the credibility of the other three witnesses, (See 2 RT. 908-909; 5 RT. 2728-2729, 2742, 2760-2762), **(3)** Jesse Robles testified the headlights of Renteria's van illuminated the inside of the suspect's van "allowing him to see", [which given the layout of the crime scene, the location of Renteria's van and the vehicles parked in front of her, as will as where Jesse Robles was standing, **was not possible**] (See 2 RT. 952-953; 5 RT. 2733-2734), and **(4)** Renteria's to testimony was used for purpose, what purpose? "To aid in convicting petitioner". The Magistrate Judge failed to fairly consider these factors.

At page 25 of the Magistrate's R&R attached hereto as Exhibit "H", the Magistrate found, citing **Estelle v. Mcguire, 502 U.S. 62 (1991)** that petitioner's claims involved state law claims and could not be litigated in the habeas corpus proceedings before the court. (See Exh. "H" page 25, lines 11-14). As petitioner will show, while the magistrate is correct that Penal Code Sec. 1473 is a state statute, **the interpretation of this statute since at least 1995 has involved the specific use of United States Supreme Court precedent.** As such, the claim is one brought specifically under federal law as is interpreted by the United States Supreme Court relevant for habeas corpus

proceedings in the federal forum within the purview of the AEDPA.

In **In re Malone, supra,** the California Supreme Court **made clear that there analysis of false evidence claims would be done using "a reasonable probability of a different result standard". (In re Malone, supra, 12 Cal.4th at 965).** This specific standard has never been founded on state law. To the contrary, the reasonable probability of a different result standard derives itself from United States Supreme Court precedent. Several California cases starting in 1995, discussing the reasonable probability of a different result standard do so, citing nothing but United States Supreme Court precedent to justify their conclusions.

In **In re Sassounian (1995) 9 Cal.4th 535** discussing the false evidence provisions of **Penal Code Sec. 1473** made it clear that their decision was being based on United States Supreme Court precedent:

> "[F]alse evidence is substantially material **or probative**: if it is of such significance that it **"may have"** affected the outcome, in the sense that with reasonable probability it **"could have"** affected the outcome...(citations) In other words, false evidence passes the indicated threshold if there is a reasonable probability that, had it not been introduced, the result would have been different. The requisite reasonable probability we believe, is such as undermines the reviewing court's confidence in the outcome.

**(See Sassounian, supra, 9 Cal.4th at p. 546, citing United States v. Bagley, 473 U.S. 667, at 678).**

In **In re Malone, supra,** the California Supreme Court relied on **In re Sassounian, supra, t**o come to their conclusion. (In re Malone, supra, 12 Cal.4th at 965 citing **Bagley, supra, a**s well as **In re Sassounian, supra,).** With this legal backdrop, it is

14.

Clear that the Magistrate erred in concluding Petitioner's false
evidence claim was one of state law only. This error, as will be
shown, was indeed prejudicial,due to the Magistrate failing to
conduct an examination of Petitioner's claims **under the reasonable
probability of a different result standard as is dictated by
current United States Supreme Court precedent.** In order to sustain
said burden under decisions such as **Bagley** and **Kyles v. Whitley,
514 U.S 419 (1995)**, it is necessary for petitioner to present to
this reviewing court the facts contradicting the Magistrate's
conclusion that the evidence against petitioner is allegedly
overwhelming. Petitioner respectfully submits and contends that,
<u>**the burden is on the beneficiary of the error either to prove that
there was no injury or suffer a reversal of his erronously obtained
judgment.**</u> (Gamache v. California, (U.S. Cal. 2010), 131 S.Ct. 591,
at 592, 178 L.Ed.2d 514; See also Brecht v. Abrahamson, (U.S. Wis.
1993), 113 S.Ct. 1710, 1723, 507 U.S. 619, 640-41). Here, the case
was close, therefor, the errors complained of were not harmless.

<u>FACTORS DEMONSTRATING THIS WAS A CLOSE CASE:</u>

Factor One(1)....

This was a close case because the outcome of this case was
tightly balanced on the jury's evaluation of the credibility of
witnesses. Like the case of **United States v. Weatherspoon**, petiti-
oner's case boiled down to a "battle over credibility", therefore,
the case was close, not overwhelming. <u>(Untied States v. Sanchez,
(C.A.9 (Cal.) 2011), 659 F.3d 1252, 1260-1261; United States v.</u>

<u>Weatherspoon, (9th Cir. 2005), 410 F.3d 1142, 1151-1152; People
v. Anderson (1978) 20 Cal.3d 647, 650-651).</u>

<u>Factor Two(2)....</u>

No physical evidence connects petitioner to this crime, and
the prosecution waited two(2) years and two(2) months after the
evidence against petitioner was first compiled before it elected
to prosecute. (See Exhibit "U" of Amended Petition). As the court
stated in **Cooper v. Sowders,** much of the prosecution's evidence
was questionable, and indeed close **because the prosecution waited
two years after the evidence against the accused was first compil-
ed before it elected to prosecute.** (See Cooper v. Sowders, 837 F.
2d 284, at 288 (1988). Additionally, the evidence in the present
case is also questionable. The prosecution originally elected not
to seek prosecution due to there being no vehicle or physical
evidence connecting petitioner to the crime. (See Exh. "T" of Amend.
Pet.). This factor has not changed, there is still no physical
evidence connecting petitioner to this crime, only questionable
eyewitness testimony.

<u>Factor Three(3)....</u>

Another indication that this was a close case is the lengthy
jury deliberation. Obvious indications of a close case is lengthy
jury deliberations. (In re Martin (1987) 44 Cal.3d 1, 51; People
v. Cardenas (1982) 31 Cal.3d 897, 907 [12 hours of deliberations
is evidence of a close case]; Lawson v. Borg (9th Cir. 1995), 60
F.3d 608, 612 [nine hours of deliberations deemed protracted.].
Here, the jury deliberated for over two full days to reach its

verdict. (5 RT. 2768, 3301-3302, 3601; 1 CT. 128, 131-132, 187).
While the California Supreme Court has indicated that lengthy
deliberations are not significant in a complex case. **(People v.
Cooper (1991) 53 Cal. 3d. 771, 837),** this was not a complex case,
it involved one count of aiding and abetting a murder and the jury
basically had to dtermine just one main fact--whether petitioner
was the person who drove this misterious white van.

