Case 2:10-cv-02343-VBF-RNB    Document 82-3    Filed 09/12/12    Page 1 of 40    Page ID #:1498

that shocks the conscience. **(Rochin v. California, 342 U.S. 165, at 172 [72 S.Ct. 205, at 209, 96 L.Ed 183], (1952)**, or government conduct that interferes with the rights implicit in the concept of ordered liberty. **(Palko c. Connecticut, 302 U.S. 319, 325-326 [58 S.Ct. 149, 152, 82 L.Ed 288], (1937).).** When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a "fair manner". **(Mathews v. Eldridge, 424 U.S. 319, at 335 [96 S.Ct. 893, at 903, 47 L.Ed.2d 18], (1976).).** This requirement has traditionally been referred to as **Procedural Due Process. (United States v. Salerno, 481 U.S. 739, at 746, 107 S.Ct. 2095, at 2101, 95 L.Ed.2d 697, (1987).).**

　　In the case at bar, Petitioner contends and submits that, amongst reasonable jurist, it would be shocking to the conscience for the court to completely disregard and not expand the record to include evidence and information [such as the exhibits  referenced to by petitioner] that proves or aids in proving matters regarding this case, this is especially so when it is the goal of the court to seek the truth and accuracy in cases. **(Rochin v. California, supra, at 172).** Habeas Corpus **Rule 7** has not been supplanted but was instead left intact to function as it always has alongside the revised § 2254, consequently, "Petitioner can call upon the Court to exercise it's authority under **Rule 7** to expand

the record"....of Rules governing 2254 cases. (McNair v.
Haley, 97 F.Supp.2d 1270, at 1284, 1286 (M.D. Ala. 2000).).

Regarding the issues on which Certificate of Appealability
is sought, in addition to the issues that follow on the
following -pages, petitioner believes it was also error for
the court not to consider that in which is labeled as Ground
19. This is so because the Magistrate Court previously ruled
that the said Ground **"related back"** to the original filing.
**(see Document 21, Report & Recommendation, pp. 11-14).** Thus,
the Court should also consider whether it was error for the
Magistrate/District Court to not rule on the said Ground after
the granting of an evidentiary hearing on Ground 19.

Furthermore, in a motion filed to the Magistrate Court by
petitioner [Motion Requesting an Order of Postconviction
Discovery] dated January 1, 2011, the court denied said motion
"as premature". Thus, in addition to the issues on which
COA is sought, is to determine when would such motion become
**"mature"** for granting. Petition presented good reason for
the need for the information sought. The Motion was not denied
as without merit, thus, this honorable Court should address the
issue.

122.

## XI.

IF THIS HONORABLE COURT AFFIRMS THE FINDINGS OF THE MAGISTRATE JUDGE, PETITIONER APPLY'S FOR A CERTIFICATE OF APPEALABILITY FROM THE DISTRICT COURT...

## ISSUES ON WHICH CERTIFICATE OF APPEALABILITY IS SOUGHT

### Issue # 1

Whether the Magistrate/District Court erred in adopting the the mistated, incorrect facts, facts not supported by the record, from the State Court, and whether it was error for the Magistrate and/or District Court to ignore many Material facts supporting Petitioner's Claims.

### Issue # 2

Whether The Magistrate/District Court erred in failing to grant relief regarding Petitioner's Claims of the introduction of false and misleading testimony by the prosecution, and whether it was error in failing to grant relief **under the totality of the circumstances** surrounding the introduction of the false and misleading testimony, taking into consideration how the "totality of the circumstances" impact the other witnsses.

### Issue # 3

Whether the Magistrate/District Court erred in concluding Petitioner's factual and Legal cliam of the presentation of false evidence within the purview of Penal Code § 1473 was beyond the scope of AEDPA.

### Issue # 4

Whether Petitioner's Right to a Fair Trial was denied by the prosecution's use of false evidence that was material to the issue of guilt, under the totality of the circumstances of this case, and whether the District Court erred in failing to grant relief.

### Issue # 5

Whether Trial Counsel was ineffective for failing to conduct a pretrial investigation into Renteria's ability to see the driver of the suspect's van and failing to investigate and produce evidence -------- that Renteria could not have seen under the circumstanes she described, which impacted Jesse Robles's testimony that he was able to see with the aid of Renteria's headlights, and whether it was error in the District Court failing to consider trial counsel's failures "cumulatively", and further, whether the District Court erred in failing to grant relief.

### Issue # 6

Whether the Magistrate/District Court erred in concluding no prejudice occurred and relief is not warrented with respect's to petitioner's claims arising from the jury's exposure to informaion regarding petitioner's prior arrest and criminal history, taking into consideration, the evidence is not so overwhelming so as to rebut the prejudice arrising from the errors in this case.

### Issue # 7

Whether the District Court erred in concluding petitioner's Claim in Ground Four(4) was not cognizable on federal habeas corpus.

### Issue # 8

Whether the Magistrate/District Court erred in failing to grant relief regarding ground seven(7), where there was prosecutorial misconduct due to the prosecutor's placement before the jury of the unredacted information regarding petitioner's arrest and criminal history, "coupled with" the prosecutor's repeated reference to petitioner having been booked during the examination of Deputy Meralla, in violation of petitioner's Due Process Right.

