1815

1    A    YES, IT IS.

2    Q    AND DID YOU TELL DETECTIVES THAT THE SHIRT

3    WAS TAN WITH LIGHT GRAY SQUARES, OR GREEN WITH DARK

4    BROWN SQUARES?

5    A    NO, I TOLD THEM IT WAS LIKE A BROWN SHIRT

6    WITH TAN.

7    Q    SO IF DETECTIVE KATZ WROTE THAT THE SHIRT

8    WAS TAN WITH LIGHT GRAY SQUARES, OR GREEN WITH DARK

9    BROWN SQUARES, THAT'S WRONG?

10    A    I ALWAYS SAID IT WAS BROWN CHECKERS TAN.

11    THAT'S WHAT I SAID.

12    Q    DO YOU REMEMBER WHAT COLOR THE GUN WAS?

13    A    BLACK.

14    Q    OKAY.  AND YOUR TESTIMONY IS THAT THE

15    SHOOTER GOT OUT OF THE VAN AND WALKED AROUND THE FRONT

16    OF THE VAN?

17    A    YES.

18    Q    ARE YOU SURE ABOUT THAT?

19    A    YES, I AM.

20    Q    OKAY.  SO IF THE OTHER WITNESSES TESTIFIED

21    THAT THE SHOOTER GOT OUT AND WALKED AROUND THE BACK OF

22    THE VAN, THEY'RE ALL MISTAKEN?

23    A    YES.  I SEEN --

24    Q    OKAY.  YOU WERE PARKED IN YOUR VEHICLE; IS

25    THAT CORRECT?

26    A    YES.

27    Q    AND YOUR VEHICLE IS NOT DEPICTED IN THESE

28    PHOTOGRAPHS; CORRECT?

1    THE COURT:  PERHAPS WE SHOULD MAKE A BETTER

2    RECORD, SHOW HER A PHOTOGRAPHS.

3    Q    BY MS. BARNES:  PHOTOGRAPHS 6 AND 9,

4    DEFENSE COUNSEL JUST SHOWED YOU YOUR VEHICLE, IS NOT

5    DEPICTED IN THERE?

6    A    I DIDN'T SEE IT.

7    Q    THE AREA WHERE YOU PARKED YOUR VEHICLE, IS

8    THAT DEPICTED IN THE PHOTOGRAPHS?

9    A    THE AREA WHERE --

10    MS. BARNES:  MAY I APPROACH?

11    THE COURT:  YES.

12    IF YOU'D IDENTIFY AGAIN, THE PICTURES.

13    Q    BY MS. BARNES:  THIS IS PEOPLE'S 6.  AND

14    THE SHOOTING HAPPENED OVER HERE ON THE CORNER OF THE

15    PHOTOGRAPH.  FOR THE RECORD, I'M POINTING TO THE LEFT

16    SIDE OF THE PHOTOGRAPH, IN FRONT OF THE FIRST CAR,

17    THERE.

18    AND THERE'S AN RR THERE.  THAT'S THE

19    ROBLES' RESIDENCE; CORRECT?

20    A    YES.

21    Q    THERE'S A WHAT LOOKS LIKE KIND OF A --

22    CUTLASS OR OLDSMOBILE, THEN ANOTHER CAR.  AND THEN AN

23    SUV-TYPE VEHICLE.  SO WERE YOU PARKED BEHIND THOSE THREE

24    CARS?

25    A    I WAS -- I JUST REMEMBER I WAS PARKED PAST

26    THE ROBLES.  PAST THEIR DRIVEWAY.

27    Q    OKAY.  WELL, THESE -- THIS PHOTOGRAPH WAS

28    TAKEN RIGHT AFTER THE MURDER.  AFTER THE SCENE WAS TAPED

1   OFF BY POLICE OFFICERS.

2              SO LET ME ASK YOU THIS.  DID YOU MOVE YOUR

3   CAR AFTER THE MURDER, OR DID YOU LEAVE IT THERE?

4        A      NO, I PROBABLY MOVED -- I CAN'T REMEMBER,

5   BECAUSE I WAS THERE.  AND I DON'T SEE THE CAR THERE.

6   BUT THAT'S WHERE I WAS PARKED.

7        Q      OKAY.  WELL, I DON'T WANT YOU TO GUESS.

8   AFTER THE MURDER HAPPENED, DID YOU MOVE YOUR CAR?  DID

9   YOU GO SOMEPLACE?

10       A      I CAN'T REMEMBER.

11       Q      WELL -- IT'S PRETTY IMPORTANT.

12              DID YOU STAY AND --

13   MR. YOUNG:  OBJECTION.  ARGUMENTATIVE.

14   THE COURT:  THE FIRST PORTION IS ARGUMENTATIVE.

15              PLEASE REPHRASE YOUR QUESTION.

16       Q      BY MS. BARNES:  YOU WATCHED THE SHOOTING,

17   THEN WHAT DID YOU DO?

18       A      I JUST SAT THERE.

19       Q      HOW LONG DID YOU SIT THERE?

20       A      FOR A LONG TIME.  UNTIL THEY LEFT.

21       Q      UNTIL THE SHOOTER LEFT?

22       A      YES.  UNTIL THEY DROVE PAST ME, AND THEY

23   TURNED ON VERMONT.

24       Q      THEN WHAT DID YOU DO?

25       A      ME AND MY KIDS AND MY BROTHER, WE GOT OUT

26   OF THE CAR.

27       Q      WHERE DID YOU GO?

28       A      WE WENT TO THE HOUSE.

1818

| | | |
|---|---|---|
| 1 | Q | HOW LONG DID YOU STAY AT THE HOUSE? |
| 2 | A | I DON'T REMEMBER. |
| 3 | Q | DID POLICE COME TO TALK TO YOU? |
| 4 | A | LATER ON, YES, THEY DID. |
| 5 | Q | AT YOUR HOUSE? |
| 6 | A | YES. |
| 7 | Q | DID YOU SLEEP AT YOUR HOUSE THAT NIGHT? |
| 8 | A | YES. |
| 9 | Q | DID YOU GO TO WORK THE NEXT DAY? |
| 10 | A | YES. |

11   Q    DID YOU GO TO THE STORE OR SOMETHING THAT
12 EVENING BEFORE YOU LEFT FOR WORK THE NEXT DAY?
13   A    PROBABLY -- I CAN'T REMEMBER.  I KNOW I WAS
14 GOING TO GO TO THE STORE.
15   Q    IS IT POSSIBLE YOUR CAR WAS PARKED RIGHT
16 BEFORE THE ROBLES' RESIDENCE FARTHER DOWN THE STREET,
17 AND JUST NOT SHOWN IN THE PICTURE?
18   A    NO.
19   Q    OKAY.  YOU SAID THAT YOU SAW THE SHOOTER
20 GET OUT, AND YOU SAW HIM SHOOTING AT SOMETHING.
21        DID YOU ACTUALLY SEE HIM SHOOTING AT CHINO?
22   A    AT FIRST, LIKE -- I THOUGHT HE WAS SHOOTING
23 AT THE CAR, BECAUSE HE WAS IN FRONT THE CAR, LOOKED LIKE
24 HE WAS HITTING.  BUT CHINO IS WALKING PAST.  HE WAS
25 WALKING THAT WAY TOWARDS GOING HOME.
26   Q    DID YOU SEE CHINO?
27   A    YES, I DID.
28   Q    AND IT'S YOUR TESTIMONY THAT CHINO IS

