Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 1 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63-78Filed 06/21/12   Page 18 of 56   Page ID
#:1265

1  of, clearly established Federal law, as determined by the Supreme Court
2  of the United States; or (2) resulted in a decision that was based on an
3  unreasonable determination of the facts in light of the evidence
4  presented in the State court proceedings."

5

6  Under the AEDPA, the "clearly established Federal law" that controls federal habeas
7  review of state court decisions consists only of holdings (as opposed to dicta) of U.S.
8  Supreme Court decisions "as of the time of the relevant state-court decision."
9  Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); see
10 also Carey v. Musladin, 549 U.S. 70, 74, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).
11     Although a particular state court decision may be both "contrary to" and "an
12 unreasonable application of" controlling Supreme Court law, the two phrases have
13 distinct meanings. See Williams, 529 U.S. at 391, 413. A state court decision is
14 "contrary to" clearly established federal law if the decision either applies a rule that
15 contradicts the governing Supreme Court law, or reaches a result that differs from the
16 result the Supreme Court reached on "materially indistinguishable" facts. See Early
17 v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam);
18 Williams, 529 U.S. at 405-06. When a state court decision adjudicating a claim is
19 contrary to controlling Supreme Court law, the reviewing federal habeas court is
20 "unconstrained by § 2254(d)(1)." See Williams, 529 U.S. at 406. But the state court
21 need not cite or even be aware of the controlling Supreme Court cases, "so long as
22 neither the reasoning nor the result of the state-court decision contradicts them." See
23 Early, 537 U.S. at 8.
24     State court decisions that are not "contrary to" Supreme Court law may be set
25 aside on federal habeas review only "if they are not merely erroneous, but 'an
26 unreasonable application' of clearly established federal law, or are based on 'an
27 unreasonable determination of the facts.'" See Early, 537 U.S. at 11 (citing 28 U.S.C.
28 § 2254(d)) (emphasis added). A state-court decision that correctly identified the

18

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 2 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 85-9   Filed 06/21/12    Page 19 of 56    Page ID
#:1266

1   governing legal rule may be rejected if it unreasonably applied the rule to the facts

2   of a particular case. See Williams, 529 U.S. at 406-10, 413 (e.g., the rejected decision

3   may state the Strickland standard correctly but apply it unreasonably); Woodford v.

4   Visciotti, 537 U.S. 19, 24-27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam).

5   However, to obtain federal habeas relief for such an "unreasonable application," a

6   petitioner must show that the state court's application of Supreme Court law was

7   "objectively unreasonable." Visciotti, 537 U.S. at 24-27; Williams, 529 U.S. at 413.

8   An "unreasonable application" is different from an erroneous or incorrect one. See

9   Williams, 529 U.S. at 409-10; Visciotti, 537 U.S. at 25; Bell v. Cone, 535 U.S. 685,

10   699, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).  Moreover, as the Supreme Court

11   recently held in Cullen v. Pinholster, – U.S. –, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d

12   557 (2011), review of state court decisions under § 2254(d)(1) "is limited to the

13   record that was before the state court that adjudicated the claim on the merits."

14        As the Supreme Court recently explained in Harrington v. Richter, - U.S. -, 131

15   S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011):

16        "Under § 2254(d), a habeas court must determine what arguments or

17        theories supported or, as here [i.e., where there was no reasoned state-

18        court decision], could have supported, the state court's decision; and

19        then it must ask whether it is possible fairminded jurists could disagree

20        that those arguments or theories are inconsistent with the holding in a

21        prior decision of this Court."

22

23   Furthermore, "[a]s a condition for obtaining habeas corpus from a federal court, a

24   state prisoner must show that the state court's ruling on the claim being presented in

25   federal court was so lacking in justification that there was an error well understood

26   and comprehended in existing law beyond any possibility for fairminded

27   disagreement." Richter, 131 S. Ct. at 786-87.

28   //

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 3 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63   Filed 06/21/12   Page 20 of 56   Page ID
#:1267

1                          **DISCUSSION**

2   **A.**   **Habeas relief is not warranted with respect to petitioner's claims arising**

3          **from the introduction of allegedly false evidence.**

4          1.   The record below

5          At petitioner's trial in April 2006, the prosecution presented the testimony of

6   Maria Renteria, a woman who resided in a rental unit behind the victim's family

7   home.  Renteria testified that she knew the victim, Jose Robles, and that she was

8   "friends" with the Robles family.  (See 3 RT 1225, 1231-32.)  On May 10, 2003, the

9   night of the murder, Renteria had just parked her van on the street in front of the

10  Robles home, but she had not yet turned off her headlights when she saw a van, "like

11  a white Dodge Caravan," facing the wrong way on the street in front of her.  Renteria

12  testified that the two vans were facing each other and that she could see a "Black

13  male" inside of the white van.  This man was the driver.  (See 3 RT 1225-26, 1228-

14  29, 1232.)

15         Renteria testified that she saw a man next to the white van firing a weapon and

16  described that man as between 18 and 20, "kind of tall, like 5' 8," heavy build, and

17  wearing a flannel shirt with checkers.  The shooter was wearing a beanie and had

18  Jheri curls under the beanie that hung down to just above his shoulders.  (See 3 RT

19  1228-29, 1239.)  Renteria agreed that the shooter was "a Black guy."  (See 3 RT

20  1235-36.)  Renteria saw the shooter get out of the white van, and, after the shooting

21  had stopped, she saw the shooter get back inside the van.  The white van started

22  driving toward her, and then it drove past her.  Renteria testified that "after it went

23  past" her, she "turned away so they wouldn't see that I had seen."  (See 3 RT 1229-

24  30.)  Her headlights shone inside the white van "until they left."  (See 3 RT 1230.)

25         Renteria testified that she had never seen the driver of the white van before that

26  night.  When asked by the prosecutor if "the person sitting here at the end of counsel

27  table" was the "person that [she] saw in the car," Renteria responded that "[i]t looks

28  like him."  (See 3 RT 1226-27, 1229-30.)  Renteria admitted that she could not

                                   20

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 4 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 58   Filed 06/21/12   Page 21 of 56   Page ID
#:1268

1    remember being able to identify the driver prior to trial. (See 3 RT 1227, 1238–39.)
2    She first testified that she had about "2 minutes" to see the driver's face before she
3    focused on the shooter, but she then revised her estimate to "more than 10 seconds"
4    during cross examination. She confirmed that she had a "good view of the person"
5    in the driver's seat. (See 3 RT 1230-31, 1236-37, 1245.) Renteria testified that she
6    did not remember whether the driver had anything on his head, nor could she
7    remember any details of his appearance or what he was wearing. (See 3 RT 1229,
8    1239-41, 1244.) Renteria admitted that she had told the police at the time that she
9    was not able to describe the driver beyond the fact that he was a Black male. (See 3
10   RT 1252.) But Renteria agreed that she "had a good view" of the driver when her
11   headlights "hit the other van." (See 3 RT 1245.)
12       During cross examination, Renteria testified that she was parked "like in the
13   middle" of the block between Budlong and Vermont, but she could not recall whether
14   she was "a little bit up or [a] little backwards" from the Robles house. (See 3 RT
15   1232-33.) Renteria clarified that the white van was "straight ahead" of her, but on the
16   wrong side of the street, pointing toward her, and facing Vermont. (See 3 RT 1226,
17   1233-34, 1241-42.) She had parked facing Budlong, "right next to the Robles house."
18   (See 3 RT 1241.) She testified that she saw the shooter exit the passenger side of the
19   white van, but he stood by the driver's side while shooting. (See 3 RT 1242.) When
20   the shooter returned to the white van, he crossed in front of the van and opened the
21   side door of the van before climbing back into the van. (See 3 RT 1243.)
22       During redirect examination, Renteria testified that she first noticed that the
23   white van was parked on the wrong side of the street. (See 3 RT 1244-45.) Renteria
24   testified during further cross examination that she first saw Jose, the victim, "cross
25   the street" and that he was walking toward his house. She then saw Jose fall. (See 3
26   RT 1249-50.) Renteria admitted that she had not told the police at the time that she
27   had seen Jose either cross the street or fall to the sidewalk during the shooting. (See
28   3 RT 1250-52.) She further testified that the white van had its lights on at first, but

21

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 5 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63-82 Filed 06/21/12   Page 22 of 56   Page ID
#:1269

1    then the lights were turned off. (See 3 RT 1249-50.) Renteria explained that "there

2    was not a lot of cars in front. You could see there was not like big cars, vehicles. So

3    you could see." (See 3 RT 1250.) Renteria, however, did not give an estimate of the

4    distance between her vehicle and the white van.

5       Following the guilty verdict against petitioner on April 28, 2006, Maria

6    Renteria testified on August 7, 2007, at the separate trial of Abel Soto, the man

7    subsequently convicted of being the shooter during the incident. At Soto's trial, she

8    was called as a witness for the defense. Renteria testified that she had parked her van

9    "past the driveway" of the Robles house, toward Budlong. (See Am. Pet., Exh. E at

10    1802-04.)[10] Renteria saw the white van coming toward her "driving on the wrong

11    side of the street" with its lights off. (See Id. at 1804.) After the van stopped, she

12    saw the passenger get out and walk in front of the white van. Renteria testified that

13    she was about 35 feet away, or about two car lengths. (See Id. at 1805-06.) Renteria

14    described the shooter as a Black man, around 5' 10," heavy build and muscular,

15    wearing a black beanie and a dark flannel shirt. She was sure that he was not

16    Hispanic and that he had black shoulder-length hair with a Jheri curl. (See Id. at

17    1808-10, 1813, 1819.) Renteria testified that she saw the driver "when they passed"

18    after the shooting. (See Id. at 1810-11.) She said that she turned away because she

19    was scared and did not want them to know that she had seen the shooting. Renteria

20    testified that she was able to recognize the driver and that she had identified him at

21    his earlier trial. (See Id. at 1811.)

