LEROY D. BACA, SHERIFF

COUNTY OF LOS ANGELES - SHERIFF'S DEPARTMENT

DETECTIVE DIVISION - HOMICIDE BUREAU

FILE NO. _____ 003-04469-0372-011 _____

CLASSIFICATION: __ MURDER - 187 P.C. _____

VICTIM(S): ___ ROBLES, JOSE RODOLFO ___ MH/16 _____

_____

_____

SUSPECT(S): ___ COLEMAN, JOFAMA REO ___ MB/20 _____

_____

DATE/TIME: ___ 05-10-2003 (SATURDAY) AT 2058 HOURS _____

LOCATION: ___ 1131 WEST 101ST STREET, LOS ANGELES _____

INVESTIGATORS: ___ S. KATZ/M. LILLIENFELD _____

COPY _____

EXHIBIT "I"

MAY 12, 2003                          -4-                          003-04469-0372-011

Item #19: One multicolored shirt button, recovered from the sidewalk area in front of the location approximately 36 feet 1 inch east of the telephone pole located in front of 1136 West 101st Street and 37 feet 9 inches north of the south curb line of West 101st Street (Lab Receipt #J325130).

Item #20: One expended projectile, recovered from the victim's shirt (Evidence Held Item #18) during examination of same (Lab Receipt #J325132).

*****************************************************************

On 05-10-2003 at 2200 hours, Detectives Danny Smith and Steve Katz were directed from their respective residences to 1131 West 101st Street, Los Angeles, in order to investigate the shooting death of Victim Jose Rodolfo Robles.

Detectives arrived on scene at approximately 2300 hours and found that the area of West 101st Street was cordoned off and contained with yellow crime scene tape. Detectives spoke with the handling unit on scene, Deputies James Andrews, #420200, and Damon Allen, #459491, assigned to Unit #31B PM's.

Deputy Allen told Detectives that he and his partner arrived on scene at approximately 2056 hours in response to an assault with a deadly weapon call. He said that he saw the victim lying on the north sidewalk of 101st Street in front of 1131 West 101st Street. The victim was being tended to by two adults. These adults were later identified as the victim's father, Rudy Robles, MH. DOB: 06-11-1968, and a female friend later identified as Lapara Jackson, FB, DOB: 03-03-1962.

Deputy Allen told Detectives that the victim appeared to bleeding from a gunshot wound to his upper right chest and from a grazing gunshot wound to the left side of his head. Shortly after their arrival, Los Angeles County Fire Fighters and Paramedics from Engine Company #170, under the direction of Captain Bowie, arrived on scene. They began treating the victim for his wounds. The victim was transported to Martin Luther King Hospital via AMR Ambulance Unit #4301.

Deputy Allen said that the victim was unable to provide him with a statement, as he was unconscious at the time of his treatment and transportation.

Deputy Allen said that the victim's father, Rudy Robles, told him that he was standing on the porch of his home approximately two houses east of the location on the south side of the street. He said that he heard two gunshot and at that time looked in a direction west of his residence. He said that he saw a male Hispanic exit a light-colored van which was stopped

27

MAY 12, 2003                              -5-                              003-04469-0372-011

in the middle of 101st Street facing in an easterly direction. The vehicle was actually positioned in the westbound lane of traffic near the vehicles parked along the north curb.

Deputy Allen stated Rudy Robles said he saw the passenger in the van exit the vehicle and walk around the rear of the van. He said the suspect approached the victim who was lying on the ground in front of the location. He said the suspect stood over the victim and shot at him, several times. The brief description provided of the suspect was that of a male Hispanic only. He said that the suspect re-entered the van at the passenger and the van drove eastbound on 101st Street toward Vermont Avenue and out of view.

Deputy Allen also said that he received information from the victim's little brother, Witness Adrian Robles, MH, DOB: 12-14-1988. He said that Adrian was visiting at a friends home at ⬛ ⬛ 101st Street. He said that Adrian told him at the time of the shooting he was inside of the house behind a metal security screen door at the front door. Adrian said that he heard approximately 13 shots and saw a light-colored van parked on 101st Street. He said it was difficult to see through the metal screen door because of the wire mesh. He saw the van leave eastbound 101st Street towards Vermont Avenue.

Deputy Allen also told Detective Katz that Witness Albert Segundo, MH, DOB: 10-06-1987, was transported to Lennox Sheriff's Station, pending the arrival of Detectives. He said that Albert had agreed voluntarily to be transported to the station in order to be interviewed by Detectives. Prior to Witness Segundo being transported to the station, he told Deputy Allen that he was walking westbound on the south side of 101st Street as the victim was walking westbound 101st Street on the north side of the street. He said the two were briefly engaged in a conversation about whether or not the witness would accompany the victim to the local liquor store at the northwest corner of Century Boulevard and Budlong Avenue. He said after the two talked from a distance that was the width of 101st Street, Victim robles decided not to go to the liquor store and began to walk eastbound towards the location of the shooting.

Witness Segundo said that he saw a van travel westbound on 101st Street and make what he believed was a U-turn at Budlong Avenue and 101st Street and continued to travel eastbound on 101st Street in the direction of the victim. He said that this van passed him and then stopped at approximately the middle of the block and directly across from where the victim was standing on the north side of the street. He said he saw the passenger exit this van, walk to the rear of the van and shoot the victim.

Deputy Allen also told Detective Katz that he had been told that the victim was a member of the "No Control" tagging crew. He also indicated that approximately 15 9mm shell casings were found in the street in front of where the victim was shot.

MAY 12, 2003                                    -6-                            003-04469-0372-011

In addition, Deputy Allen described the mini van driven by the suspects as a white mini van with dark tinted windows.

Deputy Allen will document his actions and observations in the first report and any additional supplemental report(s).

The scene location is described as the street and sidewalk area directly in front of 1131 West 101st Street, Los Angeles. This is an unincorporated Los Angeles County area described as the Vermont District which falls under the policing jurisdiction of Lennox Sheriff's Station. 101st Street is an east/west street which is bordered by Vermont Avenue to the east and Budlong Avenue to the west. It is paralleled by Century Boulevard to the north and 102nd Street to the south. The location is general comprised of single-family residences.

Detectives arrived on scene and found the weather to be clear and cool. The area was well lit by standard utility streetlights.

Detectives observed the victim's clothing (Evidence Item #18), a button appearing to have been detached from the victim's clothing (Evidence Item #19) and a volume of blood on the north sidewalk directly in front of 1131 West 101st Street. Detectives noted in this immediate area and adjacent to the clothing and volume of blood were Evidence Items #14, 15, 16 and 17, identified as expended projectiles. It should also be noted that during the examination of the victim's shirt (Evidence Item #18), Detectives recovered Evidence Item #20. one expended projectile, which fell from the shirt as it was picked up. Detectives additionally observed Evidence Items #2 and 4, expended projectiles, and recovered these items from the street in front of the location. Detectives additionally noted 11 expended 9mm cartridge cases which were recovered in the street directly in front of 1131 West 101st Street. These expended cartridge cases were subsequently held as Evidence Items #1, 3, 5, 6, 7, 8, 9, 10, 11, 12 and 13. For exact locations of the above described evidence, refer to the evidence list.

All evidence was marked, identified, photographed and ultimately collected by Detective Smith and Forensic Identification Specialist (FIS) Martin Mutuc from the Sheriff's Crime Lab. FIS Mutuc ultimately maintained possession of all evidence which was transported to the Crime Lab for a more detailed examination.

Detectives noted the following vehicles in the crime scene area:

A brown Chevy Tahoe, California License #4VIE517, parked along the north curb line directly in front of 1131 West 101st Street. The vehicle was facing west.

A blue Ford Taurus, four-door, California License #2HYP610, parked along the north curb line directly in front of 1131 West 101st Street. The vehicle was facing west.

A blue four-door Oldsmobile, California License #3COB470, parked along the north curb line directly in front of 1131 West 101st Street. The vehicle was facing west.

A gold Kia Sephia, four-door, parked along the north curb line directly in front of 1131 West 101st Street. The vehicle was facing west. Detectives noted traffic collision damage to the driver's door and driver's side passenger's door of this vehicle. It was undetermined at the time of this investigation if this damage was recent; however, it did not appear that the damage occurred in the area where this vehicle was parked, as there was a lack of corresponding debris or evidence beneath the vehicle.

A blue Nissan, two-door, California License #3PSL487, parked along the south curb line directly in front of 1140 West 101st Street. The vehicle was facing east.

A blue Nissan Sentra, California License #3SMX336, parked along the south curb line directly in front of 1136 West 101st Street. The vehicle was facing east. It should be noted that this vehicle was removed from the scene at 2331 hours, prior to photographs being taken, with Detectives' permission. The driver of this vehicle was identified as Lorenzo Ocampo Quezada, MH, DOB: 11-08-1975.

A red Ford Mustang, California License #3JFC342, parked along the south curb line directly in front of 1136 West 101st Street. The vehicle was facing east.

A black Ford Taurus, California License #3UVA999, parked along the south curb line directly in front of 1122 West 101st Street facing east.

