REDIRECT EXAMINATION

BY MS. WILLIAMS:

Q    I WAS CONFUSED FOR JUST A SECOND.  DID YOU HAVE -- WHEN YOU CIRCLE THE DEFENSE PHOTOGRAPH, DID YOU KNOW WHETHER HE BELONGED TO ANY SPECIFIC TAGGING CREW?

A    JOFAMA?

Q    YES.

A    NO.

Q    BUT YOU INDICATED THAT -- SOMETHING ABOUT P.K. AND M.K., HAD YOU SEEN HIM WITH THEM BEFORE, P.K.?

A    YES.

Q    M.K.?

A    YES.

Q    WHAT ABOUT PEOPLE FROM M.G.A.?

A    YES, ALSO.

Q    HAD YOU SEEN THOSE THREE GROUPS SORT OF HANGING OUT TOGETHER?

A    YES.

Q    SO THEY WERE ALL FRIENDLIES, THOSE TAGGING CREWS, P.K., M.K. AND M.G.A.?

A    I BELIEVE SO.

Q    AS FAR AS WHAT YOU CAN TELL?

A    FROM WHAT I KNOW, YES.

Q    DID YOU EVER SEE PEEWEE OR RATON HANGING OUT WITH THE DEFENDANT?

A    YES.

Q    AND WHAT ABOUT SOMEBODY BY THE NAME OF DRIPS, DID YOU EVER SEE ANYBODY WITH THAT NICKNAME?

```
 1        A      NO.

 2        Q      AND RATON WAS FROM EVIL KLAN (PHONETIC)?

 3        A      EVIL KLAN.

 4        Q      AND PEEWEE FROM M.K.A.?

 5        A      YES.

 6        Q      MEXICANS KICKING ASS, WHATEVER IT'S CALL?

 7        A      CORRECT.

 8        Q      DID YOU SEE RATON AND PEEWEE HANGING OUT AS

 9   WELL?

10        A      CORRECT.

11        Q      AND WHAT ABOUT THE DEFENDANT, DID YOU EVER SEE

12   HIM HANGING OUT WITH SOMEONE BY THE NAME OF DAVID BARRARA OR

13   DAVID MEDINA?

14        A      NO, I DIDN'T -- NO.

15        Q      OKAY.

16      MS. WILLIAMS:  NOTHING FURTHER.

17      THE COURT:  CROSS?

18      MR. WHITE:  THANK YOU.

19

20                    RECROSS-EXAMINATION

21   BY MR. WHITE:

22        Q      YOU YOURSELF WEREN'T PART OF ANY OF THESE

23   GROUPS YOU SAY YOUR BROTHER WERE?

24        A      MY BROTHERS WERE.  I WAS WITH THEM.  I HUNG OUT

25   WITH THEM, BUT INVOLVED, ME BEING A M.C., NO.

26        Q      DID M.C. HANG OUT WITH ANY PEOPLE LIKE PEEWEE?

27        A      YES, THEY HAVE.

28        Q      IF I'M UNDERSTANDING CORRECTLY, A LOT OF YOU
```

```
 1    GUYS GREW UP IN THE SAME AREA?

 2         A      CORRECT.

 3         Q      A LOT OF YOU GUYS WERE FRIENDS?

 4         A      CORRECT.

 5         Q      EVEN THOUGH YOU MIGHT HAVE BEEN HANGING OUT

 6    WITH DIFFERENT TAGGER GROUPS OR WHATEVER, FROM TIME TO TIME

 7    YOU GUYS WOULD INTERRELATE WITH ONE ANOTHER; RIGHT?

 8         A      FROM TIME TO TIME BEFORE ALL THE FIGHTING AND

 9    ALL THAT?

10         Q      YES.

11         A      YES.

12         Q      AND THE FIGHTING AND STUFF, DID THAT STUFF

13    START HAPPENING SOMEWHAT LATER AFTER THIS SHOOTING OR WAS

14    IT --

15         A      BEFORE.

16         Q      WAS IT BEFORE?

17         A      IT WAS BEFORE.

18      MR. WHITE:  THANK YOU, SIR.

19      MS. WILLIAMS:  MAY I?

20      THE COURT:  YES.

21

22                    REDIRECT EXAMINATION

23    BY MS. WILLIAMS:

24         Q      WITH REGARDS TO THE FIGHTING, IS IT FAIR TO

25    SAY THAT PEOPLE FROM N.C., NO CONTROL, DID NOT GET ALONG

26    EVIL KLAN, M.K.A. AND THEN M.G.A.?

27         A      CORRECT.

28         Q      SO, BASICALLY, ONE SIDE WOULD BE NO CONTROL
```

