1                    **UNITED STATES DISTRICT COURT**

2                   **CENTRAL DISTRICT OF CALIFORNIA**

3                  **SOUTHERN DIVISION AT SANTA ANA**

4        **HONORABLE ROBERT N. BLOCK, MAGISTRATE JUDGE PRESIDING**

5                              **CERTIFIED TRANSCRIPT**

6    JOFAMA COLEMAN,                      )
                                          )
7                   PETITIONER,           )
                                          )
8              VS.                        ) SACV NO. 10-2343-VBF
                                          )
9    RALPH M. DIAZ, ACTING WARDEN,        )
                                          )
10                  RESPONDENT.           )
     _____)

11

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                    SANTA ANA, CALIFORNIA

15                 WEDNESDAY, AUGUST 13, 2014

16                          9:30 A.M.

17

18

19

                    **DEBORAH D. PARKER, CSR 10342**
20                     **OFFICIAL COURT REPORTER**
                    **UNITED STATES DISTRICT COURT**
21                     **411 WEST FOURTH STREET**
                          **SUITE 1-053**
22                 **SANTA ANA, CALIFORNIA 92701**
                          **(657) 229-4305**
23                   **TRANSCRIPTS@DDPARKER.COM**

24

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1    APPEARANCES OF COUNSEL:

2        FOR THE PETITIONER, JOFAMA COLEMAN:

3                            SEAN K. KENNEDY
                             FEDERAL PUBLIC DEFENDER
4
                             JESSE GESSIN
5                            ROSE ANGULO
                             DEPUTY FEDERAL PUBLIC DEFENDERS
6                            411 WEST FOURTH STREET
                             SUITE 7-110
7                            SANTA ANA, CALIFORNIA 92701
                             (714) 338-4500
8

9        FOR THE RESPONDENT, KATHLEEN ALLISON, ACTING
         WARDEN:
10
                             STATE OF CALIFORNIA
11                           OFFICE OF ATTORNEY GENERAL

12                           JAMES WILLIAM BILDERBACK II
                             SUPERVISING DEPUTY ATTORNEY GENERAL
13
                             DAVID E. MADEO
14                           DEPUTY ATTORNEY GENERAL
                             300 SOUTH SPRING STREET
15                           SUITE 1702
                             LOS ANGELES, CALIFORNIA 90013
16                           (213) 897-2049

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2

 3  PETITIONER'S WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

 4    GEORGE LINCOLN REIS         5      19

 5
      VICTOR GOMEZ              22      38
 6

 7

 8  RESPONDENT'S WITNESSES:  DIRECT  CROSS  REDIRECT  RECROSS

 9    CHRISTIE BEACH           40      51

10

11

12                       E X H I B I T S

13  PETITIONER'S EXHIBITS:              IDENTIFICATION  EVIDENCE

14    A     BLOCKBUSTER VIDEO                              11

15    C     VIDEO TAPE                                     28

16

17                       E X H I B I T S

18  RESPONDENT'S EXHIBITS:              IDENTIFICATION  EVIDENCE

19    1-B   MAP                                   47

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   **SANTA ANA, CALIFORNIA; WEDNESDAY, AUGUST 13, 2014; 9:30 A.M.**

2           THE CLERK:  CALLING CALENDAR CASE NO. CV 10-2343,

3   JOFAMA COLEMAN VERSUS RALPH M. DIAZ, ACTING WARDEN.

4           MR. GESSIN:  GOOD MORNING, YOUR HONOR.

5           JESSE GESSIN, OFFICE OF THE FEDERAL PUBLIC

6   DEFENDER, ON BEHALF OF THE PLAINTIFF, JOFAMA COLEMAN, WHO IS

7   PRESENTLY IN COURT IN CUSTODY.

8           WITH ME AT COUNSEL TABLE, YOUR HONOR, IS

9   CO-COUNSEL ROSE ANGULO FROM THE CAPITAL *HABEAS* UNIT OF THE

10  FEDERAL PUBLIC DEFENDER'S OFFICE.

11          THE COURT:  ALL RIGHT.  GOOD MORNING.

12          MR. MADEO:  GOOD MORNING, YOUR HONOR.

13          DEPUTY ATTORNEY GENERAL DAVID MADEO FOR THE

14  RESPONDENT.

15          MR. BILDERBACK:  GOOD MORNING, YOUR HONOR.

16  SUPERVISING DEPUTY ATTORNEY GENERAL JAMES BILDERBACK FOR THE

17  WARDEN.

18          THE COURT:  GOOD MORNING.

19          ARE THERE ANY HOUSEKEEPING ISSUES THAT WE NEED TO

20  ATTEND TO BEFORE WE PROCEED WITH THE TAKING OF TESTIMONY?

21          MR. GESSIN:  NO, YOUR HONOR.

22          MR. MADEO:  NO, YOUR HONOR.

23          THE COURT:  VERY WELL.

24          MR. GESSIN, YOU MAY CALL YOUR FIRST WITNESS.

25          MR. GESSIN:  THANK YOU, YOUR HONOR.

```
 1            PLAINTIFF CALLS -- PETITIONER CALLS GEORGE REIS TO
 2   THE STAND.
 3            THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.
 4         GEORGE LINCOLN REIS, PETITIONER'S WITNESS, SWORN
 5            THE WITNESS:  I DO.
 6            THE CLERK:  PLEASE HAVE A SEAT.
 7            THE WITNESS:  THANK YOU.
 8            THE CLERK:  AND STATE YOUR FULL NAME FOR THE
 9   RECORD.
10            THE WITNESS:  MY NAME IS GEORGE LINCOLN REIS,
11   R-E-I-S.
12            THE COURT:  GO AHEAD, MR. GESSIN.
13            MR. GESSIN:  THANK YOU, YOUR HONOR.
14                       DIRECT EXAMINATION
15   BY MR. GESSIN:
16   Q.   GOOD MORNING, MR. REIS.
17   A.   GOOD MORNING.
18   Q.   WHAT IS YOUR OCCUPATION?
19   A.   I AM THE OWNER AND PRESIDENT OF A SMALL BUSINESS CALLED
20   IMAGING FORENSIC, IN WHICH I PROVIDE FORENSIC PHOTOGRAPHIC
21   ANALYSIS AND VIDEO ANALYSIS, AND I ALSO TEACH WORKSHOPS.
22   Q.   DO YOU HAVE TRAINING IN THAT OCCUPATION?
23   A.   I DO.
24   Q.   WHAT SORT OF TRAINING DO YOU HAVE?
25   A.   STARTING IN ABOUT -- IN 1989, I WENT TO WORK FOR THE
```

1    NEWPORT BEACH POLICE DEPARTMENT, AND AT THAT TIME, THEY

2    STARTED SENDING ME TO TRAINING IN VARIOUS AREAS OF FORENSIC

3    PHOTOGRAPHY, FORENSIC IMAGE ANALYSIS AND FORENSIC VIDEO

4    ANALYSIS.

5         AND THEN, AFTER LEAVING THE DEPARTMENT IN 2004, I

6    CONTINUED THAT TRAINING ON MY OWN.  MOST SIGNIFICANT WOULD

7    BE SOME OF THE COURSES I TOOK THROUGH THE LAW ENFORCEMENT

8    AND EMERGENCY SERVICES VIDEO ASSOCIATION.  IT'S KNOWN BY,

9    I BELIEVE, L-E-V-A.

10        AND, PARTICULARLY, IN 2005, I ATTENDED THEIR

11   FORENSIC VIDEO ANALYSIS AND THE LAW COURSE, WHICH WAS A

12   40-HOUR COURSE IN ANALYZING ANALOG VIDEO, SO VIDEOTAPE-TYPE

13   VIDEO, DIGITIZING THE TAPE, ANALYZING THE TAPE,

14   UNDERSTANDING THE FOUNDATIONAL PRINCIPLES OF HOW VIDEOTAPE

15   IS RECORDED AND HOW IT IS DIGITIZED AND PROPER METHODS FOR

16   DOING THAT.

17        IF I COULD REFER TO MY NOTES, I CAN LOOK AT SOME

18   ADDITIONAL --

19   Q.  THAT WILL BE OKAY.

20        DO YOU HAVE ANY CREDENTIALS IN FORENSIC VIDEO

21   ANALYSIS?

22   A.  I DO.  I ACTUALLY HAVE TWO CERTIFICATIONS IN FORENSIC

23   VIDEO ANALYSIS.  THE FIRST ONE I RECEIVED FROM THE

24   INTERNATIONAL ASSOCIATION FOR IDENTIFICATION, AND THAT'S IN

25   FORENSIC VIDEO EXAMINATION.  THE SECOND ONE I JUST RECEIVED,

```
 1   WHICH IS AS A FORENSIC VIDEO TECHNICIAN, FROM LEVA, THE

 2   ORGANIZATION I REFERRED TO EARLIER.

 3   Q.   HAVE YOU EVER WRITTEN ON THE SUBJECT OF FORENSIC VIDEO

 4   ANALYSIS?

 5   A.   YES, I HAVE.

 6   Q.   AND HAVE THOSE ARTICLES BEEN PUBLISHED?

 7   A.   YES, THEY HAVE.

 8   Q.   APPROXIMATELY, HOW MANY ARTICLES HAVE YOU WRITTEN ON

 9   FORENSIC VIDEO ANALYSIS?

10   A.   ABOUT -- WELL, ABOUT 10 IN GENERAL TO DIGITAL IMAGING,

11   DIGITAL PHOTOGRAPHY AND VIDEO ANALYSIS.  I THINK THREE OR

12   FOUR OF THEM SPECIFICALLY DISCUSSED VIDEO ANALYSIS.

13   Q.   HAVE YOU EVER GIVEN ANY LECTURES OR TAUGHT ON THE

14   SUBJECT OF FORENSIC VIDEO ANALYSIS?

15   A.   I HAVE.

16   Q.   GIVE US AN EXAMPLE OF TEACHING OR A LECTURE YOU'VE

17   GIVEN ON FORENSIC VIDEO ANALYSIS.

18   A.   WELL, I PROVIDE TRAINING, PRIMARILY, TO LAW ENFORCEMENT

19   AGENCIES AND GOVERNMENT AGENCIES.  EARLIER THIS YEAR, I

20   PROVIDED TRAINING TO 24 MEMBERS OF THE FEDERAL BUREAU OF

21   INVESTIGATION ON FORENSIC VIDEO ANALYSIS AND IMAGE

22   ENHANCEMENT.  I'VE ALSO PRESENTED WORKSHOPS AND COURSES TO

23   THE U.S. ARMY CRIME LAB, U.S. SECRET SERVICE,

24   LOS ANGELES POLICE DEPARTMENT, LOS ANGELES SHERIFF'S OFFICE.

25   Q.   APPROXIMATELY, HOW MANY WORKSHOPS DO YOU GIVE A YEAR ON
```

```
1    FORENSIC VIDEO ANALYSIS?

2    A.   IT RANGES FROM ABOUT TO 12 TO 15.

3           MR. GESSIN:  AT THIS POINT, YOUR HONOR, DEFENSE

4    WOULD ASK THE COURT TO QUALIFY MR. REIS AS AN EXPERT IN

5    FORENSIC VIDEO ANALYSIS.

6           THE COURT:  ANY OBJECTION FROM RESPONDENT?

7           MR. MADEO:  NO OBJECTION, YOUR HONOR.

8           THE COURT:  WELL, I'M SUFFICIENTLY IMPRESSED WITH

9    MR. REIS' CREDENTIALS.

10          MR. GESSIN:  THANK YOU, YOUR HONOR.

11   BY MR. GESSIN:

12   Q.   MR. REIS, DID THERE COME A TIME WHEN YOU WERE ASKED TO

13   PROVIDE FORENSIC VIDEO ANALYSIS FOR THIS CASE?

14   A.   YES.

15   Q.   AND DID YOU PROVIDE FORENSIC VIDEO ANALYSIS?

16   A.   I DID.

17   Q.   COULD YOU TELL US WHAT SORT OF ANALYSIS YOU PROVIDED

18   FOR THIS CASE?

19   A.   I WAS PROVIDED WITH A VHS VIDEOTAPE, AND I WAS ASKED TO

20   DIGITIZE THAT VIDEOTAPE, SEPARATE THE SEPARATE MOVIE

21   FILES -- SEPARATE CAMERA VIEWS INTO SEPARATE MOVIE FILES AND

22   THEN DETERMINE AT WHAT TIME THE DEFENDANT HAD -- EXCUSE ME,

23   THE PETITIONER HAD COME INTO THE SCENE AND LEFT THE SCENE.

24   Q.   AND "THE SCENE" BEING A BLOCKBUSTER VIDEO STORE?

25   A.   THAT'S CORRECT.
```