Factor Four(4)....

The jury's request for readback of testimony also establishes
this was a close case. **(People v. Pearch (1991) 229 Cal.App.3d.
1282, 1295 ["Juror question and requests to have testimony reread
are indications the deliberations were close"]; People v. Williams
(1971) 22 Cal.App.3d. 34, 38-40 [request for readback** of critical
testimony**]**.). Here, the jury requested "total readbacks" of
prosecution witnesses, Jesse Robles, Maria Renteria, Maria Perez,
Albert Segundo, Andres Sandoval, Adrian Robles, And Carlos Lopez
[all in which are critical testimony's]. (1 CT. 130).

Factor Five(5)....

The prosecution's case rested solely on eyewitnesses testimony
and said testimony is suspect, questionable, and/or unreliable.
It is submitted and contended that, The Magistrate Judge evaluated
the eyewitnesses testimony/evidence from a narrow standpoint, and
failed to examine the inherent improbabilities and/or impossibili-
ties of the eyewitnesses testimony's. Thus, **petitioner has not been
provided a fair and impartial examination of the facts as he is
entitled to.** The four eyewitnesses testimony is as follows:

17.

**A.** **THE IDENTIFICATION OF "MARIA RENTERIA":**

Renteria's "first identificaton" of petitioner was in court
three years after the crime. (See 3 RT. 1502, 1503)[3]. Renteria
never seen the person who she saw inside the suspect's white van
before. (3 RT. 1226). She admitted that she was "in shock" and
had no particular reason to pay attention to the driver. (3 RT.
1228, 1236). However, **Renteria testified petitioner was the driver
of the suspect's van.** (See 3 RT. 1229, 1237, 1244, 1245 attached
hereto as **Exhibit "J"**). She testified she had a **"GOOD VIEW"** of
**the suspect's and that there were no big vehicles or many vehicles
in front of her so she could see.** (3 RT. 1233, 1245). A key sealing
point of Renteria's testimony hinged on her headlights shining into
the suspect's white van allegedly driven by petitioner. To this,
Renteria claimed she was able to see inside the van due to her
headlight shinning inside it for two or three minutes, she later
changed her estimation to more then 10 seconds:

| | | |
|---|---|---|
| Q [Prosecutor] | HOW.LONG WOULD YOU SAY THAT YOUR LIGHTS FLASHED THE INSIDE OF THE VAN? |
| A [Renteria] | ALL THE WAY--I MEAN UNTIL THEY LEFT. |
| Q [Prosecutor] | SO HOW LONG DID YOU GET TO LOOK AT THE DEFENDANT'S FACE WHILE HE WAS IN THE VAN? |
| A [Renteria] | JUST A LITTLE BIT WHILE BECAUSE, WHEN I HEARD THE GUN SHOTS, I STARTED FOCUSING ON THE OTHER GUY. |
| Q [Prosecutor] | SO WOULD YOU SAY A MINUTE-- |
| A [Renteria] | MAYBE, 2, 3 MINUTES. YEAH, ABOUT 2 MINUTES. |
| Q [Prosecutor] | 2 MINUTES? |
| A [Renteria] | IT SEEMED LIKE FOREVER AT THE TIME. |

(See 3 RT. 1230, lines 18-28, Exh. "J").

---

[3] For the court's convenience petitioner attaches the testimony given
by Renteria, Segundo, Lopez, and Jesse Robles at petitioner's trial.
The trial transcripts of said witnesses are attached as **Exhibit "J"**.

```
Q [Def. Counsel]    BEFORE YOU HEARD THE GUN SHOTS, I KNOW YOU
                    SAID THAT YOUR LIGHTS ILLUMINATED THE OTHER
                    VAN THAT WAS ON THE OTHER SIDE OF THE STREET
                    ; IS THAT RIGHT?
A [Renteria]        IT WAS STRAIGHT--YES. IT WAS STRAIGHT AHEAD.
Q [Def. Counsel]    WHEN YOU SAY "STRAIGHT AHEAD," YOU DON'T
                    MEAN--
A [Renteria]        I MEAN YOU COULD SEE THE LIGHTS. YOU COULD
                    STILL SEE THE LIGHT HITTING THEM.
```
(See 3 RT. 1233, lines 15-23 att. hereto).

```
Q [Def. Counsel]    SO WHEN YOU SAY THAT YOU LOOKED AT THE DRIVER
                    FOR 2 MINUTES--
A [Renteria]        WELL, IT WAS-- LIKE I MEAN I LOOKED. I MEAN
                    DURING ALL THAT TIME WHEN THAT HAPPENED, THEY
                    PAST BY A LITTLE BIT, I WOULD SAY ABOUT JUST
                    2 MINUTES.
```

Renteria testified she observed the driver for more then 10 seconds but not actually 2 minutes. (See 3 RT. 1236-1237).