### Issue # 9

Whether the Magistrate/District Court erred in failing to consider the cumulative impact of Trial Counsel's failures, and was counsel Ineffective surrounding his failures regarding the jury's exposure to inadmissible and prejudicial information concerning petitioner's prior arrest and criminal history, and the other instance where the jury was exposed to petitioner having been booked/arrested.

### Issue # 10

Whether the Magistrate/district Court erred in even subjecting the error regarding the Jury's exposure to petitioner's criminal history **"during deliberation"** to harmless error analysis, in light of the fact that the error occurred "during deliberation".

### Issue # 11

Whether the Magistrate/District Court erred in failing to grant an evidentiary hearing regarding petitioner's claims under the circumstances of this case.

### Issue # 12

Whether the Magistrate/District Court erred in failing to expand the record to include the exhibits referenced to by petitioner in the Amended Petition, Petitioner's Traverse, and this Objection and Request for Certificat of Appealability.

## LEGAL STANDARD FOR ISSUANCE OF COA

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides that, in order to take an appeal from a final order denying habeas corpus, a Certificate of Appealability must be obtained from a Circuit Justice or from the district court Judge. **28 U.S.C. sec. 2253, subd. (c)(1).**

In order to obtain a COA, the petitioner need only demonstrate a substantial showing of the denial of a constitutional right. 28 U.S.C. sec 2253(c)(2). However, the petitioner need not show that he would prevail on the merits. **(Lambright v. Stewart, 220 F.3d 1022, 1025 (9th Cir.2000) (en banc) ["...[O]bviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor"]**. Rather, the petitioner is merely required to make a "modest showing" **(Lambright, supra, at 1025)** that "reasonable jurist would find the district court's assessment of the constitutional claims debatable or wrong". **(Slack v. McDaniel, 529 U.S. 473, 484 (2000).)**. As explained by the Ninth Circuit in **Jennings v. Woodford, 290 F.3d 1006, (9th Cir. 2002)**, the substantial showing standard required for COA is **"relatively low". Id., at 1011, citing Slack, supra.** Hence, a COA must issue if any of the following apply: (1) the issues are debatable among reasonable jurists; (2) another court could resolve the issues differently; or (3) the questions raised are adequate enough to encourage the petitioner to proceed further. Finally, "The Court must resolve doubt about the propriety of a COA in the petitioner's favor". **(Jennings, supra, citing Lambright, supra, at 1025)**.

The test regarding the granting of a COA is met where the petitioner makes a showing that "the petition should have been resolved in a different matter or that the issues presented were 'adequate to deserve encouragement to proceed further'. **(Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, at 1039,**

**citing Barefoot v. Estelle, 463 U.S. 880 (1983).).** This means that the petitioner does not have to prove that the district court was necessarily "wrong"--just that its resolution of the constitutional claim is "debatable":

> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail. As we stated in **Slack**, where a district court has rejected the constitutional claims on the merits, the showing required to satisfy sec. 2253(c) is straight-forward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

From all of the aforesaid, and petitioner's arguments within the Objection and Request for COA, petitioner belives that honorable court does not wish to reverse the findings of the Magistrate in this matter, he should be entitled to a COA.

Note, regarding whether the District court erred in failing to consider the "cumulative prejudice" of Trial Counsel's deficiencies see **Silva v. Woodford, 279 F.3d 825, at 834, 836, (C.A.9(Cal.)2002).**

127.

## CONCLUSION

Due to all of the argument presented in petitioner's Amended Petition, Traverse, and this Objection, it is believed that the Magistrate erred in its ruling. In order to decide the prejudice caused by the errors complained of by petitioner which obviously encroached upon his right to receive a fair and impartial trial as envisioned by the United States and California Constittutions, this Honorable Court should order an evidentiary hearing within the purview of **Habeas Corpus Rule 8** in order to obtain a more complete record of the constitutional problems currently faced by petitioner. In fact, petitioner believes, if he does not receive said evidentiary hearing allowing him to be in a far better position to present to the court the core of said errors, then petitioner will indeed be denied **Due Process.**

Dated  9/9/2012

Respectfully Submitted,

*Jofama Coleman*

[Jofama Coleman]

In Pro Per.

128.

## **"VERIFICATION"**

I, JOFAMA COLEMAN, state:

I am the petitioner in this action. I have read the foregoing/aforesaid OBJECTIONS AND REQUEST FOR CERTIFICATE OF APPEALABILITY, and the facts stated therein are true and correct of my own knowledge.

I declare under the penalty of perjury under the laws of the State of California that the foregoing/aforesaid is true and correct and that this declaration was executed on September __9th__, 2012, at CSATF/State Prison at Corcoran; P.O. Box 5242; Corcoran, CA. 93212.

/s/ _Jofama Coleman_

[JOFAMA COLEMAN],

In Propria Persona...

129.

CDCR# V-27659
CSATF/State Prison @ Corcoran
P.O. Box 5242
Corcoran, CA. 93212

[In Propria Persona]...


### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA


| | |
|---|---|
| JOFAMA COLEMAN,                      )<br>          (Petitioner),)<br>                )<br>   Vs.              )<br>                )<br>KATHLEEN ALLISON,                    )<br>         (Respondent).)<br>_____) | Case No. <u>CV-10-2343-AHM (RNB)</u><br><br>**PROOF OF SERVICE** |

I, the undersigned, hereby declare that I am a party to the above action, over the age of 18 years, and a citizen of the United States.

On the <u>9th</u> day of September, 2012, I caused the following identified legal instrument to be served:

**PETITIONER'S OBJECTIONS TO THE MAGISTRATE'S PARTIAL REPORT AND RECOMMENDATION DATED June 21, 2012, AND APPLICATION FOR A CERTIFICATE OF APPEALABILITY**

By placing a true and correct copy of said legal instrument in an envelope addressed to the person(s) whose name(s) appear below with postage prepaid, then surrendering said envelope to a California Correctional Officer stationed at the CSATF/State Prison at Corcoran, California to be processed into the United States Postal Delivery System pursuant to established prison regulation for prompt delivery:

| | |
|---|---|
| DAVID E. MADEO<br>(Deputy Attorney General)<br>300 South Spring Street<br>   Suite, 1702<br>Los Angeles, CA. 90013 | UNITED STATES DISTRICT COURT<br>  CENTRAL DIST. OF CALIFORNIA<br>Santa Ana, CA. 92701-4516<br><br>411 W. FOURTH St. |

I declare under the penalty of perjury that the foregoing is ture and correct.

Declarant   *Jofama Coleman*

EXHIBIT  "A"

EXHIBIT "A"

EXHIBIT "A"

EXHIBIT  "A"

EXHIBIT A

1








4



5

Renteria's
vehicle



STATE OF CALIFORNIA COUNTY OF LOS ANGELES

TYPE OF HEARING __T__

CASE NO. YA 06467 7-01

P202            EXH. NO 61

ADMITTED IN EVIDENCE

DATE ___2-2-02___

BY: _____ , DEPUTY

6

EXHIBIT    "B"

EXHIBIT    "B"

EXHIBIT    "B"

EXHIBIT    "B"

1    I Jofama Coleman declare the
2  following :

3

4    I am the defendant currently housed
5  at CSATF/STATE PRISON, P.O. Box 7100.
6  CORCORAN, CA. 93212. Patricia Ihara,
7  P.M.B # 139 is counsel for appellant.
8    The statement below is true and
9  correct to the best of my knowledge.

10

11   I descovered through Abel Soto that
12  in his second trial the prosecutor
13  introduced evidence that contained
14  impeachment value in regards to the
15  testimony and identification of Ms.
16  Renteria. The material was that of a
17  large truck blocking her view.
18  I had a verbal conversation with
19  trial attorney Ronald White in
20  regards to this issue.. His response
21  was to the following affect.
22  "I did not follow Abel's case, If
23  theres an issue with the D.A not
24  handing over evidence then thats something
25  for your appeal".
26    I declare under penalty of perjury
27  that the foregoing is ▓▓▓ true and
   Correct.

              Executed on this day 7.29.2008
at CSATF.                    Jofama Coleman

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV 3-95)
OSP 98 10924

**EXHIBIT B**

EXHIBIT "C"

EXHIBIT "C"

EXHIBIT "C"

EXHIBIT "C"

## DECLARATION OF RONALD WHITE, ESQ.

I, RONALD WHITE, declare as follows:

1.    I am an attorney at law duly admitted and licensed to practice before courts of this State.  I was trial counsel for Jofama Coleman in Superior Court Case No. YA059765.

2.    The facts contained herein are true of my own knowledge and if called as a witness I could testify competently thereto.

3.    The prosecution's witness Maria Renteria told the police she was parking her car when the shooting occurred in the street.  She saw the driver of the van and the shooter but was unable to pick Mr. Coleman's photo out from the photo line-up.

4.    When Ms. Renteria testified at trial, she said Mr. Coleman looked like the van driver.  Her identification testimony was unexpected.

5.    Abel Soto's trial took place after Mr. Coleman's trial.  When Mr. Coleman informed me that Ms. Renteria's testimony was impeached at Mr. Soto's trial – she was parked much farther away from the van and behind a large truck that would have obstructed her view – I told him it would help his appeal.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 22nd day of July 2008 at Gardena, California.

_Ronald White_
Ronald White

## EXHIBIT C

EXHIBIT "D"

EXHIBIT "D"

EXHIBIT "D"

EXHIBIT "D"

## DECLARATION OF PATRICIA IHARA, ESQ.

I, PATRICIA IHARA, declare as follows:

1.     I am an attorney at law duly admitted and licensed to practice before courts of this State. I was appointed to represent petitioner Jofama Coleman in his appeal from his conviction in Court of Appeal Case B202597, Superior Court Case No. YA059765.

2.     The facts contained herein are true of my own knowledge and if called as a witness I could testify competently thereto.

3.     I went to the Google homepage and clicked on maps. I typed the Robles's address [1115 W. 101st Street, Los Angeles, CA] into the search box. I then clicked on "street view." Using copies of People's Exhibits 6, 9, 58 and 59 from Abel Soto's trial, I located the Robles house. I then clicked on the white arrow and moved the street view west. I found the location where the victim was shot.