1819

1    WALKING TOWARDS --

2         A         TOWARDS, YES.

3         Q         WELL -- IF SO THE OTHER WITNESSES TESTIFIED

4    CHINO IS WALKING THE OPPOSITE DIRECTION TO GO TO THE

5    STORE, THEY WOULD BE WRONG?

6         A         YES.

7         Q         WHAT WAS CHINO WEARING?

8         A         CAN'T REMEMBER.

9         Q         OKAY.  SO YOU SAW THE SHOOTER.  WHAT DID

10   YOU SEE IN THE SHOOTER'S FACE?

11        A         HE WAS BLACK.  AND -- JUST I REMEMBER HIM

12   HAVING A LONG JHERI CURL WITH A BEANIE ON.

13        Q         SO WHEN YOU SAY JHERI CURL, DOES THAT MEAN

14   HE HAD LONGER HAIR?

15        A         LIKE -- SHOULDER LENGTH.  LIKE MAYBE UP TO

16   HERE.

17        THE COURT:  THE WITNESSES HAS PLACED HER LEFT HAND

18   JUST TO THE TOP OF HER SHOULDER, HER LEFT SHOULDER.

19        Q         BY MS. BARNES:  IT WAS CURLY?

20        A         YES.

21        Q         WAS IT WAVY, OR TIGHT CURLS?

22        A         NOT JUST -- NOT TIGHT, THE -- I MEAN --

23   JUST KIND OF -- NOT TIGHT, AND NOT LOOSE.  JUST -- I

24   DON'T KNOW.  HARD TO EXPLAIN TO YOU.

25        Q         WHAT COLOR WAS THE HAIR?

26        A         IT WAS BLACK.

27        Q         THE PERSON HAD A BEANIE; IS THAT CORRECT?

28        A         YES.

1        Q        DID THE SHIRT THE PERSON WAS WEARING, WAS

2   IT LONG-SLEEVE OR SHORT-SLEEVE?

3        A        WAS IT --

4        Q        WAS IT LONG-SLEEVE OR SHORT-SLEEVE?

5        A        HE WAS WEARING A LONG-SLEEVE FLANNEL.

6        Q        OKAY.  AND HOW MUCH OF THE PERSON'S FACE

7   DID YOU SEE?

8        A        ENOUGH THAT I CAN REMEMBER WHAT HE LOOKS.

9        Q        I UNDERSTAND THAT.  BUT I'M ASKING YOU WHAT

10  PART OF HIS FACE YOU SAW.

11       A        THE FRONT AND THE SIDE.

12       Q        OKAY.  AND WHAT MAKES YOU THINK THAT HE WAS

13  BLACK?  WHAT ABOUT -- WHAT ABOUT HIM THAT YOU SAW MADE

14  YOU THINK HE WAS BLACK?

15       A        I KNOW -- I KNOW WHEN A -- THE WAY HIS

16  FEATURES ARE, I KNOW THE WAY A BLACK PERSON LOOKS.

17       Q        HIS FEATURES, OR SKIN TONE?

18       A        BOTH.

19       MS. BARNES:  MAY I HAVE A MINUTE, YOUR HONOR?

20       THE COURT:  YES.

21

22            (A DISCUSSION WAS HELD

23            OFF THE RECORD.)

24

25       THE COURT:  IF YOU HAVE FURTHER EXHIBITS, WE'RE UP

26  TO 58.

27       MS. BARNES:  OKAY.  THANK YOU.

28            YOUR HONOR, I DO.  AND LET ME SEE, WHERE AM

1821

1    I?

2         THE COURT:   AFTER YOU MARK THEM, PLEASE SHOW THEM

3    TO MR. YOUNG.

4         MS. BARNES:   OKAY.   THESE ARE THE PART OF THE

5    ORIGINAL DISCOVERY.   BUT I'LL SHOW HIM THE ONES I'M

6    USING.   I'LL PUT A P-50.

7         THE COURT:   NO, 58, PLEASE.

8         MS. BARNES:   58?   THANK YOU.

9         THE COURT:   AND THREE BY FIVE COLOR PHOTO.

10        MS. BARNES:   YES, I HAVE FOUR OF THEM.

11        THE COURT:   THEY'LL BE MARKED 58, 59, 60, AND 61.

12

13             (PEOPLE'S EXHIBITS 58 THRU 61,

14              PHOTOGRAPHS, WERE MARKED FOR

15              IDENTIFICATION.)

16

17        MS. BARNES:   PEOPLE'S 60, AND PEOPLE'S 61.

18             COUNSEL, YOU WANT TO SEE THE ONES I'M

19    SHOWING?

20        MR. YOUNG:   YES, PLEASE.

21

22             (A DISCUSSION WAS HELD

23              OFF THE RECORD.)

24

25        Q     BY MS. BARNES:   I'M GOING TO SHOW YOU A SET

26    OF PHOTOGRAPHS.   THESE ARE DIFFERENT ONES.   I'VE JUST

27    MARKED PEOPLE'S 58 THROUGH 61.

28             IF YOU WANT TO LOOK AT THESE PICTURES.   LET

```
 1    US KNOW IF THOSE PICTURES SHOW YOUR VAN.

 2          A        THIS ONE.

 3          THE COURT:  SHE HAS POINTED TO ONE OF THE FOUR.

 4                    WHAT NUMBER IS THAT, PLEASE?

 5          MS. BARNES:  PEOPLE'S 59.

 6          THE COURT:  THANK YOU.

 7          Q        BY MS. BARNES:  SO IF WE LOOK IN THE

 8    PHOTOGRAPH THAT SAYS PEOPLE'S 58, YOUR VAN IS PARKED,

 9    THERE'S AN SUV.  AND THEN BEHIND THAT LOOKS LIKES

10    THERE'S ANOTHER TRUCK.  AND THEN THERE'S A VAN PARKED

11    BEHIND THAT.

12                    IS THAT CORRECT?

13          A        YES.

14          Q        IS THAT YOUR VAN?

15          A        YES.

16          Q        CAN YOU PUT YOUR INITIALS ABOVE YOUR VAN,

17    PLEASE?

18          A        (THE WITNESS COMPLIES.)

19          Q        WHERE IS THE ROBLES' RESIDENCE?

20          THE COURT:  THAT WAS ON 58 SHE JUST MARKED?

21          MS. BARNES:  YES, THANK YOU.

22          MR. YOUNG:  I THOUGHT SHE POINTED TO 59.

23          THE COURT:  SHE INITIALLY POINTED TO 59, BUT I

24    BELIEVE -- ARE WE CORRECT THAT AFTER SHE POINTED TO 59,

25    SHE ALSO LOCATED A CAR ON 58, AND SHE'S MARKED THAT?

26          MS. BARNES:  YES.  THANK YOU.

27

28                    (PAUSE IN PROCEEDINGS.)
```