22

23

---

24       [10]     Exhibits A through G that are attached to petitioner's Amended Petition

herein are the same exhibits petitioner attached to his first state court habeas petition

25    to the Court of Appeal, and of which he sought review in the California Supreme

26    Court. (See LD F, Exhs. A - G; LD L.) Accordingly, these exhibits are part of the

record that was before the state courts. See Pinholster, 131 S. Ct. at 1398 (review of

27    state court decisions under § 2254(d)(1) "is limited to the record that was before the

28    state court that adjudicated the claim on the merits").

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 6 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 69-5   Filed 06/21/12   Page 23 of 56   Page ID
#:1270

1    During cross examination by the prosecutor[11] in Soto's case, Renteria was
2  presented with several crime scene photographs that the prosecutor said were "taken
3  right after the murder" and asked to locate her car.   Renteria testified that she
4  remembered that she had "parked past" the Robles' driveway, but she did not see her
5  car in the photographs. Following the shooting, she got out of her car and went to her
6  house. She testified that she did not recall moving her van, although she said that she
7  had been planning to go to the store.  (See Id. at 1816-18.)  After looking at other
8  photographs of the crime scene, Renteria located her van. It was parked further away,
9  "before the Robles' residence," and behind a truck and an SUV. (See Id. at 1821-24.)
10  Renteria, however, continued to insist that she had parked "past the driveway" of the
11  Robles' house, and again said that she "was not so far from where the shooting took
12  place." (See Id. at 1826.)
13    In April 2007, petitioner filed a motion for a new trial based on allegations of
14  juror misconduct. Petitioner also raised a conclusory argument that the evidence was
15  insufficient to support the verdict. (See 2 CT 210-11, 225-26.)  A hearing was held
16  on the motion for a new trial in connection with petitioner's sentencing on August 16,
17  2007.  No argument was made in the moving papers or at the hearing concerning the
18  then recent testimony of Renteria at Soto's trial. (See 2 CT 210-26; 5 RT 3901-08.)
19  The trial court denied petitioner's motion for a new trial, finding, in relevant part, that
20  "there was overwhelming evidence presented at trial to support the jurors' verdict and
21  special finding." (See 5 RT 3909.)
22    Petitioner first raised his claims pertaining to Renteria's testimony in his
23  habeas petition to the California Court of Appeal, to which the state filed an informal
24  response.   (See LD F-H.)   The Court of Appeal rejected petitioner's claims,
25
26
27    [11]    The prosecutor at petitioner's trial was Dara Williams (See 2 RT 1),
   while the prosecutor at Soto's trial was a "Ms. Barnes" (See Am. Pet., Exh. E at
28  1814).

23

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 7 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 68-4 Filed 06/21/12    Page 24 of 56    Page ID
#:1271

1    concluding in relevant part (See LD I at 2)[12]:

> [W]e do not agree the impeachment evidence conclusively establishes Renteria lied at [petitioner's] trial. Even if her view was impeded and at an unlikely distance, we cannot conclude it was physically impossible for her to have seen [petitioner] in the illuminated front seat of the van.

> Moreover, Renteria's identification of [petitioner] added little to the already overwhelming evidence against [petitioner], which consisted of three other eyewitness identifications by individuals who had known [petitioner] over an extended period of time. While [petitioner] insists these witnesses were motivated to lie and framed him for Robles's murder, the trial court was in a far better position to evaluate their credibility and referred to the strength of this evidence in support of its denial of [petitioner's] new trial motion.

> The petition is summarily denied.

### 2.    Ground 1 of the Amended Petition

In his Ground 1, petitioner claims that he is entitled to habeas relief pursuant to Cal. Penal Code § 1473 based on the introduction of the allegedly false evidence

---

[12]    As noted in the Procedural History section above, petitioner then filed a Petition for Review of the Court of Appeal's rejection of his habeas petition in the California Supreme Court, which the California Supreme Court summarily denied without comment or citation of authority. (See LD L-N.) Under Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991), it may be presumed that the California Supreme Court, by its silent denial of petitioner's Petition for Review, did not intend to change the Court of Appeal's reasoned decision rejecting petitioner's claims pertaining the allegedly false evidence. See also Williams v. Cavazos, 646 F.3d 626, 635-36 (9th Cir. 2011), cert. granted in part, 132 S. Ct. 1088 (Jan. 13, 2012).

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 8 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 69-5 Filed 06/21/12   Page 25 of 56   Page ID
#:1272

1   by Maria Renteria. (<u>See</u> Am. Pet. at 5; <u>see also</u> Am. Pet. Attach. at 27; Trav. at 10-

2   24.) However, in order to be entitled to federal habeas relief, petitioner must show

3   that he is in custody in violation of the Constitution or laws or treaties of the United

4   States. <u>See</u> 28 U.S.C. § 2254(a); <u>see also</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68, 112

5   S. Ct. 475, 116 L. Ed. 2d 385 (1991) ("In conducting habeas review, a federal court

6   is limited to deciding whether a conviction violated the Constitution, laws, or treaties

7   of the United States."); <u>Smith v. Phillips</u>, 455 U.S. 209, 221, 102 S. Ct. 940, 71 L. Ed.

8   2d 78 (1982) ("A federally issued writ of habeas corpus, of course, reaches only

9   convictions obtained in violation of some provision of the United States

10  Constitution."); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991) (federal

11  habeas courts "do not review questions of state evidence law"). To the extent that

12  petitioner is contending that the trial court should not have admitted the allegedly

13  false evidence, or that he is entitled to habeas relief, pursuant to state law, such claims

14  are not even cognizable on federal habeas review.

16      3.    <u>Ground 2 of the Amended Petition</u>

17          a.    *petitioner's claim*

18      In his Ground 2, petitioner claims that the prosecutor's knowing presentation

19  of Renteria's false testimony violated his federal constitutional right to due process

20  and a fair trial. (<u>See</u> Am. Pet. at 5; <u>see also</u> Am. Pet. Attach. at 31-32; Trav. at 12-14,

21  24-39.) Petitioner contends that Renteria's testimony at his trial was false because

22  her testimony at the subsequent trial of Soto differed from her testimony at

23  petitioner's trial in the following respects: (a) at Soto's trial, Renteria testified that the

24  driver of the white van turned off the headlights; (b) at Soto's trial, Renteria changed

25  her testimony concerning at what point during the incident she got a good look at the

26  driver's face; (c) at Soto's trial, Renteria estimated the distance between her vehicle

27  and the white van to be 35 feet, and it was said to be about 160 feet by the prosecutor

28  based on the crime scene photographs, whereas at petitioner's trial, Renteria did not

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 9 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63-5 Filed 06/21/12   Page 26 of 56   Page ID
#:1273

1  estimate the distance and said that she had parked close enough to get a good look;

2  (d) at Soto's trial, Renteria identified her vehicle in a photograph in which she was

3  parked behind a large truck and several other vehicles, but she testified at petitioner's

4  trial that no large vehicles were in front of her; and (e) Renteria testified that she had

5  seen the victim fall to the ground, but at Soto's trial, evidence was introduced that she

6  had parked about four vehicles and a driveway-length away from the location of the

7  shooting.  In addition, petitioner's post-trial investigation showed that the distance

8  between where Renteria's vehicle is shown parked in the photographs from Soto's

9  trial and the shooting was about 128 feet, and it would have been "physically

10  impossible for Renteria to see petitioner's face through the windshield of his vehicle

11  from that distance at night." (See Am. Pet. Attach. at 29-30; Trav. at 10-14, 18, 25-

12  27, 37.)  Further, petitioner claims that the jury in Soto's trial did not find Renteria's

13  testimony credible because it convicted Soto, despite the fact that Renteria had been

14  called by the defense because her description of the shooter did not match Soto.

15  Petitioner contends that Sergeant Katz, the investigating officer who testified at

16  petitioner's trial, should have known that Renteria's identification of petitioner could

17  not have been based on what she saw that night because it would not have been

18  possible for Renteria to identify petitioner from the distance at which she had parked

19  her van. (See Am. Pet. Attach. at 30-31.)

20

21          b.      *applicable legal authority*

22          The Supreme Court has held that "a conviction obtained through use of false

23  evidence, known to be such by representatives of the State" violates the defendant's

24  right to due process.  See Napue, 360 U.S. at 269, Alcorta v. Texas, 355 U.S. 28, 78

25  S. Ct. 103, 2 L. Ed. 2d 9 (1957); Mooney v. Holohan, 294 U.S. 103, 55 S. Ct. 340, 79

26  L. Ed. 791 (1935).  Napue encompasses the knowing presentation of false evidence

27  even where the witness used to transmit the false information was unaware of its

28  falsity.  See Hayes v. Brown, 399 F.3d 972, 980-81 (9th Cir. 2005) (en banc).  In

26

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 10 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 68-3   Filed 06/21/12   Page 27 of 56   Page ID
#:1274

1   order to prevail on such a due process claim, "the petitioner must show that (1) the

2   testimony (or evidence) was actually false, (2) the prosecution knew or should have

3   known that the testimony was actually false, and (3) that the false testimony was

4   material." See United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003), cert.

5   denied, 540 U.S. 1208 (2004).

6       In assessing materiality under Napue, the Court determines whether there is

7   "any reasonable likelihood that the false testimony could have affected the judgment

8   of the jury." See Hayes, 399 F.3d at 985 (noting that the materiality standard of

9   United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), a

10   forerunner of Kyles v. Whitley, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490

11   (1955), applies to Napue claims); see also Murtishaw v. Woodford, 255 F.3d 926, 959

12   (9th Cir. 2001), cert. denied, 535 U.S. 935 (2002). The "touchstone of materiality"

13   is a "reasonable probability" of a different result. See Kyles, 514 U.S. at 434-35. The

14   impact of the withheld or perjured evidence "must be evaluated in the context of the

15   entire record." See Agurs, 427 U.S. at 112.[13]

16

17          *c.*    *analysis*

18       The record reflects that, during petitioner's trial, Renteria was not asked, and

19   did not specify, exactly where she was parked, nor did she give an estimate of the

20   distance between her vehicle and where the white van had stopped. Further, the

21   record does not reflect at what time the photographs subsequently introduced at

22   Soto's trial in which Renteria identified her parked vehicle were taken, nor does the

23   record reflect any evidence that all of the vehicles depicted in those photographs were

24   present and parked in the same locations as shown in the photographs at the time of

25   the murder. Renteria was consistent in her testimony at both trials, insisting at Soto's

26

27       [13]     When applying the materiality analysis, "there is no need for a separate

28   harmless error review." Kyles, 514 U.S. at 423; Hayes, 399 F.3d at 984-85.