A white Chevy Monte Carlo with no license plates and a VIN of 1GZ37ZXFR136577, parked along the south curb line directly in front of 1122 West 101st Street facing east.

On 05-11-2003, Sunday, at 0010 hours, Detective Katz interviewed Witness **ALBERT SEGUNDO** at Lennox Sheriff's Station. Albert is a student at George Washington Preparatory High School and is in the 10th grade. Witness Segundo said he watched as his friend, Victim Jose Robles, was shot and killed on 101st Street. He said he has known the victim since he was about 8 years old and knows him by the moniker of "Chino." He said that both he and the victim are members of the "No Control" tagging crew. He is known by the moniker of "Clown."

Witness Segundo said he was walking west on 101st Street on the south side of the street when he saw the victim walking west on the north side of 101st Street. Witness Segundo said that the victim had told him he was going to walk to the liquor store at 99th Street and Budlong Avenue. He said that the liquor store is in the turf or area of control of several different tagging

EXHIBIT "J"

EXHIBIT "J"

EXHIBIT "J"

1            COURT OF APPEAL OF THE STATE OF CALIFORNIA

2                    SECOND APPELLATE DISTRICT

3

THE PEOPLE OF THE STATE OF CALIFORNIA, )

4                        PLAINTIFF-RESPONDENT, )
                                              )
5                                             )
                                              )
6                     -VS-                     )  NO. YA059765
                                              )
7    JOFAMA COLEMAN,                          )          OCT 2 6 2007
                                              )
8                        DEFENDANT-APPELLANT. )
                                              )

9

10       APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY

11       HONORABLE ERIC C. TAYLOR, PRESIDING JUDGE

12          REPORTERS' TRANSCRIPTS ON APPEAL

13              APRIL 13 AND 14, 2006

14

15

16

17   APPEARANCES:

18   FOR THE PLAINTIFF-RESPONDENT:   EDMUND G. BROWN, JR.
                                     STATE ATTORNEY GENERAL
19                                   300 SOUTH SPRING STREET
                                     NORTH TOWER, SUITE 5001
20                                   LOS ANGELES, CA.  90013

21   FOR THE DEFENDANT-APPELLANT:    IN PROPRIA PERSONA

22

23

24   VOLUME 3 OF 5 VOLUMES

25
     PAGES 1201 TO 1322-1500
26   1501 TO 1649-

27

28

1          STEVEN KATZ,

2     CALLED AS A WITNESS BY THE PEOPLE,

3     WAS SWORN AND TESTIFIED AS FOLLOWS:

4

5     THE CLERK:  DO YOU SOLEMNLY STATE THE TESTIMONY YOU

6  ARE ABOUT TO GIVE IN THE CAUSE NOW PENDING BEFORE THIS

7  COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING

8  BUT THE TRUTH, SO HELP YOU GOD?

9     THE WITNESS:  YES.

10     THE CLERK:  YOU MAY BE SEATED.

11       STATE YOUR NAME, SPELL YOUR NAME, PLEASE.

12     THE WITNESS:  STEVEN KATZ, K-A-T-Z AND IT'S

13  S-T-E-V-E-N.

14     THE COURT:  OKAY.

15

16            DIRECT EXAMINATION

17

18     Q    BY MS. WILLIAMS:  MAY I?  THANK YOU.

19       SERGEANT KATZ, JUST TO START OUT, DID YOU EVER

20  SHOW ANY PHOTOGRAPHS TO MARIA RENTERIA WITH REGARD TO

21  ANY OF THE SUSPECTS IN THIS HOMICIDE?

22     A    NO.

23     Q    AND WHAT IS YOUR INVOLVEMENT IN THE HOMICIDE?

24  WHAT'S YOUR CURRENT POSITION?

25     A    I AM A DETECTIVE ASSIGNED TO THE LA COUNTY

26  SHERIFFS DEPARTMENT, HOMICIDE BUREAU AND I AM ONE OF THE

27  DETECTIVES WHO'S ASSIGNED TO INVESTIGATE THIS MURDER.

28     Q    HOW MANY DETECTIVES ARE THERE WHO WERE

1    ON THE SOUTH SIDE OF THE STREET; IS THAT CORRECT?

2        A    CORRECT.

3        Q    AND WAS IT DIRECTLY ACROSS FROM WHERE THE

4    SHOOTING OCCURRED?

5        A    JUST ABOUT.

6        Q    DID YOU SEE WHERE THE VAN THAT MARIA RENTERIA

7    WAS RIDING IN AND WAS PARKED, DID YOU SEE WHERE IT

8    WAS -- I'M ASSUMING IT WAS STILL AT THE LOCATION WHEN

9    YOU GOT THERE?

10       A    YOU KNOW, I'M NOT CERTAIN IF IT WAS THERE OR

11   NOT NOW.  IT MAY HAVE IN THE TIME FRAME IT HAPPENS THAT

12   BEFORE A CONTAINMENT CAN BE ESTABLISHED, VEHICLES MOVE.

13   IT'S A DYNAMIC SITUATION UNTIL POLICE OFFICERS OR

14   SHERIFF DEPUTIES GET THERE TO LOCK THE SCENE DOWN.  I

15   CAN'T RECALL IF IT WAS --

16       Q    BUT SHE WAS STILL AT THE SCENE BECAUSE SHE

17   GAVE AN INITIAL STATEMENT TO THE POLICE OFFICERS WHO

18   FIRST ARRIVED; RIGHT?  YOU HAVE THAT AMONG YOUR REPORTS;

19   CORRECT?

20       A    CORRECT.

21       Q    NOW, YOU HAD NOTED -- WITHIN REPORTS, YOU

22   ALWAYS NOTE WHAT VEHICLES ARE PARKED ON THE STREET AND

23   WHERE THEY ARE; RIGHT?

24       A    YES.

25       Q    AND ON PAGE 29, JUST IN CASE I DON'T REMEMBER,

26   ON PAGE 29 OF THE REPORTS, YOU HAVE A LIST OF THE

27   VEHICLES THAT WERE PARKED ON THE STREET; CORRECT?

28       A    IT'S NOT ALL OF THE VEHICLES THAT WERE ON THE

1    STREET, BUT WITHIN THE INNER CONTAINMENT OF THE CRIME

2    SCENE TO DESCRIBE THAT -- WHEN THAT YELLOW TAPE GOES UP

3    THAT PEOPLE CAN'T CROSS, THERE'S USUALLY AN INNER

4    CONTAINMENT AND THEN AN OUTER CONTAINMENT AND THE

5    PURPOSE FOR THAT IS SORT OF TWO LAYERS, IF YOU WILL, OF

6    CONTAINMENT.

7        Q    AND DO YOU RECALL IF THE ROBLES HOME WAS

8    WITHIN THE CONTAINMENT AREA?

9        A    I DON'T BELIEVE IT WAS WITHIN THE INNER

10   CONTAINMENT.  IT MAY HAVE BEEN WITHIN THE SECOND SET OF

11   YELLOW TAPE.

12       MR. WHITE:  I THINK THAT MAY BE ALL I HAVE FOR

13   RIGHT NOW, YOUR HONOR.

14       THE COURT:  OKAY.  REDIRECT?

15

16                    REDIRECT EXAMINATION

17

18       Q    BY MS. WILLIAMS:  WITH REGARD TO ADRIAN

19   ROBLES, WHEN HE TALKED TO YOU ABOUT GETTING INFORMATION

20   FROM HIS BROTHER ABOUT THAT THE VAN SOUNDED FAMILIAR, IN

21   OTHER WORDS, IT SOUNDED LIKE A VAN THAT HE BELIEVED

22   BELONGED TO JOFAMA, DID ADRIAN ALSO TELL YOU THAT

23   SOMEONE DID TELL HIM --

24       MR. WHITE:  OBJECTION, IT CALLS FOR HEARSAY.

25       THE COURT:  SUSTAINED.

26       MS. WILLIAMS:  CAN WE APPROACH?

27       THE COURT:  OKAY.

28

1          COURT OF APPEAL OF THE STATE OF CALIFORNIA

2             SECOND APPELLATE DISTRICT

3

4 THE PEOPLE OF THE STATE OF CALIFORNIA, )

             PLAINTIFF-RESPONDENT, )

5                              )

6                -VS-             ) NO. YA059765

                             )

7 JOFAMA COLEMAN,             )

8           DEFENDANT-APPELLANT. )

9 _____)

10    APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY

11      HONORABLE ERIC C. TAYLOR, PRESIDING JUDGE

12        REPORTERS' TRANSCRIPTS ON APPEAL

13         APRIL 6, 7, 10 AND 11, 2006

14

15

16

17 APPEARANCES:

18 FOR THE PLAINTIFF-RESPONDENT:   EDMUND G. BROWN, JR.
                                   STATE ATTORNEY GENERAL

19                                  300 SOUTH SPRING STREET
                                 NORTH TOWER, SUITE 5001

20                                  LOS ANGELES, CA.  90013

21 FOR THE DEFENDANT-APPELLANT:    IN PROPRIA PERSONA

22

23

24 ___VOLUME_2_OF_5_VOLUMES_____ ___ROBBIN_HILL,_CSR_#6853___

25    PAGES 1 TO 12-300             OFFICIAL REPORTER
     301 TO 304-600

26    601 TO 601-900
     901 TO 996-1200

27

28

                    EXHIBIT "J"