1   AND THEN VERSUS IT WOULD BE ALL THE OTHER GROUPS, E.K.,

2   M.K.A. AND N.G.A.?

3         A        CORRECT?

4         Q        AND WHEN DID THIS FIGHTING START?

5         A        A WHILE BACK.

6         Q        HOW LONG BEFORE THE MURDER?

7         A        SIX, SEVEN YEARS.

8         Q        SIX, SEVEN YEARS BEFORE THE MURDER?

9         A        (NO AUDIBLE RESPONSE).

10        Q        IS THAT "YES"?

11        A        YES.

12        Q        HAD YOU EVER SEEN A PARTICULAR -- THE VICTIM

13  AND -- JOSE ROBLES AND THE DEFENDANT, HAD YOU EVER SEEN THEM

14  FIGHTING?

15        A        NO.

16     MS. WILLIAMS:  NOTHING FURTHER.

17     THE COURT:  ANYTHING ELSE?

18     MR. WHITE:  JUST BRIEFLY.

19

20                    RECROSS-EXAMINATION

21  BY MR. WHITE:

22        Q        MR. SANDOVAL, IT SOUNDS TO ME LIKE YOU'RE --

23  AT LEAST FROM YOUR TESTIMONY, YOU'RE SAYING THAT THESE OTHER

24  THREE GROUPS, THAT ALL THE OTHER GROUPS WERE ALIGNED WITH

25  ONE ANOTHER AGAINST NO CONTROL?

26        A        CORRECT.

27        Q        THERE WERE NO OTHER GROUPS THAT NO CONTROL

28  HUNG OUT WITH?

```
 1          A       NO.  IT WASN'T ON M.C.

 2          Q       WERE THEY THE BIGGEST GROUP?

 3          A       THE P.K. AND N.K.

 4          Q       YES.  OF ALL THE GROUPS OUT THERE?

 5          A       I DON'T KNOW IF THEY WERE BIGGER FROM THE OTHER

 6  GUYS, BUT, NO.

 7          Q       SO WHY WERE ALL THE OTHER GROUPS ALIGNING

 8  THEMSELVES -- STRIKE THAT.

 9       MR. WHITE:  I DON'T HAVE ANY OTHER QUESTIONS.

10       MS. WILLIAMS:  NOTHING FURTHER.

11       THE COURT:  THANK YOU.  YOU MAY STEP DOWN.  WE'LL TAKE

12  OUR AFTERNOON RECESS.  COME BACK AT 3:20 AND PLEASE REMEMBER

13  THE ADMONITIONS.

14

15  (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT, IN

16               THE PRESENCE OF THE JURY.)

17

18       THE COURT:  ALL JURORS ARE GONE.  WE CAN TAKE OUR BREAK

19  IN THIS CASE.

20       MS. WILLIAMS:  JUST SO THE COURT IS AWARE, JEREMY

21  COLEMAN WAS ORDERED BACK FOR THIS AFTERNOON AND HE'S NOT

22  HERE.  THEY WENT TO HIS HOUSE TO TRY TO FIND HIM AND I DON'T

23  KNOW WHY THERE'S A PROBLEM BECAUSE HE SHOWN UP ON ALL OTHER

24  DAYS.  INVESTIGATING OFFICERS ASKED HIM TO CALL IF HE NEEDED

25  A RIDE AND WE SENT SOME OTHER OFFICERS OVER THERE.  SO I

26  DON'T KNOW IF THE DEFENSE HAS A BETTER TRY AT GETTING A HOLD

27  OF HIM.  BUT AT THIS POINT, I ASK FOR A BODY ATTACHMENT TO

28  BE ISSUED.
```

1         COURT OF APPEAL OF THE STATE OF CALIFORNIA

2             SECOND APPELLATE DISTRICT

3

THE PEOPLE OF THE STATE OF CALIFORNIA, )

4                               )

5              PLAINTIFF-RESPONDENT, )

6              -VS-          ) NO. YA059765

7 JOFAMA COLEMAN,               ) OCT 2 6 2007

8             DEFENDANT-APPELLANT. )

▢ **COPY**

9 _____)