1    Q.    SURVEILLANCE VIDEO IS FROM WHERE?

2    A.    FROM THE BLOCKBUSTER VIDEO STORE.

3    Q.    DID YOU USE ANY SPECIALIZED EQUIPMENT TO DO YOUR

4    ANALYSIS?

5    A.    I DID.

6    Q.    WHAT SORT OF EQUIPMENT DID YOU USE TO DO YOUR ANALYSIS?

7    A.    WELL, I USED A TAPE DECK WHICH IS A PANASONIC AG 1980

8    TAPE DECK, WHICH IS PRETTY MUCH THE STANDARD TAPE DECK AT

9    THE TIME IT WAS USED IN FORENSIC -- BY FORENSIC VIDEO

10   ANALYSIS.  I ALSO USED A DIGITIZING CARD WHICH WAS AN AVID

11   MOJO DIGITIZING CARD.  ONCE AGAIN, THE STANDARD EQUIPMENT

12   USED BY MOST FORENSIC VIDEO ANALYSTS AT THE TIME.

13   Q.    DID YOU TEST THE EQUIPMENT BEFORE YOU USED IT?

14   A.    I DID.

15   Q.    WAS IT WORKING PROPERLY AT THE TIME THAT YOU USED IT?

16   A.    YES.

17   Q.    PLEASE WALK US THROUGH THE PROCESS OF WHAT YOU DID TO

18   DIGITIZE THE -- EXCUSE ME.  STRIKE THAT.

19          PLEASE WALK US THROUGH WHAT YOU DID TO DIGITIZE

20   THE BLOCKBUSTER SURVEILLANCE VIDEO FROM ITS ORIGINAL FORMAT.

21   A.    I INSERTED THE VIDEOTAPE INTO THE TAPE DECK, AND I HAD

22   THAT ATTACHED ALREADY TO MY AVID DIGITIZING CARD.  I PLAYED

23   THE VIDEOTAPE THROUGH THE TAPE DECK.  IT WENT THROUGH THE

24   DIGITIZING CARD, AND THAT CREATED A VIDEO FILE OR A MOVIE

25   FILE THAT WAS DIGITAL AND INCLUDED EVERY FRAME OF THE PERIOD

1  IN WHICH I RECORDED.

2  Q.   WHEN YOU WERE FINISHED, WHAT DID YOU DO WITH THE

3  DIGITIZED FORMAT?

4  A.   I THEN SEPARATED THE CAMERA VIEWS INTO THE FOUR

5  SEPARATE VIDEO FILES.  THE CAMERA WAS A MULTIPLEXED VIDEO,

6  MEANING THAT THERE ARE MULTIPLE CAMERAS THAT ARE RECORDED.

7  THEY ARE RECORDED, ONE CAMERA AND THEN ANOTHER CAMERA, AND

8  THEN ANOTHER CAMERA.  SO I NEEDED TO SEPARATE THOSE OUT SO

9  THAT ONE COULD WATCH THE VIDEO AND SEE EACH CAMERA VIEW

10  SEPARATELY.

11  Q.   AND WHAT DID YOU DO WITH THE ACTUAL FOUR FILES THAT YOU

12  CREATED?

13  A.   I SAVED THEM ONTO A DVD DISK IN APPLE'S QUICK TIME

14  MOVIE FORMAT.

15  Q.   WHAT FORMAT IS THAT?  DOT?

16  A.   DOT MOV.

17  Q.   I'M SHOWING YOU WHAT'S BEEN MARKED AS DEFENSE

18  EXHIBIT A.

19       YOU HAVE A BINDER WITH YOU.  WOULD YOU PLEASE LOOK

20  AT DEFENSE EXHIBIT A.

21  A.   *(WITNESS SO COMPLIES.)*

22  Q.   IT SHOULD BE A COPY -- EXCUSE ME.  PETITIONER'S

23  EXHIBIT A.

24       MR. GESSIN:  I APOLOGIZE ABOUT THAT, JUDGE.

25  *////*

```
 1   BY MR. GESSIN:
 2   Q.   PETITIONER'S EXHIBIT A.  DO YOU RECOGNIZE THAT COPY OF
 3   THAT DVD, OR VIDEO CD?
 4   A.   I DO.
 5   Q.   THIS MORNING DID YOU HAVE A CHANCE TO LOOK AT THE
 6   DEFENSE EXHIBIT -- EXCUSE ME, PETITIONER EXHIBIT A?
 7   A.   I DID.
 8   Q.   AND IS PETITIONER EXHIBIT A, A TRUE AND ACCURATE
 9   REFLECTION OF THE FOUR DIGITAL FILES THAT YOU MADE IN YOUR
10   FORENSIC ANALYSIS?
11   A.   WELL, THE DISK I LOOKED AT THIS MORNING LOOKED
12   IDENTICAL TO THIS DISK.
13   Q.   WHEN YOU REVIEWED PETITIONER EXHIBIT A AND YOU LOOKED
14   AT THE FOUR FILES, WERE THEY THE DIGITIZED FORMAT FROM THE
15   BLOCKBUSTER SURVEILLANCE VIDEO THAT YOU CREATED DURING YOUR
16   FORENSIC ANALYSIS?
17   A.   YES, THEY WERE.
18        MR. GESSIN:  AT THIS POINT, YOUR HONOR, PETITIONER
19   MOVES INTO EVIDENCE PETITIONER'S EXHIBIT A.
20        THE COURT:  ANY OBJECTION?
21        MR. MADEO:  NO OBJECTION, YOUR HONOR.
22        THE COURT:  EXHIBIT A IS ADMITTED.
23     (PETITIONER'S EXHIBIT A RECEIVED IN EVIDENCE.)
24   Q.   AFTER THIS POINT, YOUR HONOR, I'M NOT GOING TO PLAY
25   VIDEO EXHIBIT A, I'M GOING LEAVE THAT WITH THE PROVINCE OF
```

```
 1    THE COURT, HOWEVER, I WILL ASK MR. REIS ABOUT HIS
 2    CONCLUSIONS BASED ON HIS FORENSIC ANALYSIS.  AND I'M -- AND
 3    I'LL ALSO GO OVER A PORT.  BUT I DON'T BELIEVE THAT IT
 4    ABSOLUTELY IS THERE BECAUSE OF MR. REIS' CONCLUSION.  BUT IT
 5    IS IN EVIDENCE IN CASE THE COURT WANTS TO REVIEW IT WITHIN
 6    ITS PROVINCE?
 7            THE COURT:  OKAY.  GO AHEAD.
 8    BY MR. GESSIN:
 9    Q.   I'M SHOWING WHAT'S BEEN PREVIOUSLY MARKED AS DEFENSE
10    EXHIBIT B -- EXCUSE ME, PETITIONER EXHIBIT B.
11            THE COURT:  IT'S OKAY.  YOU DON'T HAVE TO KEEP
12    CORRECTING YOURSELF.
13            MR. GESSIN:  I'M SORRY, YOUR HONOR.  I'M JUST SO
14    USED TO BEING A DEFENSE ATTORNEY.
15            THE COURT:  I KNOW.  THE TAGS ACTUALLY SAY
16    "DEFENDANT'S EXHIBIT."
17            WE'LL ALL AGREE THAT ANY TIME THAT HE USES THE
18    WORD "DEFENDANT" OR "DEFENSE" WE UNDERSTAND HIM TO BE
19    REFERRING TO THE PETITIONER.
20            MR. GESSIN:  THANK YOU, YOUR HONOR.  I'LL TRY MY
21    BEST.
22    BY MR. GESSIN:
23    Q.   ALL RIGHT.  SO PETITIONER EXHIBIT B, DO YOU RECOGNIZE
24    THAT?
25    A.   YES, I DO.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Q.   WHAT IS THAT?

2    A.   THIS IS, BASICALLY, A LETTER FORM OF REPORT THAT I HAD

3    WRITTEN IN APRIL OF 2009, REGARDING MY ANALYSIS OF THE

4    BLOCKBUSTER VIDEO.

5    Q.   DID YOU CREATE THIS LETTER REPORT?

6    A.   YES, I DID.

7    Q.   DID YOU CREATE THIS LETTER REPORT AFTER REVIEWING

8    PETITIONER'S EXHIBIT A?

9    A.   YES.

10   Q.   IS PETITIONER'S EXHIBIT B A FAIR AND ACCURATE

11   REPRESENTATION OF THE REPORT THAT YOU ORIGINALLY CREATED?

12   A.   IT IS.

13            MR. GESSIN:  DEFENSE MOVES INTO EVIDENCE

14   PETITIONER'S EXHIBIT B.

15            MR. BILDERBACK:  WE WOULD OBJECT TO THAT,

16   YOUR HONOR.

17            THE COURT:  ON WHAT GROUND?

18            MR. BILDERBACK:  ON THE GROUND THAT IT CAN CHANGE

19   CONCLUSIONS THAT AREN'T SUPPORTED BY ANY TESTIMONY THAT

20   WE'VE HEARD FROM THIS WITNESS.  AND, SPECIFICALLY, IF I

21   COULD DIRECT THE COURT TO THE THIRD PARAGRAPH FROM THE

22   BOTTOM WHERE IT SAYS:  *ON CAMERA 2, YOU ENTERED THE STORE AT*

23   *21:25:34, (9:25 P.M.)*

24            MR. GESSIN:  I'LL LAY A PROPER FOUNDATION,

25   YOUR HONOR.

```
 1              THE COURT:  I WAS GOING TO SAY IT IS A PROPER

 2   OBJECTION.

 3              MR. GESSIN:  I WILL.  I'LL LAY IT.

 4   BY MR. GESSIN:

 5   Q.   MR. REIS, YOU REVIEWED PETITIONER'S EXHIBIT A, WHICH IS

 6   THE BLOCKBUSTER SURVEILLANCE VIDEO?

 7   A.   YES, I DID.

 8   Q.   DID YOU FORENSICALLY ANALYZE THE VIDEO?

 9   A.   I DID.

10   Q.   WERE YOU ASKED -- STRIKE THAT.

11              DID YOU MAKE A CONCLUSION ABOUT WHEN MR. COLEMAN

12   ENTERED THE BLOCKBUSTER VIDEO?

13   A.   YES, I DID.

14   Q.   WHAT WAS THAT CONCLUSION?

15              MR. BILDERBACK:  OBJECTION.  LACK OF FOUNDATION

16   FOR THAT CONCLUSION.

17              THE COURT:  WELL, LET'S START WITH HIS CONCLUSION

18   AND THEN WE'LL BACK UP AND FIND OUT THE FOUNDATION.

19              YOU MAY ANSWER.

20              THE WITNESS:  IT WAS THAT HE HAD ENTERED THE STORE

21   AT 9:25 AND 34 SECONDS P.M.

22   BY MR. GESSIN:

23   Q.   HOW DID YOU KNOW THAT THAT WAS MR. COLEMAN WHO ENTERED

24   THE STORE AT 9:25:34?

25   A.   I WAS PROVIDED A DESCRIPTION OF MR. COLEMAN AND WITH
```

1    OTHER, I THINK -- THREE OTHER INDIVIDUALS THAT WERE -- WERE

2    IN THE STORE.

3    Q.    WHO PROVIDED YOU THAT IDENTIFICATION?

4            WAS MS. IHARA, MR. COLEMAN'S APPELLATE COUNSEL,

5    THE PERSON WHO PROVIDED YOU THAT INFORMATION?

6    A.    SHE WAS HIS ATTORNEY AT THE TIME, AND I BELIEVE IT WAS

7    SHE THAT PROVIDED ME WITH THAT INFORMATION.

8    Q.    AND BASED ON THAT INFORMATION, YOU MADE A CONCLUSION?

9    A.    THAT'S CORRECT.

10    Q.    AND THAT CONCLUSION WAS?

11    A.    THAT MR. COLEMAN ENTERED THE STORE AT 9:25:34 P.M.

12            MR. GESSIN:  I WOULD ASK THAT PETITIONER'S

13    EXHIBIT B BE ADMITTED INTO EVIDENCE.

14            THE COURT:  NOW, I WANT TO HEAR HOW YOU ARRIVED AT

15    THAT CONCLUSION.

16    BY MR. GESSIN:

17    Q.    PLEASE PROVIDE SOME DETAIL ON YOUR FORENSIC ANALYSIS.

18    A.    CERTAINLY.  WHAT I RECALL BEING TOLD IS THAT AT CERTAIN

19    TIMES DURING THE COURSE OF THE EVENING -- ACTUALLY, LATER

20    THAN THIS TIME, MR. COLEMAN HAD BEEN IDENTIFIED AS BEING IN

21    THE STORE.  I BELIEVE THAT SHE TOLD ME THAT SOMEONE IN LAW

22    ENFORCEMENT HAD INDICATED SO AND HAD GIVEN ME TIMES AT WHICH

23    THAT WAS THE CASE.  I THEN VIEWED THE VIDEO FRAME BY FRAME,

24    BOTH FORWARDS AND BACKWARDS.  AND WHEN I IDENTIFIED THE

25    PERSON WHO MATCHED THE DESCRIPTION OF MR. COLEMAN AND THE

```
 1   OTHERS THAT HE WAS -- I WAS TOLD HE WAS WITH, I THEN BACKED
 2   UP UNTIL THE TIME IN WHICH THAT PERSON ENTERED THE STORE.
 3              THE COURT:  I'M STILL NOT GETTING IT.
 4              WAS THERE A TIME STAMP?  WHAT WERE YOU WORKING
 5   FROM?
 6              THE WITNESS:  YES.  THERE WAS A TIME STAMP ON THE
 7   VIDEOTAPE ITSELF THAT'S VISIBLE IN THE -- ON THE TAPE IN
 8   EVERY FRAME.
 9              THE COURT:  BECAUSE I THINK WHAT'S CONFUSING TO ME
10   IS -- AND I'M NOT BLAMING THIS ON ANYBODY -- THAT I'VE BEEN
11   LED TO BELIEVE THAT YOU CONCLUDED THAT THERE WAS A MISTAKE
12   IN THE TIME STAMP.
13              MR. GESSIN:  I CAN GET INTO THAT, YOUR HONOR.
14              THE COURT:  DO YOU SEE THE PROBLEM THERE?
15   BY MR. GESSIN:
16   Q.   ARE YOU REPRESENTING THAT THE TIME STAMP IS CORRECT?
17   A.   I'M NOT OPINING ON THE ACCURACY OF THE TIME STAMP AT
18   ALL.
19   Q.   SO ALL YOU'RE OPINING ON IS WHEN MR. COLEMAN ENTERED
20   THE VIDEO STORE ACCORDING TO THE TIME STAMP?
21   A.   CORRECT.  ACCORDING TO THE TIME STAMP.
22   Q.   NOT WHETHER OR NOT THE TIME STAMP IN AND OF ITSELF IS
23   CORRECT?
24   A.   THAT'S CORRECT.
25              THE COURT:  OKAY.
```

1          MR. GESSIN:  YOUR HONOR, WE ASK THAT

2    PETITIONER'S B NOW BE ADMITTED.

3          MR. BILDERBACK:  SAME OBJECTION, YOUR HONOR.

4          THE COURT:  WELL, EXHIBIT B MERELY SUMMARIZES HIS

5    CONCLUSION.

6          MR. GESSIN:  EXACTLY.

7          MR. BILDERBACK:  MAY I BE HEARD, YOUR HONOR?

8          THE COURT:  YES.

9          MR. BILDERBACK:  WHAT THE STATEMENT IN THE -- IF

10   THE STATEMENT IN THE REPORT WAS THE TIME STAMP ON THE

11   VIDEOTAPE REFLECTS 21:25:34, WE WOULD HAVE NO OBJECTION.

12         WHAT THE STATEMENT IN THE REPORT IS, IS THAT THAT

13   WAS THE TIME HE ENTERED THE STORE.  THE WITNESS JUST

14   INDICATED HE DOESN'T KNOW WHAT TIME THE WITNESS ENTERED THE

15   STORE.  HE ONLY KNOWS WHAT TIME THE TIME STAMP ON THE TAPE

16   SAYS.  HE CANNOT SPEAK TO THE ACCURACY OF THE TIME STAMP, BY

17   HIS OWN ADMISSION.

18         THE COURT:  OF COURSE, YOUR OFFICER TESTIFIED AT

19   THE TRIAL BASED ON THE TIME STAMP, DIDN'T HE?

20         MR. GESSIN:  MULTIPLE TIMES.

21         YOUR HONOR, WE WOULD -- THERE'S GOING TO BE

22   BRIEFING, I EXPECT.  I HOPE THE COURT WILL ORDER BRIEFING

23   AFTER THIS HEARING.  WE COULD BRIEF ABOUT THE TIME STAMP.

24   THERE'S A NUMBER OF EVIDENTIARY MARKERS THAT WE CAN USE TO

25   ARGUE ABOUT WHAT THE ACTUAL --

```
 1              THE COURT:  THERE WAS A RECEIPT.  THERE WAS THE
 2    9:38.
 3              MR. GESSIN:  THERE WAS ALSO TESTIMONY ABOUT
 4    OFFICER KATZ, LOOKING AT HIS WATCH AT ONE POINT TO DETERMINE
 5    WHETHER THE TIME STAMP -- WHETHER THE VIDEO TIME STAMP WAS
 6    CORRECT, SO THAT'S SOMETHING --
 7              THE COURT:  THERE WAS TESTIMONY AT TRIAL THAT
 8    THE --
 9              MR. GESSIN:  THERE WAS.  THERE WAS TESTIMONY AT
10    TRIAL CONCERNING THE RECEIPT.
11              THE COURT:  THAT I KNOW.
12              MR. GESSIN:  AND THEN, ALSO, I BELIEVE AT ONE
13    POINT -- I BELIEVE IT'S LIKE 2346 IN THE BATES STAMP.  I'M
14    NOT TOTALLY SURE, BUT IT'S CLOSE -- WHERE OFFICER KATZ TALKS
15    ABOUT LOOKING AT HIS WATCH AND COMPARING IT TO THE TIME
16    STAMP ON THE VIDEO.  I BELIEVE HE TALKS ABOUT A SIX-MINUTE
17    GAP.  I FORGOT EXACTLY WHERE IN THE RECORD IT IS, BUT I
18    REMEMBER THERE BEING SOME DISCUSSION, AND I BELIEVE I
19    BRIEFED THAT IN MY RESPONSE TO THE --
20              THE COURT:  SIX-MINUTE GAP, BEING HIS WATCH WAS
21    SIX MINUTES AHEAD, OR SIX MINUTES --
22              MR. GESSIN:  THAT'S WHAT WE NEED TO ARGUE, BECAUSE
23    I THINK THERE'S A DISPUTE AS WHERE WE'RE AT THERE.  BUT
24    BETWEEN THE WATCH TESTIMONY AND THE RECEIPT, THE COURT I
25    BELIEVE CAN COME TO A CONCLUSION AS TO WHAT THE ACTUAL TIME
```