Jesse Robles testified the headlights of Renteria's vehicle illuminated the inside of the suspect's van. (See 2 RT. 952-953), which allegedly assisted Robles in seeing the driver of the suspect's van. The Prosecutor also highlighted and stated based upon the evidence presented that, the headlight's of Renteria's van "illuminated the inside of the suspect's van allowing both Renteria and Jesse Robles to see". (5 RT. 2733-2734).

```
[Prosecutor]    THE HEADLIGHTS ILLUMINATED THE DEFENDANT.
                TWO PEOPLE SIAD THIS, JESSE ROBLES AND MARIA
                RENTERIA, BOTH WHO WERE IN THE SAME POSITION,
                ESSENTIALLY LOOKING AT THIS, SO THEY CORROB-
                ORATE WHAT THE OTHER ONE SAID. WE KNOW THAT
                JESSE SAW BECAUSE SOMEONE ELSE SAW EXACTLY
                WHAT JESSE SAW.
                (See 5 RT. 2733-2734).
```

Renteria was also able to provide testimony that she witnessed the victim cross the street when he was shot.

```
Q [Def. Counsel]    BUT YOU ALSO JUST TOLD US THAT YOU SAW
                    CHINO FALL: IS THAT RIGHT?
A [Renteria]        UH-HUH
Q [Def. Counsel]    WHEN DID YOU SEE THAT HAPPEN?
A [Renteria]        WHEN I WAS IN THE CAR. Because, I MEAN,
                    THERE WAS NOT LIKE BIG CARS, VEHICLES. SO
                    YOU COULD SEE.
                    (See 3 RT. 1250, lines 19-25, Exh. "J").
```

19.

Renteria's testimony that there was not like big cars, vehicles, or
many vehicles was indeed false and was materially false, prejudicial
to petitioner. The totality of the circumstances, that being the
distance in which she had to observe, the location of her vehicle,
and the vehicles parked in front of her shows Renteria could not
have seen what she claimed to have saw.

After petitioner's trial, Renteria was called to testify at
Soto's trial as a defense witness, so the prosecution was in the di-
lemma  of having to impeach a witness in which it claimed credible
at petitioner's trial. In Soto's trial the prosecution attacked
Renteria's testimony as clearly being false. It was able to be
established through the use "of crime scene photos and Detective
Steven Katz's testimony that Ms. Renteria was not parked where she
claimed to have been parked during the incident. In fact, at Soto's
trial Renteria during cross-examination, she had to admit that she
was parked behind a large truck":

> Q [Prosecutor] BY MS. BARNES: I'M GOING TO SHOW YOU
> ANOTHER PHOTOGRAPH, PEOPLES 61. DO
> YOU SEE YOUR VAN PARKED BEHIND THIS
> LARGE TRUCK BEHIND--YOUR VAN PARKED
> BEHIND THE LARGE TRUCK ON PEOPLES 61?
> A [Renteria]  YES.
> (See Exh. "E" 1823, lines 5-9).

Attached hereto as Exhibit "A" is a true and correct crime
photographs showing the line of cars and the large truck in front of
Renteria's van. As such it was more probable then not that Renteria
actually could not have seen what she claimed to have saw during the
course of petitioner's trial. From the factual discrepencies, the
prosecution was able to show that Renteria was not only parked where

she claimed to have been parked, **but the distance involved was of such that it would have been impossible for Renteria to have seen what she claimed to have saw.** In this regard, Renteria, during the course of Soto's trial claimed that she was only parked about thirty-five(35) feet from the incident:

> Q [Def. Counsel] ABOUT HOW FAR AWAY FROM THE VAN WERE YOU WHEN THAT MAN GOT OUT OF THAT VAN?
>
> A [Renteria]  FROM--ABOUT HERE TO--THE END OF THE WALL.
>
> Q [Def. Counsel] WELL, NOW, THERE'S A WALL HERE WHERE I'M POINTING TO WHERE THE DOOR OPENS. AND THERE"S THE BACK WALL.
>
> A [Renteria]  THE BACK WALL.
>
> Q [Def. Counsel] THE BACK WALL?
>
> THE COURT:  ALL RIGHT. FOR THE RECORD, FROM THE WITNESS BOX TO THE BACK WALL **IS APPROXIMATELY 35 FEET.**
>
> (See Exh. "E" 1805, lines 27-28 and 1806, lines 1-10).

Based on the factors surrounding Renteria's testimony at Soto's trial and Petitioner's trial, counsel for petitioner during direct appeal investigated Renteria's testimony and position taken. Patricia Ihara (Counsel for petitioner on direct appeal) investigated Renteria's story **"and found that  at the very least Ms. Renteria had to have been somewhere like at least 128 feet from the actual incident:**

> "[I] COMPARED THE PLOT MAP TO THE STREET VIEW ON GOOGLE MAPS AND THE ASSESSOR RECORDS. I DETERMINED THAT LOT 13 IS WHERE THE ROBLES HOUSE WAS LOCATED. ACCORDING TO SERGEANT KATZ, JOSE ROBLES WAS KILLED ON THE WEST PERIMETER OF LOT 15. THE PLOT-MAP SHOWS <u>THAT IF RENTERIA WAS PARKED ON THE WEST PERIMETER OF LOT LOT 13 and JOSE ROBLES WAS SHOT AT THE WEST PERIMETER OF LOT 15, THE CLOSEST DISTANCE BETWEEN RENTERIA'S</u>

VEHICLE AND THE WHITE VAN WOULD HAVE BEEN
128 FEET".
(See True and correct copy of Ms. Ihara's **Sworn Declaration**,
pp. 1-4, att. hereto as **Exhibit "D"**).

So the testimony that Renteria was only two(2) car
lengths away from the incident, could not have been the truth:

> Q [**Def. Counsel**] SO YOU WERE A LITTLE OVER TWO
> CAR LENGTHS AWAY?
> A [**Renteria**]     YES.
> (See Exh. "E" 1806, lines 11-13).

As stated before, Renteria testified she had a "good view"
of the driver of the suspect's van with the assistance of the
headlight from her van. (See 3 RT. 1233, 1236, 1244-1245). It is
submitted and contended that, based on the totality of the circum-
stances, the location of Renteria's vehicle, the location of the
suspect's van when Renteria observed the driver "befor the shooting"
, the type and total vehicles parked on the road of 101st street,
and the testimony provided by Detective Katz at Sotos's trial, as
well as Appellate Counsel investigation and sworn declaration,
Renteria could not have seen what she testified to having seen.
The suspect's van could not have been illuminated by the headlights
of Renteria's vehicle under the totality of the circumstances,
especially with Renteria being parked behind a large dump truck,
an SUV, and two other cars. (See Exh. A pp. 1-4; Exh. "E" p. 1847
att. hereto). Common-sense tells us that Renteria's headlights
hit the tail end of the dump truck that was parked in front of her,
and could not have illuminated the inside of the suspect's van
**"that was off-set from** Renteria's van under the totality of the
circumstances of this case. Notably, Jesse Robles's position that

22.

he could see inside the suspect's with the assistance of the
headlights of Renteria's van, could have also been discredited.