I also typed in the address across the street from the Robles house [1117 W. 101st Street, Los Angeles, CA] into the search box. I then clicked on "street view." This street scene shows the location of the street lamp on the south side of the street.

4.     I then went to the Los Angeles county assessor maps at http://maps.assessor.lacounty.gov and typed into the search box the intersection of Budlong and 101st Street. Exh. F is a true and correct copy of the plot maps showing the length and width of the lots. I compared the plot map to the "street view" on Google maps and the assessor records. I determined that lot 13 is where the Robles house was located. According to Sergeant Katz, Jose Robles was killed on the west perimeter of lot 15. The plot map shows that if Renteria was parked on the west perimeter of lot 13 and Jose Robles was shot at the west perimeter of lot 15, the closest distance between Renteria's vehicle and the white van would have been 128 feet.

## EXHIBIT D

5.    I found a website that shows what a person could see in the daylight at 100 feet at www.prisonpolicy.org/zones/thousand_ feet.html. Exhibit G is a true and correct copy of the 100 feet photo from that website.

6.    I also conducted an investigation on what a normal person would be able to see at night.

Around 9:00 p.m., on August 12, 2008, I parked my car by a sidewalk on a straight road and had another person drive on the wrong side of the road facing me at a distance of about five car lengths away. There were street lamps on both sides of the street between the other car and my car. I could not see the face of the driver of the car at all when both vehicles had the headlights on.

7.    When the driver turned his headlights off, I still could not see his face because my headlights did not illuminate the interior of his vehicle at that distance.

8.    I had the driver turn on the interior lights of his car. I could not see his face well.

9.    I measured off 100 feet. I had someone stand *in the daylight* 100 feet away from me. I could not make out his facial features clearly from that distance.

10.    Before I did this investigation, I had no idea how far away 100 feet is or what is visible at that distance. However, several people I know who have participated in sports, taught children in school, or dealt with real estate, say they know how far 100 feet is between two points. It is my belief that had trial counsel presented evidence that Renteria was 128 feet away from the white van, it would have been within the common knowledge and experience of some of the jurors that it is physically impossible to get a good look at a person's face at that distance in any type

2

of light with normal vision.  However, it would have been better to show
the jury what is visible at 100 feet.

11.    Exhibit A is a true and correct copy of photographic exhibits
from Abel Soto's trial.  On Exhibit A 2 (People's Exh. No. 9) Sergeant
Katz marked the location where Jose Robles was shot with a "v"
surrounded with a circle.  Because the mark was not visible on the copy, I
marked it with a light colored sticker.  I have requested transmission of the
original exhibits to the Court of Appeal.

12.    Exhibits B and C are true and correct copies of the
declarations I received from Jofama Coleman and Ronald White, Esq.
Exhibit E are pages from the reporter's transcript of Abel Soto's trial
proceedings.  I did not renumber those pages because the original page
numbering will facilitate comparison with the original.  I have omitted
pages 1829 to 1844 from Sergeant Katz's testimony.

14.    At my request, Mr. White sent me part of his trial file.  I did
not find any photos of the crime scene in the file.  I sent two letters to Mr.
White asking him if the prosecution provided the defense with crime scene
photos of the vehicles in the area of the shooting.  I have not received a
response to this question yet.

I declare under penalty of perjury under the laws of the State of
California that the foregoing is true and correct.

Executed on this 15th day of August, 2008 at Irvine, California.

Patricia Ihara

EXHIBIT   "E"

EXHIBIT   "E"

EXHIBIT   "E"

EXHIBIT   "E"

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

```
-------------------------------------------)
THE PEOPLE OF THE STATE OF CALIFORNIA,     )
                                           )
                 PLAINTIFF-RESPONDENT,     )
                                           )
            VS.                            )  SUPERIOR COURT
                                           )  NO. YA 064697
ABEL SOTO,                                 )
                                           )
                 DEFENDANT-APPELLANT.      )  NOV 2 8 2007
-------------------------------------------)
```

APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY

HONORABLE FRANCIS J. HOURIGAN, JUDGE PRESIDING

REPORTERS' TRANSCRIPT ON APPEAL

TUESDAY, AUGUST 7, 2007

APPEARANCES:

FOR PLAINTIFF-RESPONDENT: EDMUND G. BROWN, JR.
                          STATE ATTORNEY GENERAL
                          300 SOUTH SPRING STREET
                          NORTH TOWER, SUITE 1701
                          LOS ANGELES, CALIFORNIA 90013

FOR DEFENDANT-APPELLANT:  IN PROPRIA PERSONA

VOLUME 4 OF 5
PAGES 1501 THROUGH 1676/1800, INCL.