1823

1     Q      BY MS. BARNES:  CAN YOU MARK R FOR THE

2   ROBLES' RESIDENCE?

3     A      (THE WITNESS COMPLIES.)

4   THE COURT:  THE WITNESS PUT AN R ON PEOPLE'S 58.

5     Q      BY MS. BARNES:  I'M GOING TO SHOW YOU

6   ANOTHER PHOTOGRAPH, PEOPLE'S 61.  DO YOU SEE YOUR VAN

7   PARKED BEHIND THIS LARGE TRUCK BEHIND -- YOUR VAN PARKED

8   BEHIND THE LARGE TRUCK ON PEOPLE'S 61?

9     A      YES.

10     Q      OKAY.

11            CAN YOU PUT YOUR INITIALS THERE?

12     A      (THE WITNESS COMPLIES.)

13   THE COURT:  THE WITNESS HAS INITIALED 61 IN THE

14   POSITION WHERE SHE SAYS HER CAR IS.

15   MS. BARNES:  THANK YOU.

16     Q      SO REVIEWING THESE PICTURES, IT ACTUALLY

17   APPEARS YOU PARKED YOUR CAR BEFORE THE ROBLES'

18   RESIDENCE, FURTHER AWAY FROM THE SHOOTING THAN THE

19   ROBLES' RESIDENCE; IS THAT TRUE?

20     A      NO.

21     Q      AND YOU PARKED YOUR CAR BEHIND A LARGE

22   TRUCK, LOOKS LIKE IT MAY BE SOME KIND OF A LARGE DUMP

23   TRUCK OR --

24     A      NO.

25     Q      STORAGE TRUCK?

26     A      I DON'T KNOW.

27     Q      WELL, THAT'S YOUR CAR PARKED BEHIND THE

28   TRUCK; RIGHT?

1       A       YES.

2       MS. BARNES:  IF I COULD JUST HAVE A MINUTE.

3       THE COURT:  YES.

4

5               (A DISCUSSION WAS HELD

6               OFF THE RECORD.)

7

8       Q       BY MS. BARNES:  YOU KNOW WHAT, I HAVE ONE

9   OTHER QUESTION.  DO YOU REMEMBER TESTIFYING BEFORE IN A

10  PRIOR PROCEEDING ON THIS CASE?

11      A       NO.  PRIOR PROCEEDING?

12      Q       YOU CAME TO COURT TO TESTIFY BEFORE?

13      A       YES.

14      Q       AND DO YOU REMEMBER DESCRIBING THE SHIRT AS

15  A CHECKERED FLANNEL?

16      A       YES.

17      Q       DO YOU REMEMBER DESCRIBING THE PERSON AS

18  FIVE-EIGHT AND HEAVY-SET?

19      A       HEAVY -- TO ME IS SAME THING AS MUSCULAR.

20  BUFF.

21      Q       DO YOU REMEMBER STATING THAT THE SHOOTER

22  WAS FIVE-EIGHT?

23      A       YES.  FIVE-EIGHT, BETWEEN FIVE-EIGHT, FIVE-

24  TEN.

25      Q       OKAY.  AND HEAVY-SET?

26      A       YES.

27      Q       AND DO YOU REMEMBER DEFENSE COUNSEL ASKED

28  YOU SOME QUESTIONS IF THE PERSON WAS BUILT LIKE A BODY

1    BUILDER, OR JUST HEAVY-SET, AND YOU SAID THE PERSON WAS

2    JUST HEAVY-SET?

3         A      WELL, I MEAN -- BODY BUILDERS, THERE'S

4    DIFFERENT TYPES OF BODY BUILDERS.

5         Q      DID YOU SEE THE PERSON'S ARMS TO SEE IF

6    THEY WERE MUSCULAR, OR JUST BIG?

7         A      I WAS TALKING ABOUT LIKE FROM THE

8    SHOULDER -- FROM THIS, AND THE CHEST, THE WAY IT LOOKS.

9    THAT'S THIS WAY MY HUSBAND LOOKS.  THAT'S WHY I KNOW.

10        THE COURT:  THE WITNESS POINTED TO HER OWN

11   SHOULDERS, MOVED HER HAND SLIGHTLY DOWN HER UPPER CHEST.

12        Q      BY MS. BARNES:  COULD HE HAVE JUST BEEN

13   SOMEONE WHO WAS FAT OR STOCKY IN HIS SHOULDER AREA?

14        A      NO.

15        Q      WELL, DID YOU SEE HIS ACTUAL CHEST, OR YOU

16   SAW HIM WITH CLOTHES ON?

17        A      THE WAY -- I KNOW BECAUSE, THE WAY MY

18   HUSBAND LOOKS.  THAT'S WHY I'M ABLE TO TELL.

19        Q      OKAY.  AND YOU SAID THAT THE DISTANCE

20   BETWEEN YOUR CAR AND THE SHOOTING WAS 35 FEET; IS THAT

21   CORRECT?

22        A      YES.

23        THE COURT:  WELL, AGAIN, SO WE'RE CLEAR, YOU

24   INDICATED THE BACK WALL; IS THAT CORRECT?

25        THE WITNESS:  YES.

26        THE COURT:  THAT IS 35 FEET.

27        Q      BY MS. BARNES:  YOU'RE SAYING YOU PARKED

28   RIGHT IN FRONT OF THE ROBLES' RESIDENCE?

1826

```
 1        A       PAST THE ROBLES.  PAST THEIR DRIVEWAY.

 2        Q       OKAY.  DID YOU KNOW IT'S ABOUT 160 FEET

 3   FROM THE SHOOTING SITE TO THE ROBLES' RESIDENCE?

 4        A       NO.  NOT GOOD AT -- GIVING -- I MEAN, WITH

 5   FEET, OR WHATEVER.

 6        Q       OKAY.  WELL, YOU SAID THE DISTANCE FROM

 7   HERE TO THE BACK WALL, AND THAT'S 35 FEET.  160 FEET IS

 8   SIGNIFICANTLY FARTHER THAN THAT.

 9                SO DO YOU THINK YOU'RE A LITTLE BIT OFF HOW

10   FAR AWAY YOU WERE?

11        A       NO, I JUST REMEMBER IT WAS -- I WAS PAST

12   THE DRIVEWAY -- FROM THE ROBLES.  AND I WAS NOT SO FAR

13   FROM WHERE THE SHOOTING TOOK PLACE.  I JUST -- I

14   STILL -- PICTURE.

15        Q       YOU WERE PROBABLY VERY SCARED?

16        A       YES.

17        Q       YOUR CHILDREN WERE IN THE CAR?

18        A       YES.

19        Q       AND YOUR BROTHER?

20        A       UH-HUH.  YES.

21        Q       HAD YOU EVER SEEN SOMEONE SHOT BEFORE?

22        A       YES.

23        Q       SO THAT WAS A SCARY THING FOR YOU TO WATCH?

24        A       YES.

25        Q       WERE YOU WORRIED SOMEONE WAS GOING TO SHOOT

26   YOU OR YOUR FAMILY?

27        A       IF THEY WERE TO SEE THAT I SEEN, YES.

28        Q       DID YOU SEE -- WELL, DID YOU DUCK DOWN SO
```