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 11 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 68-8 Filed 06/21/12    Page 28 of 56    Page ID
#:1275

1    trial that "I just remember I was parked past the Robles. Past their driveway." In
2    addition, after being presented at Soto's trial with the photographs of her vehicle
3    parked behind other vehicles (including a truck) and at some distance from the
4    Robles' house, Renteria continued to deny that she had been parked further away
5    from the shooting than the Robles' residence, and she specifically denied that she had
6    parked behind a "large truck." (See Am. Pet., Exh. E at 1816-17, 1822-24.)
7    Petitioner argues that "the prosecutor at petitioner's trial had to have known that
8    Renteria was parked too far from the white van to have been able to get a good look
9    at the driver" (See Trav. at 23), but petitioner has failed to adduce any evidence that
10   the prosecutor or the investigating detective who testified at petitioner's trial were
11   aware that Renteria's testimony at petitioner's trial was not consistent with some of
12   the photographs taken at the crime scene, or that any evidence existed from which the
13   distance at which Renteria had parked her van at the time of the shooting could be
14   determined.

15        In any event, mere inconsistencies in testimony are insufficient to establish that
16   the testimony of a witness was false (see United States v. Croft, 124 F.3d 1109, 1119
17   (9th Cir. 1997); United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.), cert.
18   denied, 516 U.S. 945 (1995), overruled on other grounds by Valerio v. Crawford, 306
19   F.3d 742, 764 (9th Cir. 2002) (en banc)), or that the prosecutor knowingly presented
20   perjured testimony (see, e.g., United States v. Sherlock, 962 F.2d 1349, 1364 (9th
21   Cir.), cert. denied, 506 U.S. 958 (1992); United States v. Lochmondy, 890 F.2d 817,
22   822 (6th Cir. 1989)).

23        Additionally, the Court rejects petitioner's argument that it was impossible for
24   the headlights of Renteria's van to have illuminated the interior of the white van from
25   where she was parked in the photographs and that her "false" testimony impacted
26   Jesse Robles's testimony that Renteria's headlights assisted Jesse in seeing the inside
27   of the white van. (See Trav. at 18-22; 2 RT 952-53.) Jesse Robles testified on the
28   first day of petitioner's trial that he could see petitioner seated inside the white van

28

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 12 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 68-5    Filed 06/21/12    Page 29 of 56    Page ID
#:1276

1   in part because his neighbor "was coming back home and she had her lights on." (See

2   2 RT 952, 975.) Jesse Robles denied having spoken to Renteria about the case or

3   about Renteria's forthcoming testimony. (See 2 RT 953.) Petitioner has offered no

4   evidence to support that Jesse Robles's testimony about seeing Renteria's headlights

5   also was false or that Jesse coordinated his testimony prior to trial with Renteria.

6   Rather, Jesse Robles's independent testimony serves to corroborate Renteria's later

7   testimony that her headlights illuminated the interior of the white van at the time of

8   the shooting.

9         The Court therefore finds that petitioner has failed to meet his burden of

10  showing that the Court of Appeal's conclusion that the impeachment evidence did not

11  establish that Renteria's testimony at petitioner's trial was actually false, or that it

12  would have been impossible for Renteria to have seen petitioner in the front seat of

13  the illuminated van, "was so lacking in justification that there was an error well

14  understood and comprehended in existing law beyond any possibility for fairminded

15  disagreement." Richter, 131 S. Ct. at 786-87.

16        The Court also finds that petitioner has failed to meet his burden of showing

17  that the Court of Appeal's conclusion that, when viewed in the context of the

18  "overwhelming evidence" against petitioner, Renteria's allegedly false testimony was

19  not material  (see LD I at 2) "was so lacking in justification that there was an error

20  well understood and comprehended in existing law beyond any possibility for

21  fairminded disagreement."   The record reflects that Renteria's credibility was

22  questionable in light of the extensive cross examination conducted by petitioner's

23  counsel that highlighted significant problems and inconsistencies with Renteria's

24  identification of petitioner, such as her testimony that it was the gunshots that drew

25  her attention to the white van and that she was "looking at the shooter doing all the

26  shooting"; that she was not paying any particular attention to the driver of the white

27  van before the shooting began; that her time estimate of how long she had looked at

28  the driver was inaccurate; that she had not identified petitioner in any photograph

                                            29

Case 2:10-cv-02343-VBF-RNB     Document 82-5     Filed 09/12/12     Page 13 of 40     Page
Case 2:10-cv-02343-AHM-RNB     Document 93     Filed 06/21/12     Page 30 of 56     Page ID
#:1277

1    previous to identifying petitioner at trial; that she could not remember what the driver
2    was wearing or what he looked like; that she had not provided the police with any
3    identifying information about the driver; and that her testimony at trial that she had
4    seen the victim being shot and falling to the sidewalk was inconsistent with what she
5    had told the police she had seen during the incident. (See 3 RT 1231-44, 1248-52.)
6    Further, the Court concurs with the Court of Appeal that "Renteria's identification of
7    [petitioner] added little" to the overwhelming evidence against petitioner. (See LD
8    I at 2.) Although the testimony of all four eyewitnesses who identified petitioner as
9    the driver of the white van was generally consistent, Renteria's identification was the
10    weakest of the four.  Each of the other three eyewitnesses, Jesse Robles, Carlos
11    Lopez, and Albert Segundo, described a white van parked in the same general
12    location as that described by Renteria, each of the men knew petitioner (a Black male)
13    by name, and each identified petitioner to the police by name. (See 2 RT 942-43,
14    946, 962, 967-68; 3 RT 1318-20, 1536-38, 1548-50, 1569-71, 1614-16; 4 RT 1891,
15    1893.) Each of the other three eyewitnesses also identified petitioner at trial as the
16    driver of the white van, and each of the other three testified at trial that he was certain
17    of his identification. (See 2 RT 943, 962; 3 RT 1537-38, 1550, 1615-16.) In contrast,
18    Renteria never provided a description of the driver beyond the fact that he was a
19    Black male, and she only testified at trial that petitioner "looks like him." (See 3 RT
20    1227.) Finally, other evidence was presented from several witnesses that petitioner
21    had been looking for Jose Robles that day because Jose had gotten into an argument
22    with petitioner's brother Jeremy earlier on the day of the murder. (See 3 RT 1608-16,
23    1629-31, 1633-34, 1637; 4 RT 1870-76, 1881-83.)

24
25        4.    Ground 3 of the Amended Petition
26            a.    *petitioner's claim*
27        In his Ground 3, petitioner claims that trial counsel provided ineffective
28    assistance by failing to adequately question Maria Renteria about her ability to see

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 14 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63-1   Filed 06/21/12   Page 31 of 56   Page ID
#:1278

1   the driver of the white van and for failing to investigate and produce evidence that it

2   would have been impossible for Renteria to see the driver under the circumstances

3   she described. (See Am. Pet. at 6; see also Am. Pet. Attach. at 32-37; Trav. at 39-44.)

4   Petitioner contends that his trial counsel rendered ineffective assistance in failing to:

5   (a) "question Renteria about the distance between her van and the crime scene" and

6   ask her to identify her van on the crime scene photographs; (b) adequately investigate

7   the facts and to present evidence of the distance between Renteria's car and the crime

8   scene; and (c) present evidence that a person would not have been able to see

9   petitioner's face from 128 feet away at night and that it would have been physically

10  impossible for Renteria to identify petitioner as the driver. (See Am. Pet. Attach. at

11  33-34.) Petitioner contends that his counsel was "surprised" by Renteria's in-court

12  identification of petitioner and was "unprepared to cross-examine [her] about her

13  ability to see what she said she saw." Petitioner asserts that counsel should have

14  requested that Renteria was "subject to recall," and that he should have sent an

15  investigator to the crime scene to measure the distances. (Id. at 34.) Petitioner argues

16  that Renteria's testimony was important because she was the only one of the four

17  witnesses to identify petitioner who did not know him and who "appeared to be

18  unbiased," and that "petitioner was a stranger to Renteria." Petitioner contends that

19  Renteria's testimony "bolstered the credibility of the three NC witnesses." Petitioner

20  cites the prosecutor's emphasis in closing that Renteria "had nothing to do with either

21  of the tagging crews in this case," that Renteria was "kind of an important witness,"

22  and the strength of having four witnesses identify petitioner. (See Am. Pet. Attach.

23  at 35-36; Trav. at 37.) Finally, petitioner argues that "[t]his was a close case" based

24  on the length of the jury deliberations and that fact that the jury requested a readback

25  of the complete testimony of seven witnesses. (See Am. Pet. Attach. at 36-37.)

26  //

27  //

28  //

31

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 15 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63   Filed 06/21/12   Page 32 of 56   Page ID
#:1279

1          b.    *applicable legal authority*

2        In Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d

3 674 (1984), the Supreme Court held that there are two components to an ineffective

4 assistance of counsel claim: "deficient performance" and "prejudice." "Deficient

5 performance" in this context means unreasonable representation falling below

6 professional norms prevailing at the time of trial. See Strickland, 466 U.S. at 688-89.