1    MS. WILLIAMS:  NO.

2    MR. WHITE:  NO.

3    THE COURT:  CAN WE HAVE THE FIRST WITNESS?

4    MR. WHITE:  YES.

5    MS. WILLIAMS:  YES.

6

7         (THE FOLLOWING PROCEEDINGS WERE

8          HELD IN OPEN COURT IN THE

9          PRESENCE OF THE JURY:)

10

11    THE COURT:  ALL THE JURORS ARE BACK.  AND, PEOPLE,

12  YOUR FIRST WITNESS.

13    MS. WILLIAMS:  THANK YOU.  THE PEOPLE CALL JESSE

14  ROBLES TO THE STAND.

15

16              JESSE ROBLES,

17         CALLED AS A WITNESS BY THE PEOPLE,

18         WAS SWORN AND TESTIFIED AS FOLLOWS:

19

20    THE CLERK:  DO YOU SOLEMNLY STATE THE TESTIMONY YOU

21  ARE ABOUT TO GIVE IN THE CAUSE NOW PENDING BEFORE THIS

22  COURT IS THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE

23  TRUTH, SO HELP YOU GOD?

24    THE WITNESS:  YES.

25    THE CLERK:  YOU MAY BE SEATED.

26         STATE YOUR NAME, SPELL YOUR NAME, PLEASE.

27    THE WITNESS:  JESSE ROBLES, J-E-S-S-E, R-O-B-L-E-S.

28    THE COURT:  OKAY.  COUNSEL.

DIRECT EXAMINATION

Q    BY MS. WILLIAMS:   THANK YOU.

MR. ROBLES, DIRECTING YOUR ATTENTION TO MAY 10TH OF THE YEAR 2003.  SHORTLY BEFORE 9:00 P.M. ON THAT DATE, DO YOU REMEMBER BEING AT A PARTY AT YOUR AUNT'S HOME AT 101ST STREET?

A    YES.

Q    IS THAT AT 1115 101ST STREET?

A    YES.

Q    AT THAT TIME DID YOU HAVE A BROTHER WHO YOU ALL CALLED CHINO?

A    YEAH.

Q    WHAT WAS YOUR BROTHER'S -- YOUR BROTHER CHINO'S REAL NAME?

A    JOSE ROBLES.

Q    WITH REGARD TO YOUR BROTHER, DID HE EVER TELL YOU IF HE WAS A MEMBER OF ANY SORT OF TAGGING CREW OR GROUP?

MR. WHITE:  OBJECTION; CALLS FOR HEARSAY.

THE COURT:  SUSTAINED.

Q    BY MS. WILLIAMS:  WITH REGARD TO YOUR BROTHER, DID YOU HANG OUT WITH HIM?

A    YES.

Q    AND DID YOU -- ON THE DATE OF MAY 10TH, CAN YOU TELL US WHAT HAPPENED WHILE YOU WERE AT THE PARTY?

A    I WAS IN THE BACKYARD AND WE WERE DOING BARBECUE AND FOR MOTHER'S DAY, AND I HEARD 3 GUN SHOTS.

1    SO THEN I STARTED RUNNING TO THE FRONT YARD, AND NEXT

2    THING I SEEN MY DAD OPENING THE GATE AND HE SLIDE THE

3    GATE OPENED AND HE WALKED OUT.

4            AND THEN I SEEN A WHITE VAN PASS BY, BUT HE

5    DIDN'T PAY ATTENTION TO THE WHITE VAN.  HE SEEN IT, BUT

6    HE DIDN'T BOTHER LOOKING AT IT.

7        Q    I KNOW YOU WANT TO TELL THE STORY, BUT YOU

8    HAVE TO BE CAREFUL NOT TO SAY WHAT YOUR FATHER SAW, JUST

9    WHAT YOU SAW.  YOU SAW A WHITE VAN GO BY?

10       A    YEAH.  I SAW A WHITE VAN GO BY, AND I RAN OUT.

11   AND BEFORE I EVEN GOT OUT THE GATE, I SEEN THE WHITE VAN

12   PASS BY AND I SEEN THE DRIVER.

13       Q    NOW, THE WHITE VAN THAT PASSED BY, PRIOR TO

14   SEEING IT PASS BY, OTHER THAN THE TWO GUN SHOTS THAT YOU

15   HEARD, DID YOU HEAR ANY OTHER GUN SHOTS?

16       A    YEAH.  AFTERWARDS.

17       Q    THE OTHER GUN SHOTS THAT YOU HEARD, WAS THAT

18   BEFORE THE VAN DROVE BY IT?

19       A    YEAH.

20       Q    HOW MANY GUN SHOTS TOTAL DID YOU HEAR?

21       A    15.

22       Q    SO FIRST IT WAS THE FIRST TWO, AND THEN YOU

23   HEARD ABOUT 13 MORE, IS THAT FAIR TO SAY OR IT WAS -- IT

24   2 AND THEN 15?

25       A    2, 1 AND THEN 13.

26       Q    NOW, THE VAN THAT DROVE BY YOU, IS THERE

27   ANYTHING UNUSUAL ABOUT THE VAN?

28       A    THE WOOD PANEL.

1      Q    WHEN YOU SAY THE WOOD PANELING, WHERE WAS THE

2   WOOD PANELING?

3      A    ON THE DRIVER'S SIDE, THE DRIVER DOOR.  BEHIND

4   THE DRIVER DOOR IT WAS WOOD PANELING AND FROM THE FRONT

5   I SEE NO WOOD PANELING.

6      Q    I'M GOING TO SHOW YOU A PICTURE, FIRST OF ALL,

7   OF A HOUSE ON THE STREET ON 101ST STREET WITH A GATE

8   AROUND IT.  MAY THIS BE MARKED AS PEOPLE'S 1 FOR

9   IDENTIFICATION?

10      THE COURT:  YES.

11

12         (MARKED FOR I.D. PEOPLE'S EXHIBIT 1 -

13          PHOTOGRAPH OF HOUSE.)

14

15      MS. WILLIAMS:  DO WE HAVE THE BULLETIN BOARD?

16      THE COURT:  WE NEED HELP WITH THE BOARD IN THE

17   BACK.

18      MS. WILLIAMS:  MAY I APPROACH WITH THE FIRST

19   PHOTOGRAPH?

20      THE COURT:  YES.

21      Q    BY MS. WILLIAMS:  SHOWING YOU WHAT'S BEEN

22   MARKED AS PEOPLE'S 1 FOR IDENTIFICATION, DO YOU SEE YOUR

23   HOUSE AT THE TIME WHERE THE PARTY WAS, DO YOU SEE THAT

24   IN THE PHOTOGRAPH?

25      A    YEAH.

26      Q    COULD YOU PUT A "JR" FOR YOUR INITIALS IN RED

27   PEN.  SINCE THE TOP OF THE PHOTOGRAPH IS KIND OF DARK,

28   IF YOU COULD PUT YOUR INITIALS AND WITH AN ARROW

1    POINTING TO THE HOUSE WHERE THE PARTY WAS AT ON MAY

2    10TH?