10    APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY

11     HONORABLE ERIC C. TAYLOR, PRESIDING JUDGE

12        REPORTERS' TRANSCRIPTS ON APPEAL

13       APRIL 24, 25, 26, 27, 28, 2006

14            AUGUST 16, 2007

15

16

17

18 APPEARANCES:

19 FOR THE PLAINTIFF-RESPONDENT:  EDMUND G. BROWN, JR.
                              STATE ATTORNEY GENERAL

20                         300 SOUTH SPRING STREET
                              NORTH TOWER, SUITE 5001

21                         LOS ANGELES, CA.  90013

22 FOR THE DEFENDANT-APPELLANT:  IN PROPRIA PERSONA

23

24 VOLUME 5 OF 5        ROBBIN HILL, CSR #6853
                             OFFICIAL REPORTER

25

26 PAGES 2401 TO 2520-2700
     2701 TO 2769-3000

27     3001 TO 3001-3300
     3301 TO 3302-3600

28     3601 TO 3608-3900
     3901 TO 3913-4200

1    ONCE THE PEOPLE HAVE FINISHED WITH ARGUMENT,

2    THE DEFENSE HAS AN OPPORTUNITY TO ARGUE ALSO.  AND THEN

3    IF THE PEOPLE WISH TO, THEY'LL HAVE AN OPPORTUNITY TO

4    THE REBUTTAL.  THAT'S HOW IT GOES.  THANK YOU FOR YOUR

5    PATIENCE.

6         PEOPLE, IF YOU ARE READY.

7    MS. WILLIAMS:  THANK YOU, YOUR HONOR.

8

9         OPENING ARGUMENT

10

11    BY MS. WILLIAMS:  THE DEFENDANT KILLED JOSE ROBLES.

12   JUST AS SURELY AS HE PULLED THE TRIGGER, HE DROVE THE

13   VAN, HE STOPPED IT, HE LET THE SHOOTER OUT, HE WAITED.

14   HE WAITED FOR THE SHOOTER TO DOWNLOAD THE WEAPON INTO

15   JOSE ROBLES.  HE WAITED FOR THE SHOOTER TO GET BACK IN

16   THE CAR.  HE DROVE OFF.  HE TURNED THE HEADLIGHTS OFF,

17   HE SKIDDED, LEFT A SKID MARK ON THE GROUND TO GET OUT OF

18   THERE TO ESCAPE.

19        AS THE DEFENDANT AND THE SHOOTER WERE DRIVING

20   AWAY WITH OTHER INDIVIDUALS IN THE VEHICLE, WE KNOW

21   THERE WERE OTHER INDIVIDUALS IN THERE BECAUSE SOME OF

22   THE WITNESSES SAID THERE WERE OTHER PEOPLE IN THE CAR.

23   THEY WERE BEING FOLLOWED.  THEY WERE BEING FOLLOWED BY

24   ANDRES SANDOVAL AND ALBERT SEGUNDO.  AND AS THEY WERE

25   BEING FOLLOWED, THE VAN THE DEFENDANT WAS DRIVING

26   STOPPED.  ONCE AGAIN, THE SHOOTER GOT OUT OF THE VAN.

27   ONCE AGAIN HE POINTED HIS GUN, THIS TIME AT ALBERT

28   SEGUNDO AND ANDRES SANDOVAL.  HE DIDN'T SHOOT THIS TIME

1  ESSENTIALLY EACH OF THESE TESTIMONIES NOT TO BELIEVE

2  THAT THEY ARE TELLING THE TRUTH THAT THE DEFENDANT DROVE

3  THE VAN.

4          IT'S NOT A COINCIDENCE THAT FOUR PEOPLE SAY

5  THE DEFENDANT WAS THE DRIVER OF THE VAN.  BUT THERE ARE

6  ALSO OTHER LITTLE FACTS THAT WERE PROVEN THROUGHOUT THE

7  TRIAL THAT SHOW THAT THE WITNESSES ARE TELLING THE TRUTH

8  AND WE CALL THIS CORROBORATION.  SO, IN OTHER WORDS,

9  EACH OF WHAT THEY SAY CORROBORATES, BACKS UP, TELLS US

10  THAT THE OTHER WITNESSES ARE TELLING THE TRUTH AND I'M

11  GOING TO POINT OUT SOME OF THOSE AREAS OF THAT

12  CORROBORATION RIGHT NOW.

13          FIRST OF ALL, THERE'S A WHITE VAN WITH WOOD

14  PANELING.  ALL OF THE WITNESSES, ESSENTIALLY ALL OF THE

15  EYEWITNESSES SAW THIS.  ANDRES SANDOVAL SAW THIS,

16  ANTHONY ROBLES SAW THIS, ADRIAN ROBLES, JESSE ROBLES,

17  ALBERT SEGUNDO, JOSE LOPEZ.  MARIA, SHE DOES NOT SEE THE

18  SIDE SO SHE DOESN'T SEE THE WOOD PANELING.  SHE ONLY

19  SEES THE FRONT AND THERE'S A MISSING PANEL OF WOOD ON

20  THE DRIVER'S DOOR.  ANDRES SANDOVAL SEES THAT AS THEY