```
1    WAS.  BUT THAT'S NOT WHY MR. REIS IS HERE.
2           THE COURT:  JUST SO I UNDERSTAND THE WITNESS'
3    TESTIMONY CORRECTLY, YOU PROCEEDED -- YOUR TESTIMONY IS
4    BASED ON THE TIME STAMP.
5           THE WITNESS:  CORRECT.
6           THE COURT:  YOU'RE NOT -- YOU DON'T HAVE AN
7    OPINION AS TO WHETHER THE TIME STAMP IS ACCURATE OR
8    INACCURATE.  SO YOUR TESTIMONY IS, THAT ASSUMING THE TIME
9    STAMP WAS ACCURATE, THAT BY BREAKING DOWN THE VIDEO INTO
10   PARTS, YOU'VE BEEN ABLE TO DETERMINE THAT THE PETITIONER
11   ENTERED THE STORE AT 9:25 P.M., ACCORDING TO THE TIME STAMP?
12          THE WITNESS:  YES, SIR.
13          THE COURT:  IF YOU GO BY THE TIME ON THE TIME
14   STAMP.
15          THE WITNESS:  YES, SIR.
16          THE COURT:  THAT'S YOUR PROFESSIONAL OPINION?
17          THE WITNESS:  YES, IT IS.
18          THE COURT:  ALL RIGHT.  SO THE OBJECTION TO THE
19   REPORT IS OVERRULED.
20          MR. GESSIN:  THANK YOU, YOUR HONOR.
21      (PAUSE.)
22          MR. GESSIN:  NO FURTHER QUESTIONS, YOUR HONOR.
23          THE COURT:  CROSS.
24   ////
25   ////
```

```
 1                      CROSS-EXAMINATION
 2   BY MR. MADEO:
 3   Q.   GOOD MORNING, MR. REIS.
 4   A.   GOOD MORNING.
 5   Q.   IT'S YOUR TESTIMONY, ESSENTIALLY, THAT WHEN PETITIONER
 6   ENTERED THE BLOCKBUSTER, THE ACTUAL TIME STAMP ON THE VIDEO
 7   WAS 9:25?
 8   A.   YES, SIR.
 9   Q.   AND IS IT CORRECT THAT YOU CANNOT DETERMINE THE
10   ACCURACY OF THAT TIME STAMP ITSELF?
11   A.   IT'S CORRECT THAT I DID NOT ATTEMPT TO DO SO.
12   Q.   DID NOT ATTEMPT TO DO SO.
13            SO IT COULD BE FIVE MINUTES OFF, IN OTHER WORDS?
14   A.   I HAVE NO WAY OF KNOWING.
15   Q.   YOU HAVE NO WAY OF DETERMINING AT ALL WITHIN ANY
16   APPROXIMATION HOW FAR OFF THE TIME STAMP IS?
17   A.   BASED ON THE WORK THAT I HAD DONE, THAT'S CORRECT.
18   Q.   SO IF IT WAS, SAY, 10 MINUTES OFF, THE ACTUAL TIME THAT
19   HE WAS IN THE STORE COULD BE 9:35?
20   A.   THAT WOULD BE CORRECT.
21   Q.   AND IF IT'S 15 MINUTES OFF, IT COULD BE 9:40?
22   A.   YES.
23            MR. MADEO:  IF I COULD HAVE A MINUTE, YOUR HONOR?
24            THE COURT:  YES.
25       (PAUSE.)
```

```
1              MR. MADEO:  NO FURTHER QUESTIONS, YOUR HONOR.

2              THE COURT:  OKAY.  ANYTHING FURTHER, MR. GESSIN?

3              MR. GESSIN:  NO REDIRECT.  THANK YOU, YOUR HONOR.

4         THANK YOU, MR. REIS.

5              THE COURT:  THANK YOU, MR. REIS.

6              MR. GESSIN:  UNLESS THE RESPONDENT PLANS ON

7    RE-CALLING MR. REIS, I ASK THAT HE BE EXCUSED.

8              THE COURT:  MAY MR. REIS BE EXCUSED?

9              MR. MADEO:  YES, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  MR. REIS, YOU ARE EXCUSED.

11        (PAUSE.)

12             MR. GESSIN:  YOUR HONOR, I'D LIKE LEAVE TO HAVE

13   CO-COUNSEL, ROSE ANGULO, QUESTION OUR NEXT WITNESS.

14             THE COURT:  SURE.

15             MR. GESSIN:  THANK YOU, YOUR HONOR.

16             MS. ANGULO:  GOOD MORNING, YOUR HONOR.

17             PETITIONER WOULD LIKE TO CALL INVESTIGATOR,

18   VICTOR GOMEZ, TO THE STAND.

19             THE COURT:  COME FORWARD AND BE SWORN.

20             THE CLERK:  RAISE YOUR RIGHT HAND TO BE SWORN,

21   PLEASE.

22             VICTOR GOMEZ, PETITIONER'S WITNESS, SWORN

23             THE WITNESS:  I DO.

24             THE CLERK:  HAVE A SEAT, PLEASE.

25             STATE YOUR FULL NAME FOR THE RECORD.
```

```
 1              THE WITNESS:  VICTOR GOMEZ, G-O-M-E-Z.

 2              THE COURT:  GO AHEAD, COUNSEL.

 3                       DIRECT EXAMINATION

 4   BY MS. ANGULO:

 5   Q.   INVESTIGATOR GOMEZ, WHAT IS YOUR PLACE OF EMPLOYMENT?

 6   A.   THE FEDERAL PUBLIC DEFENDER'S OFFICE.

 7   Q.   HOW LONG HAVE YOU BEEN EMPLOYED THERE?

 8   A.   I'VE BEEN A CRIMINAL DEFENSE INVESTIGATOR FOR 10 YEARS,

 9   AND I'VE BEEN EMPLOYED WITH THE FEDERAL PUBLIC DEFENDER'S

10   SINCE 2006.

11   Q.   DO YOU HAVE ANY SPECIALIZED TRAINING?

12   A.   YES.  I HAVE A BACHELOR OF SCIENCE DEGREE IN CRIMINAL

13   JUSTICE ADMINISTRATION.  I'M ALSO A GRADUATE OF THE DEFENSE

14   INVESTIGATORS ASSOCIATION OF CALIFORNIA, DEFENSE

15   INVESTIGATOR TRAINING ACADEMY, AND I ATTEND ANNUAL TRAINING

16   CONFERENCES HOSTED BY THE NATIONAL DEFENDER INVESTIGATOR

17   ASSOCIATION AND ALSO OTHER CRIMINAL-DEFENSE-ORIENTED

18   ORGANIZATIONS.

19   Q.   PLEASE GIVE US A DESCRIPTION OF YOUR DUTIES.

20   A.   I ASSIST ATTORNEYS IN ANALYZING DISCOVERY, CASE

21   DOCUMENTATION, PREPARING -- I'M SORRY, GATHERING RECORDS,

22   PHOTOGRAPHING CRIME SCENES AND EVIDENCE, VIDEO RECORDING

23   THEM AS WELL.  ALSO, LOCATING PEOPLE AND EVIDENCE,

24   CONDUCTING WITNESS INTERVIEWS AND PREPARING REPORTS.

25   Q.   THANK YOU.  DO YOUR DUTIES EVER INCLUDE MAKING TIMED
```

```
 1   DRIVING DEMONSTRATIONS?

 2   A.   THEY DO, OCCASIONALLY.

 3   Q.   WHAT IS A TIMED DRIVING DEMONSTRATION?

 4   A.   IT'S AN EXERCISE PERFORMED TO DETERMINE THE APPROXIMATE

 5   AMOUNT OF TIME IT WOULD TAKE A PERSON TO TRAVEL -- TO DRIVE

 6   FROM ONE LOCATION TO ANOTHER LOCATION, OR VARIOUS OTHER

 7   LOCATIONS.

 8   Q.   DID YOU MAKE A TIMED DRIVING DEMONSTRATION IN THIS

 9   CASE?

10   A.   YES.

11   Q.   AND WHAT WAS THE TIMED DRIVING DEMONSTRATION OF?

12   A.   THE TIMED DRIVING DEMONSTRATION WAS OF THE ROUTES

13   MR. COLEMAN COULD HAVE TAKEN, IF HE HAD COMMITTED THE CRIME

14   AND PICKED UP EVELYN MEDINA AT HER RESIDENCE.

15          COMMITTED THE CRIME, BEEN INVOLVED IN A PURSUIT

16   THAT ENDED AT THE INTERSECTION OF SOUTH HOOVER AND WEST

17   102ND STREET, TRAVELED TO THE HOME OF EVELYN MEDINA TO PICK

18   HER UP AND ALSO PICK UP JEREMY COLEMAN AT THAT LOCATION AND

19   THEN TRAVELED TO THE HOME OF THE COLEMAN BROTHERS' MOTHER'S

20   HOME AND THEN ENTER THE BLOCKBUSTER AT THE TIME SURVEILLANCE

21   CAMERAS CAPTURED HIM DOING SO.

22   Q.   OKAY.  I'M GOING TO SHOW WHAT'S BEEN PREVIOUSLY MARKED

23   AS PETITIONER'S EXHIBIT C.

24   A.   I HAVE IT HERE.

25   Q.   DO YOU RECOGNIZE THIS?
```

```
 1   A.   YES, I DO.

 2   Q.   WHAT IS IT?

 3   A.   IT IS A DVD THAT CONTAINS THE VIDEO RECORDING OF THE

 4   TIME.

 5   Q.   AND THIS IS THE RECORDING THAT YOU MADE?

 6   A.   CORRECT.

 7   Q.   WHAT KIND OF VIDEO RECORDING MACHINE DID YOU USE TO

 8   MAKE?

 9   A.   I USED DIGITAL VIDEO CAMERA RECORDER, A DIGITAL VIDEO

10   CASSETTE AND AN IN-CAR WINDSHIELD CAMERA MOUNT.

11   Q.   ARE YOU FAMILIAR WITH THE OPERATION OF THOSE MACHINES

12   AND ITEMS?

13   A.   YES.

14   Q.   HOW MANY TIMES HAVE YOU USED THE MACHINE?

15   A.   I'VE USED THE CAMERA FIVE TO 10 TIMES.

16   Q.   AND THEN, HOW MANY TIMES HAVE YOU USED THE CAR MOUNT?

17   A.   APPROXIMATELY, THREE TIMES.

18   Q.   DID YOU TEST THE VIDEO RECORDING MACHINE BEFORE YOU

19   RECORDED THE TIMED DRIVE?

20   A.   YES, I DID.  I TESTED IT IN MY OFFICE THE DAY BEFORE I

21   RECORDED THE TIMED DRIVING DEMONSTRATION BY RECORDING A CLIP

22   OF VIDEO AND AUDIO, APPROXIMATELY, FIVE SECONDS IN LENGTH.

23   I THEN PLAYED THAT BACK AND DETERMINED THAT THE CAMERA WAS

24   ACCURATELY RECORDING.

25   Q.   BOTH THE VIDEO AND THE SOUND?
```

1  A.   BOTH VIDEO AND SOUND.

2  Q.   OKAY.  WHAT IS THE FIRST STEP THAT YOU TOOK TO RECORD

3  THE TIMED DRIVE?

4  A.   I FIXED THE CAMERA MOUNT TO THE INSIDE OF THE WINDOW OF

5  THE VEHICLE I WAS USING THE TIMED DRIVING DEMONSTRATION; AND

6  THEN, I MOUNTED THE CAMERA ON THERE.

7  Q.   WHAT DID YOU DO TO START THE RECORDING?

8  A.   I POWERED ON THE CAMERA, HIT THE RECORD BUTTON AND THEN

9  DID A BRIEF INTRODUCTION AND THEN STARTED THE TIMED DRIVING

10  DEMONSTRATION.

11  Q.   DID YOU LEAVE THE CAMERA ON CONTINUOUSLY THROUGHOUT THE

12  DRIVING DEMONSTRATION?

13  A.   I DID.

14  Q.   AT WHAT POINT DID YOU TURN OFF THE CAMERA?

15  A.   I TURNED OFF THE CAMERA AT THE TIME THAT I ENTERED THE

16  PARKING LOT OF WHERE THE BLOCKBUSTER -- THE LOCATION WHERE

17  THE BLOCKBUSTER USED TO BE.  I ALSO STOPPED A STOPWATCH THAT

18  I WAS USING DURING THE COURSE OF THE DEMONSTRATION.

19  Q.   WHEN YOU WERE DONE RECORDING, DID YOU DO SOMETHING WITH

20  THE CAMERA?

21  A.   WHEN I WAS DONE RECORDING, I PLACED THE CAMERA, CAMERA

22  MOUNT INTO MY WORK BAG AND THEN THE FOLLOWING -- THE

23  RECORDING TOOK PLACE ON A SATURDAY, OCTOBER 12TH, 2013.  THE

24  FOLLOWING MONDAY, I REPORTED TO THE OFFICE.  I POWERED ON

25  THE CAMERA, REWOUND THE CASSETTE AND PLAYED IT BACK.  AT

```
1    THAT POINT, I DETERMINED THAT IT WAS AN ACCURATE DEPICTION
2    OF THE TIMED DRIVING DEMONSTRATION.
3              I THEN LABELED THE CASSETTE AND STORED IT IN THE
4    INVESTIGATION CASE FILE.  THIS WAS OCTOBER 14TH.
5              ON OCTOBER 17TH --
6    Q.   REALLY QUICK.  THE CASE FILE, IS THAT ON A COMPUTER, OR
7    IS IT A HARD FILE?
8    A.   IT IS A PHYSICAL FILE -- PAPER FILE.
9              ON OCTOBER 17TH, I MAILED THE CASSETTE TO THE
10   LITIGATION SUPPORT DEPARTMENT AT FEDERAL PUBLIC DEFENDER
11   HEADQUARTERS IN LOS ANGELES.
12   Q.   WHAT KIND OF MAIL SERVICE DID YOU USE?
13   A.   THIS WAS A SECURE COURIER SERVICE.  I THEN IN AN E-MAIL
14   AND ALSO IN A MEMO ENCLOSED IN THE MAILING ASKED LITIGATION
15   SUPPORT PERSONNEL TO COPY THE DATA FROM THE CASSETTE ON TO A
16   DVD.
17             I LATER RECEIVED THE CASSETTE AND DVD FROM THE
18   LITIGATION SUPPORT DEPARTMENT VIA SECURE COURIER SERVICE.  I
19   UPLOADED THE DATA FROM THE DVD ON TO OUR OFFICE'S COMPUTER
20   SERVICE.
21   Q.   SO THE VIDEO IS NOW IN DIGITAL FORM?
22   A.   CORRECT.
23   Q.   OKAY.
24             THE COURT:  WHAT TIME OF DAY WAS THE DEMO MADE?
25             THE WITNESS:  AT APPROXIMATELY 9:10 P.M.
```

```
 1              MS. ANGULO:  I WOULD LIKE TO PLAY A PORTION OF THE
 2   TIMED DRIVING DEMONSTRATION SO THAT HE CAN VERIFY THAT IT'S
 3   FAIR AND ACCURATE.
 4              THE COURT:  WHERE AM I GOING TO SEE IT?
 5       (PAUSE.)
 6              THE COURT:  GO AHEAD.  IF I CAN'T SEE IT, I'LL LET
 7   YOU KNOW.
 8              MS. ANGULO:  THANK YOU.
 9              THE COURT:  CAN THE WITNESS SEE IT?
10              THE WITNESS:  NOT YET, YOUR HONOR.
11              ACTUALLY, I DO SEE IT.  YES.
12              THE COURT:  WHAT ABOUT THE ATTORNEY GENERAL?  DO
13   YOU HAVE SOMETHING?
14              MR. BILDERBACK:  WE CAN SEE IT, YOUR HONOR.
15              THANK YOU.
16       (THE VIDEOTAPE WAS PLAYED.)
17   BY MS. ANGULO:
18   Q.   IS THIS THE VIDEO THAT YOU RECORDED?
19   A.   YES.
20              MS. ANGULO:  OKAY.  YOUR HONOR, I WOULD LIKE TO
21   MOVE PETITIONER'S EXHIBIT C INTO EVIDENCE, UNLESS YOU WOULD
22   LIKE TO SEE MORE VIDEO PLAYED.
23       (THE VIDEOTAPE WAS PLAYED.)
24   BY MS. ANGULO:
25   Q.   DID YOU REVIEW -- HAVE YOU SEEN THIS VIDEO BEFORE?
```

```
 1    A.   YES, I HAVE.