It must also be noted that, Jesse Robles testified that, Renteria
**was coming** from Vermont Street towards Budlong [meaning Renteria
was still driving], (2 RT. 952). However, according to Renteria,
she had already **parked** her car ------ in front of the Robles
residence **"BEFORE THE SHOOTING"**. (3 RT. 1225, 1232-1233).

| | |
|---|---|
| Q [Prosecutor] | AND SO WHEN YOU HEARD THE FIRST SHOT BEING FIRED, WERE YOU ACTUALLY STILL DRIVING OR HAD YOU PARKED? |
| A [Renteria] | NO. I HAD ALREADY PARKED ALREADY. (Exh. "J" 3 RT. 1225). |
| Q [Def. Counsel] | YOU WERE PARKED ON THE STREET. YOU HAD ALREADY PULLED OVER AND PARKED THE VEHICLE BEFORE THE SHOOTING STARTED: IS THAT RIGHT? |
| A [Renteria] | YES. |

(See 3 RT. 1232, lines 21-27, Exh. "J" ).

Petitioner contends that, one way to test credibility is to
see how the testimony fit with known facts, (Brown v. Borg, (C.A.9
(Cal.) 1991), 951 F.2d 1011, at 1016). The Magistrate Judge in the
instant case ignores this fact.

Fact One(1), there was indeed a large dump truck with wooden siding
around the truck bed, an SUV, and two other cars parked in front of
Renteria's vehicle. Fact two(2), thirty-five feet from where the
shooting occurred was an SUV in which was in the inner containment
of the yellow tape [That was not Renteria's Van]. Fact three(3), the
headlights of Renteria's vehicle could not have illuminated the
inside of the suspect's van allowing Renteria and Jesse Robles to see
given her vehicle was off-set from the suspect's van, she was parked
over 128 feet from the suspect's van, and she was parked behind a

large dump truck and other vehicles. Fact Four(4), Renteria could
not have seen what she claimed to have saw regarding the driver
[a "good view" of him] from a distance over 120 "at night". Fact
Five(5), Jesse Robles could not have seen "with the assistance of
Renteria's headlights" under the totality of the circumstances.
Fact Six(6), Albert Segundo could not have seen what he claimed to
have saw from a distance of approximately six car lengths "behind"
the suspect's van at night [which was after Segundo and his friend
followed the suspect's van to another location, it was at this point
Segundo testified to **having his clearest view of the driver,** thus,
if this observation is proven not possible any other alleged points
of observation was impossible. Segundo would have had to be able to
see through rear tinted windows of the suspect's van from over 125
feet away at night, he also claimed to be able to see "an eyebrow
piercing" on the "left side of the driver's face while looking at
the right side of his face".]. All of these facts can be proven at
an evidentiary hearing, which demonstrates the evidence is not so
overwhelming so as to rebut the prejudice arising from the errors
complained of in this case. Here, the jury was not provided crucial
facts to test the credibility of the prosecution witnesses. (**Brown
v. Borg, supra, 951 F.2d at 1016**).

There are are other contradictions surrounding Renteria's test-
imony listed in petitioner's Traverse. The two conflicting testimony's
cannot at the same time be true.

24.

1a. **AT SOTO'S TRIAL,** Renteria testified she looked at the white van because it was driving on the wrong side of the street coming towards her **"WITH THE HEADLIGHTS OFF",** (Exh. "E" pp. 1804-1805 att. hereto).

1b. **AT PETITIONER'S TRIAL,** Renteria testified that the white van was on the wrong side of the road and it had **"THE HEADLIGHTS ON".** The driver turned -the lights off **"after-wards".** (3 RT. 1246-1250).

2a. **AT SOTO'S TRIAL,** Renteria testified she saw the driver of the van when the van drove towards her vehicle **"AFTER THE SHOOTING".** (Exh. "E" pp. 1810-1811).

2b. **AT PETITIONER'S TRIAL,** Renteria testified she looked at petitioner's face for about two minutes (she later changed that estimate to more than ten seconds) **"BEFORE SHE HEARD THE GUNSHOTS"** and got a good look at the driver's face, (3 RT. 1230-1231, 1237). After the shooting, Renteria testif-ied she turned her head away as the vehicle drove in her direction because she did not want them to see her, (3 RT. 1230). Renteria did not testify that she again got a look at the driver's face as the suspect's headed in her direct-ion.

3a. **AT SOTO'S TRIAL,** Renteria testified the distance between her car and the shooting was **"35 feet";** a little over two car lengths, (Exh. "E" pp. 1806, 1825 att. hereto). However ,AN SUV WAS PARKED TWO CAR LENGTHS AWAY, which was not Renteria's car. (See Exh. "A" p.2 att. hereto). Renteria admitted she was not good at estimating distances when the prosecutor told her it was **ABOUT 160 FEET FROM THE SHOOTING SITE TO THE ROBLES RESIDENCE.** (See Exh. "E" 1826 att. hereto).

3b. **AT PETITIONER'S TRIAL,** Renteria was not asked to approximate the distance but testified she was able to get a good look at the driver, (3 RT. 1231, 1245). She was certain that she was parked **in front of the Robles house.** (3 RT. 1233).

4a. **AT SOTO'S TRIAL,** Renteria identified her van in people Exhibit No. 28 as the vehicle parked behind a large work dump truck, (See Exh. "E" 1822). There was a driveway an SUV and two other cars in front of the work truck. (See Exh. A1; E 1847 att. hereto).

4b. **AT PETITIONER'S TRIAL,** Renteria testified "there were no big vehicles, so you could see", there was not a lot of cars. (3 RT. 1250).