                          DENISE K. NAGAO, CSR NO. 7722
                          OFFICIAL REPORTER

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

**EXHIBIT E**



1   SWORN.

2

3                        MARIA RENTERIA,

4   CALLED AS A WITNESS BY THE DEFENSE, WAS SWORN AND

5   TESTIFIED AS FOLLOWS:

6          THE CLERK:  DO YOU SOLEMNLY STATE THAT THE

7   TESTIMONY YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE

8   THIS COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND

9   NOTHING BUT THE TRUTH, SO HELP YOU GOD?

10         THE WITNESS:  YES, I DO.

11         THE CLERK:  PLEASE BE SEATED IN THE WITNESS BOX.

12             ADJUSTING THE MICROPHONE, PLEASE STATE THEN

13  SPELL BOTH FIRST AND YOUR LAST NAME.

14         THE WITNESS:  MARIA, M-A-R-I-A.

15             RENTERIA.  R-E-N-T-E-R-I-A.

16    THE CLERK:  THANK YOU.

17    THE COURT:  MR. YOUNG.

18

19                    DIRECT EXAMINATION

20  BY MR. YOUNG:

21    Q      GOOD AFTERNOON, MISS RENTERIA.

22    A      GOOD AFTERNOON.

23    Q      I'D LIKE TO DIRECT YOUR ATTENTION BACK TO

24  THE DATE OF MAY 10TH, 2003.  YOU REMEMBER THAT DATE AND

25  THE INCIDENT THAT OCCURRED THAT NIGHT?

26    A      YES.

27    Q      DID THE INCIDENT THAT YOU REMEMBER -- THAT

28  NIGHT, DID THAT HAPPEN IN THE DAYTIME OR THE NIGHTTIME?

1803

```
1       A        THE NIGHTTIME.

2       Q        WAS IT LIGHT OR DARK?

3       A        IT WAS ALREADY KIND OF DARK.

4       Q        IT WAS ALREADY DARK.

5                WHERE DID YOU LIVE AT THAT TIME?

6       A        BEHIND THE ROBLES.  I WAS RENTING.  FROM

7   THE ROBLES.

8       Q        YOU LIVED BEHIND THE ROBLES' HOUSE?

9       A        YES.

10      Q        ON THE SAME PROPERTY?

11      A        THE SAME PROPERTY.

12      Q        BUT IN ANOTHER DWELLING?

13      A        YES.

14      Q        WAS THAT AT 1115 101ST STREET?

15      A        YES.

16      Q        DID YOU ARRIVE AT THAT SCENE AFTER DARK

17  THAT NIGHT?

18      A        YES.

19      Q        AND WHAT WERE YOU DRIVING?

20      A        BROWN ASTROVAN.

21      Q        BROWN ASTROVAN?

22      A        LIGHT BROWN AND BURGUNDY.

23      Q        WHERE HAD YOU BEEN BEFORE THEN?

24      A        FROM WORK.

25      Q        SO YOU WERE COMING HOME FROM WORK?

26      A        YES.

27      Q        DID YOU PARK THE CAR?  AT ALL?

28      A        YES.
```

```
 1          Q       WHERE DID YOU PARK IT?

 2          A       PAST THE ROBLES.   PAST THEIR DRIVEWAY.

 3          Q       WAS THAT ON THE STREET, THEN?

 4          A       YES.   IT WAS.

 5          Q       YOU PARKED IT ON 101ST STREET PAST THE

 6   DRIVEWAY?

 7          A       YES.

 8          Q       OF THE ROBLES' RESIDENCE?

 9          A       YES.

10          Q       SO THAT WOULD BE TOWARDS BUDLONG STREET; IS

11   THAT RIGHT?

12          A       YES.

13          Q       HAD YOU GOTTEN OUT OF THE CAR, YET?   OUT OF

14   THE VAN BEFORE SOMETHING HAPPENED THAT ATTRACTED YOUR

15   ATTENTION?

16          A       NO.

17          Q       DID YOU STILL HAVE THE LIGHTS ON?

18          A       YES.

19          Q       WHAT DID YOU SEE THAT ATTRACTED YOUR

20   ATTENTION THAT NIGHT?

21          A       WHEN A CAR TURNING -- LIKE WAS DRIVING, AND

22   WAS DRIVING ON THE WRONG SIDE OF THE STREET.   AND HAD

23   TURNED OFF THEIR LIGHTS.

24          Q       WAS THIS DRIVING ON 101ST STREET?

25          A       YES.

26          Q       AND WAS THAT CAR GOING AWAY FROM YOU, OR

27   COMING TOWARDS YOU?

28          A       TOWARDS ME.
```

1805

```
1          Q       SO IT WAS COMING TOWARDS YOU, LIGHTS OFF,
2    ON THE WRONG SIDE OF THE STREET?
3          A       YES.
4          Q       DID THAT ATTRACT YOUR ATTENTION?
5          A       YES.
6          Q       WHAT DID YOU SEE HAPPEN?
7          A       THE VAN, THE VAN PULLED -- STOPPED.  AND
8    THE PASSENGER GOT OUT OF THE CAR.  AND WALKED TOWARDS --
9    THE CAR, AND STARTED SHOOTING.
10         Q       WELL, LET'S GO BACK A LITTLE BIT.
11                 THIS WAS A VAN THAT WAS COMING DOWN THE
12   STREET?
13         A       YES.  IT WAS A WHITE VAN.
14         Q       THE PASSENGER GOT OUT OF WHICH SIDE OF THE
15   CAR?
16         A       OF THE PASSENGER SIDE.
17         Q       PASSENGER SIDE.
18                 AND DID HE GO IN FRONT OR IN BACK OF THE
19   VAN?
20         A       IN FRONT OF THE VAN.
21         Q       NOW, THE FRONT OF THE VAN WAS FACING
22   TOWARDS YOU?
23         A       YES.
24         Q       SO HE THEN WALKED IN FRONT OF WHERE YOU
25   WERE SOME FEET AWAY?
26         A       YES.
27         Q       ABOUT HOW FAR AWAY FROM THE VAN WERE YOU
28   WHEN THAT MAN GOT OUT OF THAT VAN?
```