1    THEY COULDN'T SEE YOU?

2        A    NO.

3        Q    DID YOU SEE -- DID YOU SEE THERE WAS

4    SOMEONE, DID YOU SEE SOMEONE SITTING IN ONE OF THE CARS?

5    A BLACK MALE SITTING IN ONE OF THE CARS?

6        A    NO.

7        MS. BARNES:  NO FURTHER QUESTIONS.

8        THE COURT:  MR. YOUNG, REDIRECT.

9

10                   REDIRECT EXAMINATION

11   BY MR. YOUNG:

12       Q    IS IT POSSIBLE YOU WERE ABOUT FIVE CAR

13   LENGTHS AWAY FROM THE SHOOTING?

14       A    MAYBE.  I DON'T KNOW.

15       Q    NOW, THIS VAN THAT THE SHOOTER CAME FROM,

16   YOU SAID IT WAS COMING ON THE WRONG SIDE OF THE STREET;

17   IS THAT RIGHT?

18       A    YES.

19       Q    SO IT WOULD HAVE BEEN FACING YOU, BUT ON --

20   ACTUALLY WOULD HAVE BEEN YOUR SIDE OF THE STREET IF YOU

21   HAD BEEN TRAVELING ON THE STREET INSTEAD OF PARKED AT

22   THE CURB?

23       A    YES.

24       Q    THIS EVENT BURNED IN YOUR MEMORY?

25       A    WHAT WAS THAT?

26       Q    DID THIS EVENT BURN IN YOUR MEMORY THAT

27   NIGHT?  THE SHOCK YOU SAID YOU WENT THROUGH?

28       A    YES.

1       Q       WHAT IS A JHERI CURL, NOW?  I'M NOT

2    CERTAIN.

3       A       IT'S -- KIND OF LIKE -- KIND OF LIKE A PERM

4    THAT THE BLACK MALES HAVE.  ONLY -- ONLY SEEN IT WITH

5    BLACK PEOPLE.  THEY HAVE THAT.  IT'S KIND OF -- CURLY.

6    AND JUST LIKE -- DOWN KIND OF LONG.

7          MR. YOUNG:  THANK YOU.

8                NOTHING FURTHER.

9          THE COURT:  RECROSS.

10         MS. BARNES:  NO, THANK YOU.

11         THE COURT:  YOU WISH MISS RENTERIA EXCUSED, OR ON

12   CALL, MR. YOUNG?

13         MR. YOUNG:  SHE CAN BE EXCUSED.

14         THE COURT:  ANY OBJECTION?

15         MS. BARNES:  NO.  THANK YOU.

16         THE COURT:  MISS RENTERIA, PLEASE DON'T DISCUSS

17   WHAT YOU'VE SAID HERE WITH OTHER WITNESSES, SHOULD YOU

18   SEE THEM.  BUT YOU'RE EXCUSED.

19                YOU MAY GO.  THANK YOU.

20                DEFENSE NEXT WITNESS, PLEASE.

21         MR. YOUNG:  THANK YOU.

22                THE DEFENSE WILL CALL SERGEANT KATZ.

23

24                STEVEN KATZ,

25   RECALLED AS A WITNESS, HAVING BEEN PREVIOUSLY SWORN,

26   RESUMED THE STAND AND TESTIFIED FURTHER AS FOLLOWS:

27         THE COURT:  RESTATE YOUR NAME FOR THE RECORD.

28         THE WITNESS:  STEVEN KATZ.

1845

1    HERE, PEOPLE'S 6 AND THEN PEOPLE'S 9, DO YOU RECOGNIZE

2    THESE PICTURES?

3        A    YES.

4        Q    AND YOU TESTIFIED EARLIER WHEN THERE'S A

5    MURDER, THE CRIME SCENE IS SECURED BY THE FIRST DEPUTIES

6    ON SCENE AS SOON AS THEY CAN; IS THAT CORRECT?

7        A    YES.

8        Q    AND PEOPLE ARE NOT ALLOWED TO DRIVE IN AND

9    OUT OF THE CRIME SCENE?

10       A    CORRECT.

11       Q    AND WOULD IT BE FAIR TO SAY THAT MOST

12   PEOPLE ARE BEING INTERVIEWED ANYWAY, SO THEY'RE NOT

13   REALLY LEAVING THE SCENE?

14       A    YES.

15       Q    NOW, THE PHOTOGRAPH PEOPLE'S 6, THE MURDER

16   HAPPENED ACTUALLY RIGHT IN FRONT OF THIS BLUE CAR; IS

17   THAT CORRECT?

18       A    THE OLDSMOBILE, YES.

19       Q    CAN YOU PUT THE INITIALS THERE OF

20   MR. ROBLES, KIND OF WHERE IT WOULD BE IN THERE IF HE HAD

21   IN FACT BEEN DEPICTED IN THAT PHOTOGRAPH?

22       A    THE VICTIM?

23       Q    YES.  JOSE ROBLES.

24       A    (THE WITNESS COMPLIES.)

25       THE COURT:  THE WITNESS MADE A MARK ON THE

26   PHOTOGRAPH AS REQUESTED.

27       Q    BY MS. BARNES:  THANK YOU.

28            IN THE NEXT PHOTOGRAPH, PEOPLE'S 9, CAN YOU

1846

1    DO THE SAME THING ON THAT PHOTOGRAPH?  IF YOU CAN, WHERE

2    MR. ROBLES WOULD HAVE BEEN, IF THE PICTURE HAD GONE

3    FURTHER.  DOES THAT MAKE SENSE?

4         A    YES.  I'LL BE MARKING IT ON TOP OF THE

5    VEHICLE.  BUT HE WOULD HAVE BEEN BEHIND IT.

6         Q    OKAY.

7         THE COURT:  THE WITNESS MADE A MARK ON 9 AS

8    REQUESTED.

9         Q    BY MS. BARNES:  NOW, THE NEXT PHOTOGRAPH,

10   WELL, THOSE THREE PICTURES, THOSE ARE ALL WITHIN WHERE

11   THE CRIME TAPE WAS; CORRECT?

12        A    YES.  YOU CAN SEE IT ON IF FAR RIGHT SIDE

13   OF PEOPLE'S 9.  ALMOST AT THE MIDDLE OF THE PAGE.

14        Q    THE NEXT PHOTOGRAPH IS ONE -- I JUST MARKED

15   IT.  I DON'T REMEMBER THE NUMBER.

16        A    58.  PEOPLE'S 58.

17        Q    THIS ONE NEXT TO IT WOULD BE PEOPLE'S 61.

18             PEOPLE'S 58, THERE'S -- IN THE RIGHT-HAND

19   CORNER OF THAT PICTURE, THERE'S A CHEVY BLAZER, OR

20   SOMETHING OF THAT NATURE; CORRECT?  OR IN THE LEFT-HAND

21   CORNER OF THE PICTURE?

22        A    YES.

23        Q    THAT'S THE SAME CAR THAT'S SHOWN IN

24   PEOPLE'S 6 AND PEOPLE'S 9?

25        A    CORRECT.

26        Q    OKAY.  SO MISS RENTERIA'S CAR WAS NOT ONLY

27   BEHIND THE THREE VEHICLES SHOWN IN PEOPLE'S 6 AND 9, BUT

28   IS ACTUALLY BEHIND ANOTHER VERY LARGE TRUCK; IS THAT

1847

1   CORRECT?

2       A       YES.

3       Q       AND FINALLY, THE LAST PICTURE SHOWS ANOTHER

4   ANGLE THAT'S PEOPLE'S 61 OF HER CAR BEHIND THE WORK

5   TRUCK; IS THAT CORRECT?

6       A       YES.  IT'S IN THE -- TOWARDS THE RIGHT

7   SIDE, ALMOST THE CENTER LINE OF THAT PHOTOGRAPH.

8       Q       IS THAT 35 FEET AWAY FROM WHERE THE MURDER

9   HAPPENED?

10      A       NO.

11      Q       THAT'S ACTUALLY FURTHER AWAY FROM WHERE THE

12  ROBLES RESIDENCE IS; IS THAT CORRECT?

13      A       I WOULD SAY THAT IT'S -- ALMOST -- IT'S

14  ALMOST PARKED AT THE -- WHAT WOULD BE THE WEST PERIMETER

15  OF WHAT THE ROBLES RESIDENCE WOULD HAVE BEEN.  THE WEST

16  PERIMETER LINE OF THE PROPERTY LINE.

17      Q       SO MISS RENTERIA WOULD HAVE HAD TO LOOK

18  PAST THE LARGE WORK TRUCK, PAST THE CHEVY BLAZER, AND

19  THEN THE TWO OTHER CARS IN ORDER TO SEE THE MURDER; IS

20  THAT CORRECT?

21      A       YES.  AND THERE'S SPACE IN BETWEEN THOSE AS

22  WELL, BECAUSE THERE'S DRIVEWAYS FOR EACH OF THOSE

23  RESIDENCES.  SO IT'S FURTHER.

24      MS. BARNES:  YOUR HONOR, BECAUSE OF THE SIZE OF

25  THE PHOTOS, I'D ASK THE COURT TO PUBLISH THEM TO THE

26  JURY NOW.  JUST THE TWO, PEOPLE'S 58 AND 61.

27      THE COURT:  CAN I TALK TO BOTH OF YOU AT SIDE BAR

28  BEFORE WE DO THAT?

EXHIBIT   "F"

EXHIBIT   "F"

EXHIBIT   "F"

EXHIBIT   "F"

**EXHIBIT F**

EXHIBIT  "G"

EXHIBIT  "G"

EXHIBIT  "G"

EXHIBIT  "G"



**EXHIBIT G**

EXHIBIT "H"

EXHIBIT "H"

EXHIBIT "H"

EXHIBIT "H"

Case 2:10-cv-02343-VBF-RNB    Document 82-4    Filed 09/12/12    Page 24 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 63    Filed 06/21/12    Page 1 of 56    Page ID #:1248
ID #:1961

COPY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOFAMA COLEMAN, | ) Case No. CV 10-2343-AHM (RNB) |
| Petitioner, | ) |
| | ) PARTIAL REPORT AND |
| vs. | ) RECOMMENDATION OF UNITED |
| | ) STATES MAGISTRATE JUDGE |
| KATHLEEN ALLISON, Acting | ) |
| Warden, | ) |
| Respondent. | ) |

This Partial Report and Recommendation is submitted to the Honorable A. Howard Matz, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

## PROCEEDINGS

On March 31, 2010, petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Pet.") herein. The Petition purported to allege six grounds for relief that, according to the Petition, had previously been exhausted in a Petition for Review to the California Supreme Court. Concurrently with the filing of the Petition, petitioner filed a "Motion to Stay Adjudication of Habeas Corpus Petition to Allow Petitioner to Properly Exhaust Unexhausted Federal Claims." The

1

1    Motion to Stay listed nine additional ineffective assistance of trial counsel claims that

2    petitioner indicated he wanted to raise herein, but were not yet properly exhausted.