7 To show "deficient performance," petitioner must overcome a "strong presumption"

8 that his lawyer "rendered adequate assistance and made all significant decisions in the

9 exercise of reasonable professional judgment." Id. at 690. Further, petitioner "must

10 identify the acts or omissions of counsel that are alleged not to have been the result

11 of reasonable professional judgment." Id. The reviewing court must then "determine

12 whether, in light of all the circumstances, the identified acts or omissions were

13 outside the range of professionally competent assistance." Id. The Supreme Court

14 in Strickland recognized that "it is all too easy for a court, examining counsel's

15 defense after it has proved unsuccessful, to conclude that a particular act or omission

16 of counsel was unreasonable." Id. at 689. Accordingly, to overturn the strong

17 presumption of adequate assistance, petitioner must demonstrate that "the challenged

18 action cannot reasonably be considered sound trial strategy under the circumstances

19 of the case." Lord v. Wood, 184 F.3d 1083, 1085 (9th Cir. 1999), cert. denied, 528

20 U.S. 1198 (2000).

21        To meet his burden of showing the distinctive kind of "prejudice" required by

22 Strickland, petitioner must affirmatively "show that there is a reasonable probability

23 that, but for counsel's unprofessional errors, the result of the proceeding would have

24 been different. A reasonable probability is a probability sufficient to undermine

25 confidence in the outcome." Strickland, 466 U.S. at 694.

26 //

27 //

28 //

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 16 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63595 Filed 06/21/12   Page 33 of 56   Page ID
#:1280

  *c.* *analysis*

   Petitioner raised an ineffective assistance of counsel claim corresponding to Ground 3 of the Amended Petition herein in his first state court habeas petition. (See LD F at 28-35, LD H at 4-6.) The California Court of Appeal rejected that petition with a reasoned decision addressing a claim by petitioner that corresponds generally to petitioner's Grounds 1 and 2 of the Amended Petition herein. The Court of Appeal did not explicitly address petitioner's ineffective assistance of counsel claim, although it did state at the end of its brief reasoned decision that, "The petition is summarily denied." (See LD I.) As noted above, petitioner did not raise his claims in an original habeas petition to the California Supreme Court. Instead, he filed a Petition for Review seeking "review of the order denying his petition for writ of habeas corpus which was filed on the same day as an unpublished opinion on his appeal" (see LD L at 1), which the California Supreme Court proceeded to summarily deny (see LD M, N).

   Accordingly, the standard of review applicable to Ground 3 of the Amended Petition is not clear. The Ninth Circuit recently held in Williams that a California Court of Appeal's reasoned opinion rejecting a state law claim that did not address, "obliquely or otherwise," petitioner's related but separate federal constitutional claim did not constitute an adjudication of the federal constitutional claim on the merits. See Williams, 646 F.3d at 636, 638 & n.7, 639 n.10. In such cases, the Ninth Circuit held, the AEDPA's deferential standard of review does not apply, and the federal constitutional claim must be reviewed de novo. See id. at 641; see also Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003) (finding that "AEDPA's deferential standard" does not apply "because the state court did not reach the merits" of the federal due process claim); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002) (holding that "when it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo"), cert. denied, 539 U.S. 916 (2003). However, the Supreme Court recently granted a petition for writ of certiorari to

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 17 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 63-94  Filed 06/21/12    Page 34 of 56    Page ID
#:1281

1    address this part of the <u>Williams</u> decision. <u>See Cavazos v. Williams</u>, 132 S. Ct. 1088,

2    181 L. Ed. 2d 806 (Jan. 13, 2012) (granting petition for writ of certiorari "limited to

3    Question 1 presented by the petition"); <u>Cavazos v. Williams</u>, 2011 WL 4874095

4    (Appellate Pet., Motion and Filing) (Oct. 10, 2011) (presenting Question 1 as:

5    "Whether a habeas petitioner's claim has been 'adjudicated on the merits' for

6    purposes of 28 U.S.C. § 2254(d) where the state court denied relief in an explained

7    decision but did not expressly acknowledge a federal-law basis for the claim.").

8          In any event, as discussed hereafter, even applying a de novo standard of

9    review to petitioner's Ground 3, the Court finds that habeas relief is not warranted on

10   this ineffective assistance of counsel claim. It follows that the state courts' rejection

11   of the claim necessarily was reasonable under the more deferential AEDPA standard

12   of review, if that standard of review applies. <u>See Berghuis v. Thompkins</u>, - U.S. -,

13   130 S. Ct. 2250, 2264, 176 L. Ed. 2d 1098 (2010).

14         First, as set forth above, the record reflects that counsel's extensive cross

15   examination of Renteria highlighted problems with Renteria's testimony in general

16   and with her in-court identification of petitioner in particular. Not only does the

17   record belie petitioner's contention that counsel was unprepared for his cross

18   examination of Renteria, but it reflects that Renteria's credibility was called into

19   question. Second, as the Court found above, Renteria's testimony that petitioner cites

20   from the subsequent trial of Soto did not prove that it was impossible for Renteria to

21   have seen petitioner in the driver's seat of the white van either while her vehicle was

22   parked where she testified that she had parked it, or while the white van was driving

23   toward her and before she had turned away. Third, as the Court also found above,

24   Renteria's tentative and belated identification of petitioner was not reasonably likely

25   to have carried more weight with the jury than those of the other three eyewitnesses,

26   each of whom identified petitioner by name to the police after the shooting and

27   positively identified petitioner in court. Petitioner contends that Renteria was the

28   only "unbiased" witness, but the record reflects that Renteria testified that she knew

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 18 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63-5   Filed 06/21/12   Page 35 of 56   Page ID
#:1282

1   the victim and that she was friends with his family, who were her landlords at the

2   time of the murder.[14]   Indeed, during closing arguments, petitioner's counsel argued

3   that Renteria was biased because she lived with the victim.   Petitioner's counsel also

4   argued in closing that Renteria would not have been able to identify petitioner

5   because her headlights were not directly pointing into the white van, that her

6   description of the shooting was inconsistent with that of the other witnesses, that she

7   had failed to identify petitioner from a photo she was shown soon after the shooting,

8   and that "she could not be relied upon for the accuracy of what she's telling us." (See

9   5 RT 2750-51.)   Thus, the jury was well aware of the problems with Renteria's

10   testimony in general and with her in-court identification of petitioner in particular.

11       Second, there is Ninth Circuit authority for the proposition that the length of

12   the jury deliberations is one factor to be considered in the determination of

13   Strickland's prejudice prong.   See, e.g., Jennings v. Woodford, 290 F.3d 1006, 1019

14   (9th Cir. 2002), cert. denied, 539 U.S. 958 (2003); United States v. Velarde-Gomez,

15   269 F.3d 1023, 1036 (9th Cir. 2001) (en banc).   However, the Court disagrees with

16   petitioner that the length of jury deliberations here reflects that this was "a close

17   case." (See Am. Pet. Attach. at 36-37.)   Rather, the record reflects that the jury was

18   sworn in and commenced their deliberations only late in the afternoon on April 25,

19   2006. The following morning, April 26, 2006, deliberations resumed at 9:15 a.m, and

20   the jury requested a readback of significant portions of the testimony less than two

21   hours later.   The jury made a single request for the readback of seven witnesses, and

22   the readbacks were conducted at different times over the course of that afternoon and

23   during the following day.   The record further reflects that the jury retired for the

24   

---

25       [14]   The Court notes that petitioner argues that "Maria Renteria lived in the
26   same house as the victim and his family. They all knew each other well." (See Trav.
27   at 30.) The record reflects that, although she testified that she was friends with the
     victim's family, Renteria rented a house behind the house in which the victim's
28   family lived. (See 3 RT 1231-32.)

35

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 19 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 63-9    Filed 06/21/12    Page 36 of 56    Page ID
#:1283

1    evening immediately after the second readback was completed on April 26, 2006, and

2    then reached a verdict within an hour and fifteen minutes of the last readback on the

3    third day, April 27, 2006.  (See 5 RT 2767-3602; 1 CT 130-32, 186.)

4         The Court therefore finds that petitioner has not met his burden of showing

5    that, but for counsel's failure to investigate and further question Renteria regarding

6    the exact location of her parked vehicle and/or failure to further call into question the

7    credibility of Renteria's tentative in-court identification of petitioner, there is a

8    reasonable probability that petitioner would not have been convicted.  As the

9    Supreme Court recently observed in Richter, 131 S. Ct. at 791, "In assessing

10   prejudice under Strickland, the question is not whether a court can be certain

11   counsel's performance had no effect on the outcome or whether it is possible a

12   reasonable doubt might have been established if counsel acted differently."  Rather,

13   "the likelihood of a different result must be substantial, not just conceivable."  See

14   id. at 792.  Moreover, the Court's finding that petitioner has failed to make the

15   requisite showing of prejudice renders it unnecessary to address Strickland's deficient

16   performance prong.  See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an

17   ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course

18   should be followed."); Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to

19   satisfy either prong of the Strickland test obviates the need to consider the other.");

20   Williams v. Calderon, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995), cert. denied, 516

21   U.S. 1124 (1996) (disposing of an ineffective assistance of counsel claim without

22   reaching the issue of deficient performance because petitioner failed to make the

23   requisite showing of prejudice).

24   //

25   //

26   //

27   //

28   //

36

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 20 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 63-7    Filed 06/21/12    Page 37 of 56    Page ID
#:1284

**B.      Habeas relief is not warranted with respect to petitioner's claims arising from the jury's exposure to information pertaining to petitioner's prior arrest.**

1.      The record below

On April 6, 2003,[15] approximately one month before the murder, petitioner came into contact with Deputy Marella.  Deputy Marella testified at trial about petitioner's appearance, and the prosecutor asked him, "did you take a booking photograph of him at that time?"  When the deputy responded in the negative, the prosecutor asked, "[d]id you present him for booking so that a photograph was taken?"  During the brief testimony that following concerning petitioner's appearance and his pierced eyebrow, the terms "booked," "booking," "booking photo," and "booking photograph" were used a total of eight times.  (See 3 RT 1528-30.)  Immediately after the deputy's testimony concluded, the court took a break, and, outside the presence of the jury, the following exchange occurred (See 3 RT 1530-32):

> [Counsel]:  Your Honor, as to the testimony of the last witness,
> I didn't want to object and bring more attention to it at the time.  I knew
> the purpose that this witness was testifying simply to bring this, the eye
> piercing thing up because it's going to lead to another witness.
> However, it had been indicated to me by [the prosecutor] that she was
> not going to bring up the fact that my client was arrested at that time.
> That she was only going to say that this officer had had contact with him
> and noticed the eye piercing or something like that.  But then she went
> into questions of booking and him being booked and a booking photo

---

[15]      The exhibit in question reflects an arrest date of "04-06-2003." (See LD A at Attach. 1.)  During testimony at trial and in subsequent proceedings, an arrest date of April 5, 2003, was used.  At trial, Deputy Marella testified that he came into contact with petitioner "shortly after midnight" on April 5, 2003.  (See 3 RT 1528.)