3        A    (WITNESS COMPLIES.)

4        Q    MAY THE RECORD REFLECT HE'S DONE THAT?

5        THE COURT:  CAN YOU STATE FOR THE RECORD WHAT

6    YOU'VE DONE TO THE PICTURE.

7        THE WITNESS:  EXCUSE ME?

8        THE COURT:  CAN YOU STATE FOR THE RECORD WHAT

9    YOU'VE DONE TO THE PICTURE.

10       THE WITNESS:  SHOW IT?

11       THE COURT:  JUST STATE WHAT YOU DID TO IT.

12       THE WITNESS:  I WROTE MY INITIALS RIGHT THERE, AND

13   I PUT THE ARROW POINTING TO WHERE THE BACKYARD OF MY

14   HOUSE.

15       Q    BY MS. WILLIAMS:  OKAY.  THANK YOU.

16            WERE YOU IN THE BACKYARD AND THEN YOU RAN TO

17   THE FRONT AND YOU SAID YOU STOOD AT A GATE.  DO YOU SEE

18   THAT GATE IN THIS PHOTOGRAPH?

19       A    YES.

20       Q    CAN YOU PUT A CIRCLE AROUND THE GATE WHERE YOU

21   WERE STANDING?

22       THE COURT:  COUNSEL, YOU CAN COME UP HERE IF YOU

23   WANT.

24       MR. WHITE:  THANK YOU.

25       MS. WILLIAMS:  MAY THE RECORD REFLECT HE'S DONE

26   THAT.

27       THE WITNESS:  (WITNESS COMPLIES.)

28       Q    BY MS. WILLIAMS:  NOW, WITH REGARD TO WHERE

1    YOU WERE STANDING AT THE TIME THAT YOU CAME OUT FROM THE

2    BACK, WAS THERE ANYONE STANDING WITH YOU BESIDES YOUR

3    FATHER?

4         A    EXCUSE ME?

5         Q    YOU WERE STANDING AT THE GATE BY THE FRONT OF

6    YOUR HOUSE.  YOU SAID YOUR FATHER WAS THERE AS WELL; IS

7    THAT RIGHT?

8         A    YEAH.

9         Q    IS THERE ANYBODY ELSE WITH YOU?

10        A    FRIEND OF MINE.

11        Q    DO YOU KNOW HIS NAME?

12        A    CARLOS.

13        Q    IS THAT CARLOS LOPEZ?

14        A    I DON'T KNOW HIS LAST NAME.

15        Q    OKAY.  AND WHILE YOU WERE STANDING AT THE

16   GATE, TELL US WHAT YOU SAW.

17        A    I SEEN THE -- I SEEN THE WHITE VAN PASS BY AND

18   I SEEN THE DRIVER.  AND FROM THERE, MY FRIEND SEEN THE

19   DRIVER, TOO AND JUST --

20        Q    NOW, WHEN YOU SAID THAT YOU SAW THE DRIVER,

21   DID YOU EVER SEE ANYBODY SHOOTING?

22        A    NO.

23        Q    YOU JUST HEARD THE GUN SHOTS?

24        A    YEAH.  I JUST HEARD THEM.

25        Q    HOW LONG AFTER THE GUN SHOTS ENDED DID YOU SEE

26   THE VAN PASS IN FRONT OF YOUR HOUSE?

27        A    EXCUSE ME?

28        Q    HOW LONG AFTER YOU HEARD THE GUN SHOTS DID YOU

1    SEE THE VAN PASS IN FRONT OF YOUR HOUSE?

2         A    COUPLE OF SECONDS, LESS THAN TEN.

3         Q    LESS THAN 10 SECONDS?

4         A    YEAH.

5         Q    WAS THE VAN TRAVELING SLOWLY OR WAS IT GOING

6    FAST?

7         A    FAST.

8         Q    WHEN YOU SAW THE VAN DRIVE PASS AND YOU SAID

9    YOU SAW THE DRIVER, COULD YOU DESCRIBE FOR US WHAT THE

10   DRIVER LOOKED LIKE?  COULD YOU TELL IF IT WAS WHITE OR

11   BLACK --

12        A    BLACK.

13        Q    MALE OR FEMALE?

14        A    MALE.

15        Q    COULD YOU TELL IF THE PERSON HAD ANYTHING ON

16   THEIR HEAD?

17        A    A BEANIE.

18        Q    WHAT COLOR WAS THE BEANIE?

19        A    BLACK.

20        Q    COULD YOU TELL WHAT COLOR -- IF YOU COULD

21   TELL, COULD YOU TELL THE COLOR OF THE PERSON'S SHIRT?

22        A    WHITE T-SHIRT.

23        Q    WHEN THE VAN DROVE BY, DID YOU GET A GOOD LOOK

24   AT THE FACE OF THE PERSON DRIVING THE VAN?

25        A    YES.

26        Q    WAS IT SOMEONE THAT YOU KNEW?

27        A    YEAH.

28        Q    DID YOU KNOW THE PERSON'S NAME?

1    A    YEAH.

2    Q    WHAT WAS THE PERSON'S NAME?

3    A    JOFAMA COLEMAN.

4    Q    AND PRIOR TO SEEING THIS PERSON JOFAMA COLEMAN

5    DRIVE BY IN THE VAN, HOW MANY TIMES HAD YOU SEEN HIM

6    PRIOR TO THE SHOOTING?

7    A    EXCUSE ME?

8    Q    ON THE DATE THAT THIS HAPPENED AND YOU SAW THE

9    VAN DRIVE BY, HOW MANY TIMES BEFORE THAT HAD YOU SEEN

10   THIS PERSON JOFAMA COLEMAN OVER THE TIME THAT YOU KNEW

11   HIM?  FIVE?  TEN?  TWENTY?

12   A    I'M THINKING ABOUT SOMETHING.  SORRY ABOUT

13   THAT.  CAN YOU REPEAT THE QUESTION.

14   Q    SURE.  HOW MANY TIMES HAD YOU SEEN JOFAMA

15   COLEMAN, THIS PERSON THAT YOU KNEW BY THE NAME OF JOFAMA

16   COLEMAN PRIOR TO THE DAY OF THE SHOOTING?

17   A    HOW MANY TIMES DID I SEE HIM?  ABOUT FIFTY.

18   PROBABLY MORE.

19   Q    NOW, DO YOU SEE THE PERSON THAT YOU SAW

20   DRIVING THE VAN BY YOUR HOUSE, DO YOU SEE THAT PERSON IN

21   COURT HERE TODAY?

22   A    YEAH.

23   Q    COULD YOU PLEASE POINT TO HIM AND TELL US

24   WHERE HE'S SEATED AND WHAT HE'S WEARING?

25   A    RIGHT THERE (INDICATING), BROWN, COLLAR SHIRT.

26   THE COURT:  INDICATING THE DEFENDANT.

27   Q    BY MS. WILLIAMS:  NOW, THIS PERSON CARLOS THAT

28   WAS STANDING NEXT TO YOU, DID YOU TELL CARLOS THAT YOU

1    KNEW WHO THE PERSON WAS DRIVING THE VAN?

2        A    EXCUSE ME?

3        Q    YOU SAID YOU WERE STANDING NEXT TO CARLOS.

4    DID YOU TELL CARLOS ANYTHING ABOUT WHO YOU SAW DRIVING

5    THE VAN?

6        A    NO.

7        Q    THAT NIGHT, THE NIGHT OF THE SHOOTING, DID YOU

8    TELL ANYBODY ABOUT WHO WAS DRIVING THE VAN?

9        A    YEAH.  I TOLD FRIENDS.

10        Q    WHAT FRIENDS DID YOU TELL, IF YOU REMEMBER?

11        A    I DON'T REMEMBER JUST EXACTLY WHO, BUT I JUST

12    REMEMBER I TOLD ALL MY FRIENDS.

13        Q    WHAT ABOUT YOUR FAMILY MEMBERS, DID YOU TELL

14    ANY OF YOUR FAMILY MEMBERS?

15        A    YEAH.  MY DAD.

16        Q    WHAT ABOUT ANY OF YOUR BROTHERS?

17        A    NOT THE SAME DAY BUT AFTERWARDS, YEAH.

18        Q    WHEN YOU SAY AFTERWARDS, WHEN DID YOU TELL

19    YOUR BROTHERS?

20        A    THE NEXT DAY.

21        Q    WHAT ARE THE NAMES OF THE BROTHERS WHO YOU

22    TOLD THIS TO THE NEXT DAY?

23        A    ADRIAN ROBLES AND ANTHONY ROBLES.

24        Q    ARE THEY YOUR YOUNGER BROTHERS OR OLDER

25    BROTHERS?