21  ARE FOLLOWING THE CAR, AND JESSE ROBLES SEES THAT AS THE

22  CAR GOES BY.  SO THE FACT THAT THESE FACTS EXIST THAT

23  THE WITNESSES TESTIFIED TO SHOW THAT THEY SAW WHAT THEY

24  SAW AND THEY REMEMBER WHAT THEY SAW.

25          THE NEXT CATEGORY IS THAT THE VAN ACTUALLY HAD

26  TINTED WINDOWS.  TWO PEOPLE SAW THIS, JESSE ROBLES AND

27  ALBERT SEGUNDO.  THAT WOULD BE ON THE SIDE OBVIOUSLY,

28  NOT ON THE WINDSHIELD.  THE HEADLIGHTS ILLUMINATED THE

1    DEFENDANT.  TWO PEOPLE SAID THIS, JESSE ROBLES AND MARIA

2    RENTERIA, BOTH WHO WERE IN THE SAME POSITION,

3    ESSENTIALLY LOOKING AT THIS, SO THEY CORROBORATE WHAT

4    THE OTHER ONE SAID.  WE KNOW THAT JESSE SAW WHAT HE SAW

5    BECAUSE SOMEONE ELSE SAW EXACTLY WHAT JESSE SAW.

6         WE KNOW THAT ALBERT SAW WHAT HE SAW BECAUSE

7    SOMEONE ELSE SAW WHAT ALBERT SAW.  SO THAT'S A WAY TO

8    KNOW THAT THEY ARE TELLING THE TRUTH.  MIND YOU, THE

9    WITNESSES SAID THEY DIDN'T TALK AMONGST THEMSELVES ABOUT

10   THEIR TESTIMONY.  THEY DIDN'T KNOW WHAT THE OTHER WAS

11   GOING TO SAY.

12        THE BLACK T-SHIRT.  HOW MANY SAW HIM WITH A

13   BLACK T-SHIRT.  ALBERT SEGUNDO SAW HIM WITH A BLACK

14   T-SHIRT.  MARIA LOPEZ SAW HIM WITH A BLACK T-SHIRT

15   EARLIER IN THE DAY WHEN THE DEFENDANT CAME BY WITH THE

16   GREEN CAMRY.  CARLOS LOPEZ SAW HIM BOTH EARLIER IN THE

17   DAY WHEN HE CAME BY AND AT THE TIME OF THE SHOOTING AND

18   MOST IMPORTANTLY, YOU ALL SAW WHAT HE WAS WEARING.  IF

19   IT'S NOT BLACK, IT'S REALLY, REALLY DARK BLUE.  SO

20   OBVIOUSLY SOMEONE COULD MISTAKE BLACK FOR DARK BLUE AS

21   HE'S DRIVING BY, BUT WE SEE THAT HE'S WEARING A REALLY

22   DARK SHIRT WITH A WHITE T-SHIRT UNDERNEATH.

23        THAT'S NOT WITNESS TESTIMONY.  THAT'S A FACT

24   THAT YOU ALL KNOW BECAUSE YOU ALL SAW IT WITH YOUR OWN

25   EYES.  AND THAT'S WHAT EACH OF THESE PEOPLE SAID THAT

26   THEY SAW, SO THAT MEANS IT'S MORE LIKELY THAT WHAT THEY

27   SAID IS TRUE.  AND EACH OF THESE LITTLE FACTS THAT WELL

28   ADD UP MAKES IT MORE LIKELY THAT WHAT THEY SAID IS TRUE.

1        FINALLY, WE HAVE JESSE ROBLES SAYING A WHITE

2    T-SHIRT, BUT WHAT'S INTERESTING IS THAT THE DEFENDANT

3    WAS WEARING A WHITE T-SHIRT UNDERNEATH THE BLACK

4    T-SHIRT.  SO IT IS QUITE POSSIBLE THAT WHAT JESSE ROBLES

5    SAW IS THAT BIT OF WHITE AS THE VAN DROVE BY, THAT HE

6    NOTICED THE WHITE UNDER THE T-SHIRT.  SO EVEN WHAT HE

7    SAYS IS TRUE, THE DEFENDANT HAD A WHITE T-SHIRT ON

8    UNDERNEATH IT.

9        THE EYEBROW PIERCING.  ALBERT SEGUNDO SAID HE

10   SAW THE EYEBROW PIERCING.  HE KNEW THE DEFENDANT TO HAVE

11   THAT.  DEPUTY MARELLA PULLED THE DEFENDANT OVER AROUND

12   THIS SAME TIME FRAME AND THE DEFENDANT HAD AN EYEBROW

13   PIERCING AND, ONCE AGAIN, THE DEFENSE ASKED THE

14   QUESTION, AND THE DEFENDANT DID HAVE THIS PIERCING IN

15   HIS LEFT EYEBROW SO WE KNOW THAT'S TRUE.

16       THE GUN.  TWO OF THE WITNESSES SAID THE GUN

17   WAS A BLUE STEEL GUN WHICH IS A GUN THAT LOOKS ACTUALLY

18   BLACK, BUT IT'S VERY SHINY BLACK, SO IT HAS A BLUISH

19   APPEARANCE.  ALBERT SEGUNDO AND ANTHONY ROBLES, ANDRES

20   SANDOVAL SAID IT WAS BLACK.  ONCE AGAIN, 3 PEOPLE SEE

21   THE GUN, FAIRLY CONSISTENT DESCRIPTION OF WHAT THEY SAW

22   OF THE GUN.