 2    Q.   DID YOU SEE IT TODAY?

 3    A.   I SAW IT YESTERDAY.

 4    Q.   YOU SAW IT YESTERDAY.

 5         OKAY.  IS THIS A FAIR AND ACCURATE RECORDING OF

 6    THE VIDEO THAT YOU MADE?

 7    A.   IT IS.  IT APPEARS THAT THE SOUND IS NOT PLAYING,

 8    HOWEVER.

 9         MS. ANGULO:  CAN WE MOVE THIS INTO EVIDENCE?

10         THE COURT:  WHAT'S RESPONDENT'S POSITION?

11         MR. MADEO:  NO OBJECTION, YOUR HONOR.

12         THE COURT:  ALL RIGHT.  IT'S ADMITTED.

13         (PETITIONER'S EXHIBIT C RECEIVED IN EVIDENCE.)

14         MS. ANGULO:  THANK YOU.

15    BY MS. ANGULO:

16    Q.   OKAY.  INVESTIGATOR GOMEZ, I NOW WANT TO TALK TO YOU

17    ABOUT THE ROUTE THAT YOU TOOK FOR YOUR TIMED DRIVING

18    DEMONSTRATION.

19         AS A DEMONSTRATIVE, I WANT TO SHOW YOU WHAT HAS

20    BEEN PREVIOUSLY MARKED AS PETITIONER'S EXHIBIT E.

21    A.   IT IS BEFORE ME.

22         MS. ANGULO:  OKAY.  AND, YOUR HONOR, CAN YOU SEE

23    THE DEMONSTRATIVE?

24         THE COURT:  WHY IS MINE MARKED?

25         IS THAT THE SAME AS RESPONDENT'S 1-A, OR IS THIS A
```

```
 1    DIFFERENT DOCUMENT?
 2              MR. GESSIN:  IT'S A DIFFERENT DOCUMENT,
 3    YOUR HONOR.
 4              THE COURT:  OKAY.  I HAVE IT IN FRONT OF ME.
 5              MS. ANGULO:  OKAY.  THIS IS A DEMONSTRATIVE, SO WE
 6    WON'T BE MOVING IT INTO EVIDENCE.
 7    BY MS. ANGULO:
 8    Q.    INVESTIGATOR GOMEZ, DO YOU RECOGNIZE WHAT'S BEEN
 9    PREVIOUSLY MARKED AS PETITIONER'S EXHIBIT E?
10    A.    I DO.
11    Q.    WHAT DOES THIS SHOW?
12    A.    IT SHOWS THE DRIVING ROUTE THAT I TOOK DURING THE
13    COURSE OF THE TIMED DRIVING DEMONSTRATED.
14    Q.    HOW DID YOU DECIDE ON THE ROUTE TO TAKE?
15    A.    THIS WAS BASED ON TRIAL TESTIMONY.
16    Q.    AS YOU EXPLAINED EARLIER, THIS IS THE ROUTE THAT
17    MR. COLEMAN WOULD HAVE HAD TO TAKE TO COMMIT THE SHOOTING,
18    AND --
19    A.    CORRECT.  TO HAVE COMMITTED THE CRIME, PICKED UP -- I'M
20    SORRY, ENGAGED IN THE CAR PURSUIT THAT ENDED AT THE
21    INTERSECTION OF SOUTH HOOVER, WEST 102ND STREET AND THEN
22    PICKED UP EVELYN MEDINA AND JEREMY COLEMAN AT EVELYN
23    MEDINA'S RESIDENCE, AND THEN DROPPED OFF JEREMY COLEMAN AT
24    THE HOME OF THE COLEMAN BROTHERS' MOTHER'S HOME, AND THEN
25    TRAVELED TO THE BLOCKBUSTER AND ENTERED AT THE TIME THAT
```

```
1    SURVEILLANCE VIDEO CAMERAS THERE CAPTURED HIM DOING SO.

2            THE COURT:  MY COPY, UNFORTUNATELY, IS NOT THAT

3    LEGIBLE, SO I CAN'T MAKE OUT -- I CAN'T TELL WHICH END IS

4    THE BEGINNING AND WHICH PART IS THE END.

5            MS. ANGULO:  OKAY.  WE'LL GO THROUGH EACH -- ARE

6    YOU ABLE TO SEE THE LETTERS, THE SMALL "A"?

7            THE COURT:  ACTUALLY, THEY'RE NOT LEGIBLE.

8            MS. ANGULO:  THEY'RE NOT LEGIBLE AT ALL?

9            MAY I PLEASE APPROACH THE BENCH?

10           THE COURT:  YES.

11      (PAUSE.)

12           THE COURT:  COULD HAVE BEEN BETTER IF YOU HAD DONE

13   A COLOR VERSION, LIKE THE RESPONDENT.

14           MS. ANGULO:  SORRY.

15   BY MS. ANGULO:

16   Q.   WHERE DID YOUR ROUTE BEGIN?

17           IF YOU COULD REFER TO THE LETTERS THAT ARE ON THE

18   MAP, FOR EASE OF REFERENCE.

19   A.   YES, I WILL.  THE ROUTE BEGIN AT 1131 WEST 101ST

20   STREET.  THIS IS THE LOCATION OF THE CRIME SCENE.  THAT

21   WOULD BE DEMARKED BY LETTER "A" ON THE MAP.

22           THE COURT:  DO ME A FAVOR, COUNSEL.  POINT WITH

23   YOUR FINGER TO WHERE THE LETTER "A" IS.

24           AND YOU CAN SEE WHERE SHE'S POINTING, RIGHT?  I'M

25   SAYING, IF YOU PUT YOUR FINGER ON IT.
```

```
 1              THE WITNESS:  OH, YES, SIR.  YES, YOUR HONOR, I
 2   CAN.
 3   BY MS. ANGULO:
 4   Q.    OKAY.  SO THIS IS WHERE YOU STARTED?
 5   A.    YES.
 6   Q.    OKAY.  AND WHY DID YOU BEGIN THERE?
 7   A.    I BEGAN THERE BECAUSE THAT IS WHERE THE SHOOTING
 8   OCCURRED.
 9   Q.    WHAT TIME OF NIGHT DID YOU BEGIN?
10   A.    I BEGAN AT 9:10 P.M. TO CONDUCT THE TIMED DRIVING
11   DEMONSTRATION.
12   Q.    AND WHAT KIND OF CAR WAS THE SHOOTER DRIVING, ACCORDING
13   TO TRIAL TESTIMONY?
14   A.    THE SHOOTER WAS DRIVING A WHITE DODGE CARAVAN.
15   Q.    OKAY.  WHERE DID YOU GO NEXT?
16   A.    AFTER THAT, I TRAVELED TO THE END OF THE CAR PURSUIT,
17   WHICH WAS THE INTERSECTION OF SOUTH HOOVER AND WEST 102ND
18   STREET, DEMARKED BY LETTER "B" ON THE MAP.
19   Q.    WHY DID YOU STOP THERE?
20   A.    BECAUSE, ACCORDING TO TRIAL TESTIMONY, THIS IS THE
21   LOCATION WHERE THE PEOPLE IN THE SUSPECT VEHICLE CONFRONTED
22   BYSTANDERS THAT PURSUED THE SUSPECT VEHICLE AND ANOTHER
23   VEHICLE.  AT ONE POINT, SOMEONE EXITED THE SHOOTER VEHICLE
24   AND POINTED A HANDGUN AT THE VEHICLE -- THE PURSUING
25   VEHICLE.
```

1    Q.    HOW LONG DID YOU STOP THERE FOR?

2    A.    APPROXIMATELY 10 SECONDS.

3    Q.    WHY THAT AMOUNT OF TIME?

4    A.    BECAUSE THAT'S THE AMOUNT OF TIME IT TOOK ME TO EXIT

5    THE VEHICLE, DEMONSTRATE THE POINTING OF A HANDGUN AT AN

6    IMAGINARY VEHICLE BEHIND ME AND RE-ENTER THE VEHICLE.

7              THE COURT:  POINT THAT OUT AGAIN.

8    BY MS. ANGULO:

9    Q.    LETTER "B" IS RIGHT THERE.

10             SO HE WOULD HAVE -- ACCORDING TO YOUR TESTIMONY,

11   INVESTIGATOR GOMEZ, YOU STARTED AT LETTER "A" AND THEN DROVE

12   ALONG THIS ROUTE TO WHERE THE CONFRONTATION OCCURRED,

13   ACCORDING TO TRIAL TESTIMONY?

14   A.    CORRECT.  AND I CAN READ OFF THE STREETS I TRAVELED

15   THEN, IF THAT'S NECESSARY.

16   Q.    CAN YOU, PLEASE, DO THAT.

17   A.    YES.  SO FROM THE SHOOTING LOCATION, I TRAVELED

18   EASTBOUND ON WEST 101ST STREET.  I THEN TURNED RIGHT AT

19   SOUTH VERMONT AVENUE, TRAVELING SOUTHBOUND; AND THEN, I

20   TURNED LEFT AT WEST 104 STREET, TRAVELING TO THE EAST.

21             I THEN TURNED LEFT AT SOUTH BARING CROSS STREET,

22   TRAVELING IN A NORTHBOUND DIRECTION.  I THEN MADE A RIGHT AT

23   WEST 102ND STREET, TRAVELING EASTBOUND AGAIN AND STOPPED AT

24   THE INTERSECTION OF SOUTH HOOVER AND WEST 102ND STREET.

25   Q.    THANK YOU.