5. At petitioner's trial, Renteria testified that she saw Chino fall to the ground, she also sae the shooter walking towards him to shoot him several more time. (3 RT. 1249-1250). Renteria did not say that at Soto's trial, on this point is completely silent though a seemingly critical fact that was known to the prosecution prior to Soto's trial.

The Magistrate, while dismissing petitioner's complaint that he was not prejudiced by Ms. Renteria false testimony, did not accurately evaluate what the Magistrate called overwhelming evidence of petitioner's guilt. As petitioner can demonstrate, the alleged overwhelming evidence of guilt is indeed not so overwhelming, **and if petitioner were to be able to present his evidence at an evidentiary hearing within the purview of "Habeas Corpus Rule 8"** it would be made clear that the overwhelming evidence of guilt simply does not exist and/or the evidence does not rebut the prejudice arising from the errors complained of in this case.

B. **THE IDENTIFICATION OF "ALBERT SEGUNDO":**

Albert Segundo testified and admitted that, he "never" implicated or identified petitioner as the driver of the suspect's van until trial **"three years after the crime"**. (3 RT. 1565). His

26.

identification clearly came after "he was told by Jesse Robles" that petitioner was the driver of the suspect's van. (2 RT. 944)[4]. Segundo testified he never told police a member of a gang called MKA was the shooter. (3 RT. 1558)[5]. He further testified he never said the driver of the suspect's van was a "male hispanic", and **"was certain"** that he never told any police officer that the driver was a male hispanic. (3 RT. 1558-1559). These statements were clearly "false" because he did in fact tell officers the driver was a "male hispanic" with the moniker Palone. (3 RT. 1548, 1559)[6]. Mr. Segundo's testimony as to **"being certain"** in regards to any of his positions cannot be credited or given great weight because clearly he lied, thus, his testimony that he **"was certain"** regarding his identification equally cannot be given credit or weight. (3 RT. 1543). Under the circumstances, his certainty isn't certainty at all. It appears Mr. Segundo was **untruthful** with police when asked if he could identify anyone. In this regard, it is established that Segundo implicated a few other "male hispanics" as being involved in this crime, **"Willie**

---

[4] The record should be expanded to include Exhibit "M", Police Reports within Amended Petition, so as to ascertain "the truth and facts". **(In re Ferguson, (1971) 5 Cal.3d 525, at 531; Darden v. Wainright, 477 U.S. 168, (1988).).** Exhibit "M" pp. 162-164 is relevant to show Segundo **"was told"** by Jesse Robles that Petitioner was the driver, but Segundo still failed to implicate and identify petitioner **at a point when he was claiming to be telling the truth after previously lying.** Petitioner believes a failure to expand the record would violate his **Substantive and Procedural Due Process** rights. (Rochin v. California, 342 U.S. 165, 172 [72 S.Ct. 205, at 209, (1952); Palko v. Connecticut, 302 U.S. 319, at 325-326, (1937); Mathews v. Eldridge, 424 U.S. 319, 335 (1976); U.S. v. Salerno, 481 U.S. 739, at 746, (1987).). Lonchar v. Thomas, 517 U.S. 314, 326 (1996).

[5] Exhibit "M" p. 10 of Amended Petition proves and show Segundo did in fact tell police the shooter was possibly a "male hispanic **from MKA.**

[6] Exhibit "M" pp. 10, 19-20 of Amend. Pet. proves Segundo did in fact identify the driver as a **"male hispanic"** on more then one occassion.

from DPG (Dog Pound Gangster's), **Pelon** from DPG, **"male hispanic"** as the driver of the suspect's van, **Drip's** from **EK Gang**, all in which are real people from real gangs. (3 RT. 1556, 1559-61, 1566). At petitioner's trial Segundo claimed to have lied about his identification of Willie and Palone, (3 RT. 1547-1548, 1550, att. Exh. "J"), and instead claimed that he was certain petitioner was the driver and Soto was the shooter. (Id.) This ability to admit he was playing games with his identifications of persons **in a murder investigation** should be enough to "question" the trustworthiness of his identification testimony. This is especially so, given that there are issues surrounding his ability to see what he claimed to have saw when he had his **"clearest view"** of the driver. Jesse testified that, the driver was wearing a **long hanging type black beanie** that fit snug on a persons head. (2 RT. 976). However, Segundo testified the driver **"was bald headed,** no human person can see through such a beanie and identify a person as being "bald headed". (3 RT. 1563). Additionally, it is troubling that at a point when Segundo had **"his clearest view"** of the driver he claimes/testified that he saw **"an eyebrow piercing on the left side of the driver face,** which is impossible given that **it was dark, he was at a distance of about 120 feet "behind" the suspect's van, and would have had to see through the rear windows with no view of the left side of the driver's face.** (3 RT. 1546, 1564-65, 1571-72, 1577-78; 4 RT. 1859; 3 RT. 1855-56, 1860-61)[7]. At the outset, it [which can proven at an evidentiary hearing] is impossible for

---

[7] In addition as to why the record should be expanded is the fact that Habeas Corpus Rule 7(a) has not been changed due to any new cases. (Lonchar v. thomas, 517 U.S. 314, 326 (1996) Wingo v. Wedding, 418 U.S 461, 474 (1974); McFarland V. Scott, 512 U.S. 849, at 855, (1994).). Exhibit "M" p.165 of Amend. Pet. proves and show that it was "after" Segundo followed the suspect's he seen the piercing.