1806

```
 1        A        FROM -- ABOUT HERE TO -- THE END OF THE

 2   WALL.

 3        Q        WELL, NOW, THERE'S A WALL HERE WHERE I'M

 4   STANDING.  THERE'S A WALL HERE WHERE I'M POINTING TO

 5   WHERE THE DOOR OPENS.  AND THERE'S THE BACK WALL HERE.

 6        A        THE BACK WALL.

 7        Q        THE BACK WALL.

 8        THE COURT:  ALL RIGHT.

 9                  FOR THE RECORD, FROM THE WITNESS BOX TO THE

10   BACK WALL IS APPROXIMATELY 35 FEET.

11        Q        BY MR. YOUNG:  SO YOU WERE A LITTLE OVER

12   TWO CAR LENGTHS AWAY?

13        A        YES.

14        Q        AND WHAT DID YOU SEE THAT PASSENGER DO?

15        A        HE STARTED SHOOTING.

16        Q        DID THAT PASSENGER HAVE A HANDGUN, OR A

17   RIFLE?

18        A        A HANDGUN.

19        Q        DID YOU REMEMBER WAS IT A RIGHT HAND OR

20   LEFT HAND THAT HE USED?

21        A        I JUST -- WHEN HE --

22        Q        IF YOU DON'T REMEMBER, SAY YOU DON'T

23   REMEMBER.  ANSWER ONLY WHAT YOU REMEMBER.

24        A        I DON'T REMEMBER.

25        Q        WHAT WAS THAT PERSON SHOOTING AT?

26        A        AT FIRST, I THOUGHT HE WAS SHOOTING AT

27   THE -- THE WAY HE WAS IN FRONT OF THE CAR; THEN HE WAS

28   SHOOTING INTO THE CAR -- AT CHINO AS THEY'RE WALKING.
```

1807

```
 1        Q       ALL RIGHT.

 2                CHINO WAS WALKING?

 3        A       WALKING.

 4        Q       DO YOU KNOW WHO CHINO IS?

 5        A       YES.

 6        Q       WHO IS CHINO?

 7        A       HE'S THE FATHER, WELL, THE -- HE'S THE

 8  GRANDSON OF THE PEOPLE, OF THE ROBLES I WAS RENTING

 9  FROM.

10        Q       SO HIS NAME LAST NAME IS ROBLES?

11        A       YEAH.

12        Q       WERE YOU RENTING FROM HIS GRANDPARENTS?

13        A       YES.

14        Q       DO YOU KNOW, DOES JOSE ROBLES -- DOES THAT

15  SOUND LIKE HIS REAL NAME?  OR DID YOU KNOW HIS REAL

16  NAME?

17        A       WELL, I MEAN, I JUST ALWAYS KNOWN HIM AS

18  CHINO.

19        Q       SO THIS MAN WHO GOT OUT OF THE VAN WAS

20  SHOOTING AT CHINO?

21        A       YES.

22        Q       WHAT DID YOU DO?

23        A       I WAS JUST, I WAS JUST IN SHOCK.  I WAS

24  JUST -- COULDN'T BELIEVE --

25        Q       COULDN'T BELIEVE IT WAS HAPPENING IN FRONT

26  OF YOU?

27        A       YES.

28        Q       HOW MANY SHOTS, DO YOU RECALL?
```

1808

```
1         A        TOTAL, BETWEEN 15, 17 SHOTS.
2         Q        DID YOU GET A GOOD ENOUGH LOOK AT THE
3    SHOOTER TO GIVE US A DESCRIPTION?
4         A        YES.
5         Q        WHAT DID THE SHOOTER LOOK LIKE?
6         A        HE WAS BLACK.
7         Q        BY BLACK, YOU MEAN AFRICAN AMERICAN?
8         A        YES.
9         Q        DO YOU KNOW WHAT AFRICAN AMERICANS LOOK
10   LIKE?
11        A        BLACK.
12        Q        ABOUT HOW TALL?  I'M SAYING -- I'M ASSUMING
13   IT WAS A MALE.  WAS IT A MALE OR FEMALE?
14        A        MALE.
15        Q        ALL RIGHT.
16                 ABOUT HOW TALL, IF YOU CAN GIVE AN
17   ESTIMATE?
18        A        WELL -- MAYBE A LITTLE BIT TALLER THAN YOU.
19        Q        TALLER THAN I AM?
20        A        UH-HUH.
21        Q        IF I TOLD YOU I WAS 5 FEET 10 AT MY BEST,
22   BEFORE I START TO SHRINK?
23        A        AROUND.
24        Q        TALLER THAN 5 FEET 10 IS WHAT YOU'RE
25   SAYING?
26        A        SOMEWHERE AROUND THERE.
27        Q        5 FEET 10 OR TALLER?  ARE YOU SAYING
28   TALLER, OR THE SAME --
```