3          Although petitioner stated in the Motion to Stay that his stay-and-abeyance

4    request was being made pursuant to Rhines v. Weber, 544 U.S. 269, 125 S. Ct. 1528,

5    161 L. Ed. 2d 440 (2005), under the Ninth Circuit's decision in King v. Ryan, 564

6    F.3d 1133 (9th Cir.), cert. denied, 130 S. Ct. 214 (2009), the Court's consideration

7    of the motion to stay petitioner's fully exhausted petition was not governed by

8    Rhines.  Rather, petitioner's stay motion was governed by the stay and abeyance

9    procedure approved in Calderon v. United States Dist. Court (Taylor), 134 F.3d 981,

10    987-88 (9th Cir.), cert. denied, 525 U.S. 920 (1998), and Kelly v. Small, 315 F.3d

11    1063, 1070 (9th Cir. 2004), overruled on other grounds by Robbins v. Carey, 481

12    F.3d 1143, 1149 (9th Cir. 2007).  Thus, the fact that petitioner had not even purported

13    to make the showing of good cause required under Rhines was not dispositive of

14    petitioner's stay motion, since the Rhines "good cause" limitation does not apply to

15    the "Kelly procedure."  Under the Kelly procedure, a federal district court has the

16    discretion to stay and hold in abeyance a fully exhausted petition in order to provide

17    the petitioner with the opportunity to proceed to state court to exhaust his

18    unexhausted claims.  Then, once the claims have been exhausted in state court, the

19    petitioner may return to federal court and amend his stayed federal petition to include

20    the newly-exhausted claims.  See Kelly, 315 F.3d at 1070-71; see also Jackson v.

21    Roe, 425 F.3d 654, 661 (9th Cir. 2005); James v. Pliler, 269 F.3d 1124, 1126-27 (9th

22    Cir. 2001); Anthony v. Cambra, 236 F.3d 568, 575 (9th Cir. 2000), cert. denied, 533

23    U.S. 941 (2001); Taylor, 134 F.3d at 987-88.[1]

24          Prior to ruling on petitioner's  Motion to Stay, the Court decided to afford

---

26        [1]    However, for purposes of satisfying the one-year statute of limitations

27  imposed by 28 U.S.C. § 2244(d), the newly exhausted claims do not necessarily relate
back to the filing of the original Petition.  See King, 564 F.3d at 1140-41; see also

28  Mayle v. Felix, 545 U.S. 644, 664, 125 S. Ct. 2562, 162 L. Ed 2d 852 (2005).

1   respondent the opportunity to be heard. Accordingly, the Court ordered service of the

2   Petition and petitioner's Motion to Stay on respondent.

3        In her ensuing opposition, respondent contended that petitioner's Motion to

4   Stay should be denied because, for statute of limitations purposes, the nine additional

5   ineffective assistance of trial counsel claims that petitioner indicated in his Motion

6   to Stay he wanted to raise herein did not relate back to the exhausted claims alleged

7   in the Petition, and a stay therefore would be futile. However, respondent was not

8   contending that any of petitioner's unexhausted ineffective assistance of counsel

9   claims currently were time barred. According to respondent, the one-year limitation

10   period did not commence running until June 30, 2009. Consequently, it appeared to

11   the Court that, when petitioner filed the first of his two pending California Supreme

12   Court habeas petitions on February 1, 2010, five months of the limitation period still

13   remained. Moreover, respondent had conceded that "the period of limitations

14   appear[ed] to be tolled presently." Accordingly, unless the California Supreme Court

15   expressly denied both pending habeas petitions for untimeliness, it appeared to the

16   Court that petitioner would have five months from the denial of those petitions to

17   amend his pending federal habeas petition to add any of the newly exhausted claims

18   that currently were pending before the California Supreme Court.

19        While it was conceivable that, by the time petitioner sought leave to amend his

20   pending federal habeas petition, the limitations period **might** have run with respect

21   to one or more of the claims that petitioner was seeking leave to add, it could not be

22   said with certainty as of the time the opposition was filed that a stay would be futile.

23   Nor did it make any difference that petitioner's currently pending California Supreme

24   Court habeas petitions did not include all nine of the ineffective assistance of counsel

25   claims that petitioner indicated in his stay motion he wanted to raise herein. Since the

26   limitation period still had nearly two months to run, petitioner still had time to either

27   add those claims to one of his pending California Supreme Court habeas petitions or

28   file a new California Supreme Court habeas petition that included those claims.

Case 2:10-cv-02343-VBF-RNB    Document 82-4    Filed 09/12/12    Page 27 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 63    Filed 06/21/12    Page 4 of 56    Page ID #:1251
ID #:1504

1       Accordingly, the Court decided to exercise its discretion under <u>Kelly</u> with

2  respect to petitioner's stay motion, by granting the motion on certain conditions that

3  were specified in an Order issued on May 7, 2010. The Court stated in its Order that

4  the granting of petitioner's motion was without prejudice to respondent opposing a

5  later motion to amend by petitioner on the ground that one or more of the claims that

6  petitioner was seeking to add was time barred.

7       On October 12, 2010, petitioner filed a document captioned "Motion to Amend

8  Petitioner's Habeas to Add Newly Exhausted Claims." Concurrently, petitioner

9  lodged what the Court presumed was intended as his proposed Amended Petition.

10  However, it was unclear to the Court from its review of the proposed Amended

11  Petition whether petitioner had decided to abandon the six grounds for relief alleged

12  in his original Petition. It also was unclear to the Court precisely what claims

13  petitioner now was purporting to allege. The Court therefore issued an Order on

14  October 19, 2010 requiring petitioner to lodge a revised proposed Amended Petition

15  that: (a) set forth all of his grounds for relief in the habeas form itself, and (b) if the

16  proposed Amended Petition form referenced any attached writ or supporting

17  memorandum in setting forth any of those grounds, specified the pages in the attached

18  document that applied to each of the stated grounds for relief.

19       On November 17, 2010, petitioner lodged another proposed Amended Petition

20  (hereinafter "Am. Pet.") that rectified the deficiencies about which the Court had

21  apprised petitioner in its October 19, 2010 Order re Further Proceedings.

22  Accordingly, the Court set deadlines for respondent to file either opposition to

23  petitioner's Motion to Amend or a notice of non-opposition thereto, and for petitioner

24  to file a reply if respondent did file opposition.

25       Respondent filed opposition to the Motion to Amend on December 21, 2010.

26  Petitioner filed a Reply thereto on January 20, 2011. On February 9, 2011, the Court

27  issued a Report and Recommendation in which it recommended that petitioner's

28  Motion to Amend be granted in part and denied in part. The Court found that: (a)

1    except for Grounds 11 and 19, none of the new claims alleged in the Amended
2    Petition related back to the filing of petitioner's original Petition; (b) unless a basis
3    for tolling the statute existed, petitioner's last day to file a federal habeas petition
4    containing his unrelated claims was June 30, 2010; (c) petitioner had not met his
5    burden of demonstrating that statutory tolling rendered the lodging for filing of the
6    Amended Petition herein timely; and (d) petitioner was not entitled to any equitable
7    tolling of the limitation period.  The Court further found that recent Ninth Circuit
8    precedent, including Lee v. Lampert, 610 F.3d 1125, 1128-31 (9th Cir. 2010),
9    foreclosed petitioner's reliance on an "actual innocence" exception to the AEDPA
10   statute of limitations. Accordingly, the Court recommended that petitioner's Motion
11   to Amend be granted with respect to Grounds 1-9, 11, and 19 of the proposed
12   Amended Petition and denied with respect to Grounds 10, 12-18, and 20-21 of the
13   proposed Amended Petition.

14          The Court was unaware at the time it issued its Report and Recommendation
15   that, the day before, the Ninth Circuit had decided to rehear en banc the Lee case and
16   decreed that the panel decision could not be cited as precedent in this Circuit.  The
17   Court therefore concluded that it would be necessary to issue a Supplemental Report
18   and Recommendation further addressing petitioner's actual innocence claim (which
19   would also apply to respondent's contention in respondent's Opposition
20   Memorandum that petitioner's claims were procedurally defaulted). Accordingly, on
21   February 10, 2011, the Court issued a Minute Order requiring respondent to file a
22   Supplemental Opposition Memorandum addressing the following issue:

23          Whether, if the AEDPA statute of limitations is subject to a
24          "fundamental miscarriage of justice" exception, any of the evidence
25          referenced in the Reply that was not presented at trial, including in
26          particular the forensic analysis of the Blockbuster surveillance security
27          tape that ostensibly shows when petitioner arrived at the video store and
28          with whom (see Reply at 9, 17, 18, 19-20), is sufficient to either (a)