37

1    *and the like. So the whole thing of him being – because I thought it was*

2    *going to be sanitized. ... I believe this may have been inadvertent on her*

3    *part.*

4           *[Prosecutor]: It was my screw up. I apologize. I wasn't thinking*

5    *about the booking photo and the arrest that's why I asked contact, but*

6    *I wanted to make it clear that there are photographs and I wanted to*

7    *make it clear that the jury saw those photographs and that's why. It was*

8    *my screw up. I apologize for that. I don't know if the jury knows what*

9    *a booking photo necessarily is.*

10           *The Court: I think everybody does.*

11           *[Prosecutor]: Anyway, it was my screw up and I apologize*

12    *because I didn't want to bring it to their attention, but if the court – if*

13    *counsel certainly wants a cautionary instruction, you know, with that*

14    *regard ...*

15           *[Counsel]: Like I said, I think if I had brought something up, it*

16    *would have drawn more attention to it so at this junction I don't want*

17    *to. I'm bringing it up now because I want to make sure that we proceed*

18    *cautiously every step of the way so that such an error doesn't occur*

19    *again.*

20           *[Prosecutor]: I apologize. I should have asked counsel about*

21    *that because the booking photo was only, if he showed a photograph of*

22    *him, to show that there was no piercing in the photograph. So I*

23    *apologize. But as I indicated, if counsel wants a cautionary instruction*

24    *to the jury, then I'd certainly have no objection to drafting something.*

25    *...*

26           *[Counsel]: ... At this juncture I'm indicating I'm not – unless*

27    *something else comes up in that fashion or whatever, I'm not asking for*

28    *anything additional to be done at this junction.*

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 22 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 63    Filed 06/21/12    Page 39 of 56    Page ID
#:1286
#:2258

1

2          Earlier in the trial, the prosecutor had shown petitioner's booking photograph

3    from the April 2003 arrest to witness Jesse Robles.  The booking photograph in

4    question, marked as People's Exhibit 3, had been shown to Jesse during his first

5    interview with the police after he had told Detective Katz that he recognized the

6    driver of the white van and provided Detective Katz with petitioner's name.  (See 2

7    RT 945-46, 967-69.)  The photograph was admitted into evidence without any

8    defense objection.  (See 4 RT 2173-74.)

9          Some weeks after petitioner's trial, juror No. 5 wrote a letter to the trial court

10   stating, in part (see 4 Augmentation, Reporter's Transcript on Appeal ["ART"] L-2

11   to L-3.):

12          *There was one concern about the deliberation process that still*

13          *resonates in my mind, and I would like to know whether it is normal*

14          *procedure in order to put my conscience at ease.  During the hearing,*

15          *a picture of Mr. Coleman was presented as evidence.  Later, when this*

16          *picture was presented in the jury room it entailed information about the*

17          *defendant, detailing a prior arrest which occurred a month before the*

18          *incident in question.  I know for a fact that the details of this prior arrest*

19          *influenced the jury's decision in determining the final verdict.  Since Mr.*

20          *Coleman's past was not brought up during the hearing, I have been*

21          *wondering whether the information about his previous arrest should*

22          *have been presented to the jury during the deliberation process.*

23          *I have pondered this question for awhile, and I would like to have*

24          *an answer for my peace of mind.*

25

26          After conferring with counsel, the court determined that the booking

27   photograph marked as People's Exhibit No. 3  had been folded in half during trial to

28   conceal information pertaining to petitioner's arrest while allowing witnesses to see

39

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 23 of 40   Page
ID #:3600
Case 2:10-cv-02343-AHM-RNB   Document 63   Filed 06/21/12   Page 40 of 56   Page ID
#:1287

1  a photograph of petitioner. Inadvertently, the complete exhibit had been sent to the

2  jury room during deliberations without removing the booking information. (See 4

3  ART at L-4.) Counsel represented to the court that he and the prosecutor had had a

4  discussion about the exhibit in which it had been agreed that the information about

5  petitioner's arrest that was included on the folded exhibit was to be cut off or blacked

6  out before the exhibit was sent to the jury. The prosecutor did not recall the

7  discussion, but the record reflects that no objection was raised to the exhibit. The

8  prosecutor, however, stated that it had not been her intention to show the arrest

9  information to the jury. (See 4 ART at L-21 to L-23.)

10        The information on the relevant exhibit includes petitioner's name and booking

11  number, an arrest date of April 6, 2003, his birth date, sex, race, height, weight, and

12  the charging information recorded as follows: "496(A)/PC/F/REC KNWN STOLN

13  PROP $400+; 12031(A)(2)(D) /PC/F/C/LOADED F/ARM: PROHIB/ETC;

14  12031(A)(1)/PC/F/CARY LOAD F/ARM: PUB:S/CIR; 12025(A)(1)/PC/F/CCW IN

15  VEH W/PR FEL CONV." (See LD A, Attach. 1.)

16        The jurors were requested to return to court, which eleven did.[16] Those eleven

17  jurors were sworn in and testified individually during hearings over several days.

18  Five of the jurors testified either that they did not see the reverse side of the

19  photograph, or that they could not recall seeing the information contained on the

20  reverse side. (See 4 ART at M-10 to M-11, M-22, O-3, O-8, P-4.) Six jurors did

21  recall seeing the information on the reverse side of the photograph. (See 4 ART at

22  L-9 to L-11, M-6 to M-7, M-13 to M-14, N-3 to N-4, N-6 to N-7, N-10 to N-11.)

23  Four of the jurors recalled that another juror, possibly the foreperson, had stated that

24  the information on the exhibit should not be considered during deliberations or that

25

26

---

27        [16]     When contacted by the court's clerk, one of the jurors stated that the
juror believed that "the right decision was made" and elected not to come in to testify.

28  (See 4 ART at N-13.)

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 24 of 40   Page
ID #:1501
Case 2:10-cv-02343-AHM-RNB   Document 63-1   Filed 06/21/12   Page 41 of 56   Page ID
#:1288

1  the jurors should not look at the information. (See 4 ART at L-10, L-12, N-12, O-5,

2  P-4.) Even the juror who brought the issue to the court's attention, juror No. 5,

3  testified, "I think we understand [sic] that we shouldn't ... be considering this

4  information." (See 4 ART at L-17 to L-18.) Although five of the jurors understood

5  that the information related to a prior arrest, a prior offense, or a previous contact

6  with the police by petitioner, no juror recalled any discussion during deliberations

7  concerning any prior offense or prior arrest. Similarly, no juror recalled that any juror

8  read out loud the information on the reverse side of the photograph. (See 4 ART at

9  L-10 to L-12, L-16, M-6 to M-7, M-11, M-12 to M-14, M-19 to M-20, M-22 to M-23,

10 N-3 to N-4, N-7 to N-8, N-11 to N-12, O-2, O-9 to O-10, P-4.) None of the jurors

11 testified that any juror specifically pointed to the information contained on the reverse

12 side of the photograph during deliberations or that any general discussion of

13 petitioner's past record or prior contact with the police occurred during deliberations.

14      In a subsequent motion for a new trial, counsel argued that the introduction of

15 the information on the exhibit constituted juror misconduct, that it was clear that the

16 jury had examined the information, and that petitioner was prejudiced by the

17 introduction of evidence of a criminal record suggesting dishonesty. (See 2 CT 210-

18 26; 5 RT 3901-08.) The trial court denied the motion, finding "no juror misconduct

19 or indication of actual bias or prejudice due to the forwarding of that particular

20 exhibit with criminal history in its unedited form." (See 5 RT 3908-09.)

21

22      2.   The California Court of Appeal's decision

23      In rejecting petitioner's related claim on direct appeal, the California Court of

24 Appeal determined, first, that the disclosure of the "booking information," although

25 inadvertent, should be considered "under the rubric of juror misconduct," and then

26 determined, in relevant part, as follows (see LD D at 9-12):

27          *At the outset, we concur with the trial court's assessment of the*

28          *booking information as not inherently prejudicial to the jurors'*

41

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 25 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 93-2   Filed 06/21/12   Page 42 of 56   Page ID
#:1289

1    *deliberation.  The overwhelming evidence against [petitioner] more*

2    *than rebuts the presumption he was unduly prejudiced by the disclosure*

3    *of the information.  In a different – and closer – case, we might*

4    *conclude the jurors' exposure to a defendant's booking information,*

5    *from which they could have gleaned he had a prior felony conviction*

6    *and was carrying concealed firearms when he was arrested with stolen*

7    *property worth more than $400, improperly infected the jury's*

8    *deliberations.  But this is not a close case.  [Petitioner] was identified*

9    *as the driver of the van by three witnesses who knew him well.  These*

10    *same witnesses knew Robles had recently antagonized [petitioner] by*

11    *picking on his younger brother and had heard [petitioner] threaten*

12    *revenge.  The trial court obviously viewed the case the same way and*

13    *concluded the evidence against [petitioner] was overwhelming.*

14    *The jurors' statements concerning their reaction to the booking*

15    *information confirms their focus properly remained on the evidence*

16    *before them and not on the information he had previously been arrested*

17    *on a weapons charge.  Their comments reveal the jurors appeared to*

18    *have discerned Coleman had been previously arrested for carrying a*

19    *gun, but few, if any, appeared to understand the detail of the charges.*

20    *Moreover, the impact of the information itself appeared minimal.  It is*

21    *evident only fleeting references were made to the information by one or*

22    *two small groups of jurors.  Nearly half of the jurors did not even recall*

23    *knowing about the prior arrest. ... [T]he jurors ... who saw the booking*

24    *information mentioned [petitioner's] prior arrest only in passing and*

25    *appeared to follow the court's instruction to consider only the evidence*

26    *presented at trial. [¶]  Based upon our independent review of the*

27    *evidence, therefore, we see no substantial prejudice resulting from the*

28    *jurors' inadvertent review of the booking information.*

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 26 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 83603 Filed 06/21/12    Page 43 of 56    Page ID
#:1290