26        A    YOUNGER.

27        Q    NOW, WHEN THIS HAPPENED THE NIGHT OF THE

28    SHOOTING, DID YOU TELL ANY SHERIFF DEPUTIES THAT YOU

1   RECOGNIZED THE PERSON DRIVING THE VAN?

2       A    EXCUSE ME?

3       Q    THE NIGHT THAT THE SHOOTING HAPPENED, DID YOU

4   TELL ANY SHERIFF DEPUTIES THAT YOU RECOGNIZED THE PERSON

5   DRIVING THE VAN?

6       A    NO, I DIDN'T.

7       Q    WHEN YOU FOUND OUT THAT YOUR BROTHER HAD BEEN

8   KILLED ON MAY 10TH, WERE YOU PRETTY UPSET?

9       A    YEAH.

10      Q    AND DO YOU REMEMBER TALKING TO SOME SHERIFFS

11  DETECTIVES A COUPLE OF DAYS AFTER THE HOMICIDE?

12      A    YEAH.

13      Q    AND WHEN YOU SPOKE TO THEM, WAS THAT THE FIRST

14  TIME THAT YOU HAD A LONG CONVERSATION WITH ANY OF THE

15  DEPUTIES, ANYBODY FROM THE SHERIFFS DEPARTMENT ABOUT

16  WHAT HAPPENED?

17      A    EXCUSE ME?

18      Q    WHEN YOU SPOKE TO THE HOMICIDE INVESTIGATORS A

19  COUPLE OF DAYS LATER, WAS THAT THE FIRST TIME THAT YOU

20  HAD A LONG INTERVIEW ABOUT WHAT HAPPENED?

21      A    YEAH.

22      Q    AND DO YOU REMEMBER THAT SERGEANT KATZ, STEVEN

23  KATZ SEATED NEXT TO ME, THAT HE WAS ONE OF THE

24  INVESTIGATORS THAT CAME TO TALK TO YOU?

25      A    YES, HE WAS.

26      Q    AND WHEN YOU SPOKE TO HIM ON THE 12TH, COUPLE

27  OF DAYS AFTER, DID YOU TELL HIM THAT AT THAT TIME THAT

28  IT WAS THE DEFENDANT WHO WAS DRIVING THE VAN?

1        MR. WHITE:  EXCUSE ME, YOUR HONOR.  OBJECTION;

2   LEADING.

3        THE COURT:  SUSTAINED.  IT IS LEADING.

4        Q    BY MS. WILLIAMS:  WHEN YOU SPOKE TO SERGEANT

5   KATZ, DID YOU TELL HIM THAT YOU RECOGNIZED THE DRIVER OF

6   THE VAN?

7        A    YEAH.

8        Q    AND WHO DID YOU TELL HIM WAS THE DRIVER OF THE

9   VAN?

10        A    JOFAMA COLEMAN.

11        Q    AT THAT TIME DID DETECTIVE -- SERGEANT KATZ

12   SHOW YOU A PHOTOGRAPH?

13        A    YEAH.

14        Q    WHO WAS THAT A PHOTOGRAPH OF?

15        A    JOFAMA.

16        Q    HAD YOU EVER SEEN THE DEFENDANT IN THIS WHITE

17   VAN ON ANY PRIOR OCCASIONS?

18        A    EXCUSE ME?

19        Q    HAD YOU EVER SEEN THE DEFENDANT IN A WHITE VAN

20   ON ANY DAY OTHER THAN THE DAY OF THE SHOOTING?

21        A    NO.

22        MS. WILLIAMS:  IF I COULD APPROACH WITH TWO

23   PHOTOGRAPHS I'D LIKE TO MARK PEOPLE'S 2 AND 3 FOR

24   IDENTIFICATION?

25        THE COURT:  OKAY.

26        MS. WILLIAMS:  IF I COULD HAVE A MOMENT.

27        Q    BEFORE I GO INTO THAT, I'D LIKE TO ASK YOU

28   ANOTHER QUESTION.  HAD YOU EVER HAD ANY PROBLEMS

1    YOURSELF WITH THE DEFENDANT?

2         MR. WHITE:  OBJECTION; RELEVANCE.

3         MS. WILLIAMS:  MAY WE APPROACH?

4         THE COURT:  NO.  HOLD ON.  OVERRULED.

5         Q    BY MS. WILLIAMS:  HAD YOU YOURSELF HAD ANY

6    PROBLEMS WITH THE DEFENDANT?

7         A    YEAH.

8         Q    AND WHEN WAS IT THAT YOU HAD PROBLEMS WITH THE

9    DEFENDANT?

10        A    ONE TIME I WAS WITH A FRIEND.  I FORGOT HIS

11   NAME, AND WE WERE IN THE ALLEY.  WE WERE TAGGING ON THE

12   WALLS.

13        Q    WHAT WERE YOU TAGGING ON THE WALLS?

14        A    HE WAS TAGGING.  HE WAS TAGGING "SAP."

15        Q    WHAT DOES "SAP" STAND FOR?

16        A    "STOMPING ALL PUSSIES."

17        Q    AND WHEN THAT HAPPENED, WHEN YOU WERE WITH

18   YOUR FRIEND AND HE WAS TAGGING THAT ON THE WALL, WHAT

19   HAPPENED?

20        A    JOFAMA ROLLED UP IN THE CAR IN A WHITE

21   THUNDERBIRD WITH HIS BROTHER AND THEY GOT OFF.  AND I

22   WAS ON MY BIKE, AND HE TOLD ME WHERE YOU FROM, BECAUSE

23   WE WERE CROSSING OUT THE OLD NEIGHBORHOOD.

24        Q    LET ME STOP YOU THERE FOR A SECOND.  YOU SAY

25   THAT YOU WERE CROSSING OUT HIS OLD NEIGHBORHOOD.  WHAT

26   DO YOU MEAN BY THAT?

27        A    WELL, I HEARD HE WAS FROM SOMEWHERE ELSE.

28        Q    SOME OF THE JURORS PROBABLY DON'T UNDERSTAND

1    WHAT YOU MEAN BY -- FIRST OF ALL, WHEN YOU SAY THEY GOT

2    OFF OF THE CAR, DO YOU MEAN THEY GOT OUT OF THE CAR?

3        A    YEAH.

4        Q    OKAY.  WHEN YOU SAY THE DEFENDANT'S BROTHER,

5    DO YOU KNOW WHICH BROTHER IT WAS WITH HIM?

6        A    I'M NOT SURE.  THEY LOOK ALIKE.

7        Q    AND WHEN YOU SAY YOU WERE CROSSING OFF HIS OLD

8    NEIGHBORHOOD, DO YOU MEAN THAT YOU WERE SPRAY PAINTING

9    OVER --

10        MR. WHITE:  OBJECTION; THIS IS LEADING.

11        THE COURT:  SUSTAINED.  IT IS LEADING.

12        Q    BY MS. WILLIAMS:  WHAT DO YOU MEAN BY CROSSING

13    OUT HIS OLD NEIGHBORHOOD?  WHAT EXACTLY WERE YOU DOING

14    OR YOUR FRIEND WAS DOING WHEN YOU WERE WRITING THE

15    GRAFFITI?

16        A    OH, BECAUSE HE CROSSED IT OUT AND HE PUT HIS

17    NEIGHBORHOOD AND THEY -- AND THEN HE -- HE THOUGHT I WAS

18    FROM THE SAME NEIGHBORHOOD THAT MY FRIEND WAS FROM.  I

19    TOLD HIM I WASN'T.  I TOLD HIM I WAS FROM "NC."

20        Q    YOU TOLD HIM "NC"?

21        A    YES.

22        Q    WHAT IS "NC"?

23        A    NO CONTROL.

24        Q    IS THAT A TAGGING CREW AS WELL?

25        A    YEAH.

26        Q    NOW, WHEN YOUR FRIEND WAS WRITING THIS "SAP"

27    ON THE WALL AND CROSSING OUT THE NAME OF THE OTHER

28    NEIGHBORHOOD, WHAT WAS THE NAME OF THE OTHER

1    NEIGHBORHOOD THAT HE WAS CROSSING OUT AT THAT TIME?

2         MR. WHITE:  AGAIN, YOUR HONOR, THIS IS IRRELEVANT;

3    OBJECTION.

4         THE COURT:  OVERRULED.

5         THE WITNESS:  EXCUSE ME?

6         Q    BY MS. WILLIAMS:  WHEN YOUR FRIEND WAS WRITING

7    "SAP" ON THE WALL, WHAT WAS HE WRITING OVER?  WHAT HAD

8    HE CROSSED OUT?

9         A    HE CROSSED OUT "NGA."

10        Q    AND DO YOU KNOW WHAT "NGA" STANDS FOR?

11        A    "NOT GIVING A FUCK."

12        Q    HAD YOU ALSO HEARD IT REFERRED TO AS

13   "NOTORIOUS GRAFFITI ARTISTS"?