23       THE EXPERT CAME IN AND HE TOLD YOU THAT

24   THERE'S FOUR DIFFERENT FIREARMS THAT COULD HAVE POSSIBLY

25   MADE THESE TYPE OF GENERAL RIFLING CHARACTERISTICS.  THE

26   SIZE OF THE LARSEN IS CONSISTENT WITH A BERETTA AND

27   ALBERT SEGUNDO SAID THAT IT LOOKS LIKE A BERETTA.  IT

28   WAS SIMILAR IN SIZE TO A BERETTA, WHICH IS WHAT ALL THE

1   DEPUTIES CARRY.  LARSEN IS THE MOST COMMON MANUFACTURER

2   OUT OF THESE GUNS AND LARSEN AND RPB DON'T HAVE WHAT'S

3   KNOWN AS A FIRING PIN DRAG AND THE OTHER TWO

4   MANUFACTURERS DO.  THE OTHER TWO MANUFACTURERS ALSO

5   DON'T COME IN BLUE STEEL, SO THEY WOULDN'T HAVE THAT

6   LIKE METALLIC SHINY LOOK.  SO IN ALL LIKELIHOOD IT'S

7   EITHER THE LARSEN OR THE RPB.

8           AND AS MANUEL MUNOZ TESTIFIED TO, LARSEN IS BY

9   FAR THE BIGGEST MANUFACTURER.  SO IT MAKES SENSE THAT IT

10  WOULD BE THE LARSEN.  THE REASON THIS IS IMPORTANT IS

11  THAT IT OBVIOUSLY MAKES A DIFFERENCE IN THIS CASE SINCE

12  WE DON'T HAVE A FIREARM WHAT TYPE OF FIREARM WAS USED,

13  BUT WHAT IT DOES SHOW YOU IS THAT ALBERT AND ANDRES AND

14  ANTHONY SAW WHAT THEY SAW AND THEY SAW A GUN THAT PRETTY

15  MUCH FITS THIS DESCRIPTION.  THIS IS THE LARSEN.

16          IT IS AN EXHIBIT IN THE CASE.  YOU'LL GET THE

17  EXHIBIT, AND THIS LARSEN HAS THAT SHINY BLACK

18  APPEARANCE, THAT BLUE STEEL APPEARANCE AND IT LOOKS VERY

19  MUCH LIKE A BERETTA AND I'LL GET TO THE PICTURE OF THE

20  BERETTA IN A MINUTE.

21          THE RPB FIREARM DOESN'T LOOK LIKE A BERETTA AT

22  ALL.  IT'S BIGGER.  IT LOOKS MUCH DIFFERENT.  IT'S NOT

23  SIMILAR IN SIZE TO A BERETTA AND YOU WOULDN'T DESCRIBE

24  THAT AS LOOKING AS A BERETTA.  THIS IS THE BERETTA AND

25  AS YOU CAN SEE IF YOU LOOK AT THAT ONE AND THEN THAT

26  ONE, THEY ARE VERY SIMILAR IN THE WAY THEY LOOK, IN

27  THEIR APPEARANCE AND IN SIZE.  SO BASED ON THAT, IN ALL

28  LIKELIHOOD IT WAS THE LARSEN.

1    WHAT'S IMPORTANT IS THAT BECAUSE THE KIND OF

2    GUN COULD HAVE BEEN A LARSEN, IN OTHER WORDS IF THE

3    WITNESSES SAID IN THIS CASE, WELL, IT LOOKED LIKE A

4    BERETTA AND THE GUNS THAT COULD BE NONE OF THEM LOOKED

5    ANYTHING LIKE A BERETTA, YOU WOULD BE LIKE WELL, THAT'S

6    WEIRD.  IT DIDN'T LOOK ANYTHING LIKE THAT.  BUT IN THIS

7    CASE WE KNOW THAT THEY DESCRIBED A GUN THAT COULD HAVE

8    BEEN BASED UPON THE FIREARM'S EVIDENCE.  SO THAT TENDS

9    TO SHOW THAT THEY ARE TELLING THE TRUTH THAT THEY SAW

10   WHAT THEY SAW.

11        IN THIS CASE THE EVIDENCE POINTS TO ONE PERSON

12   AND ONE PERSON ONLY AND THAT IS THE DEFENDANT JOFAMA

13   COLEMAN.  ALL OF THE EVIDENCE SHOWS THAT HE WAS THE

14   DRIVER OF THE CAR, THAT HE WAS THE ONE WHO WENT TO THE

15   LOCATION, STOPPED AND WAITED FOR THE SHOOTER TO GET

16   BACK -- TO GET OUT OF THE CAR, SHOOT, AND THEN GET BACK

17   IN.

18        NOW, WE DID ALSO HEAR FROM IN THIS CASE FROM

19   SOME DEFENSE WITNESSES.  WHAT'S IMPORTANT ABOUT THE

20   DEFENSE WITNESSES IS THAT THEY WERE VERY INCONSISTENT.

21   FIRST OF ALL, JEREMY, WHO ACTUALLY TESTIFIED FOR THE

22   PEOPLE IN THIS CASE, HE NEVER TOLD ANY DETECTIVE THAT HE

23   WAS WITH THE DEFENDANT AT THE TIME OF THE SHOOTING.  HE

24   NEVER TOLD ANY DETECTIVE THAT HE HEARD GUN SHOTS AND YET

25   HE TOLD YOU THAT HE WAS WITH THE DEFENDANT AT THE TIME