```
 1          WHO WAS INVOLVED IN THAT CONFRONTATION?
 2   A.   THE TWO SUSPECTS IN THE VEHICLE AND ALSO IN THE
 3   PURSUING VEHICLE WERE WITNESSES ALBERT SEGUNDO AND ANDRES
 4   SANDOVAL.
 5   Q.   WHERE DID YOU GO NEXT?
 6   A.    AFTER THAT, I TRAVELED TO THE HOME OF EVELYN MEDINA BY
 7   TRAVELING NORTHBOUND ON SOUTH HOOVER AND THEN MAKING A LEFT
 8   AT WEST 98TH, TRAVELING IN AN EASTBOUND DIRECTION AND
 9   STOPPING IN FRONT OF THE HOME OF EVELYN MEDINA.
10          I'M SORRY.  THAT LOCATION IS DEMARKED BY LETTER
11   "D" ON THE MAP.
12          THE COURT:  SO YOU WENT A, B, D?
13          THE WITNESS:  NO, SIR.  I WENT A, B, C.
14          MS. ANGULO:  IT'S ACTUALLY DEMARKED BY LETTER "C"
15   ON THE MAP.
16          THE WITNESS:  I APOLOGIZE.  IT'S DEMARKED BY
17   LETTER "C" ON THE MAP.
18          THE COURT:  EVELYN MEDINA IS LETTER "C"?
19          THE WITNESS:  CORRECT.  LETTER "C" IS THE HOME OF
20   EVELYN MEDINA.
21   BY MS. ANGULO:
22   Q.   SO JUST TO REVIEW, YOU WENT FROM THE SHOOTING LOCATION,
23   WHICH IS "A," AND FOLLOWED THAT TO WHERE THE CONFRONTATION
24   TOOK PLACE, WHICH IS LETTER "B."
25          AND THEN FROM THERE, YOU WENT TO EVELYN MEDINA'S
```

1   HOUSE?

2   A.   I APOLOGIZE.  IT'S A LITTLE DIFFICULT TO READ ON THE

3   SCREEN HERE AND THAT'S WHY I CONFUSED IT WITH THE LETTER

4   "D."

5   Q.   WHY DID YOU STOP AT EVELYN MEDINA'S HOUSE?

6   A.   BECAUSE BASED ON TRIAL TESTIFY, EVELYN MEDINA ENTERED

7   THE BLOCKBUSTER STORE WITH MR. COLEMAN AT THE TIME

8   SURVEILLANCE VIDEO CAMERAS CAPTURED HIM DOING SO.  SO

9   MR. COLEMAN WOULD HAVE HAD TO HAVE COMMITTED THE CRIME AND

10  THEN PICKED -- BE ENGAGED IN THE CAR PURSUIT AND THEN PICK

11  UP MS. MEDINA FROM HER HOME.

12  Q.   HOW LONG DID YOU STOP IN FRONT OF MS. MEDINA'S HOUSE?

13  A.   I STOPPED THERE FOR APPROXIMATELY 10 SECONDS.

14  Q.   WHERE DID YOU GO NEXT?

15  A.   ACCORDING TO THE TRIAL TESTIMONY, MR. COLEMAN ALSO

16  DROPPED OFF JEREMY COLEMAN AT THE LOCATION OF THE COLEMAN

17  BROTHERS' MOTHER'S HOUSE PRIOR TO TRAVELING TO THE

18  BLOCKBUSTER.

19  Q.   WHAT IS THE ROUTE THAT YOU TOOK TO GET TO THE BROTHERS'

20  HOUSE?

21  A.   AFTER STOPPING AT MS. MEDINA'S HOME, I MADE A U-TURN AT

22  THE FIRST LOCATION WHERE THERE WAS A BREAK IN THE MEDIAN

23  THAT SEPARATED TRAFFIC ON WEST 98TH -- WEST AND EASTBOUND

24  TRAFFIC ON WEST 98TH.  I MADE A U-TURN THERE, AND THEN I

25  HEADED EASTBOUND ON 98TH -- WEST 98TH STREET.

1               THEN, ON SOUTH VERMONT AVENUE, I TURNED RIGHT IN A

2    SOUTHWARD DIRECTION AND THEN AT WEST 140 STREET, I TURNED

3    LEFT IN AN EASTBOUND DIRECTION, AND I ARRIVED AT LOCATION

4    "D" DEMARKED ON THE MAP.

5    Q.   AND THAT REPRESENTS PATRICIA SERMON'S HOME?

6    A.   YES.

7    Q.   AND WHY DID YOU STOP THERE?

8    A.   I STOPPED THERE BECAUSE -- BASED ON TRIAL TESTIMONY,

9    MR. COLEMAN DROPPED OFF JEREMY COLEMAN AT PATRICIA SERMON'S

10   HOUSE AFTER THE SHOOTING.

11   Q.   HOW LONG DID YOU STOP THERE?

12   A.   FOR APPROXIMATELY 10 SECONDS.

13   Q.   WHERE DID HE GO NEXT?

14   A.   AFTER STOPPING AT THE HOME OF PATRICIA SERMON, I

15   TRAVELED NORTHBOUND ON SOUTH VERMONT AVENUE AND THEN

16   WESTBOUND ON WEST CENTURY BOULEVARD.  AND THEN, I MADE A

17   RIGHT ON SOUTH WESTERN AVENUE, HEADING NORTHBOUND UNTIL I

18   REACHED THE LOCATION WHERE THE BLOCKBUSTER WAS FORMERLY.

19   Q.   AND HOW IS THAT DEMARKED ON THE MAP?

20   A.   IT'S DEMARKED BY THE LETTER "E."

21   Q.   WHAT CAR -- SORRY.

22               AND WHY DID YOU GO TO BLOCKBUSTER?

23   A.   BECAUSE THAT IS WHERE MR. COLEMAN AND EVELYN MEDINA

24   WERE CAPTURED ON SURVEILLANCE VIDEO CAMERAS ENTERING AFTER

25   THE SHOOTING.

1    Q.    WHAT CAR WAS JOFAMA DRIVING WHEN HE ARRIVED AT

2    BLOCKBUSTER?

3    A.    ACCORDING TO TRIAL TESTIMONY, IT WAS A GREEN TOYOTA

4    CAMRY.

5    Q.    WHEN DID YOU STOP THE VIDEO RECORDING?

6    A.    AS SOON AS I PARKED THE VEHICLE IN THE PARKING LOT OF

7    THE LOCATION WHERE THE BLOCKBUSTER WAS FORMERLY, I STOPPED

8    THE RECORDER -- FIRST, I STOPPED THE STOPWATCH I WAS USING

9    TO TIME THE DEMONSTRATION AND THEN I STOPPED THE RECORDING.

10   Q.    SO YOU HAD A SEPARATE STOPWATCH BESIDES THE VIDEOTAPE

11   ON?

12   A.    CORRECT.  I WAS USING A STOPWATCH ON MY CELLULAR PHONE.

13   Q.    WHAT WAS THE TOTAL TIME OF THE TIMED DRIVING

14   DEMONSTRATION?

15   A.    THE VIDEO OF THE TIMED DRIVING DEMONSTRATION WAS 15

16   MINUTES 46 SECONDS IN DURATION.

17   Q.    AND WHAT WAS THE TIME ON YOUR STOPWATCH?

18   A.    15 MINUTES AND SIX SECONDS.

19   Q.    OKAY.  I WANT TO SHOW YOU A PREVIOUSLY MARKED

20   PETITIONER'S EXHIBIT D.

21         THIS ONE IS COLORED.  MAYBE THAT'S HELPFUL.

22   A.    IT IS BEFORE ME.

23   Q.    AND WHAT IS THIS?

24   A.    THIS IS A SCREENSHOT OF THE STOPWATCH FROM MY CELLULAR

25   PHONE, SHOWING 15 MINUTES, SIX SECONDS AND 50/10TH OF A

1    SECOND.

2    Q.   AND WHAT IS THE SECOND SCREENSHOT?

3    A.   THE SECOND SCREENSHOT IS THE META DATA OF THE SCREEN

4    SHOT WHICH SHOWS WHEN THE SCREENSHOT WAS TAKEN.

5    Q.   WHEN WAS IT TAKEN?

6    A.   OCTOBER 12TH, 2013, AT 10:50.

7    Q.   HOW LONG AFTER YOU HAD STOPPED RECORDING WAS THAT

8    SCREENSHOT TAKEN?

9    A.   I'M SORRY.  SAY AGAIN.

10   Q.   HOW LONG AFTER YOU STOPPED RECORDING DID YOU TAKE THE

11   SCREENSHOT?

12   A.   10:50, IT WOULD HAVE BEEN ABOUT AN HOUR AND FIVE

13   MINUTES AFTERWARD.

14   Q.   OKAY.  AND IS THIS A FAIR AND ACCURATE REFLECTION OF

15   THE TIME IT ACTUALLY TOOK YOU TO DRIVE THE ROUTE OF THE

16   TIMED DRIVING DEMONSTRATION?

17   A.   YES.

18           MS. ANGULO:  NO FURTHER QUESTIONS.

19           THE COURT:  ARE YOU MOVING THEM INTO EVIDENCE?

20           MS. ANGULO:  NO.  EXHIBITS D AND E ARE JUST

21   DEMONSTRATIVES.

22           THE COURT:  THEY ARE DEMONSTRATIVES.  SO IT'S HIS

23   TESTIMONY OF HOW LONG IT TOOK HIM.

24           MS. ANGULO:  YES.

25       *(PAUSE.)*

1           MS. ANGULO:  AND THE TIMED DRIVING DEMONSTRATION,

2    WHICH IS IN EXHIBIT C, WHICH WE'VE MOVED INTO EVIDENCE.

3           THE COURT:  I GET IT.  THANK YOU.

4           MS. ANGULO:  OKAY.  THANK YOU, YOUR HONOR.

5           THE COURT:  ALL RIGHT.  CROSS-EXAMINATION.

6                     CROSS-EXAMINATION

7    BY MR. MADEO:

8    Q.   GOOD MORNING, MR. GOMEZ.

9    A.   GOOD MORNING.

10   Q.   YOU JUST TESTIFIED THAT YOU DROVE THE ENTIRE ROUTE FROM

11   THE SHOOTING SITE, WHICH IS NOTED LETTER "A" ON THE MAP,

12   THAT YOU JUST HAD.

13   A.   CORRECT.

14   Q.   THAT POINTS TO THAT INTERSECTION WHERE THE WITNESSES

15   SAW THE SHOOTER, WHICH IS "B" ON THE MAP?

16   A.   YES, SIR.

17   Q.   MS. MEDINA'S HOUSE?

18   A.   YES.

19   Q.   AND YOU STOPPED AT "H" (SIC) FOR ABOUT 10 SECONDS?

20   A.   YES.

21   Q.   AND THEN YOU WENT TO THE BLOCKBUSTER ON WESTERN AVENUE?

22   A.   CORRECT.

23   Q.   AND YOU DID ALL THAT IN ABOUT 15 MINUTES; IS THAT

24   CORRECT?

25   A.   YES, SIR.

```
 1          MR. MADEO:  MAY I HAVE A MINUTE, YOUR HONOR?
 2      (PAUSE.)
 3          MR. MADEO:  NO FURTHER QUESTIONS.
 4          THE COURT:  I TAKE IT THERE'S NO REDIRECT.
 5          MR. GESSIN:  WITH THE COURT'S INDULGENCE.
 6          THE COURT:  YES.
 7      (PAUSE.)
 8          MS. ANGULO:  NO FURTHER QUESTIONS, YOUR HONOR.
 9          THE COURT:  OKAY.  MAY THIS WITNESS BE EXCUSED?
10          MR. MADEO:  YES, YOUR HONOR.
11          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.
12  YOU'RE EXCUSED.
13          ANY ADDITIONAL WITNESSES FOR THE PETITIONER?
14          MR. GESSIN:  NO, YOUR HONOR.
15          THE COURT:  HOW ABOUT THE RESPONDENT?
16          MR. MADEO:  WE HAVE ONE WITNESS, YOUR HONOR.
17          THE COURT:  LET'S HEAR IT.
18      (PAUSE.)
19          THE COURT:  CALL YOUR WITNESS.
20          MR. MADEO:  RESPONDENT CALLS SENIOR INVESTIGATOR
21  CHRISTIE BEACH.
22          SHE'S OUT IN THE HALLWAY.
23      (PAUSE.)
24          THE COURT:  COME FORWARD AND BE SWORN.
25          THE CLERK:  GOOD MORNING.
```

```
 1              RAISE YOUR RIGHT HAND, PLEASE.

 2          CHRISTIE BEACH, RESPONDENT'S WITNESS, SWORN

 3          THE WITNESS:  YES, I DO.

 4          THE COURT:  PLEASE HAVE A SEAT.

 5          STATE YOUR FULL NAME FOR THE RECORD.

 6          THE WITNESS:  CHRISTIE BEACH.  CHRISTIE,

 7   C-H-R-I-S-T-I-E; BEACH, B-E-A-C-H.

 8          THE COURT:  GO AHEAD, COUNSEL.

 9                    DIRECT EXAMINATION

10   BY MR. MADEO:

11   Q.   GOOD MORNING, AGENT BEACH.

12   A.   GOOD MORNING.

13   Q.   COULD YOU TELL US WHO YOU WORK FOR, CURRENTLY?

14   A.   I CURRENTLY WORK FOR LOS ANGELES COUNTY DISTRICT

15   ATTORNEY'S OFFICE, SENIOR INVESTIGATOR.

16   Q.   AND IN AUGUST 2012, WHO DID YOU WORK FOR?

17   A.   I WORKED FOR DEPARTMENT OF JUSTICE AND FOR THE SPECIAL

18   INVESTIGATIONS TEAM, THE BUREAU OF INVESTIGATION.

19   Q.   IN RESPONSE TO MY REQUEST IN 2012, DID YOU DRIVE

20   PARTICULAR ROUTES IN SOUTH LOS ANGELES?

21   A.   YES, I DID.

22   Q.   AND DID YOU DO SO AGAIN, NOVEMBER 2013?

23   A.   YES, I DID.

24   Q.   THERE SHOULD BE A MAP IN FRONT OF YOU, EXHIBIT 1.

25              THE COURT:  DO YOU HAVE THIS?
```

```
1                THE WITNESS:  I DO HAVE IT, YES.
2                THANK YOU, YOUR HONOR.
3    BY MR. MADEO:
4    Q.   AND THIS IS THE MAP THAT I GAVE YOU IN 2013, THE END OF
5    LAST YEAR.
6    A.   IT APPEARS TO BE, YES.
7    Q.   AND IS IT ALSO SIMILAR TO THE MAP I GAVE YOU IN
8    AUGUST OF 2012?
9    A.   YES.
10   Q.   IS THIS THE ROUTE THAT YOU TOOK WHEN YOU DROVE ON BOTH
11   OF THOSE OCCASIONS?
12   A.   YES, IT IS.
13   Q.   NOW, DID YOU WRITE A REPORT DETAILING THIS
14   INVESTIGATION?
15   A.   YES.
16   Q.   BOTH DATES?
17   A.   I DID.
18   Q.   WOULD YOU LIKE TO REVIEW THIS REPORT TO REFRESH YOUR
19   RECOLLECTION?
20   A.   YES, PLEASE.
21                MR. MADEO:  MAY I APPROACH, YOUR HONOR?
22                THE COURT:  YES.
23        (PAUSE.)
24                THE COURT:  NOW, ISN'T THE PROPER PROCEDURE FOR
25   YOU TO ASK HER A QUESTION AND IF SHE DOESN'T KNOW THE ANSWER
```

```
 1   AND THEN YOU ASK HER, VIEWING HER REPORT WOULD REFRESH HER

 2   RECOLLECTION, THEN SHE COULD CONSULT HER REPORT.

 3            MR. MADEO:  I'LL DO THAT, YOUR HONOR.  THANK YOU.

 4   BY MR. MADEO:

 5   Q.   FOR THE INVESTIGATION NOVEMBER 4, 2013, WHAT TIME DID

 6   YOU BEGIN?

 7   A.   ARE YOU REFERRING TO NOVEMBER 6TH, 2013?

 8   Q.   YES.  THAT WOULD BE NOVEMBER 6TH.

 9   A.   I BEGAN APPROXIMATELY 0904 HOURS.

10            THE COURT:  0904?

11            THE WITNESS:  904 HOURS, YOUR HONOR.  A.M.

12            THE COURT:  SO THIS IS PRETTY WORTHLESS.

13            MR. MADEO:  WELL, IT DEMONSTRATES THE ACTUAL TIME.

14            THE COURT:  NOT AT THE RIGHT TIME OF DAY.

15   BY MR. MADEO:

16   Q.   WE CAN START WITH THE OTHER INVESTIGATION YOU DID IN

17   2012.

18            CAN YOU TELL ME EXACTLY WHEN YOU STARTED ON THAT

19   DATE?

20            THE WITNESS:  YOUR HONOR, MAY I HAVE PERMISSION TO

21   REVIEW THAT REPORT?

22            THE COURT:  IF IT WILL REFRESH YOUR RECOLLECTION.

23            THE WITNESS:  IT WILL.

24            THE COURT:  OF COURSE.

25            THE WITNESS:  THANK YOU, YOUR HONOR.
```

```
 1        (PAUSE.)