Segundo to have identified an "eyebrow- piercing" on the "left side" of petitioner's face **at night** about 120 feet "behind" the suspect's van while looking at half the driver's face, specifically the right side of the driver's face[8]. Notably, the visible part of an eyebrow piercing is less then an inch in size. As such, this physical impossibility has to be used to question the veracity of Segundo's identification testimony not giving it credence. In this regard, Segundo explained that he knew of petitioner's eyebrow piercing prior to the night of the crime. (3 RT. 1550, 1577-78, Exh. "J" att.). As such, while Segundo claims to have seen petitioner's face "real clearly" after he stopped at another location after having followed the van, the identification of petitioner by Segundo **does not come from a crime scene identification. To the contrary, Segundo's testimony three years after the crime simply comes from knowing about petitioner prior to the crime.** Segundo was easily able to put petitioner in the driver's seat of the suspect's van based on him already knowing how petitioner looked, although petitioner was not a perpetrator in this crime. A reasonable jury could have concluded such.

From the forgoing, while the Magistrate may have given cred-ence--- to Mr. Segundo's identification testimony, the facts of

---

[8] Exhibit "M", Police Report pp. 8, 9, 29, 31, 39 of the Amended Petition demonstrates that throughout the course of the investigation on this case the suspect's van **windows was continuously described as being tinted dark**, thus, Segundo would have also had to be able to see through the dark tinted windows of the van. For the purpose of ascertaining the truth and reliability of Segundo's testimony, the record should be expanded to include Exhibit "M" of Amend. Pet.

this case, when viewed in total clarity with reliance on actual
and accurate facts, shows a magnitude of impossibilities that
make Segundo's identification of petitioner unreliable and/or
suspect. (Neil v. Biggers, 409 U.S. 188 (1972).

## B. THE WHITE VAN...

As is argued throughout this litigation and as far back as
petitioner's trial, the alleged eyewitnesses all claim petitioner
was driving a white van, but at no time did anyone  ever
connect either petitioner or Mr. Able Soto [the alleged shooter]
with owning a white van, petitioner wasn't connected to a van of
any sort. (2 RT. 953; 3 RT. 151-1516; 5 RT. 2432). In fact,
during the course of petitioner's trial it was affirmed that
petitioner did in fact own a green toyota camry:

> Q [Prosecutor]:   Have you ever seen him driving in a
>                   car ever?
> A [Robles, J.]:   Jofama?
> Q [Prosecutor]:   Yes.
> A [Robles, J.]:   Yes.
> Q [Prosecutor]:   What kind of car did you see him
>                   driving in?
> A [Robles, J.]:   A Green Camry.
> Q [Prosecutor]:   And on the day of the shooting, did
>                   you see him in the green Camry?
> A [Robles, J.]:   Yeah.

(See 2 RT. 953, lines 17-26, Exh. "J" att.).

It is respectfully submitted and contended that, before
the Magistrate can fully and accurately evaluate Mr. Segundo's
testimony and statements, and timing of events, it is
necessary to consider the circumstances surrounding petitioner
being at Blockbuster Video Store at 9:25 p.m., and the fact
that the crime occurred around 9:00 p.m. In this regard, as is
currently before the court petitioner is arguing a claim of

"Actual Innocence". Part of this claim hinges on the timing of events which Segundo unwittingly assists petitioner in proving petitioner could not have been the driver of the van, because petitioner is on video surveillance at Blockbuster's at 9:25 p.m., the crime occurred at 9:00 p.m., and Segundo and his friend testified to having "followed" the suspect's to another location "after the crime", which was "opposite" the direction of the Blockbuster video store petitioner was at "with his wife and her little brothers".

Although Segundo claimed to have been able to get a good look at half the driver's face, and was able to see an eyebrow piercing on the left side of the driver's face. **"Andres Sandoval"**, a friend of Segundo and the victim, testified **"it was to dark to identify the driver", he further testified he would not lie regarding identifying the suspect's.** (3 RT. 1855-1856, 1860-1861). Andres Sandoval is the witness and person that was "with Segundo" when the suspect's were being followed. Thus, we have two individuals in the same identifying positions, one testifies it "was to dark" to see, and the other, Albert Segundo supernaturally is able to see an eyebrow piercing on the left side of the driver's face. Although Segundo claimed to have been able to see the driver three different times during the crime in question, in statements made to officers he originally claimed "it was after" he and his friend followed the suspect's to another location that he was then able to see the driver, when, the suspect's passed by on 101st Street

31.

he only saw the passenger[9]. Additionally, according to Segundo's
testimony, it was after him and his friend followed the suspect's
to another location on 102nd and Hoover Street that he had his
**"clearest view"** of the person driving the suspect's van, which
was as Segundo and Sandoval sat parked **"behind"** the it. (3 RT.
1564-65, 1571-72, 1577-78)[10]. Notably, Segundo was at an
observation distance of approximatel "120 feet", it was "night
time", and the person that sat right next to him [Andres Sandoval]
testified "it was to dark to identify the driver"[11]. Thus, sense
this was Segundo's "clearest view" of the driver, the other two
alleged opportunities of observation was seriously impossible beca-
use Segundo could not have seen what he claimed to have saw at
the point where he had his clearest view of the driver. Factors
in which can demonstrated and proven at an evidentiary hearing.
The evidence against petitioner is not so overwhelming so as to
rebut the prejudice arising from the errors complained of in
petitioner's pleadings. In the case at hand, the prosecution has
not its burden of demonstrating the errors were harmless beyond
a reasonable doubt. (Gamache v. California, (U.S. Cal.2010), 131
S.Ct. 591, at 592, 178 L.Ed.2d 514 [**"the burden is on the**

---

[9]
    In the ascertainment of "the truth" the record should be expanded
to include exhibits within the Amended Petition, as stated before.
Exhibit "M" of Amend. Pet. proves and show that Segundo originally
claimed to have seen only one of the suspect's as the van passed on
101st Street, the shooter who was the passenger of the suspect's
van. (Exh. "M", Police Report pp. 162-163 of Amend. Pet.).

[10]
    Exhibit "M", Police Report p. 165 proves, demonstrates, and shows
that it was "after" he followed the van to another location that he
seen the driver of the van and noticed an eyebrow piercing. (Exh. "M"
Police Report of Amend. Petition.