1809

1      A      AROUND THE SAME HEIGHT.

2      Q      AND HOW WOULD YOU DESCRIBE THE BUILD OF THE

3  PERSON?

4      A      MUSCULAR.  STOCKY.  LIKE -- HEAVY BUILT.

5      Q      HEAVY BUILT.  YOU SAID MUSCULAR.

6              WHAT MADE YOU THINK OF MUSCULAR?

7      A      LIKE HE WORKS OUT.  LOOKED LIKE HE WORKS

8  OUT.

9      Q      YOU'RE POINTING TO YOUR SHOULDERS, MOVED

10  YOUR ARMS?

11      A      LIKE STOCKY BECAUSE --

12      Q      TRY NOT TO TALK AT THE SAME TIME.  I'LL TRY

13  NOT TO TALK AT THE SAME TIME.

14              I SAW YOU MOVE YOUR SHOULDERS UP AND YOUR

15  ARMS UP.  WHAT DID YOU MEAN BY THAT?

16      A      STOCKY.  LIKE THEY WORK OUT.  THE WAY THEIR

17  BODIES -- LIKE BUFF.

18      Q      BUFF?

19      A      YES.

20      Q      AND WHEN YOU DID YOUR ARMS UP AND YOUR

21  SHOULDER, DO YOU MEAN THEY LOOKED LIKE HE HAD WORKED

22  OUT, SOME TYPE OF WORKOUT, AND HE WAS MUSCULAR IN THAT

23  AREA?

24      A      FROM HIS SHOULDERS, THE PART RIGHT HERE,

25  YES, IT DID.

26      THE COURT:  THE WITNESS TOUCHED THE TOPS OF HER

27  SHOULDERS.

28      THE WITNESS:  JUST BUFF, LIKE -- JUST BIG.

1810

1        Q        BY MR. YOUNG:  AND DID HE HAVE ANYTHING ON

2   HIS HEAD?

3        A        BLACK BEANIE.

4        Q        A BLACK BEANIE?

5        A        YES.

6        Q        DID HE HAVE ANY COVERING?  WAS HE WEARING

7   ANY TYPE OF A SHIRT OR JACKET?

8        A        HE WAS WEARING A -- DARK FLANNEL.

9        Q        DARK FLANNEL?

10       A        YES.

11       Q        DO YOU RECALL THE PANTS?

12       A        NO, NOT REALLY.

13       Q        WELL, DO YOU RECALL IF THE PANTS WERE WHITE

14  OR DARK, OR --

15       A        THEY WERE NOT DARK.  MORE LIKE -- I JUST

16  REMEMBER JUST FOCUSING FROM THE WAIST UP.

17       Q        YOU FOCUSED FROM THE WAIST UP.

18                NOW, IS IT TRUE THAT YOU WERE A WITNESS FOR

19  THE PROSECUTION IN THE CASE OF JOFAMA COLEMAN?

20       MS. BARNES:  OBJECTION, RELEVANCE.

21       THE WITNESS:  YES.

22       THE COURT:  OBJECTION SUSTAINED.

23                THE ANSWER IS STRICKEN.

24                THE JURY IS TO DISREGARD THE ANSWER.

25       MR. YOUNG:  I'LL REPHRASE THAT.

26       Q        DID YOU SEE THE DRIVER OF THE CAR?

27       A        I SEEN THE DRIVER WHEN -- THEY GOT CLOSER.

28  WHEN THEY PASSED.  DROVE PAST ME.

1811

```
1        Q        WAS THIS AFTER THE SHOOTING, THEN?

2        A        YES.

3        Q        SO EXPLAIN HOW THAT HAPPENED.

4        A        AFTER -- AFTER -- THE SHOOTING TOOK PLACE,

5   HE GOT BACK IN THE CAR, HE WENT IN FRONT OF THE CAR, AND

6   GOT BACK INSIDE.  AND THEY DROVE PAST ME.

7                 I ONLY LOOKED AS -- LIKE BEFORE -- HOW CAN

8   I EXPLAIN.  WE LIKE UP TO HERE, MAYBE, THEN I TURNED

9   AWAY.

10            THE COURT:  ALL RIGHT.

11                AGAIN YOU POINTED AT SOMETHING.

12            THE WITNESS:  LIKE UP TO --

13            THE COURT:  POINTED ABOUT TWO FEET AWAY.

14        Q        BY MR. YOUNG:  WHY DID YOU TURN AWAY AFTER

15   LOOKING AT THE DRIVER?

16        A        BECAUSE I HAD MY KIDS IN MY CAR, AND I WAS

17   SCARED.  I DIDN'T WANT THEM TO KNOW I HAD SEEN WHAT THEY

18   DID.

19        Q        YOU DIDN'T WANT THE DRIVER TO SEE YOU

20   STARING AT HIM?

21        A        YES.

22        Q        DID YOU SEE ENOUGH OF THE FACE OF THE

23   DRIVER TO RECOGNIZE HIM?

24        A        YEAH.

25        Q        DID YOU IDENTIFY THE DRIVER AT A LATER

26   DATE?

27        A        YES.  AT THE TRIAL.

28        Q        YOU WERE YOU ASKED TO GIVE A DESCRIPTION OF
```