5

1    satisfy petitioner's burden of showing the requisite "actual innocence,"
2    or (b) entitle petitioner to an evidentiary hearing on his actual innocence
3    claim under Majoy v. Roe, 296 F.3d 770, 775-76 (9th Cir. 2002).
4
5         Based on the ensuing Supplemental Opposition Memorandum filed by
6    respondent and petitioner's Supplemental Reply Memorandum thereto, the Court
7    issued an Order re Further Proceedings on June 20, 2011. The Order advised of the
8    Court's conclusion that petitioner might be able "to muster a plausible factual case
9    meeting the exacting gateway standard established by the Supreme Court in Schlup
10   for overriding a petitioner's clear failure to meet deadlines and requirements for filing
11   a timely petition in federal court" and that petitioner's actual innocence claim
12   therefore could not be determined without the Court conducting an evidentiary
13   hearing. See Majoy, 296 F.3d at 775. The Court noted that, if it held such an
14   evidentiary hearing and concluded that petitioner had met his burden under Schlup,
15   such conclusion would also be dispositive of respondent's contention that petitioner's
16   additional claims were procedurally defaulted because the law was well established
17   that there was an actual innocence exception to the procedural default doctrine.
18   However, the need to conduct an evidentiary hearing on petitioner's actual innocence
19   claim (which would necessitate the appointment of counsel for petitioner) and to
20   reach the merits of his additional claims would be obviated if the Ninth Circuit were
21   to issue its en banc decision in Lee v. Lampert in the meantime and rule that there was
22   no actual innocence exception to the AEDPA statute of limitations. The Court further
23   noted that Grounds 1-6 of petitioner's original Petition, which now corresponded to
24   Grounds 1-9 of petitioner's proposed Amended Petition, (a) were not subject to a time
25   bar defense, and (b) were subject to the AEDPA standard of review since those claims
26   were adjudicated on the merits. The Court further noted that the AEDPA required
27   that the Court evaluate the reasonableness of the California court's adjudication of
28   those claims on the basis of the record before the state courts. Accordingly, the Court

6

Case 2:10-cv-02343-VBF-RNB   Document 82-4   Filed 09/12/12   Page 30 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63   Filed 06/21/12   Page 7 of 56   Page ID #:1254
ID #:1507

1   advised, it had decided to: (a) defer ruling on petitioner's Motion to Amend the

2   Petition to add 12 new claims, and (b) instead bifurcate the proceeding by first

3   adjudicating petitioner's original 6 claims (which corresponded to Grounds 1-9 of his

4   proposed Amended Petition). The Court therefore granted petitioner's Motion to

5   Amend, but only to the extent that it sought to amend Grounds 1-6 of petitioner's

6   original Petition by realleging instead Grounds 1-9 of petitioner's proposed Amended

7   Petition.

8         Petitioner subsequently filed objections to the June 20, 2011 Order re Further

9   Proceedings. While his objections were pending before the District Judge, the Ninth

10  Circuit issued its *en banc* decision in <u>Lee v. Lampert</u>, 653 F.3d 929 (9th Cir. 2011).

11  The Ninth Circuit ruled that a credible claim of actual innocence did constitute an

12  exception to the AEDPA statute of limitations. Based on the *en banc* decision, the

13  District Judge issued a Minute Order on October 13, 2011 wherein he noted that the

14  Ninth Circuit *en banc* decision vitiated this Court's rationale for deferring its ruling

15  on the part of petitioner's Motion to Amend seeking to add Grounds 10-21 of the

16  proposed Amended Petition. To that extent, the District Judge sustained petitioner's

17  objections to the June 20, 2011 Order and remanded the matter back to this Court for

18  further proceedings based on the *en banc* decision in <u>Lee</u>.

19        On remand from the District Judge, the Court issued another Order re Further

20  Proceedings on October 19, 2011. The Court advised therein that it remained the

21  Court's view that, in order to rule on petitioner's Motion to Amend (and specifically

22  the portion as to which the Court previously deferred ruling), it was necessary to

23  conduct an evidentiary hearing on petitioner's actual innocence claim. The Court

24  therefore appointed the Federal Public Defender to represent petitioner for purposes

25  of such evidentiary hearing. The Court further advised that it also remained the

26  Court's view that the need to conduct an evidentiary hearing on petitioner's actual

27  innocence claim had no bearing on the Court's determination of Grounds 1-6 of

28  petitioner's original Petition, which now corresponded to Grounds 1-9 of petitioner's

1    proposed Amended Petition. Accordingly, the Court advised that its appointment of

2    counsel for petitioner did not extend to those claims, which were not subject to a time

3    bar defense or a procedural default defense, and which appeared to be subject to the

4    AEDPA standard of review on the basis of the record before the state courts. The

5    Court also advised that the part of the Court's June 23, 2011 Order granting

6    petitioner's Motion to Amend, to the extent that the Motion to Amend sought to

7    amend Grounds 1-6 of petitioner's original Petition by realleging instead Grounds 1-9

8    of petitioner's Amended Petition, would stand. Further, the Court advised, since the

9    Court ultimately would have to reach the merits of those claims, no matter how it

10   decided petitioner's actual innocence claim, there was no reason to delay the briefing

11   of those claims.

12        Respondent filed an Answer to Grounds 1-9 of the Amended Petition ("Ans.")

13   on December 12, 2011, accompanied by a Memorandum of Points and Authorities

14   ("Ans. Mem."). Following multiple extensions of time, petitioner filed a "Traverse

15   in Response to Respondent's Answer to Amended Petition" on April 3, 2012

16   ("Trav."). Petitioner then filed, on April 25, 2012, a Motion to Expand the Record.

17        Thus, the issue of petitioner's entitlement to habeas relief with respect to

18   Grounds 1-9 of the Amended Petition now is ready for decision. For the reasons

19   discussed hereafter, the Court recommends that those grounds for relief be denied.[2]

20

21                          **PROCEDURAL HISTORY**

22        On April 28, 2006, petitioner was convicted by a Los Angeles County Superior

23   Court jury of first degree murder. (See 5 Reporter's Transcript on Appeal ["RT"]

24   3603-06; 1 Clerk's Transcript ["CT"] 186-88.) On August 16, 2007, after hearing

25   and denying petitioner's motion for a new trial based on juror misconduct and

26   _____

27        [2]    The Court also recommends that petitioner's Motion to Expand the

28   Record and his request for an evidentiary hearing be denied.

1   insufficiency of the evidence, the trial court sentenced petitioner to state prison for

2   an indeterminate term of 25 years to life. (See 5 RT 3901-09; 2 CT 302-04.)

3        Petitioner appealed from the judgment of conviction, raising claims generally

4   corresponding to the third, fourth, fifth, and sixth grounds for relief alleged in

5   petitioner's original Petition herein (which encompass Grounds 4-9 of petitioner's

6   Amended Petition). (See respondent's Notice of Lodging, Lodged Document ["LD"]

7   A, C.) On December 30, 2008, in an unpublished decision, the California Court of

8   Appeal rejected petitioner's claims and affirmed the judgment. (See LD D, E.)

9        While his direct appeal was pending, petitioner (through counsel) filed a

10  petition for writ of habeas corpus in the California Court of Appeal, in which he

11  alleged claims generally corresponding to the first and second grounds for relief

12  alleged in petitioner's original Petition herein (which encompass Grounds 1-3 of

13  petitioner's Amended Petition). (See LD F.) Following respondent's filing of an

14  informal response at the Court of Appeal's direction (see LD G), and petitioner's

15  letter reply thereto (see LD H), the Court of Appeal issued an Order on December 30,

16  2008 (the same date as its decision on direct appeal) denying petitioner's habeas

17  petition, in part with a reasoned decision. (See LD I.)[3]

18       On February 11, 2009, petitioner (through counsel) petitioned the California

19  Supreme Court for review of the Court of Appeal's decision on direct appeal. (See

20  LD J.) Concurrently, he also (through counsel) petitioned the California Supreme

21  Court for review of the Court of Appeal's denial of his habeas petition. (See LD L.)

---

24  [3]     Petitioner (through counsel) also filed a Petition for Rehearing of the
25  order denying petitioner's habeas petition in the Court of Appeal on January 13,
    2009, which apparently was denied on January 23, 2009. Petitioner argued therein
26  that the order relied on "incorrect facts and facts that are not supported by the record
27  to find that [petitioner] was not prejudiced by juror misconduct." (See Trav. at 7,
    Exh. A at 1; LD J at 1 (in his Petition for Review to the California Supreme Court,
28  counsel states that the Petition for Rehearing was denied on January 23, 2009).)