1    In rejecting petitioner's claim of prosecutorial misconduct, the Court of Appeal
2    determined, in relevant part, as follows (see LD D at 12-13):

3        *First, there is no evidence whatsoever the failure to redact the*
4    *booking information was intentional or deceptive. While the error may*
5    *have been careless on the part of the prosecutor, either party could have*
6    *reviewed the exhibits prior to their submission to the jury to ensure the*
7    *information was properly excluded.*

8        *We are more troubled by the prosecutor's use of the term*
9    *"booking" or "booked" during her examination of the sheriff's deputy*
10    *who arrested [petitioner] on April 5, 2003. ... [¶] Having already*
11    *determined the jurors' receipt of the booking information during*
12    *deliberations did not improperly infect their deliberations, we see no*
13    *additional prejudice resulting from the prosecutor's references to*
14    *[petitioner] having been booked on the night of April 5, 2003. Again,*
15    *were this a closer case, we might have reached a different conclusion.*
16    *In light of the strength of the evidence against [petitioner], however, he*
17    *was not substantially prejudiced by the prosecutor's statements.*

18
19    3.    <u>Grounds 4 and 6 of the Amended Petition</u>
20        In his Ground 4, petitioner claims that evidence of his prior arrest and criminal
21    history was inadmissible under California law because it was more prejudicial than
22    probative. (<u>See</u> Am. Pet. at 6; <u>see also</u> Am. Pet. Attach. at 37-39; Trav. at 44-46.) In
23    his Ground 6, petitioner claims that the jury's "inadvertent exposure to out-of-court
24    information" constituted jury misconduct under California law. (<u>See</u> Am. Pet. at 6a;
25    <u>see also</u> Am. Pet. Attach. at 46-48; Trav. at 46-52.) As set forth above, in order to be
26    entitled to federal habeas relief, petitioner must show that he is in custody in violation
27    of the Constitution or laws or treaties of the United States. To the extent that
28    petitioner is contending that the trial court should have excluded the information

43

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 27 of 40   Page
ID #:1804
Case 2:10-cv-02343-AHM-RNB   Document 63-4   Filed 06/21/12   Page 44 of 56   Page ID
#:1291

1    concerning petitioner's prior arrest pursuant to state law, or that the conduct of the

2    jury in considering the information constituted jury misconduct pursuant to California

3    law, such claims are not even cognizable on federal habeas review.[17]

4

5         4.    Grounds 5 and 9 of the Amended Petition

6              a.    *petitioner's claims*

7         In his Ground 5, petitioner claims that he was denied his federal constitutional

8    rights to an impartial jury and due process by the jury's receipt during deliberations

9    of prejudicial information about petitioner's criminal history that had not been

10   presented at trial. (See Am. Pet. at 6; see also Am. Pet. Attach. at 40-46; Trav. at 46-

11   52.) In his Ground 9, petitioner claims that the error in the introduction of the

12   information about his criminal history, whether by the trial court, the jury, the

13   prosecutor, or trial counsel, violated petitioner's federal constitutional right to an

14   impartial jury and due process of law. (See Am. Pet. at 6b; see also Am. Pet. Attach.

15   at 54-65.)

16        Petitioner argues that six of the jurors remembered seeing information about

17   petitioner's prior arrest, and that, even if the jury did not actively discuss the

18   information, the "white elephant" comment made by Juror No. 5 was "close to an

19   admission that it was an influential factor for her during the jury deliberations." (See

20   Am. Pet. Attach. at 39; Trav. at 45, 47-50.) Petitioner contends that the "main gist

21   of the error" was "whether any member of the jury was improperly influenced by

22   evidence of petitioner's prior arrest and criminal history." (See Am. Pet. Attach. at

23

24        [17]     Moreover, the Court notes that the information in question was never

25   admitted into evidence at trial. Rather, it was inadvertently included on an exhibit

26   provided to the jury during deliberations. The parties agreed following trial that the

27   portion of the exhibit containing information about petitioner's prior arrest was not

     intended to be included on the exhibit when it was admitted into evidence. (See 5 RT

28   3901-03.)

                                           44

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 28 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63   Filed 06/21/12   Page 45 of 56   Page ID
#:1292

1    54.)  Further, petitioner contends that "the receipt of information about a party or a

2    case that was not part of the evidence received at trial, [sic] leads to a presumption

3    that petitioner was prejudiced and may establish juror bias."  He also contends that

4    the "extraneous material was so inherently prejudicial that it was substantially likely

5    to have influenced a juror."  (See Am. Pet. Attach. at 54-55; Trav. at 50-51.)

6

7                 *b.*    *analysis*

8         Pursuant to the Sixth Amendment, a criminal defendant has the right to

9    confront and cross examine those whose testimony is used against him.  See

10    Pennsylvania v. Ritchie, 480 U.S. 39, 51, 107 S. Ct. 989, 998, 94 L. Ed. 2d 40 (1987).

11    Accordingly, a verdict in a criminal case must be based solely on evidence presented

12    at trial.  See Turner v. Louisiana, 379 US. 466, 472-73 (1965) ("In the constitutional

13    sense, trial by jury in a criminal case necessarily implies at the very least that the

14    evidence developed against a defendant shall come from the witness stand in a public

15    courtroom where there is full judicial protection of the defendant's right of

16    confrontation, of cross-examination, and of counsel.") (internal quotation marks

17    omitted).  Exposure to information not in evidence may deprive a defendant of his

18    "rights to confrontation, cross-examination, and assistance of counsel embodied in

19    the Sixth Amendment."  Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995); see also

20    Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir. 1986); Estrada v. Scribner, 512

21    F.3d 1227, 1238 (9th Cir.) ("A juror's communication of extrinsic facts implicates the

22    Confrontation Clause."), cert. denied, 554 U.S. 925 (2008); Jeffries v. Wood, 114

23    F.3d 1484, 1490 (9th Cir.) ("When a juror communicates objective extrinsic facts

24    regarding the defendant or the alleged crimes to other jurors, the juror becomes an

25    unsworn witness within the meaning of the Confrontation Clause."), cert. denied, 522

26    U.S. 1008 (1997).

27         Here, the record reflects that at least six of the jurors were exposed during

28    deliberations to extrinsic information concerning petitioner's prior arrest that was not

1    in evidence. Although the extrinsic evidence here was not communicated by a juror,

2    the Court concurs with the California Court of Appeal that petitioner's claims

3    pertaining to the jury's exposure to the extrinsic information should be analyzed

4    under the rubric of a juror misconduct claim.

5        Habeas relief, however, is warranted on a claim of juror misconduct based on

6    the consideration of extrinsic information only where the defendant was prejudiced

7    by the introduction of the extrinsic evidence. See Estrada, 512 F.3d at 1235, 1238;

8    see also Xiong v. Felker, No. 09-16830, slip opinion at 6264-65 (9th Cir. June 5,

9    2012) ("a jury's consideration of extrinsic evidence does not end at whether

10   misconduct occurred; upon a finding of misconduct, a rebuttable presumption of

11   prejudice applies" but the "Government may overcome the presumption of prejudice

12   with proof that the jury's consideration of extrinsic evidence was harmless"

13   (emphasis in original)).

14       In deciding whether jury misconduct was prejudicial, the Court determines

15   whether the extrinsic evidence before the jury had a "substantial and injurious effect

16   or influence in determining the jury's verdict." See, e.g., Sassounian v. Roe, 230 F.3d

17   1097, 1108 (9th Cir. 2000) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623, 113

18   S. Ct. 1710, 123 L. Ed. 2d 353 (1993)); Fields v. Brown, 503 F.3d 755, 782 n.20 (9th

19   Cir. 2007), cert. denied, 552 U.S. 1314 (2008); see also Blair v. Chrones, 452 Fed.

20   Appx. 752, 753, 2011 WL 4621002, at *1 (9th Cir. Oct. 6, 2011) (finding that the

21   introduction of extrinsic material to the jury, although misconduct, was not

22   prejudicial and quoting Brecht, 507 U.S. at 623) (now citable for its persuasive value

23   pursuant to Ninth Circuit Rule 36-3).

24       "There is no bright line test for determining whether a defendant has suffered

25   prejudice from an instance of juror misconduct" but great weight is placed "on the

26   nature of the extraneous information that has been introduced into deliberations." See

27   Rodriguez v. Marshall, 125 F.3d 739, 744 (9th Cir. 1997), overruled on other grounds

28   by Payton v. Woodford, 346 F.3d 1204, 1218 n.18 (9th Cir. 2003); Mancuso v.

46

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 30 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 63    Filed 06/21/12    Page 47 of 56    Page ID
#:1294

1   Olivarez, 292 F.3d 939, 951-52 (9th Cir. 2002); Sassounian, 230 F.3d at 1109.
2   Factors to be considered in evaluating whether extrinsic information prejudicially
3   affected the deliberations include whether and how the extrinsic material was
4   received, the length of time it was available to the jury, the extent to which the jury
5   discussed and considered it, the point in the deliberations that it was introduced, and
6   any other relevant matters. See Estrada, 512 F.3d at 1238; Mancuso, 292 F.3d at 951-
7   52; United States v. Navarro-Garcia, 926 F.2d 818, 822-23 (9th Cir. 1991);
8   Bayramoglu, 806 F.2d at 887.  Other relevant matters may include whether the
9   extrinsic information related directly to a material aspect of the case, whether the trial
10  judge gave a curative instruction to the jury or took other steps to alleviate prejudicial
11  impact, whether the allegedly prejudicial information was ambiguously phrased,
12  whether the extraneous information was otherwise admissible or merely cumulative
13  of other evidence adduced at trial, the trial context, and whether the statement was
14  prejudicial given the issues and evidence in the case. See Navarro-Garcia, 926 F.2d
15  at 823; Bayramoglu, 806 F.2d at 888; Sassounian, 230 F.3d at 1109.