14        A    YEAH.

15        Q    HAD YOU EVER HEARD THE DEFENDANT SAY THAT HE'S

16   A MEMBER OF "NGA"?

17        A    YEAH.

18        Q    WAS IT DURING THIS INCIDENT WHERE YOU WERE ON

19   YOUR BIKE AND THEY GOT OUT OF THEIR CAR WHILE YOUR

20   FRIEND WAS SPRAY PAINTING ON THE WALL?

21        A    EXCUSE ME?

22        Q    WHEN YOU HEARD THE DEFENDANT CLAIM NGA, SAY

23   THAT HE WAS A MEMBER OF NGA, WAS THIS DURING THIS

24   INCIDENT WHEN YOU WERE ON YOUR BIKE AND YOUR FRIEND WAS

25   SPRAY PAINTING ON THE WALL?  IS THAT WHEN IT HAPPENED?

26        A    YEAH.

27        Q    TELL US WHAT HAPPENED WHEN THE DEFENDANT AND

28   HIS BROTHER GOT OUT OF THE CAR WHILE YOUR FRIEND WAS

1    SPRAY PAINTING ON THE WALL?

2        A    WHAT HAPPENED?

3        Q    YES.

4        A    DO YOU WANT ME TO START ALL OVER?

5        Q    NO.  YOU ARE STANDING THERE, YOU ARE ON YOUR

6    BIKE.  THE DEFENDANT AND HIS BROTHER GET OUT OF THE CAR.

7    YOUR FRIEND IS SPRAY PAINTING ON THE WALL.  WHAT DOES

8    ANYBODY SAY OR DO AT THAT POINT?

9        A    MY FRIEND STARTS RUNNING.  HE DROPS HIS SPRAY

10   PAINT.  HE STARTS RUNNING AND JOFAMA'S BROTHER STARTS

11   CHASING HIM.  AND JOFAMA STAYS THERE AND PUT HIS HANDS

12   ON THE HANDLE BAR OF MY BIKE AND HE TOLD ME TO GET OFF,

13   AND SO I GOT OFF.  HE DRAGGED IT AND HE THREW IT OVER

14   THE GATE, AND I JUST WALKED AWAY.

15       Q    DID THE DEFENDANT SAY ANYTHING TO YOU DURING

16   THAT CONFRONTATION DURING THE TIME HE GRABBED YOUR BIKE?

17       A    HE DIDN'T SAY ANYTHING FROM THERE.

18       Q    WHAT, IF ANYTHING, DID HE SAY ABOUT NGA DURING

19   THAT TIME?

20       A    EXCUSE ME?

21       Q    DURING THE TIME HE TOOK YOUR BIKE, DID HE SAY

22   ANYTHING ABOUT NGA?

23       A    OH, NO, HE DIDN'T SAY ANYTHING ABOUT IT.

24       Q    WHEN WAS IT THAT YOU HEARD HIM SAY SOMETHING

25   ABOUT NGA?

26       A    WHEN HE SAID "WHY YOU CROSSING OUT MY HOOD?"

27       Q    WHAT DID HE SAY?  WHAT DID THE DEFENDANT

28   SPECIFICALLY SAY WHEN HE SAID "WHY ARE YOU CROSSING OUT

1    MY HOOD"?  DID HE --

2         A    HE WENT OFF AND HE SAID, "WHY YOU GUYS

3    CROSSING --" I DON'T REMEMBER EXACTLY WHAT WORDS HE SAID

4    IT, BUT HE SAID "WHY YOU GUYS CROSSING OUT MY HOOD" AND

5    HE JUST -- HE JUST SAID THAT AND MY FRIEND SAID,

6    "IT WASN'T ME," AND HE SAID, "YES, IT WAS.  YOU HAVE

7    BLUE PAINT ON YOUR HANDS."  THE SPRAY PAINT WAS GREEN

8    AND THAT'S IT.

9         Q    ALL RIGHT.  AND THEN HE TOOK YOUR BIKE?

10        A    YEAH.

11        Q    NOW, HAVE YOU EVER SEEN THE DEFENDANT SPRAY

12   PAINTING ANYTHING ON A WALL?

13        MR. WHITE:  OBJECTION; RELEVANCE.

14        THE COURT:  WHETHER OR NOT HE SAW HIM PAINT ON A

15   WALL?

16        MS. WILLIAMS:  JUST SPRAY PAINTING ON A WALL.

17        THE COURT:  OVERRULED.

18        Q    BY MS. WILLIAMS:  HAVE YOU EVER SEEN HIM DO

19   THAT?

20        A    EXCUSE ME?

21        Q    HAVE YOU EVER SEEN THE DEFENDANT SPRAY

22   PAINTING ANYTHING ON A WALL?

23        A    NO.

24        Q    NOW, AT THE TIME THAT THIS INCIDENT HAPPENED,

25   WAS IT LIGHT OUTSIDE?  DARK OUTSIDE?  EVENING?   COULD

26   YOU DESCRIBE WHAT IT WAS LIKE OUT?

27        A    EXCUSE ME?

28        Q    WHEN THE SHOOTING HAPPENED, WAS IT DAYLIGHT OR

 1    NIGHTTIME OR IN BETWEEN?

 2         A    DAYLIGHT.

 3         Q    AND DO YOU REMEMBER HOW -- WHETHER THERE WAS

 4    ANY LIGHT BESIDES WHATEVER THE DAYTIME CONDITIONS WERE

 5    OUTSIDE?  WAS THERE ANY OTHER LIGHT IN ASSISTING YOU IN

 6    SEEING THE DRIVER OF THE VAN?

 7         A    OH, YOU ARE TALKING ABOUT THE SHOOTING?

 8         Q    YES.

 9         A    OH, THAT WAS AT NIGHTTIME.

10         Q    WERE THERE ANY LIGHTS THAT ASSISTED YOU IN

11    SEEING THE INSIDE OF THE VAN, THE DRIVER OF THE VAN?

12         A    YEAH.

13         Q    WHAT WERE THOSE LIGHTS?

14         A    THE LIGHT POLE IN FRONT OF THE YARD ACROSS THE

15    STREET FROM MY HOUSE AND THE LADY THAT USED TO LIVE IN

16    THE BACKYARD OF MY HOUSE, SHE WAS COMING DOWN -- SHE WAS

17    COMING BACK FROM WHERE SHE WENT TO -- SHE LEFT.  I DON'T

18    KNOW WHERE.  SHE WAS COMING BACK HOME AND SHE HAD HER

19    LIGHTS ON.  AND JOFAMA WAS GOING DOWN VERMONT ON THE

20    RIGHT SIDE OF THE STREET, AND THE LADY WAS COMING FROM

21    VERMONT TOWARDS BUDLONG ON THE LEFT SIDE OF THE STREET.

22    SO THE VAN FLASHED -- JOFAMA VAN AND HE WAS LOOKING

23    TOWARDS MY HOUSE WHILE HE PASSED BY SO THAT'S WHY HE

24    SEEN ME.

25         Q    DO YOU MEAN THE HEADLIGHTS ON YOUR NEIGHBOR'S

26    CARS THAT WHAT YOU ARE TALKING ABOUT?

27         A    YES.

28         Q    THE NEIGHBORS, DO YOU KNOW HER NAME?

1      A     I DON'T -- MARIA.

2      Q     AND HAVE YOU SEEN HER TODAY?

3      A     YEAH.

4      Q     WHERE DID YOU SEE HER TODAY?

5      A     IN THE FIRST --

6      Q     IN THE D.A.'S OFFICE.  IN MY OFFICE?

7      A     WELL, WHEN WE WERE COMING OUT THE OFFICE.

8      Q     DID YOU TALK TO HER ABOUT YOUR TESTIMONY IN

9  THIS CASE?  DID YOU TELL HER WHAT YOU WERE GOING TO SAY?

10     A     I HAVEN'T TALKED TO HER, NO.

11     Q     DID SHE TELL YOU WHAT SHE WAS GOING TO SAY?

12     A     NO.

13     Q     NOW, YOU INDICATED THAT YOU NEVER SAW THE

14  DEFENDANT IN THIS WHITE VAN BEFORE.  DID YOU EVER SEE

15  HIM IN ANY CARS, IN ANY TYPE OF CAR?

16     A     DOES HE PASS BY BEFORE?

17     Q     NO.  HAVE YOU EVER SEEN HIM DRIVING IN A CAR

18  EVER?

19     A     JOFAMA?

20     Q     YES.

21     A     YES.

22     Q     WHAT KIND OF CAR DID YOU SEE HIM DRIVING IN?

23     A     A GREEN CAMRY.

24     Q     AND ON THE DAY OF THE SHOOTING, DID YOU SEE

25  HIM IN THE GREEN CAMRY?

26     A     YEAH.

27     Q     AND ABOUT HOW LONG BEFORE THE SHOOTING DID YOU

28  SEE HIM IN THE CAMRY?

1        A    ABOUT 4 HOURS BEFORE, 3 HOURS.

2        Q    WHERE WAS HE WHEN YOU SAW HIM IN THE GREEN

3    CAMRY EARLIER IN THE DAY?

4        A    ON 102ND AND BUDLONG BETWEEN BUDLONG AND

5    VERMONT.

6        Q    SO YOU ARE ON 101ST BETWEEN BUDLONG AND

7    VERMONT?

8        A    YES.

9        Q    DO YOU KNOW IF THERE'S A LIQUOR STORE IN THE

10   AREA WHERE YOU LIVE, LIKE A MARKET OR LIQUOR STORE?

11       A    THERE'S A LIQUOR STORE, YEAH.

12       Q    WHERE IS THAT?

13       A    ON 102ND AND VERMONT AND ON ABOUT BUDLONG

14   BETWEEN 102ND, 103RD.

15       Q    SO THERE'S ONE ON BUDLONG BETWEEN 102ND AND

16   103RD, AND THERE'S ONE ON 102ND AND VERMONT?