26   OF THE SHOOTING.

27        BUT THEN LENNIN CHAVARRIA COMES IN AND HE SAYS

28   THAT HE WAS WITH THE DEFENDANT AT THE TIME OF THE

1   SHOOTING AND DOESN'T MENTION THAT JEREMY WAS THERE.  AND

2   NOW JEREMY IS SAYING THAT HE WAS WITH THE DEFENDANT AT

3   THE TIME OF THE SHOOTING.  AND NOT ONLY THAT, BUT LENNIN

4   CHAVARRIA SAYS, HE LIST A BUNCH -- A FEW PEOPLE THAT

5   WERE THERE AND THEN HE TELLS DETECTIVE VALENTO, CONTRARY

6   TO WHAT HE SAID HERE IN COURT, HE TELLS DETECTIVE

7   VALENTO, KAREN HERNANDEZ AND KARINA HERNANDEZ WERE

8   THERE, TOO.

9           WELL, WE KNOW KAREN HERNANDEZ WASN'T THERE

10  BECAUSE SHE WAS AT THE BURGER KING EARLIER IN THAT DAY

11  WHEN THEY WENT TO THE BURGER KING AND SAW HER.  AND SHE

12  SPECIFICALLY SAID I SAW THEM EARLIER IN THE DAY AND THEN

13  I DIDN'T SEE THEM LATER IN THE DAY.  SHE WASN'T THERE.

14          AND THE PROBLEM WITH THE DEFENSE WITNESSES IS

15  THAT THEY CAN'T KEEP STRAIGHT WHO WAS THERE AND WHO

16  WASN'T THERE BECAUSE THEY ARE MAKING IT UP.  THEY ARE

17  MAKING IT UP BECAUSE THEY ARE FRIENDS WITH THE

18  DEFENDANT, BECAUSE THEY LOVE THE DEFENDANT, BECAUSE THEY

19  DON'T WANT TO SEE THE DEFENDANT CONVICTED FOR THIS.

20          AS I TOLD YOU BEFORE, THERE'S AN INSTRUCTION

21  ON A WITNESS WHO'S WILLFULLY FALSE.  THAT MEANS IN COURT

22  SOMEONE WHO LIES TO YOU IN COURT AND THAT MEANS YOU CAN

23  THROW AWAY ALL OF THEIR TESTIMONY.

24          NOW, IN THIS CASE, THERE'S JUST NO REASON TO

25  BELIEVE LENNIN CHAVARRIA OR JEREMY COLEMAN, SINCE THEY

26  ARE INCONSISTENT ABOUT WHO WAS THERE.  THE OTHER THING

27  IS THAT LENNIN CHAVARRIA ALSO SAYS THAT HE SAW A GREEN

28  TRUCK AND THAT THE PEOPLE IN THE GREEN TRUCK WERE

1    THROWING GANG SIGNS AT HIM.  NOW, IN COURT HE DENIED

2    SAYING THAT, BUT THAT'S WHAT HE TOLD DETECTIVE VALENTO

3    WHEN HE WAS ARRESTED DURING THE COURSE OF THE SEARCH

4    WARRANT.  AND HE SAYS THAT AND HE SAYS THAT FOR ONE

5    REASON BECAUSE AT THIS POINT EVERYONE IN THAT

6    NEIGHBORHOOD KNOWS A WHITE VAN WAS INVOLVED, EVERYONE.

7    TRUST ME.  HE SAYS IT BECAUSE HE WANTS TO THROW THEM OFF

8    BECAUSE HE WANTS THEM TO THINK THAT SOMEONE ELSE DID IT

9    AND HE GOES IN THERE AND SAYS THERE WAS A GREEN VAN,

10   THEY WERE THROWING GANG SIGNS, THAT'S YOUR TRUCK.

11           BY THE TIME HE GETS TO TRIAL, HE KNOWS IT'S

12   JUST NOT GOING TO FLY BECAUSE EVERYBODY AND THEIR

13   BROTHER CAME IN AND TESTIFIED THAT IT WAS A WHITE VAN

14   WITH WOOD PANELING.  SO HE KNOWS THAT NO ONE IS BUYING

15   THE GREEN TRUCK STORY SO THAT'S WHY HE CHANGES IT.  AND

16   HE SAYS I NEVER SAID THAT.  DETECTIVE VALENTO TOLD YOU

17   TO LISTEN TO THE TAPE.  IT'S ON THE TAPE.  HE SAYS A

18   GREEN COLOR SUV AND THEY WERE THROWING GANG SIGNS.

19           THEN THERE'S THE SURREPTITIOUS REPORTING IN

20   THE VAN, WHEN HE AND AARON ARREYANO -- YOU SAW THE

21   TRANSCRIPT.  YOU HEARD IT, WHEN THEY ARE IN THE VAN.

22   OKAY.  THEY ARE TALKING ABOUT THE MURDER, AND HE SAYS I

23   KNOW WHERE I WAS.  RIGHT AT THAT TIME ESSENTIALLY IN THE

24   SAME SENTENCE HE TALKS ABOUT JOFAMA AND HE TALKS ABOUT

25   THE FACT THAT THE DEFENDANT GOT INTO IT -- THE

26   DEFENDANT'S BROTHER GOT INTO IT EARLIER IN THE DAY OR

27   THAT THE DEFENDANT HAD AN ISSUE, BUT HE DOESN'T SAY AND