 2   BY MR. MADEO:

 3   Q.   HAVE YOU HAD A CHANCE TO REVIEW THE DOCUMENT?

 4   A.   YES.

 5   Q.   AND IF YOU COULD JUST DESCRIBE THE ROUTE YOU TOOK,

 6   STARTING FROM POINT A.

 7            THE COURT:  SHE DIDN'T ANSWER YOUR PENDING

 8   QUESTION, OF WHAT TIME.

 9   BY MR. MADEO:

10   Q.   WHAT TIME DID YOU ACTUALLY START ON THIS DATE?

11   A.   ON AUGUST 11TH, 2012, I STARTED APPROXIMATELY AT 2100

12   HOURS, WHICH WOULD BE 9:00 A.M.

13   Q.   DO YOU KNOW WHAT DAY OF THE WEEK THAT WAS?

14   A.   I BELIEVE IT WAS A SATURDAY.

15   Q.   CAN YOU TELL US WHERE YOU ACTUALLY STARTED THIS

16   INVESTIGATION?

17            THE WITNESS:  YOUR HONOR, MAY I READ TO REFLECT

18   THE ACCURACY OF THE DISTANCE, TIME AND --

19            THE COURT:  GO AHEAD.

20            THE WITNESS:  THANK YOU.

21            AT APPROXIMATELY 2102 HOURS, I STARTED AND DROVE

22   EASTBOUND, STARTING AT THE SOUTHEAST CORNER OF BUDLONG

23   AVENUE AND 102ND STREET IN LOS ANGELES.

24   BY MR. MADEO:

25   Q.   IS THIS MARKED "A" ON THE MAP?
```

1    A.    YES, IT IS.

2    Q.    AND IF YOU COULD GO ON AND LET US KNOW WHERE YOU WENT

3    FROM THERE.

4    A.    I CONTINUED TO SOUTH VERMONT AVENUE WHERE I DROVE

5    SOUTHBOUND TO WEST 104TH STREET.

6    Q.    AND FROM THERE?

7    A.    ON WEST 104TH STREET, I DROVE EASTBOUND AND THEN

8    NORTHBOUND TO WEST 102ND STREET.

9    Q.    AND FROM THAT POINT?

10   A.    ON WEST 102ND STREET, I DROVE EASTBOUND UNTIL I REACHED

11   THE CORNER OF WEST 102ND AND SOUTH HOOVER STREET.

12   Q.    THAT'S NOTED BY "C" ON THE MAP; IS THAT CORRECT?

13   A.    YES.

14   Q.    AND FROM THERE, COULD YOU TELL US WHERE YOU DROVE?

15   A.    AT APPROXIMATELY 2107 HOURS, I DROVE NORTHBOUND ON

16   SOUTH HOOVER FROM THE CORNER OF WEST 102ND STREET.

17   Q.    AND FROM THERE?

18   A.    I WENT WESTBOUND ON WEST CENTURY BOULEVARD AND

19   CONTINUED UNTIL SOUTH WESTERN AVENUE.

20   Q.    AND FROM THAT POINT?

21   A.    I TURNED NORTHBOUND ON SOUTH WESTERN AVENUE AND

22   CONTINUED TO THE ADDRESS OF 8811 SOUTH WESTERN AVENUE.

23   Q.    AND THAT'S NOTED BY "E" ON THE MAP; IS THAT CORRECT?

24   A.    YES.

25   Q.    AND CAN YOU TELL US EXACTLY HOW MUCH TIME IT TOOK YOU

1  TO GET FROM POINT "A" TO POINT "C"?

2  A.   THAT WAS 2.4 MINUTES.  TWO MINUTES, FOUR SECONDS AND

3  WAS --

4          GO AHEAD.  I APOLOGIZE.

5  Q.   AND CAN YOU TELL US HOW LONG IT TOOK YOU TO GET FROM

6  POINT "C" TO "E"?

7  A.   IT TOOK SIX MINUTES AND 31 SECONDS.

8  Q.   AND SO COMBINED FROM "A" TO "E," USING THIS ROUTE,

9  APPROXIMATELY HOW LONG DID IT TAKE YOU?

10  A.   APPROXIMATELY EIGHT MINUTES.

11          THE COURT:  YOU DIDN'T STOP OR PAUSE AT ANY POINT

12  ALONG THE WAY; IS THAT CORRECT?

13          THE WITNESS:  I DID, BUT IT WAS NOTED IN MY

14  REPORT.

15          THE COURT:  WHERE DID YOU PAUSE?

16          THE WITNESS:  IN BETWEEN THE FIRST, WHICH WOULD

17  BE, I BELIEVE, "A" TO "C" AND THEN "C" TO "E."

18          THE COURT:  I DON'T GET IT.  DID YOU PAUSE -- YOU

19  PAUSED -- YOU BROKE IT DOWN INTO SEGMENTS?

20          THE WITNESS:  CORRECT, YOUR HONOR.

21          THE COURT:  OKAY.  SO IF THIS WERE THE ROUTE, THEN

22  YOU COULD ADD "X" AMOUNT OF SECONDS TO THE TOTAL FOR STOP AT

23  "C" WHERE THERE WAS A CONFRONTATION; IS THAT CORRECT?

24          MR. MADEO:  I BELIEVE THAT'S CORRECT, YOUR HONOR.

25  I CAN CLEAR THAT UP IN A LITTLE BIT, IF YOU WOULD LIKE,

```
1    YOUR HONOR.

2    BY MR. MADEO:

3    Q.    THE FIRST ROUTE YOU TOOK, AGENT BEACH, YOU WENT FROM

4    "A" TO "C"; IS THAT CORRECT?

5    A.    THAT'S CORRECT.

6    Q.    AND THAT WAS THE ROUTE THAT YOU TOOK THAT YOU SAID

7    WENT -- THAT'S TWO MINUTES AND FOUR SECONDS?

8    A.    THAT'S CORRECT.

9    Q.    AND THAT'S WHERE YOU PAUSED, CORRECT?

10   A.    YES.

11   Q.    AND THEN, THE ACTUAL SECOND ROUTE YOU TOOK WAS FROM "C"

12   TO "E," AND THAT TOOK SIX MINUTES AND 31 SECONDS?

13   A.    THAT'S CORRECT.

14   Q.    AND THEN, NOVEMBER 2013, DID YOU ALSO DO ANOTHER ROUTE?

15   A.    YES, I DID.

16   Q.    AND CAN YOU TELL US WHEN YOU STARTED?

17   A.    I BELIEVE I STARTED APPROXIMATELY 0900 HOURS.

18             THE COURT:  WE -- THIS IS A DIFFERENT ROUTE?

19             MR. MADEO:  IT WAS, YOUR HONOR.

20             THE COURT:  I DON'T HAVE THAT, DO I?

21             MR. MADEO:  IT'S ON THE SAME MAP.

22             THE COURT:  IT'S MARKED ON THIS MAP?

23             MR. MADEO:  THE ACTUAL ROUTE IS ACTUALLY MARKED ON

24   THIS MAP.

25             IN FRONT OF YOU IS THE ROUTE I'M ABOUT TO DISCUSS
```

```
1   WITH AGENT BEACH, THAT I WAS USING THE MAP --

2            THE COURT:  WAIT.  SO --

3            MR. MADEO:  -- FOR DEMONSTRATIVE PURPOSES.

4            THE COURT:  MAYBE IT'S MY EYESIGHT.

5            THE FIRST ROUTE THAT YOU DESCRIBED IS NOT THE

6   ROUTE DEPICTED ON THIS MAP?

7            MR. MADEO:  IT DOES UTILIZE THE SAME POINTS OF

8   REFERENCE:  A, B, C, D.  BUT THE ACTUAL ROUTE, ITSELF, IS A

9   LITTLE BIT DIFFERENT THAN AGENT BEACH JUST TESTIFIED TO.

10  THE ACTUAL ROUTE THAT'S ON THIS MAP IS ABOUT WHAT SHE'S

11  ABOUT TO TESTIFY TO, AS FAR AS THE BLUE LINE.

12           THE COURT:  I WOULDN'T MIND SEEING THE ROUTE YOU

13  TESTIFIED TO, BECAUSE I THOUGHT SHE WAS DESCRIBING THE ROUTE

14  ON THIS MAP.  MAYBE SHE COULD MARK THE EXHIBIT.

15           DO WE HAVE THAT ONE?

16           MR. MADEO:  THIS IS A DIFFERENT MAP, YOUR HONOR.

17           MR. BILDERBACK:  MAY I APPROACH, YOUR HONOR?

18           I HAVE COPIES OF THIS OTHER MAP AS WELL.

19           THE COURT:  WE'LL PUT THE TAG ON LATER.  MAKE THIS

20  RESPONDENT'S 1-B.

21       (RESPONDENT'S EXHIBIT 1-B WAS MARKED FOR

22         IDENTIFICATION.)

23           MR. MADEO:  LET'S GO OVER, BRIEFLY, AGAIN, WHAT

24  AGENT BEACH JUST TESTIFIED TO AS FAR AS THIS ROUTE, TO MAKE

25  IT SIMPLER.
```

1          THE COURT:  WHY DON'T WE JUST -- CAN SHE JUST

2    TESTIFY --

3          IS THIS THE ROUTE THAT YOU WERE DESCRIBING BEFORE

4    THAT YOU TOOK?

5          THE WITNESS:  IT WAS.

6          THE COURT:  AND THAT WAS BACK ON AUGUST 11, 2012?

7          THE WITNESS:  YES, YOUR HONOR.

8          THE COURT:  WHAT'S THE SIGNIFICANCE OF "B"?

9    THAT'S -- WHY DID YOU MARK "B" ON THERE?

10         MR. MADEO:  NO PARTICULAR SIGNIFICANCE TO THAT

11   ONE, YOUR HONOR.  THE ONLY SIGNIFICANCE ON THIS MAP IS "A,"

12   "C" AND "D."  ON THE OTHER MAP, IT WOULD BE "A," "C," "D"

13   AND "E."

14         THE COURT:  IS 1-B WHAT SHE TESTIFIED -- 1-B IS

15   WHAT SHE TESTIFIED TO ORIGINALLY, RIGHT?

16         MR. MADEO:  THE BLUE LINE ON THE 1-B IS WHAT SHE

17   ALREADY TESTIFIED TO, THAT'S CORRECT.  THE 2003 REPORT.

18         THE COURT:  AND DOES THIS ROUTE GO PAST MEDINA'S?

19         MR. MADEO:  THIS PARTICULAR ROUTE DOES NOT GO PAST

20   MEDINA'S HOUSE.

21         THE COURT:  OKAY.  SO THIS ROUTE DOES NOT GO PAST

22   MEDINA'S HOUSE:  1-B.

23         MR. MADEO:  YES, 1-B.

24         THE COURT:  OKAY.  YOU MAY PROCEED --

25         NOW THAT YOU'VE CLARIFIED THINGS FOR ME, GO AHEAD.

1   BY MR. MADEO:

2   Q.   I WOULD LIKE YOU TO TURN TO EXHIBIT 1-A.

3        IS THIS, APPROXIMATELY, THE ROUTE THAT YOU TOOK

4   THIS -- EXCUSE ME, NOVEMBER 2013?

5   A.   YES, IT IS.

6   Q.   AND COULD YOU EXPLAIN WHERE YOU ACTUALLY BEGAN?

7   A.   I BEGAN AT POINT "A" AS SHOWN ON THE EXHIBIT, WHICH

8   WOULD BE WEST 101ST STREET AND BUDLONG.

9   Q.   AND FROM THERE YOU WENT WHERE?

10  A.   0907 HOURS, I DROVE EASTBOUND, STARTING AT THE

11  INDICATED LOCATION AT 101ST AND BUDLONG AND PROCEEDED TO

12  SOUTH VERMONT AVENUE.

13       I TURNED SOUTHBOUND ON SOUTH VERMONT AND CONTINUED

14  TO WEST 104TH STREET.

15       ON 104TH STREET, I DROVE EASTBOUND TO SOUTH BARING

16  CROSS STREET.  I TURNED NORTHBOUND ON BARING CROSS STREET

17  AND CONTINUED TO WEST 102ND STREET.

18       ON WEST 102ND STREET, I DROVE EASTBOUND UNTIL I

19  REACHED SOUTH HOOVER STREET.  ON SOUTH HOOVER STREET, I

20  DROVE NORTHBOUND TO WEST 98TH STREET.

21       ON WEST 98TH STREET, I TURNED WESTBOUND AND

22  CONTINUED TO THE RESIDENCE LOCATED AT 1031 WEST 98TH STREET.

23  Q.   AND CAN YOU TELL US EXACTLY HOW LONG THAT ROUTE TOOK?

24  A.   THAT TOOK ME FOUR MINUTES AND FOUR SECONDS.

25  Q.   AND WHAT TIME DID YOU START AGAIN AFTER THAT STOPPING?

1  A.  AT 0907 HOURS.

2  Q.  AND FROM THERE, CAN YOU TELL US WHERE YOU WENT?

3  A.  I DROVE WESTBOUND FROM THE RESIDENCE LOCATED AT

4  1031 WEST 98TH STREET.  I TURNED NORTHBOUND ONTO NORMANDY TO

5  WEST 92ND STREET.

6          ON WEST 92ND STREET, I TURNED WESTBOUND AND

7  PROCEEDED TO SOUTH WESTERN AVENUE.  I DROVE NORTHBOUND ON

8  SOUTH WESTERN AVENUE UNTIL I ARRIVED AT THE ADDRESS OF 8811

9  SOUTH WESTERN AVENUE.

10  Q.  THAT'S NOTED BY "E" ON THE MAP; IS THAT CORRECT?

11  A.  THAT'S CORRECT.

12  Q.  AND CAN YOU TELL US HOW LONG IT TOOK YOU TO GO FROM "G"

13  TO "E"?

14  A.  IT TOOK ME FIVE MINUTES AND ONE SECOND.

15  Q.  SO THE ENTIRE ROUTE FROM "A" TO "E," STOPPING AT "C"

16  AND "D" -- PASSING "C" AND "D" ALONG THE WAY, CAN YOU TELL

17  US HOW LONG IT TOOK YOU TO DRIVE THAT ROUTE?

18  A.  IT TOOK ME JUST OVER NINE MINUTES.

19  Q.  SO, IN OTHER WORDS, APPROXIMATELY, THE SAME AMOUNT OF

20  TIME AS YOU TOOK IN AUGUST OF 2012; IS THAT CORRECT?

21  A.  AROUND THAT SAME TIME, YES.

22  Q.  THAT WAS WITHIN A MINUTE, APPROXIMATELY?

23  A.  YES.

24          MR. MADEO:  MAY I HAVE JUST ONE MINUTE,

25  YOUR HONOR?

```
 1        (PAUSE.)

 2   BY MR. MADEO:

 3   Q.   WAS THERE A DIFFERENCE OF TRAFFIC CONDITIONS BETWEEN

 4   THE TWO TIMES YOU TOOK THESE ROUTES IN 2012 AND 2013,

 5   DRIVING TIME?

 6   A.   I DON'T BELIEVE THERE WAS ANYTHING SIGNIFICANTLY

 7   DIFFERENT DURING BOTH OF THE ROUTES THAT I DROVE OR BOTH THE

 8   OCCASIONS THAT I DROVE.  IT WAS A LOT OF RESIDENTIAL

 9   NEIGHBORHOOD AND IT SEEMED TO BE THE SAME CONDITIONS AT THE

10   TIME THAT I DROVE BOTH OF THOSE.

11   Q.   DID YOU NOTICE ANY KIND OF IMPEDIMENT AT ALL THAT MIGHT

12   HAVE BEEN THERE WITHIN THE TIME, TRAFFIC CONDITIONS OR

13   OTHERWISE?

14   A.   NO.

15        MR. MADEO:  I HAVE NO FURTHER QUESTIONS,

16   YOUR HONOR.

17        THE COURT:  ANY CROSS?

18        MR. GESSIN:  BRIEFLY, YOUR HONOR.

19                    CROSS-EXAMINATION

20   BY MR. GESSIN:

21   Q.   YOU JUST TESTIFIED ABOUT A ROUTE YOU TOOK ON AUGUST

22   11TH, 2012, AT APPROXIMATELY 9:00 P.M.