[11] The suspect's van windows was decribed as being tinted. (Exh. "M",

beneficiary of the erro either to prove that there was no injury or suffer a reversal of his erronously obtained judgment".]; See also Bretch v. Abrahamson, supra, 113 S.Ct. 1710, 1723, 507 U.S. 619, 640-41).

While Segundo claimed that he lied several times in the past because he was in fear for his and his family safty, this so called fear is not founded on any threats or actions from any person. In fact, this so called fear was likely claimed so as to down-play his lies and bolster his credibility. Segundo's position of holding fear is completely inconsistent with his actions throughout the course of the investigation on this case. Segundo was **naming names of several different gang members as being envolved in the crime, and the people in which** Segundo accused **were real people from real gangs**, which would put Segundo in the same position he claimed to have tryed to avoid, placing him and his family in danger. (3 RT. 1560, 1561). The different people Segundo accused were "**Willie** from D.P.D (Dog Pound Gangster's)"; "**Pelon** from D.P.G (Dog Pound Gangster's)"; A Male hispanic from  **MKA Gang**; and "**Drips from EK (Evil Klan Gang)**". (See RT. 1556, 1559-1561, 1566). All real people from real gangs. (Id.)

B. **THE IDENTIFICATION OF JESSE ROBLES:**

No one identified petitioner the night of the crime, however

Footnote 11 continues...
Police Report of Amended Petition pp. 8,9,29,31, and 39.

Robles claimed he did speak with officers "the night" of the crime, but no reports or introduced evidence supports Robles's claim. (2 RT. 979-984; 3 RT. 1508-1510).

Robles "heard" about a previous confrontation between the victim and petitioner's younger brother, it was following him having heard about this confrontation that he (Jesse Robles) implicated petitioner as the driver of the suspect's van. (2 RT. 945, 955-958). Robles **"told all his friends and family members that petitioner was the driver of the suspect's van"**. (2 RT. 944, 991-994). Robles told everyone Jofama (Petitioner) was the driver well befor anyone else identified or implicated petitioner as the driver of this imaginary white van, Carlos Lopez and Albert Segundo were two of the friends Robles "told".

Approximately ten(10) months following the crime Robles was shown a six-pac photo line-up for identification purposes, this was well after detectives had already shown Robles a "single photo" of petitioner, Robles was asked if he recognized anyone in the photo line-up. (2 RT. 958-961). Robles testified that, at first he didn't want to implicate the petitioner, but then he did **because "his family"** wanted him to, (2 RT. 983). It isn't unreasonable that after Jesse Robles "told" all his friends and family that petitioner was the driver of the suspect's van, and after his family heard about the prior confrontation between the victim and petitioner's younger brother, and after NC gang members went around showing a single year-book photo of petitioner---and upon doing so was saying petitioner was the person who committed the crime, as well as traveling rumors about petitioner being envolved in the crime, the

34.

family became convinced petitioner was behind the death of Jose Robles. Based on the family being convinced [although completely wrong], the family told/wanted Jesse Robles to implicate and say it was the petitioner that was envolved in the crime, he did so because his family wanted him to, (2 RT. 983). The two day window between the night of the crime and when Robles first spoke to officers, gave him and others plenty of time to go over the index event in his mind, fill in gaps, reconstruct details, thus, altering the original recollectons so as to eliminate inconsistencies between information in memory, and that aquired from other sources. Ultimately, petitioner became the person to blame [although completely innocent of the crime].

The crime in question occurred around 9:00 **"at night"**. (2 RT. 937). Jesse Robles described the suspect's van as having **"tinted windows"**, (See Appendix "B" of petitioner's "Traverse"). Robles did not see the actual shooting, the shots had already stopped as he ran from the back yard to the front yard gate and seen the white van **"speeding"** eastbound passing his (Robles) home. (2 RT. 972). At trial Robles testified that the driver of the suspect's van was wearing a **"white T-Shirt"** and a **"long hanging type beanie"** that fit snug on a persons head, which would mean a good portions of the driver's head and face **"was covered and/or obstructed"**. (2 RT. 976). Robles testified he never identified the driver as wearing a long sleeved black hooded Sweat-shirt with the hood of the shirt down, he also testified that he never seen the passenger, but contradicted himself  by describing what the passenger was wearing. (2 RT. 984-985). However, it's documented that Robles described the passenger as **"wearing a long sleeved black hooded Sweat-shirt with**

35.

the hood of the shirt up, **and the driver wearing a long sleeved black hooded Sweat-shirt with the hood of the shirt down, [driver was also wearing a beanie].** (See Appendex "B" of Traverse). The beanie was a "foot long", which again, would mean a good portion of the driver's head and face was covered/obstructed. (see Volume 1 of 2, of Preliminary Hearing Transcript, p.26). This is especially so were normally or it can be reasonably believed that the driver was looking in a forward direction as he **"was speeding"** away from the crime scene, and was not looking over his left shoulder or to his left making his front face visible to anyone in the front yard of the Robles's home. Under the circumstances of this case, and the layout of the area, it can reasonably be concluded or said that, Robles did not have a direct view of the driver's face. The cirme occurred on **"a very small street, there were vehicles parked on both sides of the road, and the driver of the suspect's van "was speeding",** thus, given the layout of the area and the circumstances of this case, it can reasonably be concluded that, the driver was looking in a forward direction as he sped pass the Robles's home, otherwise, it can be reasonably believed the suspect's would have crashed. (See Exhibit "A" pp.3-4 of Amend. Pet.). Robles made his observation from **"28 feet away at night"** as the suspect's van "sped by going fast" [giving Robles very little time to observe, likely less then four(4) seconds]. (2 RT. 942, 973, 985).