1812

```
 1    THE SHOOTER ALSO?
 2         A      YES.  I THINK -- I CAN'T REMEMBER.
 3         Q      DID YOU EVER -- YOU TALKED TO POLICE
 4    OFFICERS?
 5         A      YES.
 6         Q      AND DID YOU GIVE A DESCRIPTION OF THE
 7    SHOOTER TO THE POLICE OFFICERS?
 8         A      YES, I DID.
 9         Q      AND DID YOU TELL THEM THAT THE SHOOTER WAS
10    AFRICAN AMERICAN?
11         A      YES, I TOLD THEM HE WAS BLACK.
12         Q      NOW, DO YOU KNOW ABEL SOTO?
13         A      NO.
14         Q      HAD YOU EVER SEEN HIM BEFORE?
15         A      NO.  JUST HERE.  IN TRIAL.
16         Q      JUST IN THE COURT PROCEEDINGS?
17         A      YES.
18         Q      DO YOU KNOW RUDY ROBLES?
19         A      YES.
20         Q      AND WHO IS RUDY ROBLES?
21         A      JOSE'S FATHER.
22         Q      WAS HE THE ONE YOU RENTED FROM?
23         A      NO.  HIS MOTHER.
24         Q      I'M GOING TO SHOW YOU A COUPLE PHOTOGRAPHS.
25    THEY'RE MARKED FOR EXHIBITS AS 6 AND 9.  THIS IS NUMBER
26    6.  ITS SHOWS SOME CARS ON A STREET.
27               DO YOU RECOGNIZE THAT STREET SCENE AT ALL?
28         A      YES.
```

1813

```
 1          Q        YOU HAVE TO SPEAK UP, MA'AM.
 2          A        YES.
 3          Q        AND IS THAT 101ST STREET THAT NIGHT?
 4          A        YES.
 5          Q        IS YOUR CAR DEPICTED ON THERE ANYWHERE?
 6          A        I DON'T SEE IT.
 7          Q        CAN YOU TELL IF THE CAR THAT YOU WERE
 8  DRIVING WAS THERE?
 9          A        I WAS THERE, BUT I DON'T SEE IT.
10          Q        OKAY.  THERE ARE SOME CARS BLOCKING THE
11  VIEW, HERE.  LOOKING AT PEOPLE'S 9, ARE ANY OF THOSE
12  CARS YOURS?
13          A        NO.
14          Q        SO THIS SUV IS NOT YOURS?
15          A        NO.
16          Q        ALL RIGHT.
17                   IN THE BACK OF THE PHOTOGRAPH, CAN YOU MAKE
18  OUT THOSE CARS, ANY OF THOSE BACK THERE TO SEE IF
19  THEY'RE YOURS?
20          A        I CAN'T TELL.
21          Q        OKAY.
22                   NOW, DO YOU THINK THAT THAT SHOOTER COULD
23  HAVE BEEN A MEXICAN OR HISPANIC PERSON?
24          A        NO.
25          Q        YOU'RE CERTAIN IT WAS AFRICAN AMERICAN?
26          A        YES.
27          Q        DO YOU HAVE AN IDEA OF THE GENERAL AGE
28  RANGE AT ALL?  AS OPPOSED TO AN OLD GUY LIKE ME, OR
```

1    MIDDLE-AGED OR YOUNGER GUY?

2         A      YOUNGER.   MAYBE -- BETWEEN 17 TO 20 YEARS

3    OLD.

4         Q      DID YOU HEAR, WAS THERE ANYTHING SHOUTED

5    OUT BEFORE THAT SHOOTING THAT YOU COULD HEAR?

6         A      NO.

7         Q      THANK YOU.

8    MR. YOUNG:  NOTHING FURTHER.

9    THE COURT:  MISS BARNES, YOU MAY CROSS-EXAMINE.

10   MS. BARNES:  THANK YOU.

11

12                   CROSS-EXAMINATION

13   BY MS. BARNES:

14        Q      HAVE YOU READ ANY OF THE POLICE REPORTS IN

15   THIS CASE?

16        A      HAVE I WHAT?

17        Q      READ THE POLICE REPORTS?

18        A      I DON'T REMEMBER.

19        Q      ARE YOU SURE THAT THE BEANIE WAS BLACK?

20        A      YES.

21        Q      WOULD IT HELP YOU REMEMBER IF YOU LOOKED AT

22   THE POLICE REPORTS TO SEE WHAT YOUR EARLIER STATEMENT

23   WAS REGARDING THE COLOR OF THE BEANIE?

24        A      I ALWAYS SAID IT WAS BLACK.

25        Q      OKAY.  SO YOU'RE SAYING THAT IF YOUR

26   STATEMENT FROM THE POLICE OFFICERS WHEN YOU FIRST TALKED

27   TO THEM, THAT IT WAS SOMEONE WITH A WHITE BEANIE AND

28   FLANNEL SHIRT, YOU'RE SAYING THAT'S WRONG?