Case 2:10-cv-02343-VBF-RNB   Document 82-4   Filed 09/12/12   Page 33 of 40   Page
ID #:1357
Case 2:10-cv-02343-AHM-RNB   Document 63   Filed 06/21/12   Page 10 of 56   Page ID
#:1257

1   On April 1, 2009, the California Supreme Court issued separate orders summarily

2   denying both petitions without comment or citation of authority. (See LD K, M, N.)

3       On or about December 1, 2009, petitioner constructively filed a pro se motion

4   in the trial court requesting post-conviction discovery, which the trial court denied

5   on December 7, 2009. (See Exhibits to LD O.) Petitioner then constructively filed

6   a pro se habeas petition in the California Supreme Court on January 6, 2010 (proof

7   of service date),[4] in which the sole claim alleged was that the trial court had erred in

8   denying petitioner's motion for post-conviction discovery. (See LD O.) This claim

9   generally corresponds to Ground 21 of the proposed Amended Petition herein.

10      While that California Supreme Court habeas petition was pending, petitioner

11  constructively filed another habeas petition in the California Supreme Court on or

12  about March 25, 2010 (signature date).  Petitioner alleged therein claims that

13  generally correspond to Grounds 10-20 of petitioner's proposed Amended Petition

14  herein. (See LD Q.)

15      While both of his California Supreme Court habeas petitions were pending,

16  petitioner filed his original Petition herein on March 31, 2010. The signature date on

17  the Petition, and thus the earliest date on which it could have been turned over to the

18  prison authorities for mailing, was March 25, 2010.

19      In two separate orders issued on September 15, 2010, the California Supreme

20  Court summarily denied both of petitioner's habeas petitions, citing both times In re

21  Clark, 5 Cal. 4th 750 (1993). (See LD T, U.)[5]

22

23      [4]     The Ninth Circuit has held that the prison mailbox rule applies to a pro

24  se habeas petitioner's state and federal filings. See, e.g., Smith v. Duncan, 297 F.3d

25  809, 814 (9th Cir. 2002); Huizar v. Carey, 273 F.3d 1220, 1223 (9th Cir. 2001).

26      [5]     On November 1, 2011, petitioner constructively filed another pro se

27  habeas petition in the California Supreme Court, which the California Supreme Court

28  summarily denied on March 14, 2012 with citations to In re Robbins, 18 Cal. 4th 770,
                                                        (continued...)

Case 2:10-cv-02343-VBF-RNB    Document 82-4    Filed 09/12/12    Page 34 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 63-57 Filed 06/21/12    Page 11 of 56    Page ID
#:1258

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

Because petitioner is not challenging the sufficiency of the evidence to support the conviction, the following summary is taken from the "Factual and Procedural Background" of the California Court of Appeal opinion (see LD D at 2-6 (footnotes 7-9 in original), E)[6]:

### 1. The Murder

*On the evening of May 10, 2003 Jose "Chino" Robles and his family were hosting a barbecue in their backyard on 101st Street in south Los Angeles. Around 9:00 p.m. Robles, who was a member of a tagging crew known as "No Control" or "NC," decided to walk to a nearby liquor store. On the way down 101st Street, he met another member of NC, Albert Segundo, who was heading to the Robles barbecue. Segundo had just seen Coleman, the leader of the rival tagging crew "NGA," accompanied by another rival gang member known as "Drips," driving*

---

[5](...continued)
780 (1998) and In re Clark, 5 Cal. 4th at 767-69. Those citations signified that the petition was being denied for untimeliness. See, e.g., Bennett v. Mueller, 322 F.3d 573, 581-83 (9th Cir.) (recognizing California's untimeliness bar is represented by citations to Robbins and Clark), cert. denied, 540 U.S. 938 (2003). In any event, it appears from the Court's review of the petition that it was not directed to the same Superior Court conviction underlying the Petition herein. (See LD X.)

[6]      The Court notes that recent Ninth Circuit cases have accorded the factual summary set forth in a state court appellate opinion a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009), cert. denied, 130 S. Ct. 1086 (2010); Slovik v. Yates, 556 F.3d 747, 749 n.1 (9th Cir. 2009); Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009); Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008), cert. denied, 555 U.S. 1112 (2009); Mejia v. Garcia, 534 F.3d 1036, 1039 n.1 (9th Cir. 2008), cert. denied, 555 U.S. 1117 (2009).    Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. Here, petitioner does not purport to rebut the presumption.

Case 2:10-cv-02343-VBF-RNB    Document 82-4    Filed 09/12/12    Page 35 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 63-2    Filed 06/21/12    Page 12 of 56    Page ID
#:1259
#:1372

1  *slowly along the street in a white van with wood paneling.[7] Segundo warned Robles*
2  *the liquor store was in "enemy territory." Robles shrugged off the warning, replying*
3  *he would be fine because he had his knife.*

4       *Segundo walked across the street from the Robles home to pick up a friend,*
5  *crossed the street back to the sidewalk in front of the Robles home and, seconds later,*
6  *heard two gunshots. Segundo turned and saw Robles holding onto a fence rail as*
7  *Drips fired additional shots at Robles. Segundo watched as Drips reentered the van*
8  *through the passenger door. After the van sped past the Robles home, Segundo and*
9  *his friend hurried to a car and gave chase. At a stop sign a couple of streets away,*
10  *Drips got out of the van and pointed a blue steel semiautomatic gun at Segundo's*
11  *friend's car. Segundo's friend turned the car around and returned to the Robles*
12  *home.*

13

14      *2. **The Identification of Coleman***

15      *At trial four witnesses identified Coleman as the driver of the white van:*
16  *Segundo, who attended high school with Coleman and estimated he had seen him*
17  *hundreds of times before the shooting; Robles's younger brother, Jesse, who ran to*
18  *the street when he heard shots and saw the van speed away; Jesse's friend, Carlos*
19  *Lopez, who also ran to the street when shots were fired and was standing next to*
20  *Jesse when the van drove by; and Maria Renteria, who rented the house behind the*
21  *Robles home and had just parked her own van near the Robles home when the*
22  *shooting began.*

23       *a. <u>Albert Segundo</u>*

24      *Segundo testified he recognized Coleman when the white van passed him*

25

26  _____

27       [7]  *Segundo testified he had flashed an NC sign at Coleman and Drips as*
*they drove by. Sensing there might be trouble, he warned another friend, Miko, to*
28  *take some young women who were standing in the street back into the Robles home.*

Case 2:10-cv-02343-VBF-RNB   Document 82-4   Filed 09/12/12   Page 36 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63-7   Filed 06/21/12   Page 13 of 56   Page ID
#:1260

1   *before the shooting and again when the shooter, Drips, opened the door to climb*

2   *back into the van after the shooting. Segundo explained that opening the door*

3   *illuminated the van's interior. Segundo again recognized Coleman after the chase*

4   *when Drips pointed his gun at Segundo and his friend. According to Segundo,*

5   *Coleman's head was shaved; he was wearing a black T-shirt; and he had a steel bar*

6   *piercing his left eyebrow. Segundo testified he was 100 percent certain Coleman was*

7   *the driver of the van.*

8      *Coleman's counsel sought to impeach Segundo by eliciting testimony Segundo*

9   *had initially blamed two local Hispanic gang members for the shooting in an*

10  *interview with Los Angeles Sheriff deputies. Segundo admitted he had lied to the*

11  *deputies but claimed he had been afraid of retaliation from Coleman and his crew.[8]*

12      *b.  Jesse Robles*

13  *Jesse Robles was at the barbecue in his family's backyard when he heard two*

14  *shots and raced toward the street. As he ran, he heard another 13 shots. The*

15  *shooting had ended by the time he reached the gate of the driveway. He was soon*

16  *joined by his friend, Carlos Lopez. Jesse, who estimated he had seen Coleman*

17  *(whom he knew by his moniker "Illusion") more than 50 times in the neighborhood,*

18  *recognized Coleman both when Drips reentered the passenger side of the van and*

19  *when the van drove past him. As Jesse and Lopez stood there, they acknowledged to*

20  *each other Coleman was the driver. Jesse was certain the driver was Coleman even*