16      Here, the extrinsic information to which at least some of the jurors were
17  exposed was ambiguous and only indirectly related to the charges against petitioner.
18  The information on the folded portion of the exhibit reflects only that petitioner was
19  arrested, not that he was convicted on any count.  In addition, the charges listed are
20  not clearly specified, and they appear to pertain to receiving stolen property and
21  carrying a loaded firearm, rather than murder as petitioner was charged with in the
22  case before the jury.  The record reflects that the jury's exposure to the extrinsic
23  information was limited, and no evidence supports that it was the subject of lengthy
24  consideration by any members of the jury.  Indeed, although several jurors testified
25  that they understood that the information on the folded portion of the exhibit related
26  to a prior arrest, other jurors testified that they did not recall hearing or seeing
27  anything about any prior arrest. Further, no juror recalled that any general discussion
28  took place concerning the information about the prior arrest, and no juror testified

47

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 31 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63-9   Filed 06/21/12   Page 48 of 56   Page ID
#:1295

1   that any member of the jury referenced the issue of petitioner's prior arrest during

2   deliberations. Petitioner contends that the "white elephant" comment by juror No. 5

3   was "close to an admission that it was an influential factor for her during the jury

4   deliberations." (See Am. Pet. Attach. at 39 ("I don't think there was a whole lot of

5   discussion around it, but it's kind of like a white elephant in the room that you don't

6   talk about."); Trav. at 50.) The Court disagrees. When taken in the context of juror

7   No. 5's complete  testimony, it is clear that juror No. 5 understood that the

8   information was not part of the evidence, and that the juror believed that the other

9   jurors also understood that the extrinsic information should not be considered. (See

10  ART at L-10, L-12, L-17 to L-18.)

11      Finally, the record reflects that the jury was instructed that they "must

12  determine what facts have been proved from the evidence received in the trial and not

13  from any other sources," that they "must decide all questions of fact in this case from

14  the evidence presented in the trial and not from any other source," and that they must

15  not "consider or discuss facts as to which there is no evidence." (See 1 CT 134, 138;

16  5 RT 2478, 2481.) Here, several jurors testified that at least one juror reminded the

17  other jurors that they should not consider the extrinsic information that was not part

18  of the evidence at trial, and nearly half of the jurors were not even aware of the

19  existence of the extrinsic information. The Court therefore finds that petitioner has

20  failed to adduce evidence to rebut the presumption that the jurors properly followed

21  the instructions given to them. See Weeks v. Angelone, 528 U.S. 225, 234, 120 S.

22  Ct. 727, 145 L. Ed. 2d. 727 (2000); Richardson v. Marsh, 481 U.S. 200, 211, 107 S.

23  Ct. 1702, 95 L. Ed. 2d 176 (1987); Hovey v. Ayers, 458 F.3d 892, 913 (9th Cir.

24  2006).

25      Accordingly, the Court finds that, when considered within the context of the

26  overwhelming evidence against petitioner, the jury's inadvertent exposure to extrinsic

27  information concerning petitioner's prior arrest did not have a substantial and

28  injurious effect or influence in determining the jury's verdict.

48

Case 2:10-cv-02343-VBF-RNB   Document 82-5   Filed 09/12/12   Page 32 of 40   Page
Case 2:10-cv-02343-AHM-RNB   Document 63   Filed 06/21/12   Page 49 of 56   Page ID
#:1296

1    5.    Ground 7 of the Amended Petition

2        a.    *petitioner's claim*

3    In his Ground 7, petitioner claims that the prosecutor's placement before the

4    jury of the unredacted exhibit containing the arrest information, coupled with the

5    prosecutor's repeated reference to petitioner having been booked during the

6    examination of Deputy Steven Marella, constituted prosecutorial misconduct in

7    violation of petitioner's federal constitutional right to due process. (See Am. Pet. at

8    6a; see also Am. Pet. Attach. at 48-52; Trav. at 52-53.) Petitioner contends that the

9    prosecutor "committed misconduct for placing before the jury inadmissible evidence

10   that infected 'the whole trial with such unfairness as to make the conviction a denial

11   of due process.'" (See Am. Pet. Attach. at 48.) Petitioner argues that the unredacted

12   exhibit was "not an isolated act" because of the prosecutor's earlier references to

13   petitioner's "booking" and "booking photograph" during the testimony of Deputy

14   Marella. (See Id. at 49-50.) Petitioner argues that the prosecutor "breached" an

15   agreement to "exclude evidence of petitioner's prior arrest," and contends that the

16   "instances of prosecutorial misconduct must be considered together," including the

17   testimony of Deputy Marella, the arrest record that was not redacted from the exhibit

18   given to the jury, and the prosecutor's argument to the trial court that "the arrest

19   report was harmless error." (See Id. at 51-53.)

20

21        b.    *applicable legal authority*

22   Federal habeas review of prosecutorial misconduct claims is limited to the

23   narrow issue of whether the alleged misconduct "so infected the trial with unfairness

24   as to make the resulting conviction a denial of due process." See Donnelly v.

25   DeChristoforo, 416 U.S. 637, 642, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); Hein v.

26   Sullivan, 601 F.3d 897, 912 (9th Cir. 2010), cert. denied, 131 S. Ct. 2093, 179 L. Ed.

27   2d 890 (2011); Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir.), cert. denied, 519

28   U.S. 889 (1996). Misconduct is reviewed in light of the entire trial record, and relief

49

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 33 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 63-10    Filed 06/21/12    Page 50 of 56    Page ID
#:1297

1   will be granted only if the misconduct by itself infected the trial with unfairness. <u>See</u>

2   <u>Donnelly</u>, 416 U.S. at 639-43; <u>see also</u> <u>Darden v. Wainwright</u>, 477 U.S. 168, 183, 106

3   S. Ct. 2464, 91 L. Ed. 2d 144 (1986); <u>Drayden v. White</u>, 232 F.3d 704, 713 (9th Cir.

4   2000), <u>cert. denied</u>, 532 U.S. 984 (2001); <u>Furman v. Wood</u>, 190 F.3d 1002, 1006 (9th

5   Cir. 1999).

6

7                      *c.    analysis*

8           In rejecting petitioner's prosecutorial misconduct claim on direct review, the

9   Court of Appeal's explicit factual finding that "there is no evidence whatsoever the

10  [prosecutor's] failure to redact the booking information was intentional or deceptive"

11  (<u>see</u> LD D at 12), arguably qualifies as a factual finding that is presumed correct

12  unless rebutted by clear and convincing evidence. <u>See</u> 28 U.S.C. 2254(e)(1) (as

13  amended). Petitioner has not even purported to adduce clear and convincing evidence

14  that, considered within the context of the entire case, the jury's exposure to

15  petitioner's booking information was the result of a deliberate act or omission by the

16  prosecutor.

17          Further, the Court concurs with the Court of Appeal that, in light of the

18  strength of the case against petitioner, petitioner was not prejudiced by the

19  prosecutor's passing use of the terms "booking" and "booked," and that the

20  prosecutor's comments did not result in "additional prejudice" in light of the jury's

21  receipt of petitioner's booking information during deliberations. (<u>See</u> LD D at 12-

22  13.) The record reflects that the eight comments occurred within the very brief

23  testimony of Deputy Marella, the record of which constitute less than three pages in

24  the trial transcript. Deputy Marella did not directly testify that petitioner had been

25  arrested or booked; he only used the term "booking cell" once while testifying about

26  the procedure followed before petitioner was photographed. The focus of the

27  deputy's testimony was on petitioner's appearance at the time that Deputy Marella

28  "came into contact" with petitioner shortly before the murder. (<u>See</u> 3 RT 1528.)

                                              50

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 34 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 68-1 Filed 06/21/12    Page 51 of 56    Page ID
#:1298

1  Deputy Marella testified that petitioner had a "good size piercing with a [straight
2  metal] bar through his left eyebrow" at that time.  Further, Deputy Marella testified
3  that it was standard procedure to remove all jewelry before "booking photos" are
4  taken.    Marella's testimony was offered to explain why petitioner's booking
5  photograph, marked at trial as People's Exhibit 3, shows petitioner without a metal
6  bar in his eyebrow.  (See 3 RT 1529-30; LD A at Attach. 1.)  Albert Segundo
7  subsequently testified that he told police that petitioner had a piercing in his left
8  eyebrow.  (See 3 RT 1546, 1575-76.)  Further, prior to Deputy Marella's testimony,
9  Jesse Robles had testified that he had been shown People's Exhibit 3 by Deputy Katz
10  after Robles had told Deputy Katz that petitioner was the driver of the white van.
11  (See 2 RT 967; 3 RT 1320.)  As set forth above, the evidence against petitioner was
12  overwhelming, with three eyewitnesses providing positive in-court identifications of
13  petitioner, as well as supporting testimony from multiple witnesses that petitioner had
14  been driving around the neighborhood the day of the murder asking about the
15  whereabouts of the victim because petitioner's brother had been attacked by the
16  victim with a bat earlier on the same day.  Further, the jury was instructed both that
17  statements made by the attorneys are not evidence and that they must decide all
18  questions of fact based solely on the evidence received during trial.  (See 1 CT 134,
19  137-38; 2 RT 906; 5 RT 2478, 2480-81.)  Once again, the Court finds that petitioner
20  has failed to adduce evidence to rebut the presumption that the jurors properly
21  followed the instructions given to them.

22       Considering the isolated comments about "booking" and petitioner's "booking
23  photograph" in the context of the entire trial record, even when taken together with
24  the fact that the booking information was not redacted from the reverse side of
25  petitioner's booking photograph when it was viewed by some members of the jury
26  during deliberations, the Court finds that petitioner has failed to meet his AEDPA
27  burden of showing that the Court of Appeal's rejection of this prosecutorial
28  misconduct claim "was so lacking in justification that there was an error well

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 35 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 68-12 Filed 06/21/12    Page 52 of 56    Page ID
#:1299

1   understood and comprehended in existing law beyond any possibility for fairminded
2   disagreement."