17       A    YES.

18       Q    SO THERE'S TWO PRETTY CLOSE TO WHERE YOU LIVE?

19       A    YEAH.

20       Q    WHEN YOU SAW HIM ON 102ND, HE WAS NEAR THE

21   LIQUOR -- EITHER OF THE LIQUOR STORES?

22       A    YEAH.

23       Q    WHICH ONE?

24       A    HE WAS BETWEEN BUDLONG AND VERMONT ON HIS CAR

25   AND I WAS PARKED WITH SOME FRIENDS IN A VAN.  HE DIDN'T

26   SEE ME, BUT I SEEN HIM.

27       Q    AND WAS THERE ANYBODY ELSE IN THE CAR WITH

28   HIM?

1        A    YEAH, BUT I DON'T KNOW WHO THE OTHER PEOPLE

2    ARE.  I JUST RECOGNIZE HIS CAR.

3        Q    COULD YOU SEE HOW MANY PEOPLE WERE IN THE CAR

4    WITH HIM?

5        A    ABOUT FOUR.

6        Q    COULD YOU TELL WHERE THEY -- WHETHER THEY WERE

7    HISPANIC OR BLACK OR WHAT RACE THEY WERE?

8        A    BOTH HISPANIC AND BLACK.

9        Q    NOW, YOU INDICATED THAT YOU TOLD YOUR TWO

10   BROTHERS THE DAY AFTER THIS HAPPENED THAT YOU SAW THE

11   DEFENDANT DRIVING THE CAR, IS THAT RIGHT -- DRIVING THE

12   VAN?

13       A    EXCUSE ME?

14       Q    YOU SAID YOU TOLD YOUR TWO BROTHERS ON THE DAY

15   AFTER YOUR BROTHER CHINO WAS KILLED THAT YOU HAD SEEN

16   THE DRIVER OF THE CAR --

17       A    YEAH.

18       Q    -- THE VAN.

19            WHEN THE VAN DROVE BY YOU, RIGHT AFTER THE

20   SHOOTING, WAS IT THE DRIVER'S SIDE OF THE VAN THAT WAS

21   CLOSEST TO YOU?

22       A    YEAH.

23       Q    NOW, WITH REGARD TO YOUR BROTHER CHINO, JOSE,

24   DID YOU EVER SEE HIM HAVE AN ARGUMENT OR A CONFRONTATION

25   WITH THE DEFENDANT?

26       A    NOT WITH JOFAMA.

27       Q    DID YOU EVER SEE HIM HAVE AN ARGUMENT OR

28   CONFRONTATION WITH ANYONE IN THE DEFENDANT'S FAMILY?

1          A     NO, BUT I HEARD.

2          Q     DID YOU EVER SEE HIM SAY ANYTHING, YOUR

3     BROTHER SAY ANYTHING TO ANY OF THE DEFENDANT'S BROTHERS?

4          A     DID I HEAR?

5          Q     DID YOU HEAR YOUR BROTHER SAY ANYTHING TO ANY

6     OF THE DEFENDANT'S BROTHERS?

7          A     NO.

8          Q     DO YOU REMEMBER TESTIFYING IN A PRELIMINARY

9     HEARING THAT YOU HEARD YOUR BROTHER SAY SOMETHING TO

10    JEREMY?

11         MR. WHITE:  OBJECTION; EXCUSE ME.

12         THE COURT:  SUSTAINED.

13         MR. WHITE:  IT IS A REFERENCE.

14         THE COURT:  ARE YOU GOING TO READ FROM A PRELIM?

15         MS. WILLIAMS:  I'M GOING TO ASK HIM FIRST IF HE

16    REMEMBERS, BUT I CAN GIVE YOU THE PAGE.  IT'S PAGE 11.

17         MR. WHITE:  I'M GOING TO OBJECT AS LEADING THEN.

18         THE COURT:  IT IS.

19         Q     BY MS. WILLIAMS:  DO YOU REMEMBER TESTIFYING

20    AT THE PRELIMINARY HEARING IN THIS MATTER?

21         A     YEAH.

22         Q     AND AT THE PRELIMINARY HEARING, DO YOU

23    REMEMBER TALKING ABOUT YOUR BROTHER AND JEREMY COLEMAN?

24         A     YES.

25         Q     DO YOU REMEMBER SAYING THAT YOU HAD HEARD THEM

26    GET INTO AN ARGUMENT BEFORE?

27         MR. WHITE:  OBJECTION.  THIS IS LEADING.

28         THE COURT:  WELL, DO YOU WANT TO REFRESH HIS

1    RECOLLECTION WITH THE TRANSCRIPT BECAUSE IT IS LEADING,

2    OTHERWISE?

3         MS. WILLIAMS:  CAN WE APPROACH?

4         THE COURT:  NOT NOW.  I MEAN THERE'S A DIFFERENT

5    WAY TO ASK IT.

6         MS. WILLIAMS:  IT DOESN'T SUGGEST AN ANSWER.

7         THE COURT:  SURE IT DOES.  DO YOU RECALL SAYING IT.

8         MS. WILLIAMS:  "DO YOU RECALL SAYING THAT?"

9         THE COURT:  "SAYING THAT."  WELL, YOU CAN ASK HIM

10   WHAT HE RECALLS SAYING HIMSELF AND ASK HIM TO TELL US

11   WHAT HE RECALLS SAYING AT THE PRELIM.

12        Q    BY MS. WILLIAMS:  DID YOU READ YOUR

13   PRELIMINARY HEARING TESTIMONY BEFORE TAKING THE STAND

14   TODAY?  DID YOU READ THE PRELIMINARY HEARING TRANSCRIPT?

15   DID YOU READ THIS?

16        A    YEAH.

17        Q    WHEN YOU READ IT, DO YOU REMEMBER THAT YOU DID

18   SAY ALL THE THINGS THAT WERE IN THE PRELIMINARY HEARING?

19        A    YEAH.

20        Q    DO YOU REMEMBER ANYTHING -- APART FROM THE

21   PRELIMINARY HEARING, DO YOU REMEMBER EVER SEEING ANY

22   SORT OF ARGUMENT OR ANYTHING WHERE YOUR BROTHER SAID

23   SOMETHING, YOUR BROTHER CHINO SAID SOMETHING TO JEREMY

24   COLEMAN?

25        A    UH-UH.

26        MR. WHITE:  IS THAT A NO?

27        THE WITNESS:  YES.

28        Q    BY MS. WILLIAMS:  I THINK YES THAT'S A NO?

1      A     YEAH, THAT'S A NO.

2      Q     AND IF YOU LOOKED AT THE PRELIMINARY HEARING

3   TRANSCRIPT, WOULD THAT POSSIBLY REFRESH YOUR MEMORY

4   ABOUT WHETHER YOU HAD EVER SEEN YOUR BROTHER SAY

5   ANYTHING TO JEREMY COLEMAN?

6      MR. WHITE:  YOUR HONOR, THIS WITNESS HASN'T

7   INDICATED THAT HE --

8      THE COURT:  THAT'S CORRECT.

9      Q     BY MS. WILLIAMS:  DO YOU REMEMBER TESTIFYING

10  AT THE PRELIMINARY HEARING THAT YOU DID SEE SUCH A

11  CONFRONTATION?

12     A     I SAID THAT I HEARD ABOUT A CONFRONTATION.

13     Q     OKAY.  SO WHEN YOU WERE TALKING -- WHEN YOU

14  WERE TALKING ABOUT IT, IT WAS SOMETHING THAT YOU HEARD,

15  NOT SOMETHING THAT YOU SAW?

16     A     YES.

17     Q     NOW, DO YOU REMEMBER DETECTIVE VALENTO,

18  ANOTHER DETECTIVE IN THIS CASE, COMING TO YOUR HOUSE AND

19  SHOWING YOU A GROUP OF PHOTOGRAPHS?  IN OTHER WORDS, SIX

20  PHOTOGRAPHS INSTEAD OF JUST ONE PHOTOGRAPH?

21     A     I REMEMBER LOOKING AT PHOTOGRAPHS.

22     Q     I'M --

23     A     YEAH.

24     Q     DO YOU REMEMBER WHEN YOU SAW DETECTIVE VALENTO

25  THAT HE SHOWED YOU THIS GROUP OF PHOTOGRAPHS AND ASKED

26  YOU IF YOU RECOGNIZED ANYBODY IN THE GROUP OF

27  PHOTOGRAPHS?

28     A     HE ASKED ME IF I RECOGNIZED ANYBODY, YES, AND

1    I RECOGNIZED JOFAMA.

2        Q    WHEN YOU SAY YOU RECOGNIZED JOFAMA, IS THAT

3    THE PERSON THAT YOU'VE IDENTIFIED AS THE DEFENDANT?

4        A    YES.

5        Q    AND WHEN HE SHOWED YOU THIS GROUP OF

6    PHOTOGRAPHS, DID YOU LOOK AT THIS GROUP OF PHOTOGRAPHS

7    AND ACTUALLY CIRCLE ONE OF THE PHOTOGRAPHS IN THE GROUP?

8        A    YEAH.

9        Q    AND WHO WAS THE PERSON THAT YOU CIRCLED IN

10   THAT GROUP OF PHOTOGRAPHS?

11       A    JOFAMA.

12       Q    WHEN YOU SAY JOFAMA, DO YOU MEAN THE

13   DEFENDANT?  WHEN YOU SAY JOFAMA, DO YOU MEAN THE

14   DEFENDANT?  THE PERSON YOU'VE IDENTIFIED HERE IN COURT,

15   IS THAT WHO YOU MEAN?

16       A    YEAH.

17       MS. WILLIAMS:  IF I COULD JUST HAVE A SECOND.