28   HE'S WITH AARON ARREYANO IN THE CAR.

1       HE'S WITH AARON ARREYANO WHO'S SUPPOSEDLY WITH

2   THEM ON 98TH STREET, AND HE DOESN'T SAY WELL, WE KNOW

3   WHERE WE WERE.  I KNOW WHERE WE WERE.  HE SAYS I KNOW

4   WHERE I WAS.  IF HE WERE WITH AARON ARREYANO WHO'S

5   SITTING IN THAT VAN WITH HIM, HE WOULD HAVE SAID TO

6   AARON WELL, I KNOW WHERE WE WERE.  AND IF HE WERE

7   TALKING ABOUT JOFAMA AND HE WERE WITH JOFAMA, HE WOULD

8   SAY I KNOW WHERE WE WERE AND HE DENIED SAYING IT, BUT

9   IT'S ON TAPE AND HE SAID IT.  I KNOW WHERE I WAS.  NOT,

10  WE KNOW WHERE WE WERE OR I KNOW WHERE WE WERE.

11      THE DEFENDANT'S WIFE ALSO CAME IN.  HER

12  DEMEANOR WAS VERY KEY.  I MEAN I ASKED HER A QUESTION

13  AND THEN WHEN IF I PRESSED HER ON IT, SHE REALIZED THAT

14  MAYBE THAT WAS THE WRONG ANSWER TO THE QUESTION AND THEN

15  SHE SAID WELL, I DON'T KNOW.  I DON'T REMEMBER AND SHE

16  CHANGED.  I EVEN SAID WELL, DIDN'T YOU JUST CHANGE WHAT

17  YOU JUST SAID WHEN I ASKED YOU A DIFFERENT QUESTION AND

18  SHE BASICALLY SAID YES.  SHE'S UP THERE TRYING TO GET IT

19  RIGHT, NOT TRYING TO TELL THE TRUTH.  SHE'S TRYING TO

20  GET IT RIGHT SO THAT THE DEFENDANT DOESN'T GET

21  CONVICTED.  SHE AND LENNIN CHAVARRIA WERE INCONSISTENT.

22      LENNIN CHAVARRIA SAYS ONLY HE LEFT TO GO.  SHE

23  SAYS NO, LENNIN AND THE DEFENDANT LEFT TO GO.  LENNIN

24  SAYS THAT HE CAME BACK WITH JUAN MALDONADO.  SHE SAYS HE

25  CAME BACK WITH NOBODY.  SO IF YOU LOOKED AT HER ON THE

26  STAND, IT WAS JUST OBVIOUS THAT SHE WAS TRYING VERY HARD

27  TO HELP THE DEFENDANT, BUT SHE DIDN'T KNOW THE RIGHT WAY

28  TO DO THAT.  SHE DIDN'T KNOW WHAT TO SAY BECAUSE SHE

1    DIDN'T KNOW WHAT OTHER PEOPLE HAD SAID AND SHE WAS JUST

2    SITTING UP THERE AFRAID THAT SHE WAS GOING TO SCREW IT

3    UP AND, BECAUSE OF THAT, SHE DID.

4            NOW, THE DEFENDANT WENT TO THE BLOCKBUSTER

5    VIDEO STORE THAT NIGHT.  I THINK IT'S TELLING WHAT

6    MOVIES HE RENTED.  THEY WERE ALL ABOUT -- ONE WAS "CRIME

7    PARTNERS" AND "LOVE AND A BULLET."  I THINK IT SHOWS

8    WHERE HIS MINDSET WAS AT THAT POINT.  HE WENT THERE FOR

9    A SPECIFIC REASON.  HE WENT TO THAT BLOCKBUSTER VIDEO TO

10   TRY TO ESTABLISH AN ALIBI FOR HIMSELF.  HE LIKELY DIDN'T

11   KNOW THERE WERE CAMERAS THERE.

12           HE WAS THERE FOR 5 MINUTES AND PICKED OUT 3

13   MOVIES.  YOU ASK YOUR SELF WHEN WAS THE LAST TIME YOU

14   WERE ABLE TO GO TO BLOCKBUSTER AND PICK OUT 3 MOVIES IN

15   5 MINUTES.  HE WENT THERE SO THAT HE COULD GET THE

16   BLOCKBUSTER RECEIPT WHICH HE HAD WHICH HE KEPT WHICH

17   HE -- SORRY.  I'M SORRY.  THAT'S NOT TRUE.  THE

18   DETECTIVES WENT AND GOT THAT FROM BLOCKBUSTER.  HE WENT

19   THERE TO TRY TO SAY I WENT TO BLOCKBUSTER WITH EVELYN.

20           NOW, EVELYN THERE'S NO EVIDENCE THAT EVELYN

21   KNEW WHAT HAPPENED THAT NIGHT BEFORE SHE WENT TO

22   BLOCKBUSTER WITH THE DEFENDANT.  SO WHAT HAPPENED WAS,

23   AFTER THE SHOOTING, THE DEFENDANT DECIDED TO GO PICKUP

24   EVELYN, TAKE HER TO BLOCKBUSTER AND THAT WAY HE'D HAVE

25   SOMEONE WHO HE WAS WITH RIGHT AFTER THE SHOOTING.  HE

26   DID IT FAST.  HE DID IT SO THAT HE COULD ESTABLISH AN

27   ALIBI AND THAT'S WHY HE'S ONLY IN THAT STORE FOR

28   5 MINUTES AND PICKS OUT 3 MOVIES.