23   A.   YES, SIR.

24   Q.   THAT ROUTE DID NOT GO BY EVELYN MEDINA'S HOUSE?

25   A.   I DON'T KNOW WHO YOU'RE REFERRING TO.
```

```
 1   Q.   DID YOU STOP AT A RESIDENCE AS PART OF THAT DRIVING
 2   DEMONSTRATION?
 3   A.   NO.
 4   Q.   THE ROUTE THAT YOU TOOK ON NOVEMBER OF 2013, WHAT DATE
 5   WAS THAT?
 6   A.   I DON'T RECALL WHAT DAY IT WAS OF THE WEEK.  ON
 7   NOVEMBER 6, 2013?
 8   Q.   NOVEMBER 6, 2013, DO YOU RECALL WHAT DAY OF THE WEEK IT
 9   WAS?
10   A.   I DON'T.
11   Q.   BUT IT WAS IN THE MORNING?
12   A.   YES, IT WAS.
13   Q.   DO YOU SPEND A LOT OF TIME IN SOUTH CENTRAL?
14   A.   NOT TOO OFTEN, NO.
15   Q.   SO YOU CAN'T TESTIFY ABOUT THE DIFFERENCE BETWEEN A
16   SATURDAY NIGHT AND A WEEKDAY OR WEEKEND MORNING?
17   A.   AT THE TIME THAT I DID THESE DRIVING ROUTES, I DID NOT
18   SPEND A SIGNIFICANT AMOUNT OF TIME IN THE AREA.  HOWEVER,
19   FOR THE PREVIOUS SIX YEARS, I WAS ON A NARCOTICS TEAM WHERE
20   I SPENT A SIGNIFICANT AMOUNT OF TIME IN THE LOS ANGELES
21   CENTRAL AREA -- SOUTH CENTRAL.
22   Q.   MY QUESTION IS A LITTLE BIT DIFFERENT:  AT THIS POINT,
23   RIGHT NOW, ARE YOU ABLE TO TESTIFY ABOUT THE TRAFFIC
24   CONDITIONS, THE DIFFERENT TRAFFIC CONDITIONS BETWEEN A
25   RANDOM MORNING AND A SATURDAY NIGHT IN THIS AREA OF
```

1    SOUTH CENTRAL LOS ANGELES?

2    A.   I WOULD COMPETENTLY BE ABLE TO SAY THAT I COULD,

3    BECAUSE OF THE TIME THAT I HAVE SPENT DURING MORNING HOURS

4    AND EVENING HOURS IN THAT AREA IN THE PAST.

5    Q.   PLEASE TELL US, APPROXIMATELY, HOW MUCH TIME YOU SPENT

6    DRIVING AROUND THIS AREA OF SOUTH CENTRAL LOS ANGELES AT

7    NIGHT ON SATURDAY NIGHT?

8    A.   I WOULDN'T BE ABLE TO TELL YOU THAT.

9         THE COURT:  ISN'T THE RELEVANT QUESTION THE ONE

10   SHE ALREADY ANSWERED, THAT SHE DIDN'T DETECT ANY SIGNIFICANT

11   DIFFERENCE OF TRAFFIC CONDITIONS BETWEEN THE SECOND TIME SHE

12   DID IT AND THE FIRST TIME, WHICH WAS THE RELEVANT TIME?

13        MR. GESSIN:  THAT COULD BE THE COURT'S CALL.  I

14   JUST WANT TO POINT OUT FOR THE COURT --

15        THE COURT:  THAT IT WASN'T DONE UNDER THE

16   APPROPRIATE COMPARABLE CONDITIONS.  I CAN FIGURE THAT OUT.

17        MR. GESSIN:  THANK YOU, YOUR HONOR.

18        NO FURTHER QUESTIONS.

19        THE WITNESS:  THANK YOU, SIR.

20        THE COURT:  ANYTHING FURTHER ON REDIRECT?

21        MR. MADEO:  NOTHING FURTHER, YOUR HONOR.

22        THE COURT:  ALL RIGHT.

23        THE WITNESS:  MAY I BE EXCUSED, YOUR HONOR?

24        THE COURT:  YES, YOU MAY.  THANK YOU.

25        IS THAT IT FOR THE WITNESSES FOR THE RESPONDENT?

```
 1            MR. MADEO:  YES, YOUR HONOR.
 2            THE COURT:  ANYTHING FURTHER FROM THE PETITIONER?
 3            MR. GESSIN:  NOTHING, YOUR HONOR.
 4            THE COURT:  DOES THAT INCLUDES THE TAKING OF
 5   EVIDENCE AT THE EVIDENTIARY HEARING?
 6            MR. MADEO:  YES, YOUR HONOR.
 7            THE COURT:  I THOUGHT IT WOULD BE HELPFUL --
 8   MR. GESSIN MENTIONED A DESIRE FOR FURTHER BRIEFING, WHICH
 9   I'M GOING TO ALLOW.  BUT I THOUGHT TO MAKE SURE WE'RE ALL ON
10   THE SAME PAGE REGARDING THE CURRENT PROCEDURAL POSTURE OF
11   THE CASE AND WHAT REMAINS TO BE BRIEFED AND DECIDED, I WOULD
12   RECAPITULATE WHAT IS ACTUALLY A PRETTY CONVOLUTED PROCEDURAL
13   BACKGROUND, SOME OF WHICH OCCURRED PRIOR TO MY APPOINTMENT
14   OF THE PUBLIC DEFENDER.
15            BACK ON FEBRUARY 9TH, 2011, I ISSUED A REPORT AND
16   RECOMMENDATION IN WHICH I FOUND THAT, A, ACCEPT FOR GROUNDS
17   11 AND 19, NONE OF THE NEW CLAIMS ALLEGED IN THE AMENDED
18   PETITION RELATED BACK TO THE FILING OF PETITIONER'S ORIGINAL
19   PETITION; B, UNLESS A BASIS FOR TOLLING THE STATUTE EXISTED,
20   PETITIONER'S LAST DATE TO FILE A FEDERAL *HABEAS* CONDITION
21   CONTAINING HIS UNRELATED CLAIMS WAS JUNE 30TH, 2010; C,
22   PETITIONER HAD NOT MET HIS BURDEN OF DEMONSTRATING THAT
23   STATUTORY TOLLING RENDERED THE LODGING FOR FILING OF THE
24   AMENDED PETITION HEARING TIMELY AND D, THAT PETITIONER IS
25   NOT ENTITLED TO ANY EQUITABLE TOLLING OF THE LIMITATION
```

1    PERIOD.  AND I FURTHER FOUND THAT THEN BY BINDING

2    NINTH CIRCUIT PRECEDENT, INCLUDING IN PARTICULAR THE

3    THREE-JUDGE PANEL DECISION IN *LEE VERSUS LAMBERT*, FORECLOSES

4    THE PETITIONER'S RELIANCE ON ACTUAL INNOCENCE EXCEPTION TO

5    THE AEDPA STATUTE OF LIMITATIONS.

6          SO, ACCORDINGLY, I RECOMMENDED THAT THE MOTION TO

7    AMEND BE GRANTED WITH RESPECT TO GROUNDS ONE THROUGH NINE

8    WHICH CORRESPONDED TO HIS ORIGINAL GROUNDS ONE THROUGH SIX

9    AND 11 AND 19 OF THE PROPOSED AMENDED PETITION AND THAT THE

10   MOTION TO AMEND BE DENIED WITH RESPECT TO GROUNDS 10, 12 TO

11   18 AND 20 TO 21 OF THE PROPOSED AMENDED PETITION.

12         HOWEVER, THE THEN-ASSIGNED DISTRICT JUDGE NEVER

13   HAD AN OCCASION TO ACCEPT THE FINDINGS AND RECOMMENDATIONS

14   CONTAINED IN MY FEBRUARY 9TH, 2011 REPORT AND

15   RECOMMENDATION, BECAUSE AT THE TIME I ISSUED IT, I WAS

16   UNAWARE THAT THE DAY BEFORE THE NINTH CIRCUIT HAD DECIDED TO

17   REHEAR *EN BANC* THE *LEE* CASE AND DECREED THAT THE PANEL

18   DECISION COULD NOT BE CITED AS PRECEDENT IN THIS CIRCUIT.

19   SO I, THEREFORE, CONCLUDED THAT IT WAS ONLY NECESSARY FOR ME

20   TO ISSUE A SUPPLEMENTAL REPORT AND RECOMMENDATION FURTHER

21   ADDRESSING HIS ACTUAL INNOCENCE CLAIM WHICH WOULD ALSO APPLY

22   TO RESPONDENT'S CONTENTION AND RESPONDENT'S OPPOSITION

23   MEMORANDUM THAT PETITIONER'S CLAIMS WERE PROCEDURALLY

24   DEFAULTED BY VIRTUE OF THE CALIFORNIA SUPREME COURT'S

25   CITATION TO *IN RE CLARK* AND ITS TWO ORDERS DENYING THE TWO

1   2010 *HABEAS* PETITIONS FILED BY PETITIONER THAT ENCOMPASSED

2   THE NEW CLAIMS.

3           AFTER FURTHER BRIEFING BY BOTH SIDES, I ISSUED AN

4   ORDER *RE: FURTHER PROCEEDINGS* ON JUNE 20TH, 2011 FOR THE

5   REASONS EXPLAINED THEREIN, WHICH I WON'T RECAPITULATE.  I

6   DECIDED TO, A, DEFER RULING ON THE MOTION TO AMEND TO ADD

7   THE 12 NEW CLAIMS AND, B, INSTEAD BIFURCATE THE PROCEEDING

8   BY FIRST ADJUDICATING THE PETITIONER'S ORIGINAL SIX CLAIMS

9   WHICH HAD BEEN RESTATED AS GROUNDS ONE THROUGH NINE OF THE

10  PROPOSED AMENDED PETITION.  SO I, THEREFORE, GRANTED THE

11  MOTION TO AMEND BUT ONLY TO THE EXTENT THAT IT SOUGHT TO

12  AMEND GROUNDS ONE THROUGH SIX OF THE ORIGINAL PETITION BY

13  RE-ALLEGING INSTEAD THOSE SAME CLAIMS AS GROUNDS ONE THROUGH

14  NINE OF THE AMENDED PETITION.

15          THE PETITIONER FILED OBJECTIONS TO MY JUNE 20TH,

16  2011 BIFURCATION ORDER.  AND WHILE HIS OBJECTIONS WERE

17  PENDING BEFORE THE DISTRICT JUDGE, THE NINTH CIRCUIT ISSUED

18  ITS *EN BANC* DECISION IN *LEE*, BASED ON THE *EN BANC* RULING IN

19  *LEE* THAT CREDIBLE CLAIM OF ACTUAL INNOCENCE DID CONSTITUTE

20  EXCEPTION TO THE AEDPA STATUTE OF LIMITATIONS, A CONCLUSION

21  THAT WE KNOW THE SUPREME COURT REACHED AS WELL IN *MCQUIGGIN*.

22          THE DISTRICT JUDGE ISSUED A MINUTE ORDER ON

23  OCTOBER 13TH OF THAT YEAR, WHEREIN HE NOTED THAT THE

24  NINTH CIRCUIT'S *EN BANC* DECISION VITIATED MY RATIONALE FOR

25  DEFERRING RULING ON THE PART OF THE MOTION TO AMEND SEEKING