Robles testified that, the "headlights" of Renteria's vehicle "illuminated" the inside of the suspect's van **"allowing him to see petitioner's face",** (2 RT. 952-953). However, after

petitioner's trial  it was discovered that, Renteria was parked
behind a large working truck and several other vehicles.
Additionally, Renteria **"was parked"** on the western perimiter
line of the Robles's home **before** the shooting, Renteria's van
was offset from the the suspect's van [given these layouts, the
headlights of Renteria's van could not have illuminated the
suspect's van allowing him to see]. (See 3 RT. 1225, 1232;
Exhibit "E" 1816, 1818 att, hereto; Exh. "A"1-6 att. hereto).
Although Renteria testified that she "was parked" already,
before the shooting took place, Jesse Robles testified Renteria's
van was coming back from where ever she had gone, basically
saying that Renteria-- was still driving when her headlights
shined inside the suspect's van. (2 RT. 952). These two
accounts of events cannot at the same time be true, either she
was parked or driving, not both. Robles testified that, he ran
out to the front yard **"after the gunshots had ended"**. (2 RT.
972). Renteria testified **"she was parked before the gun-shots
had started"**. (3 RT. 1225, 1232). The western perimeter line
of the Robles home would to "the right" side of where Robles
stood at the gate, therefore, Renteria's "tail-lights" could
not have substituted for the headlights. Given the layout of
the crime-scene, the location of Renteria's vehicle, the location
of the vehicles parked "in front" of Renteria's vehicle, the
location where Robles was allegedly standing, and the suspect's
van that **was off-set** from Renteria's vehicle, the suspect's van

could not have been "illuminated" by the headlights of Rentera's
vehicle allowing Robles to see. These factors can be demonstrated
at an evidentiary hearing.

It is submitted and contended that, in a case solely based
on eyewitness testimony, all of the aforesaid factors are crucial
because they impact and relate to the witnesses ability to see
what they claimed to have saw. furthermore, these factors are
crucial because **one way test test credibility is to see how the
testimony fit with known facts.** (See Brown v. Borg, (C.A.9(Cal.)
1991), 951 F.2d 1011, at 1016). Here, the jury was not provided
all accurate and reliable "facts".

In order to artifically boast the credibility of Renteria's
identification testimony of petitioner, the prosecutor utilized
Jesse Robles's testimony. As to Robles it was argued to the jury
that Renteria was corroborated by Jesse Robles, therefore, Ms.
Renteria must be telling the truth:

> Closing, [Prosecutor]: THE HEADLIGHTS ILLUMINATED THE
> DEFENDANT. TWO PEOPLE SAY THIS,
> JESSE ROBLES AND MARIA RENTERIA
> BOTH OF WHO WERE IN THE SAME
> POSITION, ESSENTIALLY LOOKING
> AT THIS, SO THEY CORROBORATE
> WHAT THE OTHER ONE SAID. WE KNOW
> THAT JESSE SAW WHAT HE SAW BECAUSE
> SOMEONE ELSE SAW EXACTLY WHAT
> JESSE SAW.

(See 5 RT. 2733, lines 28, and 5 RT. 2734, lines 1-5
att. hereto as Exh. "J").

However, as previously argued, Renteria's vehicle could
not have illuminated the inside of the suspect's van allowing
Robles to see. **anti** at pp. 19, 22-23, 36-38. So the record is

38.

clear, Mr. Robles gave testimony in line with the prosecutor's

argument:

> Q [Prosecutor]: Where there any lights that assisted
> you in seeing the inside of the van,
> the driver of the van?
> A [Robles, J.]: Yeah.
> Q [Prosecutor]: What were those lights?
> A [Robles, J.]: The light pole in front of the yard
> across the street from my house and
> the lady that used to live in the
> backyard of my house, she was coming
> down--she was coming back from where
> she went to--she left. I don't know
> where. She was coming back and she
> had her lights on.
> (See 2 RT. 952, lines 10-19 att. as Exh. "J")[12]

By the jury hearing this testimony **and not being made aware**

**of the fact that Renteria and Robles could not have seen what**

**they claimed under the totality of the circumstances, and not**

**being made aware of the facts investigated by Appellant Counsel**

**Patricia Ihara,** the jury was deprived of facts that would have

allowed them to fully and accurately evaluate the evidence.

Petitioner believes that, if the jury had been made aware of

the facts, the untruthfullness in Renteria's testimony, and

the investigations that would have revealed the distance of

Renteria and the suspects, as well as the locations of vehicles

---

12

 While Mr. Robles mentions a light pole no evidence was actually
presented that would suggest and prove a light pole gave
**illumination** to the area in question, the "inside" of the
suspect's van. To the contrary, the only light mentioned to
have "illuminated" the inside of the suspect's van was Renteria's
headlights.

and witnesses, it would have put a significant "legal and factual dent" in Robles's, Renteria, and Segundo's testimony.

It is further troubling that, the length in time Robles had to observe was likely **"less then four(4) seconds"** based on the witnesses testimony. As previously shown, Robles was at an observation distance of approximately 28 feet, it was dark ["night time"], the suspect's van "was speeding", and a good portion of the driver's head and face was covered/obstructed. **anti pp. 35-36.** Thus, a more disturbing aspect of Robles's testimony lies in the fact that he had absolute amazing abilities to identify every aspect of the scene while he had a window of "only" 3 to 4 seconds to observe. in this regard, Robles gave the following description of the van, the suspects, and also described what his father was doing as the suspects "sped by". He described all of the following:

1) A white van **"with wood paneling"**.
2) Driver's **door missing** the **wood paneling.**
3) **Wheels** of the van appeared to be stock.
4) **Windows** of the van **were tinted.**
   (see 2 RT. 938-939)[13]
5) The passenger **was wearing a long black hooded sweat-shirt** with the **hood of the shirt up.**
6) Driver **was wearing a long sleeved black hooded sweat-shirt** with the hood of the shirt down.
7) Robles's attention was also focused on what his father was doing at the time the suspect's

---

[13] Exhibit "M" p. 36 of Amended Petition proves and show that Robles described all that is stated he described. For all of the reasons stated in the previous footnotes, the record should be expanded to include all Exhibit referenced to. To insure Petitioner's substantive and Procedural Due process rights are not -- violated, to seek the "truth and accurate" facts, and because Habeas Corpus Rule 7(a) has not been changed.