21  *though Coleman usually drove a green Camry and he had never seen Coleman*

22  *driving a white van.*

23  *Although Jesse told Lopez he recognized Coleman the night of the shooting,*

24  *he did not tell sheriff's deputies he knew the attackers until two days after the*

25  *shooting. He claimed he wanted to avoid testifying at trial and decided to come*

26

27     [8]   *In order to compel Segundo to testify, the court issued a body warrant*

28  *authorizing his arrest and detention pending completion of his testimony.*

Case 2:10-cv-02343-VBF-RNB Document 82-4 Filed 09/12/12 Page 37 of 40 Page
Case 2:10-cv-02343-AHM-RNB Document 63-74 Filed 06/21/12 Page 14 of 56 Page ID
#:1261

1  *forward only when his family asked him to do so.*

2          *c. Carlos Lopez*

3      *Carlos Lopez was at the Robles barbecue when the first shots were fired. He*

4  *ran after Jesse Robles toward the street, arriving in time to see the white van drive*

5  *by. According to Lopez, the van was illuminated by the headlights of another van,*

6  *allowing him to see Coleman, whom he too knew as the leader of NGA. Coleman had*

7  *a shaved head and was wearing a black T-shirt. Lopez was contacted by sheriff's*

8  *deputies soon after the shooting and identified Coleman as the shooter.*

9          *d. Maria Renteria*

10      *As Maria Renteria parked her van near the Robles driveway, her headlights*

11  *illuminated the white van, which was stopped in the middle of 101st Street some*

12  *distance down the street. Renteria watched as a dark-skinned man got out of the*

13  *white van, crossed in front of it and began shooting at what she thought was a car*

14  *parked on the side of the street. From the light of her headlights and the interior*

15  *light of the van when the shooter climbed back in, she was able to see the driver,*

16  *whom she described as a Black man. Although she was unable to identify Coleman*

17  *in a photographic lineup, at trial she testified he "looked like" the driver.*

18

19      ***3. Corroboration of Coleman's Identification and Motive***

20      *To establish preexisting animosity between Coleman and Robles, the People*

21  *elicited testimony about three previous incidents. First, Jesse testified that, sometime*

22  *before the shooting, he was in an alley watching a friend tag a wall with the acronym*

23  *"SAP" and cross out the tag "NGA." Coleman drove up with his brother, Jeremy,*

24  *and challenged Jesse and his friend, asking why they were crossing out his "hood."*

25  *Jesse's friend ran, chased by Jeremy. Coleman approached Jesse, took his bicycle*

26  *and threw it over a gate.*

27      *Second, Segundo testified he saw Robles and some others "jump" Coleman*

28  *around the corner from the Robles home a month or two before the shooting.*

14

1        *Third, three witnesses, including Lopez, testified about an incident involving*
2    *Coleman and Robles that occurred on the afternoon of the murder. During the early*
3    *afternoon, Robles and some friends were standing in front of a home on 102nd Street*
4    *around the corner from the Robles home. To their surprise, Jeremy Coleman walked*
5    *by on his way to visit his girlfriend. Jeremy asked Robles where he was from,*
6    *meaning to what tagging crew did he belong; but Robles did not answer. Jeremy*
7    *identified himself as NGA; and Robles laughed at him, prompting Jeremy to threaten*
8    *to get his brother. Robles then identified himself as NC and said, "Fuck NGA."*
9    *When Jeremy started to walk away, Robles chased him and hit him on the arm with*
10   *a baseball bat. Robles later told Lopez Jeremy had called him a "bitch."*

11       *About 30 minutes after the confrontation, Coleman and Jeremy drove to the*
12   *home on 102nd Street in Coleman's green Camry. Robles was no longer there.*
13   *Coleman asked Lopez, "Which one of you was trying to fight my brother?" When no*
14   *one answered, Jeremy asked where Robles had gone. After he was told Robles had*
15   *returned to his house, Jeremy threatened "to get Chino or anybody from NC."[9]*
16   *According to Lopez, Coleman was wearing a black T-shirt.*

17       *The People also introduced a surveillance videotape from a video store located*
18   *five to ten minutes from the crime scene, taken at 9:46 p.m. on the night of the*
19   *shooting, which showed Coleman wearing a black T-shirt over a white T-shirt.*
20   *//*
21   *//*
22   *//*
23   *//*
24

25      [9]    *Jeremy, who testified under a grant of immunity, disputed Lopez's*
26   *account and denied he had ever challenged Robles. Jeremy also claimed he had been*
27   *with Coleman at the time of the shooting, but a sheriff's deputy impeached Jeremy's*
28   *testimony with his prior statement Coleman had dropped him off earlier in the*
     *evening.*

Case 2:10-cv-02343-VBF-RNB   Document 82-4   Filed 09/12/12   Page 39 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63-76   Filed 06/21/12   Page 16 of 56   Page ID
#:1263

## GROUNDS 1-9 OF PETITIONER'S AMENDED PETITION

The claims alleged in petitioner's Amended Petition to which this Partial Report and Recommendation is directed are Grounds 1-9 (which respondent has conceded encompass the six grounds for relief alleged by petitioner in his original Petition herein). Those first nine grounds for relief are as follows:

    1.    False evidence was introduced at trial during the testimony of prosecution witness Maria Renteria, entitling petitioner to habeas relief under Cal. Penal Code § 1473. (See Am. Pet. at 5; see also Attached Memorandum of Points and Authorities ("Am. Pet. Attach.") at 27-31; Trav. at 10-24.)

    2.    The prosecutor's knowing presentation of Renteria's false testimony violated petitioner's federal constitutional right to due process and a fair trial under Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). (See Am. Pet. at 5; see also Am. Pet. Attach. at 31-32; Trav. at 24-39.)

    3.    Trial counsel provided ineffective assistance by failing to adequately question Renteria about her ability to see the driver of the van and failing to investigate and produce evidence that it would have been physically impossible for her to see the driver under the circumstances she described. (See Am. Pet. at 6; see also Am. Pet. Attach. at 32-37; Trav. at 39-44.)

    4.    Evidence of petitioner's prior arrest and criminal history was inadmissible under California law because it was more prejudicial than probative. (See Am. Pet. at 6; see also Am. Pet. Attach. at 37-39; Trav. at 44-46.)

    5.    Petitioner was denied his federal constitutional rights to an impartial jury and due process by the jury's receipt during deliberations of prejudicial information about petitioner's criminal history that had not

Case 2:10-cv-02343-VBF-RNB Document 82-4 Filed 09/12/12 Page 40 of 40 Page
Case 2:10-cv-02343-AHM-RNB Document 68-7 Filed 06/21/12 Page 17 of 56 Page ID
#:1264

1 been presented at trial. (See Am. Pet. at 6; see also Am. Pet. Attach. at

2 40-46; Trav. at 46-52.)

3       6. The jury's "inadvertent exposure to out-of-court

4 information" constituted jury misconduct under California law. (See

5 Am. Pet. at 6a; see also Am. Pet. Attach. at 46-48; Trav. at 46-52.)

6       7. The prosecutor's placement before the jury of the

7 unredacted exhibit containing petitioner's arrest information, coupled

8 with the prosecutor's repeated reference to petitioner having been

9 booked during the examination of Deputy Steven Marella, constituted

10 prosecutorial misconduct in violation of petitioner's federal

11 constitutional right to due process. (See Am. Pet. at 6a; see also Am.

12 Pet. Attach. at 48-52; Trav. at 52-53.)

13       8. Trial counsel provided ineffective assistance in failing to

14 object to the prosecutorial misconduct. (See Am. Pet. at 6a; see also

15 Am. Pet. Attach. at 52-54; Trav. at 53-54.)

16       9. The error, whether by the trial court, the jury, the

17 prosecutor, or trial counsel, violated petitioner's federal constitutional

18 right to an impartial jury and due process of law. (See Am. Pet. at 6b;

19 see also Am. Pet. Attach. at 54-65.)

20

21                **STANDARD OF REVIEW**

22      Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective

23 Death Penalty Act of 1996 ("AEDPA"):

24     "An application for a writ of habeas corpus on behalf of a person in

25     custody pursuant to the judgment of a State court shall not be granted

26     with respect to any claim that was adjudicated on the merits in State

27     court proceedings unless the adjudication of the claim--(1) resulted in

28     a decision that was contrary to, or involved an unreasonable application