3

4         6.    Ground 8 of the Amended Petition
5               a.    petitioner's claim
6         In his Ground 8 of the Amended Petition, petitioner claims that trial counsel
7   provided ineffective assistance in failing to object to the alleged prosecutorial
8   misconduct. (See Am. Pet. at 6a; see also Am. Pet. Attach. at 52-54; Trav. at 53-54.)
9   Petitioner acknowledges that counsel explained, on the record but outside the
10  presence of the jury, that he had not objected to, nor requested a cautionary
11  instruction concerning, the prosecutor's references to petitioner's "booking"
12  photograph during Detective Marella's testimony because counsel did not wish to
13  draw additional attention to petitioner's arrest. (See Am. Pet. Attach. at 50 (citing 3
14  RT 1531-32).) Plaintiff further acknowledges that trial counsel "had no opportunity
15  to object" before the information concerning petitioner's arrest on petitioner's
16  "booking photograph" was provided to the jury because counsel was not aware until
17  after the trial that the information had not been redacted from the photograph. (See
18  Id. at 50, 52-53.)
19        Respondent contends that petitioner's Ground 8 is not exhausted because,
20  although petitioner raised the claim on direct appeal to the Court of Appeal, petitioner
21  did not present the claim to the California Supreme Court in his Petition for Review
22  or in a later habeas petition. Respondent, however, requests that the Court exercise
23  its discretion to deny the claim on the merits. (See Ans. at 2, Ans. Mem. at 31-33.)
24  In his Traverse, petitioner contends the claim is exhausted because he argued in his
25  Petition for Review to the California Supreme Court that "trial counsel" erred, and
26  his Petition for Review twice cited Strickland. (See Trav. at 53 (citing Petition for
27  Review at 13, 17, 26).)
28

52

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 36 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 85-13    Filed 06/21/12    Page 53 of 56    Page ID
#:1300

             *b.*    <u>*analysis*</u>

     As a preliminary matter, the Court concurs with respondent that Ground 8 is not exhausted because, although the claim was raised on direct review to the Court of Appeal, petitioner's subsequent Petition for Review to the California Supreme Court did not fairly present a claim that his trial counsel provided ineffective assistance in failing to object to the alleged prosecutorial misconduct. In his Petition for Review, petitioner did raise the vague assertion that the "jury, the prosecutor, trial counsel, and the trial court can all be said to have erred" (<u>See</u> LD J at 13), but he did not explicitly claim that his counsel was ineffective for failing to object to the alleged prosecutorial misconduct. Further, the "Questions Presented" section of the Petition for Review did not include a claim that petitioner's counsel provided ineffective assistance. Although the Petition for Review included two citations to the <u>Strickland</u> standard of prejudice, those citations arose within the context of petitioner's jury misconduct claim, and it was not clear that the citations might pertain to a separate claim of ineffective assistance of counsel. (<u>See</u> LD J at 1, 17, 26.) Moreover, petitioner did not raise this ineffective assistance of counsel claim in any habeas petition to the California Supreme Court. Regardless, pursuant to 28 U.S.C. § 2254(b)(2), the Court has the discretion to deny an unexhausted claim on the merits. <u>See</u> <u>Jackson v. Roe</u>, 425 F.3d 654, 658 n.5 (9th Cir. 2005); <u>Washington v. Lampert</u>, 422 F.3d 864, 871 (9th Cir. 2005). The Ninth Circuit has held that a federal court may deny an unexhausted claim on the merits "only when it is perfectly clear that the applicant does not raise even a colorable federal claim." <u>Cassett v. Stewart</u>, 406 F.3d 614, 624 (9th Cir. 2005). Here, the Court has decided to exercise its discretion to deny this unexhausted claim on the merits for the following reasons.

     As petitioner acknowledges, the record reflects that counsel made a tactical decision not to object to the use of the booking photograph prior to the testimony of Deputy Marella because the prosecutor had agreed not to mention petitioner's arrest. Then, when the prosecutor used the term "booking photograph" while questioning the

53

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 37 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 63    Filed 06/21/12    Page 54 of 56    Page ID
#:1301
#:1314

1  deputy, counsel made the further tactical decision not to raise a contemporaneous
2  objection because he did not want to draw more attention to the fact that petitioner
3  had been "booked." Counsel did later object outside the presence of the jury, but, for
4  the same reason, counsel rejected the prosecutor's suggestion of a curative instruction
5  for the jury. (See 3 RT 1530-32.) The Court finds that petitioner has failed to make
6  even a colorable showing that counsel's deliberate tactical decisions not to raise a
7  contemporaneous objection to the use of the term "booking" in order not to draw
8  further attention to the fact of petitioner's prior arrest, and not to request a curative
9  instruction thereafter, were outside the wide range of what can reasonably be
10  presumed to be sound trial strategy. See Strickland, 466 U.S. at 689 ("a court must
11  indulge a strong presumption that counsel's conduct falls within the wide range of
12  reasonable professional assistance"); see also Richter, 131 S. Ct. at 788 ("Even under
13  de novo review, the standard for judging counsel's representation is a most
14  deferential one. ... The question is whether an attorney's representation amounted to
15  incompetence under 'prevailing professional norms,' not whether it deviated from
16  best practices or most common custom.").

17       Moreover, in light of the overwhelming inculpatory evidence against him, the
18  Court also finds that petitioner has failed to make even a colorable showing of a
19  reasonable probability that the outcome of the trial would have been different, but for
20  counsel's decision not to raise a contemporaneous objection to, or to seek a curative
21  instruction following, the prosecutor's passing references to petitioner having been
22  "booked" and that a booking photograph previously had been taken.

23       As to counsel's failure to object to the unredacted exhibit, the record reflects
24  that inclusion of the information pertaining to petitioner's prior arrest on People's
25  Exhibit 3 when it was provided to the jury was inadvertent. Because counsel was
26  unaware of the fact that the information had not been redacted as agreed upon before
27  it was presented to the jury, the Court finds that petitioner has failed to make even a
28  colorable showing that counsel's failure to object to the unredacted exhibit amounted

54

Case 2:10-cv-02343-VBF-RNB    Document 82-5    Filed 09/12/12    Page 38 of 40    Page
Case 2:10-cv-02343-AHM-RNB    Document 68-15    Filed 06/21/12    Page 55 of 56    Page ID
#:1302

1    to incompetence under prevailing professional norms.  This finding renders it

2    unnecessary for the Court to consider whether petitioner has made a colorable

3    showing of prejudice with respect to this part of Ground 8.

4

5    **C.    Petitioner's Motion to Expand the Record and his request for an**

6          **evidentiary hearing should be denied.**

7          Petitioner has requested that this Court conduct an evidentiary hearing with

8    respect to his claims pertaining to the allegedly false testimony of witness Renteria,

9    as well as his claims arising from "jury misconduct." (See Am. Pet. Attach. at 26,

10   220-21; Trav. at 54-55.)  Petitioner contends in his Traverse that an evidentiary

11   hearing should be granted to present evidence that the "prosecution witnesses could

12   not see what they claimed" in order to "prove the witnesses [sic] testimonial

13   statements false." (See Trav. at 54-55.)

14         In addition, in his Motion to Expand the Record ("Motion"), petitioner has

15   requested that the Court expand the record pertaining to his Grounds 1 through 9,

16   "even if [the Court] decides to hold an evidentiary" hearing. (Motion at 2.) Petitioner

17   seeks to expand the record to include "the exhibits attached to petitioner's Traverse

18   and exhibits attached to the Amended Petition." (Motion at 4.)

19         To the extent that petitioner is seeking to "expand" the record with filings and

20   orders from his state court cases (see, e.g., his exhibits attached to his Traverse

21   including the Petition for Rehearing of his habeas petition to the Court of Appeal, the

22   Court of Appeal's decision on direct review, and the Court of Appeal's decision

23   rejecting his first habeas petition; and his exhibits to the Amended Petition including

24   the California Supreme Court's denial of two habeas petitions), as well as documents

25   that were attached to petitioner's state court filings (see, e.g., exhibits from the

26   subsequent trial of Soto (see LD F, Exh. A, F, G of petitioner's state habeas petition),

27   a declaration of petitioner (see LD F, Exh. B of petitioner's state habeas petition),

28   excerpts from the trial transcript of Soto's trial (see LD F, Exh. E of petitioner's state

55

1    habeas petition), the unredacted exhibit, including booking information from

2    petitioner's prior arrest, that was provided to the jury during deliberations (see LD A,

3    Attach. 1 to petitioner's opening brief on direct appeal)), the Motion should be denied

4    as unnecessary because these documents already are part of the record.

5       Further, there is no need to expand the record or conduct an evidentiary hearing

6    with respect to Grounds 1, 4, and 6 because those claims are not even cognizable on

7    federal habeas review.

8       As to Grounds 2 and 7, the Court's findings that petitioner failed to meet his

9    burden under 28 U.S.C. § 2254(d)(1) is dispositive of the Motion and petitioner's

10    request for an evidentiary hearing under the Supreme Court's holding in Pinholster,

11    131 S. Ct. at 1398-1401, that the AEDPA requires federal courts to evaluate the

12    reasonableness of state court decisions solely on the basis of the record before the

13    state court.

14       Finally, the Motion and petitioner's request for an evidentiary hearing should

15    also be denied with respect to Grounds 3, 5, 8, and 9 because the Court was able to

16    resolve those claims by reference to the state court record. See Totten v. Merkle, 137

17    F.3d 1172, 1176 (9th Cir. 1998) (holding, in a case pre-dating the Supreme Court's

18    reversal of the Ninth Circuit in Pinholster, that "an evidentiary hearing is not required

19    on issues that can be resolved by reference to the state court record").

20

21                       **RECOMMENDATION**

22       IT THEREFORE IS RECOMMENDED that the District Court issue an Order:

23    (1) approving and accepting this Report and Recommendation; (2) denying

24    petitioner's Motion to Expand the Record and his request for an evidentiary hearing;

25    and (3) denying Grounds 1-9 of the Amended Petition.

26

27    DATED: <u>June 20, 2012</u>

28                      ROBERT N. BLOCK
                            UNITED STATES MAGISTRATE JUDGE

EXHIBIT "I"

EXHIBIT "I"

EXHIBIT "I"

EXHIBIT "I"