18           AT THIS TIME I WOULD ACTUALLY LIKE TO MARK

19   THESE TWO ITEMS AS PEOPLE'S 2A AND B.  THE FIRST IS A

20   WITNESS ADMONITION FORM.  IF THAT COULD BE MARKED AS

21   PEOPLE'S 2A.  AND PEOPLE'S 2B, I WAS GOING TO MARK TWO

22   OTHER ITEMS, BUT I NEVER USED THEM SO I WOULD ASK THAT

23   THESE BE MARKED 2A AND B RESPECTIVELY, IF THEY CAN BE SO

24   MARKED.  DEFENSE COUNSEL HAS A COPY OF THEM.

25       THE COURT:  OKAY.

26   ///

27   ///

28   ///

```
 1              (MARKED FOR IDENTIFICATION, WITNESS ADMONITION

 2         FORM AND 6 PHOTOGRAPHS, PEOPLE'S EXHIBIT

 3         NOS. 2A AND 2B.)

 4

 5    MS. WILLIAMS:  MAY I APPROACH?

 6    THE COURT:  YES.

 7    Q    BY MS. WILLIAMS:  SHOWING YOU FIRST THIS FIRST

 8    PAGE OF THIS TWO-PAGE DOCUMENT, PEOPLE'S 2A.  DO YOU

 9    RECOGNIZE THIS VICTIM WITNESS PHOTOGRAPHIC MUG SHOW UP?

10    HAVE YOU SEEN THIS BEFORE?

11    A    I DON'T REMEMBER.

12    Q    DO YOU SEE THERE'S A PLACE WHERE IT SAYS

13    "SIGNED" AND THERE'S AN "X" BY IT AND A SIGNATURE?

14    A    YEAH.

15    Q    IS THAT YOUR SIGNATURE?

16    A    YEAH.

17    Q    DO YOU SEE THE WITNESS, IT SAYS "VALENTO"

18    UNDERNEATH THAT?

19    A    YES.

20    Q    AND THEN THE DATE OF "MARCH 18TH, '04," DO YOU

21    SEE THAT?

22    A    YEAH.

23    Q    DO YOU REMEMBER IF DETECTIVE VALENTO READ THIS

24    TO YOU PRIOR TO SHOWING YOU A GROUP OF PHOTOGRAPHS?

25    A    YES.

26    Q    AND WHEN HE READ THIS TO YOU, DID HE READ THE

27    PART WHERE HE SAID YOU ARE NOT OBLIGATED TO IDENTIFY

28    ANYONE?  DO YOU REMEMBER HIM SAYING THAT?
```

1    A    YEAH.

2    Q    AND DO YOU REMEMBER HIM SAYING IT IS JUST AS

3   IMPORTANT TO FREE INNOCENT PERSONS FROM SUSPICION AS TO

4   IDENTIFY GUILTY PARTIES?  DO YOU REMEMBER HIM SAYING

5   THAT, AS WELL?  DO YOU REMEMBER DETECTIVE VALENTO

6   READING THAT TO YOU, AS WELL?

7    A    YEAH.

8    Q    NOW, AFTER DETECTIVE VALENTO READ THIS TO YOU,

9   DID YOU SIGN THIS DOCUMENT?

10    A    YEAH.

11    Q    IS THAT A YES?

12    A    YES.

13    Q    OKAY.  AND THEN FOLLOWING THAT, DID HE SHOW

14   YOU THIS GROUP OF SIX PICTURES MARKED AS PEOPLE'S 2B FOR

15   IDENTIFICATION?

16    A    YEAH.

17    Q    AND THIS GROUP OF SIX PICTURES MARKED PEOPLE'S

18   2B, DID YOU CIRCLE ANYONE IN THIS GROUP OF PICTURES AS

19   SOMEBODY WHO YOU RECOGNIZED RELATED TO THE SHOOTING?

20    A    TO ANSWER?

21    Q    YES.  WHO DID YOU CIRCLE IN THESE GROUP OF SIX

22   PICTURES?

23    A    JOFAMA.

24    Q    WHEN YOU SAY JOFAMA, WHICH ONE IS HE IN THIS

25   GROUP?

26    A    NUMBER 2.

27    Q    IS THERE A CIRCLE AROUND NUMBER 2?

28    A    YEAH.

1        Q    AND DO YOU SEE THERE'S SOME INITIALS "JR"?

2    ARE THOSE YOUR INITIALS?

3        A    YEAH.

4        Q    DID YOU WRITE THAT THERE?

5        A    YES.

6        Q    AND I SEE THE WORD "JOFAMA" WRITTEN ON THIS

7    PHOTOGRAPH.  DID YOU WRITE THAT?

8        A    YES.

9        Q    AND DID YOU CIRCLE THIS PHOTOGRAPH BECAUSE YOU

10   RECOGNIZED HIM AS THE DRIVER OF THE VAN FOLLOWING THE

11   SHOOTING?

12       A    YEAH.

13       Q    NOW, ARE YOU CERTAIN THAT THE DEFENDANT WAS

14   THE ONE DRIVING THE VAN RIGHT AFTER YOU HEARD THE SHOTS

15   BEING FIRED?

16       A    YEAH.

17       MS. WILLIAMS:  I HAVE NOTHING FURTHER.

18       THE COURT:  WHY DON'T WE TAKE A 10-MINUTE RECESS.

19   YOU CAN GO DOWNSTAIRS, JUST COME BACK AT 20 TILL.  WE'LL

20   START PROMPTLY AT 20 TILL.

21

22            (RECESS TAKEN.)

23

24            (THE FOLLOWING PROCEEDINGS WERE

25            HELD IN OPEN COURT IN THE

26            PRESENCE OF THE JURY:)

27

28       THE COURT:  THE JURORS ARE BACK, ALL CHIPPER AND

```
 1   EVERYTHING.  ONE OF THE JURORS ASKED ME IF YOU CAN BRING

 2   COFFEE IN.  YOU ALL CAN BRING COFFEE IN OR WATER.  I

 3   MEAN YOU CAN'T BRING CAPPUCCINO MAKERS IN HERE, BUT YOU

 4   CAN HAVE YOUR COFFEE.  JUST BE CAREFUL NOT TO SPILL IT

 5   OR TEA OR NO ALCOHOLIC BEVERAGES, NOTHING LIKE THAT.

 6   THAT WAS A NOD.  THIS IS A COURTROOM.

 7            ALL THE JURORS ARE BACK AND THE WITNESS IS

 8   STILL ON THE STAND UNDER OATH, AND MS. WILLIAMS.

 9       MS. WILLIAMS:  YES.  I HAVE A COUPLE MORE

10   QUESTIONS.

11       Q    MR. ROBLES, HAVE YOU EVER SEEN ANY GRAFFITI

12   FOR NGA, HAVE YOU EVER SEEN ANY OF THEIR GRAFFITI ON ANY

13   WALLS?

14       MR. WHITE:  OBJECTION; RELEVANCE.

15       THE COURT:  WELL, THAT COULD BE.  YOU WANT TO REDO

16   THE QUESTION.

17       Q    BY MS. WILLIAMS:  IN YOUR NEIGHBORHOOD WHERE

18   YOU LIVE HAVE YOU EVER SEEN ANY NGA GRAFFITI?

19       A    YEAH.

20       Q    HAVE YOU EVER SEEN ANY NICKNAMES OR MONIKERS

21   PAINTED WITH THIS GRAFFITI?

22       A    HUH?

23       Q    HAVE YOU EVER SEEN NEXT TO GRAFFITI SAYING

24   NGA, HAVE YOU SEEN ANY NAMES WRITTEN NEXT TO THAT

25   GRAFFITI?

26       A    YEAH.

27       Q    WHAT NAMES, IF ANY, CAN YOU REMEMBER BEING

28   NEXT TO THAT GRAFFITI?
```

1       MR. WHITE:  AGAIN, OBJECTION; RELEVANCE.

2       MS. WILLIAMS:  I CAN MAKE AN OFFER OF PROOF AT

3   SIDEBAR.

4       THE COURT:  OKAY.  SIDEBAR.

5

6       (THE FOLLOWING PROCEEDINGS WERE

7       HELD AT THE BENCH:)

8

9       THE COURT:  WE ARE AT SIDEBAR.

10      MS. WILLIAMS:  AT THE PRELIMINARY HEARING HE

11  TESTIFIED THAT HE HAD SEEN THE NAME "ILLUSION" WRITTEN

12  NEXT TO NGA AND THERE ARE OTHER WITNESSES WHO WILL SAY

13  THAT'S THE DEFENDANT'S MONIKER.

14      MR. WHITE:  I DON'T SEE WHAT RELEVANCE IT HAS IN

15  THIS CASE, YOUR HONOR.  THE WITNESSES, WHO ARE GOING TO

16  IDENTIFY MY CLIENT, HAS NO TESTIMONY THAT SUPPOSEDLY

17  THEY I.D.ED HIS NAME BECAUSE OF HIS NAME OR ANYTHING

18  LIKE THAT.  THEY HAVE KNOWN MY CLIENT.  THEY KNEW WHO HE

19  WAS.  THEY SAW HIM.  WHAT'S THE RELEVANCE OF TRYING TO

20  BRING IN THE NAME "ILLUSION"?  SO, IF ANYTHING, IT'S

21  TRYING TO MAKE MY CLIENT SEEM LIKE HE'S MORE OF A GANG

22  MEMBER.  THE MONIKER HAS NO RELEVANCE IN THIS CASE.

23      THE COURT:  WELL, IT'S RELEVANT.  THE QUESTION IS

24  WHETHER OR NOT IT SHOULD BE EXCLUDED.  IT IS RELEVANT TO

25  SHOW THERE WAS SOME -- THAT THIS WAS GANG-MOTIVATED OR

26  RETALIATION OR A PRIOR EVENT AGAINST GANG-RELATED.  IT'S

27  DEFINITELY RELEVANT.  IT SHOULD BE EXCLUDED AND WHY?

28      MS. WILLIAMS:  I DON'T SEE HOW IT'S PREJUDICIAL,