2742

1          NOW, THE DEFENSE WILL TRY TO MAKE YOU BELIEVE

2    THAT NOT ONE, NOT TWO, NOT THREE, BUT FOUR WITNESSES

3    DIDN'T SEE WHAT THEY SAW, THE DEFENDANT DRIVING THE

4    VEHICLE THAT WAS PART OF THE HOMICIDE.  THE DEFENSE WILL

5    TRY TO MAKE YOU BELIEVE THAT YOU DIDN'T SEE FOUR

6    WITNESSES IDENTIFY THE DEFENDANT AS THE DRIVER.  NOW,

7    THE DEFENSE COUNSEL IN THIS CASE IS VERY ELOQUENT.  YOU

8    KNOW, YOU THINK THAT WHATEVER HE'S ASKING MUST BE THE

9    MOST IMPORTANT QUESTION BECAUSE THE WAY HE'S ASKING.  IT

10   IS JUST SO VERY ELOQUENT.  BUT YOU HAVE TO SEPARATE

11   THAT.  IT'S NOT A MATTER OF WHO'S GOT THE BETTER VOICE,

12   BECAUSE HE WINS.  BUT IF YOU TAKE AWAY THE VOICE AND YOU

13   JUST LISTEN TO THE QUESTION AND THE ANSWER AND ONE WAY

14   TO DO THAT IS IF YOU HAVE ANY QUESTIONS IS TO HAVE THE

15   COURT REPORTER READ IT BACK, WHICH THEY ALWAYS SAY DON'T

16   SAY THAT, BUT YOU CAN.

17         IF YOU TAKE THAT AWAY, YOU WILL SEE THE

18   EVIDENCE FOR WHAT IT IS.  YOU HAVE FOUR PEOPLE WITH NO

19   MOTIVE TO LIE, ALL OF WHO ARE AFRAID, ALL OF WHO DON'T

20   WANT TO BE SNITCHES, WHO TOLD THE TRUTH THAT THE

21   DEFENDANT WAS DRIVING THE VAN, THAT THE DEFENDANT

22   COMMITTED THE MURDER.  SO DO NOT BE SWAYED FROM THAT

23   TRUTH.

24         THE DEFENDANT IS GUILTY OF THE CRIME CHARGED

25   AND I'M CONFIDENT THAT YOU'LL FIND HIM GUILTY.  THANK

26   YOU.

27       THE COURT:  ALL RIGHT.  THANK YOU, MS. WILLIAMS.

28           NOW MR. WHITE FOR THE DEFENSE.

1                          FINAL ARGUMENT

2

3        BY MR. WHITE:  THANK YOU VERY MUCH, YOUR HONOR.

4   MAY IT PLEASE THE COURT AND COUNSEL.

5               GOOD AFTERNOON, LADIES AND GENTLEMEN.

6   I RARELY HAD MY VOICE INTERJECTED IN A CASE AS BEING THE

7   REASON THAT ONE SHOULD NOT BELIEVE THAT THE PROSECUTION

8   HAS NOT PROVEN ITS CASE BEYOND A REASONABLE DOUBT.

9               FACT:  ON THE NIGHT OF MAY THE 10TH OF 2003,

10  JOSE ROBLES WAS KILLED ON 101ST STREET IN BETWEEN

11  VERMONT AND BUDLONG.

12              FACT:  NO WITNESS TOLD THE POLICE WHEN

13  QUESTIONED ON THE NIGHT OF THE SHOOTING THAT JOFAMA

14  COLEMAN WAS THE DRIVER OF THE VEHICLE THAT CONTAINED THE

15  SHOOTER.  JESSE ROBLES DID NOT TELL THE POLICE THAT.

16  THERE'S NO RECORD OF THAT DESPITE HIS INDICATIONS

17  THROUGH HIS TESTIMONY IN THIS COURTROOM CHANGING BACK

18  AND FORTH, FIRST SAYING THAT HE HAD APPROACHED THE

19  POLICE OFFICER AND TOLD ONE, THEN CHANGING HIS TESTIMONY

20  AND SAYING NO, HE HID IN THE HOUSE BECAUSE HE WAS AFRAID

21  OF BEING A SNITCH; THEN COMING BACK AND CHANGING HIS

22  TESTIMONY AND SAYING AGAIN, OH, I DID TELL SOME POLICE

23  OFFICER, BUT I DON'T REMEMBER WHO IT WAS.

24              THERE IS ABSOLUTELY NO RECORD THAT JESSE

25  ROBLES TOLD ANY DETECTIVE, ANY PROFFER THAT MY CLIENT,

26  MR. JOFAMA COLEMAN WAS THE DRIVER OF A WHITE VAN THAT

27  CONTAINED THE SHOOTER OF HIS BROTHER ON THE NIGHT OF THE

28  SHOOTING.  THE FIRST RECORD THAT THE POLICE HAVE OF

1   ANYONE SAYING THAT MR. COLEMAN WAS THE DRIVER OF THE VAN
2   WAS TWO DAYS LATER ON A MONDAY AFTER THE SATURDAY NIGHT
3   SHOOTING OF JOSE ROBLES.
4   YOU CAN BELIEVE THAT IF THE POLICE HAD BEEN TOLD THE
5   NAME OF THE SUSPECT, ONE OF THE TWO SUSPECTS IN THIS
6   CASE, THEY WOULD HAVE WRITTEN THAT DOWN.  I ALMOST
7   CRINGE WHEN I HEAR THE PROSECUTOR TELL US THAT IT WAS SO
8   CONFUSING OUT AT THE CRIME SCENE AND WE KNOW HOW IT IS
9   WITH PEOPLE RUNNING AROUND AND SOMEBODY MIGHT HAVE HEARD
10  THAT AND NOT WRITTEN IT DOWN.  CAN ANY OF US IN THIS
11  COURTROOM BELIEVE FOR ONE MOMENT THAT A POLICE OFFICER
12  WOULD HAVE BEEN TOLD THE NAME OF A SUSPECT AND WOULD NOT
13  HAD WRITTEN THAT DOWN, WOULD NOT HAVE A SINGLE RECORD OF
14  THAT?  IT DID NOT HAPPEN BECAUSE JESSE ROBLES DID NOT
15  SEE MY CLIENT JOFAMA COLEMAN BECAUSE HE WAS NOT THE
16  DRIVER OF THE WHITE VAN.
17          ALBERT SEGUNDO, FACT: TOLD THE POLICE IN THE
18  VERY FIRST STATEMENT THAT HE MADE ON THE NIGHT OF THE
19  SHOOTING, THAT THERE WERE TWO MEN THAT HE SAW, ONE WAS A
20  MALE THAT HE THOUGHT HE RECOGNIZED FROM A GANG CALLED
21  MKA, MEXICANS KICKING ASS OR SOMETHING TO THAT EFFECT.
22  HE SAID THAT HE THOUGHT THAT THE DRIVER WAS AN
23  UNIDENTIFIED MALE HISPANIC.
24          I ASKED HIM ON THE WITNESS STAND IF HE HAD
25  MADE SUCH A STATEMENT AND HE DENIED SAYING THAT.  HE
26  SAID THAT HE HAD NEVER TOLD THE POLICE THAT A MALE
27  HISPANIC HAD BEEN THE DRIVER OF THE CAR.  AND I
28  CONFRONTED HIM WITH THE SECOND STATEMENT HE MADE ON THE

Dawan Coleman
C.D.C.R.# V.27659
CSATF/State Prison @ Corcoran
P.O. Box 5242
Corcoran, CA. 93212

Confidential
Legal Mail

RECEIVED
CLERK, U.S. DISTRICT COURT
SOUTHERN DIVISION

SEP 12 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DIST. OF CALIFORNIA
411 W. Fourth St.
Santa Ana. CA. 92701-4516