```
 1    TO ADD GROUNDS 10 TO 21 OF THE PROPOSED AMENDED PETITION AND

 2    TO THAT EXTENT, HE SUSTAINED PETITIONER'S OBJECTIONS TO MY

 3    JUNE 20TH ORDER, REMANDED THE MATTER BACK TO ME FOR FURTHER

 4    PROCEEDINGS BASED ON THE EN BANC DECISION IN LEE.

 5           ON REMAND FROM THE DISTRICT JUDGE -- THIS IS WHERE

 6    THE PUBLIC DEFENDER FIRST COMES IN -- I HAVE ISSUED ANOTHER

 7    ORDER, REFERRING TO THE PROCEEDINGS OF OCTOBER 19, 2011.  I

 8    ADVISED THEREIN THAT REMAINED MY VIEW THAT IN ORDER TO RULE

 9    ON THE MOTION TO AMEND AND, SPECIFICALLY, THE PORTION AS TO

10    WHICH I HAD PREVIOUSLY DEFERRED RULING, IT WAS NECESSARY TO

11    CONDUCT AN EVIDENTIARY HEARING, PETITIONER'S ACTUAL

12    INNOCENCE CLAIM.  I FURTHER ADVISED AND ALSO REMAINED MY

13    VIEW THAT THE NEED TO CONDUCT AN EVIDENTIARY HEARING ON THE

14    ACTUAL INNOCENCE CLAIM HAD NO BEARING IN MY DETERMINATION OF

15    GROUNDS ONE THROUGH SIX OF THE ORIGINAL PETITION WHICH

16    CORRESPONDED TO GROUND ONE THROUGH NINE OF THE AMENDED

17    PETITION.

18           SO I ADVISED IN THAT ORDER THAT THE PART OF MY

19    JUNE 23RD, 2011 ORDER GRANTING THE MOTION TO AMEND TO THE

20    EXTENT IT SOUGHT TO AMEND GROUNDS ONE THROUGH SIX BY

21    RE-ALLEGING INSTEAD GROUNDS ONE THROUGH NINE, THAT PART OF

22    MY ORDER WOULD STAND.  AND I FURTHER ADVISED THAT SINCE I

23    ULTIMATELY WOULD HAVE TO REACH THE MERITS OF THOSE CLAIMS,

24    NO MATTER HOW I DECIDED THE ACTUAL INNOCENCE CLAIM, THERE

25    WAS NO REASON TO DELAY THE BRIEFING OF THOSE CLAIMS.
```

1       SO, FOLLOWING, RESPONDENT THEREAFTER FILED AN

2   ANSWER TO GROUNDS ONE THROUGH NINE OF THE AMENDED PETITION.

3   I'LL LEAVE OUT THE PART OBJECTING TO MY DECISION TO HOLD AN

4   EVIDENTIARY HEARING ON THE ACTUAL INNOCENCE CLAIM BECAUSE

5   THE DISTRICT JUDGE, YOU KNOW, DID NOT SUSTAIN THAT.

6       BUT RESPONDENT FILES AN ANSWER TO GROUNDS ONE

7   THROUGH NINE OF THE AMENDED PETITION.  PETITIONER FILED A

8   TRAVERSE THERETO.  I THEN ISSUED A PARTIAL REPORT OR

9   RECOMMENDATION OF JUNE 21ST, 2012.  I RECOMMENDED THEREIN

10  THE GROUNDS THAT ONE THROUGH NINE OF THE AMENDED PETITION BE

11  DENIED.

12      PETITIONER FILED OBJECTIONS.  AFTER CONSIDERING

13  THOSE OBJECTIONS, THEN ASSIGNED DISTRICT JUDGE ISSUED AN

14  ORDER FEBRUARY 12TH, 2013, ACCEPTING MY FINDINGS AND

15  RECOMMENDATIONS WITH RESPECT TO GROUNDS ONE THROUGH NINE OF

16  THE AMENDED PETITION.  THE DISTRICT JUDGE ALSO DENIED

17  PETITIONER'S MOTION TO EXPAND THE RECORD AND HIS REQUEST FOR

18  AN EVIDENTIARY HEARING INSOFAR AS THE MOTION AND REQUEST

19  RELATED TO GROUNDS ONE THROUGH NINE OF THE AMENDED PETITION,

20  AND HE ALSO DENIED THE REQUEST FOR CERTIFICATE OF

21  APPEALABILITY WITH RESPECT TO THE 12 ISSUES RELATING TO THE

22  PARTIAL REPORT OR RECOMMENDATION AS TO WHICH PETITIONER --

23  IN WHICH RELATED TO GROUNDS ONE TO NINE AS TO WHICH

24  PETITIONER REQUESTED A COA.

25      SO WHAT'S CURRENTLY PENDING BEFORE ME IS THE PART

1   OF PETITIONER'S MOTION TO AMEND SEEKING TO ADD THE 12 NEW

2   CLAIMS.

3              BOTH SIDES AGREE?

4              MR. GESSIN:  YES, YOUR HONOR.

5              MR. MADEO:  YES, YOUR HONOR.

6              THE COURT:  OKAY.  AND I DO NOT INTEND TO REVISIT

7   ANY OF MY PRIOR FINDINGS IN MY FEBRUARY 9, 2011 REPORT OR

8   RECOMMENDATION, OTHER THAN MY FINDING REGARDING THE ACTUAL

9   INNOCENCE EXCEPTION TO THE AEDPA STATUTE OF LIMITATIONS.  SO

10  NO FURTHER BRIEFING WILL BE ENTERTAINED ON MY PRIOR FINDINGS

11  THAT, A, EXCEPT FOR GROUNDS 11 AND 19, NONE OF THE NEW

12  CLAIMS ALLEGED IN THE AMENDED PETITION RELATE BACK TO THE

13  FILING OF THE ORIGINAL PETITION; B, UNLESS THE BASIS FOR

14  TOLLING OF STATUTE EXISTS, PETITIONER'S LAST DAY TO FILE HIS

15  FEDERAL HABEAS PETITION CONTAINING HIS UNRELATED CLAIMS WAS

16  JUNE 30TH, 2010; C, THAT HE HAS NOT MET HIS BURDEN

17  DEMONSTRATING THE STATUTORY TOLLING RENDERED THE LODGING FOR

18  FILING OF THE AMENDED PETITION HEREIN TIMELY; AND D, THAT HE

19  IS NOT ENTITLED TO AN EQUITABLE TOLLING OF THE LIMITATION

20  PERIOD.

21             I'M NOT GOING TO REVISIT ANY OF MY RULINGS ON

22  THAT, SINCE TECHNICALLY I NEVER SUBMITTED THAT REPORT AND

23  RECOMMENDATION TO THE DISTRICT JUDGE.  PETITIONER WILL NOT

24  BE FORECLOSED FROM FILING OBJECTIONS TO THOSE FINDINGS.  I'M

25  JUST GOING TO INCORPORATE THEM INTO MY FINAL REPORT AND

1    RECOMMENDATION.

2              SO WE'RE ALL ON THE SAME PAGE ABOUT THAT?

3              MR. GESSIN:  YES, YOUR HONOR.

4              AND YOU'RE TALKING ABOUT THE R&R FROM WHAT DATE?

5              THE COURT:  FEBRUARY 9, 2011.

6              AND I DID APPOINT -- THE PUBLIC DEFENDER HAS BEEN

7    APPOINTED FOR ALL PURPOSES ALONG THE WAY.

8              SO ASSUMING I ISSUE AN OPINION THAT THE PUBLIC

9    DEFENDER DOESN'T AGREE WITH, YOU NOT FORECLOSED FROM FILING

10   OBJECTIONS TO THE EARLIER REPORT OR RECOMMENDATION, BECAUSE

11   ACTUALLY PETITIONER NEVER -- THERE WAS NEVER EVEN AN

12   OPPORTUNITY FOR PETITIONER TO FILE OBJECTIONS, BECAUSE I

13   SORT OF DID A TIME-OUT AFTER I REALIZED THAT THE NINTH

14   CIRCUIT HAD AGREED TO REHEAR THE *EN BANC*.

15             MR. GESSIN:  I UNDERSTAND, YOUR HONOR.

16             WHEN THE COURT ISSUES AN ORDER THAT COMES FORWARD

17   TODAY, IT WILL --

18             THE COURT:  I'LL INCORPORATE WHAT I'VE REFERENCED.

19   IT'S MY PRIOR FINDINGS AND RECOMMEND -- WITH RESPECT TO

20   EVERYTHING OTHER THAN THE STATUTE OF LIMITATION ISSUE -- I

21   MEAN, OTHER THAN THE ACTUAL INNOCENCE CLAIM.

22             MR. GESSIN:  THAT SHOULD CLEAR UP THE PROCEDURE

23   QUITE A BIT, YOUR HONOR.

24             THE COURT:  I DON'T SEE THE NEED TO REPEAT ANY OF

25   THAT.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

| | |
|---|---|
| 1 | TECHNICALLY, THOUGH, I HAVE NEVER RULED ON THE |
| 2 | CONTENTION MADE IN RESPONDENT'S FIRST OPPOSITION MEMORANDUM |
| 3 | THAT ALL OF PETITIONER'S NEW CLAIMS ARE PROCEDURALLY |
| 4 | DEFAULTED BY VIRTUE OF THE CALIFORNIA SUPREME COURT'S |
| 5 | CITATION TO *CLARK* IN ITS ORDER DENYING THE TWO *HABEAS* |
| 6 | PETITIONS FILED BY PETITIONER IN 2010. |
| 7 | IN FEBRUARY 9, 2011, I RULED THAT BY VIRTUE OF |
| 8 | THAT CITATION FOR PURPOSES OF THE FEDERAL STATUTE OF |
| 9 | LIMITATIONS, THOSE PETITIONS WERE NOT PROPERLY FILED. |
| 10 | THAT'S A DIFFERENT ISSUE FROM WHETHER THOSE CLAIMS ARE |
| 11 | PROCEDURALLY DEFAULTED UNDER THE STATE BAR PROCEDURAL |
| 12 | DEFAULT DOCTRINE.  I'VE NEVER RULED ON THAT.  SO I WOULD |
| 13 | ENTERTAIN FURTHER BRIEFING ON THAT ISSUE, INCLUDING ON |
| 14 | WHETHER, YOU KNOW, *WALKER VERSUS MARTIN* IS DISPOSITIVE OF |
| 15 | THE PROCEDURAL DEFAULT ISSUE OR NOT. |
| 16 | AND I WILL, OBVIOUSLY, ENTERTAIN FURTHER BRIEFING |
| 17 | ON WHETHER THE PETITIONER SATISFIED HIS BURDEN UNDER *SCHLUP* |
| 18 | WITH RESPECT TO HIS ACTUAL INNOCENCE CLAIM WHICH, AS I NOTED |
| 19 | ALONG THE WAY, WOULD CONSTITUTE AN EXCEPTION TO BOTH THE |
| 20 | AEDPA STATUTE OF LIMITATIONS AND THE STATE PROCEDURAL |
| 21 | DEFAULT DOCTRINE, IF I WAS PREPARED TO FIND THAT HIS CLAIMS |
| 22 | WERE OTHERWISE BARRED UNDER THE PROCEDURAL DEFAULT DOCTRINE |
| 23 | PRINCIPLE. |
| 24 | WHAT I DON'T NEED IS ANY FURTHER BRIEFING OF WHAT |
| 25 | THE *SCHLUP* STANDARD IS.  I THINK I'VE BRIEFED THAT MYSELF |

1  ENOUGH TIMES.  I WANT THE FOCUS TO BE ON HOW EACH SIDE

2  BELIEVES THE EVIDENCE PRESENTED AT THE EVIDENTIARY HEARING

3  EITHER MEETS OR DOESN'T MEET THE *SCHLUP* STANDARD.  AND IT

4  SEEMS TO ME THAT RATHER -- I'M NOT FORECLOSING THE ATTORNEY

5  GENERAL FROM ARGUING WHATEVER IT WANTS TO ARGUE.  IT SEEMS

6  TO ME IT WOULD BE SORT OF A SHORTCUT HAVING -- ME HAVING TO

7  MAKE FACTUAL FINDINGS, WHICH I DON'T KNOW IF I'M PREPARED TO

8  MAKE.  ATTORNEY GENERAL TOOK THE APPROACH THAT EVEN

9  ASSUMING, ARGUENDO, THAT THE ROUTE WAS THE ROUTE -- WAS

10  TAKEN WAS THE ONE DESCRIBED BY PETITIONER'S INVESTIGATOR,

11  PETITIONER STILL LOSES, BECAUSE I ASSUME THAT THAT'S WHAT

12  YOUR POSITION IS.

13          MR. MADEO:  THAT'S CORRECT, YOUR HONOR.

14          THE COURT:  AND I THINK THAT WOULD SHORTCUT

15  MR. GESSIN WHO IS GOING TO GET A CHANCE TO GO FIRST AND

16  LAST, YOU KNOW, ARGUING OVER, SHOULDN'T ACCEPT YOUR

17  INVESTIGATOR BECAUSE SHE DID IT AT A DIFFERENT TIME OF DAY

18  AND SHE DIDN'T FOLLOW THE RIGHT ROUTE THAT THE TRIAL

19  TESTIMONY AT LEAST SUPPORTED A FINDING ON.

20          AND WHEN I RULED THAT THE NEWLY PROFFERED

21  TESTIMONY OF THE FAMILY MEMBERS THAT HE STOPPED FOR 15

22  MINUTES AT THE MOTHER'S HOUSE WAS NOT RELIABLE EVIDENCE THAT

23  I WOULD CONSIDER, I DIDN'T FORECLOSE THE PETITIONER FROM

24  ARGUING JUST BASED ON THE TESTIMONY PRESENTED AT TRIAL.

25  THERE WAS TESTIMONY, I THINK, BY THE BROTHER THAT HE WAS

```
 1    DROPPED OFF, SO I DON'T REALLY WANT TO MAKE A FINDING THAT,
 2    WELL, THE JURY MAY OR MAY NOT BELIEVE THAT TESTIMONY. I
 3    THINK IT WOULD BE MUCH EASIER FOR ALL OF US JUST TO ACCEPT
 4    HIS -- THAT EVEN IF THE -- EVEN IF WITHOUT CONCEDING THAT
 5    THE ROUTE TAKEN WAS THE ROUTE TO WHICH THE PETITIONER'S
 6    INVESTIGATOR TESTIFIED, YOU'RE GOING TO ARGUE HE STILL
 7    HASN'T MET HIS BURDEN UNDER SCHLUP, AND I SUPPOSE YOU'RE
 8    GOING TO ARGUE THAT HE HAS.
 9              MR. GESSIN:  WE ARE.
10              THE COURT:  SO WE'RE ON THE SAME PAGE ABOUT THAT?
11              MR. MADEO:  UNDERSTAND, YOUR HONOR.
12              THE COURT:  IS THERE ANYTHING ELSE TO BE
13    ACCOMPLISHED TODAY, OR ANY OTHER GUIDANCE?
14              I WAS THINKING ON SETTING A PAGE LIMITATION, BUT I
15    DON'T THINK IT'S GOING TO BE A VERY DETAILED BRIEF, IF WE
16    ELIMINATE --
17              I MEAN, YOU'RE ALLOWED TO DO CASE CITATIONS OF
18    CASES THAT YOU THINK ARE ANALOGOUS WHERE THE COURTS FOUND
19    THAT THE SCHLUP STANDARD WAS MET.  I JUST DON'T WANT ANY
20    FURTHER BRIEFING ON WHAT THE SCHLUP STANDARD IS.
21              DO YOU SEE THE DISTINCTION I'M DRAWING?
22              MR. GESSIN:  I DO, YOUR HONOR.  I UNDERSTAND
23    EXACTLY WHAT YOU WANT.  YOU WANT ANALOGOUS CASES WITH
24    PARENTHETICALS AND/OR DISCUSSIONS OF ACTUAL CIRCUMSTANCES IN
25    SAID CASES.
```

```
 1              THE COURT:  EXACTLY.  ANY OTHER QUESTIONS?
 2              SO I DON'T EVEN KNOW -- THIS WAS PRETTY
 3   STRAIGHTFORWARD TESTIMONY AND ESPECIALLY IF WE'RE GOING TO
 4   FOCUS ON THE DEFENSE INVESTIGATOR.  I DON'T KNOW IF WE NEED
 5   TO WAIT UNTIL THE REPORTER'S TRANSCRIPT IS PREPARED FOR THE
 6   PETITIONER TO START WORKING ON HIS BRIEF.
 7              MR. GESSIN:  NOT AT ALL, YOUR HONOR.
 8              THE COURT:  HOW MUCH TIME DO YOU WANT?
 9              MR. GESSIN:  A MONTH, YOUR HONOR.
10              THE COURT:  FINE.  TODAY IS THE?
11              MR. GESSIN:  THE ONLY REASON I SAY A MONTH --
12              THE COURT:  THAT'S FINE.  YOU DON'T HAVE TO
13   JUSTIFY IT.
14              HOW ABOUT SEPTEMBER 15TH?
15              MR. GESSIN:  THAT'S GREAT, YOUR HONOR.
16              THE COURT:  AND THEN, A RESPONSIVE BRIEF,
17   OCTOBER 15TH.
18              MR. MADEO:  THAT SOUNDS FINE, YOUR HONOR.
19              THE COURT:  NOW, YOU WANT TO FILE A REPLY, I
20   ASSUME.  THE REPLY BRIEF WILL BE LIMITED TO 10 PAGES.
21              HOW MUCH TIME DO YOU WANT FROM OCTOBER 15TH TO
22   FILE A REPLY?
23              YOU CAN HAVE ANOTHER 30 DAYS IF YOU WANT.
24              MR. GESSIN:  A MONTH, YOUR HONOR.
25              THE COURT:  SO THAT WOULD BE -- LET'S SEE.  MAKE
```

```
 1    THAT -- IS IT --
 2              THAT WOULD BE FRIDAY, NOVEMBER 14TH.
 3              THE CLERK:  14TH.
 4              THE COURT:  SO THAT WILL BE FRIDAY, NOVEMBER 14TH.
 5              MR. GESSIN:  YOUR HONOR, THE PROCEDURAL DEFAULT
 6    ARGUMENT THAT YOU'VE INVITED THE PARTIES TO BRIEF, WOULD
 7    THAT BE UNDER THE SAME TIME LIMITATION AS --
 8              YOU WANT IT ALL IN ONE BRIEF, CORRECT?
 9              THE COURT:  YES.
10              MR. GESSIN:  OKAY.  UNDERSTOOD, YOUR HONOR.
11    THANK YOU.
12              THE COURT:  SO I'M NOT -- ESPECIALLY BECAUSE OF
13    THE PROCEDURAL DEFAULT WHICH IS SEPARATE FROM ACTUAL
14    INNOCENCE, I'M NOT PUTTING A PAGE LIMITATION FOR THE
15    PETITIONER'S BRIEF OR THE RESPONDENT'S BRIEF.  JUST ON THE
16    REPLY BRIEF.
17              ANYTHING ELSE FOR TODAY?
18              MR. GESSIN:  NOTHING FROM THE PETITIONER.
19              THANK YOU, YOUR HONOR.
20              MR. MADEO:  NO, THANK YOU, YOUR HONOR.
21              THE COURT:  ALL RIGHT.  WE'RE ADJOURNED.
22              THE CLERK:  THIS COURT IS ADJOURNED.
23         (PAUSE.)
24              THE COURT:  BACK ON THE RECORD.
25              IT IS ORDERED AS FOLLOWS:  A TRANSCRIPT SHALL BE
```

```
 1    PREPARED AND SHALL BE DELIVERED TO THE CLERK IN ACCORDANCE

 2    WITH 28 U.S.C. SECTION 753(F) AND 18 UNITED STATES CODE,

 3    SECTION 3006(A) FOR THE USE OF THE COURT.

 4              THE TRANSCRIPT SHALL ALSO BE FURNISHED TO THE

 5    PETITIONER AND SHALL BE BILLED IN ACCORDANCE WITH THE

 6    TRANSCRIPT RATES APPROVED BY THE JUDICIAL CONFERENCE OF THE

 7    UNITED STATES AND PAID BY THE UNITED STATES DISTRICT COURT

 8    OUT OF MONEY APPROPRIATED FOR THAT PURPOSE.  THE TRANSCRIPT

 9    SHALL BE MAILED TO COUNSEL FOR PETITIONER.

10              SO IN HABEAS WE DO PAY FOR YOURS.

11              MR. GESSIN:  THAT'S GREAT.  THANK YOU, YOUR HONOR.

12              THE COURT:  AND IF A COPY OF THE TRANSCRIPT IS

13    REQUESTED BY THE ATTORNEY GENERAL, AS I'VE INDICATED, THE

14    RESPONDENT'S COPY SHALL BE BILLED IN ACCORDANCE WITH THE

15    TRANSCRIPT RATES APPROVED BY THE JUDICIAL CONFERENCE OF THE

16    UNITED STATES.

17              MR. GESSIN:  THANK YOU SO MUCH, YOUR HONOR.

18              THE CLERK:  THIS COURT IS ADJOURNED.

19         (AT 11:07 A.M., PROCEEDINGS WERE ADJOURNED.)

20

21                           -OOO-

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

67

```
 1                        CERTIFICATE

 2             I HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

 3    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

 4    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

 5    PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

 6    TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

 7    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

 8

 9    DATE:  AUGUST 25, 2014

10

11

12                        _____

13                        DEBORAH D. PARKER, OFFICIAL REPORTER

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*